## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

ADAM CLAYTON ZILM,                )
                                  )
          *Petitioner*,           )
                                  )
v.                                )   Case No.: 20-cv-509-CVE-JFJ
                                  )
SCOTT CROW, Warden,               )
                                  )
          *Respondent*.           )


## BRIEF IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY PURSUANT TO 28 U.S.C. § 2254


*Submitted by*


James L. Hankins, OBA# 15506
MON ABRI BUSINESS CENTER
2524 N. Broadway
Edmond, Oklahoma  73034
Telephone:  (405) 753-4150
Facsimile:   (405) 445-4956
E-mail:      jameshankins@ocdw.com

*Counsel for Petitioner*

## <u>TABLE OF CONTENTS</u>

I. PRIOR PROCEEDINGS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II. STATEMENT OF THE CASE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III. STATEMENT OF THE FACTS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    Remand and Reliability Hearing.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        Remand for a Second Preliminary Hearing. . . . . . . . . . . . . . . . . . 7

        The Reliability Hearing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    The Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

IV. LEGAL CLAIMS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    PROPOSITION I.

    FOUR STATE AGENTS, INCLUDING THE PROSECUTOR IN THIS CASE, COERCED AND LIED TO THE MINOR COMPLAINING WITNESS IN ORDER TO INFLUENCE HER TO TESTIFY FALSELY AGAINST ZILM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    A. Exhaustion.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    B. Merits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    PROPOSITION II.

    PROSECUTORIAL MISCONDUCT DEPRIVED ZILM OF A FAIR TRIAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

    A. Exhaustion.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

    B. Merits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

    1.      Threats of Perjury & to Re-Open Juvenile Case. . . . . . . . . . 35

    2.      Accusing Defense Counsel.. . . . . . . . . . . . . . . . . . . . . . . . . . 38

    3.      Improper Comment on Right to Trial.. . . . . . . . . . . . . . . . . . 39

    4.      Courtroom Histrionics. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

PROPOSITION III.

MULTIPLE ERRONEOUS EVIDENTIARY RULINGS PREJUDICED ZILM RESULTING IN A FUNDAMENTALLY UNFAIR TRIAL.. . . . . . . . . . . 43

A.    Exhaustion.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

B.    Merits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

PROPOSITION IV.

THE TRIAL COURT ERRED IN REFUSING TO SUPPRESS THE STATEMENT MADE BY ZILM TO POLICE... . . . . . . . . . . . . . . . . . . . 48

A.    Exhaustion.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

B.    Merits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

PROPOSITION V.

ZILM RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

A.    Exhaustion.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

B.    Merits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

A.    FAILURE TO SUPPORT REQUEST FOR ACCESSORY

INSTRUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

B.      FAILURE TO OBJECT TO PROSECUTORIAL MISCONDUCT. . .

C.      FAILURE TO OBJECT TO HEARSAY. . . . . . . . . . . . . . . . . . . . . . .

PROPOSITION VI.

THE CUMULATIVE EFFECT OF THE ERRORS DEPRIVED ZILM OF A
FUNDAMENTALLY FAIR TRIAL.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

A.      Exhaustion.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

B.      Merits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

V.      REQUEST FOR RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

## TABLE OF EXHIBITS

*Adam Clayton Zilm v. State*, No. F-2017-69 (Okl.Cr., September 6, 2018)
(Summary Opinion on direct appeal).

*State v. Adam Clayton Zilm*, No. S-2014-812 (Okl.Cr., August 6, 2015)
(Opinion on State Writ).

*Scott Allen Bolden v. State*, No. F-2015-1112 (Okl.Cr., March 24, 2017)
(Summary Opinion).

*Emory Norris Gaines v. State*, No. F-2011-876 (Okl.Cr., September 12, 2012)
(Summary Opinion).

*Gregory Antwon O'Neal v. State*, No. F-2013-958 (Okl.Cr., April 5, 2016)
(Summary Opinion).

iv

# TABLE OF AUTHORITIES

*Bolden v. State*,
    No. F-2015-1112 (Okla. Crim. App., March 24, 2017). . . . . . . . . . . . . . . 41

*Brecht v. Abrahamson*,
    507 U.S. 619 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Bosse v. State*,
    2015 OK CR 14, 360 P.2d 1203. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Cline v. United States*,
    395 F.2d 138 (8th Cir. 1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Colorado v. Connelly*,
    479 U.S. 157 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Cone v. Bell*,
    556 U.S. 449 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Crane v. Kentucky*,
    476 U.S. 683 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Donnelly v. DeChristoforo*,
    416 U.S. 637 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Gaines v. State*,
    No. F-2011-867 (Okla. Crim. App., September 12, 2012). . . . . . . . . . . . . 41

*Giglio v. United States*,
    405 U.S. 153 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Grant v. Royal*,
    886 F.3d 874 (10th Cir. 2018). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Napue v. Illinois*,
    360 U.S. 264 (1959). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 33

*O'Neal v. McAninch*,
   513 U.S. 432 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*O'Neal v. State*,
   No. F-2013-958 (Okla. Crim. App., April 5, 2016). . . . . . . . . . . . . . . . . 41

*Orozco v. Texas*,
   394 U.S. 324 (1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Patton v. Mullin*,
   425 F.3d 788 (10th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Rompilla v. Beard*,
   545 U.S. 374 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Schneckloth v. Bustamonte*,
   412 U.S. 218 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Smith v. Phillips*,
   455 U.S. 209 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Strickland v. Washington*,
   466 U.S. 668 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*United States v. Antone*,
   603 F.3d 566 (5th Cir. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States v. Agurs*,
   427 U.S. 97 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Clariot*,
   655 F.3d 550 (6th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Crockett*,
   435 F.3d 1305 (10th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Holmes*,
    413 F.3d 770 (8th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*United States v. Jones*,
    523 F.3d 1235 (10th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Van White v. State*,
    1999 OK CR 10, 990 P.2d 253. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Wiggins v. Smith*,
    539 U.S. 510 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

ADAM CLAYTON ZILM,      )
                )
      *Petitioner*,    )
                )
*v.*                )     Case No.:   20-cv-509-CVE-JFJ
                )
SCOTT CROW, Warden,    )
                )
      *Respondent*.   )

## BRIEF IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY PURSUANT TO 28 U.S.C. § 2254

Petitioner, Adam Clayton Zilm, Oklahoma Department of Corrections prisoner No. 751530, is incarcerated at the Lawton Correctional Facility, Lawton, Oklahoma, pursuant to a sentence of life imprisonment. The judgment and sentence was obtained by the State of Oklahoma through a state judicial process in violation of the laws and Constitution of the United States of America. This is Zilm's first Petition for federal habeas relief.

1

# I.   **PRIOR PROCEEDINGS**

A.   ORIGINAL CONVICTION.

      Court:        District Court of Tulsa County, State of Oklahoma.

      Case No.:    CF-2012-3037.

      Charge:     Sexual Abuse–Child Under 12.

      Plea:        Not Guilty.

      Sentences:  36 years.

      Counsel:    Allen M. Smallwood, Tulsa, OK

B.   DIRECT APPEAL.

      Court:        Oklahoma Court of Criminal Appeals

      Result:     Affirmed in a written, but unpublished, Summary Opinion *Adam Clayton Zilm v. State*, No. F-2017-67 (Okl.Cr., September 6, 2018).

      Counsel:    James L. Hankins, Oklahoma City, Oklahoma.

C.   STATE APPLICATION FOR POST-CONVICTION RELIEF.

      N/A

D.   CERTIORARI.

      Zilm sought review in the Supreme Court, which denied certiorari on October

7, 2019.  *Zilm v. Oklahoma*, No. 18-1043 (U.S.)

      Zilm has no other legal proceedings pending.

## II.   **STATEMENT OF THE CASE**

Zilm was charged by felony Information in Tulsa County on July 12, 2012, with a single count of Sexual Abuse–Child Under 12.  O.R. 28.  Preliminary examination was held before the Hon. David Youll, Special Judge of the District Court in Tulsa County on September 26, 2012.  At the conclusion of the evidence, Judge Youll overruled the defense demurrer and bound Zilm over the trial.  P.H. Tr. 09/26/2012 at 63.

However, District Judge Kurt Glassco ruled on October 7, 2013, from the bench–followed up by a written Order filed October 8, 2013–that State agents had exercised unreasonable influence over the minor complaining witness, K.A., ordered that the preliminary examination was a nullity, and ordered the case remanded for a new preliminary examination.  O.R. 338-39; Tr. 10/07/2013.

The second preliminary examination was held on November 6, 2013, before the Hon. Clifford Smith, Special District Judge of the District Court of Tulsa County.  At the conclusion of the evidence, the Court overruled the demurrer of the defense and bound Zilm over for trial.  P.H. Tr. 11/06/2013 at 96-97.

Prior to trial, a hearing was held before the Hon. Kurt Glassco pursuant to state law concerning the reliability of statements made by K.A., and the efforts of the defense to suppress them.  At the conclusion of the hearing on September 12, 2014,

Judge Glassco ruled that the hearsay statements of K.A. to forensic interviewer Amy Howard and to neighbor Katherine Sanford *lacked* sufficient indicia of reliability and ordered them suppressed.  Tr. 09/12/2014.

The State appealed this ruling to the Oklahoma Court of Criminal Appeals, which on August 6, 2015, issued a written, but unpublished Opinion affirming the trial court's order of suppression of the hearsay statements.  O.R. 511 (*State v. Adam Clayton Zilm*, No. S-2014-812 (Okl.Cr., August 6, 2015), *slip op.*)

Jury trial began in the courtroom of Judge Glassco on November 14, 2016, and concluded on November 18, 2016, when the jury found Zilm guilty and recommended sentence of 36 years.  Tr. Vol. V at 64; O.R. 674.  Formal sentencing was had on January 20, 2017, at which Judge Glassco sentenced Zilm in accordance with the verdict of the jury.  Sent. Tr. 01/20/2017 at 33.

Zilm filed notice of intent to appeal and designation of record on January 20, 2017. O.R. 716-24.  On September 6, 2018, the Oklahoma Court of Criminal Appeals issued a written, but unpublished, summary opinion denying relief in *Adam Clayton Zilm v. State*, No. F-2017-69 (Okla. Crim. App.).

Zilm sought certiorari review in the United States Supreme Court, which denied review on October 7, 2019, in *Zilm v. Oklahoma*, No. 18-1043 (U.S.).

This is Zilm's first petition for habeas corpus relief in federal court.

4

## III.   <u>STATEMENT OF THE FACTS</u>

On June 4, 2012, Katherine Sanford lived in Tulsa, Oklahoma.  Tr. III 121-25. Sanford was employed by DHS, but was suffering from Lyme disease, which attacks her brain (she had five brain lesions, including one on her brain stem) and made remembering things difficult.  *Id*.; 130-31.

Nevertheless, she remembered that on this date that one of her neighbors lived across the street and two doors down with her boyfriend and children (and the boyfriend even came over one day to introduce himself).  The boyfriend, and fiancee, was Adam Zilm.  *Id*.

One of the children, who was 11-years-old at the time, was K.A.  *Id*.

On June 4, 2012, at approximately 6:00 a.m., someone knocked on Sanford's door, Sanford instructed her roommate to open it, and it was K.A., who was upset, crying, shaking, and soaking wet.  *Id*.  According to Sanford, K.A. was upset because she believed that she had been sexually assaulted by Zilm ("She said that he tried to put [his penis] in her butt.") *Id*. 133.

Sanford called K.A.'s mother, and eventually the police.  *Id*. 133-35.  Sanford, no doubt, did the right thing in contacting the police, which initiated the investigation into what exactly happened to cause such a reaction by K.A.  K.A. was clearly upset by something, but *what exactly had occurred*?

This was the question at issue at trial.

According to the State, Zilm, who was an experienced licensed masseuse who made his living as a massage therapist, gave K.A. a massage earlier that morning and had sexually assaulted her in the process.  Tr. II 185-90 (State's opening statement).

In contrast, the defense pointed out that Zilm had no priors, was a certified massage therapist, was a caring father to the kids, had never asked to massage any of the children, and gave massages to K.A. at her request on two occasions just as a normal massage therapist would with a client.  Tr. II 205-10.

Also, as it turned out, K.A. had been sexually abused in the past, when she was 5-years-old by a "shirttail uncle" while living in Louisiana (a case that was not prosecuted, nor was the uncle punished).  *Id*.  On the night in question, K.A. drifted off to sleep during the massage (a common thing), and she had a nightmare about being sexually abused by "uncle David" in Louisiana (which was a common occurrence for K.A.), and she reacted to a jab in her rear-end area and awoke, which prompted Zilm to say, "Oh, I'm sorry, sweetheart, did that hurt?"  Tr. II 210.

After the massage, Zilm went to sleep, but K.A. was still confused about what was real and what was a dream, which is why she ended up at Sanford's house.  In fact, she knew Zilm had not abused her, knew his character, knew that she had made a mistake, and she recanted (unprompted by Zilm or anyone else) on her own almost

6

immediately after the event, saying, "I'm sorry. I told something that didn't happen." Tr. II 211-16.   Nor was there any DNA evidence. *Id.*

In fact, to this day, K.A. is adamant that Zilm did nothing inappropriate.

Despite the fact that K.A. recanted, continued to assert that the entire episode was a misunderstanding, and there was no DNA evidence to support her initial statement, the first witness called by the State was K.A.  Tr. II 217.

## REMAND & RELIABILITY HEARING

Before delving into the testimony of K.A. at trial, and how that played out, it is important to provide the Court background on how the State handled her initial allegation against Zilm–and her recantation.  Several pre-trial matters were litigated regarding the statements of K.A., and the resolution of those matters by the trial court, and this Court via a pre-trial State appeal, inform this Court's assessment of K.A.'s trial testimony and the actions of State officials.

1.   REMAND FOR A SECOND PRELIMINARY EXAMINATION.

First, in the earlier pre-trial proceedings, defense counsel moved to dismiss or remand for a new preliminary examination after it had come to light that the State had failed to divulge exculpatory evidence.

At the first preliminary hearing before Judge Youll, there were quite a bit of leading questions by the prosecutor, but the gist of the testimony by K.A. was that,

7

during a massage that she had received from Zilm, he had placed his penis inside her anus.  Tr. 09/26/2012 at 24-25.

Naturally, such testimony clearly constituted a crime.  But, as it turned out, K.A. had asserted that four State agents–including prosecutor Sarah McAmis–coerced her into testifying that way even though she wanted to recant and set the record straight.  According to K.A., pressure, lies and coercion from State actors is the reason why she testified to being anally penetrated by Zilm at the first preliminary examination.

It turned out that these accusations were true.

After this first preliminary examination, defense counsel had become aware that K.A. had recanted the allegation; and that the recantation had occurred the day after the incident, or possibly the next day, when K.A. had taken it upon herself, unprompted by anyone, to call Zilm and apologize for making a mistake, and that she had misconstrued his actions that night.  Defense counsel only learned about this recantation from K.A.'s mother, Kristi Alvarez, and upon his review of the court file in the juvenile case.  O.R. 302.

This is important because some of the relevant facts spill over into the DHS/juvenile case regarding custody of K.A. and the other children, and the prosecutor had failed to divulge any of it either to the court or the defense; it was

8

discovered only through the efforts of defense counsel who had to litigate the issue to obtain the DHS/juvenile court records.[1]  Defense counsel noted pre-trial that DHS worker Lori Hannagan had written an affidavit in the juvenile case in which K.A. told Hannagan:

> "[K.A.] might have been mistaken Mr. Zilm might not have done anything.  She just got scared and thought about the time when she was 5 and something like this happened to her."

O.R. 303 (in addition, Barbara Davis, the maternal grandmother of K.A. and Jessica Swinny-Raush, a friend of the natural mother, both informed counsel that shortly after the incident K.A. had disclosed to both of them that she had "lied" about what happened; and that she had confused the innocent actions of Zilm with a nightmare that she was having of a prior instance of sexual abuse).[2]

Counsel took it upon himself to take a sworn statement from K.A., with a court reporter present on July 24, 2013, during which K.A. confirmed that she had recanted

---

[1]     Defense counsel was allowed access to the juvenile file regarding the placement of the children, and it was in those files that he discovered–without any notice from the State–that K.A. had recanted 24 to 36 hours after the initial allegations.  Tr. IV 38.

[2]     Defense counsel was allowed by the trial court, Judge Glassco, who conferred with the Juvenile Court, Judge Fransein, to review the juvenile court records and take notes, but defense counsel was restricted to note-taking only, and was prohibited from making copies of any documents in the juvenile file.  Tr. IV 36-37.

within a day or two of the incident.  O.R. 304; O.R. 152 (sworn statement of K.A.).

K.A. also stated that she testified to the sexual assault by Zilm at the first preliminary examination only because she was told by Amy Howard (the forensic questioner from the juvenile center) that if she did not, then she might not be given back to the custody of her mother (at that time, K.A. had been placed in the custody of her uncle by the juvenile court).  O.R. 304; O.R. 172-73 (Amy "told me to say what I said before and I'd get to go back to my mom and live with her again")[3]

More disturbing, it came to light that DHS worker Lauren Hall, who worked with the Alvarez children in the juvenile case, went to the home and spoke to each of the children prior to a hearing in juvenile court concerning placement of the children.  O.R. 304.  Hall told K.A. that no one believed her recantation, and that everyone believed her first statement alleging sexual assault by Zilm, because DNA evidence proved the allegations.  O.R. 304.  This statement by Hall to K.A. was, of course, false because the State had provided DNA testing results proving that no male DNA was found on K.A.  O.R. 304.

Thus, after the first preliminary examination was held, there were serious

---

[3]     During the sworn statement with defense counsel, K.A. stated that prior to the first preliminary examination she spoke to "I think that Amy girl."  O.R. 172. In his moving papers, defense counsel clarified "that Amy girl" had to have been Amy Howard, the forensic questioner at the juvenile center.  O.R. 326.

questions surrounding the credibility of K.A., and the State regarding its *Brady* duties.  As it turned out, the State had failed to disclose: 1) that Amy Howard coerced the child, K.A., into sticking with her original story by scaring the girl with the assertion that she had to do so in order to live her mother again; and 2) Lauren Hall coerced K.A. to stick with the original allegation by falsely telling this 11-year-old girl that DNA evidence proved that Zilm was guilty when Hall knew it was false.[4]

These facts did not fall on deaf ears in the trial court.

Judge Glassco issued a written Order on October 8, 2013, finding as a matter of fact that prior to the preliminary examination, State agents had "exercised unreasonable influence on the minor child "K.A." to secure testimony to which she had since recanted repeatedly."  O.R. 339.  This is the reason that the case was remanded for a second preliminary examination.  *Id*.

Thus, prior to trial, we have evidence already that juvenile/DHS workers had coerced K.A. into sticking to her original story by lying to her about the existence of

---

[4]     The false statements made by Lauren Hall to K.A. about the DNA evidence were recorded by K.A. herself because she was so distrustful of DHS workers (*see* Defendant's Exhibit #1), and were listened to and relied upon by Judge Glassco in making his determination that the State had exercised unreasonable influence in this matter.  O.R. 338; Tr. IV 17-23; *see also* Tr. 09/09/2014 at 7 (defense counsel referencing the "direct lie" to K.A. told by Lauren Hall "which we've all heard on tape, telling her that nobody believes the second statement because there was DNA evidence to support the first statement.")

DNA evidence, and raising the specter in this child's mind that she would not get to live with her mother again if she insisted on recanting; and the prosecutor's office did not breathe a word of it to the defense prior to trial.

As bad as this was, there was still more to come, this time at the reliability hearing on the hearsay statements made by K.A.

2.   THE RELIABILITY HEARING.

The State sought to introduce hearsay statements made by K.A. to Amy Howard (the "child specialist" at the Child Abuse Network) and Katherine Sanford (the neighbor to whom K.A. went directly after the incident). *See* Tr. 09/09/2014.

At this hearing, the trial court heard testimony from both Howard and Sanford, and in an unusual procedure, from K.A. herself, who was subpoenaed by the defense, was represented by counsel, and who insisted on being heard.  Tr. 09/09/2014 at 7 ("Judge, my client very much wants to give testimony to the Court today. Specifically regarding her belief that this has been a mistake and her attempt to try to correct it, her inability to do so...she wants to testify.")

The State objected to the trial court hearing testimony from K.A., citing "a stack of case law to argue" that the testimony of K.A. would not be proper, but the trial court was not impressed and allowed it.  *Id*. 4, 118.

On the stand yet again in this case, K.A. insisted this time that Zilm did nothing

12

wrong, that she had told the neighbor (Sanford) only that she "had a nightmare" and in fact had told all of this to the prosecutor in the case, Sarah McAmis. *Id*. 122-23. K.A. pointedly told the trial court that Sarah McAmis is the one who told her that if she said what she said in the beginning, her original story implicating Zilm, then "you can go back to your mom." *Id*. 124. It is important to note that these accusations leveled against the prosecutor by K.A. *were elicited from K.A. by questions posed by Judge Glassco*, not defense counsel.

And it gets worse.

There was yet another juvenile case agent named Lori Hannagan who told K.A. to explain her recantation by blaming it on her mother. According to K.A., and remember that this is in response to questioning by Judge Glassco and not defense counsel, Hannagan told K.A. to just say that her mother told her to say that nothing happened in order to explain the recantation. *Id*. 123-24; 127.

This was a conversation that occurred at the juvenile shelter where Hannagan told K.A. to just say it was her mother who told her to recant, that way K.A. could go back home to her mother and get out of the shelter. Tr. 127. In response, K.A. testified, "I just sat there. Didn't say anything to her." *Id*.

K.A. clarified that her mother had never told her to say any such thing. *Id*. 128.

13

It thus appears that Hannagan attempted to get K.A. to completely fabricate evidence in this case, and in a coercive way by tying the fabrication to K.A. being able to see her mother again.

After hearing the testimony of K.A., prosecutor Sarah McAmis scurried to make a record with the trial court that she "would never, could never, should never, have never, stated to this victim, or any other victim, that they should testify a particular way." *Id* 137.  However, Judge Glassco had heard enough, and issued a ruling from the bench finding the hearsay statements made by K.A. to forensic interviewer Amy Howard and the neighbor Katherine Sanford to be *unreliable and therefore inadmissible*.  Tr. 09/12/2014 at 16-18.

It is particularly noteworthy that Judge Glassco found Katherine Sanford *not* credible–that is, he ruled that the hearsay statements made by K.A. to Sanford were unreliable, but he also found Sanford, as a witness, to be not credible.  According to Judge Glassco, he had "a very difficult time following the testimony of that witness. And she appeared to the Court to change her testimony as to what happened during the time that she was here."  *Id*. 18.

Unhappy with this result, the State gave notice of intent to appeal.  *Id*.

The State's appeal was heard by this Court, which on August 6, 2015, issued a written, but unpublished, opinion affirming the ruling of Judge Glassco.  O.R. 511.

14

The State presumably produced the "stack of case law" in support of its position that the trial court erred in allowing K.A. to testify at the reliability hearing but, notably, this Court held that the law not only allowed K.A. to testify, but also that the facts of this case *required* it.[5]  O.R. 513.

Thus, it was with this background that the trial proceeded before a jury.

## **THE TRIAL**

K.A. was the first witness called by the State.  Tr. II 217.

She told the jury that she was then in the 9th grade, and in light of the foregoing background, in which she had spent years trying to convince authorities that the entire incident was a misunderstanding triggered by her prior abuse in a dream-state, and was repeatedly coerced and lied to by authorities to convince her to drop her recantation, K.A. was decidedly hostile to being in court testifying against Zilm.  *Id*. 217-18 (she did not want to be in court and wanted the matter to simply go away).

Nevertheless, the State proceeded to question K.A. about her family background.  Her mother was Kristi Shaneck, and she had three siblings: two sisters P.A. (16), G.A. (10), and a brother, E.A. (13).  Zilm was her mother's fiancee and

---

[5]  On the legal proposition of the minor complaining witness testifying at the reliability hearing, this is allowed under OCCA case law in *F.D.W. v. State*, 2003 OK CR 23, ¶5, 80 P.3d 503, 504 ("[i]n some cases, the determination of reliability may require that the child witness testify, or that a separate hearing with the court be conducted").  O.R. 513.

lived with them. *Id*. 217-28. When the police got involved, she was temporarily removed from the home, was eventually placed back with her mother, but was prohibited from having contact with Zilm. *Id*.

K.A. testified that at some point during the morning of June 4, 2012, she went outside and waited behind a dumpster, and that it was sprinkling a little bit. *Id*. 230. She went to the neighbor's house, did not remember if they had a doorbell, but remembered them coming to the door. *Id*. 230-31. She then told them that, "I had a dream, like a nightmare." *Id*. 231.

Clearly, K.A. was not telling the prosecution what it wanted to hear, so the trial developed into a spectacle of the prosecutor impeaching the State's own witness with prior testimony from the first preliminary examination–the one that had been declared a "nullity" because of the coercive actions of State actors influencing the testimony of K.A. Tr. II 232.

At this attempt by the prosecutor to drag in the testimony of K.A. form the first preliminary examination, a bench conference ensued where defense counsel objected on the basis that the trial court had declared that first preliminary examination a nullity based upon improper coercion of K.A. by state actors, and this prompted a discussion of this Court's opinion on the State appeal and what it meant. *Id*. 232-35.

The trial court eventually allowed the State to impeach by using the first

16

preliminary examination transcript, but with a contemporaneous instruction to the jury about the use of impeachment evidence. *Id*. 235.

Given the green light by the trial court, the State then proceeded to go into detail about what K.A. had testified to at the first preliminary examination–which featured coerced testimony that Zilm had used his penis to touch her anus during the massage–punctuated by objections of defense counsel. *Id*. 237-88; 243 (objections of defense counsel); 255 (objections by defense counsel); 264 (objections by defense counsel); 274 (objections by defense counsel).

In fact, during one bench conference, when the trial court allowed the prosecutor to continue using the prior "unreliable statements" made to Amy Howard to impeach K.A., defense counsel stated:

> In the face of two court rulings that that statement to Amy Howard was unreliable, the jury's not gonna know that, Judge, ever?  What was the purpose of all these appeals?

Tr. II 256.  The trial court ruled that the State would be allowed to use the statements as impeachment. *Id*. 256-57.

K.A. was insistent, despite being, in essence, cross-examined on direct by Ms. McAmis–the same prosecutor whom K.A. had accused of coercing her into sticking with her original story so that she could see her mother again–that there was no sexual contact, and that Zilm's "thumb accidentally jabbed me." Tr. II 250.  K.A.

testified that she told the neighbors that she had had a dream about what had happened to her when she was five.  Tr. II 268.

Even at that point, immediately after the event when K.A. was at the neighbor's house, she testified that when the police arrived that her mom was crying, she was crying, and, "There were cops there.  I was being told to say things.  And I just had a nightmare."  Tr. II 269.

On top of this, the prosecutor also was able to introduce statements made by the neighbor (Sanders).  Tr. II 265.  This "impeachment" was doubly dubious because the trial court, and this Court, had not only ruled the hearsay statements unreliable; but the trial court had stated on the record that Sanders herself was not a credible witness.  Tr. 09/12/2014 at 18.

In fact, K.A. told the jury that, "I was told what to say."  Tr. II 251.  She testified that DHS personnel had told her what to say.  Tr. II 282 ("They told me to tell somebody that he [Zilm] had done that stuff to me, and that my mom had talked to me and told me to say that he didn't do it.")

She also reaffirmed, in front of the jury, that prosecutor Sarah McAmis told her to stick with her original story: "You [Ms. McAmis] told me after I told the truth that he did not do anything to me, you told me to go back to the story I had said before."  Tr. II 284; 284-85 ("Okay.  And just so that I can make sure, are you saying I [Ms.

18

McAmis] told you what to say?  Yes."); Tr. II 285 ("And I think you guys think I'm

not telling the truth when I say he didn't do anything.")

K.A. was also asked by the prosecutor: "Do you still consider [Zilm] your best

friend?  Answer: Yes."  Tr. II 287.  She testified that Zilm was important in her life,

a relief from her own abusive biological father, and that Zilm had never treated her

or her siblings inappropriately.   Tr. III 9-25.   At the conclusion of the direct

examination by the State, and after the jury had been dismissed, K.A. asked the trial

court if she could hug Zilm.  Tr. III 3-5.  This request was denied.  *Id*. 4-5.

On cross-examination, K.A. told the jury about how she was victimized

sexually by "uncle David" when she was 5-years-old, that he was never dealt with and

that no one had believed her, and that she had recurring nightmares over that incident

that counseling did not help.  Tr. III 26-30.

On June 4, 2012, she had fallen asleep during a massage from Zilm and had

one of the recurring nightmares about uncle David.  Tr. III 30.  She was face-down

when she awoke, felt a jab around her private area, and told Zilm to stop the massage,

and he did so.  *Id*. 26-30.

She never saw Zilm's private parts, he never exposed himself to her, and she

left the house because she was still in her nightmare-related confusion.  *Id*.  When she

realized that she had made a mistake in thinking that Zilm had done something to her

19

she, unprompted, called Zilm and said that she had been mistaken and was sorry, and Zilm reassured her that it was okay.  Tr. III 31-35.

Faced with a key witness who not only recanted her allegations against Zilm, but affirmatively accused state officials–including the prosecuting attorney–of pressuring her to testify a certain way, the State attempted to explain this situation through the testimony of Rose Turner, the Managing Director at the Child Abuse Network, part of the Children's Advocacy Center in Tulsa County, who explained to the jury the concept of "Child Sexual Abuse Accommodation Syndrome."  Tr. III 51-57.

Defense counsel objected on the basis that this Court had not accepted such testimony, and it was irrelevant in any event under the circumstances of this case.  Tr. III 50.

These objections were overruled.  *Id.*

Child Sexual Abuse Accommodation Syndrome is based upon research done in the 1980's by Dr. Roland Summit.  Tr. III 59.  Characteristics such as helplessness, secrecy, delayed disclosure, and "accommodating" the abuser because of feelings for that person and sometimes there is a recantation.  *Id*. 59-61.  Turner, of course, had to admit that the "syndrome" is not like a medical diagnosis, and that there may be other causes for these behaviors, and just because a child exhibits these behaviors it

does not mean that sexual abuse had occurred.  *Id*.

At this point, defense counsel again objected on the basis of relevancy, and pointed out that there was no evidence establishing any relevance to the evidence in this case, nor any evidence with respect to secrecy, or feelings of helplessness (other than K.A. being made to feel helpless by state officials who do not believe her), and that the bulk of the Summit material on the syndrome was speculation.  Tr. III 63.

The objection was overruled, but the issue was sorted out at a bench conference where the trial court admitted to making a "mistake" in allowing the testimony as substantive evidence on the truthfulness or untruthfulness of the child's testimony. Tr. III 64, 70.

The problem with the testimony is that Turner had never met K.A., never diagnosed K.A., and did not have any involvement with this case.  Tr. III 70.  Defense counsel continued to object.  *Id*.; 73, 74, 75, 76, 77, 79, 80, 81-82 (re-urging motion to disallow the testimony of Turner as speculative and irrelevant; objection noted and overruled).

After Turner, the State called the neighbor, Katherine Sanford.  Tr. III 121-25. Sanford testified to the fact that K.A. came over to her house that morning, appeared upset, and in a courtroom moment where everyone seemed to have forgotten the pre-trial rulings on hearsay statements made to K.A., the prosecutor asked Sanford what

K.A. said, and Sanford responded: "She came in, and I asked her, I said, what's wrong?  And she told me that Big Daddy [Zilm]–she called him Big Daddy, which–and she said had touched her."  Tr. III 127.

Despite the prior rulings on the admissibility of this hearsay, the trial court allowed the hearsay testimony under the "excited utterance" exception to the hearsay rule.  Tr. III 129.  The defense objected.  *Id*.; 132 (defense counsel again objecting, and noting that there is a difference between evidence that is admissible and evidence that is reliable).

Sanford then testified that K.A. told her that Zilm had tried to put his penis "in her butt."  Tr. III 133.  Upon hearing this, Sanford and her roommate called the police.  *Id*.

The State called the SANE nurse, Kathy Bell, who testified that K.A. was examined on June 4, 2012, which included a colposcope (a "microscope on wheels") which magnifies the area of observation x15.  Tr. III 151-55.  According to Bell, she asked K.A. what had happened, and K.A. replied that Zilm had been giving her a massage, and had "put his penis into her butt hole."  Tr. III 160.  It should be noted that K.A. insisted that she was told by authorities what to say to the SANE nurse.  Tr. II 281.

Defense counsel objected to this, noting the close proximity to this statement

22

to the others deemed unreliable, but this objection was overruled on the basis that it was admissible under the "medical advice" exception.  Tr. III 159-60.  The exam showed an "area of redness" around the anus of K.A., although all of the boxes on the exam form for genital itching, discharge, and bleeding were marked "No."  *Id*. 161-66.  The "redness" could have been caused by a thumb slipping on massage oil.  *Id*. 171.

The last State witness was Cpl. Gregory Smith of the Tulsa Police Department. Tr. III 181-85.  On the day of the incident, Zilm had left the home and went to the home of his parents.  Cpl. Smith went there, along with Det. Hodges and Officer Taylor, to interview Zilm.  Tr. III 196-200.  The interview with Zilm was played for the jury (State's Exhibit #1) over objection by the defense.  Tr. 201-08.

Cpl. Smith testified that Zilm was cooperative with police, denied sexually abusing K.A., but acknowledged that he may have in advertently jabbed her with his thumb during the massage.  Tr. 208-12.

The State then rested, and the defense demurred, which was overruled.  Tr. III 216-20.  The defense called two witnesses: K.A. and Officer Jon Wilson.

K.A. was called to lay the foundation for the recording that she had made of DHS worker Lauren Hall, who interviewed the children, including K.A. as part of the juvenile proceeding.  Tr. IV 17-23.  K.A. recorded the conversation herself with her

iPod because she did not trust Hall. *Id*. This is the recording, introduced as Defense Exhibit #1 where Hall tells K.A. that she must stick to her original claim because the DNA evidence confirms that K.A. was sexually assaulted–which was a lie. Tr. IV 21 (Defense Exhibit #1 played and admitted).

The last witness called by the defense was Officer Jon Wilson of the Tulsa Police Department. He confirmed the buccal swab samples taken from K.A. and Zilm, and anal swabs from K.A., and the fact that there was no DNA from Zilm found on K.A. Tr. IV 44-51.

After inquiry by the Court, Zilm chose to not take the stand. Tr. IV 58-67. The defense rested, and defense counsel re-urged a demurrer and motion for a directed verdict of acquittal. Tr. IV 67-69. These were overruled. *Id*.

One other matter of importance arose during the defense case concerning other defense witnesses. K.A.'s older sister, P.A., a minor, wished to testify for Zilm, but her mother, Kristi, did not appear in court. Tr. IV 26. P.A. was transported to court by a friend of Kristi's named Rhonda Shockey. *Id*. 27.

This prompted a long, rambling soliloquy from the prosecutor about the propriety of allowing the defense to call any of the minor children as witnesses, and the intersection of the ruling of Judge Fransein in the juvenile proceedings ordering the children to be kept away from defense counsel and Zilm. Tr. IV 30-36. The

24

prosecutor implied that she would seek to alter the custody status of the children in the juvenile court: "And regardless of the outcome of this trial, I would anticipate that Judge Fransein will be taking a long, hard, good look at all of this."  Tr. IV 35.

More seriously as to P.A. who was 15-years-old at the time, the prosecutor intimated that the State would be looking for *perjurious* statements of P.A. in the event that she did testify.  Tr. IV 36.  Based upon this threat of perjury, defense counsel elected to, under duress, not call P.A. as a witness.  Tr. IV 41-42.

The jury found Zilm guilty and recommended sentence of 36 years.  Tr. IV 64.

## IV.   LEGAL CLAIMS

### PROPOSITION I

**FOUR STATE AGENTS, INCLUDING THE PROSECUTOR IN THIS CASE, COERCED AND LIED TO THE MINOR COMPLAINING WITNESS IN ORDER TO INFLUENCE HER TO TESTIFY FALSELY AGAINST ZILM.**

A.   Exhaustion.

This claim was raised by Zilm in the Oklahoma Court of Criminal Appeals and denied on the merits.  *See* OCCA slip opinion at 2-4.

B.   Merits.

As he did on direct appeal, Zilm asserts that four state actors, including the prosecutor Sarah McAmis, coerced a minor complaining witness into testifying falsely at the first preliminary examination; and thereafter pressured her to lie about the veracity of her recantation.

This conduct is a violation of clearly established federal law affording basic constitutional guarantees of fundamental fairness and Due Process of law under the Fourteenth Amendment.  *See Napue v. Illinois*, 360 U.S. 264, 269 (1959).

The Supreme Court has held that in evaluating *Napue* errors, courts apply a less demanding standard of review:  whether "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."  *United States v. Agurs*,

427 U.S. 97, 103 (1976); *accord United States v. Crockett*, 435 F.3d 1305, 1317 (10th

Cir. 2006).  This materiality standard is, in effect, a form of harmless error review, but

a far lesser showing of harm is required under *Napue's* materiality standard than

under ordinary harmless error review.  *See Smith v. Phillips*, 455 U.S. 209, 220 n.10,

(1982) (describing the "materiality requirement" that applies to *Napue* and *Giglio*

claims).

Zilm recognized in the OCCA that criminal prosecutions involving allegations

of sexual abuse of a child are tough.  They become much tougher when the minor

complaining witness recants, or seeks to clarify what happened in a way which

exonerates the accused.  This case illustrates that dynamic in a dramatic way, and

highlights the way in which the State personnel involved with the child are invested

in making sure that the child does not change her story, and the lengths to which they

will go to make sure that no one believes the recantation.

In this case, DHS case worker **Lauren Hall**, forensic examiner **Amy Howard**,

juvenile case agent **Lori Hannagan**, and prosecutor **Sarah McAmis** were all guilty

of either manipulating K.A. and her testimony by either lying to her outright about

the evidence in the case, or coercing K.A. to change her testimony with threats of

taking her away from her mother–and as will be shown below, prosecutor Sarah

McAmis is particularly culpable because she knew about the recantation, failed to

27

mention anything about it at, or prior to, the first preliminary examination, obtained inculpatory testimony form K.A. at that first preliminary examination knowing it to be false, and then proceeded to use that tainted testimony to impeach K.A. at trial.

Something dramatic happened to K.A. on the morning of June 4, 2012.  What was it?  Did this emotionally damaged young girl have one of her regularly occurring dreams of past abuse which prompted a reaction during a massage, as she has asserted constantly for over five years now; or did Zilm intentionally try to place his penis in her anus?  It seems that the former is more likely because the DNA exam showed no sign that Zilm had sexual contact with K.A.

If K.A. stated to the neighbor (Sanford) that there was sexual contact, something which K.A. denied and any such statements have been deemed unreliable by the trial court and this Court, it was, according to K.A., because, "There were cops there.  I was being told to say things.  And I just had a nightmare."  Tr. II 269; *see also* Tr. II 250 (K.A. told the neighbors that she had had a dream about what had happened to her when she was five (the sexual assault by "Uncle David" in Louisiana)).

When a day or two passed, and the drama of the situation had subsided, K.A., unprompted by anyone, called Zilm and told him that she had been mistaken and that it was all a misunderstanding.  O.R. 302-04; O.R. 152 (sworn statement of K.A.).

28

But, at this point, DHS, state investigators, and law enforcement were involved and we begin to see how these four named State officials manipulated K.A. and her testimony in this case. They manipulated the testimony of K.A. and the criminal justice system unlawfully in two ways.

First, they all *knew* about the recantation but did not say anything about it to the defense or the court prior to the preliminary hearing. Remember, K.A. recanted almost immediately after the incident on June 4, 2012, within a day or two; and a preliminary examination was set before Judge Youll on September 26, 2012.

What happened during this time?

As outlined above, we know that DHS case worker Lauren Hall knew about K.A.'s recantation because she was caught on tape lying to K.A. about the DNA evidence. O.R. 304; Defense Exhibit #1 (the recording).

We know that DHS worker Lori Hannagan knew about it because she wrote it down in an official document in the juvenile file. O.R. 303.

We know that the forensic examiner from the juvenile center Amy Howard knew about it because K.A. testified that she did, she had access to K.A., and K.A. testified directly that Howard told her that if she stuck to her recantation then K.A. may not be returned to her mother. O.R. 304; O.R. 172-73 (Amy "told me to say what I said before and I'd get to go back to my mom and live with her again.")

We also know that prosecutor Sarah McAmis knew about the recantation because she had access to all of these State witnesses and resources by virtue of her office and authority as a prosecutor, to K.A., the juvenile file, and K.A. testified under oath directly at trial, in response to questioning by McAmis herself, and a second time at a pre-trial hearing, that McAmis told her that she must tell the first story (implicating Zilm) rather than the recantation so that she could go back and live with her mom.  Tr. 09/09/2014 122-23, 124; Tr. II 284-85.

So, with the approaching preliminary examination before Judge Youll coming up on September 26, 2012, what did prosecutor Sarah McAmis, Amy Howard, Lori Hannagan, and Lauren Hall do, knowing that K.A. recanted?  Nothing.

They did nothing.  They let K.A. testify under oath at the first preliminary examination that Zilm had sodomized her without informing the trial court or defense counsel that K.A. had actually refuted that testimony, on multiple occasions, and still did (and with knowledge that the DNA evidence supported Zilm, not the original complaint of K.A.).  P.H. Tr. 09/26/2012 at 24-25 (testimony of K.A. at first preliminary examination).

Had the situation remained this way through trial, Zilm would be presenting this issue as a *Brady* claim.  However, defense counsel found out about the recantation by K.A., brought it to the attention of the trial court, and the trial court

30

issued an order remanding for a new preliminary examination specifically because State actors had used "unreasonable influence on the minor child K.A. to secure testimony to which she had since recanted repeatedly." O.R. 339.

Zilm points out to this Court, however, that as bad a *simply not divulging* the recantation is, much worse is using lies and coercion on K.A. to dissuade her from even mentioning it during her testimony. This is what all four of these State actors did, and in Zilm's view their actions can fairly be construed as suborning perjury and witness manipulation of an 11-year-old girl to present false testimony.

In addition to not disclosing the recantation, Lauren Hall was caught on tape lying to K.A. about the DNA evidence and telling K.A. that no one would believe her recantation because the DNA evidence proved the first story; Amy Howard pressured K.A. to testify to the first story by telling K.A. that if she recanted then she might not be given back to her mother; Lori Hannagan told K.A. to just blame the recantation on her mother, as if it was the mother's idea and not K.A.'s true belief (to simply fabricate evidence, in other words); and prosecutor Sarah McAmis told K.A. that if she stuck to her original story implicating Zilm then K.A. could go back and live with her mother.

This is why K.A. testified the way she did at the first preliminary examination; and Judge Glassco held as much in his Order when he found unreasonable influence

31

has been exerted by State actors, declared the first preliminary examination a nullity, and then remanded the matter for  a new one.

So, what was the tactic of the prosecutor at trial?

It was simple:  use the testimony of K.A. that she and the others fabricated at the "nullity" of the first preliminary examination to impeach her recantation testimony before the jury at trial.  In Zilm's view, this is what happened.  The State was simply allowed to fabricate and coerce testimony from K.A. at the first preliminary examination, and then use that fabricated testimony at trial to impeach K.A. when she did not testify the way that the State wanted her to.

As outlined, *supra*, prosecutor Sarah McAmis did exactly that, over a long stretch of questioning K.A., peppered with defense objections the entire way; including eliciting from K.A. testimony that McAmis had pressured K.A. to testify falsely.  Tr. II 232-68.

The prosecutor also developed this theme in her closing argument, telling the jury specifically to rely upon the testimony of K.A. at the first preliminary examination (the so-called legal "nullity").  Tr. V 15 ("you can use the fact that...she did tell all of the details about that at the preliminary hearing the first time she testified under oath.  You can use all of those statements as evidence of guilt against the defendant.")

In Zilm's view, this is outrageous Government conduct and a violation of Due Process under the Fourteenth Amendment to the Constitution. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). Reversal is required if "the false testimony could, in any reasonable likelihood have affected the judgment of the jury." *See Giglio v. United States*, 405 U.S. 153 (1972) (*quoting Napue v. Illinois*, 360 U.S. 264, 271 (1959)). The false testimony here is the coerced testimony of K.A. at the original preliminary examination.

Moreover, McAmis is clearly a State actor for purposes of this claim, and Hall, Howard, and Hannagan are also considered State actors and agents of the prosecution regarding this claim. *See United States v. Antone*, 603 F.3d 566, 569-70 (5th Cir. 1979) (in this context prosecution team includes prosecutors and investigators); *United States v. Rangel*, 519 F.3d 1258, 1265 (10th Cir. 2008) (Government conceded that case agent was the alter ego of the Government and of the prosecutor).

Zilm would also note for the Court's consideration that the dynamic outline above, and the evidence presented in this case of "accommodation syndrome," is problematic for the fair functioning of the criminal justice system because, from the perspective of the State prosecutive machinery, there is *no scenario* in which the accused is either innocent or a mistake made by the complaining witness.

If the complaining witness makes an allegation, it is believed. If she recants,

33

then the recantation is not believed, and there now exists the pseudo-scientific prop used by psychologists and prosecutors of "accommodation syndrome."  In other words, in cases like this one, there is an institutional investment by the State in believing allegations and disbelieving recantations.

Zilm asserts that in his case, the State went too far in its efforts to mold K.A.'s story to fit its narrative.  McAmis, Hall, Howard, and Hannagan, each of these State actors, overtly coerced and manipulated K.A. in this case to change her testimony in a way that implicated Zilm.  McAmis used this coerced testimony during trial to impeach K.A. and to convict Zilm, and argued as much to the jury during her closing argument.

Under the *Napue* standard, the Government conduct in this case was outrageous, and there exists a reasonable likelihood that the false testimony elicited from K.A. at the preliminary examination and at trial could have affected the judgment of the jury.

The OCCA dismissed all of this evidence in the record–the recantation under oath, the recordings of coercion, the findings by the magistrate of State coercion–on the basis that the testimony complained of (the initial false story of K.A.) was not shown to be false.  Zilm asserts that this holding is both contrary to and an unreasonable application of clearly established federal law and the undisputed facts.

## PROPOSITION II

## PROSECUTORIAL MISCONDUCT DEPRIVED ZILM OF A FAIR TRIAL.

A.    <u>Exhaustion</u>.

This claim was raised by Zilm in the Oklahoma Court of Criminal Appeals and denied on the merits.  *See* OCCA slip opinion at 4-7.

B.    <u>Merits</u>.

As Zilm outlined in Proposition I, *supra*, the prosecutor committed egregious misconduct in the way she handled the recantation statements of K.A.  However, the same prosecutor committed four other instances of misconduct that must result in reversible constitutional error:  1) she threatened defense witnesses with perjury or to re-open the juvenile case if they testified; 2) she accused defense counsel of orchestrating the recording of Lauren Hall's false DNA comment to K.A.; 3) she made improper argument to the jury that Zilm should be punished for exercising his right to a jury trial; and 4) she engaged in courtroom histrionics during closing argument, which seems to be a pattern with this particular prosecutor.

1.    <u>THREATS OF PERJURY & TO RE-OPEN JUVENILE CASE</u>.

During the defense case-in-chief, there arose a discussion of whether P.A., the older, but minor, sister of K.A., would be able to testify for Zilm.  Tr. IV 26-42.  The

35

problem was that the mother of the children, Kristi Alvarez, was not at court.  The children, however, were in court, having been transported there by a family friend who had no legal authority over them.  This prompted an objection by the prosecutor, and two statements regarding the proposed testimony of P.A. that are relevant here.

First, the prosecutor, after a long general rant about the children testifying at all, noted the overlap between rulings of the juvenile court judge (Judge Fransein) that the children were to be kept away from Zilm and his counsel.  Tr. IV 30-36.  She then implied that she would seek to alter the custody status of the children in the juvenile court if they testified for Zilm: "And regardless of the outcome of this trial, I would anticipate that Judge Fransein will be taking a long, hard, good look at all of this."  Tr. IV 35.

Second, concerning 15-year-old P.A., who was present in the courthouse and ready to testify for Zilm, the prosecutor made a not-so-subtle threat that perjury charges might be filed if P.A. testified for Zilm.  Tr. IV 35 ("But now we're going to proceed with her siblings being put on the stand to testify under direct, under cross-examination, with all due respect, to potentially subject herself to some type of perjurious statement.")

Zilm was standing right there and heard these statements by the prosecutor.  In light of these statements by the prosecutor, defense counsel had a conference with

Zilm and P.A. and elected, under duress, to not call P.A.  Tr. IV 41-42.

These threats by the prosecutor effectively chilled the right of Zilm to present his defense.  *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) ("[T]he Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense.")  As set forth in his affidavit attached to the Motion to Supplement filed in this Court, Zilm asserts that he chose to not call P.A. as a witness (or his mother Mary Zilm or his fiancee Kristi Alvarez) out of fear that the prosecutor would prosecute them for perjury and seek to have the State custody proceeding re-opened and the kids taken away from Kristi.

As set forth in their affidavits and statements attached to the Motion to Supplement, each of these witnesses would have had important information for the jury to hear and was willing and able to testify if called (P.A. regarding Zilm's character as a father and all of the positive, valuable lessons that he taught her; Kristi Alvarez to testify concerning Zilm's character as a good father and fiance/boyfriend, and that he suffered from a medical condition that caused "leakage" from his penis as a result of medication which explained his statement to the police about it; and Mary Zilm, his mother, who was present during the police questioning at her home and heard the police officers discuss with Zilm whether he needed a lawyer).

2.   <u>ACCUSING DEFENSE COUNSEL</u>.

As the Court will recall, K.A. was distrustful of DHS workers and she recorded her conversation with DHS worker Lauren Hall with her iPod.   This proved embarrassing to the State, and damaging to its case, because Hall told K.A. that no one believed her recantation because the DNA evidence proved Zilm was guilty, which was a lie; and this bold manipulation of K.A.'s testimony was pivotal in the district court declaring the first preliminary examination a "nullity" and remanding for a second one.

During closing arguments, the prosecutor commented on the fact that K.A. had recorded Hall, telling the jury:

MS. MCAMIS:          [Defense] counsel also asked and also said that the fact that [K.A.] recorded Lauren Hall, that that corroborated that what everybody–that everybody told her what to say.  And when he talked about that, he talked about how gutsy, and how innovative, and how smart [K.A.] was for doing that.  Does anybody think it's a huge coincidence that right when she met with Mr. Smallwood alone, then she recorded Lauren Hall?  That's a coincidence.

MR. SMALLWOOD:     Judge, I object to that.   Ask the jury be admonished to disregard it.  She's impugning my character based on no evidence whatsoever.  Ask the jury be admonished to disregard it.  Move for mistrial.

38

THE COURT:          Motion for mistrial be denied.  Ms. McAmis, confine yourself to the matters that are actually of evidence, and not of statements of counsel during *voir dire*.

Tr. V 51.  The trial court erred in refusing to admonish the jury and refusing to grant a mistrial.  It is patently prejudicial misconduct for the prosecutor to insinuate that defense counsel had manipulated or instructed K.A. to record Lauren Hall, particularly in light of her own misconduct.

This was reversible error.  *See United States v. Holmes*, 413 F.3d 770, 775 (8th Cir. 2005) (personal unsubstantiated attacks on the character and ethics of opposing counsel have no place in the trial of any criminal or civil case); *Cline v. United States*, 395 F.2d 138, 141 (8th Cir. 1968) (improper for a prosecutor to accuse defense counsel of dishonesty).

## 3.   IMPROPER COMMENT ON RIGHT TO TRIAL.

During closing arguments, the prosecutor focused on K.A. and the struggles that she had gone through in this case (foregoing, naturally, the conduct of State agents in trying to influence her testimony), and told the jury: "It's wrong that you [Zilm] violated a little girl and then put her through the next four years to get to this day."  Tr. V 55.

Trial counsel objected, calling the comment "outrageous conduct," moved to

admonish the jury, and moved for a mistrial.  *Id*.  The trial court denied the motion for a mistrial, but did sustain the objection and instructed the jury to disregard it.  *Id*.

Despite the admonition, Zilm asserts that this statement was egregious, and that the curative instruction from the bench was ineffectual.  The prosecutor had accused Zilm of victimizing K.A. by exercising his right under the Sixth and Fourteenth Amendments to a jury trial–and that it was somehow his fault that the process had taken four years–nevermind the fact that the bulk of the delay was the State appealing a legal ruling, and that it was the State's own unlawful actions that caused the remand for a second preliminary examination.

Comment on the accused's exercise of a constitutional right is error.  *Bosse v. State*, 2015 OK CR 14, ¶30, 360 P.3d 1203 ("The exercise of a constitutional right, whether to refuse to consent to a search, to refuse to waive *Miranda* rights or to decline to testify at trial, is not evidence of guilt.") (*quoting United States v. Clariot*, 655 F.3d 550, 555 (6th Cir. 2011)).

In addition, there are "some occurrences at trial [that] may be too clearly prejudicial for . . . a "curative instruction to mitigate their effect." *Donnelly v. DeChristoforo*, 416 U.S. 637, 644 (1974).  Zilm asserts that this comment is one such occurrence.

40

4.   <u>COURTROOM HISTRIONICS</u>.

Finally, the prosecutor engaged in inflammatory courtroom histrionics.  Zilm

noted to the OCCA that this claim should not come as a shock because this prosecutor

in Tulsa County has engaged in similar conduct in multiple cases.[6]  *See Scott Allen*

*Bolden v. State*, No. F-2015-1112 (Okl.Cr., March 24, 2017) (unpublished) (Smith,

J., concurring in result) (concerned with the tactics of the prosecutor in closing

argument which involve "theatrical presentations"); *Gregory Antwon O'Neal v. State*,

No. F-2013-958 (Okl.Cr., April 5, 2016) (unpublished) (remanded for re-sentencing

because of theatrical conduct during closing of Ms. McAmis); and *Emory Norris*

*Gaines v. State*, No. F-2011-867 (Okl.Cr., September 12, 2012) (unpublished)

(prosecutor McAmis committed error in closing, but harmless).

In Zilm's case, she theatrically mocked the demeanor of Zilm when he was

questioned by the police.  Tr. V 48 ("If the police showed up right now and said an

11-year-old girl is saying you put your penis in her, your response would be horrified.

That's the most disgusting, disturbing thing anybody could ever accuse you of.  How

could you say that?  Get the hell out of my house.")

Defense counsel objected: "I object to this.  This is histrionics.  This is

improper.  And ask the jury be advised to disregard it and move for a mistrial."  *Id*.

---

[6]     Copies of these unpublished opinions are attached to this Brief.

The trial court denied the motion for a mistrial, but instructed Ms. McAmis: "Counsel, I'll ask you to refrain from histrionics." *Id*.

Even the trial court judge described her actions as histrionics. Zilm asserts that this prosecutor continues to engage in inflammatory rhetoric during closing arguments and it must result in reversible error. *See*, *e.g.*, *Pryor v. State*, 2011 OK CR 18, ¶ 5, 254 P.3d 721, 722-23 (blatant appeals to emotion are strongly disfavored, and can result in reversible error).

## **CONCLUSION**

Considered individually and collectively, these instances of prosecutorial misconduct constitute reversible error.

## PROPOSITION III

## MULTIPLE ERRONEOUS EVIDENTIARY RULINGS PREJUDICED ZILM RESULTING IN A FUNDAMENTALLY UNFAIR TRIAL.

A.    Exhaustion.

This claim was raised by Zilm in the Oklahoma Court of Criminal Appeals and

denied on the merits.  *See* OCCA slip opinion at 8-11.

B.    Merits.

As he did in the OCCA below, Zilm asserts that the trial court committed

reversible error by admitting hearsay statements made by K.A. to 1) Katherine

Sanford (the neighbor); 2) Kathy Bell (the SANE nurse); and 3) K.A.'s testimony at

the first preliminary examination.  The jury heard these prior statements of K.A. but

legally should not have, to the prejudice of Zilm.

As Zilm established, *supra*, the use by the State of hearsay statements of K.A.

was, at least in theory, drastically circumscribed in this case.  At the reliability

hearing, Judge Glassco ruled that hearsay statements made by K.A. to the neighbor

(Sanford) and to forensic interviewer Amy Howard were *unreliable and therefore*

*inadmissible*.  Tr. 09/12/2014 at 16-18.  The OCCA upheld this ruling when the State

appealed.  O.R. 511.

In addition, the testimony by K.A. at the first preliminary examination was

43

found to be coerced by State agents by Judge Glassco, and therefore a legal nullity. It is odd then, that the State was able to introduce all of these hearsay statements to the jury at trial.  It happened as follows:

As to the hearsay statements by K.A. made to Sanford, the trial court allowed them in, over objection, under the "excited utterance" exception to the hearsay rule. Tr. III 128-29; *see* 12 O.S. § 2803(2) ("A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition).

As to the hearsay statements by K.A. made to SANE nurse Kathy Bell, the trial court allowed them in, over objection, under the "medical advice" exception to the hearsay rule.  Tr. 156-60; *see* 12 O.S. § 2803(4) ("Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain or sensations, if reasonably pertinent to diagnosis or treatment.")

As to the prior testimony of K.A. at the first preliminary examination, the trial court allowed it on the basis that it was used for impeachment.  Tr. II 235; 256-57.

Defense counsel objected to the State's use of K.A.'s hearsay statements in all of these instances because her statements had been deemed legally unreliable by the trial court as to the neighbor Sanford; and the first preliminary examination testimony

44

of K.A. had been deemed coerced by State actors.[7]  Thus, there seems to be tension on this issue between the use of exceptions to the hearsay rule and impeachment rules on the one hand, which allow the statements; and the determination that the statements were unreliable and coerced, which would disallow them.

In Zilm's view, the trial court got it wrong.

First, the trial court allowed the exceptions to swallow the rule.  The purpose of the hearsay rule, generally, is to distinguish hearsay from direct evidence, which is usually given under oath, in court, upon pain of perjury, and subject to cross-examination.  Thus, hearsay is a rule of *exclusion*.  *See* 12 O.S. § 2802 ("Hearsay is not admissible except as otherwise provided by an act of the Legislature.")

The exceptions to the rule, which allow inclusion at trial without the traditional safeguards that accompany direct evidence, are exceptions because the Legislature deemed certain situations as producing, in general and without anything more, reliable information, such as the "excited utterance" and "medical advice" exceptions at issue here.

---

[7]     Although the trial court held that the hearsay statements to Sanford were unreliable, and that the testimony of K.A. at the first preliminary examination were coerced, the trial court did not explicitly rule on the reliability of the hearsay statements made to the SANE nurse, Kathy Bell.  However, defense counsel objected to them on the basis that they were made within hours of the "unreliable" statements made to the neighbor Sanford and were therefore tainted as well.  Tr. III 156-60.

The problem here is that although these exceptions to the hearsay rule are regarded generally as producing reliable information or testimony; in Zilm's case, there was "something more" in the form of special circumstances and actual findings by the trial court that, in this particular case, the general rule of reliability did not apply, and that in fact the hearsay statements made by K.A. were *not* reliable, and in the case of her prior testimony, was not only unreliable, but had been affirmatively coerced and influenced improperly by the State.

Thus, in Zilm's view, the finding by the trial court that the statements were unreliable must cut through the hearsay rule and obviate application of the two exceptions at issue here.  The reason is that the information contained in the hearsay statements has been deemed to be unreliable, and therefore the same unreliable statement cannot be magically made reliable because it is made to a SANE nurse or to a neighbor in close proximity to a startling event.

Second, and this applies chiefly to the testimony of K.A. at the first preliminary examination, the State does not have clean hands.  State actors are responsible for unlawfully influencing the testimony of K.A., by lies and coercion, which prompted the trial court to declare the first preliminary examination a nullity.  The State should not be able to profit from its own unlawful acts in this manner.

In sum, the findings by the trial court that the statements were unreliable should

46

override the application of any hearsay exceptions.  The constitutional burden of proof standard of beyond a reasonable doubt demands that the State's evidence be free of the taint of unreliability.

The OCCA found no abuse of discretion in allowing in this hearsay, but Zilm asserts that this holding is based upon the erroneous holding in Proposition I, supra, in which the OCCA found no *Napue* claim where the State clearly coerced the inculpatory statements from the minor complaining witness.

In this light, the bad faith of the prosecutor, combined with the falsity of the statements, remove this claim from state evidentiary rules to fundamentally unfair under the Fourteenth Amendment.

In the habeas context, trial errors being reviewed will be deemed harmless unless they had a substantial and injurious effect or influence in determining the verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993); *accord Patton v. Mullin*, 425 F.3d 788, 800 (10th Cir. 2005).  If this Court is in "grave doubt" as to the harmlessness of an error, the habeas petitioner must prevail.  *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995).  "Grave doubt" exists when, in light of the entire record, the matter is so evenly balanced that the Court feels itself in virtual equipoise regarding the harmlessness of the error.  *Id*.

In this case, prejudice has been shown and habeas relief is warranted.

47

## PROPOSITION IV

## THE TRIAL COURT ERRED IN REFUSING TO SUPPRESS THE STATEMENT MADE BY ZILM TO POLICE.

A.   <u>Exhaustion</u>.

This claim was raised by Zilm in the Oklahoma Court of Criminal Appeals and denied on the merits.   *See* OCCA slip opinion at 12-15.

B.   <u>Merits</u>.

Police interviewed Zilm at the home of his parents, and the jury heard a recording of that interview through the testimony of Cpl. Gregory Smith and State's Exhibit #1.   Prior to trial, defense counsel had filed a motion to suppress, a *Jackson v. Denno* hearing was held (in two parts), and the trial court issued an order denying the motion.   O.R. 608.   Defense counsel objected again to the introduction of Zilm's statements and to the recording at trial.   Tr. III 201-05.

During the interview, Zilm repeatedly denied sexually abusing K.A., but he did make statements to police in which he admitted to giving K.A. the massage, but denied intentionally touching K.A. inappropriately.   *See* State's Exhibit #1 (Q. She's stating that you put oil on her vagina and her butt, and that you tried to put your penis in her vagina.   A. I didn't do that.   Q. And then, when that didn't work, you put it in her butt.   A.  I didn't do that.)

48

He also made other statements about being "horny" but not in front of the children (they were in the living room, he was in the kitchen), that is thumb may have slipped on the oil and jabbed K.A., and when the police officer mentioned going out to the car to get a DNA kit to take a sample, Zilm remembered that he may have left DNA on K.A. because as he laid down he "squished his balls" and had some "leakage" of semen from his penis which was the result of a condition.

These statements by Zilm were seized upon by the prosecutor in closing arguments. Tr. V 37 ("But then you would have to believe this, darn the luck. Of all times for this to happen while his is giving a naked 11-year-old a massage, shoot fire, that's when his balls get squished between his legs. And darn the luck, oh, this is so bad, but darn the luck, that's when some cum comes out."; Tr. V 45 ("Because let's just say, I don't know how or why, but under some circumstances you happen to find yourself alone with an 11-year-old, and you have some cum on your hand. How would an innocent man respond to that?")

Zilm himself testified at the *Jackson v. Denno* hearing on the voluntary nature of his statements. Tr. 09/28/2016 at 39. Through his testimony, along with Cpl. Smith at trial, we know that three police officers went to interview Zilm at the home of his parents, two detectives (Smith and Hodges) and uniformed police officer (Officer Taylor). *Id*. at 51-52; Tr. III 196-200.

49

Zilm sought suppression of his statements to these officers on two grounds.

First, as argued by defense counsel at trial, officers should have issued the *Miranda* warnings to Zilm because he was in custody.  O.R. 582.  As counsel pointed out below, "custody" is a legal question that focuses on the dynamic and interplay between police and the subject being questioned; it is not a matter of location.  This means that a person may be in "custody" even if questioned in their own home.  *See Orozco v. Texas*, 394 U.S. 324 (1969); O.R. 584.

The legal inquiry of whether a suspect is in "custody" for *Miranda* purposes is whether a reasonable person in the suspect's position would have understood the situation as the functional equivalent to a formal arrest.  *See United States v. Jones*, 523 F.3d 1235 (10th Cir. 2008).

Here, Zilm was approached by three officers, one of whom was uniformed with a gun, was separated from his parents (in their own home) so that the police could talk to him privately, were in close physical proximity to Zilm the entire time, and according to Zilm, his perception of the uniformed officer who stood guard at the door was that the officer was there to "keep me from getting to my parents and to keep me from leaving."  Tr. 09/28/2016 at 51-52.  Zilm was not given *Miranda* warnings. *Id*. 52.

Contrary to the conclusion of the trial court and the OCCA, Zilm was subject

50

to the functional equivalent of an arrest during the time that he was questioned, this Court must find that he was in custody for *Miranda* purposes, and therefore suppress his statements because *Miranda* warnings were not given.

Second, and this claim was not raised in the trial court, Zilm asked if he needed a lawyer at the beginning of the interview. *See* Affidavit of Adam Clayton Zilm attached to Motion to Supplement filed in the OCCA. The detectives responded, "No, we just want to ask a few questions." (Det. Smith), and, "I don't know, do you?" (Det. Hodges).

This exchange was, curiously, not contained in the recorded version of the interview provided to the defense. Zilm verified in his affidavit that he asked them about an attorney, and their responses. In addition, Mary Zilm (Zilm's mother) was present during the exchange and can verify that it occurred. *See* Affidavit of Mary Zilm attached to Motion to Supplement filed in the OCCA.

Zilm believes that detectives deleted this exchange from the original recording, or did not record it at all. The fact that Zilm asked if he needed an attorney, and was told "no" by police, indicates deception by officers and calls into question the voluntary nature of the statements made by Zilm.

The prosecution has the burden of establishing by a preponderance of the evidence that a suspect waived his *Miranda* rights and that his statements to police

are truly the product of free choice. *Colorado v. Connelly*, 479 U.S. 157, 168-69 (1986). Voluntariness requires "careful evaluation of the totality of the circumstances, including the accused's characteristics, the conditions of the interrogation, and the conduct of law enforcement officers." *Schneckloth v. Bustamonte,* 412 U.S. 218, 226 (1973).

Voluntariness of a confession or incriminating statements is judged from the totality of the circumstances, including the characteristics of the accused and the details of the interrogation. *Van White v. State,* 1999 OK CR 10, ¶¶ 45, 990 P.2d 253, 267.

## CONCLUSION

The statements by Zilm should be suppressed because: 1) Zilm was in custody and was not advised of his rights under *Miranda*; and 2) Zilm asked whether he needed a lawyer and was told that he did not, which constitutes misconduct by law enforcement that rendered his statements involuntary. The conclusion to the contrary by the OCCA is contrary to clearly established federal law as set forth above.

## PROPOSITION V

**ZILM RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION.**

A.    <u>Exhaustion</u>.

This claim was raised by Zilm in the Oklahoma Court of Criminal Appeals and denied on the merits.  *See* OCCA slip opinion at 15-17.

B.    <u>Merits</u>.

Clearly established federal law holds that a defendant in a criminal case is entitled to the effective assistance of counsel; and constitutionally deficient counsel violates the Sixth and Fourteenth Amendments to the United States Constitution. *Strickland v. Washington*, 466 U.S. 668 (1984).

Under the familiar constitutional test established in *Strickland*, an ineffective assistance claim has two components: a defendant must show that counsel's performance was deficient, and that the deficiency prejudiced the defense.  *Wiggins v. Smith*, 539 U.S. 510, 521 (2003).

The performance of trial counsel is measured by an objective standard of reasonableness under prevailing professional norms.  *Rompilla v. Beard*, 545 U.S. 374, 380 (2005).  If counsel's performance falls under this standard, the appellant must show a reasonable probability that, absent trial counsel's deficient performance,

the outcome of the trial would have been different.  *Id*.

Here, the prosecutor clearly signaled to the defense that she would not only seek to re-open the juvenile case to change the custody arrangement of Kristi's kids (including K.A. and P.A.), but that she would also be looking to file perjury charges against defense witnesses in the event that they took the stand, specifically against P.A.  Tr. IV 35-36.

As defense counsel noted upon hearing these threats, he consulted with the witness, P.A., and elected, under duress, to not call P.A. as a witness.  Tr. IV 41-42. However, the record does not reflect that trial counsel made a record regarding the additional witnesses that Zilm wished to call, but decided not to because the threats made by the prosecutor.  These witnesses were his mother, Mary Zilm, and his fiancee and mother of K.A., Kristi Shaneck.  *See* Affidavit of Adam Clayton Zilm attached to Motion to Supplement filed in the OCCA.

Zilm argued in the OCCA that, to the extent that trial counsel's "under duress" statement in the record is deemed by insufficient to preserve this error, Zilm asserts that trial counsel's performance was deficient and that he was prejudiced thereby. Trial counsel should have made a record that Zilm felt threatened by the comments of the prosecutor, that this feeling was reasonable, that it chilled his right to present a defense, and a record should have been made that Zilm forewent calling these

witnesses because of the threats, and an offer of proof should have been made.

Zilm was prejudiced because his mother, Mary Zilm, could have corroborated the fact that Zilm actually did ask the detectives whether he needed a lawyer, and their answer that he did not.  She was standing there listening when it happened.

Similarly, the prosecutor made much of the fact that Zilm had "cum" on his fingers and told detectives that his DNA might be on K.A.  Tr. V 37; 45.  However, trial counsel failed to call Zilm or his fiancee Kristi Shaneck to the stand to explain that his "leakage" problem was actually a medical condition that had manifested when Zilm had begun taking a prostate health supplement prior to the alleged incident with K.A.

This was a critical aspect of the case because it would have explained to the jury that Zilm had ejaculate at the time because of a medical condition, not because he was aroused by K.A.

Under the *Strickland* standard, Zilm was deprived of the effective assistance of counsel, and the rejection of this claim by the OCCA was an unreasonable application of the *Strickland* standard.

## PROPOSITION VI

## THE CUMULATIVE EFFECT OF THE ERRORS DEPRIVED ZILM OF A FUNDAMENTALLY FAIR TRIAL.

A.     Exhaustion.

This claim was raised by Zilm in the Oklahoma Court of Criminal Appeals and denied.  *See* OCCA slip opinion at 18.

B.     Merits.

The OCCA found no error, thus conducted no cumulative error analysis.  Thus, because the OCCA found no error and did not conduct a cumulative error analysis, this Court must perform its own *de novo* under the *Brecht* standard.  *Grant v. Royal*, 886 F.3d 874, 995 (10th Cir. 2018).

Also, it must be noted that, in at least one instance, the Supreme Court has vacated the decision of a circuit court of appeals on the basis, in part, that "the lower courts erred in failing to assess the cumulative effect of [unlawfully] suppressed evidence with respect to [a defendant's] capital sentence." *Cone v. Bell*, 556 U.S. 449, 476 (2009).

The OCCA held that, since no individual errors required relief, there is no accumulation of error to consider.

This is incorrect.

56

As set forth, *supra*, Zilm's trial was replete with reversible error, starting at the very beginning with four State actors–including the prosecutor–lying and coercing the minor complaining witness into testifying falsely in court, with a prosecutor who threatened defense witnesses with perjury and custody challenges if they testified, accused defense counsel during closing arguments of manipulating K.A. into recording Lauren Hall, commented improperly on Zilm's right to have a jury trial as continued harassment of K.A., her continued courtroom histrionics for which she has been chastised by this Court on several occasions, the trial court allowing "unreliable" hearsay statements of K.A. under the guise of hearsay exceptions, denial of suppression of his statements to detectives during the home interview, and ineffective assistance of counsel in failing to develop the record on how the prosecutor chilled the defense by threatening defense witnesses with perjury and custody changes.

These errors are all individually reversible, and combined form a cumulative prejudicial effect that must result in reversal.

## V.  REQUEST FOR RELIEF

1. A full and fair evidentiary hearing is requested as to the Petition as a whole and in particular as to any issues which involve facts not apparent from the existing record and to any issues which involve facts disputed by the State.

2. Zilm requests specifically at least thirty (30) days after the evidentiary hearing transcript is prepared in which to file a memorandum of law in support of the Petition addressing facts developed at that hearing and previously known facts.

3. Zilm prays that the Court issue a Writ of Habeas Corpus or other appropriate Writ to have Petitioner brought before it so that he may have discharged his unconstitutional confinement and conviction.

4. Zilm requests also that the Court grant such other relief as may be appropriate as to dispose of the matter as law and justice require.

WHEREFORE, Adam Clayton Zilm, prays that the Court grant him the relief to which he may be entitled in this proceeding.

Respectfully submitted,

/s/ James L. Hankins
James L. Hankins, OBA #15506
MON ABRI BUSINESS CENTER
2524 N. Broadway
Edmond, Oklahoma 73034
Telephone: (405) 753-4150
Facsimile: (405) 445-4956
E-mail: jameshankins@ocdw.com

*Counsel for Petitioner*

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on this 19th day of January, 2021, I electronically transmitted the attached document to the Clerk of the Court using the ECF System for filing.  Based on the records currently in the file, the Clerk of the Court will transmit a Notice of Electronic filing to the following ECF Registrant:

Office of the Attorney General
e-mail:      fhc.docket@oag.state.ok.us

*/s/ James L. Hankins*
James L. Hankins