# IN THE COURT OF CRIMINAL APPEALS OF THE STATE OF OKLAHOMA

GREGORY ANTWON O'NEAL,               )
                                     )          **NOT FOR PUBLICATION**
              Appellant,             )
     vs.                             )          No. F-2013-958
                                     )
THE STATE OF OKLAHOMA,               )
                                     )                    FILED
              Appellee.              )          IN COURT OF CRIMINAL APPEALS
                                                     STATE OF OKLAHOMA

## OPINION                                           APR - 5 2016

**SMITH, PRESIDING JUDGE:**                        MICHAEL S. RICHIE
                                                         CLERK

Appellant, Gregory Antwon O'Neal, was convicted by a jury of First Degree Child-Abuse Murder (21 O.S.2011, § 701.7(C)), in the District Court of Tulsa County, Case No. CF-2011-780. On September 23, 2013, the Honorable James M. Caputo, District Judge, sentenced him to life imprisonment without possibility of parole, in accordance with the jury's recommendation.

## FACTS

Appellant was charged alternatively with causing the death of his two-month-old daughter, Tianna Marie O'Neal, or permitting another person to do so.[1] Appellant and the child's mother, Tamara Matthews, lived together with their daughter in Tulsa. When Appellant and Matthews brought Tianna to a local hospital on the evening of May 17, 2007, the child was unresponsive. Appellant told a Tulsa police officer at the hospital that he and his wife spent the day

---

[1] Appellant and the child's mother, Tamara Michelle Matthews, were jointly charged under alternative theories of committing, or permitting, Child-Abuse Murder (21 O.S.2011, § 701.7(C)). The prosecutions were severed for trial, and Appellant was tried first. After Appellant was convicted of Child Abuse Murder, Tamara Matthews entered a guilty plea to the crime of Permitting Child Abuse, 21 O.S.2011, § 843.5(B), and was sentenced to ten years imprisonment.

helping their friend, Joel Broadway, clean a house in Broken Arrow that Broadway was moving out of, and had taken Tianna with them. In the afternoon, Appellant said, he took Tianna to one of the empty bedrooms so the two of them could take a short nap. Appellant said he awoke to a high-pitched cry from Tianna, but did not know what caused her distress. A short time later, he said, she went limp, and they brought her to the hospital.

Tiana exhibited several external injuries which appeared suspicious, including a small bruise by her eye, bruising and abrasions to her shoulders, a bruise on her chest, and healing abrasions and peeling skin on her lower back and buttocks. She also exhibited injury to her upper arm that had the appearance of a bite mark, although the cause of that wound was never confirmed. Most importantly, a CT scan revealed that Tianna had sustained a skull fracture, which caused subdural bleeding and brain swelling. Dr. Passmore, a pediatrician specially trained in child-abuse injuries, also noted the possibility of retinal hemorrhaging, which can be caused by intense shaking of a child – one of a constellation of physical effects sometimes grouped together as "Shaken Baby Syndrome." An X-ray suggested that Tianna might have had a fractured rib – not acute, but in the process of healing – and a dislocated shoulder. It was later determined that the rib was not fractured and the shoulder was not dislocated. Furthermore, the autopsy did not detect the retinal hemorrhages initially reported by the pediatrician. However, the direct cause of Tianna's unresponsiveness on presentation, and the cause of her death the next day, was never disputed: brain swelling, caused by blunt force trauma which

fractured the back of her skull.

Because the initial assessment of Tianna's injuries (even before discovery of the skull fracture) gave rise to a suspicion of child abuse, Appellant was taken into custody on the evening he brought the child to the hospital.  Over the next several days, Appellant spoke with a police detective and a social service investigator, and made several phone calls from the jail to friends and family.  In those conversations, Appellant offered various explanations as to how Tianna might have been injured.  Those explanations evolved as information about Tianna's diagnosis was revised.

In the early morning hours of May 18, as medical personnel tried to save Tianna's life, Appellant was interviewed by Detective Jeremy Yerton.  At that time, police knew that Tianna had bleeding on the brain, but not that she had a skull fracture.  They also believed, erroneously, that Tianna had a dislocated shoulder and a broken rib.  When confronted with this incomplete and partially inaccurate information, Appellant admitted gently shaking Tianna to try to rouse her just before she was taken to the hospital, but denied violently shaking the infant. Pressed for other possible explanations for the infant's injuries, Appellant mentioned that earlier in the day, at Broadway's home, Tianna had fallen from a folding chair onto the floor.  He also mentioned incidents in the recent past where the infant had fallen from a couch and rolled off of a bed.  Appellant also said he had accidentally dropped Tianna about a week before.  Detective Yerton responded that all of those events would have been remote in time to have caused Tianna's head trauma.  A few days after Tianna's death, Appellant, still in

custody, spoke with Angela Varcoe, an investigator with the Department of Human Services. His account to Varcoe of events preceding Tianna's sudden distress on May 17 largely paralleled his account to Detective Yerton.[2]

Of particular interest was Appellant's telephone conversation with Joel Broadway on May 18, which was recorded and played for the jury. While Tianna was still clinging to life, Appellant sounded more concerned with his own potential accountability and ability to get out of jail. He told Broadway that because Tianna was almost exclusively in his care on May 17, "this all boils down to me." He expressed concern that if Tianna died, the charges would likely be upgraded to "the big thing" (presumably murder).

In phone conversations with his family after Tianna's death, Appellant offered other explanations for the infant's injuries. As for the bruises, Appellant said that their pediatrician, Dr. Exon, had reassured him that Tianna simply "bruised easily." Called as a witness at trial, Dr. Exon testified that he examined Tianna in his office on May 13 and again on May 14. The parents complained that she had been running a fever and was not keeping food down. Exon testified that the child's temperature was normal when he examined her, that bloodwork, X-rays, and other tests came back normal, and that according to his records, no bruises, rashes, or other external trauma were observed. Exon also denied ever telling Appellant that the child was susceptible to bruising.

On May 30, almost two weeks after Tianna's death, Appellant spoke from jail by telephone with his mother. He suggested that someone had divulged

---

[2] Appellant does not challenge the voluntariness of his custodial statements to Yerton. The voluntariness of his statements to Varcoe is discussed in Proposition VI.

4

information that could incriminate him and/or Matthews. He asked his mother to contact his attorney with new information – information he had not previously given because he wanted to save himself and Matthews. He recalled an incident where Matthews was changing Tianna's diaper, and he heard a sound that may have been Matthews slamming the baby's head against a granite counter-top; he then heard Tianna scream.[3] Appellant expressed a willingness to testify about this event. As Appellant's mother tried to calm and reassure him (and advised him to stop discussing the matter on the phone), Appellant said he wanted to go to court because Matthews was "going to have to pay for that."

The State's expert medical witnesses – Dr. Passmore, Dr. Block, and the Medical Examiner, Dr. Pfeifer – testified at length as to the nature of Tianna's injuries and possible causes for them. Appellant presented his own expert, Dr. Plunkett, whose own extensive testimony challenged much of the conventional wisdom about head trauma in infants. In essence, the State's experts believed that the complex skull fracture which ultimately killed Tianna was not likely to have been caused by a normal accident, such as a fall from a modest height, and that the effects of such a serious injury were likely to have manifested themselves quickly – that is, Tianna was unlikely to have appeared "normal" for any appreciable length of time afterward.[4] The State's experts opined that the most

---

[3] Appellant did not claim to have actually seen the act; he said the sound might have been Matthews hitting her own hand against the counter-top.

[4] Dr. Passmore estimated that Tianna suffered the skull fracture some six to twelve hours before presentment at the hospital. Appellant interprets that to mean that the injury could *not* have occurred *any sooner than* six hours before presentment. The record does not support that interpretation. Dr. Passmore described the bleeding around Tianna's brain as "acute," and while the CT scan showed some brain swelling, Passmore testified that such swelling can show up

likely cause of the skull fracture was intentional force, such as being slammed against a hard object, and that the force was most likely applied a short time before the baby arrived at the hospital. Tianna had been in Appellant's care for some time when she became unresponsive, and no one noticed anything unusual about the infant before that. The State thus contended that Appellant was most likely the culprit. The defense expert, Dr. Plunkett, disagreed with some of the State's experts' assumptions and conclusions. For example, it was Plunkett's opinion that an infant could, in fact, sustain a skull fracture like Tianna's, but not exhibit any obvious effects of such trauma for several days. This expanded time frame would make it more likely that someone else attending to Tianna may have caused the fatal injury. Plunkett also believed that skull fractures like Tianna's may be caused by falls from modest heights, such as the height of a changing table. Other facts will be presented as relevant to the propositions of error.

## DISCUSSION

In Proposition I, Appellant claims the evidence is insufficient to support his conviction for First Degree Child-Abuse Murder. Under Oklahoma law, First Degree Murder by Child Abuse does not require any specific intent to kill; save some theories not relevant here, it requires only that the accused willfully used unreasonable force on the child, which resulted in the child's death. *See* 21 O.S.2011, § 701.7(C); OUJI-CR (2nd) No. 4-65A. On direct appeal, we consider all

---

"immediately upon injury." Based on those two factors – the "acute" appearance of blood and the swelling of the brain – Passmore estimated that Tianna sustained the skull fracture "*within* six to eight, maybe 12 hours, *but most likely less than that.*"

of the evidence, in a light most favorable to the State, to decide if a rational juror could have concluded, beyond a reasonable doubt, that Tianna's fatal injury was the result of Appellant's willful conduct. *Gilson v. State*, 2000 OK CR 14, ¶ 77, 8 P.3d 883, 910. Whether or not Appellant was the *only* person who could have inflicted the fatal injury is not the decisive question. A conviction can be upheld where there are conflicts in the evidence, or where different inferences might be drawn therefrom. "[I]f there is competent evidence to support the verdict, we will not interfere on appeal." *Id.*

Appellant never admitted any intentional physical act of the intensity necessary to cause Tianna's fatal injury. The State's case depended on inferences from the nature of the injury, the surrounding circumstances, and Appellant's various statements on the subject. It was not disputed that the direct cause of Tianna's death began with a skull fracture – a "complex" skull fracture that, the experts said, took considerable force to create. It was not disputed that Tianna was in Appellant's care for much, if not most, of the day she was brought to the hospital. No one recognized anything unusual in Tianna's appearance or actions until Appellant brought her out of a bedroom, exclaiming that something was wrong with the child. Tianna's pediatrician noticed nothing unusual when he examined her a few days before. According to the State's experts, it was highly unlikely that Tianna could have sustained such a serious injury many hours, much less days, before she arrived, unconscious, at the hospital on the evening of May 17.[5] In addition to the skull fracture, Tianna exhibited several external

---

[5] One of the State's experts, Dr. Block, concluded: "Based on the fact that the baby was essentially

injuries which were suspicious, especially when considered together. None of these injuries were noted by Dr. Exon, the child's pediatrician, on May 13 or 14. While none of these other injuries contributed to Tianna's death, they were nonetheless relevant because they tended to suggest that Tianna's skull fracture was not a purely accidental injury.

The State focused on the changes in Appellant's story over time. In reference to Tianna's bruises, Appellant suggested that Tianna's pediatrician had seen them and was not concerned about them. Dr. Exon, however, denied this. In fact, when Exon was shown a photograph of Tianna's external injuries and asked if he would have noticed such injuries during an office visit, Exon's response was, "I would probably call an ambulance." As for the abraded skin on Tianna's buttocks, Appellant claimed it was caused by a loofah sponge he had used when bathing the infant. Early on, when talking to Detective Yerton, Appellant claimed that Tianna had fallen on various occasions in recent days – from a chair on May 17, and from a couch and a bed some time before that. He recalled accidentally dropping the infant. Later, after it became clear that the death was caused by considerable blunt-force trauma, Appellant related an entirely new incident, where Tianna's mother may have slammed the baby's head against a granite counter-top. Appellant said he had not previously divulged this information because he wanted to save himself and Matthews, but said he was now willing to testify about this event.

---

dead on arrival to the hospital, there is no chance that she would have in any way been lucid or normal for any time prior to that. The reason for that being the immediacy of brain swelling and neuronal nerve cell damage at the point of the injury."

Finally, the substance and tone of Appellant's statements to Joel Broadway, just hours after Tianna was brought to the hospital, were curious. At the time, Tianna was still clinging to life. In that conversation, Appellant seemed more concerned about raising bail money than about the welfare of his daughter. He told Broadway that he and Matthews were charged with injuring a minor child. He asked Broadway to pray that Tianna gets better because if she died, the charges against him would be upgraded to the "big thing." He expressed hope that everything will be okay with his daughter, because then "everything will be okay with us [himself and Matthews]." He said that "if [Tianna] does okay," then his and Matthews's prospects in court would be much "lighter."

While none of Appellant's statements contained an outright confession, they were still relevant to show what is often described as "consciousness of guilt." Evidence tending to show consciousness of guilt – sometimes labeled "statements against interest" or "admission by conduct" – includes any statements or conduct by the accused which are so unusual under the circumstances that the fact-finder may reasonably infer they were not the statements or conduct of an innocent person. The conduct may even be a crime related to the central charge, such as threatening a witness or destroying evidence.[6] Unlike an outright confession, the incriminating tendency of this type of evidence is often revealed only when the evidence is placed in the larger context. Examples include the accused's flight from the crime scene or attempt to

---

[6] *See e.g. Powell v. State*, 2000 OK CR 5, ¶ 66, 995 P.2d 510, 527 (intimidating witness to change testimony); *Paxton v. State*, 1993 OK CR 59, ¶ 12, 867 P.2d 1309, 1317 (attempting to destroy evidence); *Gideon v. State*, 1986 OK CR 112, ¶ 10, 721 P.2d 1336, 1338 (threatening witness).

kill himself, from which one might infer a desire to avoid punishment.[7] All of these examples are merely specific applications of a fundamental and incontestable principle: that the finder of fact may consider all of the circumstances surrounding a defendant's words and deeds to determine if it is reasonable that an innocent person would have uttered or performed them. *See e.g. Webster v. State*, 2011 OK CR 14, ¶ 63, 252 P.3d 259, 277 (defendant's repeated denials of ever being near the crime scene, despite evidence to the contrary, and his general "demeanor and discomfort" during police interview were "probative of his involvement and consciousness of guilt").[8]

The jury is the exclusive finder of fact; it decides what weight and credibility to give to conflicting evidence, and we accept all reasonable inferences which tend to support its verdict. *Day v. State*, 2013 OK CR 8, ¶ 13, 303 P.3d 291, 298. Viewed in a light most favorable to the State, the evidence supported a conclusion that Tianna's injuries were recent and not accidental in origin, that her fatal head injury was probably of very recent origin, that Appellant had the greatest and last opportunity to inflict that injury, and that Appellant's demeanor and inconsistent explanations for the injuries tended to show consciousness of guilt. Considering

---

[7] *See Levering v. State*, 2013 OK CR 19, ¶ 18, 315 P.3d 392, 397 (after the crime, defendant retreated to a bathroom and stabbed himself in the chest); *Dodd v. State*, 2004 OK CR 31, ¶¶ 35-37, 100 P.3d 1017, 1031-32 (defendant attempted to kill himself, in a manner similar to the way the murder victims were killed); *Honeycutt v. State*, 1988 OK CR 76, ¶ 19, 754 P.2d 557, 561 (defendant jumped bail); *Almerigi v. State*, 17 Okl.Cr. 458, 464, 188 P. 1094, 1096 (1920) (defendant altered his physical appearance).

[8] *See also Dunkle v. State*, 2006 OK CR 29, ¶ 48, 139 P.3d 228, 245 (defendant's statement to new boyfriend, in phone call from jail, saying she would not do anything "stupid" again, was admissible on the issue of whether she killed her old boyfriend); *Romano v. State*, 1995 OK CR 74, ¶¶ 7-8, 909 P.2d 92, 107 (detective's observation of defendant's body language and facial expressions during conversation were relevant even if they were not strictly "adoptive admissions").

all of this evidence together, we believe a rational trier of fact could conclude, without any reasonable doubt, that Appellant intentionally used physical force which fractured Tianna's skull, and which ultimately caused her death. *Id.* Proposition I is denied.

In Proposition II, Appellant contends that the trial court erred in redacting portions of his video interview with Tulsa County Detective Jeremy Yerton, as well as portions of telephone conversations he had with family members while he was in the Tulsa County Jail.   Appellant objected to these redactions at trial, preserving this claim for full appellate review.  We review a trial court's admission or exclusion of evidence for an abuse of discretion.  *Underwood v. State*, 2011 OK CR 12, ¶ 45, 252 P.3d 221, 242.

Yerton asked Appellant if he would be willing to take a polygraph test to support his denials of wrongdoing, and Appellant said he would.  The subject of polygraphs is mentioned a few other times; at one point Yerton asked if Appellant could swear before God that he didn't harm Tianna, as "God is the ultimate lie detector."[9]  The trial court granted the State's request to redact these comments. Appellant concedes that the results of polygraph tests are not admissible in court, *see Fulton v. State*, 1975 OK CR 200, ¶ 4, 541 P.2d 871, 872, but contends that if the police propose polygraph tests as an "interrogation technique," then it is only fair to let the jury hear the defendant's willingness to accept the challenge. Similarly, he claims that his willingness to declare his innocence before God, the "ultimate lie detector," was relevant to show the "absolute moral certainty" of his

---

[9] The State claims that Appellant agreed to redaction of the religious references.  The record is not entirely clear on this point.

11

position.

Appellant characterizes these unsworn denials as "exculpatory evidence," and claims that removing them from the jury's consideration denied him the right to present a complete defense. In our justice system, the accused is not required to present *any* evidence; but if he does, he must play by the same rules as the State, unless those rules are arbitrarily slanted against him. *See Holmes v. South Carolina,* 547 U.S. 319, 326-27, 126 S.Ct. 1727, 1732-33, 164 L.Ed.2d 503 (2006); *Pavatt v. State,* 2007 OK CR 19, ¶¶ 50-51, 159 P.3d 272, 288-89.

Throughout his lengthy conversation with Detective Yerton, Appellant consistently denied harming his daughter.[10] In our law, at least with regard to statements made out of court, a criminal defendant's denial of culpability simply does not carry the same probative weight as his admission of culpability.[11] That

---

[10] Appellant's reliance on *Crane v. Kentucky,* 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986), and *Crawford v. State,* 1992 OK CR 62, 840 P.2d 627, is misplaced. In each case, a defendant's *denial* of culpability was found to be relevant, but only as part of a larger question concerning the reliability of his subsequent *admission* of culpability. The Supreme Court in *Crane* held that the "physical circumstances that yielded the confession" were essential to the theory of defense, and the defendant was entitled to have his jury hear about them. *Crane,* 476 U.S. at 691, 106 S.Ct. at 2147. The circumstances that bore on the credibility of the defendant's confession in *Crane* included: "that [the defendant] had been detained in a windowless room for a protracted period of time, that he had been surrounded by as many as six police officers during the interrogation, that he had repeatedly requested and been denied permission to telephone his mother, and that he had been badgered into making a false confession." *Id.,* 476 U.S. at 685, 106 S.Ct. at 2143-44. In fact, in *Crane,* the defendant's initial denial of culpability is hardly mentioned in the opinion; it was just one of many circumstances he wished to present, to challenge the credibility of his ultimate confession. *See also Crawford,* 1992 OK CR 62 at ¶ 17, 840 P.2d at 633 ("Exculpatory statements which are made in the same conversation or on the same occasion as a confession or damaging admission are admissible to explain the circumstances of the confession"; citing *Crane*).

[11] This is consistent with other portions of the Evidence Code which permit otherwise inadmissible information for limited purposes. *See* 12 O.S.2011, § 2801(B)(1)(b) (a witness's prior unsworn statement is not inadmissible hearsay, if offered to rebut an express or implied charge of recent fabrication, improper influence, or improper motive); 12 O.S.2011, § 2613 and *Lewis v. State,* 1998 OK CR 24, ¶ 31, 970 P.2d 1158, 1169 (a witness's prior extrajudicial statement, inconsistent with his testimony, may be admissible, not for its own truth, but to cast doubt on the truth of his present testimony). Appellant never admitted culpability, so there was no "confession" for him to explain; the repetition of his denials, standing alone, had no probative value. As we discuss below regarding

the unsworn denial is made with apparent confidence does not make it any more "reliable" under our law.[12]   *See Folks v. State*, 2008 OK CR 29, ¶ 16, 207 P.3d 379, 383 (defendant's offer to take a polygraph test was properly excluded as self-serving).   Even after it was redacted, the video of Appellant's interview with Detective Yerton still included numerous denials of guilt, some of them emotional. Removing references to God and polygraphs did not paint an unfair or incomplete picture of the conversation.   The trial court did not abuse its discretion in redacting the video interview.

Appellant also faults the trial court for redacting portions of two telephone conversations he had with his mother and grandmother.   The redacted portions consist chiefly of Appellant's grandmother offering him, as the trial court described it, "words of encouragement and words of prayer" as he remained in custody; Appellant hardly speaks during these parts of the conversation.   The portions played for the jury focused on Appellant's responses to information relayed to him about the autopsy findings.   While the edited portions of these calls clearly show that Appellant's family was loving and supportive, we find nothing in them that would assist the jury in its task.   Appellant's complaint seems to be that the redactions removed some emotional denials of culpability (*e.g.*, "I don't know why they are trying to make it out that we wanted to hurt our baby").   But the portions of the calls that the jury *did* hear contain similar

---

Appellant's phone conversations and the "rule of completeness," a trial court is not required to admit parts of a record which simply do not clarify or explain other parts of the same record.

[12]   In contrast, witnesses are required to declare "by oath or affirmation" that they will testify truthfully.   The declaration may be in any form "calculated to awaken the witness's conscience" to the gravity of this duty.   12 O.S.2011, § 2603.   Testimony thus made is not believable *per se*, but it is treated differently – not because lying is a sin, but because perjury is a crime.

denials, as well as exhortations of encouragement and faith.

Appellant invokes the "rule of completeness" to justify playing these telephone conversations in their entirety. The rule of completeness, *see* 12 O.S.2011, § 2107, states that when one party introduces part of a record, the adverse party may require the introduction of any other part of the same record which, in fairness, should be considered contemporaneously with it. Yet in this case, Appellant's denials of culpability were adequately portrayed by the portions of the phone conversations which were played. The redacted portions were at best cumulative, and would not have materially added to, altered, or clarified the jury's understanding of the portions that were admitted.[13] The trial court did not abuse its discretion here. Proposition II is denied.

In Proposition IV, Appellant claims that the admission of evidence concerning "Shaken Baby Syndrome" was irrelevant and denied him a fair trial. The State began the presentation of its case with an instructional video on Shaken Baby Syndrome – a constellation of physical effects which may suggest that an infant has been subjected to violent (intentional) shaking. Defense counsel's objection to this video, on relevancy grounds, was overruled. The video itself was not marked as an exhibit, and is not included in the appeal record.

It is not clear why the State felt it necessary to maintain Shaken Baby Syndrome as a theme in this case. The Syndrome has been considered helpful in

---

[13] Appellant claims the redacted phone conversations unfairly portrayed him as a "selfish person" who was "not really grieving over his daughter" and whose denials of culpability were, therefore, unworthy of belief. But if any of Appellant's phone conversations tended to show consciousness of guilt, it was not those with his mother and grandmother, but a conversation he had with Joel Broadway (State's Exhibit 62), which was played in its entirety. *See* Proposition I.

suggesting possible causes for infant injury when no external cause or specific head trauma is apparent.  For example, if an infant exhibits unexplained brain swelling, retinal bleeding, and/or rib fractures, the medical literature supporting Shaken Baby Syndrome suggests these injuries may have been caused by rapid and forceful shaking of the child, causing a whiplash effect on the head.  However, in this case, initial suspicion that Tianna had a fractured rib and dislocated shoulder were quickly dispelled.  The retinal hemorrhaging detected by one of the first doctors to examine Tianna was not detected in the autopsy.  Most important, diagnostic imaging revealed the unmistakable cause of Tianna's brain swelling: her skull had been severely fractured.  The State's own experts generally shied away from the "Syndrome" label.[14]  The Medical Examiner described the cause of death as "recent blunt force closed head injury which resulted in a skull fracture and intra-cranial bleeding."  In other words, shaking – no matter how violent – was not sufficient by itself to have caused Tianna's fatal skull fracture, nor was shaking a necessary component of that injury.  The State's experts found no evidence of trauma to the child's neck or spinal cord, which would have been consistent with violent shaking.  None of Tianna's other injuries were indicative of violent shaking.  Discussion of Shaken Baby Syndrome simply was not helpful in explaining any of Tianna's injuries.

---

[14]  Referring to "Shaken Baby Syndrome," Dr. Passmore told the jury, "I don't use that terminology." The Medical Examiner, Dr. Pfeifer, said, "I do not and have not ever used 'shaken baby syndrome' in a complete autopsy report that I've done."  Dr. Block felt that the label was still useful, but Block himself helped draft a new policy on the issue for the American Academy of Pediatrics, which now recommends that pediatricians use the term "abusive head trauma" in their diagnoses, rather than a term, such as "shaken baby syndrome," implying a single mechanism for injury.  See "Abusive Head Trauma in Infants and Children," http://pediatrics.aappublications.org/content/123/5/1409 .abstract.

Nevertheless, we do not believe that discussion of the Syndrome had an unfairly prejudicial effect here. The Syndrome does not suggest any degree of malevolence on the part of the perpetrator. Its only purpose is to collect a variety of symptoms without clear external causes, and suggest that they are not likely to have resulted accidentally. Tianna exhibited a number of injuries, besides the fatal skull fracture, which (especially when considered together) were not likely to have been the result of typical accidents. Discussion of Shaken Baby Syndrome was superfluous at best, and may have been something of a distraction in this trial, but we do not believe it had an effect on the jury's verdict. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); *Webster*, 2011 OK CR 14, ¶ 74, 252 P.3d at 280. Proposition IV is denied.

In Proposition V, Appellant claims that the trial court abused its discretion by instructing the jury to exercise caution when considering the testimony of the defense expert, Dr. Plunkett. The court gave an instruction based on OUJI-CR (2nd) No. 9-20, explaining that a witness's prior statements, which are inconsistent with his testimony, may be used to evaluate his credibility. We review a trial court's instructions to the jury for an abuse of discretion. *Ball v. State*, 2007 OK CR 42, ¶ 25, 173 P.3d 81, 88. Appellant did not object to the instruction at the time, so we review only for plain error – *i.e.*, an obvious deviation from a legal rule that, while not objected to, affected his substantial rights and resulted in a miscarriage of justice. *Hogan v. State*, 2006 OK CR 19, ¶ 38, 139 P.3d 907, 923.

Appellant claims the record does not show whether the State asked for this

instruction, or indeed, what specific "inconsistency" it was intended to address. Dr. Plunkett's direct examination and cross-examination were both extensive. He spent considerable time trying to dismantle the assumptions and conclusions of the State's experts, and the prosecutor spent considerable time attacking his credibility. Appellant contends that OUJI-CR (2nd) No. 9-20 is only appropriate if the witness's prior statement is materially inconsistent with some aspect of his current testimony. While conceding that the prosecutor "embarrassed" Plunkett by bringing up some of his past errors, Appellant claims those errors were not particularly relevant to the issues in this case. We disagree.

Dr. Plunkett was called as a witness to critique the State's experts' opinions on the likely causes of Tianna's injuries. He had the same kind of training and experience as some of the State's experts. He fully understood "Shaken Baby Syndrome" and related diagnoses, but over the years, his own opinions began to depart from the conventional wisdom on the subject. The value in Plunkett's testimony – his transition from true believer to outlier – was also a vice. The prosecutor had a right to test the credibility of Plunkett's opinions in this case by pointing out that he had different opinions, on the same issues, in the past. *See Smicklas v. Spitz*, 1992 OK 145, ¶ 17, 846 P.2d 362, 369 (expert's opinion testimony in a prior case was admissible to challenge his inconsistent opinion in the present case). Plunkett was given plenty of opportunity to explain the evolution of his opinions. *See* 12 O.S.2011, § 2613(B) (extrinsic evidence of a witness's prior inconsistent statement is not admissible unless he is allowed to explain or deny same, and the opposing party is allowed to question him about

it). And while the jurors were properly informed of the possible inconsistencies, they were plainly cautioned not to use them as direct evidence of guilt or innocence.[15] We find no plain error here. Proposition V is denied.

In Proposition VI, Appellant claims the trial court erred in admitting his statements to Angela Varcoe, an investigator with the Oklahoma Department of Human Services. Varcoe visited Appellant in the county jail a few days after Tianna's death, and testified at trial about what Appellant told her regarding Tianna's injuries. Appellant claims Varcoe's testimony should have been excluded because the interview was not preceded by warnings on his right to silence, consistent with *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Appellant did not object to Varcoe's testimony at the time it was offered, so we review this claim only for plain error. *Hogan*, 2006 OK CR 19, ¶ 38, 139 P.3d at 923.

*Miranda* requires that before police may interrogate a suspect in their custody, they should ensure he understands his right to remain silent and to consult with an attorney before answering. Appellant claims Varcoe was an agent of the State, no less than a police detective. He points out that by law, the Department of Human Services is required to investigate allegations of child

---

[15] Instruction 9-20 – which, according to the Committee Comments, "should be given on the court's own motion in every instance of impeachment" – reads in relevant part:

> Evidence has been presented that on some prior occasion the witness made a statement inconsistent with his testimony in this case. This evidence is called impeachment evidence and it is offered to show that the witness's testimony is not believable or truthful. If you find that a statement was made, you may consider this impeachment evidence in determining what weight and credit to give the testimony of that witness. You may not consider this impeachment evidence as proof of innocence or guilt. You may consider this impeachment evidence only to the extent that you determine it affects the believability of the witness, if at all.

abuse and report the findings to the district attorney.  *See* 10 O.S.2011, § 7106.

We agree that under the circumstances, Varcoe, tasked with investigating Tianna's death on behalf of a state agency, was sufficiently connected to law enforcement that she should have reminded Appellant of his *Miranda* rights before questioning him in a custodial setting.  *See Blanton v. State*, 2007 OK CR 37, ¶¶ 6-16, 172 P.3d 207, 210-11 (defendant's custodial interview with DHS investigator, regarding child sexual abuse allegedly committed by him, should have been preceded by *Miranda* warnings).  In fact, Varcoe testified that she was called into this investigation by a police detective.  Because Appellant did not raise and develop this issue below, we cannot be sure that Varcoe did *not* properly advise him of his right to silence, and that the parties simply neglected to ask her about it at trial.  But assuming that she did not, we nevertheless find no plain error.[16]  Appellant's statements to Varcoe, concerning the events leading up to Tianna's death, were fairly consistent with what he had told Detective Yerton a few days before.[17]  Furthermore, Varcoe related some observations in Appellant's

---

[16] Because we find no plain error, we also need not consider whether Detective Yerton's *Miranda* warnings, a few days before, were sufficient to render Appellant's statements to Varcoe voluntary. *See generally Mitchell v. Gibson*, 262 F.3d 1036, 1057-58 (10th Cir. 2001) (the mere passage of time does not compromise a *Miranda* warning).

[17] According to Varcoe, Appellant said that Tianna had been a bit fussy and was not sleeping well, and that she fell out of a folding chair at Joel Broadway's house.  He said he awoke from a nap to Tianna shrieking; a short time later, she made a gurgling sound and went limp, and Appellant shook her "a little bit" to try to revive her.

Appellant claims he was harmed by Varcoe's testimony because she characterized him (based on what he told her) as Tianna's primary caretaker on the day in question.  It was beyond dispute that others, notably Tianna's mother, were present in Joel Broadway's home that day, giving them some opportunity to have caused the fatal injury.  But Appellant consistently told authorities and others that he was the one taking care of Tianna for most of the day.  Defense counsel successfully clarified this issue on cross-examination; the exact percentage of time Appellant and Mathews each spent caring for the child that day was a collateral matter.  Appellant also claims Varcoe's testimony

favor.  On cross-examination, Varcoe admitted that her interview was difficult because Appellant was very emotional about the loss of his infant daughter. Varcoe's testimony was not plain error, because there was no reasonable likelihood that it affected the verdict.  *Barnard v. State*, 2012 OK CR 15, ¶ 14, 290 P.3d 759, 764 (discussing similarities between harmless error and plain error). Proposition VI is denied.

In Proposition VII, Appellant claims his trial counsel performed so deficiently as to have effectively denied him his Sixth Amendment right to reasonably effective counsel.  Appellant must overcome the presumption that counsel performed competently.  Great deference is given to strategic decisions which appear reasonable at the time they were made.  Besides deficient performance, Appellant must also demonstrate prejudice from counsel's conduct. Prejudice is shown when counsel's actions undermine confidence in the outcome of the proceeding.  Failure to show either deficient performance or resulting prejudice is fatal to a claim of ineffective counsel.  *See Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).

Appellant complains that trial counsel failed to make timely objections to the trial court's instructions (see Proposition V) or to the admission of his statements to Investigator Varcoe (see Proposition VI).  We reviewed those claims for plain error, and found no reasonable probability that Appellant was unfairly prejudiced by the instruction and testimony discussed in those propositions.

---

was harmful because the prosecutor asked her about several things Appellant did *not* tell her.  In other words, the prosecutor used Varcoe to show that Appellant's explanations for the child's injuries changed over time.  But that, too, was evident from a comparison of the rest of the evidence; the prosecution used the same tactic when questioning Broadway.

Absent prejudice, Appellant's related ineffective-counsel claims also fail. *Jones v. State*, 2006 OK CR 5, ¶ 98, 128 P.3d 521, 550 (where any error was harmless, counsel's failure to object at trial does not satisfy the prejudice prong of *Strickland* inquiry).

Appellant's last ineffective-counsel claim is related to his claim of prosecutor misconduct in Proposition III, where he contends the prosecutor went beyond acceptable limits in final closing argument by suggesting inferences not based on the evidence, and by using an infant doll as a demonstrative aid to inflame the passions of the jury. The transcript suggests that the prosecutor was using something to illustrate her argument, although it is not clear what. Appellant claims trial counsel was ineffective for not objecting to this conduct and not making a better record on what was transpiring. In conjunction with that claim, Appellant filed an Application for Evidentiary Hearing, pursuant to Rule 3.11(B)(3)(b) of this Court's rules. We remanded the case to the District Court of Tulsa County for an evidentiary hearing to determine (1) whether a demonstrative aid was used in closing argument, and (2) if so, in what manner. The hearing was held October 2, 2015; the district court submitted Findings of Fact, and the parties filed supplemental briefs at this Court's invitation.

The evidentiary hearing confirmed that in final closing argument, the prosecutor employed a doll, resembling an infant, with a stuffed-cloth body and a plastic head and extremities. The witnesses at the evidentiary hearing had varying recollections of exactly what the prosecutor did to the doll, and varying

interpretations of how just dramatic those demonstrations were.[18]   But what is clear from the witnesses' descriptions is that the prosecutor did just what the trial transcript suggests: that she simulated various acts of physical abuse, including slapping the doll, biting the doll, kicking the doll across the floor and/or against the wall, and hitting the doll's head against a table:

> [The prosecutor:]   Here's what the biggest unanswered question is. What exactly did he do to her?   And it's really hard to think of that. And if you think about those prior injuries to her – let me go back just a minute.   You know when you think about the prior injuries to her buttocks... .   How hard do you have to hit her?   In what position is he hitting her?   Is he hitting her like this?   Is he pulling her legs up and hitting her like this?   ...   When you think about the injuries to her back, what exactly did he do to her?   How did, exactly, he cause those injuries?
>
> When you look at these injuries, was he grabbing her like this (*indicating*)?   Was he grabbing her like this (*indicating*)?   Are those finger marks where he was grabbing her?   That's one of the big unanswered questions.
>
> When we think about the prior injuries to her, as much as I would like to be able to tell you exactly what he did to [] her and exactly how he did it to her, we can't because he's the only person who knows. He hasn't said.   But we don't have to prove to you exactly what he did and how he did it.

(Tr. 1449-1450)

> But what happened in that bedroom?   What happened when he took her into that bedroom and he wanted to take a nap and she would not let him sleep?   *At what point in time did she go unconscious? What was the last thing she saw before her world went dark?* ...
>
> So did he bite her before he shook her?   Did he bite her after he shook her?   How did he bite her?   Was he holding her like this and biting her (*indicating*)?   Was he trying to get her to be quiet on his chest and she wouldn't so he bit her?   *I don't know.*   ...

---

[18]   Of the ten witnesses called at the hearing, almost half were the attorneys involved in the trial (both prosecutors and both defense lawyers).   The court reporter who transcribed the trial testified, as did one of the jurors.   The rest were various persons associated with either Appellant or the State.

> What exactly did he do to her to kill her (*indicating*)?  Did he do that?
> Was he down on the floor trying to sleep with her and she wouldn't
> shut up and he sat up and did this and hit her (*indicating*)?  Did he
> shake her and hit her (indicating)?  Did he shake her and punch her
> (*indicating*)?  Was she on the floor and he kicked her (*indicating*)?  I
> *don't know.*
>
> How long did she suffer in that room before he took her out to get
> help?  ...  *I hope that she immediately went unconscious.  I hope that
> she didn't suffer.*
>
> *And I wish I could tell you exactly what happened... .*

(Tr. 1451-52) (emphasis added)

Appellant complains that many of these speculations were not fair

inferences from the evidence.  The prosecutor suggested that Appellant kicked,

bit, and shook Tianna.  As noted, Tianna exhibited a number of injuries which

were not part of the mechanism of death, including various bruises and an oval

trauma pattern on her shoulder.  The Medical Examiner testified that these latter

marks had the appearance of bite marks, but he did not definitively label them as

such.  The defense expert, Dr. Plunkett, was not certain that these injuries were

bite marks.  No other evidence about the cause of these marks was presented.

Although the specific cause of a bruise may be impossible to pin down, there was

no testimony suggesting the bruises on Tianna's body were the result of anyone

kicking her.  Furthermore, by all accounts (including the Medical Examiner's),

these external injures were believed to have been older than the skull fracture.  At

times the prosecutor's closing argument focused on the age of these non-fatal

injuries, to support the alternative theory that Appellant willfully permitted child

abuse murder – *i.e.*, to show he must have been aware that *someone* was abusing

Tianna in the days before her fatal head injury.[19]   However, when the prosecutor began demonstrating with the doll (as shown in the passages excerpted above), she combined the injuries into a dramatic series of possible "re-enactments."

Counsel are generally afforded wide latitude in their arguments to a jury, and may make reasonable inferences from the evidence that has been presented. *Nobles v. State*, 1983 OK CR 112, ¶ 12, 668 P.2d 1139, 1142.   But blatant appeals to emotion are strongly disfavored, and can result in reversible error.   *See Pryor v. State*, 2011 OK CR 18, ¶ 5, 254 P.3d 721, 722-23; *Mitchell v. State*, 2006 OK CR 20, ¶ 101, 136 P.3d 671, 710.   A prosecutor's dramatic use of even properly-admitted evidence, at any time during the trial, can overstep the bounds of propriety and fair play.   For example, in *Brewer v. State*, 1982 OK CR 128, 650 P.2d 54, during the cross-examination of a defense witness, the prosecutor repeatedly stabbed a crime-scene photo of the victim with the murder weapon. We condemned this as "outrageous behavior" designed "purely for its unfair prejudicial impact on the jury."   *Id.*, 1982 OK CR 128, ¶ 5, 650 P.2d at 57.   It was one of several incidents that, considered cumulatively, warranted a new trial.   *Id.*, 1982 OK CR 128, ¶ 10, 650 P.2d at 58.[20]

---

[19] *E.g.*: "And remember that all of the doctors including Dr. Plunkett said that this injury is old. This injury had been there before the 17th. ... So forget about how it looked for a minute.  How did this baby feel?  How did this baby try to let those around her know how hurt she was?  And if you are a parent responsible for a baby and your baby looks like that, you do not just get to say, well, I don't know, I didn't take her onesie off.  You do not get to just blame it on the mother of your child and expect to walk away without any consequence whatsoever, because it's more than that."  (Tr. 1438-39)  "And if your baby has injuries that extensive and that deep, you don't just get to say, I didn't know.  You have a duty and obligation as a parent ... to get your baby out of that situation, to get your baby help, to keep your baby from being murdered."

[20] *See also Stiles v. State*, 1992 OK CR 23, ¶ 23, 829 P.2d 984, 990 (prosecutor's display, during trial, of victim's blood-soaked clothing, which had a noticeable and offensive odor, was of questionable propriety and could not be condoned, but did not rise to the level of reversible error);

Closing arguments should not be overly graphic or theatrical in nature, even when they are ostensibly based on the evidence.  In *Jones v. State*, 2006 OK CR 5, 128 P.3d 521, the defendant was tried for fatally shooting someone in the head.  We held that the *manner* in which the prosecutor, in closing argument, illustrated the homicidal act – by pointing his finger at a juror's head – "cannot be condoned," although we found the error was not so prejudicial as to require any relief in that particular case.[21]  *Id.*, 2006 OK CR 5, ¶¶ 74-75, 128 P.3d at 544-45.  In *Alverson v. State*, 1999 OK CR 21, 983 P.2d 498, the victim was killed with a baseball bat, which was admitted into evidence.   In closing argument, the prosecutor swung the bat and struck it against the floor several times.  We found this display to be "theatrical and graphic," although no relief was warranted under the circumstances.  *Id.*, 1999 OK CR 21, ¶ 41, 983 P.2d at 513.   And in *Ellis v. State*, 1992 OK CR 45, 867 P.2d 1289, the prosecutor, in the guilt-stage closing argument of a capital trial, aimed the murder weapon at the floor and "dry-fired" it.  We concluded that while the demonstration was "overly graphic," it did not warrant relief under the particular facts presented.  *Id.*, 1992 OK CR 45, ¶ 12, 867 P.2d at 1297.

During trial, witnesses may use demonstrative aids to illustrate a point, so

---

*Ford v. State*, 1986 OK CR 70, ¶¶ 8-10, 719 P.2d 457, 459-60 (prosecutor's dramatic display of homicide weapon during cross-examination of defendant warranted modification of sentence).

[21]   Jones was convicted of capital murder for walking up to a vehicle which was parked in a residential driveway in the middle of the day, sticking a gun through the driver's side window, and shooting the driver in the head to get his keys – all in front of the victim's sister and his two young daughters, whom Jones threatened to harm as well.  Jones also had a history of violent crimes. *Jones*, 2006 OK CR 5, ¶¶ 2, 95, 102, 128 P.3d at 531, 549, 550.  We found the prosecutor's demonstration did not contribute to the jury's recommendation of the death sentence in these circumstances.

long as the objects do not mislead or confuse the jury. An eyewitness may testify that a pellet pistol is roughly the same size and shape as the firearm used in the crime. *Owens v. State*, 1987 OK CR 264, ¶ 4, 747 P.2d 959, 960–61. A victim of sexual abuse may demonstrate the criminal act with the aid of anatomically-correct dolls. *Bartell v. State*, 1994 OK CR 59, ¶¶ 24-31, 881 P.2d 92, 100-01. A prosecutor's use of the same demonstrative aids, in closing argument, may also be proper, if reasonably confined to the evidence presented and the issues to be decided. *See e.g. Sanchez v. State*, 2009 OK CR 31, ¶ 74, 223 P.3d 980, 1005.[22] However, we have cautioned against the use of demonstrative aids that have not been admitted into evidence. *Cheatham v. State*, 1995 OK CR 32, ¶ 31, 900 P.2d 414, 424. A prosecutor's use of such objects can blur the distinction between real evidence and editorial gloss. Conflating evidence with argument in this manner can result in error. *See Bell v. State*, 2007 OK CR 43, ¶ 13, 172 P.3d 622, 627.[23]

"Re-enactments" of a crime can have powerful effects. "By conveying a visual image of what allegedly occurred, one side can imprint on the jury's mind

---

[22] In *Sanchez*, a trial for capital murder, we found no error in the prosecutor's use of an object admitted into evidence (shoe laces which the defendant had used to bind his victim), and an object not so admitted (a letter opener), because both were relevant to whether the defendant deserved the death penalty – specifically, whether he posed a "continuing threat to society" which, by definition, requires the jury to speculate about future probabilities. The prosecutor's point – that the evidence showed the defendant was quite capable of using ordinary objects to harm others – was entirely legitimate in that context.

[23] In *Bell*, the prosecutor used crime-scene photos in a slide presentation during opening statement. The defendant waived any objection to the use of the photographs, which were ultimately admitted into evidence anyway. But the *captions* that the prosecutor had affixed to the photos for purposes of the slide show were a different matter. The editorial nature of the captions confused evidence with argument, and contributed to the Court's decision to modify the sentence imposed. 2007 OK CR 43, ¶ 13, 172 P.3d at 627.

its version of the facts." *United States v. Wanoskia*, 800 F.2d 235, 238 (10th Cir. 1986); *see also United States v. Gaskell*, 985 F.2d 1056 (11th Cir. 1993).[24] This Court has been reluctant to admit crime-scene re-enactments "where they are posed with persons and things in various assumed situations, intended only to illustrate hypothetical situations." *Harris v. State*, 2000 OK CR 20, ¶ 10, 13 P.3d 489, 493. Introducing a demonstrative aid for the first time in closing argument is dangerous, as it can encourage speculation on matters not supported by the evidence, using objects that have never been sponsored by any witness. Using such props for "re-enactment" – to graphically imagine ways in which the crime *might* have been committed – is especially dangerous. Rather than serving to summarize and illustrate the testimony, using props in this fashion may simply beg for an emotional response while bearing no resemblance to actual events. That may have happened here.

It is not unreasonable to infer that all of Tianna's injuries were caused by the intentional infliction of physical force by an adult. Nor is it unreasonable to infer that Appellant may have inflicted all of them. The non-fatal injuries were relevant as tending to show either that Appellant willfully permitted Tianna's

---

[24] In *Gaskell*, the court concluded that a physician-witness's use of an infant doll, to demonstrate the forces at play when shaking a baby, was not sufficiently similar to the known facts, and that the probative value of the demonstration was substantially outweighed by unfair prejudicial effect:

> The sight of an adult male repeatedly shaking a representation of an infant with the degree of force necessary to manipulate the doll's head in the required fashion was likely to form a strong impression upon the jury. ... By displaying a greater degree of force than the level required to produce [injury] in a seven-month-old infant and by arbitrarily selecting a number of oscillations, the demonstration tended to implant a vision of [the defendant's] actions in the jurors' minds that was not supported by any factual basis... .

985 F.2d at 1061.

abuse by another, or the absence of accident in inflicting the injuries himself. However, we find no evidence that any of these other injuries contributed to Tianna's death, or that they occurred contemporaneously with the skull fracture. The age and cause of the non-fatal injuries appears to be uncertain, and the manner in which the prosecutor demonstrated speculative injury scenarios to the jury is disconcerting.

The State concedes there was no direct evidence that Tianna was "kicked" by anyone, but attempts to defend the prosecutor's tactics by pointing out that she "openly admitted she did not know" if Tianna was ever kicked. This response only bolsters our conclusion that the true goal of the presentation was dramatic effect – not discussion of the evidence. The myriad ways in which the prosecutor used a prop to physically imagine the death of the victim, with "We don't know" as a refrain, was simply not a fair interpretation of the evidence. *Cf. Pryor*, 2011 OK CR 18 at ¶¶ 7-8, 254 P.3d at 723-24 (finding it improper for prosecutor to repeatedly suggest that the case had been "manipulated," based only on defendant's alleged acquaintance with police chief and lead detective). We cannot condone theatrical demonstrations of speculative theories, which are calculated to encourage an emotional reaction from the jurors.[25]

---

[25] The State points out that in *Alverson* and *Ellis*, we found no reason to grant any relief despite the prosecutors' dramatic demonstrations. We did not, however, condone the prosecutors' actions. Whether such conduct warrants relief depends on the circumstances of the particular case. Alverson and his co-defendants murdered a convenience-store worker during a robbery. The victim was beaten some forty times with a baseball bat; the jury heard his screams – and the impact of the bat – on the store's surveillance tape. A piece of the handcuffs used to restrain him was found embedded in his skull. *Alverson*, 1999 OK CR 21, ¶¶ 50-51, 983 P.2d at 515. Alverson was sentenced to death. Evidence of his guilt was overwhelming. Indeed, we found it reasonable that defense counsel essentially conceded guilt and focused on trying to spare his client's life. *Id.* at ¶ 27, 983 P.2d at 510. The demonstration with the bat was during the guilt stage of Alverson's trial. *Id.* at ¶¶ 41-42, 983

Trial counsel's failure to object to the prosecutor's demonstration cannot, in our view, be deemed a reasonable strategy. *See Smith v. State*, 1982 OK CR 143, ¶¶ 21-26, 650 P.2d 904, 908 (finding, *sua sponte*, that trial counsel's error required relief). We believe that if defense counsel had objected to the prosecutor's use of the doll, there is a "reasonable probability" that the outcome of the sentencing portion of the trial would have been different. *See Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984) (applying that standard of review to ineffective-counsel claims). A "reasonable probability" is a probability sufficient to "undermine confidence in the outcome." *Id.* "The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Id.*

Ultimately, it is the trial court's responsibility to keep closing argument within proper bounds. *Pryor*, 2011 OK CR 18, ¶ 12, 254 P.3d at 726. It is the "rare case" where a prosecutor's conduct in closing argument is so unfairly prejudicial to the defendant that a new trial is warranted. *Pryor*, 2011 OK CR 18, ¶ 4, 254 P.3d at 722. In the case before us, we do not believe the prosecutor's theatrical presentation casts doubt on the jury's finding of guilt. However, we do find a reasonable probability that the presentation affected the jury's decision to

---

P.2d at 513-14. Given all these circumstances, the prosecutor's conduct in *Alverson* can safely be labeled harmless. Ellis was convicted of murdering three people and shooting at four others, in a crime spree which this Court called a "trail of horror." Ellis did not deny the acts; he raised a defense of insanity instead. The jury recommended the death sentence for all murder counts, and thousands of years for the attempts to kill. *Ellis*, 1992 OK CR 45, ¶¶ 1-6, 867 P.2d at 1293. As in *Alverson*, the conduct complained of took place in the guilt stage of a capital trial, where evidence of guilt was overwhelming, and the potential for outcome-determinative prejudice negligible. *Id.*, 1992 OK CR 45 at ¶¶ 12-14, 867 P.2d at 1297.

deny Appellant even the possibility of parole at some point in the future. Accordingly, we **REMAND** this case for a new sentencing proceeding.   22 O.S.2011, § 1066.

In Proposition VIII, Appellant claims the accumulation of errors in this case warrants a new trial.   Other than the prosecutor's use of a demonstrative aid in closing argument, we have identified no errors which, even when considered in the aggregate, warrant relief.   *Logsdon v. State*, 2010 OK CR 7, ¶ 42, 231 P.3d 1156, 1170.   Proposition VIII is denied.

## DECISION

The Judgment of the District Court of Tulsa County is **AFFIRMED**, but the case is **REMANDED** for re-sentencing.   Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch.18, App. (2016), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

AN APPEAL FROM THE DISTRICT COURT OF TULSA COUNTY
THE HONORABLE JAMES M. CAPUTO, DISTRICT JUDGE

**ATTORNEYS AT TRIAL**

JILL WEBB
MICHAEL MANNING
THE STREET LAW FIRM, P.L.L.C.
400 S. BOSTON AVE., STE 1100W
TULSA, OK 74103
COUNSEL FOR DEFENDANT

SARAH MCAMIS
BENJAMIN FU
ASSISTANT DISTRICT ATTORNEYS
TULSA COUNTY DISTRICT
    ATTORNEY'S OFFICE
500 S. DENVER, STE. 900
TULSA, OK 74103-3832
COUNSEL FOR STATE

**ATTORNEYS ON APPEAL**

WILLIAM H. LUKER
HOMICIDE DIRECT APPEALS
DIVISION
OKLAHOMA INDIGENT DEFENSE SYS.
P.O. BOX 926
NORMAN, OK 73070
COUNSEL FOR APPELLANT

E. SCOTT PRUITT
ATTORNEY GENERAL OF OKLAHOMA
THOMAS LEE TUCKER
ASSISTANT ATTORNEY GENERAL
313 NE 21ST STREET
OKLAHOMA CITY, OK 73105
COUNSEL FOR APPELLEE

**OPINION BY:  SMITH, P.J.**
LUMPKIN, V.P.J.:  CONCUR IN PART/DISSENT IN PART
JOHNSON, J.:       CONCUR
LEWIS, J.:         CONCUR IN RESULT
HUDSON, J.:        CONCUR IN PART/DISSENT IN PART

**HUDSON, J., CONCURS IN PART/DISSENTS IN PART**

I concur in the decision to affirm Appellant's First Degree Child Abuse Murder conviction. I must dissent, however, to the reversal of Appellant's sentence of life without parole and remand for resentencing based on purported ineffective assistance of trial counsel.

First, it is *noteworthy* that defense counsel did not object at trial to the prosecutor's use of the demonstrative aid during closing argument. Defense counsel testified at the Rule 3.11 hearing that she "[d]idn't object because I thought it was so over the top that [the prosecutor] would actually lose credibility with the jury . . . I thought she looked out of control." (E.H. Tr. 42). Defense counsel's failure to object was an overt, thought-out strategic decision if the prosecutor's conduct was as bad as Appellant now urges. Defense counsel's strategic decision is virtually unchallengeable on appeal and we cannot second-guess it. *Strickland v. Washington*, 466 U.S. 668, 687-88, 690-91, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *Sonnier v. State*, 2014 OK CR 13, ¶ 4, 334 P.3d 948, 950. Thus, there is no deficient performance by counsel.

Secondly, I also believe that Appellant fails to show *Strickland* prejudice, i.e., a reasonable probability of a different sentencing recommendation by the jury but for counsel's failure to object to the prosecutor's use of the demonstrative aid. Today's decision offers no rationale whatsoever for concluding that the prosecutor's purported error meant the difference between Appellant receiving a straight life sentence and a sentence of life without parole.

Moreover, it is particularly *noteworthy* that the trial judge did not intervene in the prosecutor's demonstration with the doll. As today's decision points out, it is the trial court's responsibility to keep closing argument within proper bounds. Opinion at 29 (citing *Pryor v. State*, 2011 OK CR 18, ¶ 12, 254 P.3d 721, 726). If the prosecutor's actions were so egregious, I have no doubt the experienced trial judge who presided over Appellant's trial would have intervened.

Also *noteworthy* is the lack of clarity in the record relating exactly *what* the prosecutor did with the doll. The trial court's findings of fact on remand show the testimony from courtroom participants and observers of the trial was all over the place concerning "[t]he extent of the theatrics, drama, emotion and passion" utilized by the prosecutor. 10/30/2015 *Specific Findings of Fact* at 7. The record simply does not allow us to conclude that the prosecutor's actions were so "over the top" that sentencing relief is warranted, let alone find *Strickland* prejudice based on defense counsel's failure to object. *See Stemple v. State*, 2000 OK CR 4, ¶ 47, 994 P.2d 61, 71 (prosecutor's demonstration with a baseball bat during closing argument does not warrant relief where the record does not reflect how the prosecutor was handling the bat during closing argument).

The trial court, in its findings of fact on remand, tells us that the Rule 3.11 testimony supports a finding that the prosecutor hit the doll's head on the table, slapped it with an open hand, punched it with a closed fist and kicked (or motioned as if to kick) the doll. 10/30/2015 *Specific Findings of Fact* at

6-7. The record also makes clear that the prosecutor repeatedly emphasized during her demonstration with the doll that she did not know exactly what Appellant did to the child victim in this case but merely used the doll to demonstrate and act out possible scenarios hypothesizing how the infant's injuries were sustained.

It is additionally *noteworthy* that the prosecutor's conduct falls within permissible ranges from previous rulings of this Court:

> [w]e have consistently held that the right of argument contemplates a liberal free speech and that the range of argument is wide. We have also held that both the counsel for the State and for the defense have the right to fully discuss, from their standpoint, the evidence and any inferences or deductions arising therefrom, and it is only when the State's argument is grossly improper and unwarranted upon some point which may affect the defendant's rights that reversal will be granted.

*Ellis v. State*, 1982 OK CR 167, ¶ 5, 652 P.2d 770, 771-72 (internal citations omitted).

The prosecutor's use of the demonstrative aid here falls well within the liberal freedom of speech afforded counsel for both parties during closing argument. To recapitulate: 1) defense counsel did not object to the prosecutor's argument; 2) the trial court did not intervene to stop the prosecutor's supposedly outrageous conduct; and 3) the record hardly shows the prosecutor engaged in grossly improper argument which deprived the defendant of a fundamentally fair sentencing proceeding. This Court should not be in the business of homogenizing or sanitizing the closing arguments of

3

trial prosecutors simply because we disagree with their style of arguments or believe that they inject too much dramatic effect for the jury's consideration.

Make no mistake: today's decision to reverse Appellant's sentence is a form-over-substance approach based on little more than the majority's micromanaging of the closing arguments of prosecutors. I believe we must resist the temptation to stifle permissible zealous advocacy by siphoning the life out of closing arguments as though we are programming—or, in this instance, reprogramming—robots. That is particularly so considering the safeguards employed in the criminal trial process. Appellant's jury—like virtually every jury hearing a criminal case—was instructed at the beginning of the trial that "[n]o statement or argument of any attorney is to be considered evidence." (Tr. II 420). *See* OUJI-CR 1-8A (Opening Instructions—Duty of Jurors). The written instructions provided too that "[a]rguments of counsel are not evidence in the case and if you believe the evidence introduced is different from counsel's recollection, your recollection controls." (O.R. 302).

"A jury is presumed to follow its instructions." *Weeks v. Angelone*, 528 U.S. 225, 234, 120 S. Ct. 727, 145 L. Ed. 2d 727 (2000). And the Supreme Court's own precedent recognizes that "arguments of counsel generally carry less weight with a jury than do instructions from the court." *Boyde v. California*, 494 U.S. 370, 384, 110 S. Ct. 1190, 108 L. Ed. 2d 316 (1990). The prosecutor's closing argument does not transcend these fundamental legal principles.

I am authorized to state that Judge Lumpkin joins in this writing.

4