## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| ADAM CLAYTON ZILM, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 20-CV-0509-CVE-JFJ |
| | ) | |
| SCOTT CROW, | ) | |
| | ) | |
| Respondent. | ) | |

## <u>RESPONSE TO PETITION FOR WRIT OF HABEAS CORPUS</u>

The Attorney General of the State of Oklahoma, Mike Hunter, appearing on behalf of the above-named Respondent, in response to the Petition for Writ of Habeas Corpus on file herein shows the court as follows:

1.      Petitioner, Adam Clayton Zilm, an inmate in the custody of the Lawton Correctional Facility, has filed with this Court a petition seeking federal habeas corpus relief pursuant to 28 U.S.C. § 2254 (Doc. 2).

2.      Petitioner is currently incarcerated pursuant to a judgment and sentence entered in the District Court of Tulsa County, Case No. CF-2012-3037, for Sexual Abuse of a Child under Twelve, in violation of OKLA. STAT. tit. 21, § 843.5 (2011) (Exhibit "1," Summary Opinion). Petitioner was sentenced to thirty-six years imprisonment (Exhibit 1 at 1[1]).

3.      Prior to trial, the State appealed to the Oklahoma Court of Criminal Appeals ("OCCA") a ruling by the trial court excluding hearsay statements of the victim under OKLA. STAT. tit. 21, § 2803.1 (Exhibit "2," Brief of the Appellant; Exhibit "3," Amended Response Brief of

---

[1] Except if otherwise noted, Respondent's citations refer to each document's original page numbering, as opposed to the CM/ECF header pagination.

Defendant/Appellee).  In Case Number S-2014-812, the OCCA affirmed the trial court's pretrial ruling on August 6, 2015 (Exhibit "4," Opinion).

4.     Following trial, Petitioner filed a direct appeal of his conviction and sentence, which were affirmed by the OCCA on September 6, 2018, in Case No. F-2017-69 (Exhibit 1 at 1; Exhibit "5," Brief of Appellant; Exhibit "6," Motion of the Appellant to Supplement the Record on Appeal and for Evidentiary Hearing on his Claim of Ineffective Assistance of Trial Counsel; Exhibit "7," Brief of Appellee; Exhibit "8," Reply Brief of Appellant).

5.     Petitioner petitioned the United States Supreme Court for certiorari review (Exhibit "9," Petition for Writ of Certiorari; Exhibit "10," Brief in Opposition to Petition for Writ of Certiorari).  On October 7, 2019, the United States Supreme Court denied certiorari review (Exhibit "11," Letter).

6.     Petitioner has not filed an application for state post-conviction relief (Exhibit "12," Docket Sheet for Tulsa County District Court Case No. CF-2012-3037).

7.     It appears that Petitioner has exhausted his state court remedies with respect to some of his grounds raised, but not as to at least one ground for relief.  Accordingly, below, where appropriate, Respondent asserts in each individual ground non-exhaustion and/or procedural bars.

8.     The petition is timely filed.

9.     The following transcripts are available: Pretrial and Motion Hearings on December 2, 2012, March 1, 2013, August 29, 2013, September 4, 2013, October 3, 2013, October 7, 2013, February 10, 2014, September 9, 2014, September 12, 2014, February 26, 2016, September 28, 2016, November 7, 2016, and November 9, 2016; First preliminary hearing held on September 26, 2012; Second preliminary hearing held on November 6, 2013; Transcript of Trial Proceedings (5

volumes) had on November 14, 2016-November 18, 2016; and Transcript of Sentencing Proceedings had on and January 20, 2017.  Complete copies of these transcripts—as well as the trial exhibits and original record—are being conventionally filed along with this Response. Relevant portions of the transcripts are attached to this Response as Exhibit "13."  Relevant portions of the original record are attached to this Response as Exhibit "14."

10.     Respondent is not aware of any proceedings that have been recorded but not transcribed.

11.     Petitioner claims he is entitled to a federal evidentiary hearing on "any issues which involve facts not apparent from the existing record and to any issues which involve facts disputed by the State" (Doc. 11 at 57).  This is not the standard, and Petitioner's argument for an evidentiary hearing is so inadequately developed as to be forfeited.  *See (John) Grant v. Trammell*, 727 F.3d 1006, 1025 (10th Cir. 2013).  In any event, applying the correct legal standards, Petitioner is clearly not entitled to an evidentiary hearing.  As to Petitioner's claims that are exhausted and not procedurally barred, this Court's review of Petitioner's habeas petition is limited to the record that was before the OCCA when it adjudicated his claims on the merits.  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).  Furthermore, as will be shown, Petitioner fails to show that the OCCA's adjudication of his claims resulted in unreasonable determinations of law or fact under 28 U.S.C. § 2254(d).  For these reasons, Petitioner is not entitled to an evidentiary hearing in federal court. *See id.* at 181-86; *Jones v. Warrior*, 805 F.3d 1213, 1222 (10th Cir. 2015); *Boyle v. McKune*, 544 F.3d 1132, 1135 (10th Cir. 2008).  As to Petitioner's claim that is procedurally barred, he is not entitled to an evidentiary hearing on barred claims.  *See Thacker v. Workman*, 678 F.3d 820, 836

(10th Cir. 2012) ("Because . . . Thacker's claim is procedurally barred, the district court did not err in failing to conduct an evidentiary hearing.").

## STATEMENT OF THE FACTS

The following facts are established by Petitioner's own account of the events in question.[2] In the early morning hours of June 4, 2012, Petitioner—a man of thirty years old—asked eleven-year-old K.A.[3] to give him a massage in his bedroom on his bed as he wore only his underwear (State's Trial Exhibit 1 at 5:35-6:16, 9:50-10:04, 10:50-11:03, 11:55-12:22, 42:50-43:04).[4]  After K.A. massaged Petitioner, Petitioner proceeded to massage K.A. using almond oil (State's Trial Exhibit 1 at 5:10-5:33, 6:16-6:47, 8:40-8:43).  The child was wearing only socks and a shirt pulled up over her head (State's Ex. 1 at 10:18-10:54).  K.A. was not wearing any panties (State's Trial Exhibit 1 at 27:10-27:19).  Petitioner first lathered K.A. with the almond oil, spreading it "from her lower back all the way to her calves" (State's Trial Exhibit 1 at 8:54).  As K.A. lay on her stomach, Petitioner used his hands to massage her lower back, her inner thighs, her glutes, which

---

[2] Petitioner was interviewed by Tulsa police at his parents' house on the day of the crime.  The interview was audio recorded and admitted as State's Exhibit 1 at trial (Exhibit 13, Tr. III 196-201).  Petitioner elected not to testify at trial (Exhibit 13, Tr. IV 58-61).

[3] K.A. was the daughter of Petitioner's fiancée, Kristina Alvarez, sometimes referred to as Kristina Shaneck (Exhibit 13, Tr. II 228).  Petitioner lived with K.A., her older sister, her younger sister, her younger brother, and their mother Ms. Alvarez in Tulsa, Oklahoma (Exhibit 13, Tr. II 219-20).  Petitioner was not the biological father of the children (Exhibit 13, Tr. II 220).  The children referred to him as "Big Daddy" (Exhibit 13, Tr. II 220).

[4] Ms. Alvarez was at work at the time (State's Trial Exhibit 1 at 14:55-15:02).  During the interview, Petitioner indicated he was not being sexually satisfied by Ms. Alvarez, stating that he gave "her shit all the time about it" (State's Trial Exhibit 1 at 28:45-29:33).  Petitioner also admitted that, the night before the massage, he stated in front of the children that he was "horny" because it "had been awhile" since he had been with his fiancée (State's Trial Exhibit 1 at 30:20-30:54).

he described as her "butt," and her tailbone (State's Trial Exhibit 1 at 6:47-8:29, 13:29-13:48, 15:50-15:56, 18:49-18:56).

Petitioner also massaged "close to," and "around," K.A.'s labia (State's Trial Exhibit 1 at 13:07-13:19).  He "worked" the area of her labia for around five minutes (State's Trial Exhibit 1 at 14:00-14:13).  When asked during the interview if it was possible that he touched K.A.'s vagina, Petitioner said "not intentionally" (State's Trial Exhibit 1 at 15:20-15:28).  He also massaged "the cheeks of her butt," "inside the crack," and "close to" her anus (State's Trial Exhibit 1 at 18:40-18:49, 19:18-19:27).  In massaging this area, Petitioner was using "deep pressure" and for at least part of the time he was lying down next to the child on the bed with his front toward her backside (State's Trial Exhibit 1 at 19:30-19:39, 22:50-23:57).  When told K.A. said he put his penis in her "butt," Petitioner said, "Maybe she thought that my thumb was that" (State's Trial Exhibit 1 at 20:25-21:43).  When told K.A. was adamant it was his penis, he added, "I know what she's talking about, about my thumb, because as I was sifting I got too close and it hurt; she like moved and that's when she woke up and, oh, shit, are you okay?" (State's Trial Exhibit 1 at 21:43-22:11).[5]  Petitioner again blamed his "thumb" when asked why K.A. reported that he had also tried to put his penis in her vagina (State's Trial Exhibit 1 at 22:25-22:40).  Petitioner eventually admitted that he was certain his thumb had at one point slipped into K.A.'s anus (State's Trial Exhibit 1 at 48:20-49:10).

When police stated that they would like to get a DNA sample from him, the following exchange occurred:

---

[5] Notably, Petitioner had earlier denied that K.A. ever fell asleep (State's Trial Exhibit 1 at 17:20-17:28).  When asked to explain the discrepancy, Petitioner claimed that by "woke up" he just meant "responded" (State's Trial Exhibit 1 at 22:14-22:23).

| | |
|---|---|
| Petitioner: | Wow, I do remember something. |
| Officer: | What? |
| Petitioner: | And I know that I may have DNA on her.  I know it.  Holy shit. |
| Officer: | What do you remember? |
| Petitioner: | As I went down, as I laid down, I squished my balls, so I moved them with my hand.  And that's when I started working. |
| Officer: | So when you moved them you got like skin cells on your hand or do you have like semen on your hand, or like pre-cum or something? |
| Petitioner: | No, I have leakage. |
| Officer: | Leakage is urine or pre-cum or semen? |
| Petitioner: | It's, um, I guess it would be called pre-cum.  I've been having that. |
| Officer: | Yeah, it's like seminal fluid with sperm in it. |
| Petitioner: | Yeah.  Yeah. |
| Officer: | Okay. |
| Petitioner: | Yeah, that was like on my hand. |
| Officer: | Okay, so then you started working on her and it may have transferred there? |
| Petitioner: | After I wiped it off. |
| Officer: | You wiped it off on—? |
| Petitioner: | My leg. |
| Officer: | And, so, but you still may have had, I mean, you wiped it off, but there's some there and so as you're working that may be— |
| Petitioner: | I wouldn't even have known if it was on my hand really because I had oil on me.  I tried to get it all off, and holy shit. |
| Officer: | Anywhere else you may have touched her after you did that? |

6

Petitioner:     I worked the whole region.

(State's Trial Exhibit 1 at 50:27-52:30). [6]

Beyond Petitioner's own admissions, the trial revealed additional evidence against him. After the massage, K.A. ran from her house in the rain to the home of a neighbor, Katherine Sanford, and rang the doorbell (Exhibit 13, Tr. II 263-64, Tr. III 123-24).  Ms. Sanford opened the door to find K.A., soaking wet, crying, and shaking (Exhibit 13, Tr. III 125).  Ms. Sanford let K.A. into her house and asked what was wrong (Exhibit 13, Tr. III 125-27).  K.A., who continued to cry and shake, said in a trembling voice that "Big Daddy . . . had touched her" and tried to put his penis "in her butt" (Exhibit 13, Tr. III 127, 133).[7]  Ms. Sanford's roommate called the police (Exhibit 13, Tr. III 135).

K.A. was taken that same morning to a hospital where she was examined by Nurse Kathy Bell, a Sexual Assault Nurse Examiner ("SANE") (Exhibit 13, Tr. III 142, 146, 157-58).  K.A. told Nurse Bell that Petitioner was giving her a massage and "put his penis into her butt hole" (Exhibit 13, Tr. III 159-60).[8]  Nurse Bell found an area of redness on K.A.'s anus that was sensitive to touch (Exhibit 13, Tr. III 162).  K.A. repeatedly complained of tenderness in that area (Exhibit 13, Tr. III 162-63).  Nurse Bell found the physical examination consistent with the account K.A. provided (Exhibit 13, Tr. III 166).

---

[6] Petitioner's DNA was not found in swabs taken from K.A.'s body during her sexual assault examination (Exhibit 13, Tr. III 163-165; Exhibit 13, Tr. IV 48-51).

[7] These statements of K.A. came in through Ms. Sanford at trial pursuant to Oklahoma's excited utterance exception to the hearsay rule (Exhibit 13, Tr. III 129).

[8] These statements of K.A. came in through Nurse Bell at trial pursuant to Oklahoma's medical treatment exception to the hearsay rule (Exhibit 13, Tr. III 159-60).

Well before the time of trial, K.A. recanted her allegation that Petitioner had penetrated her anus with his penis (Exhibit 13, 9/9/2014 Tr. 121-22).[9]  However, even at trial, she testified that Petitioner massaged her buttocks in the early morning hours of June 4, 2012, while they were alone in his bed and Ms. Alvarez was at work (Exhibit 13, Tr. II 236, 240-41).[10]  K.A. testified that she first gave Petitioner a massage; he was wearing only boxers (Exhibit 13, Tr. II 240-47).  K.A. moved Petitioner's boxers and massaged his "butt" with oil (Exhibit 13, Tr. II 246-47).  Petitioner then gave her a massage (Exhibit 13, Tr. II 248).  She took off her shirt and pants, leaving on only her panties (Exhibit 13, Tr. II 248).  K.A. laid on Petitioner's bed on her stomach while he massaged her back and glutes with oil (Exhibit 13, Tr. II 248-50).  K.A. testified that, due to the "slippery" oil, Petitioner's "thumb accidentally jabbed [her]" while he was massaging her glutes (Exhibit 13, Tr. II 250).  She claimed that she was asleep at the time, having a nightmare about molestation she experienced at the hands of a relative when she was five years old, and was initially confused about what was happening (Exhibit 13, Tr. III 28-30).

Additional facts will be presented below as they become relevant.

---

[9] To say K.A. was a hostile witness at trial would be an understatement.  She testified she did not want to be there, and she was obviously trying to save Petitioner from conviction (Exhibit 13, Tr. II 217-18).  She repeatedly testified she did not remember what she said in her prior testimony (Exhibit 13, Tr. II 230-32, 237-38, 242, 246-47, 249, 251, 253, 255, 259-60, 261-62, 263-64, 268, 270-71).

[10] Petitioner's allegation that, "to this day, K.A. is adamant that Zilm did nothing inappropriate" is unsupported by any evidence, and in any event, any such evidence would be barred by *Pinholster*, 563 U.S. at 181.  More importantly, as shown above, Petitioner himself admitted in his recorded police interview that he massaged the area of eleven-year-old K.A.'s labia and buttocks for multiple minutes with a mixture of oil and his pre-ejaculate (State's Trial Exhibit 1 at 13:07-13:19, 50:27-52:30).  This was not only grossly inappropriate, it was criminal, and the perspective of a *child* that it was not "inappropriate"—especially a child who the record suggests was pressured by her family and Petitioner's family to recant the allegation of penetration, as discussed more below—is irrelevant.

## **STANDARD OF REVIEW**

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant habeas relief with respect to a claim adjudicated on the merits by a state court only if the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The threshold question for this Court on habeas review is whether Petitioner seeks to apply a rule of law that was "clearly established" by the Supreme Court at the time his conviction became final. *See House v. Hatch*, 527 F.3d 1010, 1018 (10th Cir. 2008). "[C]learly established law consists of Supreme Court holdings in cases where the facts are at least closely-related or similar to the case *sub judice*." *Id.* at 1016. Where there is no clearly established federal law, that ends this Court's inquiry under § 2254(d)(1). *See id.* at 1018.

If a clearly established rule of federal law is implicated, however, then this Court must decide whether the state court's decision was contrary to, or an unreasonable application of, that clearly established rule of federal law. *See id.* A state court decision is contrary to clearly established federal law as determined by the Supreme Court when it applies a rule that contradicts the governing law set forth in the Supreme Court's cases or decides a case differently than the Supreme Court has on materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000); *Mitchell v. Gibson*, 262 F.3d 1036, 1045 (10th Cir. 2001).

A state court decision involves an unreasonable application of clearly established Federal law as determined by the Supreme Court of the United States when the state court correctly identifies the governing legal principle but applies it to the facts of the particular case in an unreasonable manner. *Valdez v. Bravo*, 373 F.3d 1093, 1096 (10th Cir. 2004); *Gilbert v. Mullin*, 302 F.3d 1166, 1171 (10th Cir. 2002). The Supreme Court has explained as follows regarding the "unreasonable application" clause:

> In § 2254(d)(1), Congress specifically used the word "unreasonable," and not a term like "erroneous" or "incorrect." Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Williams*, 529 U.S. at 411.

The Supreme Court has further held that "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). As the Tenth Circuit has explained, the fairminded jurist test is a way of measuring reasonableness:

> The Court's "fairminded jurists" test . . . serves as a proxy for "unreasonable application." It is designed to help federal courts reviewing § 2254 habeas motions to determine whether a state court decision that would be incorrect under de novo review is also unreasonable. Under the test, if all fairminded jurists would agree the state court decision was incorrect, then it was unreasonable and the habeas corpus writ should be granted. If, however, some fairminded jurists could possibly agree with the state court decision, then it was not unreasonable and the writ should be denied.

*Frost v. Pryor*, 749 F.3d 1212, 1225 (10th Cir. 2014). *Frost* further stated that federal courts

may issue the writ only when the petitioner shows there is *no possibility* fairminded jurists could disagree that the state court's decision conflicts with the Supreme Court's precedents.  Thus, even a strong case for relief does not mean that the state court's contrary conclusion was unreasonable.  If this standard is difficult to meet— and it is—that is because it was meant to be.  Indeed, AEDPA stops just short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings.  Accordingly, we will not lightly conclude that a State's criminal justice system has experienced the extreme malfunction for which federal habeas relief is the remedy.

*Id.* at 1223 (quotation marks and citations omitted, alterations adopted, emphasis in original).  This "fairminded jurists" standard applies to the determination of whether there exists clearly established federal law, as well as to the contrary to and unreasonable application clauses of § 2254(d)(1) and to § 2254(d)(2).  *See Dunn v. Madison*, 138 S. Ct. 9, 10 (2017) (*per curiam*); *Brumfield v. Cain*, 576 U.S. 305, 313-14 (2015); *White v. Woodall*, 572 U.S. 415, 427 (2014).

In addition, state court determinations of fact "shall be presumed correct" unless Petitioner rebuts the presumption by "clear and convincing evidence."  28 U.S.C. § 2254(e)(1).  Thus, a state court's decision cannot be said to be based on an unreasonable determination of the facts until a petitioner has shown by clear and convincing evidence that the state court's factual determination was incorrect.  *Black v. Workman*, 682 F.3d 880, 896-97 (10th Cir. 2012) (refusing to grant relief under § 2254(d)(2) because the petitioner had failed to present clear and convincing evidence to rebut a state court's factual finding); *but see Wood v. Allen*, 558 U.S. 290, 300-01 (2010) (declining to decide the relationship between § 2254(d)(2) and § 2254(e)(1)); *(John) Grant v. Trammell*, 727 F.3d 1006, 1024 n.6 (10th Cir. 2013) (same); *Taylor v. Maddox*, 366 F.3d 992, 999-1000 (9th Cir. 2004) (holding that § 2254(d)(2) applies to challenges based solely on the state court record whereas § 2254(e)(1) applies when the petitioner relies upon new evidence).

Finally, this Court generally may not grant relief on a claim for federal habeas relief unless "the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). "A claim has been exhausted when it has been 'fairly presented' to the state court." *Bland v. Sirmons*, 459 F.3d 999, 1011 (10th Cir. 2006) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)). "Fair presentation requires more than presenting all the facts necessary to support the federal claim to the state court or articulating a somewhat similar state-law claim." *Id.* (internal quotation marks omitted). While "[t]he petitioner need not cite book and verse on the federal constitution," he must have "raised the substance of the federal claim in state court." *Id.* (internal quotation marks omitted).

"Generally, a federal court should dismiss unexhausted claims without prejudice so that the petitioner can pursue available state-court remedies." *Id.* at 1012. However, if "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred the claims are considered exhausted and procedurally defaulted for purposes of federal habeas relief." *Cannon v. Gibson*, 259 F.3d 1253, 1265 (10th Cir. 2001) (quotation marks omitted). This results in an "anticipatory procedural bar," where "the federal courts apply [a] procedural bar to an unexhausted claim that would be procedurally barred under state law if the petitioner returned to state court to exhaust it." *Anderson v. Sirmons*, 476 F.3d 1131, 1140 n. 7 (10th Cir. 2007) (quotation marks omitted). An anticipatory procedural bar can be overcome only by establishing cause and prejudice or a fundamental miscarriage of justice. *See Cummings v. Sirmons*, 506 F.3d 1211, 1223 (10th Cir. 2007).

12

## ARGUMENT AND AUTHORITY

### GROUND ONE[11]

**GROUND ONE FAILS FOR LACK OF CLEARLY ESTABLISHED SUPREME COURT LAW. ALTERNATIVELY, THE OCCA'S REJECTION OF PETITIONER'S *NAPUE*[12] CLAIM WAS NEITHER CONTRARY TO *NAPUE* NOR LEGALLY OR FACTUALLY UNREASONABLE.**

In his first ground for relief, Petitioner contends that the State violated his due process rights under *Napue v. Illinois*, 360 U.S. 264 (1959), when four agents of the State allegedly coerced false testimony from K.A. and presented same at trial (Doc. 2 at 6; Doc. 11 at 26-34).  However, the circumstances of Petitioner's claim do not actually fall within *Napue*, such that no clearly established Supreme Court law supports his claim.  Alternatively, the OCCA's rejection of Petitioner's claim was neither contrary to *Napue* nor legally or factually unreasonable.  Habeas relief must be denied.

A.     **Background**

The State charged Petitioner with Sexual Abuse of a Child under Twelve, in violation of OKLA. STAT. tit. 21, § 843.5 (Exhibit 14, O.R. 28).  The Information alleged that Petitioner committed the crime "by willfully or maliciously touching and rubbing the buttocks of K.A., a female child under the age of 12" (Exhibit 14, O.R. 28; Exhibit 13, Tr. II 186).  To be clear, Petitioner was *not* charged with penetrating K.A., with either his penis or his finger; thus, Petitioner's persistent focus on K.A.'s original allegation of penetration, which she ultimately

---

[11] Petitioner's habeas petition refers to "grounds for relief," while his brief in support refers to "propositions."  Respondent uses "grounds," consistent with the habeas petition.

[12] *Napue v. Illinois*, 360 U.S. 264 (1959).

recanted, is a red herring (*see, e.g.*, Doc. 11 at 7-8 ("[T]he gist of the testimony by K.A. was that, during a massage that she had received from Zilm, he had placed his penis inside her anus. Naturally, such testimony clearly constituted a crime." (citation omitted)).

Petitioner's first preliminary hearing was held on September 26, 2012.  As to the June 4, 2012, massage, K.A. testified that Petitioner used oil and his hands to massage her "back and [her] glutes, which is [her] butt," and put "[h]is penis" in her "butt hole" (Exhibit 13, P.H. I 19-20, 25, 42, 44, 50, 62).  The special district judge found probable cause that the charged offense occurred and bound Petitioner over for trial (Exhibit 13, P.H. I 63).

On September 4, 2013, nearly a year after the first preliminary hearing, the defense moved the trial court to remand for a new preliminary hearing.  In relevant part, the motion alleged: (1) on July 24, 2013, K.A. gave a sworn statement to defense counsel, in the presence of only her grandmother, in which she claimed Petitioner had only "accidentally jabbed" her in the bottom with "his thumb" during the massage;[13] (2) defense counsel, upon recent review of the juvenile court file associated with K.A. and her siblings,[14] learned that an Oklahoma Department of Human Services ("DHS") worker, Lori Hannagan, knew of a recantation by K.A. in June 2012; and (3) in August 2013, the DHS worker then assigned to K.A.'s case, Lauren Hall, "told K.A. that no one believes her second statement [the recantation] and that everyone believes her first statement

---

[13] Importantly, in the statement, K.A. reaffirmed that Petitioner massaged her "butt" using his hands and oil and that she was undressed for the massage (Exhibit 14, O.R. 162, 164-65).

[14] Shortly after the crime, the State filed a deprived action with respect to K.A. and her siblings (Exhibit 14, O.R. 196).  The children were first placed in an emergency children's shelter and then, around late August 2012, with their maternal uncle (Exhibit 13, P.H. II 28-29).  In December 2012, the children were placed with their grandmother in preparation for a trial reunification with their mother (Exhibit 13, P.H. II 32).  Sometime thereafter, the children were returned to Ms. Alvarez for the trial reunification (Exhibit 13, P.H. II 43).

because there was DNA evidence to prove the first statement" (Exhibit 14, O.R. 99, 149-50, 154, 165-68, 302-04).

On October 7, 2013, the trial court ruled that the preliminary hearing was a nullity[15] and remanded for a new preliminary hearing on grounds that "individuals not employed by the District Attorney's Office, by misfeasance or malfeasance, exercised unreasonable influence on the minor child K.A. to secure testimony to which she had since recanted repeatedly" (Exhibit 13, 10/7/2013 Tr. 3; Exhibit 14, O.R. 338-40).  The trial court overruled the State's objection that the court's findings were "based upon the representations of defense counsel and without those individuals or that individual having the opportunity to be heard or represented or offer any type of her own testimony" (Exhibit 13, 10/7/2013 Tr. 6).

The second preliminary hearing was held on November 6, 2013.  Detective Mark Hodges of the Tulsa Police Department's Child Crisis Unit testified to his June 4, 2012, interview of Petitioner, summarized above in the Statement of the Facts (Exhibit 13, P.H. II 47-54).  The special district judge found that, based solely on Petitioner's statements, probable cause existed that Petitioner committed the crime charged (Exhibit 13, P.H. II 96-97).[16]

On September 9, 2014, the trial court held a reliability hearing pursuant to OKLA. STAT. tit. 12, § 2803.1(A) (Supp. 2013) (Exhibit 13, 9/9/2014 Tr. 9).[17]  Forensic interviewer Amy Howard

---

[15] The trial court later announced that it had erred in declaring the original preliminary hearing a "nullity" and ruled that, at trial, K.A. could be impeached by prior inconsistent statements given at the first preliminary hearing (Exhibit 13, 11/9/2016 Tr. 4-6).

[16] As will be discussed more below, DHS worker Ms. Hall also testified at the second preliminary hearing.

[17] Section 2803.1 provides for the admission of hearsay statements by a child under thirteen years old that describe "any act of sexual contact performed with or on the child."  OKLA. STAT. tit. 12, § 2803.1(A) (Supp. 2013).  Thus, § 2803.1 carves out a specific exception to the general hearsay

and neighbor Ms. Sanford testified to K.A.'s statements to them on the day of the crime (Exhibit 13, 9/9/2014 Tr. 11-26, 55-58, 65).   K.A. testified, on behalf of the defense, "[t]hat nothing happened" with Petitioner and that she had simply had a nightmare (Exhibit 13, 9/9/2014 Tr. 113, 121-23).[18]   The trial court—apparently concerned with the lack of "consistent repetition" (Okla. Stat. tit. 12, § 2803.1(A) (Supp. 2013)) of K.A.'s allegations in light of her recantation regarding penetration by Petitioner's penis—ruled that K.A.'s statements to Ms. Howard and Ms. Sanford were not admissible under § 2803.1 (Exhibit 13, 9/12/2014 Tr. 12-13, 17-18).   The trial court specifically noted, however, that the statements may be admissible under another exception to the hearsay rule (Exhibit 13, 9/12/2014 Tr. 17).

The State appealed the trial court's pretrial § 2803.1 ruling (Exhibit 13, 9/12/2014 Tr. 18-19).   Over a dissent, the OCCA affirmed, holding that the trial court did not abuse its discretion, particularly in light of K.A.'s testimony at the reliability hearing that was inconsistent with the proffered hearsay statements (Exhibit 4 at 3-7).

The case went to trial in November 2016.   At trial, as explained in the Statement of the Facts, K.A. testified that Petitioner had massaged her on the day in question and accidentally jabbed her anus with his thumb, but denied any penile penetration (Exhibit 13, Tr. II 236-50, Tr. III 28-30).   The prosecutor was permitted to impeach K.A. with her prior inconsistent statements

---

rule. *Folks v. State*, 207 P.3d 379, 382 (Okla. Crim. App. 2009).   "The provision requires an *in-camera* hearing for the trial court to determine that the time, content and totality of circumstances surrounding the taking of the statement provide sufficient indicia of reliability so as to render it inherently trustworthy." *Id.* "'In determining such trustworthiness, the court may consider, among other things, . . . the spontaneity and consistent repetition of the statement . . .'" *Id.* (quoting OKLA. STAT. tit. 12, § 2803.1(A)(1) (Supp. 2004)).

[18] By the time of the reliability hearing, K.A. was back in her mother's care (Exhibit 13, 9/9/2014 Tr. 124).

at the first preliminary hearing (Exhibit 13, Tr. II 230-88).   The trial court gave the jury a contemporaneous instruction that the impeachment evidence could be used only in determining what weight and credibility to give K.A.'s testimony and was not proof of guilt (Exhibit 13, Tr. II 235-36).   In addition, K.A. testified at length regarding alleged pressure she faced to take back her recantation that Petitioner had penetrated her with his penis.   In particular, K.A. testified that she had told neighbor Ms. Sanford only that she had had a nightmare about being molested during the massage (Exhibit 13, Tr. II 279); that Ms. Sanford and Ms. Sanford's roommate told her to say during the forensic interview that Petitioner "put his penis inside of [her] butt and tried [her] vagina" (Exhibit 13, Tr. II 280-81, Tr. III 38-39); that a DHS worker whose name she could not remember also told her "to tell somebody that he had done that stuff to [her]" (Exhibit 13, Tr. II 281-84); that she met with three other unnamed DHS workers just before the first preliminary hearing and they told her she would have to tell the "first story" if she wanted to be returned to her mother (Exhibit 13, Tr. III 35-36); and that, after her recantation, the prosecutor "told [her] to go back to the story [she] had said before" (Exhibit 13, Tr. II 284).

The jury was instructed that the State must prove beyond a reasonable doubt that Petitioner (1) "willfully or maliciously engaged in" (2) "sexual abuse" (3) "with or to a child under the age of twelve" (Exhibit 14, O.R. 694).   To prove "sexual abuse," the State was required to show that Petitioner "looked upon or touched or mauled or felt . . . the body or private parts . . . of a child . . . in a lewd and lascivious manner" (Exhibit 14, O.R. 694).[19]   "Lewd" was defined as "[o]bscene,

---

[19] Thus, contrary to Petitioner's focus on whether K.A. had a dream about past sexual abuse by a relative or he intentionally penetrated her with his penis (Doc. 11 at 28), the issue at trial was whether Petitioner touched K.A.'s buttocks in a lewd and lascivious manner, *a fact indisputably established by his police interview*.

lustful, indecent, lascivious, lecherous," and "lascivious" was defined as "[c]haracterized by or expressing lust or lewdness" (Exhibit 14, O.R. 695). The jury convicted Petitioner as charged (Exhibit 14, O.R. 674). The jury sentenced Petitioner to thirty-six years imprisonment and a five hundred dollar ($500.00) fine (Exhibit 14, O.R. 674).

On direct appeal, Petitioner raised his present *Napue* claim (Exhibit 5 at 23-30). The OCCA denied relief as follows:

Zilm complains on appeal that the State coerced and elicited from the child victim inculpatory testimony at the first preliminary hearing known to be false and, when she could not be pressured into denying the truth of her recantation, used the child victim's false preliminary hearing testimony to impeach her trial testimony. This, he asserts, violated the basic constitutional guarantee of fundamental fairness and due process under the Fourteenth Amendment.

If it is true that the State sponsored testimony at the preliminary hearing known to be false and then impeached the child victim's trial testimony with the false evidence at trial, this conduct would indeed violate Zilm's right to a fair trial. *See Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) (finding due process violation where state failed to correct known false testimony). *See also Giglio v. United States*, 405 U.S. 150, 153, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *Omalza v. State*, 1995 OK CR 80, ¶ 77, 911 P.2d 286, 307; *Hall v. State*, 1982 OK CR 141, ¶ 16, 650 P.2d 893, 896-97. The State has a duty to disclose false testimony which goes either to the merits of the case or the credibility of the witness. *Hall*, 1982 OK CR 141, ¶ 16, 650 P.2d at 897. The burden is on the defendant to show that (a) testimony was false or misleading, (b) the prosecution knowingly used it, and (c) its admission of false testimony was material to guilt or innocence. *Omalza*, 1995 OK CR 80, ¶ 77, 911 P.2d at 307.

The fact that a witness's testimony is impeached does not by itself establish the State knowingly used false testimony. *Id.*, 1995 OK CR 80, ¶ 78, 911 P.2d at 307. Mere inconsistencies or conflicts between witnesses' testimony will not support a claim that prosecutors used perjury to obtain a conviction. *Taylor v. State*, 1976 OK CR 255, ¶ 22, 555 P.2d 1073, 1078.

To obtain relief for the State's use of false evidence at trial it is a logical prerequisite that an appellant first show that the testimony complained of was actually false. Zilm fails to meet his burden of showing that the State knowingly used or failed to correct false evidence material to guilt or innocence in this prosecution. Zilm was not denied his due process right to a fair trial.

(Exhibit 1 at 2-4).

**B.     Petitioner's Claim Fails for Lack of Clearly Established Federal Law.**

A due process violation may result where the State obtains a conviction through evidence its representatives know to be false or "the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue*, 360 U.S. at 269; *see also United States v. Garcia*, 793 F.3d 1194, 1207 (10th Cir. 2015) ("[*Napue*] held that the Due Process Clause would be violated if the prosecutor knowingly failed to correct perjured testimony in its case, even when the evidence went only to the credibility of the witness."). "A *Napue* violation occurs when (1) a government witness committed perjury, (2) the prosecution knew the testimony to be false, and (3) the testimony was material." *Garcia*, 793 F.3d at 1207. Materiality is shown if there is "any reasonable likelihood" the false testimony "affected the judgment of the jury." *Napue*, 360 U.S. at 271; *see United States v. Bagley*, 473 U.S. 667, 678 (1985); *Giglio v. United States*, 405 U.S. 150, 154 (1972).

Importantly, however, numerous courts have held that *Napue* is not violated where conflicting versions of events are presented, including one that is claimed to be false, but the jury is well aware of the claimed falsehood and permitted to make credibility determinations and resolve the dispute. *See Woodall v. United States*, 842 A.2d 690, 698 (D.C. 2004) (rejecting *Napue* claim because "this is not a case where a presentation of known false evidence went uncorrected" (quotation marks omitted, alteration adopted)); *United States v. Geston*, 299 F.3d 1130, 1135 (9th Cir. 2002) (holding that where "conflicting versions of the incident [are] presented to the jury," the prosecutor may rely on the jury "to resolve the disputed testimony" and make credibility determinations, without violating *Napue*); *United States v. O'Keefe*, 128 F.3d 885, 896-97 (5th

19

Cir. 1997) (noting that the court has "found a violation of *Napue* in cases when . . . the government was aware that its witnesses committed perjury on the stand but such perjury was not disclosed to the jury," but finding here "that the falsehoods were sufficiently exposed before the jury to enable the jury to weigh those falsehoods in its deliberations"); *United States v. Grosz*, 76 F.3d 1318, 1327-28 (5th Cir. 1996) (rejecting *Napue* claim where defense had access to and made use of evidence that contradicted government witness's falsehood); *United States v. Adebayo*, 985 F.2d 1333, 1342 (7th Cir. 1993) (finding no *Napue* violation where defense had "leeway" to explore government witness's falsehood on cross-examination and took advantage of it, "mounting a vigorous and lengthy attack on the witness'[s] credibility"); *People v. Nash*, 222 N.E.2d 473, 477-78 (Ill. 1966) (concluding *Napue* was materially distinguishable where defense knew of false testimony and presented evidence to contradict it); *see also Bagley*, 473 U.S. at 709-10 (concern in *Napue* and related cases is the "corruption of the truth-seeking function of the trial process" (quoting *United States v. Agurs*, 427 U.S. 97, 104 (1976))).

Indeed, in *Long v. Pfister*, 874 F.3d 544, 546-50 (7th Cir. 2017) (*en banc*), *cert. denied*, 138 S. Ct. 1593 (2018), the *en banc* Seventh Circuit denied habeas relief on a petitioner's *Napue* claim on grounds of lack of clearly established federal law where the various accounts of a waffling witness were all admitted for consideration by the jury. In *Long*, a murder case, witness Brooklyn Irby identified Long as the gunman in a recorded police interview. *Long*, 874 P.3d at 546. Prior to Long's first trial, Ms. Irby recanted, telling "an investigator for the State's Attorney[] that police officers had coerced her to name Long as the shooter." *Id.* However, by the time of Long's second trial (Long obtained relief on appeal from his first trial based on prosecutorial error), Ms. Irby took the stand and "identified Long in court as the killer." *Id.* On cross, she denied having recanted

this account.  *Id.*  The defense called the State's Attorney investigator, "who testified that Irby had indeed told him that her identification had been coerced."  *Id.*  After Long was denied relief on direct appeal, he sought habeas relief.  *Id.*  The federal district court denied relief, but a panel of the Seventh Circuit reversed.  *Id.*  The panel reasoned that the prosecutor should have "immediately" and "spontaneously" corrected Ms. Irby's false testimony on cross that she had never recanted and violated *Napue* by failing to do so.  *Id.*

On *en banc* review, the Seventh Circuit found an "absence of any clearly established legal transgression."  *Id.* at 550.  Writing for the *en banc* court, Judge Easterbrook rejected Long's interpretation that "*Napue* and its successors . . . establish that the prosecutor must immediately correct any false testimony—and that it does not matter whether the defense already knows the truth, or whether the jury learns the truth before deliberating."  *Id.* at 547.  Rather, "[a]ll *Napue* itself holds is that perjury known to the prosecution must be corrected before the jury retires.  The Court did not say when or by whom."  *Id.* at 548.  The court observed that "[i]n *Napue* and its successors," *inter alia*, "false testimony was elicited," "the truth was unknown to the defense," and "the jury never learned the truth."  *Id.*  In Long's case, in contrast, defense counsel elicited the false testimony but knew the truth, and the jury was made aware that Ms. Irby lied when she testified she had never recanted.  *Id.*  Thus, Long's *Napue* claim involved "questions that have never been expressly decided by the Supreme Court: . . . Must the prosecutor correct false testimony when defense counsel already knows the truth? . . . Does the Constitution forbid a conviction obtained when all material evidence is presented to the jury before it deliberates?"  *Id.* at 548-49.  In sum, the court concluded, "[w]hen presented with the . . . open issues we have identified, the Supreme Court may resolve some or all of them in favor of a defendant in Long's

position.  But it has not done so to date, and § 2254(d)(1) accordingly prohibits a grant of collateral relief."  *Id.* at 550.

Here, too, Petitioner's *Napue* claim implicates questions not yet answered by the Supreme Court, and thus, his claim must fail for lack of clearly established Supreme Court law.  *See House*, 527 F.3d at 1018.  The only potentially false testimony introduced at trial was that Petitioner penetrated K.A.'s anus with his penis (Exhibit 13, Tr. III 133, 159-60).  However, even assuming this testimony was false, the falsehood was fully exposed, challenged, and explored, as summarized above (Exhibit 13, Tr. II 279-84, Tr. III 35-39).  Thus, the jury heard all the evidence about the recantation and the alleged pressure by the State on K.A. to withdraw her recantation.  As discussed in *Long*, no Supreme Court case considers whether *Napue* is violated where allegedly false testimony was fully exposed to the jury prior to its deliberation, and the Supreme Court has certainly not held that such circumstances violate *Napue* (Exhibit 13, Tr. II 231-32, 240-60, 283-85, Tr. III 27-37, Tr. IV 18-23).  *See Long*, 874 F.3d at 546.

Also unanswered by *Napue* is whether due process is violated where, as alleged by Petitioner, "[t]he false testimony . . . is . . . coerced testimony . . . at the original preliminary examination" (Doc. 11 at 33).  *See Schessler v. McDonald*, No. CV 11-9077, 2015 WL 10582201, at *15 (C.D. Cal. Nov. 2, 2015), *report and recommendation adopted*, No. CV-11-9077, 2016 WL 1328051 (C.D. Cal. Apr. 4, 2016) ("Petitioner also contends that Lapoint testified falsely, both at the preliminary hearing and at trial.  Petitioner's contention that Lapoint testified falsely at the preliminary hearing is not a basis for federal habeas relief, because there is no federal constitutional right to a preliminary hearing, and he is in custody as a result of his conviction after a trial." (citations omitted)); *cf. also Napue*, 360 U.S. at 269-71 (expressing repeated concern with the

22

effect of false testimony on the *jury*).  Again, Petitioner received a second preliminary hearing, and K.A.'s testimony from the first preliminary hearing was admitted only as impeachment evidence at trial (Exhibit 13, Tr. II 230-88).  Petitioner points to no clearly established federal law showing that such circumstances can give rise to a *Napue* violation.

Petitioner's claim is further unsupported by clearly established federal law because his focus is nearly entirely on whether state actors *coerced* certain testimony from K.A., not whether that testimony was *false* (*see, e.g.*, Doc. 11 at 34 ("each of these State actors[] overtly coerced and manipulated K.A. in this case to change her testimony in a way that implicated Zilm")).  To be clear, however, *Napue* is concerned with the knowing presentation of false evidence at trial, not behind-the-scenes coercion by state actors that results in false testimony at trial.  Indeed, the Tenth Circuit recently made this distinction, separately analyzing a habeas petitioner's *Napue* claim and his claim, based on the same conduct, that the State violated his due process rights by repeatedly informing his wife, a witness in his defense, that her children would not be returned to her if she supported him.  *See Whitely v. Farris*, 793 F. App'x 680, 701 (10th Cir. 2019) (unpublished),[20] *cert. denied*, *Whitely v. McCoy*, 141 S. Ct. 256 (2020) (noting, but declining to resolve, "whether clearly-established federal law provides that a defendant's due process rights are violated when government pressure results in false testimony").

For all these reasons, Petitioner's claim must be rejected at the outset for lack of clearly established federal law.

---

[20] All unpublished decisions are cited pursuant to Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

**C.    Alternatively, the OCCA's Rejection of this Claim was Not Contrary to *Napue* or Legally or Factually Unreasonable.**

Even assuming Petitioner's *Napue* claim does not fail for lack of clearly established Supreme Court law, he has not demonstrated that the OCCA's rejection of this claim was contrary to, or an unreasonable application of, *Napue*, or based on an unreasonable determination of fact. *See* 28 U.S.C. § 2254(d)(1)-(2).  Petitioner's counseled brief in support of his habeas petition offers little argument as to how the OCCA's rejection of this claim allegedly ran afoul of § 2254(d). After summarizing the facts supporting his claim at length, he states simply that

> [t]he OCCA dismissed all of this evidence in the record—the recantation under oath, the recordings of coercion, the findings by the magistrate of State coercion— on the basis that the testimony complained of (the initial false story of K.A.) was not shown to be false.  Zilm asserts that this holding is both contrary to and an unreasonable application of clearly established federal law and the undisputed facts.

(Doc. 11 at 34).  Petitioner has not satisfied either prong of § 2254(d).

For starters, even though the OCCA was not required to cite, or even be aware of, Supreme Court case law, *Richter*, 562 U.S. at 98; *Early v. Packer*, 537 U.S. 3, 8 (2002), it expressly recognized *Napue* and its holding that the State's use of false testimony at trial would violate a defendant's right to a fair trial (Exhibit 1 at 3).  Furthermore, the OCCA correctly recited the three-part test that federal courts have found to be clearly established by *Napue* (Exhibit 1 at 3).  *See Napue*, 360 U.S. at 269 ("a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction," and relief is warranted where there is a "reasonable likelihood [the false testimony] affected the judgment of the jury"); *Garcia*, 793 F.3d at 1207 ("A *Napue* violation occurs when (1) a government witness committed perjury, (2) the prosecution knew the testimony to be false, and (3) the testimony was material."); *Jenkins v. Artuz*, 294 F.3d 284, 292 (2d Cir.

2002) (discussing the clearly established principles from *Napue*, *Brady v. Maryland*, 373 U.S. 83, 87 (1963), and *Giglio*, 405 U.S. at 154, that the knowing use of false testimony that is material, *i.e.*, that in any reasonable likelihood could have affected the judgment of the jury, violates due process). Thus, the OCCA's opinion clearly was not contrary to clearly established Supreme Court law. *See Williams*, 529 U.S. at 405-06; *Mitchell*, 262 F.3d at 1045.

Nor was the OCCA's opinion legally or factually unreasonable. The OCCA determined that Petitioner failed to meet any of the three prongs of his *Napue* claim, as he failed to "show that "the testimony complained of was actually false," that "the State knowingly used or failed to correct" such false evidence, or that the false evidence was "material to guilt or innocence" (Exhibit 1 at 4). *See Garcia*, 793 F.3d at 1207 ("A *Napue* violation occurs when (1) a government witness committed perjury, (2) the prosecution knew the testimony to be false, and (3) the testimony was material."). A fairminded jurist could agree as to every prong.[21]

---

[21] Petitioner admits that the OCCA adjudicated his *Napue* claim on the merits (Doc. 11 at 26), and he concedes the OCCA expressly discussed the first prong of his *Napue* claim—whether the testimony was false (Doc. 11 at 34 ("The OCCA dismissed all of this evidence in the record . . . on the basis that the testimony complained of (the initial false story of K.A.) was not shown to be false."). Moreover, he makes no argument that the OCCA failed to adjudicate the other two prongs of his *Napue* claim, and thus, he has forfeited any such argument. *See Hancock v. Trammell*, 798 F.3d 1002, 1011 (10th Cir. 2015) (argument against merits adjudication forfeited); *see also (Donald) Grant v. Royal*, 886 F.3d 874, 932 n. 20 (10th Cir. 2018) (refusing the dissent's effort to *sua sponte* raise an argument that would result in stripping the OCCA's ruling of AEDPA deference, and finding the argument to be forfeited and waived); *Eizember v. Trammell*, 803 F.3d 1129, 1140 (10th Cir. 2015) (same); *but see Smith v. Sharp*, 935 F.3d 1064, 1076 n. 4 (10th Cir. 2019), *cert. denied*, 141 S. Ct. 186 (2020) (concluding, contrary to the aforementioned Tenth Circuit precedents, that a federal court can *sua sponte* raise an argument that a state court "plainly failed to reach" the prong of an intellectual disability claim). For preservation purposes, Respondent asserts that *Smith* is wrongly decided, as, *inter alia*, it is inconsistent with *Richter*'s presumption of a merits adjudication for a federal court to *sua sponte* find a state court failed to adjudicate a prong of a claim. *See Richter*, 562 U.S. at 99. In any event, *Smith* is distinguishable because here this Court does not even need to *presume* a merits adjudication—the OCCA expressly referenced all three prongs of Petitioner's *Napue* claim, finding he failed to show that "the

### 1.   *Petitioner Did Not Show Testimony was False*.

Based on the record before the OCCA, a fairminded jurist could agree with its conclusion that Petitioner failed to show that K.A.'s initial allegations against Petitioner were false (Exhibit 1 at 4). It bears repeating that, although Petitioner attempts to muddy the waters and imply that K.A. recanted her sexual abuse allegations against Petitioner in whole, as repeatedly discussed above, K.A. never recanted her allegation that Petitioner massaged her buttocks—the basis of the sexual abuse charge. The only recantation, and the only dispute, is as to whether Petitioner penetrated K.A.'s anus with his penis or accidentally jabbed her anus with his thumb. Petitioner points to a number of circumstances that he contends show the testimony that he penetrated K.A. with his penis was false. Put in context, these circumstances, either individually or cumulatively, fail to demonstrate that the testimony was false.

Petitioner largely focuses on arguing that the trial court found that juvenile case agent Lori Hannagan, forensic examiner Amy Howard, DHS case worker Lauren Hall, and prosecutor Sarah McAmis coerced false testimony from K.A. at the first preliminary hearing (Doc. 11 at 27, 29-32,

---

testimony complained of was actually false," that "the State knowingly used or failed to correct" such false evidence, or that the false evidence was "material to guilt or innocence" (Exhibit 1 at 4). Admittedly, in its Brief in Opposition before the Supreme Court, the State admitted that "the OCCA appeared to rest its holding on Petitioner's failure to show that the testimony at issue was false"; but, immediately thereafter, the State noted that "the OCCA also made reference to Petitioner's failure to show 'that the State knowingly used or failed to correct false evidence material to guilt or innocence in this prosecution'" (Exhibit 10 at 16 n. 17). The State then argued that certiorari review was unwarranted regardless of whether "the OCCA has already rejected the materiality element or would reject it on remand" (Exhibit 10 at 16 n. 17). At this juncture, habeas review—with its congressionally mandated, highly deferential standard of review—the OCCA's references to all three prongs of Petitioner's *Napue* claim, however brief, must be considered sufficient to show a merits adjudication. *See (Donald) Grant*, 886 F.3d at 905-06 ("On habeas review, we properly eschew the role of strict English teacher, finely dissecting every sentence of a state court's ruling to ensure all is in good order.").

26

34).  However, Petitioner misconstrues both the trial court's findings and the record.  What the trial court found, *based largely on unsupported allegations of trial counsel*, was that "individuals *not employed by the District Attorney's Office*, by misfeasance or malfeasance, exercised unreasonable influence on the minor child K.A. to secure testimony to which she had since recanted repeatedly" (Exhibit 13, 10/7/2013 Tr. 3; Exhibit 14, O.R. 338-40 (emphases added)).  Additionally, the trial court later corrected its statement that the first preliminary hearing was a "nullity" (Exhibit 13, 11/9/2016 Tr. 4-6).  Moreover, the trial court plainly found that any coercion did not happen at the hands of employees of the District Attorney's Office.  In any event, an examination of the record simply does not show that any of the complained-of individuals coerced *false* testimony from K.A. at the first preliminary hearing.

 *First*, as to juvenile case agent Ms. Hannagan, at the time of the motion to remand for a new preliminary hearing, the only allegation as to Ms. Hannagan was that she was aware of K.A.'s recantation because she referenced it in the juvenile file.  Ms. Hannagan simply noted, based on a conversation with the mother Ms. Alvarez and *through several layers of hearsay*, that K.A. had allegedly recanted her allegation of penetration during a phone conversation with Petitioner a few days after the crime (Exhibit 14, O.R. 302-03 ("On 6/7 NM Ms. Alvarez told worker K____ had called Mr. Zilm's mother and Mr. Zilm answered the phone so he talked with K____ at that time.  Since then NM said K____ told her 'she might have been mistaken Mr. Zilm might not have done anything.  She just got scared and thought about the time when she was 5 and something like this happened to her.'")).[22]  At the time of the motion to remand, there was no evidence or even

---

[22] Petitioner's suggestion that Ms. Hannagan had direct knowledge of K.A.'s recantation (Doc. 11 at 29), is inaccurate (Exhibit 14, O.R. 302-03).  If this phone conversation did indeed happen as reported, it begs the question why Petitioner did not tell his attorney about it (Exhibit 14, O.R. 302

allegation that Ms. Hannagan encouraged K.A. to abandon her recantation and testify consistent with her original allegation at the preliminary hearing.

*Second*, with regard to forensic examiner Ms. Howard, who interviewed K.A. the day of the crime, Petitioner's allegations make little sense. Petitioner's motion to remand for a new preliminary hearing did not even mention Ms. Howard (Exhibit 14, O.R. 301-11). K.A. did say in the July 2013 statement, taken by defense counsel and without the benefit of cross-examination, that "that Amy girl" told K.A. to say what she said in her original accusation of Petitioner and she could go back to her mother (Exhibit 14, O.R. 172-73). But at the time of the forensic interview K.A. had not even been removed from her mother's care, and she had not yet recanted anything (Exhibit 13, Tr. II 270).[23] Simply put, K.A.'s allegation that Ms. Howard pressured her to rescind a recantation she had not even made yet, on the promise of returning to the mother from whom she had not yet been separated, is nonsensical.

*Third*, as to DHS worker Ms. Hall, the recorded conversation between Ms. Hall and K.A. occurred on August 16, 2013, well *after* the first preliminary hearing in September 2012 (Exhibit 13, P.H. II Tr. 21-22). Furthermore, at the second preliminary hearing, Ms. Hall testified emphatically that, *prior to the first preliminary hearing*, she never told K.A. how she needed to testify, what she needed to say or not say, that "if she testified in a certain way certain things would happen," or that particular testimony would produce a certain outcome as to the juvenile deprived case or custody placement with her mother (Exhibit 13, P.H. II 19-20).

_____

("counsel only learned of this recantation from Kristi Alvarez on September 2, 2013, and upon viewing the juvenile court file on September 3, 2013")).

[23] The children remained with Ms. Alvarez for a few days before they were removed by DHS (Tr. II 270).

Ms. Hall also did not knowingly lie to K.A. about DNA evidence (Doc. 11 at 29).  Ms. Hall

testified that at the time she talked to K.A. in the recorded conversation—again, after the first

preliminary hearing—she honestly believed there was DNA evidence supporting K.A.'s original

claim of penile penetration, having misconstrued Nurse Bell's report stating that the results were

consistent with K.A.'s allegations to mean that DNA had been recovered (Exhibit 13, P.H. II Tr.

21-24).  Moreover, the context of Ms. Hall's conversation with K.A. was the upcoming juvenile

hearing concerning the termination of the children's placement with their grandmother due to the

court-prohibited contact that had occurred between K.A.'s grandmother, Ms. Alvarez, and K.A.

and Petitioner and his attorney (Exhibit 13, P.H. II Tr. 19-20, 22-24, 38).  This had nothing to do

with the criminal case.  Petitioner's suggestion that Ms. Hall pressured K.A. regarding how to

testify in his criminal case finds no support in the recording itself; what Ms. Hall said is this:

> We go to court on Monday.  There's a lot of concerns about your mom maybe
> having some conversations with Adam's attorney and Adam and you having a
> conversation, and your grandma did, and that was kind of a stipulation of you guys
> going home that no one spoke to him or the attorney and so it's very possible that
> the judge will put you back into custody on Monday, okay?  So I want you of course
> to be aware of that.  There's a lot of concerns about your recanting your story even
> though they had DNA evidence that supports your original story, and so everyone
> believes your original story and no one believes that it didn't happen.  And we're
> very concerned that now you're saying that it didn't happen, because we know it
> did.  And we don't want you to feel like you have to live your life saying it didn't
> happen, okay?  So that's our concerns, so we don't want kids put in that position,
> and parents and grandparents should *never* put children in that position, especially
> when they've been told not to, you know?

(Defendant's Trial Exhibit 1 at 0:47-2:10).

*Fourth*, as to the prosecutor, Ms. McAmis, at the time of the motion to remand, there was

no allegation, let alone evidence, that Ms. McAmis had coerced K.A. to testify falsely at the first

preliminary hearing.  Importantly, neither the trial court nor the OCCA has ever made a finding

that the prosecutor coerced testimony, false or otherwise, from K.A.  In fact, when K.A. claimed

for the first time, at the § 2803.1 reliability hearing, that the prosecutor had done so, Ms. McAmis

made the following record:

> I have never, nor would I ever meet with a child alone.  And specifically I have never met with this child alone at any time.
>
> That when I met with this child in advance of the preliminary hearing, both Heather Prater, who is the chief advocate for the District Attorney's office, and Travis Horton, who was, at the time, an Assistant District Attorney for the District Attorney's office and has subsequently left and gone into private practice, that both of those two individuals were with me at all times.  That I have a practice and procedure of never meeting with children alone, and always having persons there present.
>
> And so, as I have previously stated to the Court, and as I have endorsed in this case as witnesses both Mr. Horton and Ms. Prater, if Your Honor needs to, wants to, for the purposes of the record, hear from either Ms. Prater and/or Mr. Horton about the conversation and the statements that were or were not made during the course of that meeting, they are both available and willing to testify about those.
>
> THE COURT:  Can you represent to me as an officer of the court, that she did not make that statement to you?
>
> MS. McAMIS: 110 percent.  As I have previously stated to the Court, I recognize fully and completely that if I were ever in a situation where a child said to me, for whatever reason, recanted to me, then I have a continuing obligation, whether it is before preliminary hearing, after preliminary hearing, before jury trial, after jury trial, whatever, I have a continuing obligation, both as a prosecutor and as an attorney and as an officer of the court, I have an ethical, moral, legal, responsibility to report that information.
>
> If that had ever happened in this case, or in any other case, I would have reported that both to defense counsel and to the Court.
>
> I can absolutely without any question assure Your Honor that that was not, in any event, a conversation.  And, I would assure Your Honor that the preliminary hearing transcript demonstrates that at the time of the [first] preliminary hearing, she had not and did not recant.

(Exhibit 13, 9/9/2014 Tr. 135-37).  Based on all of the above, Petitioner has not shown anything improper on the part of these agents of the State, let alone that their alleged pressure on K.A. produced *false* testimony.

Petitioner also suggests that he has shown that K.A.'s initial allegations against him were false because she recanted to him over the phone and later under oath (Doc. 11 at 28, 30). However, K.A.'s initial allegation, made repeatedly on the same day as the sexual abuse, was that Petitioner had penetrated her anus with his penis (Exhibit 13, Tr. III 133, 159-60).  Moreover, courts generally view recantations with great suspicion.  *Allen v. Woodford*, 395 F.3d 979, 994 (9th Cir. 2005).  The mere fact of recantation does not show either that K.A.'s initial allegation was false or that her recantation is more likely to be true than her initial allegation.  *See Jones v. Taylor*, 763 F.3d 1242, 1248 (9th Cir. 2014) ("Recanting testimony is easy to find but difficult to confirm or refute: witnesses forget, witnesses disappear, witnesses with personal motives change their stories many times, before and after trial." (quotation marks omitted)).  The only argument Petitioner marshals in this regard is that K.A.'s initial allegations are less "likely because the DNA exam showed no sign that Zilm had sexual contact with K.A." (Doc. 11 at 28).  This is not an accurate description of the record.  Petitioner himself admitted he rubbed the area of K.A.'s labia and buttocks with his pre-ejaculate (State's Trial Exhibit 1 at 50:27-52:30).  Moreover, while Nurse Bell admitted on cross-examination that the redness she observed to K.A.'s anus *could* have been caused by a thumb slipping on massage oil, she testified on direct that the redness was *also* consistent with a penis penetrating K.A.'s anus (Exhibit 13, Tr. III 166, 171).  Indeed, the redness to K.A.'s anus was significant enough that she complained of tenderness on at least three different occasions during the examination (Exhibit 13, Tr. III 162-63).

In addition, the record provides ample evidence of a motive for K.A. to falsely recant her initial allegation, supporting an inference that her original allegation that Petitioner penetrated her anus with his penis was actually the truth.  K.A. was returned to the custody of her mother, Ms. Alvarez, who continued to associate with Petitioner, *after the first preliminary hearing* (Exhibit 13, Tr. II 237-38).[24]  The logical inference from the evidence is that Ms. Alvarez and Petitioner, and possibly their respective families, brought pressure on K.A. to recant her allegations against him so he could avoid prison and Ms. Alvarez could marry him.  K.A. testified that, after she was returned to her mother's custody, Ms. Alvarez moved the family around to Louisiana and later Arkansas (Exhibit 13, Tr. II 223).  While they lived in Arkansas, and while the trial was still pending, Petitioner (who was out on bond) would come to visit the family on weekends (Exhibit 13, Tr. II 228).[25]  Petitioner and Ms. Alvarez were still engaged and continued to plan their wedding (Exhibit 13, Tr. II 228-29).  Eventually, Ms. Alvarez and her children moved back to Oklahoma, and Ms. Alvarez started working in Petitioner's mother's tanning salon in Tulsa (Exhibit 13, Tr. II 229-30).  At the time of trial, Petitioner was still K.A.'s mother's fiancé, and

---

[24] As demonstrated in the above discussion of juvenile case agent Ms. Hannagan, there is no competent evidence of a recantation by K.A. until well after the first preliminary hearing.  The notation in Ms. Hannagan's file regarding a recantation shortly after the crime involved multiple levels of hearsay (Exhibit 14, O.R. 302-03).  And, again, if the phone conversation between Petitioner and K.A. really happened, then why did he not tell his attorney?  Finally, the "sworn statement" of K.A. was not taken by defense counsel until July 2013, months after the original preliminary hearing in September 2012.

[25] This, of course, was in violation of the ruling of the judge in the juvenile deprived action that Petitioner was not to have any access to the children (Exhibit 13, Tr. IV 30-31).  Before that judge, Ms. Alvarez had apparently offered sworn testimony that she would follow the court's order (Exhibit 13, Tr. IV 31).

they planned to marry after the trial was over (Exhibit 13, Tr. II 228-29).[26]  On the stand, K.A. described Petitioner as her best friend and as "my dad" (Exhibit 13, Tr. II 220, 287).  This evidence of the emotional and financial hold Petitioner and his family held over K.A.'s mother and her children explains why K.A. would recant her allegation against Petitioner to try to keep him out of prison.  *See Jones v. Taylor*, 763 F.3d 1242, 1249 (9th Cir. 2014) (recantations by a defendant's family members receive reduced "weight and reliability"); *McCray v. Vasbinder*, 499 F.3d 568, 573 (6th Cir. 2007) (family members might have a personal stake in a defendant's exoneration).  Indeed, Rose Turner, the State's expert on Child Abuse Accommodation Syndrome, testified to the powerful impact such factors—a mother's continuing relationship with a child's abuser, removal of the child from the mother's care, and financial dependency on the abuser—can play in a child's false recantation of abuse allegations (Exhibit 13, Tr. III 51-62, 64-68, 70-74).

In light of all the above circumstances, a fairminded jurist could agree Petitioner has not shown that it is more probable than not that K.A.'s original allegation was false.

## 2. *Petitioner Did Not Show Prosecutor Knew Testimony was False*

A fairminded jurist could also agree that Petitioner failed to show that the prosecutor *knew* that K.A.'s original allegation of penile penetration was false.  *See Garcia*, 793 F.3d at 1207.  There was nothing inherently unbelievable about the original allegation, it was corroborated by the SANE examination, and as already discussed, the mere fact of recantation alone did not make it false.  *See Jones*, 763 F.3d at 1248; *Allen*, 395 F.3d at 994.

---

[26] As she left the stand, K.A. requested to give Petitioner a hug, a request the trial court denied (Exhibit 13, Tr. II 290, Tr. III 37).  During closing, the prosecutor noted that K.A. was then led by the hand out of the courtroom by Petitioner's parents (Exhibit 13, Tr. V 12).

###### 3.      *Petitioner Did Not Show Testimony was Material*

Finally, a fairminded jurist could agree Petitioner's *Napue* claim suffers a lack of materiality.  The only potentially false testimony introduced at trial was that Petitioner penetrated K.A.'s anus with his penis (Exhibit 13, Tr. III 133, 159-60).  However, such was not the sexual abuse with which Petitioner was charged or of which he was convicted.  As demonstrated above, Petitioner was charged with, and the jury was instructed on, sexual abuse of a child by touching or feeling K.A.'s buttocks in a lewd and lascivious manner (Exhibit 14, O.R. 28, 694).  Penetration, or the use of Petitioner's penis, was not an element of the crime.  Further, as shown above, Petitioner's guilt of touching or feeling K.A.'s buttocks in a lewd and lascivious manner was overwhelmingly established by his own statements during the police interview and the non-recanted portions of K.A.'s testimony (State's Trial Exhibit 1 at 6:47-8:29, 13:07-13:19, 13:29-13:48, 14:00-14:13, 15:50-15:56, 18:49-18:56, 50:27-52:30; Tr. II 236, 240-41, 248-50).  While a finding that Petitioner penetrated K.A. with his penis would certainly have been relevant to Petitioner's lewd and lascivious intent, the jury could also have easily inferred such intent from the fact that Petitioner and K.A. were both largely naked, Petitioner had the child move his boxers and massage his buttocks, and he "worked" the area of her labia for multiple minutes with a mixture of oil and his pre-ejaculate (Exhibit 13, Tr. II 240-48; State's Trial Exhibit 1 at 50:27-52:30).  A fairminded jurist could agree that, even if the jury had never heard K.A.'s original allegation of penile penetration, there is absolutely no reasonable likelihood that the jury would have found Petitioner not guilty.  *See Napue*, 360 U.S. at 271.[27]

---

[27] Petitioner did not in state court, and does not now, claim that the testimony regarding penile penetration could have affected his sentence (Exhibit 2 at 23-30; Doc. 11 at 26-34).  Thus, any such argument is not properly before this Court as it is forfeited, was not made to the OCCA, and

## D.    Conclusion

For all these reasons, no clearly established Supreme Court law supports Petitioner's *Napue*

claim.  Alternatively, at least one fairminded jurist could agree with the OCCA's rejection of the

claim; thus, the decision was reasonable and habeas relief must be denied on Ground One.  *See*

*Frost*, 749 F.3d at 1225.

## GROUND TWO

### PETITIONER DOES NOT SATISFY SECTION 2254(d) WITH HIS CLAIMS OF PROSECUTORIAL ERROR.

In his second proposition, Petitioner contends that prosecutorial error deprived him of a

fair trial (Doc. 2 at 8; Doc. 11 at 35-42).  Although the OCCA adjudicated this ground for relief

on the merits, Petitioner has not raised, and has thus forfeited, any argument that the OCCA's

decision ran afoul of § 2254(d).  Alternatively, a fairminded jurist could agree with the OCCA's

decision.  Habeas relief should be denied.

## A.    Background

On direct appeal, Petitioner alleged that various instances of prosecutorial error deprived

him of a fair trial (Exhibit 5 at 31-37).  The OCCA rejected this claim:

> Zilm complains prosecutorial misconduct deprived him of his right to a fair trial.  Defense counsel objected to most of the comments at issue thus preserving alleged error for review on appeal.  Comments not met with contemporaneous objection at trial are reviewed for plain error only.  *Harney v. State*, 2011 OK CR 10, ¶ 23, 256 P.3d 1002, 1007.  "On claims of prosecutorial misconduct, relief will be granted only where the prosecutor committed misconduct that so infected the defendant's trial that it was rendered fundamentally unfair, such that the jury's verdicts should not be relied upon."  *Sanders v. State*, 2015 OK CR 11, ¶ 21, 358

is unexhausted and anticipatorily barred.  *See Beaudreaux*, 138 S. Ct. at 2560; *Anderson*, 476 F.3d at 1140 n. 7; *Bland*, 459 F.3d at 1011.  In any event, the thirty-six year sentence imposed by the jury, at the low end of the statutory range of twenty-five to life, hardly suggests that the allegedly false testimony was prejudicial as to the jury's sentencing determination (Exhibit 14, O.R. 696).

P.3d 280, 286. In making that determination, we evaluate the prosecutor's comments within the context of the entire trial, considering the propriety of the prosecutor's actions, the strength of the evidence against the defendant, and the corresponding arguments of defense counsel. *Mitchell v. State*, 2010 OK CR 14, ¶ 97, 235 P.3d 640, 661; *Cuesta-Rodriguez v. State*, 2010 OK CR 23, ¶ 96, 241 P.3d 214, 243. We will grant relief only where grossly improper and unwarranted argument affected a defendant's rights. *Sanchez v. State*, 2009 OK CR 31, ¶ 71, 223 P.2d 980, 1004.

Zilm first complains that the prosecutor improperly threatened to bring perjury charges and reopen the juvenile case if the defense called the victim's older sister to testify at trial. He asserts that this had a chilling effect on his right to present a defense. The comments at issue were not threats, veiled or otherwise, to prosecute the witness for perjury or to reopen the juvenile case. There was no error here.

Zilm also complains that during closing argument the prosecutor accused defense counsel of coaching the child victim to record a conversation she had with a DHS case worker. Defense counsel objected arguing that the comment impugned his character. While the prosecutor's argument was speculative, it did not impugn defense counsel's character.

Next, Zilm complains that the prosecutor improperly commented on his exercise of his right to trial. During closing argument the prosecutor stated, "It's wrong that you [Zilm] violated a little girl and then put her through the next four years to get to this day." Defense counsel objected to this comment and asked for a mistrial. The trial court denied the request for mistrial but sustained the objection and admonished the jury to disregard the improper comment. "[T]his Court has repeatedly held that an admonishment cures the error from improper testimony or an improper comment at trial, unless the improper testimony or comment was such that it appears to have 'determined' the result of the defendant's trial." *Harmon v. State*, 2011 OK CR 6, ¶ 39, 248 P.3d 918, 935, quoting *Parker v. State*, 2009 OK CR 23, ¶ 26, 216 P.3d 841, 849. A defendant's decision to exercise his constitutionally protected right to a jury trial is a factor which cannot be used against him at trial to influence the jury in their determinations regarding guilt or sentencing. *Barnes v. State*, 2017 OK CR 26, ¶ 10, 408 P.3d 209, 214. While the comment at issue was not a direct comment on Zilm's exercise of his right to trial, it was implied and to this extent, it was improper. The error, however, was cured by the trial court's admonishment and relief is not required.

Finally, Zilm complains that he was prejudiced when the prosecutor engaged in "inflammatory courtroom histrionics." Defense counsel objected and asked that the jury be admonished or that a mistrial be granted. The trial court denied the motion for mistrial and admonished the prosecutor. Again, we will only

grant relief on a claim of prosecutorial misconduct where it was grossly improper and affected the defendant's rights. *See Sanchez*, 2009 OK CR 31, ¶ 71, 223 P.2d at 1004. Relief is not warranted here.

(Exhibit 1 at 4-7).

## B.   Clearly Established Law Governing this Claim

The governing standard for evaluating alleged prosecutorial error was set forth by the Supreme Court in *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974). In order to prevail on a claim based on improper remarks by the prosecutor, a petitioner must demonstrate that the remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643-44. Remarks are not to be viewed in isolation but in the context of the entire trial. *Id.* at 645. The mere fact that a prosecutor may have made some inappropriate comments does not warrant relief so long as the petitioner received a fair trial. *Matthews v. Workman*, 577 F.3d 1175, 1186 (10th Cir. 2009). Petitioner's task is made all the more difficult by the application of "AEDPA's forgiving lens." *See id*.

## C.   The OCCA's Decision Did Not Run Afoul of § 2254(d)

Petitioner has failed to demonstrate that habeas relief is warranted on his claims of prosecutorial error. As an initial matter, Petitioner's counseled brief in support of his habeas petition fails to explain in what way the OCCA violated § 2254(d) in rejecting these claims or even identify which provisions of § 2254(d) he is invoking. Any argument that he can satisfy the provisions of § 2254(d) should be deemed forfeited. *See (John) Grant*, 727 F.3d at 1025 ("Such a perfunctory assertion falls well short of what's needed to overturn a judgment, let alone one as long-settled and repeatedly reviewed as this one. Even a capital defendant can waive an argument

by inadequately briefing an issue.").   In any event, the OCCA's adjudication of this claim did not run afoul of § 2254(d).[28]

To begin with, the OCCA's decision was not contrary to *Donnelly*.   While the OCCA did not cite to *Donnelly* or any other Supreme Court law, it was not required to do so.   *Richter*, 562 U.S. at 98; *Early*, 537 U.S. at 8.   Regardless, although citing to its own precedent, the OCCA correctly identified and articulated the *Donnelly* standard: "On claims of prosecutorial misconduct, relief will be granted only where the prosecutor committed misconduct that so infected the defendant's trial that it was rendered fundamentally unfair, such that the jury's verdicts should not be relied upon" (Exhibit 1 at 4-5).   The OCCA's decision was not contrary to clearly established Supreme Court law.   *See Williams*, 529 U.S. at 405-06; *Mitchell*, 262 F.3d at 1045.

The OCCA's adjudication of each of Petitioner's allegations of prosecutorial error was also legally and factually reasonable, as shown below.

### 1.      *Alleged Threats of Perjury Charges and Re-opening Juvenile Case*

As on direct appeal, Petitioner first claims the prosecutor "chilled" his right to present a defense by allegedly threatening his proffered witnesses—K.A.'s sibling, P.A.; K.A.'s mother, Ms. Alvarez; and Petitioner's own mother, Mary Zilm—with perjury charges and insinuating that she "would seek to alter the custody status of the children in the juvenile court if they testified for [him]" (Doc. 11 at 35-37; Exhibit 5 at 32-33).

As background, when Petitioner announced that he intended to call P.A. as a witness, the prosecutor expressed concern, outside the presence of the jury, that P.A. was a juvenile and did not have a parent present in court to give her permission to testify (Exhibit 13, Tr. IV 35).   The

---

[28] Petitioner admits the OCCA adjudicated this claim on the merits (Doc. 13 at 35).

prosecutor outlined the history of the juvenile court case involving K.A. and her siblings and pointed out that the judge in the juvenile deprived action had ordered Petitioner to have no contact with the children, and the judge was thinking about removing the children from their mother's custody again because she had allowed the defendant to be around the children.  The prosecutor merely pointed out that—regardless of the outcome of the criminal trial—she anticipated that the judge in the juvenile case would be reviewing it (Exhibit 13, Tr. IV 30-35).  There was no threat against P.A. if she testified.

The prosecutor then expressed concern that if P.A. did testify she might be perjuring herself:

> Your Honor was concerned enough about [K.A.'s] best interest, I don't know, two, three years ago that you appointed an attorney for her.  But now we're going to proceed with her sibling [P.A.] being put on the stand to testify under direct, under cross-examination, with all due respect, to potentially subject herself to some type of perjurious statement.  And the [sic] yet, we're just –

> Counsel can laugh at that, but we have prior recorded statements by [P.A.] that if she is today going to say something completely different, it's not just enough for counsel to sit and laugh at that.  We have to understand –

(Exhibit 13, Tr. IV 35-36).  The prosecutor made no mention of potential perjury charges against any other defense witness (Exhibit 13, Tr. IV 32-36).

The trial court ruled that it would allow P.A. to testify (Exhibit 13, Tr. IV 41).  Trial counsel announced that he would not be calling P.A. based on the "veiled threats of perjury charges" (Exhibit 13, Tr. IV 41).  The court did not take the statements of the prosecutor to be threats of perjury charges and told trial counsel, "But Mr. Smallwood, you do what you feel is best for your case.  I have ruled that she can testify.  And you use your best decision on going forward on how you wish to proceed in your case" (Exhibit 13, Tr. IV 41).  Notably, trial counsel made no mention

of not calling Ms. Zilm or Ms. Alvarez because of the alleged chilling effect of the prosecutor's comments regarding P.A. (Exhibit 13, Tr. IV 40-42).

Petitioner's prosecutorial error claim based on the above-described record is unsupported by clearly established Supreme Court law. Petitioner cites to *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (Doc. 11 at 37), in which the Court reaffirmed that "the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." (Quotation marks omitted). However, *Crane* involved the *exclusion* of evidence by the trial court, albeit on the State's motion. *See Crane*, 476 U.S. at 685-86. Here, in contrast, the trial court expressly ruled that P.A. could testify (Exhibit 13, Tr. IV 41). *Crane* does not involve facts that are closely related or similar to this case, and thus, it cannot supply clearly established law for this claim. *See House*, 527 F.3d at 1016.

Although Petitioner does not cite it, in *Webb v. Texas*, 409 U.S. 95, 97-98 (1972) (*per curiam*), the Supreme Court held a trial judge's "lengthy and intimidating warning" and "threatening remarks" effectively caused the defendant's only witness not to testify in violation of the Due Process Clause. Accordingly, "a court may . . . violate a defendant's constitutional rights by actively encouraging a witness not to testify, or by badgering a witness to remain silent." *United States v. Smith*, 997 F.2d 674, 680 (10th Cir. 1993). "A judge's admonition to a witness can violate *Webb* if it is threatening and employs coercive language indicating the court's expectation of perjury." *Id.* (quotation marks omitted). However, *Webb* ultimately cannot provide clearly established law here either. While the Tenth Circuit has applied *Webb* to conduct by the prosecutor, *see, e.g., id.*, the Supreme Court has not done so. Thus, no clearly established law addresses a prosecutor's alleged threatening of a defense witness with perjury charges. *See Graves*

40

*v. Swarthout*, 471 F. App'x 768, 771 (9th Cir. 2012) (unpublished) ("There is no Supreme Court caselaw holding that a prosecutor commits misconduct when he or she threatens a defense witness with prosecution and thereby causes the witness to either refuse to testify or invoke the Fifth Amendment."); *Blackwell v. Hansen*, No. 17-CV-0625, 2017 WL 2778520, at *7 (D. Colo. June 26, 2017) (unpublished) ("*Webb* involved threats by a judge, not the prosecutor.  *Webb* does not constitute clearly established law in relation to Applicant's first claim because application of *Webb* would require the Court to 'expressly extend' *Webb*'s reasoning to a different 'factual context.' No other Supreme Court case has applied the holding in *Webb* to circumstances involving alleged threats by a prosecutor.  The lack of any clearly established federal law terminates the Court's inquiry under § 22554(d)(1)." (quoting *House*, 527 F.3d at 1016-17) (citations omitted)).

In any event, even assuming this claim did not fail for lack of clearly established law, the Tenth Circuit has held that "[j]udges and prosecutors do not necessarily commit a *Webb*-type violation merely by advising a witness of the possibility that he or she could face prosecution for perjury if his or her testimony differs from that he or she has given previously."  *Smith*, 997 F.2d at 680.  Here, the OCCA made a presumptively correct finding that "[t]he comments at issue were not threats, veiled or otherwise, to prosecute the witness for perjury or to reopen the juvenile case" (Exhibit 1 at 5).  *See* 28 U.S.C. § 2254(e)(1).  Petitioner has not acknowledged this finding, let alone attempted to overcome it with clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1). In any event, the OCCA's finding is fully supported by the record, as described above.  The prosecutor did not threaten P.A. with perjury but instead simply noted the potential of P.A. perjuring if she testified contrary to her prior recorded statement (Exhibit 13, Tr. IV 35-36).  There was no mention of Ms. Zilm or Ms. Alvarez and certainly no discussion of perjury with regard to

41

them.  Finally, the prosecutor's discussion of the juvenile deprived action was irrespective to anyone testifying for Petitioner (Exhibit 13, Tr. 30-35).  A fairminded jurist could agree with the OCCA's rejection of this claim.

### 2.   Allegedly Insinuating that Defense Counsel Instructed K.A. to Record her Conversation with DHS Worker Ms. Hall

Petitioner next complains, as he did on direct appeal, that the prosecutor improperly suggested in closing argument that defense counsel coached K.A. to record her conversation with DHS worker Ms. Hall (Exhibit 5 at 33-35; Doc. 11 at 38-39).

As background, the complained of argument by the prosecutor was in response to the argument by trial counsel about "[h]ow gutsy and innovative and smart" it was for K.A. to record her conversation with Ms. Hall because K.A. did not trust the DHS worker (Exhibit 13, Tr. V 30-31).  The prosecutor remarked, "Does anybody think it's a huge coincidence that right when she met with Mr. Smallwood alone, then she recorded Lauren Hall?  That's a coincidence." (Exhibit 13, Tr. V 51).  Trial counsel objected to the argument at trial and requested a mistrial (Exhibit 13, Tr. V 51).  The trial court denied the motion for mistrial but admonished the prosecutor (Exhibit 13, Tr. V 51).

The OCCA found that "[w]hile the prosecutor's argument was speculative, it did not impugn defense counsel's character" (Exhibit 1 at 6).  Petitioner does not acknowledge this finding, let alone show it was unreasonable or point to clear and convincing evidence that it was incorrect.  *See* 28 U.S.C. § 2254(e)(1).  Indeed, even if defense counsel told K.A. to record the conversation with Ms. Hall, there was nothing improper in that.  Thus, as the OCCA reasonably determined, the comment did not impugn defense counsel.  Furthermore, under clearly established law, "it is not enough that the prosecutors' remarks were undesirable or even universally

condemned"; "[t]he relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quotation marks omitted); *see also Berger v. United States*, 295 U.S. 78, 88-89 (1935) (condemning prosecutorial use of "improper suggestions, insinuations, and, especially, assertions of personal knowledge" but reversing only because prosecutorial "misconduct was pronounced and persistent" and case against Berger was not strong).  Here, a fairminded jurist could agree that, even if the prosecutor's remark was speculative and undesirable, it did not render Petitioner's trial fundamentally unfair.  As previously discussed, even with K.A.'s recantation of the allegation of penile penetration, Petitioner was charged with, and convicted of, rubbing her buttocks in a lewd and lascivious manner, conduct established by his own recorded admissions and K.A.'s trial testimony (Exhibit 14, O.R. 28, 694-95, 674; State's Trial Exhibit 1 at 18:40-18:49, 19:18-19:27; Exhibit 13, Tr. II 236, 240-41).  The evidence against Petitioner was overwhelming, and any purportedly improper comment by the prosecutor during closing did not render his trial fundamentally unfair.

### 3.      *Alleged Comment on Petitioner Exercising his Right to Trial*

As on direct appeal, Petitioner further contends that the prosecutor improperly commented on his exercising his right to a trial (Doc. 2 at 38-39; Exhibit 5 at 35-36).  Specifically, Petitioner points to the prosecutor's statement that it was wrong for him to put K.A. "[t]hrough the next four years to get to this day" (Tr. V 55).  At trial, defense counsel objected to this statement, and the trial court sustained the objection and admonished the jury to disregard the comment (Tr. V 55). On appeal, the OCCA found this statement was improper to the extent it was an implied comment

on Petitioner's exercise of his right to trial, but that the error was cured by the trial court's admonishment to the jury (Exhibit 1 at 7).

A fairminded jurist could agree with the OCCA's decision this claim.  In *Donnelly*, 416 U.S. at 645, the Supreme Court found Donnelly's trial was not rendered fundamentally unfair by a single, "admittedly . . . ambiguous" remark by the prosecutor that "was but one moment in an extended trial and was followed by specific disapproving instructions."  Here, too, the prosecutor's comment was ambiguous—as the OCCA found, it was at worst an implied comment on Petitioner's exercise of his trial right.  Indeed, as the State argued on direct appeal, the remark could also have been interpreted as a comment on the upheaval in K.A.'s life since she disclosed the sexual assault, Petitioner's continuing relationship with her mother, and the opportunity Petitioner and K.A.'s mother had to influence her testimony in the lengthy period between the crime and the trial (Exhibit 7 at 22).  Moreover, as in *Donnelly*, the trial court immediately admonished the jury to not consider the comment (Exhibit 13, Tr. V 55).  In fact, while *Donnelly* noted that "some occurrences at trial may be too clearly prejudicial for such a curative instruction to mitigate their effect," it found "the comment in this case is hardly of such character."  *Donnelly*, 416 U.S. at 644.  Thus, while *Donnelly* contemplated that there could be a case where an immediate admonishment to the jury to not consider a prosecutor's statement would not nullify any harm, this statement was dicta.  *See House*, 527 F.3d at 1015 ("Clearly established law is determined by the United States Supreme Court, and refers to the Court's holdings, as opposed to the dicta." (quotation marks omitted)).  Petitioner points to no case, and Respondent cannot locate one, in which the Supreme Court overturned a conviction based on a single ambiguous comment by the

prosecutor that the jury was immediately instructed to disregard.  *See Simmons v. South Carolina*, 512 U.S. 154, 171 (1994) ("[J]uries ordinarily are presumed to follow the court's instructions.").

### 4.    *Alleged Courtroom "Histrionics"*

Finally, Petitioner argues, as he did on direct appeal, that the "the prosecutor engaged in inflammatory courtroom histrionics" (Doc. 2 at 41-42; Exhibit 5 at 36-37).  The prosecutor made the challenged comments when describing Petitioner's demeanor when he was interviewed by the police and making the point that he did not show the actions of an innocent man.  Specifically, the prosecutor observed, "If the police showed up right now and said an 11-year-old girl is saying you put your penis in her, your response would be horrified.  That's the most disgusting, disturbing thing anybody could ever accuse you of.  How could you say that?  Get the hell out of my house." (Exhibit 13, Tr. V 48).  Trial counsel objected to the alleged "histrionics," and the objection was sustained by the trial court (Exhibit 13, Tr. V 48).  The trial court also admonished the prosecutor to "refrain from histrionics" (Exhibit 13, Tr. V 48).  The OCCA found relief was unwarranted because the comment neither was "grossly improper" nor "affected the defendant's rights" (Exhibit 1 at 7).

A fairminded jurist could agree with the OCCA's decision on this claim.  It was not improper for the prosecutor to comment on Petitioner's demeanor and the reasonable inferences to be drawn therefrom.  *See Fryer v. Aldridge*, No. CIV-14-662, 2017 WL 187550, at *7 (W.D. Okla. Jan. 17, 2017) (unpublished) (OCCA reasonably denied relief where "the prosecutor's comments in closing argument were related to Petitioner's demeanor and reasonable inferences drawn from her demeanor").  In *Darden*, in light of the overwhelming evidence of Darden's guilt, the Supreme Court refused to grant relief on prosecutorial error even where, among other things,

45

the prosecutor made "several offensive," "undoubtedly . . . improper," "comments reflecting an emotional reaction to the case." *Darden*, 477 U.S. at 180.  Here, even if delivered with emotion, the prosecutor's comments themselves were not improper and certainly did not render Petitioner's trial fundamentally unfair.  As already discussed, overwhelming evidence showed that Petitioner rubbed K.A.'s buttocks in a lewd and lascivious manner (State's Trial Exhibit 1 at 18:40-18:49, 19:18-19:27; Exhibit 13, Tr. II 236, 240-41).

Petitioner also claims, as he did before the OCCA, that the prosecutor in his case "has engaged in similar conduct in multiple cases," citing to three other OCCA cases involving his same prosecutor, Ms. McAmis (Doc. 11 at 41; Exhibit 5 at 36-37).  However, the focus of habeas review is whether *Petitioner's* trial was free of harmful constitutional error.  *See* 28 U.S.C. § 2254(a) ("The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court *only on the ground that he is in custody in violation of* the Constitution or laws or treaties of the United States." (emphasis added)).  To the extent that Petitioner is attempting to invoke Footnote Nine of *Brecht v. Abrahamson*, 507 U.S. 619 (1993), he does not even mention Footnote Nine, let alone marshal any argument he falls within it.  *See Underwood v. Royal*, 894 F.3d 1154, 1176 (10th Cir. 2018) (explaining that, in the so-called "Footnote Nine" of *Brecht*, the Supreme Court recognized, in addition to structural error, "another potential type of error warranting automatic relief," where an egregious trial error is combined with a pattern of prosecutorial misconduct, "even if it did not substantially influence the jury's verdict" (quotation marks omitted)).  Petitioner has forfeited any argument that he is entitled to relief under Footnote Nine without a showing of prejudice.  *See (John) Grant*, 727 F.3d at 1025.

In any event, Footnote Nine should not afford Petitioner relief.  "[M]ost constitutional errors can be harmless."  *Neder v. United States*, 527 U.S. 1, 8 (1999).  In *Brecht*, the Supreme Court held that the *Kotteakos* standard—"whether the error 'had substantial and injurious effect or influence in determining the jury's verdict'"—applies on habeas review.  *Brecht*, 507 U.S. at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).  Thus, to obtain habeas relief, a petitioner must show "actual prejudice" from trial error.  *Id.* (quotation marks omitted).  In Footnote Nine, however, the Court stated,

> Our holding does not foreclose the possibility that in an unusual case, a deliberate and especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct, might so infect the integrity of the proceeding as to warrant the grant of habeas relief, even if it did not substantially influence the jury's verdict.  We, of course, are not presented with such a situation here.

*Id.* at 638 n. 9 (citation omitted)).

"*Brecht* does not truly establish an exception for 'deliberate and especially egregious errors;' it merely 'does not foreclose the possibility' that such an exception could exist."  *Hassine v. Zimmerman*, 160 F.3d 941, 959 n. 29 (3d Cir. 1998) (quoting *Brecht*, 507 U.S. at 638 n. 9).  In any event, the Tenth Circuit has held that "[t]he due process concerns flagged by footnote nine of *Brecht* will manifest themselves only in very limited circumstances."  *Duckett v. Mullin*, 306 F.3d 982, 994-95 (10th Cir. 2002).  In *Duckett*, the Tenth Circuit refused to apply Footnote Nine to prosecutorial misconduct in spite of its recognition that the prosecutor involved had a long history of similar misconduct and its certainty that the misconduct was deliberate.  *Id.* at 993-95.  Indeed, after summarizing the prosecutor's long history of "persistent misconduct," the Tenth Circuit announced that same had "without doubt harmed the reputation of Oklahoma's criminal justice system and left the unenviable legacy of an indelibly tarnished legal career."  *Id.* at 994.  The Tenth

47

Circuit concluded "that 'the key consideration to whether the footnote's exemption will be applicable is whether the integrity of the proceeding was so infected that the entire trial was unfair." *Id.* at 995 (quotation marks omitted). "*Brecht* itself involved a prosecutor's repeated improper and egregious remarks to the jury, in violation of [Supreme Court law], concerning the defendant's pretrial silence"; "[n]evertheless, the Supreme Court analyzed the prosecutorial misconduct under a harmless-error standard, finding that the facts in the case did not involve a 'deliberate and especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct.'" *Id.* (quoting *Brecht*, 507 U.S. at 638 n. 9). Thus, as to Duckett, the Tenth Circuit concluded he "likewise failed to show that the prosecutorial misconduct in the present case so infected the trial as to make the proceeding fundamentally unfair and thus immune from harmless-error review." *Id.*

Here, Petitioner's prosecutorial error claim is clearly not within the "limited" circumstances envisioned by Footnote Nine. *Duckett*, 306 F.3d at 994-95. The alleged "histrionics" by the prosecutor, combined with "similar conduct" in other cases, is nothing akin to "persistent misconduct" so egregious it "harmed the reputation of Oklahoma's criminal justice system," in *Duckett*, or repeated comments concerning the defendant's pretrial silence, in *Brecht*; if the claims in those cases were subject to harmless-error review, then Petitioner's claim here certainly is. Moreover, the single instance of "histrionics" complained of by Petitioner, immediately followed by a sustained objection and an admonishment of the prosecutor (Exhibit 13, Tr. V 48), did not so infect the integrity of the proceeding that Petitioner's entire trial was rendered unfair. *Duckett*, 306 F.3d at 995.

48

**D.      Conclusion**

Based on all of the above, a fairminded jurist could agree with the OCCA's rejection of

Petitioner's prosecutorial error claims.  Habeas relief is unwarranted.  *See Frost*, 749 F.3d at 1225.

### GROUND THREE

> PETITIONER'S CONSTITUTIONAL CLAIM
> CHALLENGING EVIDENTIARY RULINGS OF THE TRIAL
> COURT IS PROCEDURALLY BARRED.
> ALTERNATIVELY, THIS CLAIM IS REALLY A STATE
> LAW CLAIM AND FAILS FOR LACK OF CLEARLY
> ESTABLISHED FEDERAL LAW.   IN ANY EVENT,
> PETITIONER'S TRIAL WAS NOT RENDERED
> FUNDAMENTALLY UNFAIR.

In his third ground for relief, Petitioner argues that various evidentiary rulings by the trial

court rendered his trial fundamentally unfair (Doc. 2 at 9; Doc. 11 at 43-47).  Petitioner did not

fairly present this ground for relief to the OCCA as a federal constitutional claim, and thus, it is

unexhausted and anticipatorily barred.  Even if the claim is considered by this Court, it is at bottom

a state law claim and unsupported by clearly established Supreme Court law.   In any event,

assuming this claim was fairly presented to the OCCA, the OCCA reasonably rejected it.  Habeas

relief must be denied.

**A.      Background**

As discussed more below, Petitioner raised a state law version of this claim on direct appeal

(Exhibit 5 at 38-41).  The OCCA denied relief as follows:

> Zilm argues that the trial court erred in admitting the hearsay statements the
> child victim made to her neighbor and to the SANE nurse, as well as the child
> victim's testimony from the first preliminary hearing.  Defense counsel objected to
> the introduction of this evidence preserving the error for review on appeal.  *See
> Pullen v. State*, 2016 OK CR 18, ¶ 10, 387 P.3d 922, 927.  We review the trial
> court's ruling on the admissibility of evidence for an abuse of discretion.  *Id.*

The trial court held a reliability hearing regarding the admissibility of statements made by a child under thirteen years of age as is required by 12 O.S.2011, § 2803.1.  The trial court held that the child victim's hearsay statements made to her neighbor lacked sufficient indicia of reliability under section 2803.1 and should be suppressed.  The State appealed this pretrial ruling to this Court.  This Court found in an unpublished opinion, that the trial court did not abuse its discretion in suppressing the hearsay statements made to the neighbor.  *State v. Zilm*, S-2014-812 (Okl.Cr. August 6, 2015).

At trial, the neighbor testified about the hearsay statements the child victim made to her.  Defense counsel objected noting that the statements had been judicially found to be unreliable.  The State argued that the statements were admissible under the excited utterance exception to the hearsay rule and the trial court allowed their introduction under 12 O.S.2011, § 2803(2).  Zilm argues on appeal that the trial court's ruling was error.

The statements at issue provide a text book example of excited utterances. *See Martinez v. State*, 2016 OK CR 3, ¶ 50, 371 P.3d 1100, 1113 ("An excited utterance must meet three foundational requirements: (1) a startling event or condition; (2) a statement relating to that startling event or condition; (3) made while the declarant is under the stress of excitement caused by the startling event or condition.").  Although the trial court found at the reliability hearing that the statements lacked sufficient indicia of reliability for admissibility under section 2803.1, that ruling is not inconsistent with the court's ruling at trial that the statements were admissible as excited utterances under section 2803(2).  This is an instance where the statements, although inadmissible under one exception to the hearsay rule, were admissible under a different exception.  The trial court did not abuse its discretion in allowing the admission of the child victim's hearsay statements made to the neighbor under the excited utterance exception to the hearsay rule.

Zilm also argues that the trial court erred in allowing the State to introduce the hearsay statement the child victim made to the SANE nurse during the exam.  This statement, made the same morning as the sexual assault, was made for purposes of receiving medical diagnosis and treatment and was admissible under 12 O.S.2011, § 2803(4). *See Kennedy v. State*, 1992 OK CR 67, ¶¶ 10-12, 839 P.2d 667, 670 (statements made by sexual abuse victim during the course of an interview with a doctor for the purpose of diagnosis and treatment were properly admitted under 2803(4)).  The trial court did not abuse its discretion in allowing the admission of the child victim's hearsay statement made to the SANE nurse.

Finally, Zilm argues the trial court erred in allowing the State, over defense objection, to impeach the child victim's trial testimony with her sworn testimony from the first preliminary hearing because her testimony at this earlier proceeding

50

was unreliable.  As the State points out, any party may impeach its own witness. 12 O.S.2011, § 2607.  This Court has held, however, that:

> [T]he State must follow the law regarding impeachment evidence. A witness subject to cross-examination must testify and be given a chance to explain or deny any discrepancy between that testimony and previous statements before evidence of the previous statement is admissible.  At that point the witness may be impeached with the specific inconsistent portions of her statement.

*Stiles v. State*, 1999 OK CR 19, ¶ 6, 989 P.2d 955, 958.  *See also* 12 O.S.2011, § 2613 (a party may impeach a witness with prior inconsistent statements).

> The State called the child victim to testify and she was a hostile witness. She testified inconsistently with her testimony from the first preliminary hearing and the State impeached her trial testimony with her testimony from the first preliminary hearing.  Prior to the admission of this evidence, the trial court instructed the jury, both during trial and again in written instructions, that the inconsistent prior testimony could only be used for impeachment purposes and was not evidence of proof of guilt or innocence.  The child victim was afforded the opportunity through direct and cross examination to explain her inconsistent prior testimony.  The trial court did not abuse its discretion in allowing the State to impeach her trial testimony with her prior inconsistent testimony.  This proposition does not warrant relief.

(Exhibit 1 at 6-12 (indent error corrected)).

## B.   Petitioner's Federal Claim is Unexhausted and Anticipatorily Barred

Before this Court, Petitioner claims that the above-described evidentiary rulings—combined with his allegations that the State violated *Napue* and coerced false testimony from K.A. and "the bad faith of the prosecutor"—"remove this claim from state evidentiary rules to fundamentally unfair under the Fourteenth Amendment" (Doc. 11 at 47).  However, Petitioner did not fairly present a *constitutional* claim before the OCCA.  Petitioner's transformed claim is unexhausted and anticipatorily barred.

On direct appeal, Petitioner raised this ground for relief with the heading, "**PROPOSITION    III.    MULTIPLE    ERRONEOUS    EVIDENTIARY    RULINGS**

PREJUDICED ZILM RESULTING IN A FUNDAMENTALLY UNFAIR TRIAL." (Exhibit 5 at 38).  Despite Petitioner's reference to a "fundamentally unfair trial" in the proposition heading, Petitioner did not include a single citation to any constitutional provision or federal authority in the entire proposition (Exhibit 5 at 38-41).  Rather, Petitioner based his claim entirely on state law, arguing that while certain hearsay exceptions allow for the admission of hearsay that is traditionally considered reliable, such as the "excited utterance" and "medical treatment" exceptions, the trial court's prior ruling that K.A.'s hearsay statements were unreliable "obviate[d] application of the [hearsay] exceptions" at issue (Exhibit 5 at 40).  As to the standard of review, Petitioner stated, "Evidentiary rulings by the trial court are reviewed for an abuse of discretion" (Exhibit 5 at 38).  Petitioner concluded the proposition: "In sum, the findings by the trial court that the statements were unreliable should override the application of any hearsay exceptions.  The constitutional burden of proof standard of beyond a reasonable doubt demands that the State's evidence be free of the taint of unreliability." (Exhibit 5 at 41).

Based on the above, Petitioner did not fairly present his present constitutional claim to the OCCA, as he did not present a federal constitutional claim "in a manner sufficient to put the [state] court[] on notice of the federal constitutional claim." *Prendergast v. Clements*, 699 F.3d 1182, 1184 (10th Cir. 2012).  First, Petitioner essentially bookended a state-law claim with unexplained references to "a fundamentally unfair trial" and "the constitutional burden of proof."  To fairly present a federal due process challenge, however, "it is not enough to make a general appeal to a constitutional guarantee as broad as due process to present the 'substance' of such a claim to a state court." *Gray v. Netherland*, 518 U.S. 152, 163 (1996).  As the Fifth Circuit puts it,

> A fleeting reference to the federal constitution, tacked onto the end of a lengthy, purely state-law evidentiary argument, does not sufficiently alert and afford a state

> court the opportunity to address an alleged violation of federal rights.  Moreover,
> to hold that vague references to such expansive concepts as due process and fair
> trial fairly present, and therefore exhaust, federal claims is to eviscerate the
> exhaustion requirement.

*Wilder v. Cockrell*, 274 F.3d 255, 260 (5th Cir. 2001); *see Zuniga v. Falk*, No. 15-1118, 618 F.

App'x 407, 411 (10th Cir. July 10, 2015) (unpublished) (concluding that federal due process claim

based on trial court's refusal to sever petitioner's trial from that of his codefendant was

unexhausted because, "[a]lthough [the direct appeal] brief cited the Fifth, Sixth, and Fourteenth

Amendments at the tail end of his state law argument," this "conclusory reference to a fair trial

and the Constitution [was] insufficient to put the state court on notice that [petitioner] was raising

a federal constitutional claim" (quotation marks omitted)); *Cole v. Zavaras*, No. 09-1293, 349 F.

App'x 328, 331 (10th Cir. Oct. 16, 2009) (unpublished) (holding that some of petitioner's "claims

were not presented to the state courts as *federal* constitutional claims" where state post-conviction

motion in some instances "state[d] in a conclusory fashion that the alleged error violated

[petitioner's] federal constitutional rights, but [the motion] cite[d] no federal case law to support

those claims and [did] little to connect the claim with the rights [the motion] alleged were violated"

(emphasis in original)); *see also Rivera v. Illinois*, 556 U.S. 148, 158, 160 (2009) ("[E]rrors of

state law do not automatically become violations of due process" because "[t]he Due Process

Clause . . . safeguards not the meticulous observance of state procedural prescriptions, but the

fundamental elements of fairness in a criminal trial" (quotation marks omitted)).

Second, Petitioner identified the standard of review for the admission of evidence but did

not specify what standard of review would apply for a constitutional due process claim.  *See*

*(Donald) Grant*, 886 F.3d at 895-96 (finding Grant exhausted a substantive competency claim, but

not a procedural competency claim, where, *inter alia*, his direct appeal brief included the standard

for the former claim but not the latter).  Third, in *Baldwin v. Reese*, 541 U.S. 27, 33 (2004), the Supreme Court found a lack of fair presentation where the state-court "petition refer[red] to provisions of the Federal Constitution in respect to *other* claims but not in respect to [the] one" at issue and "[t]he petition provide[d] no citation of any case that might have alerted the court to the alleged federal nature of the claim."  (Emphasis in original).  Here, too, Petitioner's direct appeal brief invoked federal constitutional provisions and Supreme Court and other federal case law with respect to *other* claims, but not the present one (Exhibit 5 at 23-24, 29, 33, 35, 36, 44-45, 47). Fourth and finally, while Petitioner's direct appeal claim asserted that the trial court's prior unreliability finding foreclosed application of hearsay exceptions in § 2803 (Exhibit 5 at 40), it did not articulate his present argument that the evidentiary rulings—combined with his allegations that the State violated *Napue* and coerced false testimony from K.A. and "the bad faith of the prosecutor"—"remove this claim from state evidentiary rules to fundamentally unfair under the Fourteenth Amendment" (Doc. 11 at 47).  *See (Donald) Grant*, 886 F.3d at 891 ("[T]here is no fair presentation if the claim before the state court was only 'somewhat similar' to the claim pressed in the habeas petition.").

Thus, Petitioner's present constitutional claim is not only unexhausted, but subject to an anticipatory procedural bar.  Under Oklahoma law, a claim that could have been, but was not, raised on direct appeal is procedurally barred.  *Nguyen v. State*, 879 P.2d 148, 149 (Okla. Crim. App. 1994).  The Tenth Circuit has held that "[t]his is an independent and adequate state ground for denying habeas relief."  *Ellis v. Hargett*, 302 F.3d 1182, 1186 (10th Cir. 2002).[29]  Here, this

---

[29] Additional rules apply for the bar to be adequate when a barred claim of ineffective assistance of counsel is at issue, *see English v. Cody*, 146 F.3d 1257, 1263 (10th Cir. 1998), but that is not the case here.

Court should find that Petitioner's claim as presently raised is subject to an anticipatory procedural bar and is therefore defaulted in federal court. *Anderson*, 476 F.3d at 1140 n. 7; *Cannon*, 259 F.3d at 1265. Petitioner does not acknowledge his failure to exhaust a federal claim, let alone allege cause and prejudice or a fundamental miscarriage of justice to overcome his default (Doc. 2 at 10).

Alternatively, assuming that this Court concludes that Petitioner fairly presented a federal constitutional claim to the OCCA based on the alleged evidentiary errors, then a number of additional principles still limit this Court's review. First, assuming a fair presentation, it must be *presumed* the OCCA adjudicated the constitutional claim on the merits. *See Richter*, 562 U.S. at 99. This is so even where the OCCA silently adjudicates a federal claim. *See id.* at 98-99. Indeed, the OCCA's failure to explicitly discuss the federal constitutional aspect of this claim is unsurprising given that Petitioner himself did not raise it as a federal constitutional claim, as discussed above. *See Johnson v. Williams*, 568 U.S. 289, 299 (2013) ("[A] state court may not regard a fleeting reference to a provision of the Federal Constitution or federal precedent as sufficient to raise a separate federal claim. Federal courts of appeals refuse to take cognizance of arguments that are made in passing without proper development."); *Pinholster*, 563 U.S. at 182 (AEDPA is "backward-looking" and "focuses on what a state court knew and did"). Thus, assuming a fair presentation is found, then AEDPA deference is owed to the OCCA. Second, Petitioner concedes the OCCA denied this ground for relief on the merits, and he has thus forfeited any argument that AEDPA deference does not apply. *See Hancock*, 798 F.3d at 1011. Finally, in reviewing this ground for relief, this Court must constrain its review of the OCCA's decision to the arguments that were before the OCCA when it decided this claim. *See Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2560 (2018) (*per curiam*) (Ninth Circuit "committed fundamental error[]" when

it "considered arguments against the state court's decision that Beaudreaux never even made in his state habeas petition"); *Pinholster*, 563 U.S. at 181 ("[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.").

## C. Petitioner's Claim is Really a State Law Claim that Fails for Lack of Clearly Established Supreme Court Law

"[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  Furthermore, as the Tenth Circuit has recognized, "the Ninth Circuit has gone so far as to hold no clearly established Supreme Court law exists with respect to evidentiary claims at all." *Holland v. Allbaugh*, 824 F.3d 1222, 1229 (10th Cir. 2016) (citing *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) ("[The Supreme Court] has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ.")); *see also Estelle*, 502 U.S. at 75 n. 5 ("Because we need not reach the issue, we express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime.").  Specifically, as to a hearsay challenge, the Ninth Circuit has held that "[b]ecause there is no Supreme Court case establishing the fundamental unfairness of admitting multiple hearsay testimony, *Holley* prohibits us from finding in [the petitioner]'s favor on this due process claim." *Zapien v. Davis*, 849 F.3d 787, 794 (9th Cir. 2015); *see also Smith v. McDowell*, No. SAC-V-16-272, 2017 WL 3842600, at *6 (C.D. Cal. May 2, 2017), *report and recommendation adopted*, No. SAC-V-16-272, 2017 WL 3842588 (C.D. Cal. Aug. 31, 2017)

(unpublished) ("There is no clearly established federal law establishing that the admission of hearsay evidence violates the Constitution.").

Here, Petitioner at bottom challenges the trial court's evidentiary rulings under Oklahoma hearsay rules (*see, e.g.*, Doc. 11 at 45 ("the trial court allowed the [hearsay] exceptions to swallow the [hearsay] rule"), 46 ("the finding by the trial court that the statements were unreliable must cut through the hearsay rule and obviate application of the two exceptions at issue here"), 46-47 ("the findings by the trial court that the statements were unreliable should override the application of any hearsay exceptions")). Such challenges are not cognizable in habeas. *See Estelle*, 502 U.S. at 67-68. Moreover, "because there is no Supreme Court case establishing the fundamental unfairness of admitting multiple hearsay testimony," *Zapien*, 849 F.3d at 794, to the extent Petitioner raises a constitutional due process claim it still must be rejected for lack of clearly established Supreme Court law, *House*, 527 F.3d at 1018.[30]

**D.     A Fairminded Jurist Could Agree with the OCCA's Rejection of Petitioner's Constitutional Claim**

Despite the lack of clearly established Supreme Court precedent on this claim, Respondent recognizes that the Tenth Circuit has held that habeas relief may be granted with regard to state court evidentiary rulings where the rulings "rendered the trial so fundamentally unfair that a denial of constitutional rights results." *Mayes v. Gibson*, 210 F.3d 1284, 1293 (10th Cir. 2000). Put differently, the question in habeas proceedings "is not whether this evidence was admissible under state law, but instead whether, considered in light of the entire record, its admission resulted in a fundamentally unfair trial." *Knighton v. Mullin*, 293 F.3d 1165, 1171 (10th Cir. 2002).

---

[30] Notably, Petitioner did not on direct appeal, and does not now, raise a Confrontation Clause claim.

Here, a fairminded jurist could agree Petitioner's trial was not rendered fundamentally unfair by the complained-of hearsay. Petitioner complains about the admission of the following hearsay statements: (1) K.A.'s statements to the neighbor, Ms. Sanford; (2) K.A.'s statements to Nurse Bell, the SANE nurse; and (3) K.A.'s testimony at the first preliminary examination (Doc. 11 at 43). The record shows that these hearsay statements were not even improper under state law, let alone did they render Petitioner's trial fundamentally unfair. *See Zapien*, 849 F.3d at 794 ("It is not at all clear that there was a violation of California law, let alone one so fundamentally unfair that it amounted to a due process violation.").

The question answered by the trial court at the § 2803.1 reliability hearing, and then reviewed by the OCCA on the State's pretrial appeal, was whether K.A.'s hearsay statements to Ms. Howard and Ms. Sanford were sufficiently reliable, based on various statutorily enumerated factors, to be admitted under § 2803.1, a *broad* exception to the hearsay rule for statements of a child describing sexual abuse. The trial court—apparently concerned with the lack of "consistent repetition" (Okla. Stat. tit. 12, § 2803.1(A) (Supp. 2013)) of K.A.'s allegations in light of her recantation regarding penetration by Petitioner's penis—ruled that K.A.'s statements to Ms. Howard and Ms. Sanford were not admissible under § 2803.1 (Exhibit 13, 9/12/2014 Tr. 12-13, 17-18). The court's inquiry at the reliability hearing did not involve consideration of whether the statements were admissible under any other, *narrower* hearsay exceptions for statements arising in contexts that by their nature provide substantial guarantees of trustworthiness. *See Mitchell v. State*, 120 P.3d 1196, 1204 (Okla. Crim. App. 2005). Indeed, the trial court specifically noted that the statements may be admissible under another exception to the hearsay rule (Exhibit 13,

9/12/2014 Tr. 17). Notably, other hearsay exceptions do not have the specific requirement of "consistent repetition" as does § 2803.1(A).

At trial, K.A.'s statements to Ms. Sanford were admitted as excited utterances under OKLA. STAT. tit. 12, § 2803(2) (2011) (Exhibit 13, Tr. III 129). The rationale behind the excited utterance exception to the hearsay rule is that "[a] statement that has been offered in a moment of excitement—without the opportunity to reflect on the consequences of one's exclamation—may justifiably carry more weight with a trier of fact than a similar statement offered in the relative calm of the courtroom." *Mitchell*, 120 P.3d at 1204-05 (quoting *White v. Illinois*, 502 U.S. 346, 356 (1992)).

K.A.'s statement to Nurse Bell that Petitioner "put his penis into her butt hole" was admitted under the medical treatment exception to the hearsay rule under OKLA. STAT. tit. 12, § 2803(4) (2011) for statements made for purposes of medical diagnosis or treatment and describing medical history (Exhibit 13, Tr. III 159-160). The rationale behind the medical treatment exception is that the declarant has a "motivation to provide truthful information in order to promote diagnosis and treatment." *United States v. Barrett*, 8 F.3d 1296, 1300 (8th Cir. 1993) (discussing Fed. R. Evid. 803(4), the counterpart to Oklahoma's § 2803(4)). In any event, the trial court did not rule on the reliability of K.A.'s statement to Nurse Bell at the reliability hearing, and there was no allegation at trial that Nurse Bell coerced K.A. into making the statement.

Finally, the trial court's determination at the reliability hearing that particular hearsay statements of K.A. were not admissible under § 2803.1 due to a lack of consistent repetition did not amount to a finding that her first preliminary hearing testimony was unreliable or false. In fact, when defense counsel objected at trial to K.A.'s impeachment with her prior inconsistent

testimony from the first preliminary hearing based on an argument that this would introduce "a statement which this Court and the Court of Criminal Appeals has determined to be unreliable," the trial court emphatically rejected this logic: "No. No. No. The Court of Criminal Appeals has not determined her statements are not. They determined that [as to] the forensic interviewer, and the first witness [the neighbor]." (Exhibit 13, Tr. II 233-34).

Thus, Petitioner's suggestion that the trial court found at the reliability hearing that K.A.'s statements were false or generally unreliable is unsupported by both the record and the state law applied by the court. The fact that the court found a lack of consistent repetition—meaning the statements were not sufficiently reliable for the broad hearsay exception in § 2803.1—did not automatically mean the statements were unreliable under other narrower hearsay exceptions that arise in contexts that by their nature provide substantial guarantees of trustworthiness. *See Mitchell*, 120 P.3d at 1204. Thus, the main premise of Petitioner's claim must fail. (Doc. 11 at 46-47 ("the findings by the trial court that the statements were unreliable should override the application of any hearsay exceptions")).

Petitioner also argues his trial was rendered fundamentally unfair by combination of the complained-of evidentiary errors and the alleged *Napue* error argued in Ground One (Doc. 11 at 47). Again, this argument was not made to the OCCA and is therefore not properly before this Court. *See Beaudreaux*, 138 S. Ct. at 2560. In any event, as shown at length in Ground One, a fairminded jurist could agree that Petitioner's *Napue* claim failed on all three prongs (*see* Ground One(C), *supra*). Thus, he has not shown any *Napue* error that could combine with these claimed evidentiary errors to render his trial fundamentally unfair.

Finally, as previously discussed ad nauseam, Petitioner's guilt of touching or feeling K.A.'s buttocks in a lewd and lascivious manner was overwhelmingly established by his own statements during the police interview and the non-recanted portions of K.A.'s testimony (State's Trial Exhibit 1 at 6:47-8:29, 13:07-13:19, 13:29-13:48, 14:00-14:13, 15:50-15:56, 18:49-18:56, 50:27-52:30; Exhibit 13, Tr. II 236, 240-41, 248-50). The admission of K.A.'s hearsay statements, that Petitioner penetrated her with his penis, could not have been prejudicial.

**E.     Conclusion**

For all these reasons, Ground Three does not warrant habeas relief.

**GROUND FOUR**

**THE OCCA REASONABLY REJECTED PETITIONER'S CHALLENGES TO THE ADMISSIBILITY OF HIS STATEMENT TO POLICE BASED ON *MIRANDA V. ARIZONA*[31] AND *JACKSON V. DENNO*[32].**

In his fourth ground for relief, Petitioner argues that the trial court erred in failing to suppress his statement to police because, first, he did not receive warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), despite allegedly being in in custody at the time of the statements ("*Miranda* challenge"), and second, he allegedly asked whether he needed a lawyer and was told he did not, rendering his statements involuntary ("voluntariness challenge") (Doc. 2 at 11; Doc. 11 at 48-52).  A fairminded jurist could agree with the OCCA's adjudication of both Petitioner's *Miranda* claim and his voluntariness claim.  Habeas relief must be denied.

---

[31] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[32] *Jackson v. Denno*, 378 U.S. 368 (1964).

A.     **Background**

The trial court conducted a hearing to determine the admissibility of the Petitioner's statement to police pursuant to *Jackson v. Denno*, 378 U.S. 368 (1964).  The evidence at the *Jackson v. Denno* hearing showed the following.  The morning of the crime, Detective Mark Hodges of the Tulsa Police Department observed K.A.'s forensic interview from behind a two-way mirror (Exhibit 13, 2/25/2016 Tr. 5-6, 32).  Later that day, around 11 a.m. or noon, he, Corporal Greg Smith, and Officer Jay Taylor went to Petitioner's parents' home in Tulsa to speak with Petitioner (Exhibit 13, 2/25/2016 Tr. 6, 22, 24-25, 35, 42).  While Officer Taylor was uniformed, Detective Hodges and Corporal Smith were wearing slacks and polo shirts with Tulsa Police Department insignia sewed on (Exhibit 13, 2/25/2016 Tr. 6, 35).  Detective Hodges and Corporal Smith both wore guns and badges on their belts (Exhibit 13, 2/25/2016 Tr. 6, 36).  The officers knocked on the door of the home, and Petitioner's father answered and invited them inside (Exhibit 13, 2/25/2016 Tr. 7).  Petitioner's father retrieved Petitioner from a bedroom, and Petitioner agreed to speak with the officers (Exhibit 13, 2/25/2016 Tr. 8, 9/28/2016 Tr. 47).  Petitioner, Detective Hodges, and Corporal Smith all went to the living room, where they sat down and conducted the interview (Exhibit 13, 2/25/2016 Tr. 8).

At no time during the interview did the police threaten or harass Petitioner or promise or offer him anything (Exhibit 13, 2/25/2016 Tr. 10-11, 36).  Petitioner, who was thirty years old at the time of the interview, did not appear to be under the influence of any intoxicating substances and, although he stated he had not had much sleep, he did not appear to be affected by fatigue and was not falling asleep during the interview (Exhibit 13, 2/25/2016 Tr. 14-15, 38, 9/28/2016 Tr. 40).  According to Detective Hodges and Corporal Smith, at all points, Petitioner was free to leave

and was free to ask the police to leave (Exhibit 13, 2/25/2016 Tr. 11, 37). Petitioner, on the other hand, testified that the "uniformed officer" stood at the front door, situated in such a way that Petitioner's "parents couldn't get to [him] and [he] wasn't going anywhere" (Exhibit 13, 9/28/2016 Tr. 51). Petitioner testified that he did not feel he was free to leave (Exhibit 13, 9/28/2016 Tr. 52). In any event, Petitioner did not ask to end the interview or for the police to leave (Exhibit 13, 2/25/2016 Tr. 11, 37; 9/28/2016 Tr. 60). Petitioner was not under arrest nor was he arrested at the end of the interview (Exhibit 13, 2/25/2016 Tr. 11, 37, 41). When the police asked to obtain a DNA sample from Petitioner, he asked to speak to his father (Exhibit 13, 2/25/2016 Tr. 13). Petitioner admitted in his testimony he was freely allowed to leave the room to speak to his father (Exhibit 13, 9/28/2016 Tr. 61-62). Petitioner left the living room to speak to his father; he and his father then returned and said he wanted to speak to a lawyer first (Exhibit 13, 2/25/2016 Tr. 13, 30, 39-40). Detective Hodges testified this was the first time he "heard any mention of a request for an attorney" (Exhibit 13, 2/25/2016 Tr. 13). Likewise, Corporal Smith testified that Petitioner never asked for an attorney up until this point (Exhibit 13, 2/25/2016 Tr. 37). Upon that statement, the police terminated the interview and left (Exhibit 13, 2/25/2016 Tr. 13-14, 9/28/2016 Tr. 75). Petitioner was not arrested and that time, and indeed was not arrested until weeks later (Exhibit 13, 9/28/2016 Tr. 75).

The entire encounter was recorded from the time the officers approached the house to the time when they left (Exhibit 13, 2/25/2016 Tr. 5-8, 25, 35; State's Trial Exhibit 1). The recording lasted just over an hour (Exhibit 13, 2/25/2016 Tr. 49). Detective Hodges testified that he did not have any conversations with Petitioner "that are not contained on that recording [State's Trial

Exhibit 1]" (Exhibit 13, 2/25/2016 Tr. 18, 28).  Corporal Smith testified to the same (Exhibit 13, 2/25/2016 Tr. 47-48).  Furthermore, Petitioner himself testified:

> Q     Did you ever say to them before the issue of your DNA came up that you wanted an attorney?
>
> A     No.

(Exhibit 13, 9/28/2016 Tr. 60).

Based on the above, the trial court found that the recorded interview and Petitioner's statements were admissible because Petitioner's "statement was voluntary, without duress and not given in a custodial setting.  [Petitioner] was free to leave and in fact left the room during the interrogation only to return and invoke his right to legal counsel after a conversation with his father" (Exhibit 14, O.R. 608-09; Exhibit 13, Tr. III 204).[33]

Petitioner raised his *Miranda* claim and voluntariness claim on direct appeal (Exhibit 5 at 42-46).  In an affidavit submitted with his direct appeal, Petitioner claimed for the first time that, at the start of the police interview, he asked the officers if he needed an attorney and they said he did not (Exhibit 6, Attachment 1 at 2).  Petitioner further stated, "I believe that agents for the State, most likely the Detectives who interviewed me, deleted from the recording the part of the conversation about me asking for an attorney, as well as the Detective telling me that I did not

---

[33] Any findings of the OCCA *or the trial court* underlying this claim are entitled to a presumption of correctness, including that "[Petitioner] was free to leave and in fact left the room during the interrogation only to return and invoke his right to legal counsel after a conversation with his father" (Exhibit 14, O.R. 609).  *See* 28 U.S.C. § 2254(e)(1); *Trice v. Ward*, 196 F.3d 1151, 1169 (10th Cir. 1999) (determining, as to challenge to petitioner's confession, that "any subsidiary factual findings made by the state trial court at the conclusion of the *in camera* hearing are entitled to a 'presumption of correctness' under § 2254(e)(1)").

need one" (Exhibit 6, Attachment 1 at 2).  Petitioner's mother, Mary Zilm, attested to a similar

account in an affidavit (Exhibit 6, Attachment 2 at 1-2).

As Petitioner concedes (Doc. 11 at 48), the OCCA rejected his *Miranda* claim and

voluntariness claim on the merits:

> The morning the sexual assault was reported, Tulsa police detectives interviewed Zilm at his parents' house and the interview was audio recorded. Zilm subsequently filed a motion to suppress his statement arguing that it was inadmissible because the statement was made during a custodial interrogation and the detectives did not advise him of his rights pursuant to *Miranda v. Arizona*.[2] Prior to trial the court held a *Jackson v. Denno*[3] hearing to address the admissibility of Zilm's statement.  The trial court denied Zilm's motion to suppress and Zilm argues on appeal that this ruling was error.  We review the trial court's ruling on a motion to suppress for an abuse of discretion.  *See Bramlett v. State*, 2018 OK CR 19, ¶ 10, 422 P.3d 788, 793, citing *State v. Pope*, 2009 OK CR 9, ¶ 4, 204 P.3d 1285, 1287.  We defer to the trial court's findings of fact unless they are clearly erroneous and we review the trial court's legal conclusions derived from those facts *de novo*.  *Bramlett*, 2018 OK CR 19, ¶ 10, 422 P.3d at 793, citing *Gomez v. State*, 2007 OK CR 33, ¶ 5, 168 P.3d 1139, 1141-42.

> [2] 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

> [3] 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

> It is well established that "police officers are not required to administer Miranda warnings to everyone whom they question."  *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977).  Rather, *Miranda* warnings are only required when a person is subject to a custodial interrogation which occurs where questioning is initiated by law enforcement officers after a person has been taken into custody or is otherwise deprived of his freedom in any significant way.  *Miranda*, 384 U.S. at 467, 86 S.Ct. at 1624.  *See also Little v. State*, 1981 OK CR 46, ¶ 4, 627 P.2d 445, 447.  A person is in custody for purposes of *Miranda* when there is "a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."  *Stansbury v. California*, 511 U.S. 318, 322, 114 S.Ct. 1526, 1529, 128 L.Ed.2d 293 (1994) (*per curiam*), quoting *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (*per curiam*).  The relevant inquiry as to whether a suspect is in custody is how a reasonable person in the suspect's position would have understood the situation.  *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.C. 3138, 3151, 82 L.Ed.2d 317 (1984).  If a reasonable person facing the same factual circumstances would have felt he or she was not at liberty to terminate the interrogation and leave,

the person is in custody for *Miranda* purposes.  *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457, 465, 133 L.Ed.2d 383 (1995).  The record strongly supports the conclusion that Zilm was not in custody at the time he made his statement to the detectives and that his statement was the product of a free and deliberate choice. The trial court's decision denying Zilm's motion to suppress was not an abuse of discretion.

Zilm also argues on appeal that his statement was not knowingly and voluntarily made because he asked the detectives if he needed a lawyer and was told that he did not.  This was not argued below.  Zilm neither raised it in his motion to suppress nor argued it at the *Jackson v. Denno* hearing.  Zilm has therefore waived consideration of this issue except as it may constitute plain error.  *Cheatham v. State*, 1995 OK CR 32, ¶ 48, 900 P.2d 414, 427.  To be entitled to relief for plain error, Zilm must prove that an error occurred, that the error is plain and obvious, and that the error affected his substantial rights.  *See Hogan v. State*, 2006 OK CR 19, ¶ 38, 139 P.3d 907, 923.  He has not made this showing.

(Exhibit 1 at 12-15 (select italics added)).

**B.     A Fairminded Jurist Could Agree with the OCCA's Rejection of Petitioner's *Miranda* Claim**

Pursuant to *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."  Specifically, "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda*, 384 U.S. at 444.  "An officer's obligation to administer *Miranda* warnings attaches, however, 'only where there has been such a restriction on a person's freedom as to render him in custody.'"  *Stansbury v. California*, 511 U.S. 318, 322 (1994) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam) (internal quotation marks omitted)).  "In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the

66

interrogation, but 'the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Id.* at 1322 (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam) (internal quotation marks omitted, alteration by *Stansbury*)).   "[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned."   *Id.* at 322.   Thus, "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation."   *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984).   "[T]he crucial question [is:] . . . if encountered by a 'reasonable person,' would the identified circumstances add up to custody as defined in *Miranda*?" *Thompson v. Keohane*, 516 U.S. 99, 113 (1995).

In *Beckwith v. United States*, 425 U.S. 341, 343, 347 (1976), the Supreme Court rejected Beckwith's claim that he was "in custody" for *Miranda* purposes when questioned in a private home where he occasionally stayed.   Beckwith and the government agents sat for nearly three hours at the dining room table and had, according to the agents, "a 'friendly' and 'relaxed'" conversation.   *Id.* at 342-43.   The Court held that "[a]n interview with Government agents in a situation such as the one shown by this record simply does not present the elements which the *Miranda* Court found so inherently coercive as to require its holding."   *Id.* at 347.   In contrast, in *Orozco v. Texas*, 394 U.S. 324, 325 (1969), the Court found Orozco was "in custody" where four police officers entered the boardinghouse bedroom where he was sleeping during early morning hours, all immediately began questioning him, and testified that he was under arrest and not free to leave at that time.   However, *Orozco* is the unusual case.   "Courts are *much less likely* to find the circumstances custodial when the interrogation occurs in familiar or at least neutral

67

surroundings, such as the suspect's home." *United States v. Ritchie*, 35 F.3d 1477, 1485 (10th Cir. 1994) (quotation marks omitted, alteration adopted, emphasis in original).

Here, Petitioner has not satisfied § 2254(d) with respect to the OCCA's adjudication of his *Miranda* claim.  For starters, Petitioner offers little in the way of argument as to how the OCCA's adjudication of this claim ran afoul of § 2254(d)(1) or (d)(2).  In fact, he does not even cite these provisions and simply concludes his ground for relief with the following: "Zilm was in custody and was not advised of his rights under *Miranda* . . . . The conclusion to the contrary by the OCCA is contrary to clearly established federal law as set forth above" (Doc. 11 at 52).  Petitioner's suggestion that he can satisfy the provisions of § 2254(d) is so inadequately developed it should be deemed forfeited.  *See (John) Grant*, 727 F.3d at 1025.

In any event, the OCCA's decision could not have been contrary to *Miranda*, as the Court expressly recognized and correctly articulated the rule from *Miranda* that warnings are required when a person is subjected to custodial interrogation (Exhibit 1 at 13 (citing *Miranda*, 384 U.S. at 467)).  Indeed, while the OCCA was not required to do so, *Richter*, 562 U.S. at 98; *Early*, 537 U.S. at 8, it cited and discussed a slew of relevant Supreme Court cases, including *Miranda*, *Mathiason*, *Stansbury*, *Beheler*, *McCarty*, and *Thompson* (Exhibit 1 at 13-14).  Thus, the OCCA's opinion clearly was not contrary to clearly established Supreme Court law.  *See Williams*, 529 U.S. at 405-06; *Mitchell*, 262 F.3d at 1045.

Nor was the OCCA's opinion legally or factually unreasonable.  The interview took place at Petitioner's parents' house in their living room (Exhibit 13, 2/25/2016 Tr. 8).  *See Ritchie*, 35 F.3d at 1485 ("Courts are *much less likely* to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the suspect's home."

(quotation marks omitted, alteration adopted, emphasis in original)).[34]   As the trial court found, the evidence showed that during the interview Petitioner was free to leave and, indeed, at one point was freely permitted to leave the room (Exhibit 14, O.R. 609; Exhibit 13, 2/25/2016 Tr. 13, 30, 39-40, 9/28/2016 Tr. 61-62).   Petitioner was not under arrest nor was he arrested at the end of the interview (Exhibit 13, 2/25/2016 Tr. 11, 37, 41).   While Petitioner testified that he believed he was not free to leave (Exhibit 13, 9/28/2016 Tr. 52), his subject perspective is irrelevant.   *See Thompson*, 516 U.S. at 113; *Stansbury*, 511 U.S. at 322; *McCarty*, 468 U.S. at 442.   Under all of these circumstances, a fairminded jurist could agree that a reasonable person in Petitioner's circumstances would not have believed they were under arrest or not free to leave, and thus, he was not "in custody" for purposes of *Miranda* (Exhibit 1 at 14).   *See Thompson*, 516 U.S. at 113; *Stansbury*, 511 U.S. at 322; *McCarty*, 468 U.S. at 442.

## C.   A Fairminded Jurist Could Agree with the OCCA's Rejection of Petitioner's Voluntariness Claim

"It is now axiomatic that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession." *Jackson*, 378 U.S. at 376.   Thus, even where a defendant was not "in custody" for *Miranda* purposes, his confession still must be voluntary to be admissible.   "[N]oncustodial interrogation might possibly in some situations, by virtue of some special circumstances, be characterized as one where the behavior of law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined." *Beckwith*, 425 U.S. at 347-48 (quotation marks omitted, alterations adopted); *see also United States v. Cash*, 733 F.3d 1264, 1280 n. 12 (10th Cir.

---

[34] Contrary to Petitioner's suggestion (Doc. 11 at 50), the circumstances of his interview are nothing like that in *Orozco*, 394 U.S. at 325.

2013) ("[E]ven when a confession is not obtained in violation of *Miranda*, it must nonetheless be voluntary to be admissible.").

"[A] confession, in order to be admissible, must be free and voluntary; that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." *Bram v. United States*, 168 U.S. 532, 542-43 (1897). The question is "whether a defendant's will was overborne by the circumstances surrounding the giving of a confession," taking "into consideration the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Dickerson v. United States*, 530 U.S. 428, 434 (2000) (quotation marks omitted). The determination of voluntariness "depends upon a weighing of the circumstances of pressure against the power of resistance of the person confessing." *Id.* (quotation marks omitted, alteration adopted). Notably, "deception is a common interview technique," and "it has not led courts (and certainly not the Supreme Court) to find that a subject's incriminating answers were involuntary." *Dassey v. Dittmann*, 877 F.3d 297, 313 (7th Cir. 2017); *see also Frazier v. Cupp*, 394 U.S. 731, 739 (1969) (fabricating a co-conspirator's confession is relevant, but "insufficient in our view to make this otherwise voluntary confession inadmissible").

"[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'" *Colorado v. Connelly*, 479 U.S. 157, 167, 170 (1986); *see also Cash*, 733 F.3d at 1281 ("[I]t is clear after *Connelly* that a confession is only involuntary if the police use coercive activity to undermine the suspect's ability to exercise his free will."). However, "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of

the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." *Mathiason*, 429 U.S. at 495.

Here, Petitioner has not satisfied § 2254(d) with respect to the OCCA's adjudication of his voluntariness claim. For starters, Petitioner once again offers little in the way of argument as to how the OCCA's adjudication of this claim ran afoul of § 2254(d)(1) or (d)(2). As with his *Miranda* claim, he does not even cite these provisions and instead simply ends his ground for relief in conclusory fashion: "Zilm asked whether he needed a lawyer and was told that he did not, which constitutes misconduct by law enforcement that rendered his statements involuntary. The conclusion to the contrary by the OCCA is contrary to clearly established federal law as set forth above" (Doc. 11 at 52). Petitioner's suggestion that he can satisfy the provisions of § 2254(d) is so inadequately developed it should be deemed forfeited. *See (John) Grant*, 727 F.3d at 1025.

In any event, the OCCA's decision was not contrary to clearly established Supreme Court law. While the OCCA did not cite Supreme Court authority with regard to voluntariness other than its references to *Jackson v. Denno* (Exhibit 1 at 12-15), it was not required to do so. *Richter*, 562 U.S. at 98; *Early*, 537 U.S. at 8. Moreover, the OCCA correctly recognized that the appropriate inquiry was whether Petitioner's statement to police "was the product of a free and deliberate choice" (*compare* Exhibit 1 at 14, *with Bram*, 168 U.S. at 542-43). Nothing about the OCCA's opinion was contrary to clearly established Supreme Court law. *See Williams*, 529 U.S. at 405-06; *Mitchell*, 262 F.3d at 1045.

Nor was the OCCA's opinion legally or factually unreasonable. The trial court and the OCCA made presumptively correct findings that Petitioner's statement to police was voluntary, without duress, and the product of a free and deliberate choice (Exhibit 14, O.R. 608-09; Exhibit

1 at 14).  Given these facts, the OCCA reasonably made the legal determination that Petitioner's statement was voluntary.  *See Dickerson*, 530 U.S. at 434; *Bram*, 168 U.S. at 542-43.  Petitioner's only argument to the contrary is that, according to his and his mother's affidavits on direct appeal, the police practiced deception by telling him he did not need an attorney and then deleting that portion of the encounter from the recording (Doc. 11 at 51-52).  Even assuming such "deception" by police could render a confession involuntary, the OCCA reasonably rejected these self-serving, fantastical allegations that were brand new on direct appeal (Exhibit 1 at 15).  In particular, these new allegations were belied by Petitioner's own testimony at the *Jackson v. Denno* hearing— where he testified that he never asked for an attorney prior to the discussion of the DNA test (Exhibit 13, 9/28/2016 Tr. 60)—and the testimony of the officers that the recording spanned the entire encounter (Exhibit 13, 2/25/2016 Tr. 18, 28, 47-48).  A fairminded jurist could agree Petitioner's statement was voluntary and admissible.

D.     **Conclusion**

A fairminded jurist could agree that Petitioner was not in custody, such that he was not entitled to *Miranda* warnings, and that his statement was voluntary.  Habeas relief must be denied.

## GROUND V

**THE OCCA REASONABLY APPLIED *STRICKLAND* IN CONCLUDING THAT PETITIONER FAILED TO SHOW INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL.**

In his fifth ground for relief, Petitioner claims he received ineffective assistance of trial counsel (Doc. 2 at 16[35]; Doc. 11 at 53-55).  The OCCA reasonably applied *Strickland* in rejecting this claim.  Accordingly, relief must be denied.

## A.    Background

Petitioner raised his claim of ineffective assistance of trial counsel on direct appeal (Exhibit 5 at 47-49).  As he concedes (Doc. 11 at 53), the OCCA denied relief on the merits:

> Zilm contends that he was denied constitutionally effective assistance of counsel.  This Court reviews claims of ineffective assistance of counsel *de novo*, to determine whether counsel's constitutionally deficient performance, if any, prejudiced the defense so as to deprive the defendant of a fair trial with reliable results.  *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *Malone v. State*, 2013 OK CR 1, ¶ 14, 293 P.3d 198, 206.  Under this test, Zilm must affirmatively prove prejudice resulting from his attorney's actions.  *Strickland*, 466 U.S. at 693, 104 S.Ct. at 2067; *Head v. State*, 2006 OK CR 44, ¶ 23, 146 P.3d 1141, 1148.  "To accomplish this, it is not enough to show the failure had some conceivable effect on the outcome of the proceeding." *Id.*  Rather, Zilm must show that there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different.  *Id.*  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.*  This Court need not determine whether counsel's performance was deficient if the claim can be disposed of on the ground of lack of prejudice.  *See Malone*, 2013 OK CR 1, ¶ 16, 293 P.3d at 207.

> Zilm argues that after the prosecutor made veiled threats to file perjury charges against a proffered defense witness defense counsel should have made a record of the other witnesses the defense intended to call but decided not to because of the prosecutor's threats.  Zilm has failed to show either that counsel's performance was deficient or that this alleged deficient performance affected the outcome of his case.  Without such proof, his ineffective assistance of counsel claim is denied.

> In conjunction with this claim, Zilm filed a motion to supplement the record and application for evidentiary hearing on claim of ineffective assistance of counsel contemporaneously with his brief attaching supporting affidavits. This Court will order an evidentiary hearing if "the application and affidavits . . . contain sufficient

---

[35] Page 16 of the habeas petition refers to the electronically stamped page number sixteen, included by Petitioner at the end of the form petition.

information to show this Court by clear and convincing evidence [that] there is a strong possibility trial counsel was ineffective for failing to utilize or identify the complained-of evidence." Rule 3.11(B)(3)(b)(i), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2018). Having reviewed Zilm's request for an evidentiary hearing to develop his claims and the materials offered to support that request, this Court finds that he has failed to meet his burden as he has not shown a strong possibility that the outcome of his trial would have been different. Rule 3.11, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2018). Zilm is not entitled to an evidentiary hearing to further develop his ineffective assistance of counsel allegations, and his motion, as well as this claim, is denied. *See Simpson v. State*, 2010 OK CR 6, ¶ 53, 230 P.3d 888, 905-06.

(Exhibit 1 at 15-17).

## B. *Strickland* Standard

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court set forth the familiar standard a defendant must meet to raise a successful ineffective assistance of counsel claim. A defendant seeking relief based on ineffective assistance of counsel must prove counsel's performance was deficient and that his defense was prejudiced by that performance. *Strickland*, 466 U.S. at 687. As to performance, Petitioner bears the burden of proving that counsel's performance was unreasonable, and this Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 687, 689. As to prejudice, Petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

This standard was designed to be difficult to meet, even on *de novo* review. *Richter*, 562 U.S. at 105. However,

> [e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under

74

> *Strickland* with unreasonableness under § 2254(d).   When § 2254(d)
> applies, the question is not whether counsel's actions were reasonable.   The
> question is whether there is any reasonable argument that counsel satisfied
> *Strickland*'s deferential standard.

*Id.* (citations and quotation marks omitted).

## C.      The OCCA Reasonably Rejected This Claim

Petitioner fails to demonstrate that the OCCA's rejection of his ineffective assistance claim was contrary to, or an unreasonable application of, clearly established Supreme Court law, or based on an unreasonable determination of fact.  Although Petitioner makes no argument against a merits adjudication or under the "contrary to" prong of § 2254(d)(1), Respondent would note that, when the OCCA denies a Rule 3.11 motion to supplement the record on direct appeal, such "operates as an adjudication on the merits of the *Strickland* claim and is therefore entitled to deference under § 2254(d)(1)." *Lott v. Trammell*, 705 F.3d 1167, 1213 (10th Cir. 2013).  Moreover, the Rule 3.11 standard is not contrary to *Strickland*.  *Id.* ("The OCCA's decision in [*Simpson v. State*, 230 P.3d 888 (Okla. Crim. App. 2010),] also clarifies that the interplay of Rule 3.11's 'clear and convincing' evidentiary standard and its 'strong possibility of ineffectiveness' substantive standard is 'intended to be less demanding than the test imposed by *Strickland*.'").  Indeed, the OCCA here correctly recognized that, under *Strickland*, Petitioner must demonstrate deficient performance and a reasonable probability of a different result (Exhibit 1 at 15-16).

Petitioner's only argument that he can satisfy § 2254(d) as to this claim is a conclusory assertion that the OCCA unreasonably applied *Strickland* (Doc. 11 at 55).  Petitioner's argument is so inadequately developed to be forfeited.  *See (John) Grant*, 727 F.3d at 1025.  In any event, as shown below, a fairminded jurist could agree that Petitioner has not shown he received ineffective assistance.

Petitioner argues that counsel rendered ineffective assistance in failing to make an adequate record that alleged prosecutorial error, in threatening his proffered witnesses with perjury charges and threatening to re-open the juvenile deprived case, caused him not to call those witnesses and "chilled" his right to present a defense (Doc. 11 at 54-55).  First, as to P.A., K.A.'s minor sister, as previously shown in Ground Two(C)(1), *supra*, the OCCA made a presumptively correct finding that the prosecutor's "comments . . . were not threats, veiled or otherwise, to prosecute the witness for perjury or to reopen the juvenile case" (Exhibit 1 at 5).  *See* 28 U.S.C. § 2254(e)(1). Petitioner has not acknowledged this finding, let alone attempted to overcome it with clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1).  Furthermore, as previously discussed, the trial court did not take the statements of the prosecutor to be threats of perjury charges and told trial counsel, "But Mr. Smallwood, you do what you feel is best for your case.  I have ruled that she can testify.  And you use your best decision on going forward on how you wish to proceed in your case" (Exhibit 13, Tr. IV 41).  There was nothing improper, so counsel was not ineffective for failing to object or make a further record.  *See Coones v. Shelton*, 692 F. App'x 498, 502 (10th Cir. 2017) (unpublished) ("[state] court reasonably concluded that trial counsel was not ineffective for failing to raise a meritless objection . . . .").

Second, Petitioner contends counsel should have made a record regarding his mother, Mary Zilm, choosing not to testify, as she would "have corroborated the fact that [Petitioner] actually did ask the detectives whether he needed a lawyer, and their answer that he did not" (Doc. 11 at 54).  Even subsequent to a finding that a confession is voluntary and admissible, a defendant generally has the right "to introduce testimony about the environment in which the police secured his confession."  *Crane*, 476 U.S. at 691.  Here, however, Petitioner was not prevented from doing

so.  The problem for Petitioner is that, even if counsel did not make a record regarding Mary Zilm's proposed testimony, this does not change the fact that the prosecutor's complained-of statements were directed entirely at *P.A.'s* proposed testimony (Exhibit 13, Tr. IV 30-36).  Moreover, even had Ms. Zilm testified, her testimony would have been thoroughly discredited by the recording of the full episode in which the police were at her house and interviewed Petitioner, as well as the testimony of the officers.  As previously discussed, the record at the *Jackson v. Denno* hearing showed indisputably, even by Petitioner's own testimony, that he made no mention of counsel prior to the request for a DNA sample (Exhibit 13, 2/25/2016 Tr. 13, 18, 28, 37, 47-48, 9/28/2016 Tr. 60).  Petitioner has shown neither deficient performance nor prejudice, and a fairminded jurist could agree with the OCCA's rejection of this claim.  *See Richter*, 562 U.S. at 105.

Third, Petitioner complains that "trial counsel failed to call [himself] or his fiancee Kristi Shaneck [also known as, Alvarez] to the stand to explain that his 'leakage' problem was actually a medical condition that had manifested when Zilm had begun taking a prostate health supplement prior to the alleged incident with K.A." (Doc. 11 at 55).  To begin with, again, the prosecutor's complained-of statements were directed entirely at *P.A.'s* proposed testimony (Exhibit 13, Tr. IV 30-36).  In any event, Petitioner's suggestion that trial counsel failed to call him because of statements of the prosecutor is totally belied by the record.  At trial, during a colloquy regarding his decision not to testify, Petitioner admitted that he understood his absolute right to testify and that he was waiving that right as a free and voluntary choice, not due to any threats or promises (Exhibit 13, Tr. IV 60-61).  *See Ashworth v. Rudek*, 561 F. App'x 678, 682 (10th Cir. 2014) (unpublished) (OCCA reasonably rejected claim of ineffective assistance for failure to call

defendant to testify where "at no point during the court's colloquy did Ashworth indicate his decision was uninformed or involuntary").

As to K.A.'s mother Ms. Alvarez, she would have been subject to a blistering cross-examining regarding the fact that, in violation of the juvenile deprived judge's order and contrary to her sworn testimony in that case, she moved the children to Arkansas, allowed Petitioner to spend weekends with her and the children in Arkansas, brought the children to the tanning salon where she worked and where Petitioner frequented, and continued her plan to marry Petitioner after the trial despite the allegations against him by her daughter (Exhibit 13, Tr. II 223, 228-30, Tr. IV 33-35). In fact, counsel could reasonably have determined that putting Ms. Alvarez on the stand would only have cemented in the jurors' minds that any pressure on K.A. to alter her testimony came from her own family and Petitioner's family, not from State agents. In addition, Petitioner's motion to supplement to the OCCA offered no evidence from any medical professional to verify his alleged "leakage" problem. For all these reasons, Petitioner has shown neither deficient performance nor prejudice in counsel's failure to call Ms. Alvarez. *See Strickland*, 466 U.S. at 689 ("[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." (quotation marks omitted)); *Pearl v. Jones*, 280 F. App'x 677, 681 (10th Cir. 2008) (unpublished) (concluding Pearl failed to show *Strickland* prejudice based on counsel's failure to call him to testify where he would have been impeached by prosecutor).

**D.      Conclusion**

A fairminded jurist could agree with the OCCA's rejection of Petitioner's claim of ineffective assistance of trial counsel.  Habeas relief must be denied.

## GROUND SIX

**THE OCCA REASONABLY REJECTED PETITIONER'S CUMULATIVE ERROR CLAIM.**

As his final ground for relief, Petitioner contends the cumulative effect of the errors raised in the above grounds warrants relief (Doc. 2 at 16; Doc. 11 at 56-57).  The OCCA reasonably rejected Petitioner's cumulative error claim because there was no error to cumulate.  Petitioner is not entitled to habeas relief.

**A.      Background**

On direct appeal, Petitioner contended that cumulative error denied him a fair trial and warranted relief (Exhibit 5 at 49-50).  The OCCA denied relief:

> Zilm claims that even if no individual error in his case merits reversal, the cumulative effect of the errors committed requires a new trial or sentence modification.  The cumulative error doctrine applies when several errors occurred at the trial court level, but none alone warrants reversal.  Although each error standing alone may be of insufficient gravity to warrant reversal, the combined effect of an accumulation of errors may require a new trial.  *Martinez v. State*, 2016 OK CR 3, ¶ 85, 371 P.3d 1100, 1119.  Cumulative error does not deprive the defendant of a fair trial when the errors considered together do not affect the outcome of the proceeding.  *Baird v. State*, 2017 OK CR 16, ¶ 42, 400 P.3d 875, 886.  And clearly, a cumulative error claim is baseless when this Court fails to sustain any of the alleged errors raised on appeal.  *Id.*  There were no errors, either individually or when considered together, that deprived Zilm of a fair trial.  This claim is denied.

(Exhibit 1 at 17-18).

## B.     Preservation of Arguments

Before turning to the merits of Petitioner's cumulative error claim, Respondent must preserve a number of arguments for potential appellate review.

First, the Tenth Circuit has rejected the argument that cumulative error analysis is not supported by clearly established federal law.  *See Hanson v. Sherrod*, 797 F.3d 810, 852 n. 16 (10th Cir. 2015) ("[W]hen a habeas petitioner raises a cumulative error argument under due process principles the argument is reviewable because 'Supreme Court authority clearly establishes the right to a fair trial and due process.'" (quoting *Darks v. Mullin*, 327 F.3d 1001, 1017 (10th Cir. 2003))).  However, for purposes of preservation, Respondent maintains that there is no clearly established federal law on this issue and that the Tenth Circuit's reliance on general principles of "the right to a fair trial and due process," *see id.*, is improper pursuant to *Wright v. Van Patten*, 552 U.S. 120, 125-26 (2008) (no clearly established federal law where no decision of the Supreme Court "squarely addresses the issue").  *See also, e.g.*, *Bush v. Carpenter*, 926 F.3d 644, 686 n. 16 (10th Cir. 2019) ("Although we are bound by Tenth Circuit precedent on this issue, we note, in passing, that the Supreme Court has never recognized the concept of cumulative error. And, because there is no 'clearly established Federal law' on this issue, we question whether a state appellate court's rejection of a cumulative error argument can justify federal habeas relief under the standards outlined in § 2254(d)."); *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002) ("The Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief.").

*Cone v. Bell*, 556 U.S. 449 (2009), relied on by Petitioner (Doc. 11 at 56), is inapposite.  In *Cone*, the State suppressed various documents that "var[ied] in kind," but each "share[d] a

common feature: Each strengthens the inference that Cone was impaired by his use of drugs around the time his crimes were committed." *Cone*, 556 U.S. at 470.   In reversing and remanding to the Court of Appeals, the Supreme Court stated, "Although we conclude that the suppressed evidence was not material to Cone's conviction for first-degree murder, the lower courts erred in failing to assess the cumulative effect of the suppressed evidence with respect to Cone's capital sentence." *Id.* at 476. This statement by the Supreme Court giving instructions for reconsideration on remand does not amount to a holding of the Supreme Court.  *See House*, 527 F.3d at 1015.  Furthermore, at best, *Cone* establishes that federal courts may consider the cumulative effect of highly related errors of the same kind.  It says nothing about a cumulative error claim encompassing unrelated (alleged) errors of different types, like those Petitioner attempts to cumulate here.

Respondent also respectfully disagrees with the Tenth Circuit's conclusion that deficient performance from an ineffective assistance claim denied on the prejudice prong can cumulate.  *See (Donald) Grant*, 886 F.3d at 954-55.  Only constitutional errors may be considered in a cumulative error analysis.  *Littlejohn v. Trammell*, 704 F.3d 817, 868 (10th Cir. 2013).  The Supreme Court held in *Strickland* that a defendant claiming ineffective assistance of counsel does not establish constitutional error unless he satisfies both prongs.  *Strickland*, 466 U.S. at 692 ("any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution").   Thus, Respondent respectfully submits, for preservation purposes, that the Tenth Circuit's prior holdings are incorrect.  *Cf. Forrest v. Florida Dept. of Corrections*, 342 F. App'x 560, 565 (11th Cir. 2009) (unpublished) (denying claim of cumulative error based on allegations of ineffective assistance of counsel due to the lack of clearly established law); *Hood v. Dretke*, 93 F. App'x 665, 671-72 (5th Cir. 2004) (unpublished) (because the

petitioner did not demonstrate prejudice, his ineffective assistance of counsel claim did not amount to constitutional error and could not be included in a cumulative error analysis).  At the very least, there is no Supreme Court case that clearly provides for the inclusion of errors by counsel in a cumulative error claim.

In addition, as shown above, a number of Petitioner's claims are not supported by clearly established Supreme Court law, including Grounds One, Two(C)(1), and Three.  "In the federal habeas context, the only otherwise harmless errors that can be aggregated are federal constitutional errors."  *Littlejohn v. Trammell*, 704 F.3d 817, 868 (10th Cir. 2013) (quotation marks omitted).  Furthermore, under AEDPA, the existence of federal constitutional error is dictated by clearly established Supreme Court law.  28 U.S.C. § 2254(d)(1); *Carey v. Musladin*, 549 U.S. 70, 76-77 (2006).  Thus, Respondent submits, this Court may consider only constitutional errors supported by clearly established Supreme Court in its cumulative error analysis.  The Tenth Circuit recently rejected this argument when raised by Respondent in *Cuesta-Rodriguez v. Carpenter*, 916 F.3d 885, 917 (10th Cir. 2019), *cert. denied*, 140 S. Ct. 844 (2020), concluding that although Cuesta-Rodriguez's underlying constitutional claim was not supported by any clearly established Supreme Court law, "that doesn't preclude our inclusion of the error in our determination whether, in the aggregate, the various errors denied Cuesta-Rodriguez a fair trial."  For preservation purposes, Respondent respectfully disagrees—to allow a habeas petitioner to circumvent the "clearly established" law requirement of § 2254(d)(1) by simply raising claims unsupported by clearly established federal law in a cumulative error vehicle would render that provision a nullity.

**C.      The OCCA Reasonably Rejected Petitioner's Cumulative Error Claim**

"A cumulative-error analysis aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *Smith v. Duckworth*, 824 F.3d 1233, 1255 (10th Cir. 2016) (quotation marks omitted).  "The cumulative-error analysis applies where there are two or more actual errors.  It does not apply, however, to the cumulative effect of non-errors." *Id.* (quotation marks omitted).

Here, Petitioner's cumulative error claim does not entitle him to relief.  To begin with, AEDPA deference is applicable to the OCCA's adjudication of this claim on the merits. *See* 28 U.S.C. § 2254(d).  Petitioner, relying on *(Donald) Grant*, claims that review is *de novo* because "the OCCA found no error and did not conduct a cumulative error analysis" (Doc. 11 at 56). *(Donald) Grant* is inapposite.  In *(Donald) Grant*, the Tenth Circuit, in denying two of Grant's ineffective assistance claims on prejudice grounds, had "effectively assumed that counsel's performance was constitutionally deficient," such that it was "obliged to assess these two assumed errors in a cumulative-error analysis." *(Donald) Grant*, 886 F.3d at 954-55.  Meanwhile, "the OCCA had not conduct[ed] a cumulative-error analysis (much less one involving these precise errors)," so review was *de novo*. *Id.* at 955.  Here, in contrast, as shown in the Grounds for Relief above, Petitioner has shown no error, and in particular Respondent demonstrated that the OCCA reasonably rejected his *Strickland* claims on both prongs.  Deference applies.

A fairminded jurist could agree that Petitioner was not entitled to cumulative error relief.  As to Petitioner's claim that four State actors lied and coerced false testimony from K.A. (Doc. 11

83

at 57), as discussed at length in Ground One, Petitioner showed neither improper conduct by the State nor false testimony.

As to Petitioner's claim that the "prosecutor . . . threatened defense witnesses with perjury and custody challenges," the OCCA made a presumptively correct finding, not overcome by Petitioner, that the prosecutor did not make any "threats, veiled or otherwise" (Exhibit 1 at 5). *See* 28 U.S.C. § 2254(e)(1).

As to Petitioner's claim that the prosecutor impugned defense counsel (Doc. 11 at 57), the OCCA found that the comment at issue "did not impugn defense counsel's character" (Exhibit 1 at 6).

As to Petitioner's complaint that the prosecutor improperly commented on Petitioner's exercising his right to a trial (Doc. 11 at 57), the OCCA found that to the extent this comment was improper, the error was cured by the trial court's admonishment to the jury (Exhibit 1 at 7). Petitioner cites to no Supreme Court case requiring a state court to consider a cured error in a cumulative error analysis. *See Derden v. McNeel*, 978 F.2d 1453, 1458 (5th Cir. 1992) ("[A]ny cumulative error theory must refer only to *errors* committed in the state trial court. . . . If an action of the trial court cured a putative error, the petitioner is complaining only of an adverse event rather than actual error." (emphasis in original)).

As to the prosecutor's alleged histrionics (Doc. 11 at 57), the OCCA found the prosecutor's comment was not "grossly improper" (Exhibit 1 at 7).

As to the admission of K.A.'s statements, as shown in Ground Three, any constitutional version of this claim is unexhausted, anticipatorily barred, and cannot be considered in a cumulative error analysis. *See Cuesta-Rodriguez*, 916 F.3d at 916 ("In a cumulative error analysis,

84

a court may not consider claims that are procedurally defaulted." (quotation marks omitted, alterations adopted)).  Alternatively, as shown above, the record shows that the hearsay statements at issue were not improper under state law.

As to Petitioner's *Miranda* and voluntariness claims, the OCCA found that Petitioner's statement to police was neither involuntary nor in violation of *Miranda* (Exhibit 1 at 12-15).

Finally, as to Petitioner's ineffective assistance claim, the OCCA denied same on both *Strickland* prongs (Exhibit 1 at 16 "Zilm has failed to show either that counsel's performance was deficient or that this alleged deficient performance affected the outcome of his case.")).

Because the OCCA found no error in all of these grounds, it reasonably found no cumulative error (Exhibit 1 at 16).  *See Smith*, 824 F.3d at 1255.

**D.     Conclusion**

For all the above reasons, this Court must deny relief on Petitioner's cumulative error claim.

**<u>CONCLUSION</u>**

Based on the above and foregoing law and reasoning, federal habeas corpus relief is unwarranted.  Petitioner's petition for federal habeas corpus relief should therefore be denied in its entirety by this Court.

Respectfully submitted,

**MIKE HUNTER**
**ATTORNEY GENERAL OF OKLAHOMA**

**s/ Caroline E.J. Hunt_____**
**CAROLINE E.J. HUNT, O.B.A. #32635**
**ASSISTANT ATTORNEY GENERAL**
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921
Fax: (405) 522-4534
**Service email: fhc.docket@oag.state.ok.us**
**ATTORNEYS FOR RESPONDENT**

## CERTIFICATE OF SERVICE

X I hereby certify that on March 22, 2021, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.

X I hereby certify that on March 22, 2021, I served the attached document via the ECF system on the following registrant:

James L. Hankins
MON ABRI BUSINESS CENTER
2524 N. Broadway
Edmond, Oklahoma 73034

s/ Caroline E.J. Hunt

86