FILED
IN COURT OF CRIMINAL APPEALS
STATE OF OKLAHOMA

APR - 2 2015

MICHAEL S. RICHIE
CLERK

# IN THE COURT OF CRIMINAL APPEALS
## OF THE STATE OF OKLAHOMA

STATE OF OKLAHOMA, )
)
)
Appellant, )
)              Court of Criminal Appeals Case No.
)              SR-2014-0812
)
v. )
)              Tulsa County Case No.
)              CF-2012-3037
)
ADAM CLAYTON ZILM, )
)
)
Appellee. )
)

RECEIVED

APR 0 2 2015

ATTORNEY GENERAL

## BRIEF OF THE APPELLANT

Sarah McAmis, OBA#15903
Assistant District Attorney
Tulsa County Courthouse
500 S. Denver, Suite 900
Tulsa, OK 74103
(918) 624-0240

1

EXHIBIT 2

## Table of Contents

Statement of the Case ................................................................3

Statement of the Facts ................................................................4

Standard of Review ..................................................................26

Argument and Authority ............................................................27

Conclusion ............................................................................42

Certificate of Delivery ..............................................................43

## Cases

*Davenport v. State*, 1991 OK CR 14, 806 P.2d 655 ...............................31

*Folks v. State*, 2008 OK CR 29, 207 P.3d 379....................................34

*F.D.W. v. State*, 2003 OK CR 23, 80 P.3d 503....................................35

*In the Matter of P.F.*, 2005 OK CIV APP 50, 118 P.3d 224 ......................36

*In re K.U.*, 2006 OK CIV APP 88, 140 P.3d 568..................................38

*State v. Juarez*, 2013 OK CR 6, 299 P.3d 870....................................40

## Statutes

12 Okla. Stat. § 2803.1 .........................................................27, 28

## STATEMENT OF THE CASE

On or about July 12, 2012, the Appellant State of Oklahoma filed its original Information charging the Appellee with one count of Sexual Abuse of a Minor Child. (O.R. 14-17). A Preliminary Hearing was held on September 26, 2012, and the Honorable David Youll ordered the Appellee bound over for trial. (September 26, 2012, Tr.). Thereafter, on November 8, 2012, the Appellee filed his first Motion to Quash. (O.R. 18-25). The Appellant filed its Response and Objection to the Motion to Quash on November 16, 2012. (O.R. 26-32). The Motion was overruled by the District Court on December 10, 2012. (December 10, 2012, Tr.).

On February 19, 2013, the Appellee filed a "Motion for Order Authorizing Face-to-Face Interview with Minor Children and Memorandum of Law in Support". (O.R. 33-35). The Appellant filed its Response and Objection on February 25, 2013. (O.R. 36-42). The parties argued the issue at a Motion Hearing on March 1, 2013. (March 1, 2013, Tr.). Thereafter, on July 24, 2013, Appellee's counsel took the sworn deposition of the child victim. On September 3, 2013, the Appellant filed a Motion in Limine which sought to exclude the deposition statement. (O.R. 80-94). After oral argument, the District Court approved an attorney for the child victim on September 5, 2013 and then officially appointed attorney April Seibert on September 12, 2013.

On September 25, 2013, the Appellee filed a "Motion for Reconsideration of Counsel's Motion to Remand for Meaningful Preliminary Hearing". (O.R. 106-116). The District Court heard argument on October 3, 2013 and then took the matter under advisement. (October 3, 2013, Tr.). On October 7, 2013, the District Court remanded the matter for further Preliminary Hearing. (October 7, 2013, Tr.).

The subsequent Preliminary Hearing was held on November 6, 2013 before the Honorable

Judge Clifford Smith and the Appellee was again bound over for trial. (November 6, 2013, Tr.). On December 30, 2013, the Appellee filed a Motion to Quash the new Preliminary Hearing evidence. (O.R. 118-129). The Appellant filed a Response and Objection on January 17, 2014 (O.R. 130-137) and the Appellee filed a Reply on February 4, 2014. The Motion to Quash was overruled by the District Court on February 10, 2014 and the case was set to begin jury trial on October 6, 2014. (February 10, 2014, Tr.).

In preparation for the jury trial setting, the District Court set a Reliability Hearing for the Appellant's "Notice of Intent to Offer Hearsay Statements of Children Under the Age of Thirteen Years" which had been previously filed on August 23, 2013. (O.R. 50-51). The Reliability Hearing was conducted on September 9, 2014 and continued for Ruling on September 12, 2014. (September 9, 2014, Tr.). On that date, the District Court ruled that the child hearsay statements made by the victim to the forensic interviewer and to the neighbor would be suppressed. (September 12, 2014, Tr., p.17, lines 19-21, p.18, lines 2-3). Thereafter, the Appellant announced and perfected its appeal. (O.R. 138-172). The jury trial proceedings were then stayed pending the outcome of the appeal.

The Appellant announced its intent to appeal in open court and appeals pursuant to Section 1053 of Title 22 of the Oklahoma statutes. (O.R. 138-172).

## STATEMENT OF THE FACTS

By the filing of its Information, the Appellant alleged that victim K.A. had been sexually abused by Appellee Adam Zilm on or about June 4, 2012. (O.R. 14-17). At the time of the first Preliminary Hearing on September 26, 2012, victim K.A. was eleven-years-old and in the fifth grade. (September 26, 2012, Tr., p.5, lines 16-20). When K.A. was in the fourth grade, she lived in

4

a home with her mother and the Appellee. (September 26, 2012, Tr., p.11, lines 19-21). Her mother and the Appellee shared a bedroom. (September 26, 2012, Tr., p.14, lines 8-10).

On many different occasions, the Appellee gave K.A. "massages" while she was not wearing any clothes. (September 26, 2012, Tr., p. 15, line 16, p.25, lines 21-25, p.17, lines 1-12). K.A. also gave the Appellee "massages" on his buttocks underneath his underwear. (September 26, 2012, Tr., p.26, lines 8-12). The Appellee taught K.A. how to give "massages". (September 26, 2012, Tr., p.16, lines 7-9). During the "massages", the Appellee and K.A. would use oil. (September 26, 2012, Tr., p.16, lines 20-22, p.17, line 11).

On the date in question, K.A.'s mother was at work. (September 26, 2012, Tr., p. 15, lines 9-10). The Appellee and K.A. were alone in the bedroom together. (September 26, 2012, Tr., p.15, lines 17-21). The Appellee was wearing his underwear. (September 26, 2012, Tr., p.15, lines 22-24). While the Appellee was lying on his bed, he moved the back of his underwear down, and K.A. used oil to "massage" the Appellee's back and buttocks. (September 26, 2012, Tr., p.16, lines 10-11, p. 16, line 25-p.17, lines 1-4, p.18, lines 5-15). The Appellee then asked K.A. if she wanted a "massage". (September 26, 2012, Tr., p.18, lines 19-22).

After K.A. took off her shirt, pants, and panties, the Appellee used oil to "massage" her back and buttocks. (September 26, 2012, Tr., p.19, lines 1, 20-24). The Appellee then touched K.A. with his penis in her butthole and she was scared. (September 26, 2012, Tr., p.24, lines 18-21, p.25, lines 1-6).

When the Appellee was done, K.A. put her clothes on and went to her bedroom. (September 26, 2012, Tr., p.53, line 6, p.54, lines 8-9). She tried to wake up her older sister and tell her, but the sister would not wake up. (September 26, 2012, Tr., p.54, lines 14-22). K.A. first

waited for her mom to come home, then went outside in the rain and waited by the dumpster. (September 26, 2012, Tr., p.54, lines 23-25, p.55, lines 9-19). K.A. then went to her neighbors' home across the street and told them what had happened. (September 26, 2012, Tr., p.55, lines 10-25). The police then became involved. (September 26, 2012, Tr., p.29, lines 12-14).

K.A. subsequently disclosed to her mother what the Appellee had done to her. (September 26, 2012, Tr., p.57, lines 2-3). K.A.'s mother was then speaking with the Appellee on the phone and her mother asked K.A. if K.A. wanted to speak with the Appellee. (September 26, 2012, Tr., p.57, lines 20-25). K.A. told her mother "sure" because she did not know what else to say. (September 26, 2012, Tr., p.58, line 1, p.29, lines 22-25) The Appellee then told K.A. that he put his hands on her back and that it could have been his thumb. (September 26, 2012, Tr., p.30, lines 1-3). The Appellee also asked K.A. if she was okay. (September 26, 2012, Tr., p.30, lines 2-3) During the same conversation, K.A. expressed interest in getting a puppy and her mother conditioned the idea upon the Appellee's approval. (September 26, 2012, Tr., p.58, lines 8-25).

Months after the first Preliminary Hearing and after the Motion to Quash the Preliminary Hearing had been denied, Appellee's counsel filed a "Motion for Order Authorizing Face-to-Face Interview with Minor Children and Memorandum of Law in Support" on February 19, 2013. (O.R. 32-35). In his Motion, the Appellee argued:

> Counsel should not have to rely on evidence gathered by the Department of Human Services (almost always composed of individuals hostile to a criminal defendant charged with sexual abuse) to develop evidence which would be favorable to the defendant and/or cast doubt on the credibility of the alleged victim which the Department of Human Services clearly has concluded as the victim to sexual abuse…and that Counsel should have the right to interview those children…under circumstances which would enhance the chances of truthful and complete and objective

responses to counsel's questions. Those circumstances, based upon counsel's 37 years of experience, rarely occur in DHS forensic interviews. (O.R. 33).

The Appellant State of Oklahoma filed its Response and Objection on February 25, 2013. (O.R. 36-42). In its pleading the Appellant set forth that no one could force an out-of-court meeting with any witness – whether adult or child. (O.R. 38-39). The State argued that with respect to the case at bar, the minor victim was not entitled to any less protection, simply because she was a child. (O.R. 39). The State outlined that because the minor victim was in the custody of the Department of Human Services, it was the responsibility of the Department to act in the place of her parents and to either consent or not consent to the interview requests of the Defendant. (O.R. 40-41). The State also set forth that because the minor victim was represented by her own attorney, it was incumbent upon defense counsel to facilitate any interview requests through that attorney. (O.R. 40-41). The State assured the Court that both the Department of Human Services AND the minor victim's attorney did NOT consent to an out-of-court interview on her behalf. (O.R. 40-41).

A Hearing on the matter was held before the Honorable Judge Glassco on March 1, 2013. (March 1, 2013, Tr.). During the Hearing, the Appellant informed the Court and the Appellee that regardless of where the child victim and her siblings were currently physically located and/or regardless of whom they were living with, the children were in the custody of the Department of Human Services. (March 1, 2013, Tr., p.4, lines 7-13). The Appellant explained that DHS was the current legal guardian and custodian and that DHS was the entity that was charged with making decisions on behalf of the children. (March 1, 2013, Tr., p.4, lines 13-16). The Appellant told the Court that DHS had denied the Appellee's request for an interview, as had the

child's lawyer. (March 1, 2013, Tr., p.4, lines 17-23).

Even after being provided that information, the Appellee's counsel inquired of the Court why he could not be given the name of the custodians of the children so that he could inquire of the custodians about whether they would give permission for an interview. (March 1, 2013, Tr., p.4, lines 24-25, p.5, lines 1-2). It was again explained to Appellee's counsel that the custodians did not have the authority to authorize an interview, but rather, that authority was placed solely with the Department of Human Services. (March 1, 2013, Tr., p.5, lines 3-22). Appellee's counsel told the Court:

> Judge, all I want is to have someone in whom I have some confidence tell me that in an unpressured situation, in a situation where no one was trying to get this girl to say or not say anything, inquire of her if she has any answers to some questions, and if she has any opinion with respect to my client's character, and/or the character of her little sister with respect to truthfulness? That's all I'm asking...(March 1, 2013, Tr., p.15, lines13-20)...I can represent to the Court what I'm going to do, and I want to be very up front and aboveboard. You if deny this motion [sic], I'm gonna contact her lawyer, the actual hands-on lawyer who really does have contact with her, and ask that lawyer to ask her those questions. If that's her protector-ist, if you will, then I think that she'll either do that or she won't, and perhaps I'll find something out. (March 1, 2013, Tr., p.17, lines 2-10)...I'm going to go to the horse's mouth. (March 1, 2013, Tr., p.18, line 21).

At the conclusion of the Hearing, the District Court then directed Appellee's counsel how to proceed:

> It would seem to me, Mr. Smallwood, that you need to make a call to this lawyer. And you need to represent do you get to interview this child or not?...And if they refuse to speak with you – and then we have an instruction already that deals with, it's proper for an attorney to interview clients, if you have an instruction that you would like to submit that the witness refused to be interviewed, I'll consider it. Because it would seem like that would be fair under

8

the circumstances. (March 1, 2013, Tr., p.18, lines 23-25, p.19, lines 4-8).

Subsequently, after becoming aware that Appellee's counsel had proceeded in taking a sworn statement from the child victim on July 24, 2013, the Appellant filed a "Motion in Limine Regarding Prior Sexual Abuse and Statement Taken by Defense Counsel". (O.R. 73-79). In the Motion, the Appellant informed the Court that on or about July 8, 2013, defense counsel sent a letter to the minor victim's attorney and informed her that he "intended" to take the child's "statement" but did not include a date, time, or location for that statement. (O.R. 77-78). The Appellant informed the Court that Appellee's counsel did not notify the minor victim's legal custodian, the Department of Human Services, before taking the statement despite the fact that he had been directly and repeatedly told that the Department would not agree to submit the minor victim for an interview. (O.R. 77). The Appellant likewise informed the Court that Appellee's counsel did not notify the State of Oklahoma before taking the statement. (O.R. 77). Instead, the Appellant informed the Court that on July 24, 2013, without any further notice to the minor victim's legal custodian, attorney, and/or any other party, Appellee's counsel and a court reporter appeared at the home of the minor victim's grandmother and took a sworn statement from the minor victim. (O.R. 78).

As set forth in the Appellant's Motion, during the "sworn statement", only Appellee's counsel was present to question the minor victim. (O.R. 78). The Motion explained that the minor victim was not represented by her own attorney, her mother was not present, and her legal custodian, DHS, was not present. (O.R. 78). Also contained within that Motion, the Appellant set forth the history and the impropriety of what had occurred. (O.R. 73-79). The Appellant further set

forth that the "statement" taken by Appellee's counsel was extremely leading and suggestive and that it was not conducted in any type of forensically sound manner. (O.R. 78). As examples, the Appellant referenced portions of the transcript of the sworn statement wherein representative questions by Appellee's counsel include one that took 17 lines of transcript and another that took 26 lines before the minor child was allowed to answer. (O.R. 78).

On August 28, 2013, Appellant filed his Response to the State's Motion. (O.R. 65-71). In his Response, Appellee's counsel admitted that he "did not notify DHS" before arranging or conducting his interview of the minor child. (O.R. 66). Appellee's counsel claimed in the Response that he had a "good reason" for not doing so. (O.R. 66). As his "good reason", counsel admitted that "DHS would have prevented counsel...from taking the statement" so he simply made the choice to do so without their knowledge and/or consent. (O.R. 66).

A Hearing was held on the matter on August 29, 2013 and the Court heard extensive argument. (August 29, 2013, Tr., p.42, line 17- p.70, line 2). After hearing the arguments of counsel, the District Court stated:

> I have read this transcript. Okay? My inclination, quite frankly,
> today is to allow the transcript for the purposes of cross-examination.
> Because it is a sworn statement. Ms. McAmis, whoever is the legal
> custodian entity of this child, which I believe is DHS from what
> you're telling me...is the person that needs to come in and make an
> objection about this. Not the State of Oklahoma. I don't believe that
> you have standing to stand in their shoes and make that objection
> based upon what's been given to me here. Now, if they file an
> objection, we'll have another hearing on it. As it is right now, the
> way I see this, this statement is only admissible for cross-
> examination purposes. And I'll grant you an exception. (August 29,
> 2013, Tr., p.67, lines 2-18).

On September 3, 2013, the Appellant filed a Motion to Reconsider the Judge's Ruling and

argued and asserted that the Appellant did in fact have standing to object. (O.R. 73-79). On the same date, the Appellant also filed a Motion in Limine which sought to exclude portions of the "sworn statement" that had been taken by Appellee's counsel. (O.R. 80-94). On September 4, 2013, the Appellee filed a "Motion to Dismiss and/or in the alternative to Remand for Preliminary Hearing for the State's Failure to Provide Exculpatory Evidence on a Timely Basis Which Denied Defendant Due Process of Law in a Meaningful Preliminary Hearing and Memorandum of Law in Support". (O.R. 95-105). In the Motion, Appellee's counsel referred to both the "sworn statement" that he had taken of the minor victim and to alleged conduct by a DHS worker after the taking of the "sworn statement". (O.R. 98). On September 25, 2013, the Appellee filed a "Motion for Reconsideration of Counsel's Motion to Remand for Meaningful Preliminary Hearing". (O.R. 106-116).

The Court heard extensive argument on October 3, 2013. (October 3, 2013, Tr., p.2, line 3-p.41, line 9). On October 7, 2013, the Court reconvened to issue a Ruling. (October 7, 2013, Tr.). The Court found that the first Preliminary Hearing was a "nullity" and the matter was remanded for a new Preliminary Hearing. (October 7, 2013, Tr., p.3, lines 22-23).

On November 6, 2013, a second Preliminary Hearing was held. (November 6, 2013, Tr.). Kristina Alvarez testified that her daughter, K.A., was born on March 7, 2001. (November 6, 2013, Tr., p.9, lines 14-18). Ms. Alvarez, K.A., her three siblings, and the Appellee all lived together at 131 North Louisville Ave, Tulsa, in Tulsa County, Oklahoma in June of 2012 and they had lived there for approximately three years. (November 6, 2013, Tr., p.9, line 19-p.10, line 15). The Appellee was approximately 30-years-old at the time. (November 6, 2013, Tr., p.10, lines 16-18). Ms. Alvarez worked overnights and the Appellee stayed home with the children. (November

6, 2013,Tr., p.11, lines 2-18).  On the morning of June 4, 2012, Ms. Alvarez received a phone call at work and then the Tulsa Police Department responded to her neighbor's home.  (November 6, 2013,Tr., p.11, line 23-p.12, lines 1-14).

Detective Mark Hodges testified that he has been a law enforcement officer for 19 years and that he was assigned to the Child Crisis Unit for 8 years.  (November 6, 2013, Tr., p.48, lines 1-13). On June 4, 2012, Det. Hodges interviewed the Appellee.  (November 6, 2013, Tr., p.10, lines 8-13).  The Appellee was not under arrest and he was free to leave at all times.  (November 6, 2013, Tr., p.52, lines 21-25).  The Appellee told Det. Hodges that he lived with K.A., her mother, and her siblings.  (November 6, 2013, Tr., p.54, lines 9-11).  The Appellee then described his version of the events that had taken place that morning with 11-year-old K.A..

The Appellee said that while Ms. Alvarez was at work, he and K.A. were lying on his bedroom bed at around 5:00 or 5:30 in the morning.  (November 6, 2013, Tr., p.57, lines 1-5, p.55, lines 16-21).    The Appellee explained that K.A. was wearing a t-shirt and socks, but no panties, and that he was wearing boxers.  (November 6, 2013, Tr., p.55, line 17-p.56, lines 1-21).  The Appellee said that K.A. massaged his back.  (November 6, 2013, Tr., p.55, lines 12-13).  After the back massage, the Appellee said that he put almond oil on K.A. and massaged her buttocks and the area that runs next to her labia majora.  (November 6, 2013, Tr., p.57, lines 18-25, p.58, lines 3-6). The Appellee said that he went around K.A.'s vaginal area with his thumbs and that he rubbed or massaged her labia majora for around five minutes.  (November 6, 2013, Tr., p.58, lines 12-23). The Appellee said he put his thumbs in the crack of K.A.'s anus.  (November 6, 2013, Tr., p.59, lines 11-14).  The Appellee also said that he rubbed K.A.'s inner thighs.  (November 6, 2013, Tr., p.59, lines 19-20).

12

The Appellee said that while he was rubbing K.A.'s buttocks, his hand slipped on the oil and his thumb jammed her anus. (November 6, 2013, Tr., p.60, lines 16-19). The Appellee said that K.A. jumped and that he apologized. (November 6, 2013, Tr., p.60, lines 16-19). When asked about the medical trauma to K.A.'s anus, he said that it could only have been from when he slipped and poked her with his thumb. (November 6, 2013, Tr., p.62, lines 17-18).

The Appellee said that he had massaged K.A. in the way described above ten times. (November 6, 2013, Tr., p.63, lines 6-9). The Appellee acknowledged that this type of massage with an 11-year-old girl did not look very good. (November 6, 2013, Tr., p.64, lines 7-11). The Appellee also acknowledged that the night before the most recent massage of K.A., while Ms. Alvarez was at work and while he was home alone with the children, he had made a comment to the children about how he was horny. (November 6, 2013, Tr., p.67, lines 2-3, p.68, lines 1-3).

The Appellee was asked why his DNA might be found on K.A.. (November 6, 2013, Tr., p.64, lines 16-17). The Appellee responded by saying "Wow. Oh shit" and then said that when he laid down next to K.A., he squashed his testicles. (November 6, 2013, Tr., p.66, line 9, p.64, lines 20-21). The Appellee said that he reached his hand into his boxers to adjust himself, got pre-cum leakage on his hand, and then continued to massage K.A.. (November 6, 2013, Tr., p.64, line 22-p.65, lines 1-3).

At the conclusion of the second Preliminary Hearing, the Appellee was bound over for District Court Arraignment. (November 6, 2013, Tr. p.97, lines 9-15). The Appellee filed a "Motion to Quash Evidence Adduced at Preliminary Hearing and Memorandum of Law in Support" on December 30, 2013 (O.R. 118-129) and the Appellant filed a Response and Objection on January 17, 2014. (O.R. 130-137). The Motion to Quash was overruled by the District Court on

February 10, 2014 and the case was set for Jury Trial on October 6, 2014. (February 10, 2014, Tr., p.18, lines 7-8, p.19, line 11).

On September 9, 2014, the case proceeded to a Child Hearsay Reliability Hearing pursuant to 12 Okla. Stat. § 2803.1. (September 9, 2014, Tr., O.R. 50-51). Before the Hearing began, the Appellant brought it to the Court's attention that the child victim had been subpoenaed by the Appellee to appear and testify at the Hearing and that it was the Appellant's position that the Court should not allow the child victim to be called to testify and/or should not consider the child victim's testimony for the purposes of the Hearsay Hearing. (September 9, 2014, Tr., p.4, lines 9-25, p.5, lines 1-2). In response to the Appellant's initial argument, the Appellee argued that the child victim's testimony at the Hearsay Hearing was important because he argued that at the time of her initial disclosure of sexual abuse against the Appellee "she was operating under either sleep or a dream-like state hearkening back to a three- or four-year-old instance of child molestation by her uncle, I believe, in the State of Louisiana." (September 9, 2014, Tr., p.5, lines19-22).

For the purposes of establishing the reliability of its proffered child hearsay statements, the Appellant first called Amy Howard as a witness. (September 9, 2014, Tr., p.10, line 6). Ms. Howard told the Court that she had previously worked as a hospital social worker and a child welfare investigator and that as part of her employment in both of those positions, she had received training on how to interview children when there had been an allegation of abuse or neglect and that she had in fact interviewed children as part of her employment in both of those positions. (September 9, 2014, Tr., p.13, lines 20-25, p.14, lines 1-14). Ms. Howard testified that for the past five and one-half years, she has been employed as a Child Specialist for the

Child Abuse Network and that her position includes working as both a forensic interviewer and a mental health specialist. (September 9, 2014, Tr., p.11, lines 8-17). Ms. Howard told the Court that she had been specially trained to conduct fact-finding forensic interviews of children by utilizing a nationally recognized method known as the CornerHouse or "RATAC" method. (September 9, 2014, Tr., p.11, lines 20-25, p.12, lines 6-10). Ms. Howard testified that she had been trained in both the initial CornerHouse method and in the advanced method and that she has continued to update her training in the years after. (September 9, 2014, Tr., p.12, lines 11-22). Ms. Howard stated that as part of her continuing training and experience, she participates in monthly national peer reviews and quarterly statewide peer reviews. (September 9, 2014, Tr., p.12, lines 22-25). Ms. Howard explained that she has conducted over 2500 forensic interviews during her tenure at the Child Abuse Network and that she has testified as a forensic interviewer in Oklahoma and in other states. (September 9, 2014, Tr., p.14, lines 15-25, p.15, lines 1-2). Ms. Howard testified that she teaches social science and human services at both Tulsa Community College and Saint Gregory's University and that she has a license in clinical social work. (September 9, 2014, Tr., p.15, lines 3-12).

When preparing to conduct a forensic interview, Ms. Howard explained that she receives only very limited information regarding the basics of the allegation because it gives her the opportunity to seek the information from the child herself. (September 9, 2014, Tr., p.15, lines 13-22). Ms. Howard told the Court that the forensic interviews are recorded from start to finish by audio and video. (September 9, 2014, Tr., p.15, lines 23-24). Ms. Howard explained that the "RATAC" process is a five-part interview process which stands for rapport, anatomy identification, touch inquiry, abuse scenario, and closure. (September 9, 2014, Tr., p.11, lines

25-p.12, lines 1-2).   She stated that the "RATAC" process allows for a non-leading, non-suggestive interview that gives a child the opportunity to talk about her experiences without having something put in her mind that did or did not happen. (September 9, 2014, Tr., p.13, lines 17-19).  She told the Court that an investigator observes the forensic interview through a one-way mirror and may communicate with her through an earpiece, but that it is ultimately her responsibility to determine what questions should be asked and in what way the questions should be asked. (September 9, 2014, Tr., p.16, lines 7-24).

Ms. Howard then described the interview that she had conducted on June 4, 2012 of the child victim in the case at bar, K.A.. (September 9, 2014, Tr., p.16, line 25-p.17, line 5).  Ms. Howard stated that during the course of the interview, only herself and K.A. were in the room and that Detective Mark Hodges from the Tulsa Police Department was watching from behind the two-way mirror.  (September 9, 2014, Tr., p.17, lines 19-25, p.18, line 6).  Ms. Howard testified that K.A. was eleven-years-old at the time of the interview and that Ms. Howard explained the "rules of the room" including the fact that there was a two-way mirror and that Ms. Howard would be wearing an earpiece, etc., to K.A. before the interview began.  (September 9, 2014, Tr., p.18, lines 10-13).  Ms. Howard stated that she utilized the "RATAC" procedure during the course of the interview with K.A. and that she began the interview by establishing rapport. (September 9, 2014, Tr., p.18, lines 14-25, p.19, line 1).

Ms. Howard testified that, during the interview, she was able to ascertain that the abuse that K.A. was describing had occurred earlier on the same morning as the interview.  (September 9, 2014, Tr., p.19, lines 3-7).  Ms. Howard described K.A. as being very quiet during the interview, but that she seemed open to talking.  (September 9, 2014, Tr., p.19, lines 1-2).  Ms.

Howard said that at times during the interview, K.A. was whispering her answers and that she was able to communicate well. (September 9, 2014, Tr., p.19, lines 12-18). Ms. Howard said that K.A. was "cocooned in a blanket" during the interview and that she stayed in the blanket during the entire interview. (September 9, 2014, Tr., p.19, lines 11-14).

Ms. Howard explained that she asked K.A. why she had come to talk today and that before that question was asked, there had been no discussion whatsoever about any type of abuse. (September 9, 2014, Tr., p.20, lines 11-14). Ms. Howard explained that K.A. conveyed that no one had told her what to say during the course of the forensic interview. (September 9, 2014, Tr., p.49, lines 3-15). In response to the question as to why she was there, Ms. Howard stated that K.A. was the one who brought up the abuse by telling her that Adam (the Appellee), who she also referred to as "Big Daddy" or "A" (because she was uncomfortable saying "Adam"), had touched her inappropriately during a massage. (September 9, 2014, Tr., p.20, lines 17-25, p.21, lines 7-9). Ms. Howard testified that K.A. "rattled off really quickly" all that had happened, including the fact that she told Adam she wanted to go to bed and then she ran from him out of the bedroom and out of the house to the neighbors, and that Ms. Howard then took a step back and slowly went through the interview process. (September 9, 2014, Tr., p.20, lines 24-25, p.21, lines 1-6).

Ms. Howard testified that throughout her interview of K.A., she used non-leading, open-ended questions. (September 9, 2014, Tr., p.21, lines 12-14). She also testified that she sometimes used multiple choice questions with two options and a "something else" or "anything else" option to give K.A. an opportunity to give a different answer. (September 9, 2014, Tr., p.21, lines 14-17). Ms. Howard described that during the forensic interview, K.A. was clear in

describing the details about what had happened. (September 9, 2014, Tr., p.21, lines 19-22). As an example, Ms. Howard referenced points in the forensic interview when K.A. was describing the bedroom in which the abuse had occurred and was very specific about the color of the sheets, how the pillows were, and how one pillow was harder than the other. (September 9, 2014, Tr., p.21, lines 19-25, p.22, lines 1-2). Ms. Howard also detailed how K.A. was very spontaneous and described things that had not been asked about, such as giving examples of how things felt to her. (September 9, 2014, Tr., p.22, lines 3-5).

Ms. Howard testified that after K.A. had blurted out the information in the beginning of the forensic interview and as Ms. Howard went back over the information, K.A. was consistent throughout and she continued to tell Ms. Howard the same information. (September 9, 2014, Tr., p.22, lines 6-13). Ms. Howard said that K.A. never took back anything that she had disclosed during the forensic interview and that she never said that she was mistaken and/or that she had made it up. (September 9, 2014, Tr., p.22, lines 14-17).

Ms. Howard described K.A.'s non-verbal demeanor during the forensic interview as very withdrawn and that she basically stayed inside of her blanket as if she were unwilling to come out – in a "turtle-ish"-type fashion. (September 9, 2014, Tr., p.22, lines 22-25, p.23, lines 1-5). Ms. Howard testified that she had explained to K.A. during the forensic interview that she should correct Ms. Howard if Ms. Howard got anything wrong and that several times during the interview, K.A. actually demonstrated that she had understood the instruction by following-through and correcting Ms. Howard by stating things such as "that's not what I said". (September 9, 2014, Tr., p.23, lines 6-17). Ms. Howard explained that the fact that K.A. corrected Ms. Howard and the fact that K.A. sought clarification during the forensic interview by

asking Ms. Howard to explain was significant because it meant that K.A. was following what Ms. Howard said throughout the interview and that K.A. felt comfortable during the interview. (September 9, 2014, Tr., p.23, lines 10-25).

Ms. Howard testified that during the course of the forensic interview, K.A. was spontaneous in her answers and in the information that she provided. (September 9, 2014, Tr., p.24, lines 6-10). Ms. Howard testified that K.A. used terminology during the course of the forensic interview that was consistent with what Ms. Howard would expect of a child of that age and ability. (September 9, 2014, Tr., p.24, lines 11-14). Ms. Howard also testified that during the course of the forensic interview, she did not become aware of any information from K.A. which caused any concern about a motive to fabricate. (September 9, 2014, Tr., p.24, lines 2-5).

Ms. Howard was asked what factors she looks at during the course of a forensic interview to determine the reliability of the interview. (September 9, 2014, Tr., p.52, line 25, p.53, line 1). Ms. Howard said she considers the content of the forensic interview, how the child's demeanor is during the interview, and whether she stays consistent throughout the interview. (September 9, 2014, Tr., p.53, lines 2-4). Ms. Howard testified that K.A. was consistent in her disclosure, her demeanor was appropriate for what they were discussing and that it stayed the same throughout, and that there was not anything about K.A.'s description of the experience that changed from the beginning to the end. (September 9, 2014, Tr., p.53, lines 5-9). Through Ms. Howard, the actual DVD of K.A.'s forensic interview was admitted into evidence. (September 9, 2014, Tr., p.25, lines16-p.26, lines 1-7).

During cross-examination, Ms. Howard was asked what was posed as a hypothetical question about whether it would impact Ms. Howard's determination that the forensic interview

of K.A. was reliable if after K.A.'s disclosures during the forensic interview, K.A. had subsequently recanted and/or said that she was "dreaming" or "having flashbacks from a prior molestation". (September 9, 2014, Tr., p.45, lines 16-23). Ms. Howard responded that it would not affect her opinion as to the reliability of the forensic interview. (September 9, 2014, Tr., p.45, lines 16-24, p.46, lines 1-25, p.47, lines 1-3). Ms. Howard also testified that recantation by a victim can be a part of the disclosure process and the fact that a victim recants does not necessarily mean that the abuse did not happen. (September 9, 2014, Tr., p.48, lines 17-23). Ms. Howard testified that if a child recants after a forensic interview, that recantation does not mean that the initial disclosure during the forensic interview was invalid. (September 9, 2014, Tr., p.48, lines 24-25, p.49, lines 1-2).

Ms. Howard was also asked whether during the forensic interview, K.A. had disclosed a previous occasion of sexual abuse in the form of sodomy that had happened to her by a different perpetrator, her uncle, in another state on Christmas Eve when she was five-year-old and Ms. Howard answered in the affirmative. (September 9, 2014, Tr., p.38, lines 16-21). Ms. Howard testified that she was able to determine that there was a significant time frame between the abuse perpetrated by the uncle and the abuse perpetrated by "Adam". (September 9, 2014, Tr., p.51, lines 9-18). Ms. Howard said that K.A. told her that she had already spoken to others about the abuse by the uncle. (September 9, 2014, Tr., p.51, lines 19-21). Ms. Howard testified that she informed and directed K.A. that during the course of the forensic interview, they were only going to discuss and talk about the abuse that was specifically perpetrated by the "Adam" and that there was no further discussion about the uncle. (September 9, 2014, Tr., p.51, lines 19-24).

During cross-examination, Ms. Howard was asked about the hypothetical of a child being

20

hypervigilant and possibly mis-interpreting certain touches. (September 9, 2014, Tr., p.39, lines 2-25, p.40, lines 1-17).  However, Ms. Howard testified that the type of touching that K.A. had described during the forensic interview was not simple, innocent, or mistaken, but that she was very specific in her descriptions of touching that amounted to sexual abuse. (September 9, 2014, Tr., p.52, lines 1-19).

During the Hearsay Reliability Hearing, the State of Oklahoma also called Katherine Sanford to testify. (September 9, 2014, Tr., p.53, line 25-p.54, line 1).  Ms. Sanford was an employee of the Department of Human Services and had worked at the Laura Dester Children's Center for ten years. (September 9, 2014, Tr., p.68, lines 9-13).  Ms. Sanford lived across the street from K.A. and the Appellee and she had known the Appellee for approximately four or five months. (September 9, 2014, Tr., p.69, lines 10-21). Ms. Sanford testified that between 6:00 and 6:15 a.m. on June 4, 2012, she was in the shower getting ready to go to work.  (September 9, 2014, Tr., p.55, lines 8-20).  Ms. Sanford said that it had been raining hard that morning. (September 9, 2014, Tr., p.55, lines 21-25, p.56, line 1).  While Ms. Sanford was in the shower, she heard the doorbell ring several times and she called out to her roommate, who was sleeping, to answer the door. (September 9, 2014, Tr., p.56, lines 2-8, 22, p.72, lines 3-8).  Ms. Sanford said that her roommate did not answer her so she got out of the shower, put on a robe, went to the front door and asked who was there. (September 9, 2014, Tr., p.56, lines 20-25, p.57, lines 1-2). Ms. Sanford said that K.A. identified that it was her at the door, that she knew K.A. as her eleven-year-old neighbor, and that she opened the door immediately. (September 9, 2014, Tr., p.57, lines 3-16).

Ms. Sanford said that K.A. was soaking wet, had a towel on her head, and was very upset,

scared, crying and shaking. (September 9, 2014, Tr., p.57, lines 17-23, p.72, lines 23-25). Ms. Sanford explained that she had no prior knowledge that K.A. would be coming over and that she had no idea what was wrong with K.A., so she asked her what was wrong. (September 9, 2014, Tr., p.57, lines 24-25, p.58, lines 1-6). Ms. Sanford said that K.A. told her that "Adam" (who K.A. called "Big Daddy") had touched her. (September 9, 2014, Tr., p.58, lines 7-18). Ms. Sanford said that as K.A. was telling her what had happened, K.A. continued to cry and was very upset. (September 9, 2014, Tr., p.58, lines 22-24). Ms. Sanford described that she calmly invited K.A. into the home and then Ms. Sanford woke her roommate and let her know that there was an emergency. (September 9, 2014, Tr., p.59, lines 1-11). Ms. Sanford described that she and her roommate attempted to calm K.A. and that Ms. Sanford called K.A.'s mother, Kristi, and told her to come immediately to the home. (September 9, 2014, Tr., p.60, lines 1-25). Ms. Sanford testified that K.A. told her that she had pretended to be asleep when "Big Daddy" came into her room, she saw his penis, and that he had tried to put his penis in her butt. (September 9, 2014, Tr., p.64, lines 20-25, p.65, lines 1-9).

Ms. Sanford testified that when Kristi arrived and was told what had happened, Kristi fell apart and as K.A. was crying, K.A. began to hold and comfort her mother. (September 9, 2014, Tr., p.61, lines 13-20, p.62, lines 3-6). Ms. Sanford testified that no one was trying to interrogate K.A. and that no one had told her what to say. (September 9, 2014, Tr., p.62, lines 9-12). Ms. Sanford also testified that a phone call was placed to the police. (September 9, 2014, Tr., p.61, lines 21-24).

Ms. Sanford explained that after the police arrived, she took K.A. and her mother Kristi to the hospital so that K.A. could be given a SANE exam. (September 9, 2014, Tr., p.63, lines 6-

8).  Immediately after the SANE exam, Ms. Sanford testified that she took K.A. and Kristi to the Justice Center for the forensic interview.  (September 9, 2014, Tr., p.63, lines 9-12).  Ms. Sanford explained that she told K.A. that they were going to the Justice Center and that a lady would take her into a room and ask her questions but that no one told K.A. what to say or how to say it. (September 9, 2014, Tr., p.63, lines 20-25, p.64, lines 1-8).  After the forensic interview at the Justice Center, Ms. Sanford said that K.A. came back to her residence and stayed with her for a time period. (September 9, 2014, Tr., p.64, lines 9-12).

During the next couple of days when K.A. was staying with Ms. Sanford, K.A. told Ms. Sanford that her mother, Kristi, did not believe her.  (September 9, 2014, Tr., p.66, lines 20-25). While she was staying with Ms. Sanford, K.A. never took back her disclosure about "Big Daddy" nor did she say that she had lied or made anything up. (September 9, 2014, Tr., p.67, lines 1-5).

On cross-examination, Ms. Sanford testified that when she opened the door and discovered K.A. that morning, she did <u>not</u> believe that K.A. had just awakened from a nightmare or that her demeanor was consistent with a child who had just awakened from a nightmare. (September 9, 2014, Tr., p.73, lines 8-18).

After extensive argument and over the State's strenuous objection, the Defendant was then allowed the opportunity to present the victim K.A. for the purposes of the child hearsay reliability hearing. (September 9, 2014, Tr., p.101, line 9-p.113, line 25).  The Court was the one who conducted the inquiry of K.A.  (September 9, 2014, Tr., p.117, lines 7-8).  The Court noted that during her testimony, K.A. was emotional and tearful. (September 9, 2014, Tr., p.124, lines 22-23).  K.A. told the Court that she referred to "Adam" by the name "Big Daddy". (September 9, 2014, Tr., p.121, lines 7-16).  K.A. testified that she had told the neighbor that she had had a

nightmare. (September 9, 2014, Tr., p.121, line 25- 122, lines 1-2). K.A. also testified that she had tried to tell "Sarah" and Lori Hannagan from DHS that "Big Daddy" had not touched her inappropriately and that she had been taken away from her mom because she said that nothing had happened. (September 9, 2014, Tr., p.122, lines 13-22, p.123, lines 3-8). K.A. further testified that "Lori" told her that she could go home if she said that her mom had told her to say that nothing had happened and that "Sarah" (referring to the undersigned Assistant District Attorney) told K.A. that if she said what she had said in the beginning, that she could go back to living with her mom. (September 9, 2014, Tr., p.124, lines 11-15, p.127, lines 1-25). K.A. testified that all of this was a mistake because she had had a nightmare on the night in question and that her neighbor Katherine had told her what to say at the Justice Center. (September 9, 2014, Tr., p.129, lines 13-16, p.130, lines 2-13). K.A. also testified that she was "pretty sure it was like the first night that we weren't at Katherine and Karen's" that she "told my mom that it was a mistake" and that "it wasn't true that it had happened". (September 9, 2014, Tr., p.130, lines 18-24). K.A. told the Court that she "just want[ed] all of this to be over with". (September 9, 2014, Tr., p.133, lines 2-3).

After K.A. testified, the undersigned responded to certain statements that K.A. had made. (September 9, 2014, Tr., p.135, line 5-p.137, line 14). As an officer of the Court, the undersigned affirmed to the Court that she had never met with or spoken to K.A. alone and that when she had met with K.A., Assistant District Attorney Travis Horton and Victim Advocate Heather Prater had been with her at all times. (September 9, 2014, Tr., p.135, lines 10-21). The undersigned affirmed to the Court that she had never made the statements to K.A. that K.A. had testified to and that she would never and had never told K.A. or any other victim that she should

testify in a certain way or that if she didn't testify in a certain way, she would or would not be allowed to go home. (September 9, 2014, Tr., p.137, lines 3-10). The undersigned also affirmed to the Court that K.A. had never recanted the allegations to her and that if any child or any witness had ever recanted to her, the undersigned understood that she had an ethical, moral, and legal responsibility to report that information and that if that situation ever had or ever did arise, the undersigned would report that information immediately to both the defense counsel and the Court. (September 9, 2014, Tr., p.136, lines 4-25, p.137, lines 1-14). The Hearing was then concluded for the day with the Court taking the matter under advisement. (September 9, 2014, Tr., p.139, lines 16-18).

On September 12, 2014, the parties met again so that the Court could announce its ruling on the issue of the Child Hearsay proffered by the State. (September 12, 2014, Tr., p.4, lines 14-15). The Court stated that it had viewed the video and reviewed the transcript of K.A.'s forensic interview and that it would allow further argument from the parties. (September 12, 2014, Tr., p.4, lines 18-21). After hearing the argument of the parties, the Court announced that he had read "2803.1" and the "*Davenport*" case and that based upon a totality of the circumstances, he was suppressing the forensic interview of K.A. conducted by Amy Howard and that it would not be admissible. (September 12, 2014, Tr., p.17, lines 11-21). The Court also suppressed the statements made by K.A. to Katherine Sanford (September 12, 2014, Tr., p.17, lines 22-25, p.18, lines 1-6). With respect to his ruling regarding Ms. Sanford, the Court explained that he had a difficult time following her and that she appeared to change her testimony about what had happened. (September 12, 2014, Tr., p.18, lines 3-6). The Court offered no further comment on why it was suppressing the forensic interview conducted by Ms. Howard. Upon the Court's

ruling, the State announced its intent to appeal the ruling and requested that the case be stayed pending the appeal. (September 12, 2014, Tr., p.18, lines 18-24, p.19, lines 1-2). Thereafter, the State perfected its appeal to this Court. (O.R. 138-172).

## STANDARD OF REVIEW

In his Ruling wherein he determined that the child hearsay statements offered by the State should be denied and suppressed, Judge Glassco did not clearly articulate his reasoning but, in so ruling, he made an implied finding that the statements were not inherently trustworthy. (September 12, 2014, Tr., p.17, lines 11-25, p.18, lines 1-6). A trial court's decision to suppress evidence is reviewed for an abuse of discretion. *State v. Pope*, 2009 OK CR 9, ¶ 4, 204 P.3d 1285, 1287. The appellate court defers to the trial court's findings of fact unless they are clearly erroneous and reviews the trial court's legal conclusions de novo. *Id.* "An abuse of discretion is any unreasonable or arbitrary action taken without proper consideration of the facts and law pertaining to the issue; a clearly erroneous conclusion and judgment, clearly against the logic and effect of the facts. *Neloms v. State*, 2012 OK CR 7, ¶ 35, 274 P.3d 161, 170.

Because the State has appealed under 22 O.S. Sec. 1053(5), the State is also required to demonstrate that this appeal is in the best interests of justice. See *State v. Sayerwinnie*, 2007 OK CR 11, 157 P.3d 137, 137 ("we define the phrase "best interests of justice" to mean that the evidence suppressed forms a substantial part of the proof of the pending charge, and the State's ability to prosecute the case is substantially impaired or restricted absent the suppressed or excluded evidence").

## ARGUMENT AND AUTHORITY

### THE DISTRICT COURT ERRED WHEN FINDING THAT THE CHILD HEARSAY STATEMENTS SHOULD BE SUPPRESSED AND DENIED.

As set forth above, the Appellant State of Oklahoma presented substantial evidence to demonstrate that the proffered child hearsay statements were inherently reliable and should be admitted. Despite that evidence, Judge Glassco denied and suppressed the statements without providing a sufficient factual basis to support his decision. Judge Glassco's ruling was made without proper consideration of the facts and law pertaining to the issue and he reached a clearly erroneous conclusion. By ruling that the statements would not be admissible, the trial court suppressed a substantial part of the State's proof of the pending charge. As a result of the ruling and without the statements, the State's ability to prosecute the case is substantially impaired and restricted.

The Oklahoma Legislature has provided a specific procedure to be utilized when the State of Oklahoma seeks to introduce the hearsay testimony of a child who has previously described acts of sexual or physical abuse. Pursuant to 12 Okla. Stat. § 2803.1, the following procedure must be followed before such hearsay may be admitted:

> A. A statement made by a child who has not attained thirteen (13) years of age...which describes any act of physical abuse against the child...or any act of sexual contact performed with or on the child...by another, is admissible in criminal and juvenile proceedings in the courts in this state if:
>
> 1. The court finds, in a hearing conducted outside the presence of the jury, that the time, content and totality of circumstances surrounding the taking of the statement provide sufficient indicia of reliability so as to render it inherently trustworthy. In determining such trustworthiness, the court may consider, among

other things, the following factors: the spontaneity and consistent repetition of the statement, the mental state of the declarant, whether the terminology used is unexpected of a child of similar age or of an incapacitated person, and whether a lack of motive to fabricate exists; and

2. The child...either:

a. testifies or is available to testify at the proceedings in open court or through an alternative method pursuant to the provisions of the Uniform Child Witness Testimony by Alternative Methods Act or Section 2611.2 of this title, or

b. is unavailable as defined in Section 2804 of this title as a witness. When the child...is unavailable, such statement may be admitted only if there is corroborative evidence of the act.

B. A statement may not be admitted under this section unless the proponent of the statement makes known to the adverse party an intention to offer the statement and the particulars of the statement at least ten (10) days in advance of the proceedings to provide the adverse party with an opportunity to prepare to answer the statement.

In the case at bar, the Appellant followed the mandated procedure and filed its "Notice of Intent to Offer Hearsay Statements of Children Under the Age of Thirteen Years" on August 23, 2013. (O.R. 50-51). The trial Court then properly scheduled and conducted the Reliability Hearing on September 9, 2014. (September 9, 2014, Tr.). However, the Appellant alleges that the trial court should not have allowed the child victim to testify at the Reliability Hearing, that the Court should not have considered subsequent statements made by the child victim, and that the Court erred when it suppressed the offered statements.

In the statute itself, the Legislature refers to the "statement" in its singular form nine (9) different times. 12 Okla. Stat. § 2803.1. The statute does not suggest or imply in any fashion that the singular statement should be compared to any other statements made by the same child. Id. The statute likewise does not state that any subsequent statements of the child should be

considered. Id. Instead, the statute repeatedly refers to the trial court's review of each singular statement. Id.

This Court is well aware that every witness who speaks to law enforcement, testifies at preliminary hearing, and then testifies at jury trial is bound to have some type of inconsistency in his or her testimony.  There are a variety of factors that may account for the inconsistencies, including; the passage of time, the witness's emotional state at the time of the original occurrence versus the time of testimony months later, the way the particular question is phrased and who is asking the question, etc.  All of those inconsistencies can and should be the subject of cross-examination at the time of trial and attorneys may then argue that the inconsistencies go to the credibility of the witness.  It is then incumbent upon the jury to consider all of those factors and arguments.

The Appellant respectfully submits that this phenomenon is not limited to adult witnesses but also occurs with child victims and witnesses.  In fact, child witnesses may even have more inconsistencies due to factors including their age and developmental abilities at the time of the incident versus the time of trial, whether or not they have had family support, and whether or not they have been in counseling.  Whether adult or child, it might even be more suspect if a witness made the exact same statement each and every time because, in that instance, it could be argued that the statement was actually more like a script and not a real occurrence.

This distinction is important because if the child hearsay statute is to be interpreted the way that it has been in this case – ie: that the court should consider each of the child's statements against each other and in comparison to each other rather than considering the four-corners of each statement in and of itself, then it would stand to reason that child hearsay would almost

never be admissible. Using the logic employed herein, if the trial court compared what the child said to the forensic interviewer with what the child said at the preliminary hearing with what the child said at the jury trial and/or with what the child said at any other times between the original statement and the jury trial, there would necessarily be some type of inconsistency that would render the hearsay inadmissible. The child hearsay statute would therefore be rendered useless.

Instead, the Appellant asserts that the trial court must look at the four-corners of each individual statement as offered by the proponent. Within that particular statement, the Court should consider whether the child was spontaneous and consistent, what her mental state was at the time, whether she used terminology that was expected and whether a lack of motive to fabricate exists. Once the trial court makes a determination as to whether that particular statement provides a sufficient indicia of reliability so as to render it inherently trustworthy, then the Appellant submits that the trial court should move on to the next offered statement and independently consider that statement within its four-corners.

Of course, in the case at bar, when looking at each of the different statements made by the child victim, she does not simply have inconsistencies in her testimony. Instead, after she initially disclosed abuse and then testified at the first Preliminary Hearing, the victim in the case at bar recanted her testimony and now claims that the abuse never happened. During the proceedings with the trial court, the Appellee argued that this was the deciding factor and that her subsequent recantation must necessarily be considered when determining the reliability of the original statements. However, if that were the case, then the State of Oklahoma would never be able to proceed to jury trial on a case in which a child victim recanted before or at trial. Because the complexities and reasons behind a subsequent recantation are so dynamic, that type of

blanket-rule simply cannot be the case and would serve to thwart justice in certain child abuse cases.

This Court has previously examined and ruled upon this exact issue.  In *Davenport v. State*, 1991 OK CR 14, ¶ 1-2, 806 P.2d 655, the defendant was charged with sexually abusing his nine-year-old step-son.  The case began when the child victim, M.C., disclosed the abuse to his friend.  ¶ 2.  The friend told his mother, who then called police.  ¶ 2.  A police officer spoke with M.C. and the child disclosed that the defendant had performed oral sodomy on him.  ¶ 3.  The defendant was also interviewed by police and he confessed that he had in fact performed oral sodomy on M.C..  ¶ 3.  The case proceeded to jury trial.

At the trial, M.C. was embarrassed about the sexual abuse and he was concerned about his step-father going to jail.  ¶ 8.  When M.C. testified, he tried to recant his previous statements and said that it had all been a dream.  ¶ 8.  The defendant was convicted and perfected an appeal. ¶ 1.

On appeal, the defendant argued that because M.C.'s testimony was so incredible and unworthy of belief, corroboration should have been required.  ¶ 8.  In upholding the conviction, the Court of Criminal Appeals held:

> Where there is a conflict in the testimony, it is the exclusive province of the jury to weigh the testimony and draw their conclusion therefrom, and if there is any competent evidence to support their verdict it will not be disturbed by this Court. Furthermore, we find that corroboration of M.C.'s testimony was provided by the appellant's confession.  ¶ 8.

The defendant also alleged that the trial court had committed error by allowing a psychologist to give expert testimony to the jury about child "Accommodation Syndrome".  ¶ 10.

The trial court allowed the testimony because M.C. had recanted his first story of abuse. ¶ 10. The trial court only allowed the psychologist to give general testimony and he was not allowed to offer any opinion regarding M.C.'s credibility nor was he allowed to comment on whether M.C.'s behavior fit with the Syndrome. ¶ 10.

On appeal, the Court of Criminal Appeals recognized that the Syndrome describes the behavioral patterns of sexually abused children. ¶ 10. The Court outlined the testimony of the psychologist who explained the stages of sexually abused children as: (1) periods of secrecy and helplessness, (2) periods where the child accommodates the adult, (3) delayed and conflicting disclosure, and (4) retraction of the story. ¶ 10. The Court of Criminal Appeals found that the trial court had properly held an in-camera hearing before the testimony was presented to the jury and that it appeared that the trial court had made a finding that the Syndrome was generally accepted in the medical community as reliable. ¶ 11.

The Court of Criminal Appeals then stated that it had conducted its own independent search of appropriate medical and legal doctrines regarding the Syndrome. ¶ 13. The Court made a determination from its own research that the Syndrome was in fact a generally accepted doctrine. ¶ 13. Citing from a recent Law Review article, the Court found:

> The syndrome was first assembled through the research of Roland C. Summit, M.D., whose specialty is in community consultation to diverse clinical and para-clinical sexual abuse programs. The research is entitled "The Child Sexual Abuse Accommodation Syndrome". (citations omitted). The doctor starts with secrecy (1) and quotes from individual cases such as "This is our secret; nobody else will understand", "don't tell anybody", "nobody will believe you", "don't tell your mother, she will hate you, she will kill you, kill me, send you away, etc." The doctor ends with the "retraction" stage (5). This stage explains why a child recants. His findings show that the child is often abandoned by a father, the

father calls the child a liar, the mother then does not believe the child, further, the mother suffers from hysteria and rage, the family is fragmented and the child may be placed in custody. He goes on to show that the father or stepfather is threatened with disgrace and imprisonment and that the child is blamed for "the whole mess". The mother starts on the child by statements such as "why do you insist on telling those awful stories about father?", "If we sent him to prison, we won't be a family anymore." Doctor Summit's research has been widely quoted by other experts in the field....Through our independent research, we find the syndrome to be valid and without medical dissent.

Numerous courts have allowed an expert to testify in rebuttal to explain delay in reporting as well as why a child recants. (citations omitted). Furthermore, many jurisdictions have allowed expert testimony describing the reactions of typical child victims of sexual abuse if it will assist the jury in deciding whether or not the alleged abuse occurred....Thus, because [the pyschologist's] testimony concerned only the typical behavior patterns of child victims of sexual abuse, we find that its admission under 12 O.S. 1981, § 2702 was not error. ¶ 14.

Finally, the defendant alleged that the trial court committed error by allowing the jury to hear the child hearsay statements that M.C. made to the officer because he alleged that the statements did not bear sufficient indicia of reliability. ¶ 20. The Court of Criminal Appeals found that the trial court had conducted a pre-trial child hearsay reliability hearing pursuant to 12 O.S. § 2803.1. ¶ 20. At the hearing the Court found that the trial court had determined that the statements contained sufficient indicia of reliability. ¶ 20. The Court then found that M.C.'s statements "remained consistent" and that the trial court had not erred. ¶ 20.

In the case at bar, the trial court's only explanation whatsoever for suppressing the child victim's statements was that he had read the "*Davenport*" case and he had difficulty following the adult neighbor. (September 12, 2014, Tr., p.17, lines 11-21). The Appellant submits that pursuant to the *Davenport* case, the record is in fact clear that the child hearsay offered by the

Appellant in the pre-trial reliability hearing did in fact contain sufficient indicia of reliability. The trial court incorrectly suppressed the statements and incorrectly failed to make any type of factual finding that was consistent with the testimony presented. The Appellant submits that the jury in the case at bar should be permitted to hear the child hearsay as presented at the reliability hearing, the subsequent recantation and testimony of the victim when she presumably continues her recantation at the jury trial, and then it will be a question of fact for the jury to determine which statements to rely upon and whether or not the Appellee is guilty as charged.

In *Folks v. State*, 2008 OK CR 29, ¶ 4-5, 207 P.3d 379, the defendant was convicted of sexually abusing five-year-old D.R. by putting his penis in her mouth and bottom. Some of the sexual acts had occurred in the presence of six-year-old J.F. ¶ 4. Before trial, both D.R. and J.F. were forensically interviewed and a DVD of D.R.'s interview was admitted at trial after an in-camera hearsay reliability hearing had been conducted by the trial court. ¶ 5, 10. On cross-exam, D.R., provided testimony that was inconsistent with her forensic interview in that she said she had never seen the defendant's penis and that she did not remember saying that anything had come out of his penis. ¶ 7. On re-direct, D.R. was again inconsistent by stating that she did not remember what had happened that was nasty. ¶ 8. J.F. recanted what he had previously disclosed and denied ever seeing the defendant sexually abuse D.R.. ¶ 6.

Even though the testimony that D.R. provided at trial was in some ways inconsistent with what she had said during her forensic interview and even though J.F. had recanted at trial, the jury was still allowed to hear and consider the child hearsay of D.R. and J.F.'s initial statements that the State offered under 12 Okla. Stat. § 2803.1. In affirming the conviction, the Court of Criminal Appeals found that the forensic interview of D.R. had been properly admitted pursuant

to 12 Okla. Stat. § 2803.1.  The Court noted that "the trial court should consider, as in the present case, whether the questioning coerced or lead the child victim in any way to testify in a certain manner." ¶ 12.

In the case at bar, there is no evidence whatsoever that during the time that the child made the proffered statements, she was coerced or led in any manner.  To the contrary, the evidence presented at the hearing by the Appellant demonstrated remarkable reliability from a child who had literally just fled from the act of sexual abuse and who was still experiencing the trauma and emotion of the event.

In *F.D.W. v. State*, 2003 OK CR 23, ¶ 1 , 80 P.3d 503, the defendant alleged that the trial court committed error by admitting child hearsay statements because the trial court never questioned the children to determine if they knew right from wrong or the difference between the truth and a lie.  The Court of Criminal Appeals recognized that the trial court was required to determine if the child hearsay statements appeared reliable under the circumstances in which they were made. ¶ 3.  The Court noted that the trial court did not question or meet with the children in a separate hearing but instead considered the hearsay testimony after hearing from a child welfare specialist from the Department of Human Services.  ¶ 4, 5.  However, the Court found that:

> the statute only requires that a finding be made that the statements appeared reliable *under the circumstances under which they were made* and that the time, content and totality of *circumstances surrounding the taking of the statement* provide sufficient indicia of reliability so as to render the statements inherently trustworthy. ¶ 4.

As in *F.D.W.*, it was not required in the case at bar that the trial court hear from the victim during the course of the reliability hearing.  Instead, the trial court's review should have been

limited to the particular circumstances under which each offered statement was made.

The Court of Civil Appeals has considered the issue of child hearsay in *In the Matter of P.F.*, 2005 OK CIV APP 50, 118 P.3d 224. In that case, a father was accused of causing his daughter to be deprived as a result of the sexual abuse he had perpetrated upon her. ¶ 1-2. The child was interviewed by a worker from the Department of Human Services and the worker was allowed to testify about the hearsay statements made by the child. ¶ 3-4. After the DHS worker interviewed the child, a forensic interview was done and recorded on DVD. ¶ 5. The DVD of the interview was admitted, even though the forensic interviewer did not appear or testify and his or her credentials, or lack thereof, were never established. ¶ 5. Ultimately, the Court of Civil Appeals reversed and remanded the deprived adjudication because the trial court did not follow the proper procedures with respect to the admission of child hearsay. ¶ 47-48.

In so doing, the Court discussed the proper procedures for child hearsay admissibility. The Court found that the "trial court must ascertain whether the child is 'available' to testify at trial *and* when the out-of-court statements were made". ¶ 31. The Court then distinguished between the different considerations for the statement at the time that it was taken versus the considerations at the time of trial:

> ...the inquiry into "availability" at two points in time, at trial and when the out-of-court statements were made, serves separate and distinct purposes because the important concern is the availability of the testimony.
>
> The concept of competency overlaps with the matter of physical presence. There is a dual aspect of the process. Thus, the question is not only "availability" at time of trial but also "availability" at the time the out-of-court utterances were given. It would be, and is, a mistake to equate "availability" of a witness to testify at the trial

with "competency" of a witness at the time of the making of the out-of-court statements.

At this time in the proceedings, the focus is upon the availability of the testimony as opposed to the physical presence of the child, so before the testimony becomes "available," it must meet the trustworthiness test.

The statute, 12 O.S.2001, § 2804, defines when a child is unavailable. At the close of the hearing to determine trustworthiness, a trial court must find whether the child was available to testify in court. Second, the trial court must find whether the child was a competent witness when the out-of-court statements were made, considering among other factors the presumption that a child is a competent witness. These two rulings involve distinct purposes and consequences.

This Court finds the rationale of *A.D.B.* to be persuasive. The reason for the competency-at-the-time-of-utterance determination is that the issue concerns the availability of the testimony from the child rather than the child's mere physical availability. Moreover, as noted in the concurring views in *A.D.B.*, a purpose for the determination is to incorporate this factor into and as one of the indicia of reliability. Even though the Legislature has provided factors to consider in a reliability hearing, the Legislature has not limited the factors for the trial court's consideration to those set out in the statute in deciding whether the child's statements are reliable. On the contrary, the statute directs that the "court may consider, *among other things*" the listed factors. 12 O.S.2001, § 2803.1 (A)(1). Thus, this Court also holds that the trial court has the duty to determine whether the child, here P.F., was a competent witness when she made the statements to W.V. in the initial interview with W.V., prior to the DVD recording. This task is aided by the statutory rebuttable presumption of competency to testify…The trial court did not make this determination and apparently did not even consider the competency issue…

Last, the substitute, and supposedly qualified, interviewer was not present at trial and available for cross-examination. Moreover, the record wholly fails to demonstrate any qualifications by any interviewer and W.V. testified that she was not qualified for this purpose. It is self-evident that conduct of the interview of a child by a qualified interviewer is designed to avoid having the statement refused… ¶ 30-40 (citations omitted).

Unlike the *In the Matter of P.F.* case, the Appellant herein did properly submit the qualifications and experience of the forensic interviewer. In addition, the DVD of the minor child's interview was properly identified and admitted into evidence. In so doing, the Appellant was able to demonstrate not only that the minor child's statement was inherently trustworthy, but also that the minor child was competent and available at the time of her initial hearsay statements.

In the case of *In re K.U.*, 2006 OK CIV APP 88, 140 P.3d 568, the Court of Civil Appeals considered the issue of whether the proffered child hearsay should be considered in conjunction with the child's testimony at the trial. ¶ 16. The State alleged that six-year-old K.U. was a deprived child because she had been sexually abused by her father. ¶ 1. At the beginning of the investigation, K.U. was interviewed by a social worker. ¶ 2. The social worker was allowed to testify to the child hearsay statements at trial. ¶ 8. The decision was made by the trial court after the trial court interviewed K.U. in chambers and determined that it would be too traumatic for her to testify, even though she was available to do so. ¶ 7-8. Ultimately, the Court ruled that the trial court should have made a proper finding regarding whether K.U. was in fact available or unavailable. ¶ 26.

In so ruling, the Court discussed whether or not K.U.'s appearance and testimony at the trial should have had a bearing on the reliability determination regarding the proposed hearsay. ¶ 16, et seq. The Court found:

> Father contends the evidence presented was insufficient to ensure
> the hearsay statements were reliable, citing *In re P.F., supra,* 118

P.3d at 230, for the proposition that "before the testimony becomes 'available,' it must meet the trustworthiness test." Father points to the fact that, during her interview with the trial judge, K.U. acknowledged meeting with Jimerson-Beach but failed to offer any substantive testimony regarding the circumstances surrounding her out-of-court statements. Father contends that, as such, the trial court did not have sufficient evidence upon which to base its determination either that K.U.'s extra-judicial statements to Jimerson-Beach bore sufficient indicia of reliability or that K.U. was competent at the time she made the statements implicating Father in sexual abuse.

Father's argument assumes the trial court must base its trustworthiness determination exclusively on the testimony of the minor child, when this condition is nowhere set forth in §2803.1. The trial court merely is charged with finding "in a hearing conducted outside the presence of the jury, that the time, content and totality of circumstances surrounding the taking of the statement provide sufficient indicia of reliability so as to render it inherently trustworthy." 12 O.S.Supp.2004 §2803.1(A)(1). In so doing, "the court may consider, among other things, the following factors: the spontaneity and consistent repetition of the statement, the mental state of the declarant, whether the terminology used is unexpected of a child of similar age or of an incapacitated person, and whether a lack of motive to fabricate exists." *Id.* These enumerated factors clearly anticipate the trial court's reliance on witnesses other than the minor child in gleaning information about the time, content, and circumstances surrounding the taking of the out-of-court statements. Indeed, it would not be expected that a minor child, especially one as young as K.U., would testify regarding her mental state, the age-appropriateness of her terminology, or the spontaneousness and consistency of her extra-judicial statements. We affirm the trial court's finding that the circumstances showed sufficient indicia of reliability.

Pursuant to *In re K.U.*, the trial court should consider the proffered child hearsay statement in and of itself – and not by comparing it to the subsequent testimony or non-testimony of the child. The trial court should also consider what the adult witnesses opine about the

statement itself, instead of relying upon the child to state her opinion regarding the reliability of her statements. In the case at bar, the trial court did not follow either of those propositions.

This Court has also recently reviewed the procedure for determining the reliability of child hearsay statements in *State v. Juarez*, 2013 OK CR 6, 299 P.3d 870. In that case, the case never proceeded to jury trial or to a child hearsay reliability hearing because the trial court quashed the information after the state had exclusively relied upon child hearsay during the preliminary hearing. ¶ 2. The Court of Criminal Appeals recognized:

> Title 12, § 2803.1 is primarily intended to establish the standard for when the hearsay statements of a child under age 13, about the physical or sexual abuse of that child, can be admitted at trial...
>
> § 2803.1 lists various "factors" that can be considered in making the determination of whether the entire context of the hearsay statement(s) at issue provides "sufficient indicia of reliability so as to render [the hearsay] inherently trustworthy." The language of § 2803.1 makes clear, however, that the factors listed therein are not the only factors that can be considered in making this fundamental reliability/"trustworthiness" determination. *See* 12 O.S.2011, § 2803.1(A) (listing factors that "the court may consider, among other things," when "determining such trustworthiness").

The Court then examined whether, under the particular facts of *Juarez*, the trial court had properly questioned the reliability of the testimony. ¶ 10. In that particular case, the Court found that in her hearsay statement, the child told the forensic interviewer multiple times that she thought the act of molestation that she was describing "was a dream", that she did not "know if it was a dream", that she did not remember "if it was a dream or not" and that she could not think of anything that would help her know "if it was a dream or for real". ¶ 10 and footnote 8. After

finding that:

> "[T]he hearsay testimony presented by the State under § 2803.1 was questionable on many levels – most importantly, the fact that the non-testifying victim repeatedly told the person who questioned her that she, herself, was not sure if the lewd molestation she was accusing Juarez of committing had actually occurred or if the encounter she was describing was just "a dream",

the Court of Criminal Appeals sustained the trial court's finding that the Information was properly quashed. ¶ 12.

The Appellant respectfully submits that using the rationale set forth in the *Juarez* decision, the facts in the case at bar are clearly distinguishable and the hearsay offered in the case at bar did not suffer from any of the concerns expressed in *Juarez*. Instead, the hearsay offered in the case at bar has overwhelming indicia of reliability as to render it inherently trustworthy.

In the case at bar, the child victim was 11-years-old at the time that the State alleges she was sexually abused. After unsuccessfully attempting to awaken her sister, K.A. ran outside and hid in the rain. She then knocked on her neighbor's door and made an immediate, unsolicited outcry. When discovered by the neighbor, K.A. was very upset, scared, crying and shaking. The neighbor had been an employee of the Department of Human Services for 10 years. She stated that K.A. was consistent and that she did not believe that K.A. had just awakened from a nightmare.

K.A. went from her neighbor's house to a SANE exam and then straight to the Justice Center for a forensic interview. At the forensic interview, K.A. kept herself "cocooned in a blanket". She immediately disclosed the abuse, at times in a whisper. She then remained consistent as the forensic interviewer went back over the details. K.A. demonstrated that she

understood the rules of the interview and that she could correct the interviewer and seek clarification from her.

The forensic interviewer testified regarding her extensive training and credentials. She testified that K.A. was spontaneous in the information that she provided, used expected terminology, and that she was consistent. No information came to light during the forensic interview which caused a concern for a motive to fabricate.

After the Appellant rested at the child hearsay reliability hearing, the trial court should have made findings that both offered statements were inherently reliable and it was error for the trial court to suppress the statements. As such, the Appellant respectfully requests that the trial court's decision be over-ruled.

## CONCLUSION

The Appellant respectfully requests that this Court find that the trial court erred and that the child hearsay statements should not have been suppressed and denied.

Respectfully submitted,

STEVE KUNZWEILER
DISTRICT ATTORNEY
IN AND FOR TULSA COUNTY

Sarah McAmis, OBA #15903
Assistant District Attorney

42

## CERTIFICATE OF DELIVERY

This is to certify that on the _____ day of April, 2015, a true and correct copy of the foregoing Brief was mailed and/or faxed to Allen Smallwood, Attorney for Appellee Zilm, 1310 S. Denver Ave., Tulsa, OK 74119, and to April Seibert, Attorney for the Minor Child, 624 S. Denver Ave., #300, Tulsa, OK 74119.

Sarah McAmis
Assistant District Attorney
500 S. Denver Ave., Suite 900
Tulsa, OK 74103
(918) 624-0240