# IN THE COURT
## OF CRIMINAL APPEALS OF THE STATE OF OKLAHOMA

FILED
IN COURT OF CRIMINAL APPEALS
STATE OF OKLAHOMA
DEC 18 2017

ADAM CLAYTON ZILM, )
)
*Appellant*, )
)
*vs.* )          Case No.:     F-2017-69
)
THE STATE OF OKLAHOMA, )          District Court of Tulsa County
)          Case No.:     CF-2012-3037
*Appellee.* )

## ORIGINAL BRIEF FOR AND ON
## BEHALF OF APPELLANT ADAM CLAYTON ZILM

*Submitted by*:

James L. Hankins, OBA #15506
TIMBERBROOKE BUSINESS CENTER
929 N.W. 164th St.
Edmond, Oklahoma 73013
Phone:     405.753.4150
Fax:        405.445.4956
E-mail:    jameshankins@ocdw.com

*Counsel for Appellant*

EXHIBIT 5

## TABLE OF CONTENTS

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    Remand & Reliability Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        1.    Remand for a Second Preliminary Examination . . . . . . . . . . . . . . 6

        2.    The Reliability Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    The Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

PROPOSITION I

    FOUR STATE AGENTS, INCLUDING THE PROSECUTOR IN THIS
    CASE, COERCED AND LIED TO THE MINOR COMPLAINING
    WITNESS IN ORDER TO INFLUENCE HER TO TESTIFY FALSELY
    AGAINST ZILM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    A.    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    B.    Merits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

PROPOSITION II

    PROSECUTORIAL MISCONDUCT DEPRIVED ZILM OF A FAIR TRIAL
    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

    A.    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

    B.    Merits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

        1.    Threats of Perjury & to Re-Open Juvenile Case . . . . . . . . . . . . . 32

        2.    Accusing Defense Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

        3.    Improper Comment on Right to Trial . . . . . . . . . . . . . . . . . . . . . . 35

4.    Courtroom Histrionics  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

PROPOSITION III

MULTIPLE ERRONEOUS EVIDENTIARY RULINGS PREJUDICED
ZILM RESULTING IN A FUNDAMENTALLY UNFAIR TRIAL . . . . . . . . . . 38

A.    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

B.    Merits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

PROPOSITION IV

THE TRIAL COURT ERRED IN REFUSING TO SUPPRESS THE
STATEMENT MADE BY ZILM TO POLICE . . . . . . . . . . . . . . . . . . . . . . . . 42

A.    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

B.    Merits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

PROPOSITION V

ZILM RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL IN
VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS; AND
ARTICLE II, SECTIONS 7 AND 20 OF THE OKLAHOMA
CONSTITUTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

A.    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

B.    Merits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

PROPOSITION VI

THE ACCUMULATION OF ERRORS AT TRIAL RESULTED IN A
FUNDAMENTALLY UNFAIR ADJUDICATORY PROCEEDING IN
VIOLATION OF THE RIGHTS OF ZILM UNDER THE FOURTEENTH

AMENDMENT TO THE UNITED STATES CONSTITUTION AND
ARTICLE II, SECTION 7 OF THE OKLAHOMA CONSTITUTION. . . . . . . . 49

    A.    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

    B.    Merits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

## TABLE OF AUTHORITIES

*Bechtel v. State,*
    1987 OK CR 126, 738 P.2d 559 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Bolden v. State,*
    No. F-2015-1112 (Okl.Cr., March 24, 2017) (unpublished) . . . . . . . . . . . . . . . 36

*Bosse v. State,*
    2015 OK CR 14, 360 P.3d 1203 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Brewer v. State,*
    2006 OK CR 16, 133 P.3d 892 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Carter v. State,*
    2008 OK CR 2, 177 P.3d 572 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Chapman v. California,*
    386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) . . . . . . . . . . . . . . . . . . . . . . . 23

*Cline v. United States,*
    395 F.2d 138 (8th Cir. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Coffia v. State,*
    2008 OK CR 24, 191 P.3d 594 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Colorado v. Connelly,*
    479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) . . . . . . . . . . . . . . . . . . . . . 45

*Crane v. Kentucky,*
    476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) . . . . . . . . . . . . . . . . . . . . 33

*Donnelly v. DeChristoforo,*
    416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974) . . . . . . . . . . . . . . . . . . . . . 36

*Fisher v. State,*
    2009 OK CR 12, 206 P.3d 607 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Gaines v. State,*
    No. F-2011-867 (Okl.Cr., September 12, 2012) (unpublished) . . . . . . . . . . . . . . 36

*Giglio v. United States*,
    405 U.S. 153, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) . . . . . . . . . . . . . . . . . . . . . . . 29

*Grant v. State*,
    2004 OK CR 24, 95 P.3d 178 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Harmon v. State*,
    2011 OK CR 6, 248 P.3d 918 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Littlejohn v. State*,
    2008 OK CR 12, 181 P.3d 736 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Napue v. Illinois*,
    360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) . . . . . . . . . . . . . . . . . . 23, 29

*O'Neal v. State*,
    No. F-2013-958 (Okl.Cr., April 5, 2016) (unpublished) . . . . . . . . . . . . . . . . . . 36

*Orozco v. Texas*,
    394 U.S. 324, 89 S.Ct. 1094, 22 L.Ed.2d 311 (1969) . . . . . . . . . . . . . . . . . . . . . 44

*Pryor v. State*,
    2011 OK CR 18, 254 P.3d 721 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Schneckloth v. Bustamonte*,
    412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) . . . . . . . . . . . . . . . . . . . . . 45

*Simpson v. State*,
    1994 OK CR 40, 876 P.2d 690 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Simpson v. State*,
    2010 OK CR 6, 230 P.3d 888 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Smith v. Phillips*,
    455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982) . . . . . . . . . . . . . . . . . . . . . . 23

*Strickland v. Washington*,
    466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) . . . . . . . . . . . . . . . . . . . . 47

*United States v. Agurs*,
    427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Antone*,
    603 F.3d 566 (5th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Clariot*,
    655 F.3d 550 (6th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*United States v. Crockett*,
    435 F.3d 1305 (10th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Holmes*,
    413 F.3d 770 (8th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*United States v. Jones*,
    523 F.3d 1235 (10th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*United States v. Rangel*,
    519 F.3d 1258 (10th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Van White v. State*,
    1999 OK CR 10, 990 P.2d 253 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

# IN THE COURT
## OF CRIMINAL APPEALS OF THE STATE OF OKLAHOMA

ADAM CLAYTON ZILM,        )
                                      )

       *Appellant,*        )
                                        )

vs.                                )       Case No.:    F-2017-69
                                        )

THE STATE OF OKLAHOMA,    )       District Court of Tulsa County
                                        )       Case No.:    CF-2012-3037

       *Appellee.*         )

## BRIEF-IN-CHIEF OF APPELLANT

Appellant Adam Clayton Zilm, by and through the undersigned counsel, presents the following argument and authorities in support of his appeal from the Judgment and Sentence below. Appellant will be referred to by name. The Appellee, State of Oklahoma, will be referred to as the State. Citation to the record will be as follows: Jury Trial Transcript (Tr. _); Preliminary Examination Transcript (P.H. Tr._); Sentencing Hearing Transcript (Sent. Tr. _); Motion Hearing Transcript (Mot. Tr._); and Original Record (O.R. _).

## STATEMENT OF THE CASE

Zilm was charged by felony Information in Tulsa County on July 12, 2012, with a single count of Sexual Abuse–Child Under 12. O.R. 28. Preliminary examination was held before the Hon. David Youll, Special Judge of the District Court in Tulsa County on September 26, 2012. At the conclusion of the evidence, Judge Youll overruled the defense demurrer and bound Zilm over the trial. P.H. Tr. 09/26/2012 at 63.

However, District Judge Kurt Glassco ruled on October 7, 2013, from the bench–followed up by a written Order filed October 8, 2013–that State agents had exercised unreasonable influence over the minor complaining witness, K.A., ordered that the preliminary examination was a nullity, and ordered the case remanded for a new preliminary examination. O.R. 338-39; Tr. 10/07/2013.

The second preliminary examination was held on November 6, 2013, before the Hon. Clifford Smith, Special District Judge of the District Court of Tulsa County. At the conclusion of the evidence, the Court overruled the demurrer of the defense and bound Zilm over for trial. P.H. Tr. 11/06/2013 at 96-97.

Prior to trial, a hearing was held before the Hon. Kurt Glassco concerning the reliability of statements made by K.A., and the efforts of the defense to suppress them. At the conclusion of the hearing on September 12, 2014, Judge Glassco ruled that the hearsay statements of K.A. to forensic interviewer Amy Howard and to neighbor Katherine Sanford lacked sufficient indicia of reliability and ordered them suppressed. Tr. 09/12/2014.

The State appealed this ruling to this Court, which on August 6, 2015, issued a written, but unpublished Opinion affirming the trial court's order of suppression of the hearsay statements. O.R. 511 (*State v. Adam Clayton Zilm*, No. S-2014-812 (Okl.Cr., August 6, 2015), *slip op.*)

Jury trial began in the courtroom of Judge Glassco on November 14, 2016, and concluded on November 18, 2016, when the jury found Zilm guilty and recommended sentence of 36 years. Tr. Vol. V at 64; O.R. 674. Formal sentencing was had on January 20, 2017, at which Judge Glassco sentenced Zilm in accordance with the verdict of the jury. Sent. Tr. 01/20/2017 at 33.

Zilm filed notice of intent to appeal and designation of record on January 20, 2017. O.R. 716-24.

## STATEMENT OF THE FACTS

On June 4, 2012, Katherine Sanford lived in Tulsa, Oklahoma.  Tr. III 121-25.

Sanford was employed by DHS, but was suffering from Lyme disease, which attacks her

brain (she had five brain lesions, including one on her brain stem) and made remembering

things difficult.  *Id.*; 130-31.

Nevertheless, she remembered that on this date that one of her neighbors lived across

the street and two doors down with her boyfriend and children (and the boyfriend even came

over one day to introduce himself).  The boyfriend, and fiancee, was Adam Zilm.  *Id.*

One of the children, who was 11-years-old at the time, was K.A.  *Id.*

On June 4, 2012, at approximately 6:00 a.m., someone knocked on Sanford's door,

Sanford instructed her roommate to open it, and it was K.A., who was upset, crying, shaking,

and soaking wet.  *Id.*  According to Sanford, K.A. was upset because she believed that she

had been sexually assaulted by Zilm ("She said that he tried to put [his penis] in her butt.")

*Id.* 133.

Sanford called K.A.'s mother, and eventually the police.  *Id.* 133-35.  Sanford, no

doubt, did the right thing in contacting the police, which initiated the investigation into what

exactly happened to cause such a reaction by K.A.  K.A. was clearly upset by something, but

*what exactly had occccurred*?

This was the question at issue at trial.

According to the State, Zilm, who was an experienced licensed masseuse who made

his living as a massage therapist, gave K.A. a massage earlier that morning and had sexually assaulted her in the process. Tr. II 185-90 (State's opening statement).

In contrast, the defense pointed out that Zilm had no priors, was a certified massage therapist, was a caring father to the kids, had never asked to massage any of the children, and gave massages to K.A. at her request on two occasions just as a normal massage therapist would with a client. Tr. II 205-10.

Also, as it turned out, K.A. had been sexually abused in the past, when she was 5-years-old by a "shirttail uncle" while living in Louisiana (a case that was not prosecuted, nor was the uncle punished). *Id.* On the night in question, K.A. drifted off to sleep during the massage (a common thing), and she had a nightmare about being sexually abused by "uncle David" in Louisiana (which was a common occurrence for K.A.), and she reacted to a jab in her rear-end area and awoke, which prompted Zilm to say, "Oh, I'm sorry, sweetheart, did that hurt?" Tr. II 210.

After the massage, Zilm went to sleep, but K.A. was still confused about what was real and what was a dream, which is why she ended up at Sanford's house. In fact, she knew Zilm had not abused her, knew his character, knew that she had made a mistake, and she recanted (unprompted by Zilm or anyone else) on her own almost immediately after the event, saying, "I'm sorry. I told something that didn't happen." Tr. II 211-16. Nor was there any DNA evidence. *Id.*

In fact, to this day, K.A. is adamant that Zilm did nothing inappropriate.

Despite the fact that K.A. recanted, continued to assert that the entire episode was a misunderstanding, and there was no DNA evidence to support her initial statement, the first witness called by the State was K.A.  Tr. II 217.

## REMAND & RELIABILITY HEARING

Before delving into the testimony of K.A. at trial, and how that played out, it is important to provide the Court background on how the State handled her initial allegation against Zilm–and her recantation.   Several pre-trial matters were litigated regarding the statements of K.A., and the resolution of those matters by the trial court, and this Court via a pre-trial State appeal, inform this Court's assessment of K.A.'s trial testimony and the actions of State officials.

1.   REMAND FOR A SECOND PRELIMINARY EXAMINATION.

First, in the earlier pre-trial proceedings, defense counsel moved to dismiss or remand for a new preliminary examination after it had come to light that the State had failed to divulge exculpatory evidence.

At the first preliminary hearing before Judge Youll, there were quite a bit of leading questions by the prosecutor, but the gist of the testimony by K.A. was that, during a massage that she had received from Zilm, he had placed his penis inside her anus. Tr. 09/26/2012 at 24-25.

Naturally, such testimony clearly constituted a crime.  But, as it turned out, K.A. had asserted that four State agents–including prosecutor Sarah McAmis–coerced her into

testifying that way even though she wanted to recant and set the record straight. According to K.A., pressure, lies and coercion from State actors is the reason why she testified to being anally penetrated by Zilm at the first preliminary examination.

It turned out that these accusations were true.

After this first preliminary examination, defense counsel had become aware that K.A. had recanted the allegation; and that the recantation had occurred the day after the incident, or possibly the next day, when K.A. had taken it upon herself, unprompted by anyone, to call Zilm and apologize for making a mistake, and that she had misconstrued his actions that night. Defense counsel only learned about this recantation from K.A.'s mother, Kristi Alvarez, and upon his review of the court file in the juvenile case. O.R. 302.

This is important because some of the relevant facts spill over into the DHS/juvenile case regarding custody of K.A. and the other children, and the prosecutor had failed to divulge any of it either to the court or the defense; it was discovered only through the efforts of defense counsel who had to litigate the issue to obtain the DHS/juvenile court records.[1] Defense counsel noted pre-trial that DHS worker Lori Hannagan had written an affidavit in the juvenile case in which K.A. told Hannagan:

> "[K.A.] might have been mistaken Mr. Zilm might not have done anything. She just got scared and thought about the time when she was 5 and something like this happened to her."

---

[1] Defense counsel was allowed access to the juvenile file regarding the placement of the children, and it was in those files that he discovered–without any notice from the State–that K.A. had recanted 24 to 36 hours after the initial allegations. Tr. IV 38.

O.R. 303 (in addition, Barbara Davis, the maternal grandmother of K.A. and Jessica Swinny-Raush, a friend of the natural mother, both informed counsel that shortly after the incident K.A. had disclosed to both of them that she had "lied" about what happened; and that she had confused the innocent actions of Zilm with a nightmare that she was having of a prior instance of sexual abuse).[2]

Counsel took it upon himself to take a sworn statement from K.A., with a court reporter present on July 24, 2013, during which K.A. confirmed that she had recanted within a day or two of the incident.  O.R. 304; O.R. 152 (sworn statement of K.A.).

K.A. also stated that she testified to the sexual assault by Zilm at the first preliminary examination only because she was told by Amy Howard (the forensic questioner from the juvenile center) that if she did not, then she might not be given back to the custody of her mother (at that time, K.A. had been placed in the custody of her uncle by the juvenile court). O.R. 304; O.R. 172-73 (Amy "told me to say what I said before and I'd get to go back to my mom and live with her again")[3]

More disturbing, it came to light that DHS worker Lauren Hall, who worked with the

---

[2]       Defense counsel was allowed by the trial court, Judge Glassco, who conferred with the Juvenile Court, Judge Fransein, to review the juvenile court records and take notes, but defense counsel was restricted to note-taking only, and was prohibited from making copies of any documents in the juvenile file. Tr. IV 36-37.

[3]       During the sworn statement with defense counsel, K.A. stated that prior to the first preliminary examination she spoke to "I think that Amy girl." O.R. 172. In his moving papers, defense counsel clarified "that Amy girl" had to have been Amy Howard, the forensic questioner at the juvenile center. O.R. 326.

Alvarez children in the juvenile case, went to the home and spoke to each of the children

prior to a hearing in juvenile court concerning placement of the children. O.R. 304. Hall

told K.A. that no one believed her recantation, and that everyone believed her first statement

alleging sexual assault by Zilm, because DNA evidence proved the allegations. O.R. 304.

This statement by Hall to K.A. was, of course, false because the State had provided DNA

testing results proving that no male DNA was found on K.A. O.R. 304.

Thus, after the first preliminary examination was held, there were serious questions

surrounding the credibility of K.A., and the State regarding its *Brady* duties. As it turned out,

the State had failed to disclose: 1) that Amy Howard coerced the child, K.A., into sticking

with her original story by scaring the girl with the assertion that she had to do so in order to

live her mother again; and 2) Lauren Hall coerced K.A. to stick with the original allegation

by falsely telling this 11-year-old girl that DNA evidence proved that Zilm was guilty when

Hall knew it was false.[4]

These facts did not fall on deaf ears in the trial court.

Judge Glassco issued a written Order on October 8, 2013, finding as a matter of fact

that prior to the preliminary examination, State agents had "exercised unreasonable influence

---

[4]     The false statements made by Lauren Hall to K.A. about the DNA evidence were
recorded by K.A. herself because she was so distrustful of DHS workers (*see* Defendant's Exhibit
#1), and were listened to and relied upon by Judge Glassco in making his determination that the State
had exercised unreasonable influence in this matter. O.R. 338; Tr. IV 17-23; *see also* Tr. 09/09/2014
at 7 (defense counsel referencing the "direct lie" to K.A. told by Lauren Hall "which we've all heard
on tape, telling her that nobody believes the second statement because there was DNA evidence to
support the first statement.")

on the minor child "K.A." to secure testimony to which she had since recanted repeatedly." O.R. 339. This is the reason that the case was remanded for a second preliminary examination. *Id.*

Thus, prior to trial, we have evidence already that juvenile/DHS workers had coerced K.A. into sticking to her original story by lying to her about the existence of DNA evidence, and raising the specter in this child's mind that she would not get to live with her mother again if she insisted on recanting; and the prosecutor's office did not breathe a word of it to the defense prior to trial.

As bad as this was, there was still more to come, this time at the reliability hearing on the hearsay statements made by K.A.

## 2.     THE RELIABILITY HEARING.

The State sought to introduce hearsay statements made by K.A. to Amy Howard (the "child specialist" at the Child Abuse Network) and Katherine Sanford (the neighbor to whom K.A. went directly after the incident). *See* Tr. 09/09/2014.

At this hearing, the trial court heard testimony from both Howard and Sanford, and in an unusual procedure, from K.A. herself, who was subpoenaed by the defense, was represented by counsel, and who insisted on being heard. Tr. 09/09/2014 at 7 ("Judge, my client very much wants to give testimony to the Court today. Specifically regarding her belief that this has been a mistake and her attempt to try to correct it, her inability to do so...she wants to testify.")

The State objected to the trial court hearing testimony from K.A., citing "a stack of case law to argue" that the testimony of K.A. would not be proper, but the trial court was not impressed and allowed it. *Id.* 4, 118.

On the stand yet again in this case, K.A. insisted this time that Zilm did nothing wrong, that she had told the neighbor (Sanford) only that she "had a nightmare" and in fact had told all of this to the prosecutor in the case, Sarah McAmis. *Id.* 122-23. K.A. pointedly told the trial court that Sarah McAmis is the one who told her that if she said what she said in the beginning, her original story implicating Zilm, then "you can go back to your mom." *Id.* 124. It is important to note that these accusations leveled against the prosecutor by K.A. *were elicited from K.A. by questions posed by Judge Glassco*, not defense counsel.

And it gets worse.

There was yet another juvenile case agent named Lori Hannagan who told K.A. to explain her recantation by blaming it on her mother. According to K.A., and remember that this is in response to questioning by Judge Glassco and not defense counsel, Hannagan told K.A. to just say that her mother told her to say that nothing happened in order to explain the recantation. *Id.* 123-24; 127.

This was a conversation that occurred at the juvenile shelter where Hannagan told K.A. to just say it was her mother who told her to recant, that way K.A. could go back home to her mother and get out of the shelter. Tr. 127. In response, K.A. testified, "I just sat there. Didn't say anything to her." *Id.*

Page 11 of 51

K.A. clarified that her mother had never told her to say any such thing. *Id*. 128.

It thus appears that Hannagan attempted to get K.A. to completely fabricate evidence in this case, and in a coercive way by tying the fabrication to K.A. being able to see her mother again.

After hearing the testimony of K.A., prosecutor Sarah McAmis scurried to make a record with the trial court that she "would never, could never, should never, have never, stated to this victim, or any other victim, that they should testify a particular way." *Id* 137.

However, Judge Glassco had heard enough, and issued a ruling from the bench finding the hearsay statements made by K.A. to forensic interviewer Amy Howard and the neighbor Katherine Sanford to be *unreliable and therefore inadmissible*. Tr. 09/12/2014 at 16-18.

It is particularly noteworthy that Judge Glassco found Katherine Sanford *not* credible–that is, he ruled that the hearsay statements made by K.A. to Sanford were unreliable, but he also found Sanford, as a witness, to be not credible. According to Judge Glassco, he had "a very difficult time following the testimony of that witness. And she appeared to the Court to change her testimony as to what happened during the time that she was here." *Id*. 18.

Unhappy with this result, the State gave notice of intent to appeal. *Id*.

The State's appeal was heard by this Court, which on August 6, 2015, issued a written, but unpublished, opinion affirming the ruling of Judge Glassco. O.R. 511. The State

presumably produced the "stack of case law" in support of its position that the trial court erred in allowing K.A. to testify at the reliability hearing but, notably, this Court held that the law not only allowed K.A. to testify, but also that the facts of this case *required* it.[5] O.R. 513.

Thus, it was with this background that the trial proceeded before a jury.

## THE TRIAL

K.A. was the first witness called by the State.  Tr. II 217.

She told the jury that she was then in the 9th grade, and in light of the foregoing background, in which she had spent years trying to convince authorities that the entire incident was a misunderstanding triggered by her prior abuse in a dream-state, and was repeatedly coerced and lied to by authorities to convince her to drop her recantation, K.A. was decidedly hostile to being in court testifying against Zilm. *Id*. 217-18 (she did not want to be in court and wanted the matter to simply go away).

Nevertheless, the State proceeded to question K.A. about her family background. Her mother was Kristi Shaneck, and she had three siblings: two sisters P.A. (16), G.A. (10), and a brother, E.A. (13).  Zilm was her mother's fiancee and lived with them. *Id*. 217-28.  When the police got involved, she was temporarily removed from the home, was eventually placed back with her mother, but was prohibited from having contact with Zilm. *Id*.

---

[5]     On the legal proposition of the minor complaining witness testifying at the reliability hearing, this Court cited *F.D.W. v. State*, 2003 OK CR 23, ¶5, 80 P.3d 503, 504 ("[i]n some cases, the determination of reliability may require that the child witness testify, or that a separate hearing with the court be conducted").  O.R. 513.

K.A. testified that at some point during the morning of June 4, 2012, she went outside and waited behind a dumpster, and that it was sprinkling a little bit. *Id*. 230. She went to the neighbor's house, did not remember if they had a doorbell, but remembered them coming to the door. *Id*. 230-31. She then told them that, "I had a dream, like a nightmare." *Id*. 231.

Clearly, K.A. was not telling the prosecution what it wanted to hear, so the trial developed into a spectacle of the prosecutor impeaching the State's own witness with prior testimony from the first preliminary examination–the one that had been declared a "nullity" because of the coercive actions of State actors influencing the testimony of K.A. Tr. II 232.

At this attempt by the prosecutor to drag in the testimony of K.A. form the first preliminary examination, a bench conference ensued where defense counsel objected on the basis that the trial court had declared that first preliminary examination a nullity based upon improper coercion of K.A. by state actors, and this prompted a discussion of this Court's opinion on the State appeal and what it meant. *Id*. 232-35.

The trial court eventually allowed the State to impeach by using the first preliminary examination transcript, but with a contemporaneous instruction to the jury about the use of impeachment evidence. *Id*. 235.

Given the green light by the trial court, the State then proceeded to go into detail about what K.A. had testified to at the first preliminary examination–which featured coerced testimony that Zilm had used his penis to touch her anus during the massage–punctuated by objections of defense counsel. *Id*. 237-88; 243 (objections of defense counsel); 255

(objections by defense counsel); 264 (objections by defense counsel); 274 (objections by defense counsel).

In fact, during one bench conference, when the trial court allowed the prosecutor to continue using the prior "unreliable statements" made to Amy Howard to impeach K.A., defense counsel stated:

> In the face of two court rulings that that statement to Amy Howard was unreliable, the jury's not gonna know that, Judge, ever? What was the purpose of all these appeals?

Tr. II 256.  The trial court ruled that the State would be allowed to use the statements as impeachment. *Id*. 256-57.

K.A. was insistent, despite being, in essence, cross-examined on direct by Ms. McAmis–the same prosecutor whom K.A. had accused of coercing her into sticking with her original story so that she could see her mother again–that there was no sexual contact, and that Zilm's "thumb accidentally jabbed me." Tr. II 250.  K.A. testified that she told the neighbors that she had had a dream about what had happened to her when she was five.  Tr. II 268.

Even at that point, immediately after the event when K.A. was at the neighbor's house, she testified that when the police arrived that her mom was crying, she was crying, and, "There were cops there. I was being told to say things. And I just had a nightmare." Tr. II 269.

On top of this, the prosecutor also was able to introduce statements made by the

neighbor (Sanders).  Tr. II 265.  This "impeachment" was doubly dubious because the trial

court, and this Court, had not only ruled the hearsay statements unreliable; but the trial court

had stated on the record that Sanders herself was not a credible witness.  Tr. 09/12/2014 at

18.

      In fact, K.A. told the jury that, "I was told what to say."  Tr. II 251.  She testified that

DHS personnel had told her what to say.  Tr. II 282 ("They told me to tell somebody that he

[Zilm] had done that stuff to me, and that my mom had talked to me and told me to say that

he didn't do it.")

      She also reaffirmed, in front of the jury, that prosecutor Sarah McAmis told her to

stick with her original story: "You [Ms. McAmis] told me after I told the truth that he did not

do anything to me, you told me to go back to the story I had said before."  Tr. II 284; 284-85

("Okay.  And just so that I can make sure, are you saying I [Ms. McAmis] told you what to

say?  Yes."); Tr. II 285 ("And I think you guys think I'm not telling the truth when I say he

didn't do anything.")

      K.A. was also asked by the prosecutor: "Do you still consider [Zilm] your best friend?

Answer: Yes."  Tr. II 287.  She testified that Zilm was important in her life, a relief from her

own abusive biological father, and that Zilm had never treated her or her siblings

inappropriately.  Tr. III 9-25.  At the conclusion of the direct examination by the State, and

after the jury had been dismissed, K.A. asked the trial court if she could hug Zilm.  Tr. III 3-

5.  This request was denied.  *Id*. 4-5.

On cross-examination, K.A. told the jury about how she was victimized sexually by "uncle David" when she was 5-years-old, that he was never dealt with and that no one had believed her, and that she had recurring nightmares over that incident that counseling did not help. Tr. III 26-30.

On June 4, 2012, she had fallen asleep during a massage from Zilm and had one of the recurring nightmares about uncle David. Tr. III 30. She was face-down when she awoke, felt a jab around her private area, and told Zilm to stop the massage, and he did so. *Id.* 26-30.

She never saw Zilm's private parts, he never exposed himself to her, and she left the house because she was still in her nightmare-related confusion. *Id.* When she realized that she had made a mistake in thinking that Zilm had done something to her she, unprompted, called Zilm and said that she had been mistaken and was sorry, and Zilm reassured her that it was okay. Tr. III 31-35.

Faced with a key witness who not only recanted her allegations against Zilm, but affirmatively accused state officials–including the prosecuting attorney–of pressuring her to testify a certain way, the State attempted to explain this situation through the testimony of Rose Turner, the Managing Director at the Child Abuse Network, part of the Children's Advocacy Center in Tulsa County, who explained to the jury the concept of "Child Sexual Abuse Accommodation Syndrome." Tr. III 51-57.

Defense counsel objected on the basis that this Court had not accepted such testimony, and it was irrelevant in any event under the circumstances of this case. Tr. III 50.

These objections were overruled. *Id.*

Child Sexual Abuse Accommodation Syndrome is based upon research done in the 1980's by Dr. Roland Summit. Tr. III 59. Characteristics such as helplessness, secrecy, delayed disclosure, and "accommodating" the abuser because of feelings for that person and sometimes there is a recantation. *Id.* 59-61. Turner, of course, had to admit that the "syndrome" is not like a medical diagnosis, and that there may be other causes for these behaviors, and just because a child exhibits these behaviors it does not mean that sexual abuse had occurred. *Id.*

At this point, defense counsel again objected on the basis of relevancy, and pointed out that there was no evidence establishing any relevance to the evidence in this case, nor any evidence with respect to secrecy, or feelings of helplessness (other than K.A. being made to feel helpless by state officials who do not believe her), and that the bulk of the Summit material on the syndrome was speculation. Tr. III 63.

The objection was overruled, but the issue was sorted out at a bench conference where the trial court admitted to making a "mistake" in allowing the testimony as substantive evidence on the truthfulness or untruthfulness of the child's testimony. Tr. III 64, 70.

The problem with the testimony is that Turner had never met K.A., never diagnosed K.A., and did not have any involvement with this case. Tr. III 70. Defense counsel continued to object. *Id.*; 73, 74, 75, 76, 77, 79, 80, 81-82 (re-urging motion to disallow the testimony of Turner as speculative and irrelevant; objection noted and overruled).

After Turner, the State called the neighbor, Katherine Sanford.  Tr. III 121-25.

Sanford testified to the fact that K.A. came over to her house that morning, appeared upset,

and in a courtroom moment where everyone seemed to have forgotten the pre-trial rulings

on hearsay statements made to K.A., the prosecutor asked Sanford what K.A. said, and

Sanford responded: "She came in, and I asked her, I said, what's wrong?  And she told me

that Big Daddy [Zilm]—she called him Big Daddy, which—and she said had touched her." Tr.

III 127.

Despite the prior rulings on the admissibility of this hearsay, the trial court allowed

the hearsay testimony under the "excited utterance" exception to the hearsay rule. Tr. III 129.

The defense objected.  *Id.*; 132 (defense counsel again objecting, and noting that there is a

difference between evidence that is admissible and evidence that is reliable).

Sanford then testified that K.A. told her that Zilm had tried to put his penis "in her

butt." Tr. III 133.  Upon hearing this, Sanford and her roommate called the police.  *Id.*

The State called the SANE nurse, Kathy Bell, who testified that K.A. was examined

on June 4, 2012, which included a colposcope (a "microscope on wheels") which magnifies

the area of observation x15.  Tr. III 151-55.  According to Bell, she asked K.A. what had

happened, and K.A. replied that Zilm had been giving her a massage, and had "put his penis

into her butt hole." Tr. III 160.  It should be noted that K.A. insisted that she was told by

authorities what to say to the SANE nurse. Tr. II 281.

Defense counsel objected to this, noting the close proximity to this statement to the

others deemed unreliable, but this objection was overruled on the basis that it was admissible under the "medical advice" exception. Tr. III 159-60. The exam showed an "area of redness" around the anus of K.A., although all of the boxes on the exam form for genital itching, discharge, and bleeding were marked "No." *Id.* 161-66. The "redness" could have been caused by a thumb slipping on massage oil. *Id.* 171.

The last State witness was Cpl. Gregory Smith of the Tulsa Police Department. Tr. III 181-85. On the day of the incident, Zilm had left the home and went to the home of his parents. Cpl. Smith went there, along with Det. Hodges and Officer Taylor, to interview Zilm. Tr. III 196-200. The interview with Zilm was played for the jury (State's Exhibit #1) over objection by the defense. Tr. 201-08.

Cpl. Smith testified that Zilm was cooperative with police, denied sexually abusing K.A., but acknowledged that he may have inadvertently jabbed her with his thumb during the massage. Tr. 208-12.

The State then rested, and the defense dumurred, which was overruled. Tr. III 216-20. The defense called two witnesses: K.A. and Officer Jon Wilson.

K.A. was called to lay the foundation for the recording that she had made of DHS worker Lauren Hall, who interviewed the children, including K.A. as part of the juvenile proceeding. Tr. IV 17-23. K.A. recorded the conversation herself with her iPod because she did not trust Hall. *Id.* This is the recording, introduced as Defense Exhibit #1 where Hall tells K.A. that she must stick to her original claim because the DNA evidence confirms that

K.A. was sexually assaulted–which was a lie.  Tr. IV 21 (Defense Exhibit #1 played and admitted).

The last witness called by the defense was Officer Jon Wilson of the Tulsa Police Department.  He confirmed the buccal swab samples taken from K.A. and Zilm, and anal swabs from K.A., and the fact that there was no DNA from Zilm found on K.A.  Tr. IV 44-51.

After inquiry by the Court, Zilm chose to not take the stand.  Tr. IV 58-67.  The defense rested, and defense counsel re-urged a demurrer and motion for a directed verdict of acquittal.  Tr. IV 67-69.  These were overruled.  *Id.*

One other matter of importance arose during the defense case concerning other defense witnesses.  K.A.'s older sister, P.A., a minor, wished to testify for Zilm, but her mother, Kristi, did not appear in court.  Tr. IV 26.  P.A. was transported to court by a friend of Kristi's named Rhonda Shockey.  *Id.* 27.

This prompted a long, rambling soliloquy from the prosecutor about the propriety of allowing the defense to call any of the minor children as witnesses, and the intersection of the ruling of Judge Fransein in the juvenile proceedings ordering the children to be kept away from defense counsel and Zilm.  Tr. IV 30-36.  The prosecutor implied that she would seek to alter the custody status of the children in the juvenile court: "And regardless of the outcome of this trial, I would anticipate that Judge Fransein will be taking a long, hard, good look at all of this."  Tr. IV 35.

More seriously as to P.A. who was 15-years-old at the time, the prosecutor intimated that the State would be looking for *perjurious* statements of P.A. in the event that she did testify.  Tr. IV 36.  Based upon this threat of perjury, defense counsel elected to, under duress, not call P.A. as a witness.  Tr. IV 41-42.

The jury found Zilm guilty and recommended sentence of 36 years.  Tr. IV 64.

## PROPOSITION I

**FOUR STATE AGENTS, INCLUDING THE PROSECUTOR IN THIS CASE, COERCED AND LIED TO THE MINOR COMPLAINING WITNESS IN ORDER TO INFLUENCE HER TO TESTIFY FALSELY AGAINST ZILM.**

A.      Standard of Review.

Zilm asserts that four state actors, including the prosecutor Sarah McAmis, coerced a minor complaining witness into testifying falsely at the first preliminary examination; and thereafter pressured her to lie about the veracity of her recantation.

This conduct is a violation of basic constitutional guarantees of fundamental fairness and Due Process of law under the Fourteenth Amendment. *See Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). Normally, when appellant has asserted and shown a *constitutional* error, "reversal is in order unless the State can show the error was harmless beyond a reasonable doubt." *Simpson v. State*, 1994 OK CR 40, ¶ 34, 876 P.2d 690 (*citing Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967)).

However, with *Napue* errors, courts apply a less demanding standard of review: whether "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *accord United States v. Crockett*, 435 F.3d 1305, 1317 (10th Cir. 2006). This materiality standard is, in effect, a form of harmless error review, but a far lesser showing of harm is required under *Napue's* materiality standard than under ordinary harmless error review. *See Smith v. Phillips*, 455 U.S. 209, 220 n.10, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982)

(describing the "materiality requirement" that applies to *Napue* and *Giglio* claims).

B.    Merits.

Criminal prosecutions involving allegations of sexual abuse of a child are tough. They become much tougher when the minor complaining witness recants, or seeks to clarify what happened in a way which exonerates the accused.  This case illustrates that dynamic in a dramatic way, and highlights the way in which the State personnel involved with the child are invested in making sure that the child does not change her story, and the lengths to which they will go to make sure that no one believes the recantation.

In this case, DHS case worker **Lauren Hall**, forensic examiner **Amy Howard**, juvenile case agent **Lori Hannagan**, and prosecutor **Sarah McAmis** were all guilty of either manipulating K.A. and her testimony by either lying to her outright about the evidence in the case, or coercing K.A. to change her testimony with threats of taking her away from her mother–and as will be shown below, prosecutor Sarah McAmis is particularly culpable because she knew about the recantation, failed to mention anything about it at, or prior to, the first preliminary examination, obtained inculpatory testimony form K.A. at that first preliminary examination knowing it to be false, and then proceeded to use that tainted testimony to impeach K.A. at trial.

Something dramatic happened to K.A. on the morning of June 4, 2012.  What was it? Did this emotionally damaged young girl have one of her regularly occurring dreams of past abuse which prompted a reaction during a massage, as she has asserted constantly for over

five years now; or did Zilm intentionally try to place his penis in her anus?  It seems that the former is more likely because the DNA exam showed no sign that Zilm had sexual contact with K.A.

If K.A. stated to the neighbor (Sanford) that there was sexual contact, something which K.A. denied and any such statements have been deemed unreliable by the trial court and this Court, it was, according to K.A., because, "There were cops there.  I was being told to say things.  And I just had a nightmare."  Tr. II 269; *see also* Tr. II 250 (K.A. told the neighbors that she had had a dream about what had happened to her when she was five (the sexual assault by "Uncle David" in Louisiana)).

When a day or two passed, and the drama of the situation had subsided, K.A., unprompted by anyone, called Zilm and told him that she had been mistaken and that it was all a misunderstanding.  O.R. 302-04; O.R. 152 (sworn statement of K.A.).

But, at this point, DHS, state investigators, and law enforcement were involved and we begin to see how these four named State officials manipulated K.A. and her testimony in this case.  They manipulated the testimony of K.A. and the criminal justice system unlawfully in two ways.

First, they all *knew* about the recantation but did not say anything about it to the defense or the court prior to the preliminary hearing.  Remember, K.A. recanted almost immediately after the incident on June 4, 2012, within a day or two; and a preliminary examination was set before Judge Youll on September 26, 2012.

What happened during this time?

As outlined above, we know that DHS case worker Lauren Hall knew about K.A.'s recantation because she was caught on tape lying to K.A. about the DNA evidence.  O.R. 304; Defense Exhibit #1 (the recording).

We know that DHS worker Lori Hannagan knew about it because she wrote it down in an official document in the juvenile file.  O.R. 303.

We know that the forensic examiner from the juvenile center Amy Howard knew about it because K.A. testified that she did, she had access to K.A., and K.A. testified directly that Howard told her that if she stuck to her recantation then K.A. may not be returned to her mother.  O.R. 304; O.R. 172-73 (Amy "told me to say what I said before and I'd get to go back to my mom and live with her again.")

We also know that prosecutor Sarah McAmis knew about the recantation because she had access to all of these State witnesses and resources by virtue of her office and authority as a prosecutor, to K.A., the juvenile file, and K.A. testified under oath directly at trial, in response to questioning by McAmis herself, and a second time at a pre-trial hearing, that McAmis told her that she must tell the first story (implicating Zilm) rather than the recantation so that she could go back and live with her mom.  Tr. 09/09/2014 122-23, 124; Tr. II 284-85.

So, with the approaching preliminary examination before Judge Youll coming up on September 26, 2012, what did prosecutor Sarah McAmis, Amy Howard, Lori Hannagan, and

Lauren Hall do, knowing that K.A. recanted?  Nothing.

They did nothing.  They let K.A. testify under oath at the first preliminary examination that Zilm had sodomized her without informing the trial court or defense counsel that K.A. had actually refuted that testimony, on multiple occasions, and still did (and with knowledge that the DNA evidence supported Zilm, not the original complaint of K.A.).  P.H. Tr. 09/26/2012 at 24-25 (testimony of K.A. at first preliminary examination).

Had the situation remained this way through trial, Zilm would be presenting this issue as a *Brady* claim.  However, defense counsel found out about the recantation by K.A., brought it to the attention of the trial court, and the trial court issued an order remanding for a new preliminary examination specifically because State actors had used "unreasonable influence on the minor child K.A. to secure testimony to which she had since recanted repeatedly."  O.R. 339.

Zilm points out to this Court, however, that as bad a *simply not divulging* the recantation is, much worse is using lies and coercion on K.A. to dissuade her from even mentioning it during her testimony.  This is what all four of these State actors did, and in Zilm's view their actions can fairly be construed as suborning perjury and witness manipulation of an 11-year-old girl to present false testimony.

In addition to not disclosing the recantation, Lauren Hall was caught on tape lying to K.A. about the DNA evidence and telling K.A. that no one would believe her recantation because the DNA evidence proved the first story; Amy Howard pressured K.A. to testify to

the first story by telling K.A. that if she recanted then she might not be given back to her mother; Lori Hannagan told K.A. to just blame the recantation on her mother, as if it was the mother's idea and not K.A.'s true belief (to simply fabricate evidence, in other words); and prosecutor Sarah McAmis told K.A. that if she stuck to her original story implicating Zilm then K.A. could go back and live with her mother.

This is why K.A. testified the way she did at the first preliminary examination; and Judge Glassco held as much in his Order when he found unreasonable influence has been exerted by State actors, declared the first preliminary examination a nullity, and then remanded the matter for a new one.

So, what was the tactic of the prosecutor at trial?

It was simple:  use the testimony of K.A. that she and the others fabricated at the "nullity" of the first preliminary examination to impeach her recantation testimony before the jury at trial.  In Zilm's view, this is what happened.  The State was simply allowed to fabricate and coerce testimony from K.A. at the first preliminary examination, and then use that fabricated testimony at trial to impeach K.A. when she did not testify the way that the State wanted her to.

As outlined, *supra*, prosecutor Sarah McAmis did exactly that, over a long stretch of questioning K.A., peppered with defense objections the entire way; including eliciting from K.A. testimony that McAmis had pressured K.A. to testify falsely.  Tr. II 232-68.

The prosecutor also developed this theme in her closing argument, telling the jury

specifically to rely upon the testimony of K.A. at the first preliminary examination (the so-called legal "nullity"). Tr. V 15 ("you can use the fact that...she did tell all of the details about that at the preliminary hearing the first time she testified under oath. You can use all of those statements as evidence of guilt against the defendant.")

In Zilm's view, this is outrageous Government conduct and a violation of Due Process under the Fourteenth Amendment to the Constitution. *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). Reversal is required if "the false testimony could, in any reasonable likelihood have affected the judgment of the jury." *See Giglio v. United States*, 405 U.S. 153, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (*quoting Napue v. Illinois*, 360 U.S. 264, 271, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959)). The false testimony here is the coerced testimony of K.A. at the original preliminary examination.

Moreover, McAmis is clearly a State actor for purposes of this claim, and Hall, Howard, and Hannagan are also considered State actors and agents of the prosecution regarding this claim. *See United States v. Antone*, 603 F.3d 566, 569-70 (5th Cir. 1979) (in this context prosecution team includes prosecutors and investigators); *United States v. Rangel*, 519 F.3d 1258, 1265 (10th Cir. 2008) (Government conceded that case agent was the alter ego of the Government and of the prosecutor).

Zilm would also note for the Court's consideration that the dynamic outline above, and the evidence presented in this case of "accommodation syndrome," is problematic for the fair functioning of the criminal justice system because, from the perspective of the State

prosecutive machinery, there is *no scenario* in which the accused is either innocent or a mistake made by the complaining witness.

If the complaining witness makes an allegation, it is believed. If she recants, then the recantation is not believed, and there now exists the pseudo-scientific prop used by psychologists and prosecutors of "accommodation syndrome." In other words, in cases like this one, there is an institutional investment by the State in believing allegations and disbelieving recantations.

Zilm asserts that in his case, the State went too far in its efforts to mold K.A.'s story to fit its narrative. McAmis, Hall, Howard, and Hannagan, each of these State actors, overtly coerced and manipulated K.A. in this case to change her testimony in a way that implicated Zilm. McAmis used this coerced testimony during trial to impeach K.A. and to convict Zilm, and argued as much to the jury during her closing argument.

Under the *Napue* standard, the Government conduct in this case was outrageous, and there exists a reasonable likelihood that the false testimony elicited from K.A. at the preliminary examination and at trial could have affected the judgment of the jury. Thus, this case must be reversed and remanded for a new trial.

## PROPOSITION II

### PROSECUTORIAL MISCONDUCT DEPRIVED ZILM OF A FAIR TRIAL.

A.      Standard of Review.

Relief is required on a claim of prosecutorial misconduct only when the misconduct effectively deprived the accused of a fair trial or a fair and reliable sentencing proceeding. *Harmon v. State*, 2011 OK CR 6, ¶ 80, 248 P.3d 918, 943.  In making that determination, this Court evaluates the prosecutor's comments within the context of the entire trial, "considering not only the propriety of the prosecutor's actions, but also the strength of the evidence against the defendant and the corresponding arguments of defense counsel."  *Id.*; *see also Brewer v. State,* 2006 OK CR 16, ¶ 13, 133 P.3d 892, 895 (reversal is not required unless in light of the entire record defendant suffered prejudice).

B.      Merits.

As outlined in Proposition I, *supra*, the prosecutor committed egregious misconduct in the way she handled the recantation statements of K.A.  However, the same prosecutor committed four other instances of misconduct that must result in reversible error:  1) she threatened defense witnesses with perjury or to re-open the juvenile case if they testified; 2) she accused defense counsel of orchestrating the recording of Lauren Hall's false DNA comment to K.A.; 3) she made improper argument to the jury that Zilm should be punished for exercising his right to a jury trial; and 4) she engaged in courtroom histrionics during closing argument, which seems to be a pattern with this particular prosecutor.

1.    THREATS OF PERJURY & TO RE-OPEN JUVENILE CASE.

During the defense case-in-chief, there arose a discussion of whether P.A., the older, but minor, sister of K.A., would be able to testify for Zilm. Tr. IV 26-42. The problem was that the mother of the children, Kristi Alvarez, was not at court. The children, however, were in court, having been transported there by a family friend who had no legal authority over them. This prompted an objection by the prosecutor, and two statements regarding the proposed testimony of P.A. that are relevant here.

First, the prosecutor, after a long general rant about the children testifying at all, noted the overlap between rulings of the juvenile court judge (Judge Fransein) that the children were to be kept away from Zilm and his counsel. Tr. IV 30-36. She then implied that she would seek to alter the custody status of the children in the juvenile court if they testified for Zilm: "And regardless of the outcome of this trial, I would anticipate that Judge Fransein will be taking a long, hard, good look at all of this." Tr. IV 35.

Second, concerning 15-year-old P.A., who was present in the courthouse and ready to testify for Zilm, the prosecutor made a not-so-subtle threat that perjury charges might be filed if P.A. testified for Zilm. Tr. IV 35 ("But now we're going to proceed with her siblings being put on the stand to testify under direct, under cross-examination, with all due respect, to potentially subject herself to some type of perjurious statement.")

Zilm was standing right there and heard these statements by the prosecutor. In light of these statements by the prosecutor, defense counsel had a conference with Zilm and P.A.

Page 32 of 51

and elected, under duress, to not call P.A.  Tr. IV 41-42.

These threats by the prosecutor effectively chilled the right of Zilm to present his

defense.  *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S.Ct. 2142, 2146, 90 L.Ed.2d 636

(1986) ("[T]he Constitution guarantees criminal defendants a meaningful opportunity to

present a complete defense.")  As set forth in his affidavit attached to the Motion to

Supplement filed in this Court, Zilm asserts that he chose to not call P.A. as a witness (or his

mother Mary Zilm or his fiancee Kristi Alvarez) out of fear that the prosecutor would

prosecute them for perjury and seek to have the State custody proceeding re-opened and the

kids taken away from Kristi.

As set forth in their affidavits and statements attached to the Motion to Supplement,

each of these witnesses would have had important information for the jury to hear and was

willing and able to testify if called (P.A. regarding Zilm's character as a father and all of the

positive, valuable lessons that he taught her; Kristi Alvarez to testify concerning Zilm's

character as a good father and fiance/boyfriend, and that he suffered from a medical

condition that caused "leakage" from his penis as a result of medication which explained his

statement to the police about it; and Mary Zilm, his mother, who was present during the

police questioning at her home and heard the police officers discuss with Zilm whether he

needed a lawyer).

    2.    <u>ACCUSING DEFENSE COUNSEL</u>.

As the Court will recall, K.A. was distrustful of DHS workers and she recorded her

conversation with DHS worker Lauren Hall with her iPod.  This proved embarrassing to the

State, and damaging to its case, because Hall told K.A. that no one believed her recantation

because the DNA evidence proved Zilm was guilty, which was a lie; and this bold

manipulation of K.A.'s testimony was pivotal in the district court declaring the first

preliminary examination a "nullity" and remanding for a second one.

During closing arguments, the prosecutor commented on the fact that K.A. had

recorded Hall, telling the jury:

| MS. MCAMIS: | [Defense] counsel also asked and also said that the fact that [K.A.] recorded Lauren Hall, that that corroborated that what everybody–that everybody told her what to say.  And when he talked about that, he talked about how gutsy, and how innovative, and how smart [K.A.] was for doing that.  Does anybody think it's a huge coincidence that right when she met with Mr. Smallwood alone, then she recorded Lauren Hall?  That's a coincidence. |
|---|---|
| MR. SMALLWOOD: | Judge, I object to that.  Ask the jury be admonished to disregard it.  She's impugning my character based on no evidence whatsoever.  Ask the jury be admonished to disregard it.  Move for mistrial. |
| THE COURT: | Motion for mistrial be denied.  Ms. McAmis, confine yourself to the matters that are actually of evidence, and not of statements of counsel during *voir dire*. |

Tr. V 51.  The trial court erred in refusing to admonish the jury and refusing to grant a

mistrial.  It is patently prejudicial misconduct for the prosecutor to insinuate that defense

counsel had manipulated or instructed K.A. to record Lauren Hall, particularly in light of her own misconduct.

This was reversible error.  *See United States v. Holmes*, 413 F.3d 770, 775 (8th Cir. 2005) (personal unsubstantiated attacks on the character and ethics of opposing counsel have no place in the trial of any criminal or civil case); *Cline v. United States*, 395 F.2d 138, 141 (8th Cir. 1968) (improper for a prosecutor to accuse defense counsel of dishonesty).

3.      IMPROPER COMMENT ON RIGHT TO TRIAL.

During closing arguments, the prosecutor focused on K.A. and the struggles that she had gone through in this case (foregoing, naturally, the conduct of State agents in trying to influence her testimony), and told the jury: "It's wrong that you [Zilm] violated a little girl and then put her through the next four years to get to this day."  Tr. V 55.

Trial counsel objected, calling the comment "outrageous conduct," moved to admonish the jury, and moved for a mistrial.  *Id*.  The trial court denied the motion for a mistrial, but did sustain the objection and instructed the jury to disregard it.  *Id*.

Despite the admonition, Zilm asserts that this statement was egregious, and that the curative instruction from the bench was ineffectual.  The prosecutor had accused Zilm of victimizing K.A. by exercising his right under the Sixth and Fourteenth Amendments to a jury trial–and that it was somehow his fault that the process had taken four years–nevermind the fact that the bulk of the delay was the State appealing a legal ruling, and that it was the State's own unlawful actions that caused the remand for a second preliminary examination.

Page 35 of 51

Comment on the accused's exercise of a constitutional right is error. *Bosse v. State*, 2015 OK CR 14, ¶30, 360 P.3d 1203 ("The exercise of a constitutional right, whether to refuse to consent to a search, to refuse to waive *Miranda* rights or to decline to testify at trial, is not evidence of guilt.") (*quoting United States v. Clariot*, 655 F.3d 550, 555 (6th Cir. 2011)).

In addition, there are "some occurrences at trial [that] may be too clearly prejudicial for . . . a "curative instruction to mitigate their effect." *Donnelly v. DeChristoforo*, 416 U.S. 637, 644, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). Zilm asserts that this comment is one such occurrence.

4.       COURTROOM HISTRIONICS.

Finally, the prosecutor engaged in inflammatory courtroom histrionics. This should not come as a shock to this Court because this prosecutor has engaged in similar conduct in multiple cases.[6] *See Scott Allen Bolden v. State*, No. F-2015-1112 (Okl.Cr., March 24, 2017) (unpublished) (Smith, J., concurring in result) (concerned with the tactics of the prosecutor in closing argument which involve "theatrical presentations"); *Gregory Antwon O'Neal v. State*, No. F-2013-958 (Okl.Cr., April 5, 2016) (unpublished) (remanded for re-sentencing because of theatrical conduct during closing of Ms. McAmis); and *Emory Norris Gaines v. State*, No. F-2011-867 (Okl.Cr., September 12, 2012) (unpublished) (prosecutor McAmis

---

[6]       Copies of these unpublished opinions are attached to this Brief, and are presented to the Court because they represent prior instances where this Court has either questioned the tactics of prosecutor Sarah McAmis or have found error in her courtroom histrionics.

committed error in closing, but harmless).

In Zilm's case, she theatrically mocked the demeanor of Zilm when he was questioned by the police.  Tr. V 48 ("If the police showed up right now and said an 11-year-old girl is saying you put your penis in her, your response would be horrified.  That's the most disgusting, disturbing thing anybody could ever accuse you of.  How could you say that?  Get the hell out of my house.")

Defense counsel objected: "I object to this.  This is histrionics.  This is improper.  And ask the jury be advised to disregard it and move for a mistrial."  *Id.*  The trial court denied the motion for a mistrial, but instructed Ms. McAmis: "Counsel, I'll ask you to refrain from histrionics."  *Id.*

Even the trial court judge described her actions as histrionics.  Zilm asserts that this prosecutor continues to engage in inflammatory rhetoric during closing arguments and it must result in reversible error.  *See, e.g., Pryor v. State*, 2011 OK CR 18, ¶ 5, 254 P.3d 721, 722-23 (blatant appeals to emotion are strongly disfavored, and can result in reversible error).

## CONCLUSION

Considered individually and collectively, these instances of prosecutorial misconduct constitute reversible error.

**PROPOSITION III**

**MULTIPLE ERRONEOUS EVIDENTIARY RULINGS PREJUDICED ZILM RESULTING IN A FUNDAMENTALLY UNFAIR TRIAL.**

A.    Standard of Review.

Evidentiary rulings by the trial court are reviewed for an abuse of discretion. *Carter v. State*, 2008 OK CR 2, ¶ 11, 177 P.3d 572.

B.    Merits.

Zilm asserts that the trial court committed reversible error by admitting hearsay statements made by K.A. to 1) Katherine Sanford (the neighbor); 2) Kathy Bell (the SANE nurse); and 3) K.A.'s testimony at the first preliminary examination.  The jury heard these prior statements of K.A. but legally should not have, to the prejudice of Zilm.

As Zilm established, *supra*, the use by the State of hearsay statements of K.A. was, at least in theory, drastically circumscribed in this case.  At the reliability hearing, Judge Glassco ruled that hearsay statements made by K.A. to the neighbor (Sanford) and to forensic interviewer Amy Howard were *unreliable and therefore inadmissible*. Tr. 09/12/2014 at 16-18.  This Court upheld this ruling when the State appealed.  O.R. 511.

In addition, the testimony by K.A. at the first preliminary examination was found to be coerced by State agents by Judge Glassco, and therefore a legal nullity.  It is odd then, that the State was able to introduce all of these hearsay statements to the jury at trial.  It happened as follows:

As to the hearsay statements by K.A. made to Sanford, the trial court allowed them

Page 38 of  51

in, over objection, under the "excited utterance" exception to the hearsay rule. Tr. III 128-29; *see* 12 O.S. § 2803(2) ("A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition).

As to the hearsay statements by K.A. made to SANE nurse Kathy Bell, the trial court allowed them in, over objection, under the "medical advice" exception to the hearsay rule. Tr. 156-60; *see* 12 O.S. § 2803(4) ("Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptons, pain or sensations, if reasonably pertinent to diagnosis or treatment.")

As to the prior testimony of K.A. at the first preliminary examination, the trial court allowed it on the basis that it was used for impeachment.  Tr. II 235; 256-57.

Defense counsel objected to the State's use of K.A.'s hearsay statements in all of these instances because her statements had been deemed legally unreliable by the trial court as to the neighbor Sanford; and the first preliminary examination testimony of K.A. had been deemed coerced by State actors.[7] Thus, there seems to be tension on this issue between the use of exceptions to the hearsay rule and impeachment rules on the one hand, which allow the statements; and the determination that the statements were unreliable and coerced, which would disallow them.

---

[7]     Although the trial court held that the hearsay statements to Sanford were unreliable, and that the testimony of K.A. at the first preliminary examination were coerced, the trial court did not explicitly rule on the reliability of the hearsay statements made to the SANE nurse, Kathy Bell. However, defense counsel objected to them on the basis that they were made within hours of the "unreliable" statements made to the neighbor Sanford and were therefore tainted as well. Tr. III 156-60.

Page 39 of 51

In Zilm's view, the trial court got it wrong.

First, the trial court allowed the exceptions to swallow the rule. The purpose of the hearsay rule, generally, is to distinguish hearsay from direct evidence, which is usually given under oath, in court, upon pain of perjury, and subject to cross-examination. Thus, hearsay is a rule of *exclusion*. *See* 12 O.S. § 2802 ("Hearsay is not admissible except as otherwise provided by an act of the Legislature.")

The exceptions to the rule, which allow inclusion at trial without the traditional safeguards that accompany direct evidence, are exceptions because the Legislature deemed certain situations as producing, in general and without anything more, reliable information, such as the "excited utterance" and "medical advice" exceptions at issue here.

The problem here is that although these exceptions to the hearsay rule are regarded generally as producing reliable information or testimony; in Zilm's case, there was "something more" in the form of special circumstances and actual findings by the trial court that, in this particular case, the general rule of reliability did not apply, and that in fact the hearsay statements made by K.A. were *not* reliable, and in the case of her prior testimony, was not only unreliable, but had been affirmatively coerced and influenced improperly by the State.

Thus, in Zilm's view, the finding by the trial court that the statements were unreliable must cut through the hearsay rule and obviate application of the two exceptions at issue here. The reason is that the information contained in the hearsay statements has been deemed to

be unreliable, and therefore the same unreliable statement cannot be magically made reliable because it is made to a SANE nurse or to a neighbor in close proximity to a startling event.

Second, and this applies chiefly to the testimony of K.A. at the first preliminary examination, the State does not have clean hands. State actors are responsible for unlawfully influencing the testimony of K.A., by lies and coercion, which prompted the trial court to declare the first preliminary examination a nullity. The State should not be able to profit from its own unlawful acts in this manner.

In sum, the findings by the trial court that the statements were unreliable should override the application of any hearsay exceptions. The constitutional burden of proof standard of beyond a reasonable doubt demands that the State's evidence be free of the taint of unreliability.

### PROPOSITION IV

### THE TRIAL COURT ERRED IN REFUSING TO SUPPRESS THE STATEMENT MADE BY ZILM TO POLICE.

A.    Standard of Review.

Review of a district court's decision on a motion to suppress is a mixed question of law and fact, and this Court accepts those of the district court's factual determinations supported by the evidence and review the law *de novo*. *Coffia v. State*, 2008 OK CR 24, ¶ 5, 191 P.3d 594, 596.

B.    Merits.

Police interviewed Zilm at the home of his parents, and the jury heard a recording of that interview through the testimony of Cpl. Gregory Smith and State's Exhibit #1. Prior to trial, defense counsel had filed a motion to suppress, a *Jackson v. Denno* hearing was held (in two parts), and the trial court issued an order denying the motion. O.R. 608. Defense counsel objected again to the introduction of Zilm's statements and to the recording at trial. Tr. III 201-05.

During the interview, Zilm repeatedly denied sexually abusing K.A., but he did make statements to police in which he admitted to giving K.A. the massage, but denied intentionally touching K.A. inappropriately. *See* State's Exhibit #1 (Q. She's stating that you put oil on her vagina and her butt, and that you tried to put your penis in her vagina. A. I didn't do that. Q. And then, when that didn't work, you put it in her butt. A. I didn't do that.)

He also made other statements about being "horny" and telling others in the house about it because Kristi was not at home, that is thumb may have slipped on the oil and jabbed K.A., and when the police officer mentioned going out to the car to get a DNA kit to take a sample, Zilm remembered that he may have left DNA on K.A. because as he laid down he "squished his balls" and had some "leakage" of semen from his penis which was the result of a condition.

These statements by Zilm were seized upon by the prosecutor in closing arguments. Tr. V 37 ("But then you would have to believe this, darn the luck. Of all times for this to happen while his is giving a naked 11-year-old a massage, shoot fire, that's when his balls get squished between his legs. And darn the luck, oh, this is so bad, but darn the luck, that's when some cum comes out."; Tr. V 45 ("Because let's just say, I don't know how or why, but under some circumstances you happen to find yourself alone with an 11-year-old, and you have some cum on your hand. How would an innocent man respond to that?")

Zilm himself testified at the *Jackson v. Denno* hearing on the voluntary nature of his statements. Tr. 09/28/2016 at 39. Through his testimony, along with Cpl. Smith at trial, we know that three police officers went to interview Zilm at the home of his parents, two detectives (Smith and Hodges) and uniformed police officer (Officer Taylor). *Id.* at 51-52; Tr. III 196-200.

Zilm seeks suppression of his statements to these officers on two grounds.

First, as argued by defense counsel below, officers should have issued the *Miranda*

warnings to Zilm because he was in custody. O.R. 582.  As counsel pointed out below, "custody" is a legal question that focuses on the dynamic and interplay between police and the subject being questioned; it is not a matter of location.  This means that a person may be in "custody" even if questioned in their own home. *See Orozco v. Texas*, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969); O.R. 584.

The legal inquiry of whether a suspect is in "custody" for *Miranda* purposes is whether a reasonable person in the suspect's position would have understood the situation as the functional equivalent to a formal arrest.  *See United States v. Jones*, 523 F.3d 1235 (10th Cir. 2008).

Here, Zilm was approached by three officers, one of whom was uniformed with a gun, was separated from his parents (in their own home) so that the police could talk to him privately, were in close physical proximity to Zilm the entire time, and according to Zilm, his perception of the uniformed officer who stood guard at the door was that the officer was there to "keep me from getting to my parents and to keep me from leaving." Tr. 09/28/2016 at 51-52. Zilm was not given *Miranda* warnings. Id. 52.

Contrary to the conclusion of the trial court, Zilm was subject to the functional equivalent of an arrest during the time that he was questioned, this Court must find that he was in custody for *Miranda* purposes, and therefore suppress his statements because *Miranda* warnings were not given.

Second, and this claim was not raised below, Zilm asked if he needed a lawyer at the

beginning of the interview.  *See* Affidavit of Adam Clayton Zilm attached to Motion to Supplement.  The detectives responded, "No, we just want to ask a few questions." (Det. Smith), and, "I don't know, do you?" (Det. Hodges).

This exchange was, curiously, not contained in the recorded version of the interview provided to the defense. Zilm verifies in his affidavit that he asked them about an attorney, and their responses.  In addition, Mary Zilm (Zilm's mother) was present during the exchange and can verify that it occurred.  *See* Affidavit of Mary Zilm attached to Motion to Supplement.

Zilm believes that detectives deleted this exchange from the original recording, or did not record it at all.  The fact that Zilm asked if he needed an attorney, and was told "no" by police, indicates deception by officers and calls into question the voluntary nature of the statements made by Zilm.

The prosecution has the burden of establishing by a preponderance of the evidence that a suspect waived his *Miranda* rights and that his statements to police are truly the product of free choice. *Colorado v. Connelly*, 479 U.S. 157, 168-69, 107 S.Ct. 515, 522-23, 93 L.Ed.2d 473 (1986).  Voluntariness requires "careful evaluation of the totality of the circumstances, including the accused's characteristics, the conditions of the interrogation, and the conduct of law enforcement officers." *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973).

Voluntariness of a confession or incriminating statements is judged from the totality

of the circumstances, including the characteristics of the accused and the details of the interrogation. *Van White v. State,* 1999 OK CR 10, ¶¶ 45, 990 P.2d 253, 267.

## CONCLUSION

The statements by Zilm should be suppressed because: 1) Zilm was in custody and was not advised of his rights under *Miranda*; and 2) Zilm asked whether he needed a lawyer and was told that he did not, which constitutes misconduct by law enforcement that rendered his statements involuntary.

## PROPOSITION V

## ZILM RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS; AND ARTICLE II, SECTIONS 7 AND 20 OF THE OKLAHOMA CONSTITUTION.

A.      Standard of Review.

The ultimate legal question of whether defense counsel was constitutionally effective is decided by this Court *de novo*. *Fisher v. State*, 2009 OK CR 12, ¶ 25, 206 P.3d 607 ("this Court makes the ultimate decision regarding a claim of ineffective assistance of counsel"); *see also Littlejohn v. State*, 2008 OK CR 12, ¶ 28, 181 P.3d 736, 745. Findings of fact by the trial court are reviewed for an abuse of discretion. *Id.*

B.      Merits.

A Defendant in a criminal case is entitled to the effective assistance of counsel; and constitutionally deficient counsel violates the Sixth and Fourteenth Amendments to the United States Constitution as well as article II, §§ 7 and 20 of the Oklahoma Constitution. *See Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under the familiar constitutional test established in *Strickland*, an ineffective assistance claim has two components: a defendant must show that counsel's performance was deficient, and that the deficiency prejudiced the defense. *See Grant v. State*, 2004 OK CR 24, ¶ 3, 95 P.3d 178.

Here, the prosecutor clearly signaled to the defense that she would not only seek to re-open the juvenile case to change the custody arrangement of Kristi's kids (including K.A. and P.A.), but that she would also be looking to file perjury charges against defense

witnesses in the event that they took the stand, specifically against P.A.  Tr. IV 35-36.

As defense counsel noted upon hearing these threats, he consulted with the witness, P.A., and elected, under duress, to not call P.A. as a witness.  Tr. IV 41-42.  However, the record does not reflect that trial counsel made a record regarding the additional witnesses that Zilm wished to call, but decided not to because the threats made by the prosecutor.  These witnesses were his mother, Mary Zilm, and his finacee and mother of K.A., Kristi Shaneck.  *See* Affidavit of Adam Clayton Zilm attached to Motion to Supplement.

To the extent that trial counsel's "under duress" statement in the record is deemed by this Court insufficient to preserve this error, Zilm asserts that trial counsel's performance was deficient and that he was prejudiced thereby.  Trial counsel should have made a record that Zilm felt threatened by the comments of the prosecutor, that this feeling was reasonable, that it chilled his right to present a defense, and a record should have been made that Zilm forewent calling these witnesses because of the threats, and an offer of proof should have been made.

Zilm was prejudiced because his mother, Mary Zilm, could have corroborated the fact that Zilm actually did ask the detectives whether he needed a lawyer, and their answer that he did not.  She was standing there listening when it happened.

Similarly, the prosecutor made much of the fact that Zilm had "cum" on his fingers and told detectives that his DNA might be on K.A.  Tr. V 37; 45.  However, trial counsel failed to call Zilm or his fiancee Kristi Shaneck to the stand to explain that his "leakage"

problem was actually a medical condition that had manifested when Zilm had begun taking

a prostate health supplement prior to the alleged incident with K.A.

This was a critical aspect of the case because it would have explained to the jury that

Zilm had ejaculate at the time because of a medical condition, not because he was aroused

by K.A.

Under the *Strickland* standard, Zilm was deprived of the effective assistance of

counsel and this Court must reverse his conviction and sentence.

## PROPOSITION VI

**THE ACCUMULATION OF ERRORS AT TRIAL RESULTED IN A FUNDAMENTALLY UNFAIR ADJUDICATORY PROCEEDING IN VIOLATION OF THE RIGHTS OF ZILM UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE II, SECTION 7 OF THE OKLAHOMA CONSTITUTION.**

A.      <u>Standard of Review</u>.

This Court reviews claims of cumulative error as a question of law *de novo*. *See*

*Simpson v. State*, 2010 OK CR 6, ¶ 55, 230 P.3d 888.  In *Bechtel v. State*, 1987 OK CR 126,

738 P.2d 559, 561, this Court stated: "When a review of the entire record reveals numerous

irregularities that tend to prejudice the rights of the defendant, and where a cumulation of

said irregularities denies the defendant a fair trial, the case will be reversed, even though one

of said errors standing alone would not be ample to justify reversal."

B.      <u>Merits</u>.

As set forth, *supra*, Zilm's trial was replete with reversible error, starting at the very

beginning with four State actors–including the prosecutor–lying and coercing the minor complaining witness into testifying falsely in court, with a prosecutor who threatened defense witnesses with perjury and custody challenges if they testified, accused defense counsel during closing arguments of manipulating K.A. into recording Lauren Hall, commented improperly on Zilm's right to have a jury trial as continued harassment of K.A., her continued courtroom histrionics for which she has been chastised by this Court on several occasions, the trial court allowing "unreliable" hearsay statements of K.A. under the guise of hearsay exceptions, denial of suppression of his statements to detectives during the home interview, and ineffective assistance of counsel in failing to develop the record on how the prosecutor chilled the defense by threatening defense witnesses with perjury and custody changes.

These errors are all individually reversible, and combined form a cumulative prejudicial effect that must result in reversal.

## CONCLUSION

Based upon the foregoing argument and authority, Zilm requests that this Court reverse the judgment of the district court, vacate his conviction and sentence, and remand this case for a new trial.

DATED this 18th day of December, 2017.

Respectfully submitted,

Page 50 of 51

James L. Hankins, OBA #15506
TIMBERBROOKE BUSINESS CENTER
929 N.W. 164th St.
Edmond, OK 73013
Phone:        405.753.4150
Fax:          405.445.4956
E-mail:       jameshankins@ocdw.com

*COUNSEL FOR APPELLANT*

## CERTIFICATE OF SERVICE

I certify that on this 18th day of December, 2017, a true and correct copy of the foregoing was delivered to the Clerk of this Court for transmittal to the Attorney General of the State of Oklahoma.

_____
James L. Hankins, OBA #15506

# IN THE COURT OF CRIMINAL APPEALS OF THE STATE OF OKLAHOMA

SCOTT ALLEN BOLDEN, )
             Appellant, )   **NOT FOR PUBLICATION**

v. )   Case No. F-2015-1112

STATE OF OKLAHOMA )

             Appellee. )

**FILED**
IN COURT OF CRIMINAL APPEALS
STATE OF OKLAHOMA

MAR 2.4 2017

MICHAEL S. RICHIE
CLERK

## S U M M A R Y   O P I N I O N

**LUMPKIN, PRESIDING JUDGE:**

Appellant Scott Allen Bolden was tried by jury and convicted of First Degree Murder (Count I) (21 O.S.2011, § 701.7); and Child Abuse by Injury (Count II) (21 O.S.2011, § 843.5(A)) in the District Court of Tulsa County, Case No. CF-2013-2191. The jury recommended as punishment life imprisonment for each count and a five thousand dollar ($5,000.00) fine in Count I and a five hundred dollar ($500.00) fine in Count II. The trial court sentenced accordingly, ordering the sentences to run consecutively.[1] It is from this judgment and sentence that Appellant appeals.

Appellant raises the following propositions of error in support of his appeal:

    I.      Prosecutorial misconduct deprived Appellant of his rights to due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution, and Art. II, §§ 7 & 20 of the Oklahoma Constitution.

    II.     The trial court abused its discretion by admitting irrelevant and highly prejudicial evidence of shaken baby syndrome,

---

[1] Appellant must serve 85% of his sentences in both counts before becoming eligible for consideration for parole. 21 O.S.2011, § 13.1.

1

which violated Appellant's rights to a fair trial and due
process under the Fifth, Sixth, and Fourteenth
Amendments to the U.S. Constitution, and Art. II, §§ 7 &
20 of the Oklahoma Constitution.

III. The trial court's misinstruction violated Appellant's rights
to due process and a fair trial under the Fifth, Sixth, and
Fourteenth Amendments to the U.S. Constitution, and Art.
II, §§ 7 & 20 of the Oklahoma Constitution.

IV. The trial court violated Appellant's right to confront adverse
witnesses under the Sixth, and Fourteenth Amendments to
the U.S. Constitution, and Art. II, § 20 of the Oklahoma
Constitution.

V. Appellant received ineffective assistance of counsel
violating his rights under the Sixth and Fourteenth
Amendments to the U.S. Constitution and Art. II, § 20 of
the Oklahoma Constitution.

VI. The cumulative effect of all the errors deprived Appellant of
a fair trial.

After thorough consideration of these propositions and the entire record
before us on appeal including the original record, transcripts, and briefs of the
parties, we have determined that under the law and the evidence no relief is
warranted.

In Proposition I, Appellant contends that prosecutorial misconduct denied
him a fair trial. Specifically, he complains about: 1) comments regarding the
defense expert's witness fee; 2) testimony regarding Appellant's lack of remorse;
3) personally vouching for the credibility of state's witnesses; 4) speculation on
facts beyond the scope of evidence; 5) courtroom theatrics; and 6) appealing to
jurors' emotions.

2

It is well established that a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial. *Davis v. State*, 2011 OK CR 29, ¶ 74, 268 P.3d 86, 128. In order for the remarks of the prosecuting attorney to constitute reversible error they must be flagrant and of such a nature as to be prejudicial to the defendant. *Id*. From a practical standpoint, every slight excess by the prosecutor does not require that a verdict be overturned and that a new trial be ordered. *Id*.

The majority of the prosecutor's conduct now challenged was not met with contemporaneous defense objections. Therefore, our review is for plain error only. *Malone v. State*, 2013 OK CR 1, ¶ 40, 293 P.3d 198, 211. Under the test set forth in *Simpson v. State*, 1994 OK CR 40, ¶¶ 10, 26, 30, 876 P.2d 690, 694, 699, 701 this Court determines whether the appellant has shown an actual error, which is plain or obvious, and which affects his or her substantial rights. This Court will only correct plain error if the error seriously affects the fairness, integrity or public reputation of the judicial proceedings or otherwise represents a miscarriage of justice. *Id*.  *See Hogan v. State*, 2006 OK CR 19, ¶ 38, 139 P.3d 907, 923. *See also Jackson v. State*, 2016 OK CR 5, ¶ 4, 371 P.3d 1120, 1121; *Levering v. State*, 2013 OK CR 19, ¶ 6, 315 P.3d 392, 395.

While we have found that a prosecutor may comment on the veracity of the defense expert witnesses and their testimony, *Duckett v. State*, 1995 OK CR 61, ¶ 23, 919 P.2d 7, 19, we have found it improper for the prosecutor to argue

3

that an expert was testifying a certain way only because he was being paid to do so.  *See Martinez v. State*, 1999 OK CR 33, ¶ 47, 984 P.2d 813, 826. Looking at the challenged comments in context, the prosecutor's questioning of defense expert Dr. Wigren and prosecution expert Dr. Block were proper inquiries into their qualifications and possible bias, particularly as it related to their reasons for testifying and their fees. The prosecutor was within her legal bounds to test the credibility of the doctors' opinions, particularly where they had differing opinions. The prosecutor's questioning of the doctors did not constitute plain error as it did not affect Appellant's right to a fair trial. Regarding the prosecutor's comments in closing argument pertaining to the credibility of the defense expert, any inappropriate comments were not so prejudicial as to have denied Appellant a fair trial.  *Id.*, 1999 OK CR 33, ¶ 48, 984 P.2d at 826.

We next consider Appellant's claim that the prosecutor improperly commented on the lack of remorse in the guise of demeanor testimony. Having thoroughly reviewed the challenged comments made during the examination of six witnesses, opening statement and closing argument, we find that only one instance drew an objection. In this instance, during the direct examination of the chief detective on the case, Detective Swanson, the prosecutor asked if at any time after the detective told Appellant that the decedent could die from her injuries, did Appellant express any remorse about her condition. Defense counsel raised an objection on the grounds of speculation. This objection was overruled and the witness was allowed to answer based on her own observations.

4

Appellant directs us to *Bell v. State,* 2007 OK CR 43, 172 P.3d 622  where we said that whether the defendant expressed remorse for the victims of her reckless driving was not relevant to any issue before the jury and that the prosecutor's questions, in the context of the trial, were misleading. This Court found the prosecutor's inquiry "irrelevant and potentially inflammatory, designed to appeal to jurors' emotions". *Id.,* 2007 OK CR 43, ¶ 8, 172 P.3d at 625. However, in *Webster v. State,* 2011 OK CR 14, ¶ 63, 252 P.3d 259, 276-77 this Court noted that the defendant's demeanor and discomfort during a police interview were probative of his involvement and consciousness of guilt.

Unlike *Bell,* the question to Detective Swanson was an isolated inquiry forming a minor part of the prosecutor's examination of the witness. The trial court did not abuse its discretion overruling the objection.

We review the remainder of the comments challenged for plain error.  *See Hogan,* 2006 OK CR 19, ¶ 38, 139 P.3d at 923. We find no error and thus no plain error. The fact finder may consider all of the circumstances surrounding a defendant's words and deeds to determine if it is reasonable that an innocent person would have uttered them or performed them. The prosecutor's inquiries and comments on the lack of remorse were minor and when compared to the great weight of evidence against Appellant, not sufficient to warrant relief.

Regarding the claims of improper vouching, this Court has held that argument is impermissible vouching only if the jury could reasonably believe that the prosecutor professes a personal belief in the credibility of a witness either through explicit personal assurances of the witness's veracity or by implying that

5

information not presented to the jury supports the witness's testimony. *Hanson v. State*, 2009 OK CR 13, ¶ 31, 206 P.3d 1020, 1030 *citing to Warner v. State*, 2006 OK CR 40, ¶ 24, 144 P.3d 838, 860. The challenged comment actually drew an objection which was overruled. Reading the challenged comment in context, it was made in response to a comment made during the defense closing argument and it was based on testimony from the two doctors that they had worked the better part of their lives in the area of child abuse and child abuse prevention. As the evidence supported the comment, we find it was not improper. *Warner*, 2006 OK CR 40, ¶ 25, 144 P.3d at 861. Further, based upon the evidence in the case, any assurances by the prosecution did not determine the verdict.

Further, we find the prosecutor did not engage in speculation but argued the facts as presented at trial. Appellant was charged not only with first degree murder but also with child abuse by injury. Argument regarding the 21 bruises observed on the decedent and their possible causes was relevant in proving the child abuse by injury charge. The comments were well within the wide range of argument permitted in closing argument. *Sanchez v. State*, 2009 OK CR 31, ¶ 71, 223 P.3d 980, 1004. Reviewing only for plain error, we find no error and thus no plain error.

Appellant next argues the prosecutor improperly demonstrated to the jury how the decedent's injuries occurred. There is nothing in the record indicating any improper physical actions of the prosecutor. As Appellant notes, no objections were raised to the prosecutor's alleged demonstrations, the court reporter did not make any notation in the record that the prosecutor made any

6

sort of physical movements demonstrating how the decedent was injured, nor did the judge comment on the record concerning the prosecutor's conduct. Appellant's reliance on a question from defense counsel to Detective Swanson is not sufficient to establish the prosecutor's conduct. As we said in *Warner*, 2006 OK R 40, ¶ 186, 144 P.3d at 889-90, "[t]here is nothing in the record concerning the prosecutor's actions except defense counsel's after the fact assertion. Counsel's failure to timely object and raise the issue before the trial court has left this Court with an insufficient record to review on appeal."

In the absence of any record, Appellant supports his argument two ways. First, he relies on affidavits contained in his application to supplement the record and a 3.11 motion for an evidentiary hearing on Sixth Amendment grounds filed contemporaneously with his appellate brief. However, those affidavits are not a part of the record at this point as supplementation of the record is permitted only upon filing of a motion for new trial (which Appellant has not done) and in support of an allegation of ineffective assistance of counsel. Rule 3.11(B)(3)(b), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2017). Appellant's attempt to support a claim of prosecutorial misconduct with Rule 3.11 materials is not permissible. To the extent these affidavits are relevant to the 3.11 Motion, we will address them in Proposition V.

Appellant further cites to several portions of the prosecutor's closing argument, including comments previously challenged in this proposition, which he claims support his allegation of prosecutorial theatrics. Appellant compares the prosecutor's words to those used in a previous unpublished case where the

7

prosecutor (the same assistant District Attorney as in the present case) improperly used a demonstrative aid to illustrate how the victim was injured. Any comparison with another case is inappropriate as a claim of prosecutorial misconduct cannot be substantiated by arguing that because the prosecutor was found to have used theatrics in one case, that she did it again in another case. Without any actual record of the prosecutor's conduct in this case, we refuse to find her conduct in this case improper based upon the record of a separate case. In the absence of any record of the prosecutor's alleged courtroom theatrics, we will not read her words as indicative of inappropriate conduct.

Appellant also seeks to have us find the prosecutor's conduct inappropriate and error by calling it a re-enactment of the crime. This Court has been reluctant to admit crime scene reenactments where they are posed with persons and things in various assumed situations, intended only to illustrate hypothetical situations. *Harris v. State*, 2000 OK CR 20, ¶ 10, 13 P.3d 489, 493. However, without any documentation of the prosecutor's physical actions, we cannot call them a re-enactment of the crime. *See Stemple v. State*, 2000 OK CR 4, ¶ 47, 994 P.2d 61, 71. In the absence of any record supporting the claim of "courtroom theatrics", this claim of error is waived.

Appellant's last claim of prosecutorial misconduct argues that the prosecutor appealed to the jury's emotions and sympathy. It is improper for prosecutors to ask jurors to have sympathy for victims. *Warner*, 2006 OK CR 40, ¶ 190, 144 P.3d at 890; *Jones v. State*, 1987 OK CR 103, ¶ 15, 738 P.2d 525, 529; *Tobler v. State*, 1984 OK CR 90, ¶ 16, 688 P.2d 350, 354. "It is

8

clearly improper for a prosecutor to make arguments which tend to 'divert the jury from its duty to decide the case on the evidence.'" *Jones,* 1987 OK CR 103, ¶ 17, 738 P.2d at 530.

The only instance which drew an objection was the questioning of prosecution expert witness Dr. Wallace and her use of a demonstrative aid – slides – in describing Shaken Baby Syndrome (SBS). Defense counsel's objection was overruled. The record reflects that a pre-trial hearing was held on the defense's motion *in limine* to prevent use of the demonstrative aid. The motion was denied as the aid was found relevant and routinely admissible. The demonstrative aid explained the mechanics of a severe brain injury to a baby. It did not illustrate or recreate the precise force involved or manner in which the force was inflicted upon the decedent in this case. Appellant's objection was properly overruled.

Reviewing the remainder of the challenged comments for plain error, we find none. The prosecutor's arguments were based upon the photos of the severely injured decedent and the experts' testimony regarding the cause and severity of those injuries. While some of the comments verged on the emotional, they were based on the evidence and not sufficient to warrant a reversal of the conviction. This Court has recognized that "in the heat of argument, counsel do occasionally make remarks that are not justified by the testimony, and which are, or may be prejudicial to the accused." *Roberts v. State,* 1994 OK CR 1, ¶ 15, 868 P.2d 712, 718. "However, we are loathe to overturn a conviction on the basis of prosecutor's comments standing alone, 'for the statements or conduct must be

viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial.'" *Id.* We have thoroughly reviewed the closing argument in its entirety and all of Appellant's claims of prosecutorial misconduct. The challenged comments have been reviewed within the context of the entire trial, considering not only the propriety of the prosecutor's actions, but also the strength of the evidence against the defendant and the corresponding arguments of defense counsel. *See Mitchell v. State*, 2010 OK CR 14, ¶ 97, 235 P.3d 640, 661; *Simpson v. State*, 2010 OK CR 6, ¶ 26, 230 P.3d 888, 899. Given the strength of the State's evidence against Appellant, and the jury instruction not to let sympathy, sentiment or prejudice enter into their deliberations, we find that any inappropriate comments made in closing argument or in questioning witnesses did not deprive Appellant of a fair trial or affect the jury's assessment of punishment. There was no plain error here. This proposition is denied.

In Proposition II, we find the trial court did not abuse its discretion in admitting testimony of Shaken Baby Syndrome (SBS) and an accompanying demonstrative aid. *See Marshall v. State*, 2010 OK CR 8, ¶ 24, 232 P.3d 467, 474 (challenges to the admission of evidence are reviewed for abuse of discretion).

As Appellant's explanation for the decedent's injuries was not consistent with testimony from medical experts regarding the possible causes of those injuries, evidence of SBS was relevant for the jury's consideration in determining Appellant's guilt of the charges of first degree murder and child abuse. *See Postelle v. State*, 2011 OK CR 30, ¶ 31, 267 P.3d 114, 131; 12 O.S.2011, § 2401

(relevant evidence is evidence having any tendency to make the existence of a fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence). While the evidence showed that the decedent did not sustain a neck injury, she did suffer a severe brain injury resulting in subdural and retinal hemorrhaging. Medical experts testified that the absence of a neck injury does not necessarily equate to the absence of SBS. Two pediatricians testified that the evidence showed that the decedent was the victim of abusive head trauma that involved a shaking mechanism as well as blunt force trauma. One of these experts, Dr. Wallace, in explaining SBS, used slides to illustrate what happens to a baby's brain when it is shaken.

Based upon the evidence of the decedent's injuries and manner of death, the testimony and demonstrative aid illustrating SBS was helpful in explaining possible causes of the decedent's brain injury. Further, contrary to Appellant's argument, this Court has previously found SBS sufficiently reliable to be presented to a jury. *See Day v. State*, 2013 OK CR 8, ¶ 7, 303 P.3d 291, 296. We find evidence of SBS was clearly not introduced solely for its emotional impact. It was relevant evidence, more probative than prejudicial on the possible causes of the decedent's injuries. The trial court did not abuse its discretion in admitting the evidence.

In Proposition III, Appellant contends the trial court erred in failing to *sua sponte* instruct the jury regarding re-enactments and alleged accomplice testimony. As Appellant did not request these instructions nor object to their absence, we review only for plain error. *Daniels v. State*, 2016 OK CR 2, ¶ 3, 369

P.3d 381, 383. We find no error and thus no plain error in the trial court's omission of an instruction on crime scene re-enactments. Dr. Wallace's use of the SBS demonstrative aid did not constitute a re-enactment of the crime in this case.    The demonstrative aid, slides showing a gender neutral baby and what happens to a baby's head when it is shaken,   was a general explanation of the mechanics of a severe brain injury on a baby. It was never claimed that the demonstrative aid illustrated what happened to the decedent in this case, nor was it promoted as illustrating or recreating the precise force involved or manner in which the force was inflicted upon the decedent. The use of the demonstrative did not constitute the re-enactment of the abuse inflicted on the decedent and the trial court did not err in failing to instruct the jury on crime re-enactments.

The trial court also did not err in failing to instruct the jury that Heidi Benjamin was an accomplice. The test used to determine whether a witness is an accomplice is whether he could be indicted for the offense for which the accused is being tried. *Bryson v. State*, 1994 OK CR 32, ¶ 38, 876 P.2d 240, 256.  In pre-trial pleadings, the defense did not consider Benjamin an accomplice, arguing that she was not being held criminally liable for the offenses with which the defendant was charged. Under the evidence in this case, she could not have been charged with First Degree Murder and Child Abuse by Injury as was Appellant. There was no evidence that Benjamin actually inflicted any of the decedent's injuries. Neither Benjamin nor Appellant attributed any of the decedent's injuries to Benjamin. She was appropriately charged with permitting child abuse and child neglect for allowing Appellant to treat the decedent in a

12

manner which she herself admitted was too rough and abusive. As she was not an accomplice to the crimes of First Degree Murder and Child Abuse by Injury, the trial court did not err in failing to *sua sponte* instruct on accomplice liability. Finding no error in the court's omission of the above two discussed instructions, we find no plain error.

In Proposition IV, Appellant challenges the court's ruling on a motion *in limine* limiting the cross-examination of Heidi Benjamin regarding her history with the Missouri Department of Social Services pertaining to her care of the decedent. The prosecutor argued she had no problem with defense counsel cross-examining on official findings or substantiated complaints from the Missouri Dept. of Social Services. However, the prosecutor sought to limit inquiry into the investigations which resulted in no findings or were unsubstantiated. The trial court ruled that the defense could cross-examine into referrals that were substantiated and inquiry into unsubstantiated referrals was precluded.

Before the trial court and now on appeal, Appellant argues that he should have been allowed to inquire about an allegation in the Missouri files involving Benjamin shaking the decedent even though it was found to be unsubstantiated. Appellant asserts the prior allegation of shaking was relevant to establish a defense and for purposes of impeaching Benjamin's testimony based on bias and prejudice.

A ruling on a motion *in limine* is merely advisory and not conclusive. *Short v. State*, 1999 OK CR 15, ¶ 65, 980 P.2d 1081, 1102-03. To properly preserve the issue contained in such a motion, the proposition must be introduced at trial,

13

and if overruled, objections should occur at that time. *Id.* Appellant's failure to raise the issue during Benjamin's testimony or ask her any questions about her involvement with the Missouri Dept. of Social Services waives all but plain error review. *Id.*

Exposure of a witness's motive to testify is a proper and important function of cross-examination. *Livingston v. State,* 1995 OK CR 68, 907 P.2d 1088, 1092-93. Bias is never collateral and the right to impeach for bias is construed liberally; a witness may be cross-examined on any matter tending to show bias or prejudice. *Id.* Here, there was never any indication or allegation that Benjamin caused the decedent's fatal injury.

An unsubstantiated and dismissed claim that Benjamin shook the decedent months before her death was not relevant to her bias against Appellant or a motive to lie regarding whether the last injury inflicted upon the decedent was accidental or purposeful. We find no error, and thus no plain error in the trial court's limitation on the cross-examination of Benjamin.

Next, Appellant continues his challenge to the SBS demonstrative aid calling it inadmissible testimonial hearsay. Appellant advances a page long discussion of testimonial hearsay as addressed in *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) and *Melendez-Diaz v. Massachusetts,* 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009). It is very clear from the record that the demonstrative aid used by the prosecution did not refer to or illustrate the actual injuries to the decedent in this case. The slides, showing how a gender neutral baby's brain reacts to force, do not have the

14

characteristics of testimonial evidence addressed in *Crawford* and *Melendez-Diaz.* This finding makes Appellant's arguments of inadmissibility due to the absence of a finding of the indicia of reliability of the demonstrative aid and because the aid was created by an unnamed forensic pathologist who was not shown to be unavailable to testify moot. These concerns are only relevant if the evidence is found to be testimonial hearsay. The trial court did not abuse its discretion in admitting the SBS demonstrative aid. *See Marshall,* 2010 OK CR 8, ¶ 24, 232 P.3d at 474.

In Proposition V, Appellant contends he was denied the effective assistance of counsel by: 1) counsel's failure to object to the instances of prosecutorial misconduct raised in Proposition I; and 2) the failure to request or object to the lack of jury instructions that the SBS demonstrative aid was a re-enactment and that Heidi Benjamin was an accomplice as raised in Proposition III.

This Court reviews ineffective assistance of counsel claims under the two-part test mandated by the United States Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). *Malone v. State,* 2013 OK CR 1, ¶ 14, 293 P.3d 198, 206. The *Strickland* test requires an appellant to show: (1) that counsel's performance was constitutionally deficient; and (2) that counsel's deficient performance prejudiced the defense. *Id.* Unless the appellant makes both showings, "it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable." *Id.*

15

The Court begins its analysis with the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Id.,* 2013 OK CR 1, ¶ 15, 293 P.3d at 206 *citing Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. Appellant must overcome this presumption and demonstrate that counsel's representation was unreasonable under prevailing professional norms and that the challenged action could not be considered sound trial strategy. *Id.* This Court has stated that the issue is whether counsel exercised the skill, judgment and diligence of a reasonably competent defense attorney in light of his overall performance. *Id.,* 2013 OK CR ¶ 15, 293 P.3d at 206-207.

When a claim of ineffectiveness of counsel can be disposed of on the ground of lack of prejudice, that course should be followed. *Id.,* 2013 OK CR 1, ¶ 16, 293 P.3d at 207 *citing Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069. To demonstrate prejudice an appellant must show that there is a reasonable probability that the outcome of the trial would have been different but for counsel's unprofessional errors. *Id.* "The likelihood of a different result must be substantial, not just conceivable." *Id. quoting Harrington v. Richter,* 562 U.S. 86, 112, 131 S.Ct. 770, 792, 178 L.Ed.2d 624 (2011).

In Proposition I, we thoroughly reviewed Appellant's claims of prosecutorial misconduct. While the majority of the claims were reviewed for plain error, we found no errors, plain or otherwise warranting relief. Any objections by defense counsel would have been denied. We will not find counsel ineffective for failing to raise objections which would have been overruled. *Eizember v. State,* 2007 OK CR 29, ¶ 155, 164 P.3d 208, 244.

Appellant further finds counsel ineffective for failing to request or object to the absence of instructions that the SBS demonstrative aid was a crime scene re-enactment and the accomplice liability of Heidi Benjamin. These specific allegations of error were raised and addressed in Proposition III. There we found the use of the demonstrative aid was not a re-enactment and Heidi Benjamin was not an accomplice. Any objections to the contrary or request for instructions on those issues would have been denied.

Having thoroughly reviewed the claims of ineffective assistance of counsel, we find Appellant has failed to overcome the presumption that counsel's representation was reasonable under prevailing professional norms. Accordingly, we find that Appellant was not denied the effective assistance of counsel and this proposition of error is denied.

Tendered for filing contemporaneously with the appellate brief is *Appellant's Application to Supplement Appeal Record or in the Alternative Request for Evidentiary Hearing Pursuant to Rule 3.11(A) and/or on Claims of Ineffective Assistance of Counsel.*

Rule 3.11(B)(3)(b), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2016) allows an appellant to request an evidentiary hearing when it is alleged on appeal that trial counsel was ineffective for failing to utilize available evidence which could have been made available during the course of trial. *Warner*, 2006 OK CR 40, ¶ 207, 144 P.3d at 893. Once an application has been properly submitted along with supporting affidavits, this Court reviews the application to see if it contains sufficient evidence to show

this Court by clear and convincing evidence there is a strong possibility trial counsel was ineffective for failing to utilize or identify the complained-of evidence. *Id. See also Grissom v. State,* 2011 OK CR 3, ¶ 80, 253 P.3d 969, 995; *Simpson v. State*, 2010 OK CR 6, ¶ 53, 230 P.3d 888, 905-906.

Appellant first asserts that trial counsel was ineffective for failing to object to the prosecutor's "courtroom theatrics" addressed in Proposition I.  To support this claim, Appellant includes Exhibit B, a signed affidavit from trial counsel, that during closing argument the prosecutor offered the story of the decedent's final moments before going unconscious. He asserts the prosecutor screamed "shut up" as she made a shaking action with her hands, that she discussed punching and kicking the decedent and made those actions by punching the air and kicking the floor. He argues there was no evidence to support those actions. He also states that in questioning Detective Swanson, the prosecutor asked about proving that a baby had been kicked, punched or slammed and as she did so, she kicked the floor, punched the air and slammed an imaginary object to the floor.  Again, counsel states there was no evidence to support the prosecutor's actions.

Appellant also includes Exhibit C, a signed affidavit from Brenda Bolden, Appellant's mother.  She states in part that she remembered seeing the prosecutor in closing argument shake her fists in the air and kick the air while explaining how the decedent was injured.  Ms. Bolden also states she remembered the prosecutor throwing a book on the floor, claiming it was the sound of the decedent's head slamming onto the floor, and the prosecutor

shaking papers in the air and yelling "shut up" in explaining what Appellant did to the decedent.

As we stated in Proposition I, none of this conduct attributed to the prosecutor is reflected in the record. Therefore, we found the claim of prosecutorial misconduct waived for lack of a record to review.

Now in the 3.11 Motion, we must consider the attached affidavits. In his affidavit, defense counsel states the evidence did not support the prosecutor kicking the floor, shaking her fists or punching the air.

The medical evidence showed that the decedent had 21 bruises on her body as well as a bruise to the back of the head and a severe brain injury. Several of the first responders testified to the numerous bruises on the decedent's body and that she was unconscious when they arrived. Dr. Groves, one of the treating physicians at St. Francis Hospital, testified that the decedent had multiple areas of bruising all over her body. This was in addition to a severe brain injury, requiring immediate surgery by a neurosurgeon upon presentation at the hospital, and multiple retinal hemorrhages in her eyes. Dr. Groves testified that the retinal hemorrhages were not consistent with the normal play that a child would have with a caregiver and were not consistent with a fall from several feet onto a couch or any other surface.  Dr. Groves testified that the "constellation of findings of severe subdural hemorrhage and extensive retinal hemorrhage with a loss of consciousness is extremely suggestive of a nonaccidental trauma, abuse head trauma mechanism."

Dr. John, the Medical Examiner, testified that in performing the autopsy on the decedent he observed a "subdural hemorrhage, subarachnoid hemorrhage, retinal hemorrhages" as well as "multiple contusions on the body." He described bruises of varying colors found all over the decedent's body and head. Dr. John determined the decedent's cause of death to be complications following blunt force injury to the head.

Detective Swanson testified that due to "the totality of the injuries, the numerous bruises, the severe head injury, ultimate death of her, and the excuses I'd been given, I believed that it was child abuse, that it was nonaccidental trauma."

Dr. Block, the president of the American Academy of Pediatrics, testified that there were no alternative explanations other than rotation, shaking, impact kind of forces that are significant and serious in nature in order to create the decedent's brain injury. Dr. Wallace, one of the decedent's treating pediatricians and an expert in child abuse and neglect pediatrics, testified that the evidence showed the decedent was the victim of abusive head trauma that involved a shaking mechanism as well as blunt force trauma.

This Court has previously upheld demonstrations that are based on the evidence presented at trial and not theatrical demonstrations. *Jones v. State*, 2006 OK CR 5, ¶ 75, 128 P.3d 521, 544-45; *Gilbert v. State*, 1997 OK CR 71, ¶ 94-95, 951 P.2d 98, 121. This Court has found the prosecutor pointing his finger to illustrate a shooting (*Jones*, 2006 OK CR 5, ¶ 75, 128 P.3d 521); swinging a baseball bat and hitting the floor several times (*Alverson v. State*,

1999 OK CR 21, ¶ 41, 983 P.2d 498, 513) and dry firing a gun (*Ellis v. State,* 1992 OK CR 45, ¶ 12, 867 P.2d 1289, 1297) to be theatrical or overly graphic but within the wide range or argument permitted in closing argument and not sufficient to warrant relief.

Based upon the testimony in the record before us, if the prosecutor did shake her fists, kick the floor or punch the air or drop a book on the floor in an attempt to explain how the decedent was injured, we find nothing in that conduct so improper that the absence of any objections by defense counsel rendered counsel's performance ineffective. Such actions would have been reasonable inferences on the evidence so that any objection by defense counsel would have been overruled. And even if an objection was not overruled, such conduct by the prosecutor was not sufficient to warrant relief as it was within the wide latitude permitted in closing argument. Any omission by defense counsel did not prejudice Appellant so as to deny him a fair trial. Appellant has failed to show by clear and convincing evidence a strong possibility that defense counsel was ineffective for failing to object to any alleged courtroom theatrics on the part of the prosecutor.

Appellant next refers us to Proposition IV where he argued the trial court improperly limited his right to cross-examine Benjamin about a complaint filed with the Missouri Dept. of Social Services that she shook the decedent on a previous occasion. To support his claim for an evidentiary hearing, he includes Exhibit A, an affidavit from Laura Giblin, an OIDS investigator. Ms. Giblin states in part that she verified that trial counsel had in his trial files a letter from the

21

Missouri Dept. of Social Services, indicating that Benjamin had been the subject of investigations by the Missouri Dept. of Social Services. Appellant also includes a copy of that letter which states in part that on August 5, 2012, the Dept. of Social Services received an investigation alleging that Benjamin had shaken the decedent and that the conclusion was unsubstantiated.  The letter goes on to say that the Social Services worker reported that she had received paperwork from a physician stating that there was no evidence of shaken baby.

While we do not have an affidavit from trial counsel stating he had the letter in his file, the affidavit and attachments to the Rule 3.11 motion indicate he had the letter in his possession. However, appellate counsel does not assert that trial counsel was ineffective for failing to use the letter at trial, nor can he make such a claim.  The record clearly shows counsel tried to get the information about the previous shaking allegation before the jury. And appellate counsel even recognizes these efforts in the 3.11 motion. Appellate counsel's argument merely repeats that raised in appellate brief – that Appellant was prejudiced by the trial court's limitation on his ability to cross-examine Benjamin on the investigation into the shaking allegation and requests supplementation of the record on appeal with the extra record exhibits included herein.

Appellate counsel has misconstrued the purpose of a 3.11 motion to remand for an evidentiary on Sixth Amendment grounds. He has made no claim of trial counsel's ineffectiveness on this issue. As such, he has failed to show by clear and convincing evidence there is a strong possibility trial counsel was ineffective for failing to utilize the information on the prior shaking allegation.

Having thoroughly reviewed Appellant's 3.11 Motion and accompanying affidavits, we find he has failed to show by clear and convincing evidence a strong possibility that defense counsel was ineffective for failing to investigate further and utilize the complained-of evidence.   We decline to grant Appellant's application for an evidentiary hearing on Sixth Amendment grounds. We also deny his motion to supplement the record.

In Proposition VI,   Appellant asserts that cumulative error warrants a new trial or a modification of his sentence. A cumulative error argument has no merit when this Court fails to sustain any of the other errors raised by Appellant. *Warner*, 2006 OK CR 40, ¶ 223, 144 P.3d at 896. However, when there have been numerous irregularities during the course of a trial that tend to prejudice the rights of the defendant, reversal will be required if the cumulative effect of all the errors is to deny the defendant a fair trial. *Id.* While certain errors did occur in this case, even considered together, they were not so egregious or numerous as to have denied Appellant a fair trial. Therefore, no new trial or modification of sentence is warranted.

## DECISION

The **JUDGMENTS** and **SENTENCES** are **AFFIRMED**. The **motion to Supplement the Record** and **Remand for Evidentiary hearing on Sixth Amendment grounds** is **DENIED**.[2]   Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch.18, App. (2017), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

AN APPEAL FROM THE DISTRICT COURT OF TULSA COUNTY
THE HONORABLE WILLIAM D. LaFORTUNE, DISTRICT JUDGE

---

[2] The Clerk of this Court is directed to return the motion to defense counsel and keep a copy for record keeping purposes. Rule 1.13(K), *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch. 18, App. (2016)

| APPEARANCES AT TRIAL | APPEARANCES ON APPEAL |
|---|---|
| JOHN DUNN<br>M.J. DENMAN<br>616 SOUTH MAIN, STE. 206<br>TULSA, OK  74119<br>COUNSEL FOR DEFENDANT | RAYMOND E. DENECKE<br>P.O. BOX 926<br>NORMAN, OK  73070<br>COUNSEL FOR APPELLANT |
| TIM HARRIS<br>DISTRICT ATTORNEY<br>SARAH MCAMIS<br>MARK MORGAN<br>ASSISTANT DISTRICT ATTORNEYS<br>500 S. DENVER<br>TULSA, OK  74103<br>COUNSEL FOR THE STATE | E. SCOTT PRUITT<br>ATTORNEY GENERAL OF OKLAHOMA<br>WILLIAM R. HOLMES<br>ASSISTANT ATTORNEY GENERAL<br>313 N.E. 21ST ST.<br>OKLAHOMA CITY, OK  73105<br>COUNSEL FOR THE STATE |

OPINION BY:  LUMPKIN, P.J.
LEWIS, V.P.J. Concur in Result
JOHNSON, J.: Concur in Result
SMITH, J.: Concur in Result
HUDSON, J.: Concur

RA

24

**SMITH, JUDGE, CONCURRING IN RESULT:**

I continue to be concerned with prosecutors' tactics in closing argument. Counsel may argue reasonable inferences from the evidence, but when they make theatrical presentations, with only the slimmest connection to the established facts, they do so at their peril. Child-abuse murder trials may be inherently emotional proceedings, but counsel should nevertheless maintain professionalism. I cannot condone the prosecutors' conduct in this case, but I agree that it did not contribute to the verdict or the sentence.

IN THE COURT OF CRIMINAL APPEALS OF THE STATE OF OKLAHOMA



GREGORY ANTWON O'NEAL,      )
                            )      NOT FOR PUBLICATION
          Appellant,        )
    vs.                     )      No. F-2013-958
                            )
THE STATE OF OKLAHOMA,      )
                            )                    FILED
          Appellee.         )          IN COURT OF CRIMINAL APPEALS
                                           STATE OF OKLAHOMA

          **O P I N I O N**                   APR - 5 2016

SMITH, PRESIDING JUDGE:                   MICHAEL S. RICHIE
                                              CLERK

Appellant, Gregory Antwon O'Neal, was convicted by a jury of First Degree

Child-Abuse Murder (21 O.S.2011, § 701.7(C)), in the District Court of Tulsa

County, Case No. CF-2011-780. On September 23, 2013, the Honorable James

M. Caputo, District Judge, sentenced him to life imprisonment without possibility

of parole, in accordance with the jury's recommendation.

## FACTS

Appellant was charged alternatively with causing the death of his two-

month-old daughter, Tianna Marie O'Neal, or permitting another person to do so.[1]

Appellant and the child's mother, Tamara Matthews, lived together with their

daughter in Tulsa. When Appellant and Matthews brought Tianna to a local

hospital on the evening of May 17, 2007, the child was unresponsive. Appellant

told a Tulsa police officer at the hospital that he and his wife spent the day

---

[1] Appellant and the child's mother, Tamara Michelle Matthews, were jointly charged under
alternative theories of committing, or permitting, Child-Abuse Murder (21 O.S.2011, § 701.7(C)). The
prosecutions were severed for trial, and Appellant was tried first. After Appellant was convicted of
Child Abuse Murder, Tamara Matthews entered a guilty plea to the crime of Permitting Child Abuse,
21 O.S.2011, § 843.5(B), and was sentenced to ten years imprisonment.

helping their friend, Joel Broadway, clean a house in Broken Arrow that Broadway was moving out of, and had taken Tianna with them. In the afternoon, Appellant said, he took Tianna to one of the empty bedrooms so the two of them could take a short nap. Appellant said he awoke to a high-pitched cry from Tianna, but did not know what caused her distress. A short time later, he said, she went limp, and they brought her to the hospital.

Tiana exhibited several external injuries which appeared suspicious, including a small bruise by her eye, bruising and abrasions to her shoulders, a bruise on her chest, and healing abrasions and peeling skin on her lower back and buttocks. She also exhibited injury to her upper arm that had the appearance of a bite mark, although the cause of that wound was never confirmed. Most importantly, a CT scan revealed that Tianna had sustained a skull fracture, which caused subdural bleeding and brain swelling. Dr. Passmore, a pediatrician specially trained in child-abuse injuries, also noted the possibility of retinal hemorrhaging, which can be caused by intense shaking of a child – one of a constellation of physical effects sometimes grouped together as "Shaken Baby Syndrome." An X-ray suggested that Tianna might have had a fractured rib – not acute, but in the process of healing – and a dislocated shoulder. It was later determined that the rib was not fractured and the shoulder was not dislocated. Furthermore, the autopsy did not detect the retinal hemorrhages initially reported by the pediatrician. However, the direct cause of Tianna's unresponsiveness on presentation, and the cause of her death the next day, was never disputed: brain swelling, caused by blunt force trauma which

fractured the back of her skull.

Because the initial assessment of Tianna's injuries (even before discovery of the skull fracture) gave rise to a suspicion of child abuse, Appellant was taken into custody on the evening he brought the child to the hospital.  Over the next several days, Appellant spoke with a police detective and a social service investigator, and made several phone calls from the jail to friends and family.  In those conversations, Appellant offered various explanations as to how Tianna might have been injured.  Those explanations evolved as information about Tianna's diagnosis was revised.

In the early morning hours of May 18, as medical personnel tried to save Tianna's life, Appellant was interviewed by Detective Jeremy Yerton.  At that time, police knew that Tianna had bleeding on the brain, but not that she had a skull fracture.  They also believed, erroneously, that Tianna had a dislocated shoulder and a broken rib.  When confronted with this incomplete and partially inaccurate information, Appellant admitted gently shaking Tianna to try to rouse her just before she was taken to the hospital, but denied violently shaking the infant.  Pressed for other possible explanations for the infant's injuries, Appellant mentioned that earlier in the day, at Broadway's home, Tianna had fallen from a folding chair onto the floor.  He also mentioned incidents in the recent past where the infant had fallen from a couch and rolled off of a bed.  Appellant also said he had accidentally dropped Tianna about a week before.  ·Detective Yerton responded that all of those events would have been remote in time to have caused Tianna's head trauma.  A few days after Tianna's death, Appellant, still in

custody, spoke with Angela Varcoe, an investigator with the Department of Human Services. His account to Varcoe of events preceding Tianna's sudden distress on May 17 largely paralleled his account to Detective Yerton.[2]

Of particular interest was Appellant's telephone conversation with Joel Broadway on May 18, which was recorded and played for the jury. While Tianna was still clinging to life, Appellant sounded more concerned with his own potential accountability and ability to get out of jail. He told Broadway that because Tianna was almost exclusively in his care on May 17, "this all boils down to me." He expressed concern that if Tianna died, the charges would likely be upgraded to "the big thing" (presumably murder).

In phone conversations with his family after Tianna's death, Appellant offered other explanations for the infant's injuries. As for the bruises, Appellant said that their pediatrician, Dr. Exon, had reassured him that Tianna simply "bruised easily." Called as a witness at trial, Dr. Exon testified that he examined Tianna in his office on May 13 and again on May 14. The parents complained that she had been running a fever and was not keeping food down. Exon testified that the child's temperature was normal when he examined her, that bloodwork, X-rays, and other tests came back normal, and that according to his records, no bruises, rashes, or other external trauma were observed. Exon also denied ever telling Appellant that the child was susceptible to bruising.

On May 30, almost two weeks after Tianna's death, Appellant spoke from jail by telephone with his mother. He suggested that someone had divulged

---

[2] Appellant does not challenge the voluntariness of his custodial statements to Yerton. The voluntariness of his statements to Varcoe is discussed in Proposition VI.

4

information that could incriminate him and/or Matthews.  He asked his mother to contact his attorney with new information – information he had not previously given because he wanted to save himself and Matthews.  He recalled an incident where Matthews was changing Tianna's diaper, and he heard a sound that may have been Matthews slamming the baby's head against a granite counter-top; he then heard Tianna scream.[3]  Appellant expressed a willingness to testify about this event.  As Appellant's mother tried to calm and reassure him (and advised him to stop discussing the matter on the phone), Appellant said he wanted to go to court because Matthews was "going to have to pay for that."

The State's expert medical witnesses – Dr. Passmore, Dr. Block, and the Medical Examiner, Dr. Pfeifer – testified at length as to the nature of Tianna's injuries and possible causes for them.  Appellant presented his own expert, Dr. Plunkett, whose own extensive testimony challenged much of the conventional wisdom about head trauma in infants.  In essence, the State's experts believed that the complex skull fracture which ultimately killed Tianna was not likely to have been caused by a normal accident, such as a fall from a modest height, and that the effects of such a serious injury were likely to have manifested themselves quickly – that is, Tianna was unlikely to have appeared "normal" for any appreciable length of time afterward.[4]  The State's experts opined that the most

---

[3] Appellant did not claim to have actually seen the act; he said the sound might have been Matthews hitting her own hand against the counter-top.

[4] Dr. Passmore estimated that Tianna suffered the skull fracture some six to twelve hours before presentment at the hospital.  Appellant interprets that to mean that the injury could *not* have occurred *any sooner than* six hours before presentment.  The record does not support that interpretation.  Dr. Passmore described the bleeding around Tianna's brain as "acute," and while the CT scan showed some brain swelling, Passmore testified that such swelling can show up

5

likely cause of the skull fracture was intentional force, such as being slammed against a hard object, and that the force was most likely applied a short time before the baby arrived at the hospital.  Tianna had been in Appellant's care for some time when she became unresponsive, and no one noticed anything unusual about the infant before that.  The State thus contended that Appellant was most likely the culprit.  The defense expert, Dr. Plunkett, disagreed with some of the State's experts' assumptions and conclusions.  For example, it was Plunkett's opinion that an infant could, in fact, sustain a skull fracture like Tianna's, but not exhibit any obvious effects of such trauma for several days.  This expanded time frame would make it more likely that someone else attending to Tianna may have caused the fatal injury.  Plunkett also believed that skull fractures like Tianna's may be caused by falls from modest heights, such as the height of a changing table.  Other facts will be presented as relevant to the propositions of error.

## DISCUSSION

In Proposition I, Appellant claims the evidence is insufficient to support his conviction for First Degree Child-Abuse Murder.  Under Oklahoma law, First Degree Murder by Child Abuse does not require any specific intent to kill; save some theories not relevant here, it requires only that the accused willfully used unreasonable force on the child, which resulted in the child's death.  *See* 21 O.S.2011, § 701.7(C); OUJI-CR (2nd) No. 4-65A.  On direct appeal, we consider all

---

"immediately upon injury."  Based on those two factors – the "acute" appearance of blood and the swelling of the brain – Passmore estimated that Tianna sustained the skull fracture "*within* six to eight, maybe 12 hours, *but most likely less than that.*"

of the evidence, in a light most favorable to the State, to decide if a rational juror could have concluded, beyond a reasonable doubt, that Tianna's fatal injury was the result of Appellant's willful conduct. *Gilson v. State*, 2000 OK CR 14, ¶ 77, 8 P.3d 883, 910. Whether or not Appellant was the *only* person who could have inflicted the fatal injury is not the decisive question. A conviction can be upheld where there are conflicts in the evidence, or where different inferences might be drawn therefrom. "[I]f there is competent evidence to support the verdict, we will not interfere on appeal." *Id.*

Appellant never admitted any intentional physical act of the intensity necessary to cause Tianna's fatal injury. The State's case depended on inferences from the nature of the injury, the surrounding circumstances, and Appellant's various statements on the subject. It was not disputed that the direct cause of Tianna's death began with a skull fracture – a "complex" skull fracture that, the experts said, took considerable force to create. It was not disputed that Tianna was in Appellant's care for much, if not most, of the day she was brought to the hospital. No one recognized anything unusual in Tianna's appearance or actions until Appellant brought her out of a bedroom, exclaiming that something was wrong with the child. Tianna's pediatrician noticed nothing unusual when he examined her a few days before. According to the State's experts, it was highly unlikely that Tianna could have sustained such a serious injury many hours, much less days, before she arrived, unconscious, at the hospital on the evening of May 17.[5] In addition to the skull fracture, Tianna exhibited several external

---

[5] One of the State's experts, Dr. Block, concluded: "Based on the fact that the baby was essentially

injuries which were suspicious, especially when considered together.   None of these injuries were noted by Dr. Exon, the child's pediatrician, on May 13 or 14. While none of these other injuries contributed to Tianna's death, they were nonetheless relevant because they tended to suggest that Tianna's skull fracture was not a purely accidental injury.

The State focused on the changes in Appellant's story over time.   In reference to Tianna's bruises, Appellant suggested that Tianna's pediatrician had seen them and was not concerned about them.   Dr. Exon, however, denied this. In fact, when Exon was shown a photograph of Tianna's external injuries and asked if he would have noticed such injuries during an office visit, Exon's response was, "I would probably call an ambulance."   As for the abraded skin on Tianna's buttocks, Appellant claimed it was caused by a loofah sponge he had used when bathing the infant.   Early on, when talking to Detective Yerton, Appellant claimed that Tianna had fallen on various occasions in recent days – from a chair on May 17, and from a couch and a bed some time before that.   He recalled accidentally dropping the infant.   Later, after it became clear that the death was caused by considerable blunt-force trauma, Appellant related an entirely new incident, where Tianna's mother may have slammed the baby's head against a granite counter-top.   Appellant said he had not previously divulged this information because he wanted to save himself and Matthews, but said he was now willing to testify about this event.

---

dead on arrival to the hospital, there is no chance that she would have in any way been lucid or normal for any time prior to that.  The reason for that being the immediacy of brain swelling and neuronal nerve cell damage at the point of the injury."

Finally, the substance and tone of Appellant's statements to Joel Broadway, just hours after Tianna was brought to the hospital, were curious. At the time, Tianna was still clinging to life. In that conversation, Appellant seemed more concerned about raising bail money than about the welfare of his daughter. He told Broadway that he and Matthews were charged with injuring a minor child. He asked Broadway to pray that Tianna gets better because if she died, the charges against him would be upgraded to the "big thing." He expressed hope that everything will be okay with his daughter, because then "everything will be okay with us [himself and Matthews]." He said that "if [Tianna] does okay," then his and Matthews's prospects in court would be much "lighter."

While none of Appellant's statements contained an outright confession, they were still relevant to show what is often described as "consciousness of guilt." Evidence tending to show consciousness of guilt – sometimes labeled "statements against interest" or "admission by conduct" – includes any statements or conduct by the accused which are so unusual under the circumstances that the fact-finder may reasonably infer they were not the statements or conduct of an innocent person. The conduct may even be a crime related to the central charge, such as threatening a witness or destroying evidence.[6] Unlike an outright confession, the incriminating tendency of this type of evidence is often revealed only when the evidence is placed in the larger context. Examples include the accused's flight from the crime scene or attempt to

---

[6] *See e.g. Powell v. State*, 2000 OK CR 5, ¶ 66, 995 P.2d 510, 527 (intimidating witness to change testimony); *Paxton v. State*, 1993 OK CR 59, ¶ 12, 867 P.2d 1309, 1317 (attempting to destroy evidence); *Gideon v. State*, 1986 OK CR 112, ¶ 10, 721 P.2d 1336, 1338 (threatening witness).

kill himself, from which one might infer a desire to avoid punishment.[7]  All of these examples are merely specific applications of a fundamental and incontestable principle: that the finder of fact may consider all of the circumstances surrounding a defendant's words and deeds to determine if it is reasonable that an innocent person would have uttered or performed them.  *See e.g. Webster v. State*, 2011 OK CR 14, ¶ 63, 252 P.3d 259, 277 (defendant's repeated denials of ever being near the crime scene, despite evidence to the contrary, and his general "demeanor and discomfort" during police interview were "probative of his involvement and consciousness of guilt").[8]

The jury is the exclusive finder of fact; it decides what weight and credibility to give to conflicting evidence, and we accept all reasonable inferences which tend to support its verdict.  *Day v. State*, 2013 OK CR 8, ¶ 13, 303 P.3d 291, 298. Viewed in a light most favorable to the State, the evidence supported a conclusion that Tianna's injuries were recent and not accidental in origin, that her fatal head injury was probably of very recent origin, that Appellant had the greatest and last opportunity to inflict that injury, and that Appellant's demeanor and inconsistent explanations for the injuries tended to show consciousness of guilt.  Considering

---

[7]  *See Levering v. State*, 2013 OK CR 19, ¶ 18, 315 P.3d 392, 397 (after the crime, defendant retreated to a bathroom and stabbed himself in the chest); *Dodd v. State*, 2004 OK CR 31, ¶¶ 35-37, 100 P.3d 1017, 1031-32 (defendant attempted to kill himself, in a manner similar to the way the murder victims were killed); *Honeycutt v. State*, 1988 OK CR 76, ¶ 19, 754 P.2d 557, 561 (defendant jumped bail); *Almerigi v. State*, 17 Okl.Cr. 458, 464, 188 P. 1094, 1096 (1920) (defendant altered his physical appearance).

[8]  *See also Dunkle v. State*, 2006 OK CR 29, ¶ 48, 139 P.3d 228, 245 (defendant's statement to new boyfriend, in phone call from jail, saying she would not do anything "stupid" again, was admissible on the issue of whether she killed her old boyfriend); *Romano v. State*, 1995 OK CR 74, ¶¶ 7-8, 909 P.2d 92, 107 (detective's observation of defendant's body language and facial expressions during conversation were relevant even if they were not strictly "adoptive admissions").

all of this evidence together, we believe a rational trier of fact could conclude, without any reasonable doubt, that Appellant intentionally used physical force which fractured Tianna's skull, and which ultimately caused her death.   *Id.* Proposition I is denied.

In Proposition II, Appellant contends that the trial court erred in redacting portions of his video interview with Tulsa County Detective Jeremy Yerton, as well as portions of telephone conversations he had with family members while he was in the Tulsa County Jail.   Appellant objected to these redactions at trial, preserving this claim for full appellate review.   We review a trial court's admission or exclusion of evidence for an abuse of discretion.   *Underwood v. State*, 2011 OK CR 12, ¶ 45, 252 P.3d 221, 242.

Yerton asked Appellant if he would be willing to take a polygraph test to support his denials of wrongdoing, and Appellant said he would.   The subject of polygraphs is mentioned a few other times; at one point Yerton asked if Appellant could swear before God that he didn't harm Tianna, as "God is the ultimate lie detector."[9]   The trial court granted the State's request to redact these comments. Appellant concedes that the results of polygraph tests are not admissible in court, *see Fulton v. State*, 1975 OK CR 200, ¶ 4, 541 P.2d 871, 872, but contends that if the police propose polygraph tests as an "interrogation technique," then it is only fair to let the jury hear the defendant's willingness to accept the challenge. Similarly, he claims that his willingness to declare his innocence before God, the "ultimate lie detector," was relevant to show the "absolute moral certainty" of his

---

[9] The State claims that Appellant agreed to redaction of the religious references.  The record is not entirely clear on this point.

position.

Appellant characterizes these unsworn denials as "exculpatory evidence," and claims that removing them from the jury's consideration denied him the right to present a complete defense. In our justice system, the accused is not required to present *any* evidence; but if he does, he must play by the same rules as the State, unless those rules are arbitrarily slanted against him. *See Holmes v. South Carolina*, 547 U.S. 319, 326-27, 126 S.Ct. 1727, 1732-33, 164 L.Ed.2d 503 (2006); *Pavatt v. State*, 2007 OK CR 19, ¶¶ 50-51, 159 P.3d 272, 288-89.

Throughout his lengthy conversation with Detective Yerton, Appellant consistently denied harming his daughter.[10] In our law, at least with regard to statements made out of court, a criminal defendant's denial of culpability simply does not carry the same probative weight as his admission of culpability.[11] That

---

[10] Appellant's reliance on *Crane v. Kentucky*, 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986), and *Crawford v. State*, 1992 OK CR 62, 840 P.2d 627, is misplaced. In each case, a defendant's *denial* of culpability was found to be relevant, but only as part of a larger question concerning the reliability of his subsequent *admission* of culpability. The Supreme Court in *Crane* held that the "physical circumstances that yielded the confession" were essential to the theory of defense, and the defendant was entitled to have his jury hear about them. *Crane*, 476 U.S. at 691, 106 S.Ct. at 2147. The circumstances that bore on the credibility of the defendant's confession in *Crane* included: "that [the defendant] had been detained in a windowless room for a protracted period of time, that he had been surrounded by as many as six police officers during the interrogation, that he had repeatedly requested and been denied permission to telephone his mother, and that he had been badgered into making a false confession." *Id.*, 476 U.S. at 685, 106 S.Ct. at 2143-44. In fact, in *Crane*, the defendant's initial denial of culpability is hardly mentioned in the opinion; it was just one of many circumstances he wished to present, to challenge the credibility of his ultimate confession. *See also Crawford*, 1992 OK CR 62 at ¶ 17, 840 P.2d at 633 ("Exculpatory statements which are made in the same conversation or on the same occasion as a confession or damaging admission are admissible to explain the circumstances of the confession"; citing *Crane*).

[11] This is consistent with other portions of the Evidence Code which permit otherwise inadmissible information for limited purposes. *See* 12 O.S.2011, § 2801(B)(1)(b) (a witness's prior unsworn statement is not inadmissible hearsay, if offered to rebut an express or implied charge of recent fabrication, improper influence, or improper motive); 12 O.S.2011, § 2613 and *Lewis v. State*, 1998 OK CR 24, ¶ 31, 970 P.2d 1158, 1169 (a witness's prior extrajudicial statement, inconsistent with his testimony, may be admissible, not for its own truth, but to cast doubt on the truth of his present testimony). Appellant never admitted culpability, so there was no "confession" for him to explain; the repetition of his denials, standing alone, had no probative value. As we discuss below regarding

the unsworn denial is made with apparent confidence does not make it any more "reliable" under our law.[12]  *See Folks v. State*, 2008 OK CR 29, ¶ 16, 207 P.3d 379, 383 (defendant's offer to take a polygraph test was properly excluded as self-serving).  Even after it was redacted, the video of Appellant's interview with Detective Yerton still included numerous denials of guilt, some of them emotional. Removing references to God and polygraphs did not paint an unfair or incomplete picture of the conversation.  The trial court did not abuse its discretion in redacting the video interview.

Appellant also faults the trial court for redacting portions of two telephone conversations he had with his mother and grandmother.  The redacted portions consist chiefly of Appellant's grandmother offering him, as the trial court described it, "words of encouragement and words of prayer" as he remained in custody; Appellant hardly speaks during these parts of the conversation.  The portions played for the jury focused on Appellant's responses to information relayed to him about the autopsy findings.  While the edited portions of these calls clearly show that Appellant's family was loving and supportive, we find nothing in them that would assist the jury in its task.  Appellant's complaint seems to be that the redactions removed some emotional denials of culpability (*e.g.*, "I don't know why they are trying to make it out that we wanted to hurt our baby").  But the portions of the calls that the jury *did* hear contain similar

---

Appellant's phone conversations and the "rule of completeness," a trial court is not required to admit parts of a record which simply do not clarify or explain other parts of the same record.

[12]  In contrast, witnesses are required to declare "by oath or affirmation" that they will testify truthfully.  The declaration may be in any form "calculated to awaken the witness's conscience" to the gravity of this duty. 12 O.S.2011, § 2603. Testimony thus made is not believable *per se*, but it is treated differently – not because lying is a sin, but because perjury is a crime.

suggesting possible causes for infant injury when no external cause or specific head trauma is apparent.  For example, if an infant exhibits unexplained brain swelling, retinal bleeding, and/or rib fractures, the medical literature supporting Shaken Baby Syndrome suggests these injuries may have been caused by rapid and forceful shaking of the child, causing a whiplash effect on the head. However, in this case, initial suspicion that Tianna had a fractured rib and dislocated shoulder were quickly dispelled.  The retinal hemorrhaging detected by one of the first doctors to examine Tianna was not detected in the autopsy.  Most important, diagnostic imaging revealed the unmistakable cause of Tianna's brain swelling: her skull had been severely fractured.  The State's own experts generally shied away from the "Syndrome" label.[14]  The Medical Examiner described the cause of death as "recent blunt force closed head injury which resulted in a skull fracture and intra-cranial bleeding."  In other words, shaking – no matter how violent – was not sufficient by itself to have caused Tianna's fatal skull fracture, nor was shaking a necessary component of that injury.  The State's experts found no evidence of trauma to the child's neck or spinal cord, which would have been consistent with violent shaking.  None of Tianna's other injuries were indicative of violent shaking.  Discussion of Shaken Baby Syndrome simply was not helpful in explaining any of Tianna's injuries.

---

[14]  Referring to "Shaken Baby Syndrome," Dr. Passmore told the jury, "I don't use that terminology." The Medical Examiner, Dr. Pfeifer, said, "I do not and have not ever used 'shaken baby syndrome' in a complete autopsy report that I've done."  Dr. Block felt that the label was still useful, but Block himself helped draft a new policy on the issue for the American Academy of Pediatrics, which now recommends that pediatricians use the term "abusive head trauma" in their diagnoses, rather than a term, such as "shaken baby syndrome," implying a single mechanism for injury.  See "Abusive Head Trauma in Infants and Children," http://pediatrics.aappublications.org/content/123/5/1409 .abstract.

Nevertheless, we do not believe that discussion of the Syndrome had an unfairly prejudicial effect here. The Syndrome does not suggest any degree of malevolence on the part of the perpetrator. Its only purpose is to collect a variety of symptoms without clear external causes, and suggest that they are not likely to have resulted accidentally. Tianna exhibited a number of injuries, besides the fatal skull fracture, which (especially when considered together) were not likely to have been the result of typical accidents. Discussion of Shaken Baby Syndrome was superfluous at best, and may have been something of a distraction in this trial, but we do not believe it had an effect on the jury's verdict. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); *Webster*, 2011 OK CR 14, ¶ 74, 252 P.3d at 280. Proposition IV is denied.

In Proposition V, Appellant claims that the trial court abused its discretion by instructing the jury to exercise caution when considering the testimony of the defense expert, Dr. Plunkett. The court gave an instruction based on OUJI-CR (2nd) No. 9-20, explaining that a witness's prior statements, which are inconsistent with his testimony, may be used to evaluate his credibility. We review a trial court's instructions to the jury for an abuse of discretion. *Ball v. State*, 2007 OK CR 42, ¶ 25, 173 P.3d 81, 88. Appellant did not object to the instruction at the time, so we review only for plain error – *i.e.*, an obvious deviation from a legal rule that, while not objected to, affected his substantial rights and resulted in a miscarriage of justice. *Hogan v. State*, 2006 OK CR 19, ¶ 38, 139 P.3d 907, 923.

Appellant claims the record does not show whether the State asked for this

instruction, or indeed, what specific "inconsistency" it was intended to address. Dr. Plunkett's direct examination and cross-examination were both extensive. He spent considerable time trying to dismantle the assumptions and conclusions of the State's experts, and the prosecutor spent considerable time attacking his credibility. Appellant contends that OUJI-CR (2nd) No. 9-20 is only appropriate if the witness's prior statement is materially inconsistent with some aspect of his current testimony. While conceding that the prosecutor "embarrassed" Plunkett by bringing up some of his past errors, Appellant claims those errors were not particularly relevant to the issues in this case. We disagree.

Dr. Plunkett was called as a witness to critique the State's experts' opinions on the likely causes of Tianna's injuries. He had the same kind of training and experience as some of the State's experts. He fully understood "Shaken Baby Syndrome" and related diagnoses, but over the years, his own opinions began to depart from the conventional wisdom on the subject. The value in Plunkett's testimony – his transition from true believer to outlier – was also a vice. The prosecutor had a right to test the credibility of Plunkett's opinions in this case by pointing out that he had different opinions, on the same issues, in the past. *See Smicklas v. Spitz*, 1992 OK 145, ¶ 17, 846 P.2d 362, 369 (expert's opinion testimony in a prior case was admissible to challenge his inconsistent opinion in the present case). Plunkett was given plenty of opportunity to explain the evolution of his opinions. *See* 12 O.S.2011, § 2613(B) (extrinsic evidence of a witness's prior inconsistent statement is not admissible unless he is allowed to explain or deny same, and the opposing party is allowed to question him about

17

it).  And while the jurors were properly informed of the possible inconsistencies, they were plainly cautioned not to use them as direct evidence of guilt or innocence.[15]  We find no plain error here.  Proposition V is denied.

In Proposition VI, Appellant claims the trial court erred in admitting his statements to Angela Varcoe, an investigator with the Oklahoma Department of Human Services.  Varcoe visited Appellant in the county jail a few days after Tianna's death, and testified at trial about what Appellant told her regarding Tianna's injuries.  Appellant claims Varcoe's testimony should have been excluded because the interview was not preceded by warnings on his right to silence, consistent with *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).  Appellant did not object to Varcoe's testimony at the time it was offered, so we review this claim only for plain error.  *Hogan*, 2006 OK CR 19, ¶ 38, 139 P.3d at 923.

*Miranda* requires that before police may interrogate a suspect in their custody, they should ensure he understands his right to remain silent and to consult with an attorney before answering.  Appellant claims Varcoe was an agent of the State, no less than a police detective.  He points out that by law, the Department of Human Services is required to investigate allegations of child

---

[15] Instruction 9-20 – which, according to the Committee Comments, "should be given on the court's own motion in every instance of impeachment" – reads in relevant part:

> Evidence has been presented that on some prior occasion the witness made a statement inconsistent with his testimony in this case.  This evidence is called impeachment evidence and it is offered to show that the witness's testimony is not believable or truthful.  If you find that a statement was made, you may consider this impeachment evidence in determining what weight and credit to give the testimony of that witness.  You may not consider this impeachment evidence as proof of innocence or guilt.  You may consider this impeachment evidence only to the extent that you determine it affects the believability of the witness, if at all.

abuse and report the findings to the district attorney.  *See* 10 O.S.2011, § 7106.

We agree that under the circumstances, Varcoe, tasked with investigating Tianna's death on behalf of a state agency, was sufficiently connected to law enforcement that she should have reminded Appellant of his *Miranda* rights before questioning him in a custodial setting.  *See Blanton v. State*, 2007 OK CR 37, ¶¶ 6-16, 172 P.3d 207, 210-11 (defendant's custodial interview with DHS investigator, regarding child sexual abuse allegedly committed by him, should have been preceded by *Miranda* warnings).  In fact, Varcoe testified that she was called into this investigation by a police detective.  Because Appellant did not raise and develop this issue below, we cannot be sure that Varcoe did *not* properly advise him of his right to silence, and that the parties simply neglected to ask her about it at trial.  But assuming that she did not, we nevertheless find no plain error.[16]  Appellant's statements to Varcoe, concerning the events leading up to Tianna's death, were fairly consistent with what he had told Detective Yerton a few days before.[17]  Furthermore, Varcoe related some observations in Appellant's

---

[16]  Because we find no plain error, we also need not consider whether Detective Yerton's *Miranda* warnings, a few days before, were sufficient to render Appellant's statements to Varcoe voluntary. *See generally Mitchell v. Gibson*, 262 F.3d 1036, 1057-58 (10th Cir. 2001) (the mere passage of time does not compromise a *Miranda* warning).

[17]  According to Varcoe, Appellant said that Tianna had been a bit fussy and was not sleeping well, and that she fell out of a folding chair at Joel Broadway's house. He said he awoke from a nap to Tianna shrieking; a short time later, she made a gurgling sound and went limp, and Appellant shook her "a little bit" to try to revive her.

Appellant claims he was harmed by Varcoe's testimony because she characterized him (based on what he told her) as Tianna's primary caretaker on the day in question. It was beyond dispute that others, notably Tianna's mother, were present in Joel Broadway's home that day, giving them some opportunity to have caused the fatal injury. But Appellant consistently told authorities and others that he was the one taking care of Tianna for most of the day. Defense counsel successfully clarified this issue on cross-examination; the exact percentage of time Appellant and Mathews each spent caring for the child that day was a collateral matter. Appellant also claims Varcoe's testimony

favor.  On cross-examination, Varcoe admitted that her interview was difficult because Appellant was very emotional about the loss of his infant daughter. Varcoe's testimony was not plain error, because there was no reasonable likelihood that it affected the verdict.  *Barnard v. State*, 2012 OK CR 15, ¶ 14, 290 P.3d 759, 764 (discussing similarities between harmless error and plain error). Proposition VI is denied.

In Proposition VII, Appellant claims his trial counsel performed so deficiently as to have effectively denied him his Sixth Amendment right to reasonably effective counsel.  Appellant must overcome the presumption that counsel performed competently.  Great deference is given to strategic decisions which appear reasonable at the time they were made.  Besides deficient performance, Appellant must also demonstrate prejudice from counsel's conduct. Prejudice is shown when counsel's actions undermine confidence in the outcome of the proceeding.  Failure to show either deficient performance or resulting prejudice is fatal to a claim of ineffective counsel.  *See Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).

Appellant complains that trial counsel failed to make timely objections to the trial court's instructions (see Proposition V) or to the admission of his statements to Investigator Varcoe (see Proposition VI).  We reviewed those claims for plain error, and found no reasonable probability that Appellant was unfairly prejudiced by the instruction and testimony discussed in those propositions.

was harmful because the prosecutor asked her about several things Appellant did *not* tell her.  In other words, the prosecutor used Varcoe to show that Appellant's explanations for the child's injuries changed over time.  But that, too, was evident from a comparison of the rest of the evidence; the prosecution used the same tactic when questioning Broadway.

Absent prejudice, Appellant's related ineffective-counsel claims also fail. *Jones v. State*, 2006 OK CR 5, ¶ 98, 128 P.3d 521, 550 (where any error was harmless, counsel's failure to object at trial does not satisfy the prejudice prong of *Strickland* inquiry).

Appellant's last ineffective-counsel claim is related to his claim of prosecutor misconduct in Proposition III, where he contends the prosecutor went beyond acceptable limits in final closing argument by suggesting inferences not based on the evidence, and by using an infant doll as a demonstrative aid to inflame the passions of the jury. The transcript suggests that the prosecutor was using something to illustrate her argument, although it is not clear what. Appellant claims trial counsel was ineffective for not objecting to this conduct and not making a better record on what was transpiring. In conjunction with that claim, Appellant filed an Application for Evidentiary Hearing, pursuant to Rule 3.11(B)(3)(b) of this Court's rules. We remanded the case to the District Court of Tulsa County for an evidentiary hearing to determine (1) whether a demonstrative aid was used in closing argument, and (2) if so, in what manner. The hearing was held October 2, 2015; the district court submitted Findings of Fact, and the parties filed supplemental briefs at this Court's invitation.

The evidentiary hearing confirmed that in final closing argument, the prosecutor employed a doll, resembling an infant, with a stuffed-cloth body and a plastic head and extremities. The witnesses at the evidentiary hearing had varying recollections of exactly what the prosecutor did to the doll, and varying

interpretations of how just dramatic those demonstrations were.[18]  But what is clear from the witnesses' descriptions is that the prosecutor did just what the trial transcript suggests: that she simulated various acts of physical abuse, including slapping the doll, biting the doll, kicking the doll across the floor and/or against the wall, and hitting the doll's head against a table:

> [The prosecutor:] Here's what the biggest unanswered question is. What exactly did he do to her?  And it's really hard to think of that. And if you think about those prior injuries to her – let me go back just a minute.  You know when you think about the prior injuries to her buttocks… .  How hard do you have to hit her?  In what position is he hitting her?  Is he hitting her like this?  Is he pulling her legs up and hitting her like this?  …  When you think about the injuries to her back, what exactly did he do to her?  How did, exactly, he cause those injuries?

> When you look at these injuries, was he grabbing her like this (*indicating*)?  Was he grabbing her like this (*indicating*)?  Are those finger marks where he was grabbing her?  That's one of the big unanswered questions.

> When we think about the prior injuries to her, as much as I would like to be able to tell you exactly what he did to [] her and exactly how he did it to her, we can't because he's the only person who knows. He hasn't said.  But we don't have to prove to you exactly what he did and how he did it.

(Tr. 1449-1450)

> But what happened in that bedroom?  What happened when he took her into that bedroom and he wanted to take a nap and she would not let him sleep?  *At what point in time did she go unconscious? What was the last thing she saw before her world went dark?* …

> So did he bite her before he shook her?  Did he bite her after he shook her?  How did he bite her?  Was he holding her like this and biting her (*indicating*)?  Was he trying to get her to be quiet on his chest and she wouldn't so he bit her?  *I don't know.* …

---

[18]  Of the ten witnesses called at the hearing, almost half were the attorneys involved in the trial (both prosecutors and both defense lawyers).  The court reporter who transcribed the trial testified, as did one of the jurors.  The rest were various persons associated with either Appellant or the State.

What exactly did he do to her to kill her (*indicating*)? Did he do that? Was he down on the floor trying to sleep with her and she wouldn't shut up and he sat up and did this and hit her (*indicating*)? Did he shake her and hit her (indicating)? Did he shake her and punch her (*indicating*)? Was she on the floor and he kicked her (*indicating*)? *I don't know.*

How long did she suffer in that room before he took her out to get help? ... *I hope that she immediately went unconscious. I hope that she didn't suffer.*

*And I wish I could tell you exactly what happened... .*

(Tr. 1451-52) (emphasis added)

Appellant complains that many of these speculations were not fair inferences from the evidence. The prosecutor suggested that Appellant kicked, bit, and shook Tianna. As noted, Tianna exhibited a number of injuries which were not part of the mechanism of death, including various bruises and an oval trauma pattern on her shoulder. The Medical Examiner testified that these latter marks had the appearance of bite marks, but he did not definitively label them as such. The defense expert, Dr. Plunkett, was not certain that these injuries were bite marks. No other evidence about the cause of these marks was presented. Although the specific cause of a bruise may be impossible to pin down, there was no testimony suggesting the bruises on Tianna's body were the result of anyone kicking her. Furthermore, by all accounts (including the Medical Examiner's), these external injures were believed to have been older than the skull fracture. At times the prosecutor's closing argument focused on the age of these non-fatal injuries, to support the alternative theory that Appellant willfully permitted child abuse murder – *i.e.*, to show he must have been aware that *someone* was abusing

Tianna in the days before her fatal head injury.[19]  However, when the prosecutor began demonstrating with the doll (as shown in the passages excerpted above), she combined the injuries into a dramatic series of possible "re-enactments."

Counsel are generally afforded wide latitude in their arguments to a jury, and may make reasonable inferences from the evidence that has been presented. *Nobles v. State*, 1983 OK CR 112, ¶ 12, 668 P.2d 1139, 1142.  But blatant appeals to emotion are strongly disfavored, and can result in reversible error.  *See Pryor v. State*, 2011 OK CR 18, ¶ 5, 254 P.3d 721, 722-23; *Mitchell v. State*, 2006 OK CR 20, ¶ 101, 136 P.3d 671, 710.  A prosecutor's dramatic use of even properly-admitted evidence, at any time during the trial, can overstep the bounds of propriety and fair play.  For example, in *Brewer v. State*, 1982 OK CR 128, 650 P.2d 54, during the cross-examination of a defense witness, the prosecutor repeatedly stabbed a crime-scene photo of the victim with the murder weapon. We condemned this as "outrageous behavior" designed "purely for its unfair prejudicial impact on the jury." *Id.*, 1982 OK CR 128, ¶ 5, 650 P.2d at 57.  It was one of several incidents that, considered cumulatively, warranted a new trial. *Id.*, 1982 OK CR 128, ¶ 10, 650 P.2d at 58.[20]

---

[19] *E.g.*: "And remember that all of the doctors including Dr. Plunkett said that this injury is old.  This injury had been there before the 17th. ... So forget about how it looked for a minute.  How did this baby feel?  How did this baby try to let those around her know how hurt she was?  And if you are a parent responsible for a baby and your baby looks like that, you do not just get to say, well, I don't know, I didn't take her onesie off.  You do not get to just blame it on the mother of your child and expect to walk away without any consequence whatsoever, because it's more than that." (Tr. 1438-39)  "And if your baby has injuries that extensive and that deep, you don't just get to say, I didn't know.  You have a duty and obligation as a parent ... to get your baby out of that situation, to get your baby help, to keep your baby from being murdered."

[20] *See also Stiles v. State*, 1992 OK CR 23, ¶ 23, 829 P.2d 984, 990 (prosecutor's display, during trial, of victim's blood-soaked clothing, which had a noticeable and offensive odor, was of questionable propriety and could not be condoned, but did not rise to the level of reversible error);

Closing arguments should not be overly graphic or theatrical in nature, even when they are ostensibly based on the evidence. In *Jones v. State*, 2006 OK CR 5, 128 P.3d 521, the defendant was tried for fatally shooting someone in the head. We held that the *manner* in which the prosecutor, in closing argument, illustrated the homicidal act – by pointing his finger at a juror's head – "cannot be condoned," although we found the error was not so prejudicial as to require any relief in that particular case.[21] *Id.*, 2006 OK CR 5, ¶¶ 74-75, 128 P.3d at 544-45. In *Alverson v. State*, 1999 OK CR 21, 983 P.2d 498, the victim was killed with a baseball bat, which was admitted into evidence. In closing argument, the prosecutor swung the bat and struck it against the floor several times. We found this display to be "theatrical and graphic," although no relief was warranted under the circumstances. *Id.*, 1999 OK CR 21, ¶ 41, 983 P.2d at 513. And in *Ellis v. State*, 1992 OK CR 45, 867 P.2d 1289, the prosecutor, in the guilt-stage closing argument of a capital trial, aimed the murder weapon at the floor and "dry-fired" it. We concluded that while the demonstration was "overly graphic," it did not warrant relief under the particular facts presented. *Id.*, 1992 OK CR 45, ¶ 12, 867 P.2d at 1297.

During trial, witnesses may use demonstrative aids to illustrate a point, so

---

*Ford v. State*, 1986 OK CR 70, ¶¶ 8-10, 719 P.2d 457, 459-60 (prosecutor's dramatic display of homicide weapon during cross-examination of defendant warranted modification of sentence).

[21] Jones was convicted of capital murder for walking up to a vehicle which was parked in a residential driveway in the middle of the day, sticking a gun through the driver's side window, and shooting the driver in the head to get his keys – all in front of the victim's sister and his two young daughters, whom Jones threatened to harm as well. Jones also had a history of violent crimes. *Jones*, 2006 OK CR 5, ¶¶ 2, 95, 102, 128 P.3d at 531, 549, 550. We found the prosecutor's demonstration did not contribute to the jury's recommendation of the death sentence in these circumstances.

long as the objects do not mislead or confuse the jury.  An eyewitness may testify that a pellet pistol is roughly the same size and shape as the firearm used in the crime.  *Owens v. State*, 1987 OK CR 264, ¶ 4, 747 P.2d 959, 960–61.  A victim of sexual abuse may demonstrate the criminal act with the aid of anatomically-correct dolls.  *Bartell v. State*, 1994 OK CR 59, ¶¶ 24-31, 881 P.2d 92, 100-01.  A prosecutor's use of the same demonstrative aids, in closing argument, may also be proper, if reasonably confined to the evidence presented and the issues to be decided.  *See e.g. Sanchez v. State*, 2009 OK CR 31, ¶ 74, 223 P.3d 980, 1005.[22]  However, we have cautioned against the use of demonstrative aids that have not been admitted into evidence.  *Cheatham v. State*, 1995 OK CR 32, ¶ 31, 900 P.2d 414, 424.  A prosecutor's use of such objects can blur the distinction between real evidence and editorial gloss.  Conflating evidence with argument in this manner can result in error.  *See Bell v. State*, 2007 OK CR 43, ¶ 13, 172 P.3d 622, 627.[23]

"Re-enactments" of a crime can have powerful effects.  "By conveying a visual image of what allegedly occurred, one side can imprint on the jury's mind

---

[22] In *Sanchez*, a trial for capital murder, we found no error in the prosecutor's use of an object admitted into evidence (shoe laces which the defendant had used to bind his victim), and an object not so admitted (a letter opener), because both were relevant to whether the defendant deserved the death penalty – specifically, whether he posed a "continuing threat to society" which, by definition, requires the jury to speculate about future probabilities.  The prosecutor's point – that the evidence showed the defendant was quite capable of using ordinary objects to harm others – was entirely legitimate in that context.

[23] In *Bell*, the prosecutor used crime-scene photos in a slide presentation during opening statement. The defendant waived any objection to the use of the photographs, which were ultimately admitted into evidence anyway.  But the *captions* that the prosecutor had affixed to the photos for purposes of the slide show were a different matter.  The editorial nature of the captions confused evidence with argument, and contributed to the Court's decision to modify the sentence imposed.  2007 OK CR 43, ¶ 13, 172 P.3d at 627.

its version of the facts." *United States v. Wanoskia*, 800 F.2d 235, 238 (10th Cir. 1986); *see also United States v. Gaskell*, 985 F.2d 1056 (11th Cir. 1993).[24]   This Court has been reluctant to admit crime-scene re-enactments "where they are posed with persons and things in various assumed situations, intended only to illustrate hypothetical situations." *Harris v. State*, 2000 OK CR 20, ¶ 10, 13 P.3d 489, 493.   Introducing a demonstrative aid for the first time in closing argument is dangerous, as it can encourage speculation on matters not supported by the evidence, using objects that have never been sponsored by any witness.   Using such props for "re-enactment" – to graphically imagine ways in which the crime *might* have been committed – is especially dangerous.   Rather than serving to summarize and illustrate the testimony, using props in this fashion may simply beg for an emotional response while bearing no resemblance to actual events. That may have happened here.

It is not unreasonable to infer that all of Tianna's injuries were caused by the intentional infliction of physical force by an adult.   Nor is it unreasonable to infer that Appellant may have inflicted all of them.   The non-fatal injuries were relevant as tending to show either that Appellant willfully permitted Tianna's

---

[24] In *Gaskell*, the court concluded that a physician-witness's use of an infant doll, to demonstrate the forces at play when shaking a baby, was not sufficiently similar to the known facts, and that the probative value of the demonstration was substantially outweighed by unfair prejudicial effect:

> The sight of an adult male repeatedly shaking a representation of an infant with the degree of force necessary to manipulate the doll's head in the required fashion was likely to form a strong impression upon the jury. ... By displaying a greater degree of force than the level required to produce [injury] in a seven-month-old infant and by arbitrarily selecting a number of oscillations, the demonstration tended to implant a vision of [the defendant's] actions in the jurors' minds that was not supported by any factual basis... .

985 F.2d at 1061.

abuse by another, or the absence of accident in inflicting the injuries himself. However, we find no evidence that any of these other injuries contributed to Tianna's death, or that they occurred contemporaneously with the skull fracture. The age and cause of the non-fatal injuries appears to be uncertain, and the manner in which the prosecutor demonstrated speculative injury scenarios to the jury is disconcerting.

The State concedes there was no direct evidence that Tianna was "kicked" by anyone, but attempts to defend the prosecutor's tactics by pointing out that she "openly admitted she did not know" if Tianna was ever kicked. This response only bolsters our conclusion that the true goal of the presentation was dramatic effect – not discussion of the evidence. The myriad ways in which the prosecutor used a prop to physically imagine the death of the victim, with "We don't know" as a refrain, was simply not a fair interpretation of the evidence. *Cf. Pryor*, 2011 OK CR 18 at ¶¶ 7-8, 254 P.3d at 723-24 (finding it improper for prosecutor to repeatedly suggest that the case had been "manipulated," based only on defendant's alleged acquaintance with police chief and lead detective). We cannot condone theatrical demonstrations of speculative theories, which are calculated to encourage an emotional reaction from the jurors.[25]

---

[25] The State points out that in *Alverson* and *Ellis*, we found no reason to grant any relief despite the prosecutors' dramatic demonstrations. We did not, however, condone the prosecutors' actions. Whether such conduct warrants relief depends on the circumstances of the particular case. Alverson and his co-defendants murdered a convenience-store worker during a robbery. The victim was beaten some forty times with a baseball bat; the jury heard his screams – and the impact of the bat – on the store's surveillance tape. A piece of the handcuffs used to restrain him was found embedded in his skull. *Alverson*, 1999 OK CR 21, ¶¶ 50-51, 983 P.2d at 515. Alverson was sentenced to death. Evidence of his guilt was overwhelming. Indeed, we found it reasonable that defense counsel essentially conceded guilt and focused on trying to spare his client's life. *Id.* at ¶ 27, 983 P.2d at 510. The demonstration with the bat was during the guilt stage of Alverson's trial. *Id.* at ¶¶ 41-42, 983

Trial counsel's failure to object to the prosecutor's demonstration cannot, in our view, be deemed a reasonable strategy. *See Smith v. State*, 1982 OK CR 143, ¶¶ 21-26, 650 P.2d 904, 908 (finding, *sua sponte*, that trial counsel's error required relief). We believe that if defense counsel had objected to the prosecutor's use of the doll, there is a "reasonable probability" that the outcome of the sentencing portion of the trial would have been different. *See Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984) (applying that standard of review to ineffective-counsel claims). A "reasonable probability" is a probability sufficient to "undermine confidence in the outcome." *Id.* "The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Id.*

Ultimately, it is the trial court's responsibility to keep closing argument within proper bounds. *Pryor*, 2011 OK CR 18, ¶ 12, 254 P.3d at 726. It is the "rare case" where a prosecutor's conduct in closing argument is so unfairly prejudicial to the defendant that a new trial is warranted. *Pryor*, 2011 OK CR 18, ¶ 4, 254 P.3d at 722. In the case before us, we do not believe the prosecutor's theatrical presentation casts doubt on the jury's finding of guilt. However, we do find a reasonable probability that the presentation affected the jury's decision to

---

P.2d at 513-14. Given all these circumstances, the prosecutor's conduct in *Alverson* can safely be labeled harmless. Ellis was convicted of murdering three people and shooting at four others, in a crime spree which this Court called a "trail of horror." Ellis did not deny the acts; he raised a defense of insanity instead. The jury recommended the death sentence for all murder counts, and thousands of years for the attempts to kill. *Ellis*, 1992 OK CR 45, ¶¶ 1-6, 867 P.2d at 1293. As in *Alverson*, the conduct complained of took place in the guilt stage of a capital trial, where evidence of guilt was overwhelming, and the potential for outcome-determinative prejudice negligible. *Id.*, 1992 OK CR 45 at ¶¶ 12-14, 867 P.2d at 1297.

deny Appellant even the possibility of parole at some point in the future. Accordingly, we **REMAND** this case for a new sentencing proceeding. 22 O.S.2011, § 1066.

In Proposition VIII, Appellant claims the accumulation of errors in this case warrants a new trial. Other than the prosecutor's use of a demonstrative aid in closing argument, we have identified no errors which, even when considered in the aggregate, warrant relief. *Logsdon v. State*, 2010 OK CR 7, ¶ 42, 231 P.3d 1156, 1170. Proposition VIII is denied.

## DECISION

The Judgment of the District Court of Tulsa County is **AFFIRMED**, but the case is **REMANDED** for re-sentencing. Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch.18, App. (2016), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

AN APPEAL FROM THE DISTRICT COURT OF TULSA COUNTY
THE HONORABLE JAMES M. CAPUTO, DISTRICT JUDGE

**ATTORNEYS AT TRIAL**

JILL WEBB
MICHAEL MANNING
THE STREET LAW FIRM, P.L.L.C.
400 S. BOSTON AVE., STE 1100W
TULSA, OK 74103
COUNSEL FOR DEFENDANT


SARAH MCAMIS
BENJAMIN FU
ASSISTANT DISTRICT ATTORNEYS
TULSA COUNTY DISTRICT
    ATTORNEY'S OFFICE
500 S. DENVER, STE. 900
TULSA, OK 74103-3832
COUNSEL FOR STATE

**ATTORNEYS ON APPEAL**

WILLIAM H. LUKER
HOMICIDE DIRECT APPEALS
DIVISION
OKLAHOMA INDIGENT DEFENSE SYS.
P.O. BOX 926
NORMAN, OK 73070
COUNSEL FOR APPELLANT


E. SCOTT PRUITT
ATTORNEY GENERAL OF OKLAHOMA
THOMAS LEE TUCKER
ASSISTANT ATTORNEY GENERAL
313 NE 21ST STREET
OKLAHOMA CITY, OK 73105
COUNSEL FOR APPELLEE

**OPINION BY:  SMITH, P.J.**
LUMPKIN, V.P.J.:   CONCUR IN PART/DISSENT IN PART
JOHNSON, J.:        CONCUR
LEWIS, J.:          CONCUR IN RESULT
HUDSON, J.:         CONCUR IN PART/DISSENT IN PART

**HUDSON, J., CONCURS IN PART/DISSENTS IN PART**

I concur in the decision to affirm Appellant's First Degree Child Abuse Murder conviction. I must dissent, however, to the reversal of Appellant's sentence of life without parole and remand for resentencing based on purported ineffective assistance of trial counsel.

First, it is *noteworthy* that defense counsel did not object at trial to the prosecutor's use of the demonstrative aid during closing argument. Defense counsel testified at the Rule 3.11 hearing that she "[d]idn't object because I thought it was so over the top that [the prosecutor] would actually lose credibility with the jury . . . I thought she looked out of control." (E.H. Tr. 42). Defense counsel's failure to object was an overt, thought-out strategic decision if the prosecutor's conduct was as bad as Appellant now urges. Defense counsel's strategic decision is virtually unchallengeable on appeal and we cannot second-guess it. *Strickland v. Washington*, 466 U.S. 668, 687-88, 690-91, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *Sonnier v. State*, 2014 OK CR 13, ¶ 4, 334 P.3d 948, 950. Thus, there is no deficient performance by counsel.

Secondly, I also believe that Appellant fails to show *Strickland* prejudice, i.e., a reasonable probability of a different sentencing recommendation by the jury but for counsel's failure to object to the prosecutor's use of the demonstrative aid. Today's decision offers no rationale whatsoever for concluding that the prosecutor's purported error meant the difference between Appellant receiving a straight life sentence and a sentence of life without parole.

Moreover, it is particularly *noteworthy* that the trial judge did not intervene in the prosecutor's demonstration with the doll. As today's decision points out, it is the trial court's responsibility to keep closing argument within proper bounds. Opinion at 29 (citing *Pryor v. State*, 2011 OK CR 18, ¶ 12, 254 P.3d 721, 726). If the prosecutor's actions were so egregious, I have no doubt the experienced trial judge who presided over Appellant's trial would have intervened.

Also *noteworthy* is the lack of clarity in the record relating exactly *what* the prosecutor did with the doll. The trial court's findings of fact on remand show the testimony from courtroom participants and observers of the trial was all over the place concerning "[t]he extent of the theatrics, drama, emotion and passion" utilized by the prosecutor. 10/30/2015 *Specific Findings of Fact* at 7. The record simply does not allow us to conclude that the prosecutor's actions were so "over the top" that sentencing relief is warranted, let alone find *Strickland* prejudice based on defense counsel's failure to object. *See Stemple v. State*, 2000 OK CR 4, ¶ 47, 994 P.2d 61, 71 (prosecutor's demonstration with a baseball bat during closing argument does not warrant relief where the record does not reflect how the prosecutor was handling the bat during closing argument).

The trial court, in its findings of fact on remand, tells us that the Rule 3.11 testimony supports a finding that the prosecutor hit the doll's head on the table, slapped it with an open hand, punched it with a closed fist and kicked (or motioned as if to kick) the doll. 10/30/2015 *Specific Findings of Fact* at

6-7. The record also makes clear that the prosecutor repeatedly emphasized during her demonstration with the doll that she did not know exactly what Appellant did to the child victim in this case but merely used the doll to demonstrate and act out possible scenarios hypothesizing how the infant's injuries were sustained.

It is additionally *noteworthy* that the prosecutor's conduct falls within permissible ranges from previous rulings of this Court:

> [w]e have consistently held that the right of argument contemplates a liberal free speech and that the range of argument is wide.  We have also held that both the counsel for the State and for the defense have the right to fully discuss, from their standpoint, the evidence and any inferences or deductions arising therefrom, and it is only when the State's argument is grossly improper and unwarranted upon some point which may affect the defendant's rights that reversal will be granted.

*Ellis v. State*, 1982 OK CR 167, ¶ 5, 652 P.2d 770, 771-72 (internal citations omitted).

The prosecutor's use of the demonstrative aid here falls well within the liberal freedom of speech afforded counsel for both parties during closing argument.   To recapitulate: 1) defense counsel did not object to the prosecutor's argument; 2) the trial court did not intervene to stop the prosecutor's supposedly outrageous conduct; and 3) the record hardly shows the prosecutor engaged in grossly improper argument which deprived the defendant of a fundamentally fair sentencing proceeding.  This Court should not be in the business of homogenizing or sanitizing the closing arguments of

3

trial prosecutors simply because we disagree with their style of arguments or believe that they inject too much dramatic effect for the jury's consideration.

Make no mistake: today's decision to reverse Appellant's sentence is a form-over-substance approach based on little more than the majority's micromanaging of the closing arguments of prosecutors. I believe we must resist the temptation to stifle permissible zealous advocacy by siphoning the life out of closing arguments as though we are programming—or, in this instance, reprogramming—robots. That is particularly so considering the safeguards employed in the criminal trial process. Appellant's jury—like virtually every jury hearing a criminal case—was instructed at the beginning of the trial that "[n]o statement or argument of any attorney is to be considered evidence." (Tr. II 420). *See* OUJI-CR 1-8A (Opening Instructions—Duty of Jurors). The written instructions provided too that "[a]rguments of counsel are not evidence in the case and if you believe the evidence introduced is different from counsel's recollection, your recollection controls." (O.R. 302).

"A jury is presumed to follow its instructions." *Weeks v. Angelone*, 528 U.S. 225, 234, 120 S. Ct. 727, 145 L. Ed. 2d 727 (2000). And the Supreme Court's own precedent recognizes that "arguments of counsel generally carry less weight with a jury than do instructions from the court." *Boyde v. California*, 494 U.S. 370, 384, 110 S. Ct. 1190, 108 L. Ed. 2d 316 (1990). The prosecutor's closing argument does not transcend these fundamental legal principles.

I am authorized to state that Judge Lumpkin joins in this writing.

4

# IN THE COURT OF CRIMINAL APPEALS OF THE STATE OF OKLAHOMA

EMORY NORRIS GAINES,  ]          **NOT FOR PUBLICATION**

    Appellant,  ]

v.  ]          Case No. F-2011-876

THE STATE OF OKLAHOMA,  ]

    Appellee.  ]

      FILED
IN COURT OF CRIMINAL APPEALS
    STATE OF OKLAHOMA

## SUMMARY OPINION

SEP 1 2 2012

**LEWIS, VICE-PRESIDING JUDGE:**

MICHAEL S. RICHIE
CLERK

    Emory Norris Gaines, Appellant, was tried by jury and found guilty of Count 1, child abuse, in violation of 21 O.S.Supp.2009, § 843.5(A); and Count 3, child neglect, in violation of 21 O.S.Supp.2009, § 843.5(C); in the District Court of Tulsa County, Case No. CF-2010-244. The jury found Appellant committed these crimes after former conviction of one (1) felony, and sentenced Appellant to fifteen (15) years imprisonment in Count 1, and thirty (30) years imprisonment in Count 3.[1] The Honorable Kurt G. Glassco, District Judge, pronounced judgment and sentence accordingly. Mr. Gaines appeals the following propositions of error:

1.     Improper evidence and unmistakable prosecutorial argument concerning probation and parole combined to deprive Appellant of his right to a fair jury sentencing trial under the 14th Amendment to the United States Constitution and Art. II, § 7, of the Oklahoma Constitution;

---

[1] Appellant must serve 85% of his sentences before being eligible for consideration for parole. 21 O.S.Supp.2009, § 13.1(14).

2.  The trial court abused its discretion in admitting Spechelle Jones sentencing letter, an error compounded by improper prosecutorial argument seeking sympathy for and contrasting the character of Jones vis-à-vis Appellant, in violation of Appellant's rights to a fair sentencing trial under the 14th Amendment to the United States Constitution and Art. II, § 7, of the Oklahoma Constitution;

3.  Victim impact evidence and argument intentionally evoking sympathy and justice for the victim, in combination with needless duplication of and argument emphasizing inflammatory photographs of the victim, violated Appellant's rights to a fair sentencing trial under the 14th Amendment to the United States Constitution and Art. II, § 7, of the Oklahoma Constitution;

4.  Cumulative error deprived Appellant of a fair sentencing trial in violation of the 14th Amendment to the United States Constitution and Art. II, § 7, of the Oklahoma Constitution.

In Proposition One, Appellant argues that improper evidence of suspended sentences on his prior convictions, and the prosecutor's related arguments,[2] denied him a fair sentencing trial. By failing to object to the admission of these documents or the prosecutor's comments on the grounds he asserts on appeal, Appellant waived all but plain error, which is error "going to

---

[2] Appellant includes within this single proposition of error claims that the judgments and sentences were improperly admitted, the prosecutor improperly argued about his prior suspended sentences in violation of *Hunter v. State*, 2009 OK CR 17, ¶ 9, 208 P.3d 931, 933, and erroneously mis-stated the "85% Rule" of 21 O.S.Supp.2009, § 13.1, in violation of *Florez v. State*, 2010 OK CR 21, ¶¶ 6-9, 239 P.3d 156, 158-59. This type of proposition arguably violates this Court's Rule 3.5(A)(5), providing that "[e]ach proposition of error shall be set out separately in the brief," and [m]erely mentioning a possible issue in an argument or citation to authority does not constitute the raising of a proposition of error on appeal." Failure to comply with this rule can result in waiver of an issue on appeal. The issues here are waived in any event and will be reviewed only for plain error.

the foundation of the case or taking from the defendant a right essential to his defense." *Simpson v. State*, 1994 OK CR 40, ¶¶ 2, 12, 876 P.2d 690, 693, 695. We find the prosecutor made an obvious error during her closing argument at sentencing by emphasizing Appellant's prior suspended sentences, stating that he had received the "gift of probation," a "second chance," and "another shot" on prior convictions. We have condemned virtually indistinguishable statements as plain error. *Hunter*, 2009 OK CR 17, ¶¶ 8-9, 208 P.3d at 933. However, we find under the facts and circumstances of this case that these improper comments did not contribute to the sentences imposed, and the error is harmless. 20 O.S.2011, § 3001.1; *Taylor v. State*, 2011 OK CR 8, ¶ 54, 248 P.3d 362, 378 (plain error in sentencing argument is harmless unless it had substantial influence on outcome, or leaves the court in grave doubt whether it had such effect). Proposition One is denied.

In Proposition Two, Appellant argues that the trial court abused its discretion in the admission of a typewritten letter submitted by the co-defendant to the court at her sentencing, and that the prosecutor used the letter to unfairly prejudice his sentence.[3] Defense counsel objected to the letter at trial on different grounds than those asserted here, and has waived all but plain error. *Brown v. State*, 2008 OK CR 3, ¶ 11, 177 P.3d 577, 580. Because

---

[3] This evidence, and the allegedly prejudicial argument concerning the letter, occurred in the first stage of trial, but Appellant specifies "the unduly prejudicial effect of the admission and the State's use of the Jones' sentencing letter to the trial court was as to punishment."

the letter was properly admitted to rebut and explain testimony and arguments of the defense, neither the admission of the letter nor the prosecutor's subsequent comments on the evidence were plain error. *Van White v. State*, 1999 OK CR 10, ¶ 82, 990 P.2d 253, 274. This proposition is denied.

Appellant's Proposition Three argues that he was denied a fair sentencing by lay and expert "victim impact" testimony, the admission of duplicative photographs, and the prosecutor's improper attempts to evoke sympathy. Appellant objected to only six (6) photographs, waiving all but plain error to the remaining photographs. *Simpson*, 1994 OK CR 40, ¶ 2, 876 P.2d at 693. His failure to timely object to the testimony of the State's lay and expert witnesses on the grounds asserted here has waived all but plain error. *Id.* We find the admission of the challenged evidence and testimony was proper to show the element of injury, the likely degree of force involved, and the nature of the subsequent neglect. Appellant has not shown error, much less plain error. In the few instances where defense counsel objected to the prosecutor's arguments, his objections were either sustained, curing any error, or properly overruled. Again, Appellant has not shown that any error in evidence or argument had a substantial influence on his sentences. *Taylor*, 2011 OK CR 8, ¶ 55, 248 P.3d at 379 (evaluating alleged misconduct within context of entire trial, considering prosecutor's actions, strength of the evidence, and arguments of defense). Proposition Three is denied.

Proposition Four argues that cumulative error requires modification of the sentences.   The cumulative error doctrine applies when several errors occurred at the trial court level, but none alone warrants reversal.   Even if Appellant's trial was not error free, the errors, even when considered in the aggregate, did not render the trial fundamentally unfair, or taint the jury's verdicts or sentences. *Hanson v. State*, 2009 OK CR 13, ¶¶ 55-56, 206 P.3d 1020, 1035.  This proposition is denied.

## DECISION

The Judgment and Sentence of the District Court of Tulsa County is **AFFIRMED**.   Pursuant to Rule 3.15, Rules of the Court of Criminal Appeals, Title 22, Ch. 18, App. (2012), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

**AN APPEAL FROM THE DISTRICT COURT OF TULSA COUNTY**
**THE HONORABLE KURT G. GLASSCO, DISTRICT JUDGE**

APPEARANCES AT TRIAL                    APPEARANCES ON APPEAL

BRIAN MARTIN                            TERRY J. HULL
1331 S. DENVER                          OKLA. INDIGENT DEFENSE SYSTEM
TULSA, OK 74119                         P.O. BOX 926
ATTORNEYS FOR DEFENDANT                 NORMAN, OK 73070-0926
                                        ATTORNEY FOR APPELLANT

SARAH McAMIS                            E. SCOTT PRUITT
ASST. DISTRICT ATTORNEY                 ATTORNEY GENERAL OF OKLAHOMA
500 S. DENVER                           DONALD D. SELF
TULSA, OK 74103                         ASSISTANT ATTORNEY GENERAL
ATTORNEY FOR THE STATE                  313 N.E. 21st ST.
                                        OKLAHOMA CITY, OK 73105
                                        ATTORNEYS FOR APPELLEE


OPINION BY LEWIS, V.P.J.
A. JOHNSON, P.J.:  Concurs
LUMPKIN, J.:  Concurs
C. JOHNSON, J.:  Concurs
SMITH, J.:  Concurs