

ORIGINAL

IN COURT OF CRIMINAL
STATE OF OKLAHOMA

MAR 19 2018

*1039531055*

No. F-2017-69

# IN THE COURT OF CRIMINAL APPEALS OF THE STATE OF OKLAHOMA

ADAM CLAYTON ZILM,

Appellant,

-vs-

THE STATE OF OKLAHOMA,

Appellee.

**BRIEF OF APPELLEE**
**FROM TULSA COUNTY DISTRICT COURT**
**CASE NO. CF-2012-3037**

MIKE HUNTER
ATTORNEY GENERAL OF OKLAHOMA

DONALD D. SELF, OBA # 8062
ASSISTANT ATTORNEY GENERAL

313 NE 21st Street
Oklahoma City, Oklahoma 73105
(405) 521-3921
(405) 522-4534 (FAX)

ATTORNEYS FOR APPELLEE

MARCH 19, 2018

Exhibit 7

**IN THE COURT OF CRIMINAL APPEALS
FOR THE STATE OF OKLAHOMA**

ADAM CLAYTON ZILM,        )
                                    )
            Appellant,     )
                                    )
v.                              )     Case No. F-2017-69
                                  )
THE STATE OF OKLAHOMA,   )
                                  )
            Appellee.     )

**BRIEF OF APPELLEE**

**STATEMENT OF THE CASE**

Adam Clayton Zilm, hereinafter referred to as the defendant, was tried by Information in the District Court of Tulsa County, Case Number CF-2012-3037, on one count of Sexual Abuse of a Child Under Age 12, in violation of 21 O.S.2011, § 843.5 (O.R. 28-31). Trial by jury was held November 14-18, 2016, before the Honorable Kurt G. Glassco, District Judge.[1] The defendant was represented by counsel.

The jury convicted the defendant as charged and recommended a sentence of thirty-six (36) years imprisonment and a $500 fine (O.R. 674). The trial court

---

[1]The Original Record will be referred to herein as "O.R." The transcript of the first preliminary hearing held on Sept. 26, 2012, will be referred to herein as "P.H.Tr. I." The transcript of the second preliminary hearing held on Nov. 6, 2013, will be referred to herein as "P.H.Tr.II." The transcript of the hearing held on Sept. 9, 2014, will be referred to herein as "Tr. Sept. 9, 2014." The transcript of the *Jackson v. Denno* hearings held on Feb. 26, 2016 and Sept. 28, 2016, respectively, will be referred to herein as "Tr. Feb. 26, 2016" and "Tr. Sept. 28, 2016." The transcript of the jury trial will be referred to herein as "Tr." The transcript of the sentencing hearing will be referred to herein as "S.Tr."

sentenced the defendant in accordance with the jury's verdict (S. Tr. 33; O.R. 711-713).

From this Judgment and Sentence the defendant has perfected his appeal to this Court.

## STATEMENT OF FACTS

The defendant lived with 11-year-old K.A., her older sister, her younger sister, her younger brother and their mother Kristina Alvarez[2] in Tulsa in June 2012. The defendant was not the biological father of the children. The children referred to him as "Big Daddy" (Tr. II 219-221). Katherine Sanford lived down the street from K.A. and her family. On the morning of June 4, 2012, Ms. Sanford was getting ready for work when her door bell began to ring about 6:15 a.m. Ms. Sanford was not expecting anyone at that hour, but she answered the door to find 11-year-old K.A. crying at the door. It was raining very hard and K.A. was soaking wet (Tr. III 123-125).

Ms. Sanford let K.A. into her house. K.A. was very upset, crying and shaking. Ms. Sanford asked K.A. what was wrong. K.A. said Big Daddy touched her while she was sleeping (Tr. III 125-126). K.A. went on to say Big Daddy tried to put his penis in K.A.'s "butt" (Tr. III 133). Ms. Sanford called K.A.'s mother at work and told her she needed to come to Ms. Sanford's house. Ms. Sanford's roommate called the police (Tr. III 133-135). When Ms. Alvarez arrived, Ms. Sanford told her what K.A. had said about Big Daddy. Ms. Alvarez fell to the

---

[2]Ms. Alvarez also was known as Kristi Shaneck (Tr. II 219).

ground crying and moaning.  She got on the couch in the living room where K.A. hugged her mother and tried to comfort her (Tr. III 134).  Even after the police arrived, Ms. Alvaraez laid on the couch crying (Tr. III 134-135).  Neither Ms. Sanford or her roommate told K.A. what to say (Tr. III 137).

K.A. was taken that same morning to Hillcrest Hospital where she was examined by Nurse Kathy Bell, a Sexual Assault Nurse Examiner (SANE) (Tr. III 146, 157-158).  As part of the examination, Nurse Bell took a history from K.A. where K.A. told her the defendant was giving her a massage.  K.A. said he put his penis in her "butt hole."  K.A. said she went outside behind a dumpster and then ran to her neighbor's house (Tr. III 159-160).  During her physical examination of K.A., Nurse Bell found an area of redness on her anus.  K.A.'s anus was sensitive to touch.  The tenderness was significant enough that Nurse Bell felt it needed further evaluation and that it should be documented in her record of the examination (Tr. III 162-163).  K.A. did not mention having a nightmare or that she was mistaking it for a sexual assault by her uncle some years before (Tr. III 165).  Nurse Bell found the physical exam consistent with the history K.A. gave her (Tr. III 166).

Well before the time of trial, K.A. had recanted her accusations against the defendant (Tr. Sept. 9, 2014, 121-122).  K.A. testified at trial that after the sexual assault by the defendant was reported to the police she and her siblings were placed in foster care with her uncle.  Later K.A. and her siblings were allowed to

3

go back to live with their mother.  She moved the family around to Louisiana and later Arkansas in the years before the trial.  The defendant would come to visit the family on weekends in Arkansas.  He was still their mother's fiancé.  Even by the time of trial, they planned to marry after the trial was over (Tr. II 222-229).  K.A.'s mother worked at a tanning salon in Arkansas until the defendant bought spray tan equipment for her so she could work at the defendant's mother's tanning salon in Tulsa (Tr. II 229-230).

K.A. was a reluctant witness at trial and said she did not want to be there (Tr. II 217-218).  She testified that the defendant had given her massages before June 4, 2012.  She said she was "never completely naked" during the massages. She said the massages happened in the living room and in the bedroom the defendant shared with her mother (Tr. II 236).  She also gave the defendant massages using oil and massaged his buttocks or "glutes" as she called it (Tr. II 237).

K.A. testified that on the morning of June 4, 2012, her mother was at work and the defendant gave her a massage that morning around 4:00 or 5:00 a.m. in the defendant's bedroom on his bed.  Her siblings were in their bedrooms asleep (Tr. II 240-241).  K.A. testified that she gave the defendant a massage that morning at his request.  He was wearing boxer shorts (Tr. II 242-243).  The defendant was laying on his stomach on the bed when K.A. massaged him using oil.  K.A. said she massaged his glutes by moving his underwear (Tr. II 246).

4

K.A. testified that she asked the defendant to give her a massage that morning. She took off her shirt and stripped down to her panties. K.A. laid on the defendant's bed on her stomach while he massaged her back and glutes with oil (Tr. II 248-250). K.A. testified that the oil was "like, really slippery." She said his thumb slipped and "accidently jabbed me" in the vagina (Tr. II 250).

K.A. acknowledged that she testified at preliminary hearing that the defendant thought she was asleep because her eyes were closed and he put his penis in her "butt." Then she testified that she did not remember (Tr. II 254-255). K.A. also testified that she told Amy Howard in her forensic interview that the defendant put his penis in her "butt" (Tr. II 257). She testified that she remembered testifying at preliminary hearing that she felt scared when the defendant put his penis in her "butt." K.A. also acknowledged that she told Amy Howard that she was scared when the defendant put his penis in her "butt" (Tr. II 259-260). K.A. also acknowledged that she testified at preliminary hearing that she got the defendant to stop by acting like she was waking up (Tr. II 260).

The defendant was interviewed by Tulsa police at his parent's house on the day of the crime. The interview was audio recorded (Tr. III 196-201; State's Exhibit 1). In the interview, the defendant said he had a back problem and asked K.A. to give him a massage that morning. The defendant said he was only wearing his underwear. He then massaged 11-year-old K.A. using oil. The defendant said K.A. took her panties off and pulled her shirt up over her head. He said he

massaged her back, her glutes, which he described as her "butt," and her sacrum (State's Exhibit 1).

The defendant admitted massaging around K.A.'s vagina and that he got close to it.  He also admitted that he massaged close to her anus.  When asked if he touched K.A.'s vagina, the defendant said not intentionally.  When told the victim said he put his penis in her butt, the defendant said it was possible his thumb went in her "butt" during the massage.  He said he must have "jabbed" her with his thumb in the anus.  The defendant admitted that the night before he made a statement in the presence of K.A. and her siblings that he was "horny" (State's Exhibit 1).

When asked by the police if they could take a DNA sample from the defendant, he replied, "Wow, I do remember something." The defendant then claimed that when he laid down next to K.A. to massage her, his "balls" got caught between his legs.  The defendant said he felt seminal fluid come out of his penis, and he wiped it with his hand.  The defendant said he continued to massage K.A. and that it was possible his DNA was transferred to her body by this method (State's Exhibit 1).

The defendant's DNA was not found in swabs taken from K.A.'s body during her sexual assault examination (Tr. III 163-165; Tr. IV 48-51).

The defendant elected not to testify at trial (Tr. IV 58-61).  Additional facts will be discussed as they become pertinent to the State's argument.

**PROPOSITION I**

**THE STATE DID NOT COERCE K.A. OR ALLOW HER
TO PRESENT KNOWINGLY PERJURED TESTIMONY.**

In his first proposition of error, the defendant argues that his constitutional right to due process was violated when the State allegedly coerced K.A. to falsely accuse the defendant at the first preliminary hearing and then allegedly pressured her to withdraw her recantation. The defendant names DHS case worker Lauren Hall, forensic examiner Amy Howard, DHS case agent Lori Hannigan and prosecutor Sarah McAmis as the state agents who allegedly coerced K.A. to falsely accuse the defendant and then allegedly pressured her to withdraw her recantation. The State submits there was no evidence that any of the four above named women ever told K.A. to falsely accuse the defendant, and the defendant fails to show any of them encouraged K.A. to falsely withdraw her recantation.

The Supreme Court held in *United States v. Agurs*, 427 U.S. 97, 103, 96 S. Ct. 2392, 2397, 49 L. Ed. 2d 342 (1976):

> [a] conviction obtained by knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.

The relevant standard from *Agurs* is whether: (1) "the undisclosed evidence demonstrates that the prosecution's case includes perjured testimony"; (2) "the prosecution knew or should have known, of the perjury"; and (3) "there is any reasonable likelihood that the false testimony could have affected the judgment

of the jury." *Agurs*, 427 U.S. at 103-104.  "A new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury.'" *Giglio v. United States*, 405 U.S. 150, 154, 92 S. Ct. 763, 766, 31 L. Ed. 2d 104 (1972)(internal citations omitted).  "Finding of materiality of evidence is required under *Brady"* [*v. Maryland]*, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196, 10 L. Ed. 2d 215(1963), *Giglio*, 405 U.S. at 154.  To establish a *Brady* violation, Petitioner "must demonstrate that (1) the prosecution  suppressed evidence; (2) the evidence was favorable to the accused; and (3) the evidence was material to the defense.  *Scott v. Mullin*, 303 F.3d 1222, 1230 (10th Cir. 2002).  The defendant has not satisfied the first prong of the *Brady* test in that he has totally failed to show that the prosecution suppressed evidence that K.A. recanted her accusations against him.  The defendant admits there was no *Brady* violation because he became aware of the recantation before trial (Brief of Appellant, p.27).  In fact, the defendant was granted a new preliminary hearing held on November 6, 2013, in which K.A. did not testify (P.H. II Tr. 3).

In addition, the Petitioner has presented no credible evidence to show K.A. perjured herself at his first preliminary hearing and that the prosecutor knew, or should have known, that her testimony was perjured. *Agurs*, 427 U.S. at 103-104. K.A.'s testimony at the first preliminary hearing that the defendant put his penis in her "butt hole" was believable.  There was nothing incredible or inconsistent in her testimony that would have caused the prosecutor to suspect she was lying

when she accused the defendant of sexual assault (P.H. I 23-24).  There was no basis to show the prosecutor knew, or should have known, her testimony at the first preliminary hearing held on September 26, 2012, was anything but truthful. Of course, the defendant claims K.A.'s recantation at trial was the truth so there was no subornation of perjury in her recantation from his perspective.    The defendant's claim would require this Court to believe that an experienced prosecutor would risk her career, law license and possible prison time, to conspire with the other alleged state actors to suborn perjury.  The defendant fails to support his claim that the State presented knowingly perjured testimony of K.A. at his first preliminary hearing.

The defendant claims that DHS case worker Lauren Hall lied to K.A. about DNA evidence when she made a welfare check on K.A. (Brief of Appellant, p.26; Defendant's Exhibit 1).  That claim is not supported by the record.    Lauren Hall visited K.A. at her home on August 16, 2013, for a monthly home welfare visit. Ms. Hall did not realize her conversation was being recorded by K.A. (P.H. II Tr. 21-22).  This was after the first preliminary hearing.  In the recording of the conversation, Ms. Hall expressed concern about K.A.'s recantation because she thought the DNA evidence supported K.A.'s original story.  Ms. Hall's talk with K.A. in the recording is conversational, not confrontational, and she did not tell K.A. what to say at the second preliminary hearing held on November 6, 2013.

Most of the conversation had to do with K.A.'s custody arrangements (Defendant's Exhibit 1).

Ms. Hall testified at the second preliminary hearing that she never told K.A. what to say in her testimony in any of the hearings held in this case. Ms. Hall testified that at the time she talked to K.A. in the recorded conversation she believed there was DNA evidence supporting K.A.'s original claim of sexual abuse based on her understanding of the SANE exam. Ms. Hall testified she did not know her statement about the DNA results was inaccurate at the time she made it to K.A. (P.H. II Tr. 21-24). As such, there was no evidence that Ms. Hall intentionally misrepresented the results of the DNA testing at the time she talked to K.A. on August 16, 2013, or that she coerced K.A. to stick to her original allegations against the defendant.

The defendant next claims that DHS worker Lori Hannagan knew about the recantation because she wrote it down in the juvenile file. In somewhat circular logic, the defendant's only support for that claim is a reference to his Motion to Dismiss, filed on September 4, 2013, for the State allegedly failing to disclose the recantation of K.A. (Brief of Appellant, p.26; O.R. 302-303). That motion is at best self-serving hearsay filed by the defendant. Even if taken as true however, the motion contains a claim that K.A. called the defendant's mother on June 7, 2012, in an attempt to reach the defendant to say that K.A. might have been mistaken about the sexual assault (O.R. 302-303). In addition, the defendant acknowledges

10

that K.A. called him within a day or two after the day in question and allegedly told him she was "mistaken" in her claim of a sexual assault by the defendant (Brief of Appellant, p.25). As such, the defendant was aware of the alleged recantation well before his preliminary hearing. The claim does not prove the State withheld evidence of the recantation from the defendant. Clearly the defendant was on notice of the recantation by the time of the second preliminary hearing because Ms. Hall testified about it (P.H. II Tr. 21-24). In addition, as shown below, the defendant took a sworn statement from K.A. on July 24, 2013, in which she recanted her allegations against the defendant (O.R. 149-176). The jury heard all the evidence about the alleged recantation and the alleged pressure by the State on K.A. to withdraw her recantation at trial through the testimony of K.A. (Tr. II 231-232, 240-260, 283-285; Tr. III 27-37; Tr. IV 18-23).

The defendant claims Amy Howard, who conducted the forensic examination of K.A. the day of the sexual assault, knew about the recantation because K.A. allegedly told her during the forensic examination. Again the defendant supports this claim with a reference to his Motion to Dismiss, filed on September 4, 2013 (Brief of Appellant, p.26; O.R. 304). Again, that motion is at best self-serving hearsay filed by the defendant and does not even mention Amy Howard (O.R. 304). The defendant also references a sworn statement of K.A. taken by trial counsel on July 24, 2013, which is a hearsay statement and not subject to cross-examination, where K.A. claimed "that Amy girl" told K.A. to say what she said in

11

her original accusation of the defendant, and she could go back to her mother (O.R. 172-173). Again, this self-serving hearsay does not prove the State withheld evidence of the recantation from the defendant, and clearly the defendant was on notice of the recantation when K.A.'s statement was taken by trial counsel on July 24, 2013 (O.R. 172-173).

Finally, the defendant claims the prosecutor, Ms. McAmis, withheld the recantation from the defendant because she had access to the witnesses and the juvenile file. He also cites K.A.'s testimony at trial that Ms. McAmis told her to stick to her first story that the defendant sexually assaulted her (Brief of Appellant, p.26). However, Ms. McAmis made it clear on the record that she never told K.A. what to say, did not know K.A. had recanted and once she was aware of the recantation did not tell K.A. to disavow her recantation. Ms. McAmis told the trial court:

> As I have previously stated to the Court, I recognize fully and completely that if I were ever in a situation where a child said to me, for whatever reason, recanted to me, then I have a continuing obligation, whether it is before preliminary hearing, after preliminary hearing, before jury trial, after jury trial, whatever, I have a continuing obligation, both as a prosecutor and as an attorney and as an officer of the court, I have a ethical, moral, legal, responsibility to report that information.
> If that had ever happened in this case, or in any other case, I would have reported that both to defense counsel and to the court.
> I can absolutely without any question assure Your Honor that that was not, in any event, a conversation.

> And, I would assure Your Honor that the preliminary
> hearing transcript demonstrates that at the time of the
> preliminary hearing, she had not and did not recant.

(Tr. Sept. 9, 2014, pp.135-136).

The record in this case as outlined above does not support the defendant's

claim that Ms. McAmis knew, or should have known, that K.A. perjured herself

in her testimony at the first preliminary hearing. *Agurs*, 427 U.S. at 103-104.

What the record does show is that K.A. was returned to the custody of her mother,

who continued to associate with the defendant, after the preliminary hearing. The

logical inference from the evidence is that K.A.'s mother and the defendant

brought pressure on K.A. to recant her allegations against the defendant so the

defendant could avoid prison and her mother could marry him. K.A. testified that,

after she reported the sexual assault by the defendant, her mother moved the

family around to Louisiana and later Arkansas. When they lived in Arkansas, and

while the trial was still pending, the defendant would come to visit the family on

weekends. He was still K.A.'s mother's fiancé, and their wedding was on hold

until after the defendant's trial in this case. Even by the time of trial, they

planned to marry after the trial was over (Tr. II 222-229).

K.A.'s mother worked at a tanning salon in Arkansas until the defendant

bought spray tan equipment for her so she could work at the defendant's mother's

tanning salon in Tulsa (Tr. II 229-230). This was all evidence of the emotional and

financial hold the defendant and his family held over K.A.'s mother and her

children and explained why K.A. would recant her allegations against the defendant to try to keep him out of prison.

There was no credible evidence that Ms. Hall, Ms. Hannigan, Ms. Howard or Ms. McAmis ever told K.A. to falsely accuse the defendant or told her that she had to withdraw her recantation. As such, there was no credible evidence that Ms. McAmis suborned perjury by presenting K.A.'s testimony at the first preliminary hearing. *Agurs*, 427 U.S. at 103-104. In addition, the defendant claims the testimony of K.A. at trial was truthful where she recanted her allegations of a sexual assault by the defendant. As such, there was no alleged subornation of perjury at trial. Furthermore, as previously referenced, the defendant admits there was no *Brady* violation because he became aware of K.A.'s recantation well before trial (Brief of Appellant, p.27). In fact, the defendant was granted a new preliminary hearing held on November 6, 2013, based on the recantation, in which K.A. did not testify (P.H. II Tr. 3; O.R. 338-339). As such, any error in the first preliminary hearing was cured by the ruling of the trial court and this Court in remanding for a new preliminary hearing. Accordingly, this claim is without merit.

**PROPOSITION II**

**THE PROSECUTOR'S CONDUCT WAS NOT IMPROPER
AND DID NOT DENY THE DEFENDANT A FAIR TRIAL.**

The defendant claims in his second proposition of error that the prosecutor allegedly: (A) threatened to charge K.A.'s sister, P.A., with perjury if P.A. testified

14

for the defendant; (B) insinuated that trial counsel manipulated or instructed K.A. to record her conversation with Lauren Hall; (C) improperly commented on the defendant's exercise of his right to trial; and, (D) engaged in "histrionics" in closing argument by pointing out the defendant's demeanor when questioned by police about the sexual assault of K.A. (Brief of Appellant, pp. 31-37). He asserts that the now complained of conduct and argument by the prosecutor denied him a fair trial and sentencing.

The State notes initially that trial counsel did not object to the prosecutor's alleged threat to charge P.A. with perjury if she testified for the defendant, thereby waiving all but plain error on that complaint. *See Harney v. State*, 2011 OK CR 10, ¶ 23, 256 P.3d 1002, 1007 (failure to object at trial to alleged prosecutorial misconduct waives all but plain error)*; Grissom v. State*, 2011 OK CR 3, ¶ 68, 253 P.3d 969, 992. In *Simpson v. State*, 1994 OK CR 40, ¶ 23, 876 P.2d 690, 698, this Court held:

> If defense counsel does not object, this Court has repeatedly held the error is waived for all but fundamental error, now properly known as plain error, which has been defined as an error which goes to the foundation of the case, or which takes from a defendant a right essential to his defense.

Because the prosecutor acted properly during the now complained of comments and closing argument, no prosecutorial error occurred and this proposition must be denied.

As this Court noted in *Malone v. State*, 2013 OK CR 1, ¶ 41, 293 P.3d 198, 211, it reviews claims of prosecutorial error for plain error under the following standard:

> To be entitled to relief under the plain error doctrine, [an appellant] must prove: 1) the existence of an actual error (i.e., deviation from a legal rule); 2) that the error is plain or obvious; and 3) that the error affected his substantial rights, meaning the error affected the outcome of the proceeding. *See Simpson v. State,* 1994 OK CR 40, ¶¶ 3, 11, 23, 876 P.2d 690, 694, 695, 698; 20 O.S.2001, § 3001.1. If these elements are met, this Court will correct plain error only if the error "seriously affect[s] the fairness, integrity or public reputation of the judicial proceedings" or otherwise represents a "miscarriage of justice." *Simpson,* 1994 OK CR 40, ¶ 30, 876 P.2d at 701.

In *Donnelly v. DeChristoforo*, 416 U.S. 637, 645, 94 S. Ct. 1868, 1872, 40 L. Ed. 2d 431 (1974), the Supreme Court held that the standard for establishing the appropriateness of a prosecutor's comments during trial is whether the prosecutor's remarks made the defendant's trial so fundamentally unfair as to deny him due process. This Court holds that in order for a prosecutor's statements at trial to warrant relief, "Appellant must show not only that error occurred but that the resulting prejudice from the error was such that reversal is warranted." *Bland v. State*, 2000 OK CR 11, ¶ 91, 4 P.3d 702, 726.

The State submits there was nothing improper in the prosecutor's comments about the potential testimony of P.A. or in closing argument in this case where the prosecutor talked about the facts of the case and the fair

16

inferences that could be drawn from the evidence. *See Pavatt v. State*, 2007 OK CR 19, ¶ 65, 159 P.3d 272, 292 (prosecutor allowed to suggest reasonable inferences from the evidence).

**A.    Allegedly threatening to charge P.A. with perjury if she testified for the defendant at trial**

The defendant claims the prosecutor threatened to charge P.A. with perjury if she testified on behalf of the defendant. What the prosecutor said was there was the potential of P.A. subjecting herself to perjury if she testified contrary to the prior recorded statements made by P.A. In any event, these comments were made outside the presence of the jury (Tr. IV 35-36). This line of argument was based on fair inferences from the evidence. *See Mitchell v. State*, 2010 OK CR 14, ¶ 97, 235 P.3d 640, 661 (prosecutor has wide latitude in making argument and drawing fair inferences from the evidence). The prosecutor did not threaten P.A. with perjury and did not prevent the defendant from calling her as a witness. When the defendant announced that he intended to call P.A. as a witness, the prosecutor expressed concern that P.A. was a juvenile and did not have a parent present in court to give her permission to testify (Tr. IV 35). The prosecutor outlined the history of the juvenile court case involving K.A. and her siblings and pointed out that Judge Fransein had ordered the defendant to have no contact with the children, and the judge was thinking about removing the children from their mother's custody again because she had allowed the defendant to be around

17

the children.  The prosecutor merely pointed out that — regardless of the outcome
of the criminal trial — she anticipated that Judge Fransein would be reviewing the
juvenile case (Tr. 30-35).  There was no threat against P.A. if she testified.

The prosecutor then expressed concern that if P.A. did testify she might be
subjecting herself to perjury:

> Your Honor was concerned enough about [K.A.'s] best
> interest, I don't know, two, three years ago that you
> appointed an attorney for her.  But now we're going to
> proceed with her sibling [P.A.] being put on the stand to
> testify under direct, under cross-examination, with all
> due respect, to potentially subject herself to some type of
> perjurious statement.  And the yet, we're just –
>
> Counsel can laugh at that, but we have prior recorded
> statements by [P.A.] that if she is today going to say
> something completely different, it's not just enough for
> counsel to sit and laugh at that.  We have to understand
> –

(Tr. IV 35-36).

The prosecutor did not threaten P.A. with perjury but merely pointed out
the potential peril she faced if she presented perjured testimony to the court.  The
defendant was not prevented from presenting the testimony of P.A.  The trial court
ruled that it would allow P.A. to testify (Tr. IV 41).  Trial counsel announced that
he would not be calling P.A. based on the "veiled threats of perjury charges" (Tr.
IV 41).  The court did not take the statements of the prosecutor to be threats of
perjury charges and told trial counsel, "But Mr. Smallwood, you do what you feel
is best for your case.  I have ruled that she can testify.  And you use your best

18

decision on going forward on how you wish to proceed in your case" (Tr. IV 41). As such, the prosecutor did not prevent P.A. from testifying or prevent the defendant from presenting a defense.

The defendant also claims trial counsel did not call his mother, Mary Zilm, or his fiancé, Kristina Alvarez, as witnesses because of the alleged chilling effect the prosecutor's comments allegedly had on the defense (Brief of Appellant, p.33). The record, however, shows the only witness the defense decided not to call was P.A. There was no mention of not calling Ms. Zilm or Ms. Alvarez because of the alleged chilling effect of the prosecutor's comments regarding P.A. (Tr. IV 40-42). There was no mention by the prosecutor of potential perjury charges against any other defense witness (Tr. IV 32-36).  The prosecutor did not threaten to file perjury charges against P.A. and there was no mention of the defense not calling the other two witnesses at trial because of the alleged chilling affect  (Tr. IV 41-42).

The defendant relies on hearsay exhibits attached to his Rule 3.11 Motion to attempt to show prejudice by not calling the witnesses.   As explained further in Proposition VI, below, all references to that motion, and attachments thereto, are not a proper part of the appellate record and are not before the Court as part of the appeal at this time. *See* Rule 3.11(C), *Rules of the Court of Criminal Appeals*, Title 22, Ch 18, App. (2017); *Dewberry v. State*, 1998 OK CR 10, ¶ 9, 954 P.2d 774, 776. Accordingly, there is no basis to support the defendant's claim that he

was prevented from presenting a defense by the prosecutor's comments about P.A.'s potential perjury. There is certainly no evidence that the prosecutor threatened Ms. Zilm or Ms. Alvarez with perjury. In any event the defendant did not object to the prosecutor's comments at trial, and it certainly did not rise to the level of plain error. *See Harney*, 2011 OK CR 10, ¶ 23, 256 P.3d at 1007 (failure to object at trial to alleged prosecutorial misconduct waives all but plain error).

**B. Allegedly insinuating that defense counsel instructed K.A. to record her conversation**

The defendant claims that the prosecutor insinuated in closing argument that trial counsel manipulated or instructed K.A. to record her conversation with Lauren Hall contained in Defendant's Exhibit 1 (Tr. V 51). The complained of argument by the prosecutor was in response to the argument by trial counsel about "[h]ow gutsy and innovative and smart" it was for K.A. to record her conversation with Ms. Hall because K.A. did not trust DHS (Tr. V 30-31). Trial counsel objected to the argument at trial and requested a mistrial which was denied (Tr. V 51). The prosecutor's argument was in response to trial counsel's argument about how gutsy and smart K.A. was to record the conversation. Even if defense counsel told K.A. to record the conversation with Ms. Hall, there was nothing improper in that. K.A. testified that she recorded the conversation because she did not trust Ms. Hall or DHS (Tr. IV 20). To the extent there was any error in the comment, the defendant cannot complain about error he invited.

*Cuesta-Rodriguez v. State*, 2010 OK CR 23, ¶ 73, 241 P.3d 214, 237; *see also*
*DeRosa v. State*, 2004 OK CR 19, ¶ 70, 89 P.3d 1124, 1149 (defendant failed to
show he was denied a fair trial by prosecutor's argument in response to defense
counsel's argument).

The defendant fails to show how the argument by the prosecutor attacked
the credibility of defense counsel or implied that defense counsel was dishonest.
To the extent this Court finds any error in the conduct of the prosecutor by the
objection, it did not prejudice the defendant's right to due process or any other
constitutional right. *DeRosa*, 2004 OK CR 19, ¶ 52, 89 P.3d at 1144.

## C.    Alleged comment on the defendant exercising his right to trial

The defendant claims the prosecutor improperly commented on the
defendant exercising his right to trial.  The defendant claims that when the
prosecutor argued that it was wrong for the defendant to put the victim "[t]hrough
the next four years to get to this day" it was an improper comment on his exercise
of the right to a jury trial (Brief of Appellant, pp.35-36) (Tr. V 55).  The comment
did not mention the exercise of the defendant's right to trial and was instead a
comment on the upheaval in K.A.'s life since she disclosed the sexual assault.
K.A. testified that after the sexual assault by the defendant was reported to the
police she and her siblings were placed in foster care with her uncle.  Later K.A.
and her siblings were allowed to go back to live with their mother, who moved the
family around to Louisiana and later Arkansas.  The defendant would come to visit

the family on weekends in Arkansas.  He was still their mother's fiancé.  Even by the time of trial, they planned to marry after the trial was over (Tr. II 222-229).

K.A.'s mother worked at a tanning salon in Arkansas until the defendant bought spray tan equipment for her so she could work at the defendant's mother's tanning salon in Tulsa (Tr. II 229-230).  The argument was a proper comment on the defendant continuing to be a part of K.A.'s life after the sexual assault up until the trial. It showed the opportunity the defendant and K.A.'s mother had to influence her testimony in the lengthy period between the crime and the trial. *See Warner v. State*, 2006 OK CR 40, ¶ 173, 144 P.3d 838, 888 (prosecutor's comments based on the evidence at trial were not improper).   To the extent there was any error in the comment, it was cured when the trial court sustained trial counsel's objection, and the trial court admonished the jury to disregard the comment (Tr. V 55).  *See Jones v. State*, 2006 OK CR 5, ¶ 44, 128 P.3d 521, 539-540 (any error cured when trial court sustained trial counsel's objections).  As such, the defendant fails to show he was denied a fair trial or sentencing by the prosecutor's argument.

## D.    **Alleged courtroom "histrionics"**

Finally, the defendant complains that the prosecutor engaged in alleged courtroom "histrionics" when she argued that the defendant's demeanor when he was interviewed by the police did not show the actions of an innocent man.  Trial counsel objected to the alleged "histrionics" and his objection was sustained by

the trial court (Tr. V 48). There was nothing improper in the prosecutor commenting on the demeanor of the defendant when he was confronted by police. *See Stouffer v. State*, 2006 OK CR 46, ¶ 169, 147 P.3d 245, 276 (not improper for prosecutor to comment on defendant's cool demeanor after murder).

In *Underwood v. State*, 2011 OK CR 12, ¶ 75, 252 P.3d 221, 250, the defendant objected to the prosecutor "prancing around" in front of the jury and "screaming" at them. This Court held, "The prosecutor's comments may have been delivered with emotion, but no one could deny that emotionally-charged evidence had been presented in this trial." *Id.* So too in this case, there was emotionally charged evidence of the defendant's sexual assault of the 11-year-old victim. There was nothing improper in the prosecutor's comment on the defendant's demeanor when confronted with the crime by the police. To the extent this Court finds any error in the comment, it was cured when the trial court sustained trial counsel's objection (Tr. V 48). *See Jones*, 2006 OK CR 5, ¶ 44, 128 P.3d at 539-540 (any error cured when trial court sustained trial counsel's objections).

### E.   Conclusion

This Court held in *Hanson v. State*, 2009 OK CR 13, ¶ 18, 206 P.3d 1020, 1028, when viewing a claim of prosecutorial misconduct:

> [w]e evaluate the alleged misconduct within the context
> of the entire trial, considering not only the propriety of
> the prosecutor's actions, but also the strength of the

evidence against the defendant and the corresponding arguments of defense counsel.

The conduct of the prosecutor in this case did not deny the defendant a fair trial or sentencing. *See Howell v. State*, 2006 OK CR 28, ¶ 11, 138 P.3d 549, 556 (argument of prosecutor within wide latitude afforded during closing argument). The conviction and sentence were not based on the allegedly improper conduct or remarks by the prosecutor. *See Davis v. State*, 2011 OK CR 29, ¶ 181, 268 P.3d 86, 129 (defendant's conviction based on facts of case rather than argument of prosecutor). As this Court discussed in *Romano v. State*, 1993 OK CR 8, ¶ 41, 847 P.2d 368, 380:

> We recognize, as did the United States Supreme Court in *United States v. Young*, 270 U.S. 1, 10, 105 S. Ct. 1038, 1043, 84 L. Ed. 2d 1, 9 (1985), that "in the heat of argument, counsel do occasionally make remarks that are not justified by the testimony, and which are, or may be prejudicial to the accused." However, ". . .a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." *Id.*, 470 U.S. at 11, 105 S. Ct. at 1044, 84 L. Ed. 2d at 11. This Court has held that in order for the remarks of the prosecuting attorney to constitute reversible error they must be flagrant and of such a nature as to be prejudicial to the defendant.

The prosecutor's conduct and arguments in this case were properly based on the evidence at trial.

24

The defendant fails to show he was denied a fundamentally fair trial by the alleged improper conduct and argument of the prosecutor where the evidence of his guilt was overwhelming as shown in the Statement of Facts, *supra*. *See Myers v. State*, 2006 OK CR 12, ¶ 59, 133 P.3d 312, 329 (prosecutorial misconduct harmless where evidence of guilt is overwhelming)*; Bland*, 2000 OK CR 11, ¶ 110, 4 P.3d at 730. As such this proposition of error must fail.

## PROPOSITION III

### THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN ADMITTING THE EVIDENCE RAISED IN DEFENDANT'S PROPOSITION III.

The defendant claims in his third proposition of error that the trial court abused its discretion by admitting various evidence. Specifically, the defendant claims the trial court erred by admitting alleged hearsay statements made by K.A. to her neighbor, Katherine Sanford, and to the SANE nurse, Kathy Bell. The defendant also claims K.A. was improperly impeached with her prior testimony from the first preliminary hearing.

The admissibility of evidence is within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion. *Davis v. State*, 2011 OK CR 29, ¶ 156, 268 P.3d 86, 125. *See Stouffer*, 2006 OK CR 46, ¶ 60, 147 P.3d at 263 (an abuse of discretion is "a clearly erroneous conclusion and judgment, one that is clearly against the logic and effect of the facts presented.")(internal citations omitted). There was no abuse of discretion by the trial court in admitting

25

the now complained of testimony and allowing the impeachment evidence to be used at trial as explained further below.

## A.    Excited utterance to Ms. Sanford

The defendant claims the trial court abused its discretion by admitting the testimony of Ms. Sanford regarding excited utterances made by K.A. to her neighbor Ms. Sanford the morning of the sexual assault.   The defendant relies on an earlier ruling of the trial court where the court found the testimony of Ms. Sanford regarding K.A.'s statements to her was not reliable (Tr. Sept. 12, 2014, pp.16-18).   However, that ruling of the court was based on a hearing on the reliability of child hearsay statements made by K.A. under 12 O.S.2011, § 2803.1. The trial court found the testimony of Ms. Sanford to be contradictory.   The court noted that the statement of K.A. to Ms. Sanford could be admissible under another section of the hearsay rule (Tr. Sept. 12, 2014, pp. 17-18).   The trial court did not rule on the reliability of K.A.'s statement to Nurse Bell at the September 12, 2014 hearing.   At trial, the court found K.A.'s statements to Ms. Sanford were properly admitted as an excited utterance (Tr. III 129).   The State maintains the statements made by K.A. to Ms. Sanford immediately after the sexual assault by the defendant were properly admitted as an exception to the hearsay rule as an excited utterance under 12 O.S.2011, § 2803(2), and the trial court did not abuse its discretion by admitting them.

26

The testimony by Ms. Sanford regarding K.A.'s statement to her right after the sexual assault was admissible as an excited utterance, which is a well established exception to the hearsay rule. 12 O.S.2011, § 2803(2). An excited utterance is admissible as it relates to an existing startling event when made while under the stress of excitement caused by the event. *Frederick v. State,* 2017 OK CR 12, ¶ 55, 400 P.3d 786, 808; *Taylor v. State*, 2011 OK CR 8, ¶ 21, 248 P.3d 362, 370; *Slaughter v. State*, 1997 OK CR 78, ¶ 36, 950 P.2d 839, 852. Whether a statement qualifies as an excited utterance does not depend on a fixed time, but on the facts and circumstances of each individual case. *Williams v. State*, 1996 OK CR 16, ¶ 17, 915 P.2d 371, 378-379; *see Marquez v. State*, 1995 OK CR 17, ¶ 16, 890 P.2d 980, 984 (statement made next day after startling event admissible as excited utterance where startling event continued to exist).

The statement by K.A. to Ms. Sanford was admissible as an excited utterance as the victim was upset, hysterical and crying at the time she made the statement because of the defendant's sexual assault on her which had just ended minutes before. *See Hancock v. State*, 2007 OK CR 9, ¶ 83, 155 P.3d 796, 816 (declarant must be under extreme stress of startling event at the time the excited utterance is made). Ms. Sanford was K.A.'s neighbor. K.A. repeatedly rang Ms. Sanford's doorbell right after the sexual assault. K.A. was soaking wet and crying at the door (Tr. III 123-125). Ms. Sanford let K.A. into her house. K.A. was very upset, crying and shaking. Ms. Sanford asked K.A. what was wrong. K.A. said

27

Big Daddy touched her while she was sleeping (Tr. III 125-126).  K.A. went on to say Big Daddy tried to put his penis in K.A.'s "butt" (Tr. III 133). K.A. referred to the defendant as Big Daddy (Tr. II 220).

K.A. went to Ms. Sanford's house shortly after the sexual assault. Regardless of the timing of the statement, K.A. was clearly still under the stress of excitement caused by the assault and her escape from the defendant in the pouring rain. Her statement to Ms. Sanford was made within a few minutes of the attack while she was still under the excitement of the startling event which was her sexual assault at the hands of the defendant. As such, it was properly admitted as an exception to the hearsay rule, and the trial court did not abuse its discretion by its admission at trial.

Finally, if the Court should find any error in the admission of the excited utterance of K.A. to Ms. Sanford, any such error was harmless considering the remaining overwhelming evidence of the defendant's guilt as shown in the Statement of Facts, *supra.  See Cuesta-Rodriguez,* 2010 OK CR 23, ¶ 40, 241 P.3d at 230 (confrontation clause violation subject to harmless error analysis); *Logsdon v. State*, 2010 OK CR 7, ¶ 37, 231 P.3d 1156, 1169 (hearsay evidence harmless in light of remaining overwhelming evidence of defendant's guilt); *Hunt v. State*, 2009 OK CR 21, ¶ 12, 218 P.3d 516, 519; *Van White  v. State*, 1999 OK CR 10, ¶ 32, 990 P.2d 253, 265 (constitutional error subject to harmless error analysis)(citing, *Chapman v. California,* 386 U.S. 18, 24, 87 S. Ct. 824, 828, 17

28

L. Ed. 2d 705 (1967)).  As such, the defendant fails to show how he was prejudiced by the excited utterance of K.A. to Ms. Sanford being admitted into evidence and this proposition of error must fail.

**B.      Statement to SANE Nurse**

Next the defendant complains that the testimony of SANE Nurse Kathy Bell about the statements K.A. made to her in her medical history during her sexual assault examination were unreliable and should not have been admitted.  He fails to allege how the statements of K.A. to Nurse Bell were unreliable.  The defendant acknowledges the trial court did not find the statement by K.A. to Nurse Bell to be unreliable.   The defendant also acknowledges the trial court overruled his objection at trial and admitted the statement to Nurse Bell under the medical treatment exception to the hearsay rule under § 2803(4) (Tr. III 159-160) (Brief of Appellant, p.39 n.7). That exception to the hearsay rule includes, "Statements made for purposes of medical diagnosis or treatment and describing medical history . . . ."  The defendant does not claim that K.A.'s statement to Nurse Bell does not fall under that exception.  There was no allegation at trial that Nurse Bell coerced K.A. into making the statement.    Nurse Bell testified that as part of the sexual assault examination, she took a history from K.A. where K.A. told her the defendant was giving her a massage. K.A. said he put his penis in her "butt hole." K.A. said she went outside behind a dumpster and then ran to her neighbor's house (Tr. III 159-160).

This was clearly admissible evidence describing medical history under § 2803(4). *See Frederick,* 2017 OK CR 12, ¶ 57, 400 P.3d at 808-809 (victim's statement to paramedic admissible under § 2803(4) as statement made for the purposes of medical treatment); *Moore v. State*, 1988 OK CR 176, ¶ 39, 761 P.2d 866, 873 (statement made to emergency room nurse as part of victim's medical history properly admitted under § 2803(4)).  As such, the trial court did not abuse its discretion by admitting the testimony of Nurse Bell.

**C.    Impeachment of K.A. by her prior testimony**

The defendant next claims the trial court erred by allowing the State to impeach the trial testimony of K.A. with her prior inconsistent testimony at the first preliminary hearing.  The defendant claims that because the trial court remanded the case for a new preliminary hearing that somehow made the preliminary hearing testimony of K.A. unavailable to impeach her trial testimony. There was no such provision in the order of the trial court remanding the case for a new preliminary hearing (O.R. 338-339).

Under the Oklahoma Rules of Evidence, any party may impeach its own witness. 12 O.S.2011, § 2607;  *Stiles v. State*, 1999 OK CR 19, ¶ 6, 989 P.2d 955, 958. Furthermore, that party may impeach its witness by introducing extrinsic evidence of prior inconsistent statements of that witness, provided that the witness "is afforded an opportunity to explain or deny the same and the opposite

30

party is afforded an opportunity to interrogate the witness thereon." 12 O.S.2011,

§ 2613(B); *Stiles*, 1999 OK CR 19, ¶ 6, 989 P.2d at 958.

The State called K.A. as its witness. To say K.A. was a hostile witness is an

understatement. She was obviously trying to save the defendant from conviction.

She testified at trial that she did not want to be there (Tr. II 217-218). She

repeatedly testified that she did not remember what she said in her prior

testimony (Tr. II 230-231, 232, 237-238, 242, 246-247, 249, 251, 253, 255, 259-

260, 261-262, 263-264, 268, 270-271). The prosecutor then impeached K.A. by

questioning her about her prior inconsistent statements at the preliminary

hearing (Tr. II 230-288). The trial court gave the jury a contemporaneous

instruction that the impeachment evidence could only be used in determining

what weight and credibility to give to the testimony of K.A. at trial and that the

impeachment evidence was not proof of guilt (Tr. II 235-236).

It was obvious that K.A. was trying very hard to distance herself from her

preliminary hearing testimony where she testified the defendant put his penis in

her butt while he was giving her a massage (P.H. Tr. I, 23-25). Accordingly, the

trial court did not abuse its discretion by allowing K.A. to be impeached with her

prior inconsistent statements from her preliminary hearing testimony. *See Omalza

v. State*, 1995 OK CR 80, ¶¶ 47, 49, 911 P.2d 286, 302 (noting that inconsistent

statements can be used for impeachment after witness testifies and offered chance

to explain discrepancy); *United States v. Owens*, 484 U.S. 554, 564, 108 S. Ct.

838, 845, 98 L. Ed. 2d 951 (1988) (witness admitted *memory loss* before inconsistent statements admitted). The prior inconsistent testimony of K.A. at the preliminary hearing clearly calls into question her credibility while testifying at trial.

In *Douglas v. State*, 1997 OK CR 79, ¶ 88, 951 P.2d 651, 676, the State called a witness to testify regarding a shooting outside her apartment. On the stand, she claimed she could not recall anything. The State then called a police officer who testified to the statements she made in the interview after the shooting. *Douglas*, 1997 OK CR 79, ¶ 88, 951 P.2d at 676. On appeal, the appellant claimed the officer's testimony was impermissible hearsay. This Court rejected that argument, holding the testimony was offered for impeachment purposes and thus was properly admitted. *Douglas*, 1997 OK CR 79, ¶ 89, 951 P.2d at 676.

Evidence that K.A. changed her story between the time of the first preliminary hearing and trial, over four years later, was probative on the issue of the defendant's guilt. It allowed the jury to determine if K.A. was being truthful when giving her testimony at the preliminary hearing — less than four months after the sexual assault while she was in DHS custody — or when testifying over four years later — when she was back in her mother's custody and had repeated contacts with the defendant awaiting trial — and denied that the sexual assault occurred. *See Warner*, 2006 OK CR 40, ¶ 30, 144 P.3d at 862 (relevant evidence

is that which makes a material fact more or less probable than it would be without the evidence (citing 12 O.S.2011, § 2401)).

Accordingly, the defendant fails to show the trial court abused its discretion by allowing the testimony of Ms. Sanford and Nurse Bell under well established exceptions to the hearsay rule or by allowing the State to impeach K.A. with her prior inconsistent statements from the first preliminary hearing. Accordingly, this proposition must fail.

## PROPOSITION IV

### THE DEFENDANT'S STATEMENT TO POLICE OFFICERS AT HIS PARENTS' HOUSE WAS NOT TAKEN IN VIOLATION OF HIS FIFTH AMENDMENT RIGHT AGAINST SELF-INCRIMINATION WHERE HE WAS NOT IN POLICE CUSTODY.

In his fourth proposition of error, the defendant claims his interview by Tulsa police at his parents' house on the day of the sexual assault was taken in violation of his Fifth Amendment right against self-incrimination because he was not advised of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). The State maintains it was not a custodial interrogation where the defendant was at his parents' house, the police were invited inside the house and the defendant was not in police custody.

The trial court in the present case conducted a hearing to determine the admissibility of the defendant's statement under *Jackson v. Denno*, 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964). The trial court found the defendant was

not in police custody when he was questioned by police at his parents' house (Tr. III 204). This Court has held when a trial court finds in a *Jackson v. Denno* hearing that a statement was made voluntarily and not in violation of *Miranda*, the Court will not disturb the trial court's ruling when it is supported by the evidence. *Johnson v. State*, 2012 OK CR 5, ¶ 15, 272 P.3d 720, 727; *Burnett v. State*, 1993 OK CR 26, ¶ 13, 853 P.2d 226, 231. The evidence in this case clearly supported a finding that the defendant was not in police custody at his parents' house when he was interviewed by the police, where he was not arrested before or after the interview, and that his statements were voluntary.

Detective Mark Hodges and two other Tulsa police officers located the defendant at his parents' house in Tulsa on the day of the sexual assault. Det. Hodges and Det. Greg Smith were wearing detective uniforms when they went to the door of the parents' house and asked to speak to the defendant. The defendant's father invited them into the house and the defendant agreed to speak to them in the living room of the house. The interview was recorded (Tr. Sept. 25, 2016, 5-8; State's Exhibit 1).

At no time during the interview did the police threaten the defendant or promise him anything. The defendant was free to leave and the defendant was free to ask the police to leave. The defendant did not ask to end the interview or for the police to leave. The defendant was not under arrest nor was he arrested at the end of the interview. When the police asked to obtain a DNA sample from

the defendant, he talked to his father and said he wanted to talk to a lawyer first. The interview was then terminated, and the police left (Tr. Sept. 25, 2016, 10-13).

The defendant claims for the first time on appeal that he asked the police if he needed a lawyer (Brief of Appellant, pp.44-45). That claim is part of his Rule 3.11 Motion and is not properly before the Court at this time as more fully shown in Proposition V below. However, the defendant did testify at the *Jackson v. Denno* hearing when it was continued on September 28, 2016, but he did not claim that he asked if he needed a lawyer (Tr. Sept. 28, 2016, 40-54). In fact, the defendant testified that when the police asked if they could take a DNA sample from him he declined and asked for a lawyer. The defendant acknowledged that was the first time he asked for a lawyer during the interview (Tr. Sept. 28, 2016, 53-54). He specifically acknowledged on cross-examination that he did not ask for an attorney before the issue of the DNA came up (Tr. Sept. 28, 2016, 60).

The requirement of *Miranda* warnings is directed to "police interrogation while in **custody**. . ." *Id.* at 477 (emphasis added). The defendant was not in police custody while he was being voluntarily questioned at his parents' house. He was not arrested until weeks later (Tr. Sept. 28, 2016, 75). The purpose of *Miranda* warnings is to protect a suspect against the compulsion to incriminate himself arising from an official **custodial** interrogation. *Battie v. Estelle*, 655 F.2d 692, 697 (5th Cir. 1981) (emphasis added).

35

The defendant was not handcuffed during the interview, he was not restrained in any way and he was free to leave.  He was not forced or coerced into talking to the police.  It is well established that *Miranda* rights cannot be invoked outside the context of custodial interrogation. *McNeil v. Wisconsin*, 501 U.S. 171, 182 n.3, 111 S. Ct. 2204, 2211 n.3, 115 L. Ed. 2d 158 (1991).  In *Glenn v. State*, 1988 OK CR 16, ¶ 7, 749 P.2d 121, 125, this Court held:

> Custodial interrogation is that questioning initiated by law enforcement officers after a person has been taken into custody or is otherwise deprived of his freedom in any significant way.

The defendant in the present case was not in police custody when he was questioned by the Tulsa police detectives.  The detectives did not threaten the defendant in any way.  The defendant acknowledged at the *Jackson v. Denno* hearing that he did not ask for a lawyer until the detectives asked him for a DNA sample.  The police then terminated the interview and left (Tr. Sept. 28, 2016, 10-13, 40-54, 60).  These facts do not show a defendant who was in police custody or was deprived of his freedom by the police.  The evidence shows the opposite of an individual who was coerced into making a statement or deprived of his liberty by the police.

The fact the defendant was not in police custody was further shown when he was not arrested after the interview.  If he was truly in police custody, he would not have been allowed to walk away after admitting to giving a massage to a naked

11-year-old girl and putting his thumb in her anus.  The defendant was not arrested until weeks later (Tr. Sept. 28, 2016, 75).

Finally, the defendant claims his constitutional rights were violated by the taking of his statement, and he was prejudiced by the use of the statement at trial.  The State maintains the statement was not the result of a custodial interrogation as outlined above and therefore did not violate his *Miranda* rights. However, even if the statement was taken in violation of *Miranda*, and the State does not concede that point, any error was harmless due to the overwhelming evidence of the defendant's guilt as shown in the Statement of Facts, *supra*. *Frederick v. State*, 2001 OK CR 34, ¶ 93, 37 P.3d 908, 934;  *Jackson v. State*, 2001 OK CR 37, ¶ 9 n.3, 41 P.3d 395, 397 n.3;  *Webb v. State*, 1988 OK CR 216, ¶ 7, 763 P.2d 115, 116.  As such, the defendant fails to show the trial court abused its discretion by allowing his statement to police to be admitted into evidence. Therefore, this proposition of error must fail.

<u>**PROPOSITION V**</u>

**THE DEFENDANT WAS NOT DENIED EFFECTIVE ASSISTANCE OF COUNSEL.**

The defendant asserts in his fifth proposition of error that he was denied effective assistance of trial counsel because of counsel's failure to make a record about his decision not to call witnesses because of the prosecutor's alleged threat to file perjury charges against defense witnesses if they testified.  The defendant claims trial counsel did not call his mother, Mary Zilm, his fiancé, Kristina

37

Alvarez, and the defendant as witnesses because of the alleged chilling effect the prosecutor's comments had on the defense (Brief of Appellant, pp.47-51). The record, however, shows the only witness the defense decided not to call was P.A., the juvenile sister of K.A. There was no mention of not calling other witnesses because of the alleged chilling effect of the prosecutor's comments regarding P.A. (Tr. IV 40-42). There was no mention by the prosecutor of potential perjury charges against any other defense witness (Tr. IV 32-36). The defendant fails to show deficient performance by trial counsel or that he was prejudiced by the alleged ineffective assistance of counsel regarding not calling these three witnesses raised for the first time on appeal. As previously shown in Proposition II(A), *supra*, the prosecutor did not threaten to file perjury charges against P.A. and there was no mention of the defense calling the other three witnesses.

In order to establish ineffective assistance of counsel, defendant must prove that counsel's performance was deficient and that such deficient performance prejudiced his defense. *Williams v. Taylor*, 529 U.S. 362, 390-391, 120 S. Ct. 1495, 1511-1512, 146 L. Ed. 2d 389 (2000); *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 874 (1984). The *Strickland* Court recognized the danger that "intrusive post-trial inquiry into attorney performance" could "encourage the proliferation of ineffectiveness challenges. Criminal trials resolved unfavorably to the defendant would increasingly come to be followed by

a second trial, this one of counsel's unsuccessful defense." *Strickland,* 466 U.S. at 690.

As this Court is well aware, since that time there have in fact been a proliferation of ineffectiveness challenges.  In two decisions handed down after *Strickland,* the Supreme Court again emphasized its finding under the Constitution that the *Strickland* standard is intended to be a tough standard for a defendant to meet on appeal:

> The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.

*Harrington v. Richter,* 562 U.S. 86, 105, 131 S. Ct. 770, 788, 178 L. Ed. 2d 624 (2011) (internal citations and quotation marks omitted); *see also Cullen v. Pinholster*, 563 U.S.170, 197, 131 S. Ct. 1388, 1408, 179 L. Ed. 2d 557 (2011) (quoting with approval *Richter*, 562 U.S. at 105).

Further, "while in some instances even an isolated error can support an ineffective-assistance claim if it is sufficiently egregious and prejudicial, it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy."  *Richter*, 562 U.S. at 111 (internal citations and quotation marks omitted).  "*[S]trickland* specifically commands that a court 'must indulge [the] strong presumption' that counsel 'made all significant decisions in the exercise of reasonable professional judgment'." *Pinholster*, 563

39

U.S. at 196 (internal citations omitted).  The record in this case shows that trial counsel's performance was not deficient under prevailing professional norms for defense counsel.  Trial counsel obtained a recantation from K.A., filed numerous motions on behalf of the defendant and tenaciously defended the case. Finally, with respect to the prejudice prong of *Strickland*, the High Court clarified in *Richter* that *"Strickland* asks whether it is **reasonably likely** the result [of the trial] would have been different" if counsel had acted differently. *Richter*, 562 U.S. at 111-12 (internal citations and quotation marks omitted) (emphasis added).  Defendant in the present case fails to show a "substantial likelihood" of a different result in his trial but for trial counsel's alleged deficient performance in this case. *See Pinholster*, 563 U.S. at 202 (defendant failed to show trial counsel's performance affected the outcome of his trial).  This Court has held that the prejudice determination is based upon whether the outcome of the trial would have been different but for defense counsel's unprofessional errors. *Bland*, 2000 OK CR 11, ¶ 112 n.11, 4 P.3d at 730 n.11.  This Court went on to hold that "when a claim of ineffective assistance of counsel can be disposed of on the ground of lack of prejudice, that course should be followed." *Id.*

**A.     Failure to call witnesses**

The defendant claims that trial counsel was ineffective by not calling his mother, Mary Zilm, his fiancé, Kristina Alvarez, and himself as witnesses because of the alleged chilling effect the prosecutor's comments had on the defense.  The

problem is that the comments by the prosecutor he complains about were about K.A.'s minor sister, P.A. As previously shown in Proposition II(A) *supra*, the prosecutor did not threaten P.A. with perjury but merely pointed out the potential peril she faced if she presented perjured testimony to the court. The defendant was not prevented from presenting the testimony of P.A. The trial court ruled that it would allow P.A. to testify (Tr. IV 41). Trial counsel announced that he would not be calling P.A. based on the "veiled threats of perjury charges" (Tr. IV 41). The court did not take the statements of the prosecutor to be threats of perjury charges and told trial counsel, "But Mr. Smallwood, you do what you feel is best for your case. I have ruled that she can testify. And you use your best decision on going forward on how you wish to proceed in your case" (Tr. IV 41). More importantly there was no mention of the defendant wanting to call the three witnesses he raises now for the first time on appeal (Tr. IV 40-42). There was certainly no threat of perjury charges made against any of them by the prosecutor (Tr. IV 32-36).

The defendant has tendered a Rule 3.11 Motion, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch.18, App. (2017) in support of this claim. Attached to his Rule 3.11 Motion are three affidavits: one each from the defendant, Mary Zilm and Kristi Shaneck, a.k.a. Kristina Alvarez. The defendant claims those affidavits show important information for the defense that each of the witnesses would have provided if called at trial (Exhibits to Motion for Evidentiary

41

Hearing under Rule 3.11, tendered December 18, 2017). An evidentiary hearing is not warranted by the facts of this case where it appears the defendant's allegations can be resolved on the available record.

A review of the record and the defendant's motion for evidentiary hearing fails to show ineffective assistance of counsel. The defendant has not rebutted the strong presumption of regularity of trial proceedings and competency of trial counsel by clear and convincing evidence to warrant an evidentiary hearing. The defendant has tendered for filing a Motion for Evidentiary Hearing on his claim of ineffective assistance of counsel under Rule 3.11. However, all references to that motion, and attachments thereto, are not a proper part of the appellate record and are not before the Court as part of the appeal at this time. *See* Rule 3.11(C), *Rules of the Court of Criminal Appeals*, Title 22, Ch 18, App. (2017); *Dewberry*, 1998 OK CR 10, ¶ 9, 954 P.2d at 776.

This Court's Rule 3.11 provides the standard the defendant must satisfy in order to obtain an evidentiary hearing for an ineffective assistance claim based on non-record evidence. For an evidentiary hearing to be ordered on such a claim, Rule 3.11 requires that "the application and affidavits must contain sufficient information to show this Court by clear and convincing evidence there is a strong possibility trial counsel was ineffective for failing to utilize or identify the complained-of evidence." Rule 3.11(B)(3)(b)(i), *Rules of the Oklahoma Court of*

*Criminal Appeals*, Title 22, Ch.18, App. (2016)(emphasis added); *Simpson v. State*, 2010 OK CR 6, ¶ 53, 230 P.3d 888, 905-906.

The defendant fails to show it reasonably likely the result of trial would have been different if trial counsel had utilized these three witnesses at trial. He claims his mother's testimony "could have corroborated the fact that Zilm actually did ask the detectives whether he needed a lawyer, and their answer that he did not" (Brief of Appellant, p.48). The problem with that assertion is that if Mrs. Zilm had testified to that effect, her testimony would have been impeached by the defendant's own testimony at the *Jackson v. Denno* hearing that he did not ask for a lawyer until the detectives asked him if they could take a DNA sample. The defendant testified at the *Jackson v. Denno* hearing that when the police asked if they could take a DNA sample from him he declined and asked for a lawyer. The defendant acknowledged that was the first time he asked for a lawyer during the interview (Tr. Sept. 28, 2016, 53-54). He specifically acknowledged on cross-examination that he did not ask for an attorney before the issue of the DNA sample came up (Tr. Sept. 28, 2016, 60). Furthermore, even if the defendant did ask if he needed a lawyer at the beginning of the interview, and the record does not support that he asked such a question, that was not an unequivocal invocation of the right to counsel. *Thrasher v. State*, 2006 OK CR 15, ¶ 13, 134 P.3d 846, 850; *Parker v. State*, 1996 OK CR 19, ¶ 9, 917 P.2d 980, 983-984. This Court found in *McHam v. State*, 2005 OK CR 28, ¶¶ 28-30, 126 P.3d 662, 671-

672, that the defendant's question, after advisement of *Miranda* rights, "This is a murder case. Don't I need a lawyer" was not an unequivocal invocation of the right to counsel:

> The United States Supreme Court has held that the "primary protection" afforded those subject to custodial interrogation is the *Miranda* warnings themselves; once a suspect has been advised of his right to deal with police only through counsel, interrogation may continue unless the suspect invokes that right unequivocally. To hold otherwise would unnecessarily hamper legitimate police investigation, as officers "would be forced to make difficult judgment calls about whether the suspect in fact wants a lawyer even though he has not said so, with the threat of suppression if they guess wrong." *Davis v. United States,* 512 U.S. 452, 461, 114 S. Ct. 2350, 2356, 129 L. Ed. 2d 362 (1994); *see also Edwards v. Arizona,* 451 U.S. 477, 485, 101 S. Ct. 1880, 1885, 68 L. Ed. 2d 378 (1981).

*McHam*, 2005 OK CR 28, ¶ 30, 126 P.3d at 672.

Therefore, even if Mrs. Zilm testified that the defendant asked if he needed lawyer, it was not an invocation of the right to counsel. As such, the defendant fails to show prejudice by his mother not being called as a witness.

The defendant also claims trial counsel was ineffective for failing to call himself or Ms. Alvarez to testify about his alleged medical problem regarding "leakage" of seminal fluids to corroborate his explanation to the police about how his DNA might be found on K.A.'s body. Again, the defendant fails to show that the prosecutor threatened perjury against him or Ms. Alvarez if they testified at trial. As such, he was not prevented from calling them at trial. Moreover, it was

a sound strategic decision not to call the defendant as a witness at trial.  He would have been subject to cross-examination about his interview with the police and the admissions he made in that interview along with the facts of the crime.  The defendant would no doubt now be claiming ineffective assistance of counsel if trial counsel *had* put him on the witness stand.  In fact, the defendant affirmatively waived his right to testify.

The defendant stated under oath at trial that he did not want to testify.  The defendant testified that he was 35-years-old and had an associate's degree.  He was not under the influence of drugs or alcohol.   The defendant said he understood his right to testify and that he had discussed it with his attorney.  The defendant said he did not wish to testify and acknowledged that no one had threatened him or promised him anything to give up his right to testify  (Tr. IV 59-61).

Likewise, if trial counsel had called Ms. Alvarez as a witness she would have been subject to extensive cross-examination about her continued relationship with the defendant after the sexual assault.  Cross-examination of Ms. Alvarez would have emphasized the fact she moved the children to Arkansas, allowed the defendant to spend weekends with her and the children in Arkansas, brought the children to the tanning salon where she worked and where the defendant frequented, and that she continued her plan to marry the defendant after the trial despite the allegations against him by her daughter (Tr. IV 33-35).  Furthermore,

there was no DNA from the defendant found on K.A. (Tr. III 163-165; Tr. IV 48-51). Based on those facts, it was a reasonable trial strategy not to call the defendant or Ms. Alvarez as witnesses for the defense. *See Malone*, 2013 OK CR 1, ¶ 19, 293 P.3d at 207 (strategic decisions of trial counsel are "virtually unchallengeable" on appeal (citing *Strickland*, 466 U.S. at 690-691)).

Recall, the standard for prejudice is, whether there is a "substantial" likelihood of a different result. *Richter*, 562 U.S. at 112. Defendant has not made such a showing. *See Hancock v. State*, 2007 OK CR 9, ¶¶ 111-113, 155 P.3d 769, 822 (rejecting, among other claims, an assertion that counsel failed to properly utilize a 911 call and police reports to impeach the State's witness who reported the shooting, and reasoning, "Imaginative criticisms of trial counsel's performance issue all too readily from the gainful vantage of a zealous hindsight."); *Goulsby v. State*, 1987 OK CR 184, ¶ 13, 742 P.2d 567, 572 (choosing to stress one defense, where two defenses were arguable, was a valid defense tactic); *Phillips v. State*, 1982 OK CR 136, ¶ 9, 650 P.2d 876, 879 ("The fact that another attorney would have pursued a different strategy does not establish ineffectiveness or incompetency of counsel."). *See also Romano v. Gibson*, 278 F.3d 1145, 1154 (10th Cir. 2002) ("There are countless ways to provide effective assistance in any given case[,]' and '[e]ven the best criminal defense attorneys would not defend a particular client in the same way.'" (citing *Strickland*, 466 U.S. at 689)).

Finally, the defendant provides no affidavit with his Rule 3.11 Motion from any medical professional to verify his alleged "leakage" problem.

Accordingly, the defendant fails to show deficient performance, much less prejudice by trial counsel's failure to call his mother, his fiancé or himself as witnesses at trial.

**B.    Conclusion**

This Court has held it will view a claim of ineffective assistance of counsel based on the facts of the case from the perspective of the trial "viewed as of the time of the counsel's conduct." *DeLozier v. State*, 1998 OK CR 76, ¶ 46, 991 P.2d 22, 31. It is all too easy to Monday morning quarterback months or years after the trial and attempt to pick apart defense counsel's trial strategy. When viewed in the proper perspective from the time of the trial, the Court asks if the conduct was professionally unreasonable. If there is an error, it must be so egregious that it indicates deficient performance by counsel, "[f]alling outside the wide range of reasonable professional assistance." *Id.* "Many significant errors will not meet this highly demanding standard." *DeLozier*, 1998 OK CR 76, ¶ 46, 991 P.2d at 31. As the Supreme Court has repeatedly held, there are many different ways to defend a case that meet the *Strickland* standard. *Richter*, 562 U.S. at 106; *Strickland*, 466 U.S. at 689.

In the case at hand, counsel's overall performance indicates capable advocacy. The defendant was represented by an experienced trial counsel. Trial

47

counsel faced an uphill battle considering the strong evidence of the defendant's guilt as shown in the Statement of Facts, *supra*.   Trial counsel filed numerous motions on behalf of the defendant, obtained a recantation by the victim, got a second preliminary hearing for the defendant and extensively cross-examined the State's witnesses.   The jury obviously did not find K.A.'s recantation to be persuasive in light of her contemporaneous statements to Ms. Sanford and Nurse Bell to the contrary.  The defendant fails to show how trial counsel not calling the witnesses outlined above prejudiced the result of the trial.  *See Stouffer*, 2006 OK CR 46, ¶ 190, 147 P.3d at 278 (defendant was not prejudiced by the alleged ineffective assistance of counsel in light of the overwhelming evidence of his guilt).

The defendant has failed to succeed at the difficult task of surmounting *Strickland's* high bar as reiterated by the Supreme Court in *Richter*.  The defendant has failed to establish a substantial likelihood of a different result in trial but for counsel's alleged errors. *Richter*, 562 U.S. at 112.  Therefore, the defendant is not entitled to relief and this claim is without merit.

**PROPOSITION VI**

**THERE WAS NO CUMULATIVE ERROR**.

In his final proposition of error, the defendant contends that the alleged cumulative errors in his case require reversal of his conviction. For the reasons previously discussed, the State maintains there were no errors to accumulate.  A cumulative error argument has no merit when this Court fails to sustain any of

48

the other errors raised on appeal. *Engles v. State*, 2015 OK CR 17, ¶ 13, 366 P.3d 311, 315.  Cumulative error applies when "several errors" occur at trial. *Hanson v. State*, 2009 OK CR 13, ¶ 55, 206 P.3d 1020, 1035.

Moreover, even where there are multiple errors, they will not require reversal where the cumulative effect did not deny the defendant a fair trial.  The alleged errors identified in this case, even considered in the aggregate, did not render his trial fundamentally unfair.  *Postelle v. State,* 2011 OK CR 30, ¶ 94, 267 P.3d 114, 146; *Mitchell*, 2010 OK CR 14, ¶ 129, 235 P.3d at 665.  As such, this proposition of error must be denied.

## **CONCLUSION**

The defendant's contentions have been answered by both argument and citations of authority.  The State contends that no error occurred which would require reversal or modification and, therefore, respectfully requests that the judgment and sentence be affirmed.

Respectfully Submitted,

**MIKE HUNTER**
**ATTORNEY GENERAL OF OKLAHOMA**


By:_____
**DONALD D. SELF, OBA # 8062**
**ASSISTANT ATTORNEY GENERAL**

313 N.E. 21st Street
Oklahoma City, Oklahoma 73105
(405) 521-3921
Fax (405) 522-4534

**ATTORNEYS FOR APPELLEE**

**CERTIFICATE OF SERVICE**

      I hereby certify that a true and correct copy of the above and foregoing Brief of Appellee was mailed this 19th day of March  2018, by depositing it in the U.S. Mails, postage prepaid to:

James L. Hankins
Attorney at Law
929 N.W. 164th St.
Edmond, OK 73013

_____
DONALD D. SELF

50