No. _____

# In the Supreme Court of the United States

---

ADAM CLAYTON ZILM,

*Petitioner,*

v.

THE STATE OF OKLAHOMA,

*Respondent.*

---

*On Petition for a Writ of Certiorari to the
Oklahoma Court of Criminal Appeals*

---

## PETITION FOR A WRIT OF CERTIORARI

---

James L. Hankins
  *Counsel of Record*
TIMBERBROOKE BUSINESS CENTER
929 N.W. 164th St.
Edmond, Oklahoma 73013
Telephone: 405.751.4150
Facsimile: 405.445.4956
E-mail: jameshankins@ocdw.com

*Counsel for Petitioner*

---

Becker Gallagher · Cincinnati, OH · Washington, D.C. · 800.890.5001

EXHIBIT 9

i

## QUESTIONS PRESENTED FOR REVIEW

Petitioner was convicted of child sex abuse. However, the minor complaining witness recanted the allegation, more than once under oath and without prompting, and the state district court found as a matter of fact that state actors had coerced her pre-trial testimony at the preliminary examination. The State nevertheless used this coerced testimony at trial against Zilm. On appeal, Zilm argued that the State violated his Due Process rights by using false testimony to convict him under *Napue v. Illinois*, 360 U.S. 264 (1959). The Oklahoma Court of Criminal Appeals rejected this claim on the basis that Zilm had not shown that the testimony was "false." Zilm petitioned that court for rehearing, asking if he was required to show falsity by a preponderance, clear and convincing, beyond a reasonable doubt, or some other legal standard. The lower appellate court declined to answer this legal question. The questions presented is:

1. What is the burden of proof for the accused to show an error under *Napue*?

2. Did Zilm meet this burden?

2

## TABLE OF CONTENTS

QUESTIONS PRESENTED FOR REVIEW ...............i

TABLE OF AUTHORITIES .......................................iv

OPINION BELOW ......................................................1

JURISDICTION .........................................................1

CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED ...........................1

STATEMENT OF THE CASE.....................................1

STATEMENT OF THE FACTS ..................................3

    REMAND & RELIABILITY HEARING................5

        1.  REMAND FOR A SECOND PRELIMINARY EXAMINATION...............6

        2.  THE RELIABILITY HEARING. ...............10

    THE TRIAL .........................................................13

REASONS FOR GRANTING THE WRIT ................22

CONCLUSION .........................................................24

APPENDIX

Appendix A  Summary Opinion in the Court of Criminal Appeals of the State of Oklahoma (September 6, 2018) . . . . . . . . . . . App. 1

Appendix B  Judgment and Sentence in the District Court in and for Tulsa County, Oklahoma, No. CF-2012-3037 (January 20, 2017) . . . . . . . . . . . App. 16

iii

Appendix C Opinion in the Court of Criminal
Appeals of the State of Oklahoma, No.
S-2104-812
(August 6, 2015) . . . . . . . . . . . . App. 24

Appendix D Order Denying Petition for Rehearing
in the Court of Criminal Appeals of
the State of Oklahoma
(November 7, 2018) . . . . . . . . . . App. 33

4

## TABLE OF AUTHORITIES

**CASES**

*Giglio v. United States*,
  405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104
  (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Miller v. Pate*,
  386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967)  22

*Mooney v. Holohan*,
  294 U.S. 103, 55 S.Ct. 340, 79 L.Ed.2d 791
  (1935) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Napue v. Illinois*,
  360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217
  (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . i, 1, 22

*Pyle v. Kansas*,
  317 U.S. 213, 63 S.Ct. 177, 87 L.Ed.2d 214
  (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Antone*,
  603 F.3d 566 (5th Cir. 1979) . . . . . . . . . . . . . . . . . . 23

*United States v. Rangel*,
  519 F.3d 1258 (10th Cir. 2008) . . . . . . . . . . . . . . . . 23

**CONSTITUTION**

U.S. Const. amend. XIV . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**STATUTES**

28 U.S.C. § 1254(1) . . . . . . . . . . . . . . . . . . . . . *passim*

5

Adam Clayton Zilm petitions respectfully for a writ of certiorari to review the judgment of the Oklahoma Court of Criminal Appeals.

## OPINION BELOW

The Oklahoma Court of Criminal Appeals issued an unpublished Summary Opinion in this case on September 6, 2018. *See* attached Appendix "A" (*Adam Clayton Zilm v. State of Oklahoma*, No. F-2017-69 (Okl.Cr., September 6, 2018)). The court subsequently denied Zilm's petition for rehearing on November 7, 2018, in an unpublished Order Denying Petition for Rehearing. *See* attached Appendix "D."

## JURISDICTION

The judgment of the Oklahoma Court of Criminal Appeals was entered on September 6, 2018, and rehearing was denied by that court on November 7, 2018. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1254(1).

## CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED

The Fourteenth Amendment to the Constitution provides, in relevant part:

No State shall...deprive any person of life, liberty, or property, without due process of law.

## STATEMENT OF THE CASE

Zilm was charged by felony Information in Tulsa County, State of Oklahoma, on July 12, 2012, with a single count of Sexual Abuse–Child Under 12. Preliminary examination was held before the Hon.

2

David Youll, Special Judge of the District Court in Tulsa County on September 26, 2012. At the conclusion of the evidence, Judge Youll overruled the defense demurrer and bound Zilm over the trial.

However, state district judge Kurt Glassco ruled on October 7, 2013, from the bench–followed up by a written Order filed October 8, 2013–that State agents had exercised unreasonable influence over the minor complaining witness, K.A., ordered that the preliminary examination was a nullity, and ordered the case remanded for a new preliminary examination.

The second preliminary examination was held on November 6, 2013, before the Hon. Clifford Smith, Special District Judge of the District Court of Tulsa County. At the conclusion of the evidence, the Court overruled the demurrer of the defense and bound Zilm over for trial.

Prior to trial, a hearing was held before the Hon. Kurt Glassco concerning the reliability of statements made by K.A., the principal complaining witness, and the efforts of the defense to suppress them. At the conclusion of the hearing on September 12, 2014, Judge Glassco ruled that the hearsay statements of K.A. to forensic interviewer Amy Howard and to neighbor Katherine Sanford lacked sufficient indicia of reliability and ordered them suppressed.

The State appealed this ruling to the Oklahoma Court of Criminal Appeals, which on August 6, 2015, issued a written, but unpublished Opinion affirming the trial court's order of suppression of the hearsay statements. See appendix "C."

3

Jury trial began in the courtroom of Judge Glassco on November 14, 2016, and concluded on November 18, 2016, when the jury found Zilm guilty and recommended sentence of 36 years. Formal sentencing was had on January 20, 2017, at which Judge Glassco sentenced Zilm in accordance with the verdict of the jury.

Zilm filed notice of intent to appeal and designation of record on January 20, 2017. The Oklahoma Court of Criminal Appeals denied relief on direct appeal on September 6, 2018. The court also denied Zilm's petition for rehearing on November 7, 2018.

### STATEMENT OF THE FACTS

This case involves allegations by Zilm that four state actors, including the prosecutor, coerced the minor complaining witness to give false testimony.

The case began on June 4, 2012, with Katherine Sanford, who lived in Tulsa, Oklahoma. Tr. III 121-25. Sanford was employed by DHS, but was suffering from Lyme disease, which attacks her brain (she had five brain lesions, including one on her brain stem) and made remembering things difficult. *Id.*; 130-31.

Nevertheless, she remembered that on this date that one of her neighbors lived across the street and two doors down with her boyfriend and children (and the boyfriend even came over one day to introduce himself). The boyfriend, and fiancee, was Adam Zilm. *Id.*

One of the children, who was 11-years-old at the time, was K.A. *Id.*

4

On June 4, 2012, at approximately 6:00 a.m., someone knocked on Sanford's door, Sanford instructed her roommate to open it, and it was K.A., who was upset, crying, shaking, and soaking wet. *Id.* According to Sanford, K.A. was upset because she believed that she had been sexually assaulted by Zilm ("She said that he tried to put [his penis] in her butt.") *Id.* 133.

Sanford called K.A.'s mother, and eventually the police. *Id.* 133-35. As Zilm pointed out in the state courts below, Sanford, no doubt, did the right thing in contacting the police, which initiated the investigation into what exactly happened to cause such a reaction by K.A. K.A. was clearly upset by something, but *what exactly had occurred*?

This was the question at issue at trial.

According to the State, Zilm, who was an experienced licensed masseuse who made his living as a massage therapist, gave K.A. a massage earlier that morning and had sexually assaulted her in the process. Tr. II 185-90 (State's opening statement).

In contrast, the defense pointed out that Zilm had no priors, was a certified massage therapist, was a caring father to the kids, including K.A., had never asked to massage any of the children, and gave massages to K.A. at her request on two occasions just as a normal massage therapist would with a client. Tr. II 205-10.

Also, as it turned out, K.A. had been sexually abused in the past, when she was 5-years-old by a "shirttail uncle" while living in Louisiana (a case that was not prosecuted, nor was the uncle punished). *Id.* On the night in question, K.A. drifted off to sleep

5

during the massage (a common thing), and she had a nightmare about being sexually abused by "uncle David" in Louisiana (which was a common occurrence for K.A.), and she reacted to a jab in her rear-end area and awoke, which prompted Zilm to say, "Oh, I'm sorry, sweetheart, did that hurt?"  Tr. II 210.

After the massage, Zilm went to sleep, but K.A. was still confused about what was real and what was a dream, which is why she ended up at Sanford's house. In fact, she knew Zilm had not abused her, knew his character, knew that she had made a mistake, and she recanted (unprompted by Zilm or anyone else) on her own almost immediately after the event, saying, "I'm sorry.  I told something that didn't happen." Tr. II 211-16.   Nor was there any DNA evidence corroborating the State's theory of the case that K.A. had in fact been sexually assaulted by Zilm.  *Id.*

In fact, to this day, K.A. is adamant that Zilm did nothing inappropriate.

Despite the fact that K.A. recanted, continued to assert that the entire episode was a misunderstanding, and there was no DNA evidence to support her initial statement, the first witness called by the State at the jury trial was K.A.  Tr. II 217.

## REMAND & RELIABILITY HEARING

As Zilm did in the courts below, it is helpful to provide to the Court some pre-trial background before delving into the testimony of K.A. at trial.

Several pre-trial matters were litigated regarding the statements of K.A., and the resolution of those matters by the trial court, and the Oklahoma Court of

6

Criminal Appeals via a pre-trial State appeal, inform this Court's assessment of K.A.'s trial testimony and the actions of State officials.

1.  REMAND FOR A SECOND PRELIMINARY EXAMINATION.

First, in the earlier pre-trial proceedings, defense counsel moved to dismiss or remand for a new preliminary examination after it had come to light that the State had failed to divulge exculpatory evidence.

At the first preliminary hearing before Judge Youll, there were quite a bit of leading questions by the prosecutor, but the gist of the testimony by K.A. was that, during a massage that she had received from Zilm, he had placed his penis inside her anus. Tr. 09/26/2012 at 24-25.

Clearly, such testimony was evidence of a serious crime. But, as it turned out, K.A. had asserted that four State agents–including prosecutor Sarah McAmis–coerced her into testifying that way even though she wanted to recant and set the record straight. According to K.A., pressure, lies and coercion from State actors is the reason why she testified to being anally penetrated by Zilm at the first preliminary examination.

It turned out that these accusations were true.

After this first preliminary examination, defense counsel had become aware that K.A. had recanted the allegation; and that the recantation had occurred the day after the incident, or possibly the next day, when K.A. had taken it upon herself, unprompted by anyone, to call Zilm and apologize for making a mistake, and

7

that she had misconstrued his actions that night. Defense counsel only learned about this recantation from K.A.'s mother, Kristi Alvarez, and upon his review of the court file in a parallel juvenile case.  O.R. 302.

This is important because some of the relevant facts spill over into the DHS/juvenile case regarding custody of K.A. and the other children, and the prosecutor had failed to divulge any of it either to the court or the defense; it was discovered only through the efforts of defense counsel who had to litigate the issue to obtain the DHS/juvenile court records.[1] Defense counsel noted pre-trial that DHS worker Lori Hannagan had written an affidavit in the juvenile case in which K.A. told Hannagan:

> "[K.A.] might have been mistaken Mr. Zilm might not have done anything. She just got scared and thought about the time when she was 5 and something like this happened to her."

O.R. 303 (in addition, Barbara Davis, the maternal grandmother of K.A. and Jessica Swinny-Raush, a friend of the natural mother, both informed counsel that shortly after the incident K.A. had disclosed to both of them that she had "lied" about what happened; and that she had confused the innocent actions of Zilm

---

[1] Defense counsel was allowed access to the juvenile file regarding the placement of the children, and it was in those files that he discovered–without any notice from the State–that K.A. had recanted 24 to 36 hours after the initial allegations.  Tr. IV 38.

8

with a nightmare that she was having of a prior instance of sexual abuse).[2]

Counsel took it upon himself to take a sworn statement from K.A., with a court reporter present on July 24, 2013, during which K.A. confirmed that she had recanted within a day or two of the incident. O.R. 304; O.R. 152 (sworn statement of K.A.).

K.A. also stated that she testified to the sexual assault by Zilm at the first preliminary examination only because she was told by Amy Howard (the forensic questioner from the juvenile center) that if she did not, then she might not be given back to the custody of her mother (at that time, K.A. had been placed in the custody of her uncle by the juvenile court). O.R. 304; O.R. 172-73 (Amy "told me to say what I said before and I'd get to go back to my mom and live with her again")[3]

More disturbing, it came to light that DHS worker Lauren Hall, who worked with the Alvarez children in the juvenile case, went to the home and spoke to each of the children prior to a hearing in juvenile court concerning placement of the children. O.R. 304. Hall

---

[2] Defense counsel was allowed by the trial court, Judge Glassco, who conferred with the Juvenile Court, Judge Fransein, to review the juvenile court records and take notes, but defense counsel was restricted to note-taking only, and was prohibited from making copies of any documents in the juvenile file. Tr. IV 36-37.

[3] During the sworn statement with defense counsel, K.A. stated that prior to the first preliminary examination she spoke to "I think that Amy girl." O.R. 172. In his moving papers, defense counsel clarified "that Amy girl" had to have been Amy Howard, the forensic questioner at the juvenile center. O.R. 326.

9

told K.A. that no one believed her recantation, and that everyone believed her first statement alleging sexual assault by Zilm, because DNA evidence proved the allegations.  O.R. 304.  This statement by Hall to K.A. was, of course, *provably false* because the State had provided DNA testing results proving that no male DNA was found on K.A.  O.R. 304.

Thus, after the first preliminary examination was held, there were serious questions surrounding the credibility of K.A., and the State regarding its *Brady* duties. As it turned out, the State had failed to disclose: 1) that Amy Howard coerced the child, K.A., into sticking with her original story by scaring the girl with the assertion that she had to do so in order to live her mother again; and 2) Lauren Hall coerced K.A. to stick with the original allegation by falsely telling this 11-year-old girl that DNA evidence proved that Zilm was guilty when Hall knew it was false.[4]

These facts did not fall on deaf ears in the state trial court.

Judge Glassco issued a written Order on October 8, 2013, finding as a matter of fact that prior to the

---

[4] The false statements made by Lauren Hall to K.A. about the DNA evidence were recorded by K.A. herself because she was so distrustful of DHS workers (*see* Defendant's Exhibit #1), and were listened to and relied upon by Judge Glassco in making his determination that the State had exercised unreasonable influence in this matter.  O.R. 338; Tr. IV 17-23; *see also* Tr. 09/09/2014 at 7 (defense counsel referencing the "direct lie" to K.A. told by Lauren Hall "which we've all heard on tape, telling her that nobody believes the second statement because there was DNA evidence to support the first statement.")

10

preliminary examination, State agents had "exercised unreasonable influence on the minor child "K.A." to secure testimony to which she had since recanted repeatedly." O.R. 339. This is the reason that the case was remanded for a second preliminary examination. *Id.*

Thus, prior to trial, we have evidence already that juvenile/DHS workers had coerced K.A. into sticking to her original story by lying to her about the existence of DNA evidence, and raising the specter in this child's mind that she would not get to live with her mother again if she insisted on recanting; and the prosecutor's office did not breathe a word of it to the defense prior to trial.

As bad as this was, there was still more, this time at the reliability hearing on the hearsay statements made by K.A.

2. THE RELIABILITY HEARING.

The State sought to introduce hearsay statements made by K.A. to Amy Howard (the "child specialist" at the Child Abuse Network) and Katherine Sanford (the neighbor to whom K.A. went directly after the incident). *See* Tr. 09/09/2014. Such a hearing is required under state law in order for the trial court to exercise its gate-keeping role whether to allow such hearsay.

At this hearing, the trial court heard testimony from both Howard and Sanford, and in an unusual procedure, from K.A. herself, who was subpoenaed by the defense, was represented by counsel, and who insisted on being heard. Tr. 09/09/2014 at 7 ("Judge, my client very much wants to give testimony to the

1

Court today.  Specifically regarding her belief that this
has been a mistake and her attempt to try to correct it,
her inability to do so...she wants to testify.")

The State objected to the trial court hearing
testimony from K.A., citing "a stack of case law to
argue" that the testimony of K.A. would not be proper,
but the trial court was not impressed and allowed it.
*Id.* 4, 118.

On the stand yet again in this case, K.A. insisted
yet again that Zilm did nothing wrong, that she had
told the neighbor (Sanford) only that she "had a
nightmare" and in fact had told all of this to the
prosecutor in the case, Sarah McAmis.  *Id.* 122-23.
K.A. pointedly told the trial court that Sarah McAmis
is the one who told her that if she said what she said in
the beginning (her original story implicating Zilm),
then "you can go back to your mom." *Id.* 124.  It is
important to note, and for this Court to realize, that
these accusations leveled against the prosecutor by
K.A. *were elicited from K.A. by questions posed by
Judge Glassco*, not defense counsel.

And it gets worse.

There was yet another juvenile case agent named
Lori Hannagan who told K.A. to explain her
recantation by blaming it on her mother.  According to
K.A., and remember that this is in response to
questioning by Judge Glassco and not defense counsel,
Hannagan told K.A. to just say that her mother told
her to say that nothing happened in order to explain
the recantation.  *Id.* 123-24; 127.

This was a conversation that occurred at the
juvenile shelter where Hannagan told K.A. to just say

12

it was her mother who told her to recant, that way K.A. could go back home to her mother and get out of the shelter. Tr. 127. In response, K.A. testified, "I just sat there. Didn't say anything to her." *Id*.

K.A. clarified that her mother had never told her to say any such thing. *Id*. 128.

It thus appears that Hannagan attempted to get K.A. to completely fabricate evidence in this case, and in a coercive way by tying the fabrication to K.A. being able to see her mother again.

After hearing the testimony of K.A. at this hearing, prosecutor Sarah McAmis made a record with the trial court that she "would never, could never, should never, have never, stated to this victim, or any other victim, that they should testify a particular way." *Id* 137. However, Judge Glassco had heard enough, and issued a ruling from the bench finding the hearsay statements made by K.A. to forensic interviewer Amy Howard and the neighbor Katherine Sanford to be *unreliable and therefore inadmissible*. Tr. 09/12/2014 at 16-18.

It is particularly noteworthy that Judge Glassco found Katherine Sanford *not* credible–that is, he ruled that the hearsay statements made by K.A. to Sanford were unreliable, but he also found Sanford, as a witness, to be not credible. According to Judge Glassco, he had "a very difficult time following the testimony of that witness. And she appeared to the Court to change her testimony as to what happened during the time that she was here." *Id*. 18.

Unhappy with this result, the State gave notice of intent to appeal. *Id*.

1

The State's appeal was heard by the Oklahoma Court of Criminal Appeals, which on August 6, 2015, issued a written, but unpublished, opinion *affirming* the ruling of Judge Glassco. O.R. 511. Thus, it was with this background that the trial proceeded before a jury.

## THE TRIAL

K.A. was the first witness called by the State. Tr. II 217.

She told the jury that she was then in the 9th grade, and in light of the foregoing background, in which she had spent years trying to convince authorities that the entire incident was a misunderstanding triggered by her prior abuse in a dream-state, and was repeatedly coerced and lied to by authorities to convince her to drop her recantation, K.A. was decidedly hostile to being in court testifying against Zilm. *Id.* 217-18 (she did not want to be in court and wanted the matter to simply go away).

Nevertheless, the State proceeded to question K.A. about her family background. Her mother was Kristi Shaneck, and she had three siblings: two sisters P.A. (16), G.A. (10), and a brother, E.A. (13). Zilm was her mother's fiancee and lived with them. *Id.* 217-28. When the police got involved, she was temporarily removed from the home, was eventually placed back with her mother, but was prohibited from having contact with Zilm. *Id.*

K.A. testified that at some point during the morning of June 4, 2012, she went outside and waited behind a dumpster, and that it was sprinkling a little bit. *Id.* 230. She went to the neighbor's house, did not

14

remember if they had a doorbell, but remembered them coming to the door. *Id.* 230-31. She then told them that, "I had a dream, like a nightmare." *Id.* 231.

Clearly, K.A. was not telling the prosecution what it wanted to hear, so the trial developed into a spectacle of the prosecutor impeaching the State's own minor complaining witness with prior testimony from the first preliminary examination–the one that had been declared a "nullity" because of the coercive actions of State actors influencing the testimony of K.A.  Tr. II 232.

At this attempt by the prosecutor to drag in the testimony of K.A. from the first preliminary examination, a bench conference ensued where defense counsel objected on the basis that the trial court had declared that first preliminary examination a nullity based upon improper coercion of K.A. by state actors, and this prompted a discussion of the opinion of the Court of Criminal Appeals and what it meant. *Id.* 232-35.

The trial court eventually allowed the State to impeach by using the first preliminary examination transcript, but with a contemporaneous instruction to the jury about the use of impeachment evidence. *Id.* 235.

Given the green light by the trial court, the State then proceeded to go into detail about what K.A. had testified to at the first preliminary examination–which featured coerced testimony that Zilm had used his penis to touch her anus during the massage–punctuated by objections of defense counsel. *Id.* 237-88; 243 (objections of defense counsel); 255

1

(objections by defense counsel); 264 (objections by defense counsel); 274 (objections by defense counsel).

In fact, during one bench conference, when the trial court allowed the prosecutor to continue using the prior "unreliable statements" made to Amy Howard to impeach K.A., defense counsel stated:

> In the face of two court rulings that that statement to Amy Howard was unreliable, the jury's not gonna know that, Judge, ever? What was the purpose of all these appeals?

Tr. II 256. The trial court ruled that the State would be allowed to use the statements as impeachment. *Id*. 256-57.

K.A. was insistent, despite being, in essence, cross-examined on direct by Ms. McAmis–the same prosecutor whom K.A. had accused of coercing her into sticking with her original story so that she could see her mother again–that there was no sexual contact, and that Zilm's "thumb accidentally jabbed me." Tr. II 250. K.A. testified that she told the neighbors that she had had a dream about what had happened to her when she was five. Tr. II 268.

Even at that point, immediately after the event when K.A. was at the neighbor's house, she testified that when the police arrived that her mom was crying, she was crying, and, "There were cops there. I was being told to say things. And I just had a nightmare." Tr. II 269.

On top of this, the prosecutor also was able to introduce statements made by the neighbor (Sanders). Tr. II 265. This "impeachment" was doubly dubious

16

because the trial court, and the OCCA, had not only
ruled the hearsay statements unreliable; but the trial
court had stated on the record that Sanders herself was
not a credible witness.  Tr. 09/12/2014 at 18.

In fact, K.A. told the jury that, "I was told what to
say." Tr. II 251.  She testified that DHS personnel had
told her what to say. Tr. II 282 ("They told me to tell
somebody that he [Zilm] had done that stuff to me, and
that my mom had talked to me and told me to say that
he didn't do it.")

She also reaffirmed, in front of the jury, that
prosecutor Sarah McAmis told her to stick with her
original story: "You [Ms. McAmis] told me after I told
the truth that he did not do anything to me, you told
me to go back to the story I had said before." Tr. II
284; 284-85 ("Okay.  And just so that I can make sure,
are you saying I [Ms. McAmis] told you what to say?
Yes."); Tr. II 285 ("And I think you guys think I'm not
telling the truth when I say he didn't do anything.")

K.A. was also asked by the prosecutor: "Do you still
consider [Zilm] your best friend?  Answer: Yes." Tr. II
287.  She testified that Zilm was important in her life,
a relief from her own abusive biological father, and that
Zilm had never treated her or her siblings
inappropriately.  Tr. III 9-25.  At the conclusion of the
direct examination by the State, and after the jury had
been dismissed, K.A. asked the trial court if she could
hug Zilm. Tr. III 3-5.  This request was denied. *Id*. 4-
5.

On cross-examination, K.A. told the jury about how
she was victimized sexually by "uncle David" when she
was 5-years-old, that he was never dealt with and that

1

no one had believed her, and that she had recurring nightmares over that incident that counseling did not help.  Tr. III 26-30.

On June 4, 2012, she had fallen asleep during a massage from Zilm and had one of the recurring nightmares about uncle David. Tr. III 30. She was face-down when she awoke, felt a jab around her private area, and told Zilm to stop the massage, and he did so.  *Id*. 26-30.  She never saw Zilm's private parts, he never exposed himself to her, and she left the house because she was still in her nightmare-related confusion.  *Id*.  When she realized that she had made a mistake in thinking that Zilm had done something to her she, unprompted, called Zilm and said that she had been mistaken and was sorry, and Zilm reassured her that it was okay.  Tr. III 31-35.

Faced with a key witness who not only recanted her allegations against Zilm, but affirmatively accused state officials–including the prosecuting attorney–of pressuring her to testify a certain way, the State attempted to explain this situation through the testimony of Rose Turner, the Managing Director at the Child Abuse Network, part of the Children's Advocacy Center in Tulsa County, who explained to the jury the concept of "Child Sexual Abuse Accommodation Syndrome."  Tr. III 51-57.

Defense counsel objected on the basis that this Court had not accepted such testimony, and it was irrelevant in any event under the circumstances of this case.  Tr. III 50.

These objections were overruled.  *Id*.

18

Child Sexual Abuse Accommodation Syndrome is based upon research done in the 1980's by Dr. Roland Summit. Tr. III 59. Characteristics such as helplessness, secrecy, delayed disclosure, and "accommodating" the abuser because of feelings for that person and sometimes there is a recantation. *Id*. 59-61. Turner, of course, had to admit that the "syndrome" is not like a medical diagnosis, and that there may be other causes for these behaviors, and just because a child exhibits these behaviors it does not mean that sexual abuse had occurred. *Id*.

At this point, defense counsel again objected on the basis of relevancy, and pointed out that there was no evidence establishing any relevance to the evidence in this case, nor any evidence with respect to secrecy, or feelings of helplessness (other than K.A. being made to feel helpless by state officials who do not believe her), and that the bulk of the Summit material on the syndrome was speculation. Tr. III 63.

The objection was overruled, but the issue was sorted out at a bench conference where the trial court admitted to making a "mistake" in allowing the testimony as substantive evidence on the truthfulness or untruthfulness of the child's testimony. Tr. III 64, 70.

The problem with the testimony is that Turner had never met K.A., never diagnosed K.A., and did not have any involvement with this case. Tr. III 70. Defense counsel continued to object. *Id*.; 73, 74, 75, 76, 77, 79, 80, 81-82 (re-urging motion to disallow the testimony of Turner as speculative and irrelevant; objection noted and overruled).

1

After Turner, the State called the neighbor, Katherine Sanford. Tr. III 121-25. Sanford testified to the fact that K.A. came over to her house that morning, appeared upset, and in a courtroom moment where everyone seemed to have forgotten the pre-trial rulings on hearsay statements made to K.A., the prosecutor asked Sanford what K.A. said, and Sanford responded: "She came in, and I asked her, I said, what's wrong? And she told me that Big Daddy [Zilm]—she called him Big Daddy, which—and she said had touched her." Tr. III 127.

Despite the prior rulings on the admissibility of this hearsay, the trial court allowed the hearsay testimony under the "excited utterance" exception to the hearsay rule. Tr. III 129. The defense objected. *Id*.; 132 (defense counsel again objecting, and noting that there is a difference between evidence that is admissible and evidence that is reliable).

Sanford then testified that K.A. told her that Zilm had tried to put his penis "in her butt." Tr. III 133. Upon hearing this, Sanford and her roommate called the police. *Id*.

The State called the SANE nurse, Kathy Bell, who testified that K.A. was examined on June 4, 2012, which included a colposcope (a "microscope on wheels") which magnifies the area of observation x15. Tr. III 151-55. According to Bell, she asked K.A. what had happened, and K.A. replied that Zilm had been giving her a massage, and had "put his penis into her butt hole." Tr. III 160. It should be noted that K.A. insisted that she was told by authorities what to say to the SANE nurse. Tr. II 281.

20

Defense counsel objected to this, noting the close proximity to this statement to the others deemed unreliable, but this objection was overruled on the basis that it was admissible under the "medical advice" exception. Tr. III 159-60. The exam showed an "area of redness" around the anus of K.A., although all of the boxes on the exam form for genital itching, discharge, and bleeding were marked "No." *Id.* 161-66. The "redness" could have been caused by a thumb slipping on massage oil. *Id.* 171.

The last State witness was Cpl. Gregory Smith of the Tulsa Police Department. Tr. III 181-85. On the day of the incident, Zilm had left the home and went to the home of his parents. Cpl. Smith went there, along with Det. Hodges and Officer Taylor, to interview Zilm. Tr. III 196-200. The interview with Zilm was played for the jury (State's Exhibit #1) over objection by the defense. Tr. 201-08.

Cpl. Smith testified that Zilm was cooperative with police, denied sexually abusing K.A., but acknowledged that he may have in advertently jabbed her with his thumb during the massage. Tr. 208-12.

The State then rested, and the defense dumurred, which was overruled. Tr. III 216-20. The defense called two witnesses: K.A. and Officer Jon Wilson.

K.A. was called to lay the foundation for the recording that she had made of DHS worker Lauren Hall, who interviewed the children, including K.A. as part of the juvenile proceeding. Tr. IV 17-23. K.A. recorded the conversation herself with her iPod because she did not trust Hall. *Id.* This is the recording, introduced as Defense Exhibit #1 where Hall

2

tells K.A. that she must stick to her original claim because the DNA evidence confirms that K.A. was sexually assaulted–which was a lie.  Tr. IV 21 (Defense Exhibit #1 played and admitted).

The last witness called by the defense was Officer Jon Wilson of the Tulsa Police Department. He confirmed the buccal swab samples taken from K.A. and Zilm, and anal swabs from K.A., and the fact that there was no DNA from Zilm found on K.A.  Tr. IV 44-51.

After inquiry by the Court, Zilm chose to not take the stand. Tr. IV 58-67. The defense rested, and defense counsel re-urged a demurrer and motion for a directed verdict of acquittal.  Tr. IV 67-69.  These were overruled.  *Id*.

The jury found Zilm guilty and recommended sentence of 36 years.  Tr. IV 64.

On direct appeal, Zilm raised as an issue that the State had used false testimony from K.A. from the "nullity" that was the first preliminary hearing. However, the OCCA concluded that Zilm had failed to show that her testimony was false, and thus denied relief.

Zilm sought rehearing in order to ascertain the nature of his burden of showing that the statements were false, but the OCCA denied rehearing without further explanation of its opinion on direct appeal.

22

## REASONS FOR GRANTING THE WRIT

This Court should grant the writ in order to clarify the nature of the burden on the accused to show that the State has used false testimony in a criminal case.

The general Due Process principles applicable here are not in question. This Court has held multiple times that use by the State of false testimony, known by the State to be false, "is incompatible with 'rudimentary demands of justice.'" *Mooney v. Holohan*, 294 U.S. 103, 112, 55 S.Ct. 340, 79 L.Ed.2d 791 (1935) (*per curiam*); *see also Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Miller v. Pate*, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967); *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); and *Pyle v. Kansas*, 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed.2d 214 (1942).

When the State uses false testimony, it constitutes outrageous Government conduct and a violation of Due Process under the Fourteenth Amendment to the Constitution. *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). Further, reversal is required if "the false testimony could, in any reasonable likelihood have affected the judgment of the jury." *See Giglio v. United States*, 405 U.S. 153, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (*quoting Napue v. Illinois*, 360 U.S. 264, 271, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959)). The false testimony here is the coerced testimony of K.A. at the original preliminary examination.

In addition, Sarah McAmis, the prosecutor, is clearly a State actor for purposes of this claim, and Hall, Howard, and Hannagan are also considered State

2

actors and agents of the prosecution regarding this claim. *See United States v. Antone*, 603 F.3d 566, 569-70 (5th Cir. 1979) (in this context prosecution team includes prosecutors and investigators); *United States v. Rangel*, 519 F.3d 1258, 1265 (10th Cir. 2008) (Government conceded that case agent was the alter ego of the Government and of the prosecutor).

However, Zilm is not aware that this Court has ever identified the quantum of proof he must satisfy in order to sustain a Due Process violation of this nature, and the Oklahoma Court of Criminal Appeals did not articulate any standard in denying his claim.

As Zilm asked the OCCA below, without getting any answer, is he required to show that the testimony of K.A. at the first preliminary hearing was false by a preponderance of the evidence, or by clear and convincing evidence, or beyond a reasonable doubt, or some other legal standard such as beyond all doubt? Zilm sought clarification of this legal question in the OCCA below, but did not get an answer. He seeks an answer in this Court, and contends that under the facts of his case, he can satisfy any standard required to make such a showing.

Zilm presented evidence in the record that the testimony of K.A. at the first preliminary hearing was false because:

1. K.A. herself testified under oath on more than one occasion that it was false;

2. The trial court found as a matter of fact that State actors had coerced K.A. to testify falsely at the first preliminary hearing and ruled that the first

24

preliminary was a nullity because of this State action;

3. The trial court found the hearsay statements of K.A. made to a forensic interviewer (the same statements essentially that K.A. made at the coerced first preliminary hearing) were unreliable and therefore inadmissible;

4. The OCCA upheld the finding of the trial court that the hearsay statements of K.A. were unreliable and inadmissible.

Thus, Zilm presented evidence in the record that State actors (four of them) coerced K.A. to testify falsely, K.A. herself testified that her initial allegations were false, the initial allegations as K.A. testified to under oath at the first preliminary hearing were found to be coerced as a matter of fact by the trial court prior to trial, the hearsay statements of K.A. to a State forensic interviewer were found to be unreliable as a matter of fact by the trial court, and this decision was upheld by the OCCA in an interlocutory appeal by the State.

Yet, the OCCA held that Zilm had failed "to show" that the statements of K.A. were false. Under these facts, Zilm cannot imagine any legal standard which supports this conclusion. He therefore seeks clarification from this Court of exactly what his burden is under the law to make such a showing.

## CONCLUSION

For the reasons stated above, the Petitioner prays respectfully that a Writ of Certiorari issue to review

2

the judgment of the Oklahoma Court of Criminal Appeals.

DATED this 5th day of February, 2019.

Respectfully submitted,

James L. Hankins, Okla. Bar No. 15506
   *Counsel of Record*
TIMBERBROOKE BUSINESS CENTER
929 N.W. 164th St.
Edmond, Oklahoma 73013
Telephone: 405.751.4150
Facsimile: 405.445.4956
E-mail: jameshankins@ocdw.com

*Counsel for Petitioner*