No. 18-1043

===============================================================

In The

# Supreme Court of the United States

———————— ♦ ————————

ADAM CLAYTON ZILM,

*Petitioner,*

vs.

THE STATE OF OKLAHOMA,

*Respondent.*

———————— ♦ ————————

**On Petition For Writ Of Certiorari To The
Court Of Criminal Appeals Of Oklahoma**

———————— ♦ ————————

**BRIEF IN OPPOSITION TO
PETITION FOR WRIT OF CERTIORARI**

———————— ♦ ————————

MIKE HUNTER
Attorney General of Oklahoma

CAROLINE E.J. HUNT*
Assistant Attorney General

RANDALL J. YATES
Assistant Solicitor General

313 NE 21st Street
Oklahoma City, Oklahoma 73105
(405) 521-3921
(405) 522-4534 Fax

fhc.docket@oag.ok.gov
Caroline.Hunt@oag.ok.gov
Randall.Yates@oag.ok.gov
*Attorneys for Respondent*

*\*Counsel of Record*                    June 3, 2019

===============================================================

EXHIBIT 10

i

## QUESTIONS PRESENTED

Petitioner was convicted of child sexual abuse "by willfully or maliciously touching and rubbing the buttocks of" the eleven-year-old daughter of his fiancée in a lewd and lascivious manner. In his police interview introduced at trial, Petitioner admitted at length, and in great detail, how he massaged the child's buttocks, tailbone, around her labia, and inner thighs with almond oil and, possibly, pre-ejaculate he wiped from his penis. He further claimed that he, at one point, accidentally jabbed inside the child's anus with his thumb. As to the victim, although she recanted her initial allegation that Petitioner had penetrated her anus with his penis, she maintained at every stage that Petitioner had indeed massaged her buttocks—the basis of the sexual abuse charge. Both accounts came out at trial: the massage with only an accidental thumb jab to the child's anus, and the massage with purposeful penetration by Petitioner's penis. In any event, however, whether Petitioner penetrated the child's anus with his penis was irrelevant to, and not an element of, the sexual abuse charge based on touching and rubbing the girl's buttocks. Despite this, Petitioner claims that the admission of the child's recanted allegation that he penetrated her anus with his penis violated his due process rights under *Napue v. Illinois*, 360 U.S. 264 (1959). The court below found that Petitioner had not shown that the testimony that he penetrated the child's anus with his penis was false.

ii

**QUESTIONS PRESENTED**—Continued

The questions presented are:

1)   Whether this Court should grant a writ of certiorari to review what quantum of proof applies to show that testimony is false under *Napue* where Petitioner's claim fails on grounds not reached by the court below and where no court has ever addressed this issue.

2)   Whether this Court should grant a writ of certiorari to review whether Petitioner has met his burden to show the testimony was false where this fact-bound issue alleges the misapplication of a properly stated legal rule and the decision of the court below is not even arguably in conflict with any decision of this Court or any other court.

iii

## TABLE OF CONTENTS

Page

QUESTIONS PRESENTED ................................  i

STATEMENT OF THE CASE .............................  2

   A.  Factual Background ..................................  2

   B.  Procedural Background ............................  8

REASONS FOR DENYING THE WRIT ..............  14

  I.  THIS CASE IS A POOR VEHICLE FOR RESOLVING THE FIRST QUESTION PRESENTED, AND IN ANY EVENT FURTHER PERCOLATION IS REQUIRED ................  14

     A.  As Petitioner's *Napue* claim fails on grounds not yet reached by the lower court, this case is a poor vehicle for resolving the first question presented....  14

     B.  Further percolation among the lower courts is required on the first question presented .............................................  20

  II.  THE SECOND QUESTION PRESENTED IS UNWORTHY OF CERTIORARI REVIEW, AND REGARDLESS THE LOWER COURT'S DECISION WAS CORRECT .....  22

     A.  The question of whether Petitioner has met his burden of showing that testimony was false for purposes of *Napue* is unworthy of certiorari review because it alleges the misapplication of a properly stated legal rule, is in reality a dispute with the trial court's evidentiary rulings, and is a fact-bound issue ..............  22

iv

TABLE OF CONTENTS—Continued

Page

B.  The lower court's decision is correct
and is not even arguably in conflict with
a decision of this Court or any other
court ........................................................  24

CONCLUSION....................................................  36

v

TABLE OF AUTHORITIES

Page

FEDERAL CASES

*Allen v. Woodford,*
  395 F.3d 979 (9th Cir. 2005)....................................25

*Arizona v. Evans,*
  514 U.S. 1 (1995) ...................................................21

*Blumberg v. Garcia,*
  687 F. Supp. 2d 1074 (C.D. Cal. 2010) ...................20

*Box v. Planned Parenthood of Ind. and Ky., Inc.,*
  587 U.S. ___, 2019 WL 2257160 (2019)..................21

*Fields v. Blades,*
  No. 1:95-CV-00422-EJL, 2015 WL 1481397
  (D. Idaho Mar. 31, 2015).........................................20

*Giglio v. United States,*
  405 U.S. 150 (1972) ..........................................13, 15

*Halbert v. Michigan,*
  545 U.S. 605 (2005) ...............................................23

*In re Sassounian,*
  887 P.2d 527 (Cal. 1995)..........................................20

*Isaac v. Cain,*
  588 F. App'x 318 (5th Cir. 2014).............................20

*Jones v. Taylor,*
  763 F.3d 1242 (9th Cir. 2014)............................25, 27

*Long v. Pfister,*
  874 F.3d 544 (7th Cir. 2017)........................18, 19, 23

*Massachusetts v. Sheppard,*
  468 U.S. 981 (1984) ...............................................24

vi

TABLE OF AUTHORITIES—Continued

Page

*McClung v. Silliman*,
  6 [19 U.S.] Wheat. 598 (1821) ................................15

*McCray v. New York*,
  461 U.S. 961 (1983) ................................................21

*McCray v. Vasbinder*,
  499 F.3d 568 (6th Cir. 2007)..................................27

*Napue v. Illinois*,
  360 U.S. 264 (1959) .......................................*passim*

*People v. Gray*,
  617 N.E.2d 217 (Ill. App. Ct. 1993).........................20

*People v. Nash*,
  222 N.E.2d 473 (Ill. 1966) ......................................18

*Sprietsma v. Mercury Marine*,
  537 U.S. 51 (2002) .................................................. 17

*The Monrosa v. Carbon Black Exp., Inc.*,
  359 U.S. 180 (1959) ................................................15

*United States v. Adebayo*,
  985 F.2d 1333 (7th Cir. 1993)..................................18

*United States v. Agurs*,
  427 U.S. 97 (1976) ..................................................18

*United States v. Bagley*,
  473 U.S. 667 (1985) ..........................................15, 18

*United States v. Barrett*,
  8 F.3d 1296 (8th Cir. 1993)......................................34

*United States v. Garcia*,
  793 F.3d 1194 (10th Cir. 2015)................................15

vii

TABLE OF AUTHORITIES—Continued

Page

*United States v. Geston*,
  299 F.3d 1130 (9th Cir. 2002)..................................17

*United States v. Grosz*,
  76 F.3d 1318 (5th Cir. 1996)....................................18

*United States v. O'Keefe*,
  128 F.3d 885 (5th Cir. 1997)....................................17

*White v. Illinois*,
  502 U.S. 346 (1992) ...............................................34

*Woodall v. United States*,
  842 A.2d 690 (D.C. Cir. 2004)..................................17

STATE CASES

*Folks v. State*,
  207 P.3d 379 (Okla. Crim. App. 2009)...............10, 11

*Mitchell v. State*,
  120 P.3d 1196 (Okla. Crim. App. 2005)............33, 34

*Omalza v. State*,
  911 P.2d 286 (Okla. Crim. App. 1995)...............13, 15

*Pickens v. State*,
  126 P.3d 612 (Okla. Crim. App. 2005)....................24

STATUTES

28 U.S.C. § 2254(e)(1).................................................20

OKLA. STAT. tit. 12, § 2803(2) (2011)..........................34

OKLA. STAT. tit. 12, § 2803(4) (2011)..........................34

viii

TABLE OF AUTHORITIES—Continued

Page

OKLA. STAT. tit. 12, § 2803.1(A)
(Supp. 2013)................................................10, 11, 33

OKLA. STAT. tit. 12, § 2803.1(A)(1) (Supp. 2004) ........11

OKLA. STAT. tit. 21, § 843.5 .........................................8


RULES

Fed. R. Evid. 803(4).....................................................34

Rule 10, *Rules of the Supreme Court of the
United States*....................................................22, 35

Rule 12.7, *Rules of the Supreme Court of the
United States*...........................................................2

1

**No. 18-1043**

————————◆————————

In The
# Supreme Court of the United States

————————◆————————

ADAM CLAYTON ZILM,

*Petitioner,*

vs.

THE STATE OF OKLAHOMA,

*Respondent.*

————————◆————————

**On Petition For Writ Of Certiorari To The
Court Of Criminal Appeals Of Oklahoma**

————————◆————————

**BRIEF IN OPPOSITION TO
PETITION FOR WRIT OF CERTIORARI**

————————◆————————

Respondent respectfully urges this Court to deny Petitioner Adam Clayton Zilm's petition for a writ of certiorari to review the unpublished opinion of the Oklahoma Court of Criminal Appeals ("OCCA") entered in this case on September 6, 2018, *Zilm v. State*, No.

2

F-2017-69, slip op. (Okla. Crim. App. Sept. 6, 2018) (un-published), Pet'r Appx. A.[1]

———————◆———————

## STATEMENT OF THE CASE

### A.  Factual Background

The following facts are established by Petitioner's own account of the events in question.[2] In the early morning hours of June 4, 2012, Petitioner—a man of thirty years old—asked eleven-year-old K.A.[3] to give him a massage in his bedroom on his bed as he wore only his underwear (State's Exhibit 1 at 5:35-6:16, 9:50-10:04, 10:50-11:03, 11:55-12:22, 42:50-43:04).[4]

———————

[1] Record references in this brief are abbreviated as follows: citations to Petitioner's Petition for Writ of Certiorari will be cited as "Petition"; citations to Petitioner's trial transcripts will be cited as "Tr." with the volume number; citations to the first preliminary hearing will be cited as "P.H. I"; citations to the second prelimi-nary hearing will be cited as "P.H. II"; citations to all other pre-trial transcripts will be cited by "Tr." preceded by the date; and citations to the original record will be cited as "O.R." *See* Rule 12.7, *Rules of the Supreme Court of the United States*.

[2] Petitioner was interviewed by Tulsa police at his parent's house on the day of the crime. The interview was audio recorded and admitted as State's Exhibit 1 at trial (Tr. III 196-201). Peti-tioner elected not to testify at trial (Tr. IV 58-61).

[3] K.A. was the daughter of Petitioner's fiancée, Kristina Al-varez (Tr. II 228). Petitioner lived with K.A., her older sister, her younger sister, her younger brother, and their mother Ms. Alva-rez in Tulsa, Oklahoma (Tr. II 219-20). Petitioner was not the bi-ological father of the children (Tr. II 220). The children referred to him as "Big Daddy" (Tr. II 220).

[4] Ms. Alvarez was at work at the time (State's Exhibit 1 at 14:55-15:02). During the interview, Petitioner indicated he was

3

After K.A. massaged Petitioner, Petitioner proceeded to massage K.A. using almond oil (State's Exhibit 1 at 5:10-5:33, 6:16-6:47, 8:40-8:43). The child was wearing only socks and a shirt pulled up over her head (State's Ex. 1 at 10:18-10:54). K.A. was not wearing any panties (State's Exhibit 1 at 27:10-27:19). Petitioner first lathered K.A. with the almond oil, spreading it "from her lower back all the way to her calves" (State's Exhibit 1 at 8:54). As K.A. lay on her stomach, Petitioner used his hands to massage her lower back, her inner thighs, her glutes, which he described as her "butt," and her tailbone (State's Exhibit 1 at 6:47-8:29, 13:29-13:48, 15:50-15:56, 18:49-18:56).

Petitioner also massaged "close to," and "around," K.A.'s labia (State's Exhibit 1 at 13:07-13:19). He "worked" the area of her labia for around five minutes (State's Exhibit 1 at 14:00-14:13). When asked during the interview if it was possible that he touched K.A.'s vagina, Petitioner said "not intentionally" (State's Exhibit 1 at 15:20-15:28). He also massaged "the cheeks of her butt," "inside the crack," and "close to" her anus (State's Exhibit 1 at 18:40-18:49, 19:18-19:27). In massaging this area, Petitioner was using "deep pressure" and for at least part of the time he was lying down next to the child on the bed with his front toward her backside (State's Exhibit 1 at 19:30-19:39, 22:50-23:57).

---

not being sexually satisfied by Ms. Alvarez, stating that he gave "her shit all the time about it" (State's Exhibit 1 at 28:45-29:33). Petitioner also admitted that, the night before the massage, he stated in front of the children that he was "horny" because it "had been awhile" since he had been with his fiancée (State's Exhibit 1 at 30:20-30:54).

4

When told K.A. said he put his penis in her "butt," Petitioner said, "Maybe she thought that my thumb was that" (State's Exhibit 1 at 20:25-21:43). When told K.A. was adamant it was his penis, he added, "I know what she's talking about, about my thumb, because as I was sifting I got too close and it hurt; she like moved and that's when she woke up and, oh, shit, are you okay?" (State's Exhibit 1 at 21:43-22:11).[5] Petitioner again blamed his "thumb" when asked why K.A. reported that he had also tried to put his penis in her vagina (State's Exhibit 1 at 22:25-22:40). Petitioner eventually admitted that he was certain his thumb had at one point slipped into K.A.'s anus (State's Exhibit 1 at 48:20-49:10).

When police stated that they would like to get a DNA sample from him, the following exchange occurred:

Petitioner:   Wow, I do remember something.

Officer:       What?

Petitioner:   And I know that I may have DNA on her. I know it. Holy shit.

Officer:       What do you remember?

Petitioner:   As I went down, as I laid down, I squished my balls, so I moved them

---

[5] Notably, Petitioner had earlier denied that K.A. ever fell asleep (State's Exhibit 1 at 17:20-17:28). When asked to explain the discrepancy, Petitioner claimed that by "woke up" he just meant "responded" (State's Exhibit 1 at 22:14-22:23).

5

|               | with my hand. And that's when I started working. |
|---------------|--------------------------------------------------|
| Officer:      | So when you moved them you got like skin cells on your hand or do you have like semen on your hand, or like pre-cum or something? |
| Petitioner:   | No, I have leakage. |
| Officer:      | Leakage is urine or pre-cum or semen? |
| Petitioner:   | It's, um, I guess it would be called pre-cum. I've been having that. |
| Officer:      | Yeah, it's like seminal fluid with sperm in it. |
| Petitioner:   | Yeah. Yeah. |
| Officer:      | Okay. |
| Petitioner:   | Yeah, that was like on my hand. |
| Officer:      | Okay, so then you started working on her and it may have transferred there? |
| Petitioner:   | After I wiped it off. |
| Officer:      | You wiped it off on—? |
| Petitioner:   | My leg. |
| Officer:      | And, so, but you still may have had, I mean, you wiped it off, but there's some there and so as you're working that may be— |

6

| Petitioner: | I wouldn't even have known if it was on my hand really because I had oil on me. I tried to get it all off, and holy shit. |
| Officer: | Anywhere else you may have touched her after you did that? |
| Petitioner: | I worked the whole region. |

(State's Exhibit 1 at 50:27-52:30).[6]

Beyond Petitioner's own admissions, the trial revealed additional evidence against him. After the massage, K.A. ran from her house in the rain to the home of a neighbor, Katherine Sanford, and rang the doorbell (Tr. II 263-64; Tr. III 123-24). Ms. Sanford opened the door to find K.A., soaking wet, crying, and shaking (Tr. III 125). Ms. Sanford let K.A. into her house and asked what was wrong (Tr. III 125-27). K.A., who continued to cry and shake, said in a trembling voice that "Big Daddy . . . had touched her" and tried to put his penis "in her butt" (Tr. III 127, 133).[7] Ms. Sanford's roommate called the police (Tr. III 135).

K.A. was taken that same morning to a hospital where she was examined by Nurse Kathy Bell, a Sexual Assault Nurse Examiner ("SANE") (Tr. III 142, 146, 157-58). K.A. told Nurse Bell that Petitioner was

---

[6] Petitioner's DNA was not found in swabs taken from K.A.'s body during her sexual assault examination (Tr. III 163-65; Tr. IV 48-51).

[7] These statements of K.A. came in through Ms. Sanford at trial pursuant to Oklahoma's excited utterance exception to the hearsay rule (Tr. III 129).

7

giving her a massage and "put his penis into her butt
hole" (Tr. III 159-60).[8] Nurse Bell found an area of red-
ness on K.A.'s anus that was sensitive to touch (Tr. III
162). K.A. repeatedly complained of tenderness in that
area (Tr. III 162-63). Nurse Bell found the physical ex-
amination consistent with the account K.A. provided
(Tr. III 166).

Well before the time of trial, K.A. recanted her al-
legation that Petitioner had penetrated her anus with
his penis (9/9/2014 Tr. 121-22).[9] However, even at trial,
she testified that Petitioner massaged her buttocks in
the early morning hours of June 4, 2012, while they
were alone in his bed and Ms. Alvarez was at work (Tr.
II 236, 240-41). K.A. testified that she first gave Peti-
tioner a massage; he was wearing only boxers (Tr. II
240-47). K.A. moved Petitioner's boxers and massaged
his "butt" with oil (Tr. II 246-47). Petitioner then gave
her a massage (Tr. II 248). She took off her shirt and

_____

[8] These statements of K.A. came in through Nurse Bell at
trial pursuant to Oklahoma's medical treatment exception to the
hearsay rule (Tr. III 159-60).

[9] To say K.A. was a hostile witness at trial would be an un-
derstatement. She testified she did not want to be there, and she
was obviously trying to save Petitioner from conviction (Tr. II 217-
18). She repeatedly testified she did not remember what she said
in her prior testimony (Tr. II 230-32, 237-38, 242, 246-47, 249,
251, 253, 255, 259-60, 261-62, 263-64, 268, 270-71). The prosecu-
tor was permitted to impeach K.A. with her prior inconsistent
statements at the first preliminary hearing (Tr. II 230-88). The
trial court gave the jury a contemporaneous instruction that the
impeachment evidence could be used only in determining what
weight and credibility to give to K.A.'s testimony and was not proof
of guilt (Tr. II 235-36).

8

pants, leaving on only her panties (Tr. II 248). K.A. laid on Petitioner's bed on her stomach while he massaged her back and glutes with oil (Tr. II 248-50). K.A. testified that, due to the "slippery" oil, Petitioner's "thumb accidentally jabbed [her]" while he was massaging her glutes (Tr. II 250). She claimed that she was asleep at the time, having a nightmare about molestation she experienced at the hands of a relative when she was five years old, and was initially confused about what was happening (Tr. III 28-30).

## B. Procedural Background

The State charged Petitioner with Sexual Abuse of a Child under Twelve, in violation of OKLA. STAT. tit. 21, § 843.5 (O.R. 28). The Information alleged that Petitioner committed the crime "by willfully or maliciously touching and rubbing the buttocks of K.A., a female child under the age of 12" (O.R. 28; Tr. II 186).

Preliminary hearing was held on September 26, 2012. As to the June 4, 2012, massage, K.A. testified that Petitioner used oil and his hands to massage her "back and [her] glutes, which is [her] butt," and put "[h]is penis" in her "butt hole" (P.H. I 19-20, 25, 42, 44, 50, 62). The special district judge found probable cause that the charged offense occurred and bound Petitioner over for trial (P.H. I 63).

On September 4, 2013, the defense moved the trial court to remand for a new preliminary hearing. In relevant part, the motion alleged: (1) on July 24, 2013, K.A. gave a sworn statement to defense counsel, in the

9

presence of only her grandmother, in which she claimed Petitioner had only "accidentally jabbed" her in the bottom with "his thumb" during the massage;[10] (2) defense counsel, upon recent review of the juvenile court file associated with K.A. and her siblings,[11] learned that an Oklahoma Department of Human Services ("DHS") worker, Lori Hannagan, knew of a recantation by K.A. in June 2012; and (3) in August 2013, the DHS worker then assigned to K.A.'s case, Lauren Hall, "told K.A. that no one believes her second statement [the recantation] and that everyone believes her first statement because there was DNA evidence to prove the first statement" (O.R. 99, 149-50, 154, 165-68, 302-04).

On October 7, 2013, the trial court ruled that the preliminary hearing was a nullity[12] and remanded for a new preliminary hearing on grounds that "individuals not employed by the District Attorney's Office, by

---

[10] Importantly, in the statement, K.A. reaffirmed that Petitioner massaged her "butt" using his hands and oil and that she was undressed for the massage (O.R. 162, 164-65).

[11] Shortly after the crime, the State filed a deprived action with respect to K.A. and her siblings (O.R. 196). The children were first placed in an emergency children's shelter and then, around late August 2012, with their maternal uncle (P.H. II 28-29). In December 2012, the children were placed with their grandmother in preparation for a trial reunification with their mother (P.H. II 32). Sometime thereafter, the children were returned to Ms. Alvarez for the trial reunification (P.H. II 43).

[12] The trial court later announced that it had erred in declaring the original preliminary hearing a "nullity" and ruled that, at trial, K.A. could be impeached by prior inconsistent statements given at the first preliminary hearing (11/9/2016 Tr. 4-6).

10

misfeasance or malfeasance, exercised unreasonable influence on the minor child K.A. to secure testimony to which she had since recanted repeatedly" (10/7/2013 Tr. 3; O.R. 338-40). The trial court overruled the State's objection that the court's findings were "based upon the representations of defense counsel and without those individuals or that individual having the opportunity to be heard or represented or offer any type of her own testimony" (10/7/2013 Tr. 6).

The second preliminary hearing was held on November 6, 2013. Detective Mark Hodges of the Tulsa Police Department's Child Crisis Unit testified to his June 4, 2012, interview of Petitioner, summarized above in the Factual Background (P.H. II 47-54). The special district judge found that, based solely on Petitioner's statements, probable cause existed that Petitioner committed the crime charged (P.H. II 96-97).[13]

On September 9, 2014, the trial court held a reliability hearing pursuant to OKLA. STAT. tit. 12, § 2803.1(A) (Supp. 2013) (9/9/2014 Tr. 9).[14] Forensic interviewer

---

[13] As will be discussed more below, DHS worker Ms. Hall also testified at the second preliminary hearing.

[14] Section 2803.1 provides for the admission of hearsay statements by a child under thirteen years old that describe "any act of sexual contact performed with or on the child." OKLA. STAT. tit. 12, § 2803.1(A) (Supp. 2013). Thus, § 2803.1 carves out a specific exception to the general hearsay rule. *Folks v. State*, 207 P.3d 379, 382 (Okla. Crim. App. 2009). "The provision requires an *in-camera* hearing for the trial court to determine that the time, content and totality of circumstances surrounding the taking of the statement provide sufficient indicia of reliability so as to render it inherently trustworthy." *Id.* "'In determining such trustworthiness, the court may consider, among other things, . . . the spontaneity and

11

Amy Howard and neighbor Ms. Sanford testified to K.A.'s statements to them on the day of the crime (9/9/2014 Tr. 11-26, 55-58, 65). K.A. testified, on behalf of the defense, "[t]hat nothing happened" with Petitioner and that she had simply had a nightmare (9/9/2014 Tr. 113, 121-23).[15] The trial court—apparently concerned with the lack of "consistent repetition" (OKLA. STAT. tit. 12, § 2803.1(A) (Supp. 2013)) of K.A.'s allegations in light of her recantation regarding penetration by Petitioner's penis—ruled that K.A.'s statements to Ms. Howard and Ms. Sanford were not admissible under § 2803.1 (9/12/2014 Tr. 12-13, 17-18). The trial court specifically noted, however, that the statements may be admissible under another exception to the hearsay rule (9/12/2014 Tr. 17).

The State appealed the trial court's pretrial § 2803.1 ruling (9/12/2014 Tr. 18-19). Over a dissent, the OCCA affirmed, holding that the trial court did not abuse its discretion, particularly in light of K.A.'s testimony at the reliability hearing that was inconsistent with the proffered hearsay statements (O.R. 510-17).

The case went to trial in November 2016. The jury was instructed that the State must prove beyond a reasonable doubt that Petitioner (1) "willfully or maliciously engaged in" (2) "sexual abuse" (3) "with or to a child under the age of twelve" (O.R. 694). To prove

---

consistent repetition of the statement. . . .' " *Id.* (quoting OKLA. STAT. tit. 12, § 2803.1(A)(1) (Supp. 2004)).

[15] By the time of the reliability hearing, K.A. was back in her mother's care (9/9/2014 Tr. 124).

12

"sexual abuse," the State was required to show that Petitioner "looked upon or touched or mauled or felt . . . the body or private parts . . . of a child . . . in a lewd and lascivious manner" (O.R. 694).[16] "Lewd" was defined as "[o]bscene, lustful, indecent, lascivious, lecherous," and "lascivious" was defined as "[c]haracterized by or expressing lust or lewdness" (O.R. 695). The jury convicted Petitioner as charged (O.R. 674). The jury sentenced Petitioner to thirty-six years imprisonment and a $500.00 fine (O.R. 674).

On direct appeal, the OCCA affirmed Petitioner's conviction and sentence. *Zilm*, No. F-2017-69, slip op. at 2. In relevant part, the OCCA rejected Petitioner's *Napue* claim:

> Zilm complains on appeal that the State coerced and elicited from the child victim inculpatory testimony at the first preliminary hearing known to be false and, when she could not be pressured into denying the truth of her recantation, used the child victim's false preliminary hearing testimony to impeach her trial testimony. This, he asserts, violated the basic constitutional guarantee of fundamental fairness and due process under the Fourteenth Amendment.

---

[16] Thus, contrary to Petitioner's suggestion that "the question at issue at trial" was whether Petitioner had purposely penetrated K.A. with his penis or accidentally jabbed her with his thumb, Petition at 4-5, the issue at trial was whether Petitioner touched K.A.'s buttocks in a lewd and lascivious manner, a fact established by his police interview.

13

If it is true that the State sponsored testimony at the preliminary hearing known to be false and then impeached the child victim's trial testimony with the false evidence at trial, this conduct would indeed violate Zilm's right to a fair trial. *See Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) (finding due process violation where state failed to correct known false testimony). *See also Giglio v. United States*, 405 U.S. 150, 153, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *Omalza v. State*, 1995 OK CR 80, ¶ 77, 911 P.2d 286, 307; *Hall v. State*, 1982 OK CR 141, ¶ 16, 650 P.2d 893, 896-97. The State has a duty to disclose false testimony which goes either to the merits of the case or the credibility of the witness. *Hall*, 1982 OK CR 141, ¶ 16, 650 P.2d at 897. The burden is on the defendant to show that (a) testimony was false or misleading, (b) the prosecution knowingly used it, and (c) its admission of false testimony was material to guilt or innocence. *Omalza*, 1995 OK CR 80, ¶ 77, 911 P.2d at 307.

The fact that a witness's testimony is impeached does not by itself establish the State knowingly used false testimony. *Id.*, 1995 OK CR 80, ¶ 78, 911 P.2d at 307. Mere inconsistencies or conflicts between witnesses' testimony will not support a claim that prosecutors used perjury to obtain a conviction. *Taylor v. State*, 1976 OK CR 255, ¶ 22, 555 P.2d 1073, 1078.

14

To obtain relief for the State's use of false evidence at trial it is a logical prerequisite that an appellant first show that the testimony complained of was actually false. Zilm fails to meet his burden of showing that the State knowingly used or failed to correct false evidence material to guilt or innocence in this prosecution. Zilm was not denied his due process right to a fair trial.

*Zilm*, No. F-2017-69, slip op. at 2-4.

On November 7, 2018, the OCCA denied Petitioner's request for rehearing. *Order Denying Petition for Rehearing*, No. F-2017-69 (Okla. Crim. App. Nov. 7, 2018), Pet'r Appx. D. On February 5, 2019, Petitioner filed a petition for writ of certiorari with this Court seeking review of the OCCA's decision.

———————◆———————

## REASONS FOR DENYING THE WRIT

### I.

## THIS CASE IS A POOR VEHICLE FOR RESOLVING THE FIRST QUESTION PRESENTED, AND IN ANY EVENT FURTHER PERCOLATION IS REQUIRED.

### A. As Petitioner's *Napue* claim fails on grounds not yet reached by the lower court, this case is a poor vehicle for resolving the first question presented.

Petitioner's case is a poor vehicle for resolution of the first question presented—what quantum of proof a

15

defendant must satisfy to show that testimony was false for purposes of a *Napue* claim. Petition at 23. Even assuming that this Court granted certiorari review and reversed on the question presented, Petitioner's *Napue* claim fails on at least two alternative grounds not yet reached by the OCCA.

On appellate review, "[t]he question before an appellate Court is, was the judgment correct, not the ground on which the judgment professes to proceed." *McClung v. Silliman*, 6 [19 U.S.] Wheat. 598, 603 (1821). Thus, this Court decides cases only "in the context of meaningful litigation," and when the challenged issue may not affect the ultimate judgment of the court below, that issue "can await a day when [it] is posed less abstractly." *The Monrosa v. Carbon Black Exp., Inc.*, 359 U.S. 180, 184 (1959). As will be shown, the OCCA's judgment was correct. This Court should deny the petition for writ of certiorari.

First, to prove a *Napue* violation, a defendant bears the burden of establishing that the false "testimony was material to guilt or innocence." *Omalza v. State*, 911 P.2d 286, 307 (Okla. Crim. App. 1995); *accord United States v. Garcia*, 793 F.3d 1194, 1207 (10th Cir. 2015) (same). Materiality is shown if there is "any reasonable likelihood" the false testimony "affected the judgment of the jury." *Napue*, 360 U.S. at 271; *see Giglio v. United States*, 405 U.S. 150, 154 (1972); *United States v. Bagley*, 473 U.S. 667, 678 (1985).

16

Here, Petitioner's *Napue* claim suffers a lack of materiality.[17] The only potentially false testimony introduced at trial was that Petitioner penetrated K.A.'s anus with his penis (Tr. III 133, 159-60). However, such was not the sexual abuse with which Petitioner was charged or of which he was convicted. As demonstrated in the Statement of the Case, Petitioner was charged with, and the jury was instructed on, sexual abuse of a child by touching or feeling K.A.'s buttocks in a lewd and lascivious manner (O.R. 28, 694). Penetration, or the use of Petitioner's penis, was not an element of the crime. Further, as shown above, Petitioner's guilt of touching or feeling K.A.'s buttocks in a lewd and lascivious manner was overwhelmingly established by his own statements during the police interview and the non-recanted portions of K.A.'s testimony (State's Exhibit 1 at 6:47-8:29, 13:07-13:19, 13:29-13:48, 14:00-14:13, 15:50-15:56, 18:49-18:56, 50:27-52:30; Tr. II 236, 240-41, 248-50). Even if the jury had never heard K.A.'s original allegation of penile penetration, there is absolutely no reasonable likelihood that the jury would

_____

[17] The OCCA appeared to rest its holding on Petitioner's failure to show that the testimony at issue was false. *Zilm*, No. F-2017-69, slip op. at 4. However, the OCCA also made reference to Petitioner's failure to show "that the State knowingly used or failed to correct false evidence *material to guilt or innocence* in this prosecution." *Id.* (emphasis added). Regardless of whether the OCCA has already rejected the materiality element or would reject it on remand, this case is a poor candidate for certiorari review.

17

not have found Petitioner guilty. *See Napue*, 360 U.S.
at 271.[18]

Second, *Napue* is not violated where conflicting
versions of events are presented, including one that is
claimed to be false, but the jury is well aware of the
claimed falsehood and permitted to make credibility
determinations and resolve the dispute. *See Woodall v.
United States*, 842 A.2d 690, 698 (D.C. Cir. 2004) (re-
jecting *Napue* claim because "this is not a case where
a presentation of known false evidence went uncor-
rected" (quotation marks omitted, alteration adopted));
*United States v. Geston*, 299 F.3d 1130, 1135 (9th Cir.
2002) (holding that where "conflicting versions of the
incident [are] presented to the jury," the prosecutor
may rely on the jury "to resolve the disputed testi-
mony" and make credibility determinations, without
violating *Napue*); *United States v. O'Keefe*, 128 F.3d
885, 896-97 (5th Cir. 1997) (noting that the court has
"found a violation of *Napue* in cases when . . . the gov-
ernment was aware that its witnesses committed per-
jury on the stand but such perjury was not disclosed to
the jury," but finding here "that the falsehoods were

---

[18] The issue of whether the testimony could have affected Pe-
titioner's sentence was neither pressed nor passed upon below,
12/18/2017 Brief of Appellant at 23-30 (OCCA No. F-2017-69)
("Direct Appeal Brief"); *Zilm*, No. F-2017-69, slip op. at 4, such
that it would not be an appropriate subject for certiorari review,
*see Sprietsma v. Mercury Marine*, 537 U.S. 51, 55-56 (2002). In
any event, the thirty-six year sentence imposed by the jury, at the
low end of the statutory range of twenty-five to life, hardly sug-
gests that the allegedly false testimony was prejudicial as to the
jury's sentencing determination (O.R. 696).

18

sufficiently exposed before the jury to enable the jury to weigh those falsehoods in its deliberations"); *United States v. Grosz*, 76 F.3d 1318, 1327-28 (5th Cir. 1996) (rejecting *Napue* claim where defense had access to and made use of evidence that contradicted government witness's falsehood); *United States v. Adebayo*, 985 F.2d 1333, 1342 (7th Cir. 1993) (finding no *Napue* violation where defense had "leeway" to explore government witness's falsehood on cross-examination and took advantage of it, "mounting a vigorous and lengthy attack on the witness'[s] credibility"); *People v. Nash*, 222 N.E.2d 473, 477-78 (Ill. 1966) (concluding *Napue* was materially distinguishable where defense knew of false testimony and presented evidence to contradict it); *see also United States v. Bagley*, 473 U.S. 667, 709-10 (1985) (concern in *Napue* and related cases is the "corruption of the truth-seeking function of the trial process" (quoting *United States v. Agurs*, 427 U.S. 97, 104 (1976))). As Judge Easterbrook recently wrote, "[a]ll *Napue* itself holds is that perjury known to the prosecution must be corrected before the jury retires." *Long v. Pfister*, 874 F.3d 544, 548 (7th Cir. 2017) (*en banc*), *cert. denied*, 138 S. Ct. 1593 (2018) (recognizing that the Supreme Court has never answered whether a prosecutor must "correct false testimony when defense counsel already knows the truth" and whether "the Constitution forbid[s] a conviction obtained when all material evidence is presented to the jury before it deliberates").[19]

---

[19] Respondent recognizes that *Long* was decided on habeas review and the *en banc* Seventh Circuit was therefore limited to

19

In this case, Petitioner's trial did not violate *Napue* because, even assuming false testimony was presented, the falsehood was fully exposed, challenged, and explored. In particular, K.A. testified that she had told neighbor Ms. Sanford only that she had had a nightmare about being molested during the massage (Tr. II 279); that Ms. Sanford and Ms. Sanford's roommate told her to say during the forensic interview that Petitioner "put his penis inside of [her] butt and tried [her] vagina" (Tr. II 280-81; Tr. III 38-39); that a DHS worker whose name she could not remember also told her "to tell somebody that he had done that stuff to [her]" (Tr. II 281-84); that she met with three other unnamed DHS workers just before the first preliminary hearing and they told her she would have to tell the "first story" if she wanted to be returned to her mother (Tr. III 35-36); and that, after her recantation, the prosecutor "told [her] to go back to the story [she] had said before" (Tr. II 284). Because the jury heard all the evidence about the alleged recantation and the alleged pressure by the State on K.A. to withdraw her recantation, *Napue* was not violated (Tr. II 231-32, 240-60, 283-85; Tr. III 27-37; Tr. IV 18-23). *See Long*, 874 F.3d at 546 (rejecting *Napue* claim where, although eyewitness falsely denied on the stand that she had previously recanted her identification of Long as the shooter, the defense called an individual who testified

_____

clearly established Supreme Court law in rendering its decision. *Long*, 874 F.3d at 547. Nevertheless, Respondent submits that *Long*'s reasoning is fully in line with the above-cited cases rejecting *Napue* claims on direct review because the falsehood was exposed to the jury.

20

that the eyewitness had previously recanted and told him that her identification had been coerced).

## B. Further percolation among the lower courts is required on the first question presented.

As Petitioner states, his first question presented—what quantum of proof a defendant must satisfy to show that testimony was false for purposes of a *Napue* claim—appears to be a matter of first impression in this Court. Petition at 23. However, Petitioner does not identify *any* court that has addressed the first question presented. Petition at 22-24. Indeed, Respondent cannot locate even a single case addressing what quantum of proof a defendant must satisfy to show that testimony was false for purposes of a *Napue* claim. Only a handful of courts have even referenced a quantum of proof when analyzing a *Napue* claim, and those courts have all simply applied the burden of proof generally applicable to an appellant or habeas petitioner. *See, e.g., Isaac v. Cain*, 588 F. App'x 318, 326-27 (5th Cir. 2014) (unpublished) (applying "clear and convincing evidence" standard of 28 U.S.C. § 2254(e)(1) in federal habeas proceeding); *Blumberg v. Garcia*, 687 F. Supp. 2d 1074, 1123 (C.D. Cal. 2010) (same); *Fields v. Blades*, No. 1:95-CV-00422-EJL, 2015 WL 1481397, at *17 (D. Idaho Mar. 31, 2015) (unpublished) (same); *In re Sassounian*, 887 P.2d 527, 537 (Cal. 1995) (state habeas petitioner had burden of proving facts in support of his claims by a preponderance of the evidence); *People v. Gray*, 617 N.E.2d 217, 225 (Ill. App. Ct. 1993)

21

(state habeas petitioner had burden of proving facts by clear and convincing evidence).

This Court generally waits for multiple lower courts to address issues left unanswered in its decisions before granting certiorari review. *See Box v. Planned Parenthood of Ind. and Ky., Inc.*, 587 U.S. ___, ___, 2019 WL 2257160, *1-2 (2019) (*per curiam*) (denying review of the second question presented because no other circuit had addressed the question); *Arizona v. Evans*, 514 U.S. 1, 24 n. 1 (1995) (Ginsburg, J., dissenting) ("We have in many instances recognized that when frontier legal problems are presented, periods of 'percolation' in, and diverse opinions from, state and federal appellate courts may yield a better informed and more enduring final pronouncement by this Court."); *McCray v. New York*, 461 U.S. 961, 963 (1983) (Stevens, J., respecting denial of petitions for writs of certiorari) ("In my judgment it is a sound exercise of discretion for the Court to allow the various States to serve as laboratories in which the issue receives further study before it is addressed by this Court."). In light of the total lack of lower courts that have weighed in on this issue, the issue requires further percolation. At this juncture, certiorari review is unwarranted.

22

**II.**

**THE SECOND QUESTION PRESENTED IS UN-WORTHY OF CERTIORARI REVIEW, AND RE-GARDLESS THE LOWER COURT'S DECISION WAS CORRECT.**

**A. The question of whether Petitioner has met his burden of showing that testimony was false for purposes of *Napue* is unworthy of certiorari review because it alleges the mis-application of a properly stated legal rule, is in reality a dispute with the trial court's evi-dentiary rulings, and is a fact-bound issue.**

Petitioner's second question presented—whether he has satisfied his burden of showing that testimony was false—is not worthy of certiorari review for multi-ple reasons. "A petition for a writ of certiorari is rarely granted when the asserted error consists of erroneous factual findings or the misapplication of a properly stated rule of law." Rule 10, *Rules of the Supreme Court of the United States*.

Here, first, Petitioner's request for certiorari re-view is at bottom a challenge to the application of a properly stated rule of law. The OCCA correctly recog-nized that, under *Napue*, the admission of false testi-mony may violate a defendant's right to a fair trial. *Zilm*, No. F-2017-69, slip op. at 3. Moreover, as shown previously, no precedent of this Court or any other court specifies the quantum of proof a defendant must meet to show that testimony was false under *Napue*. Thus, whatever quantum of proof the OCCA applied, it

23

could not have violated this Court's precedents. Petitioner simply disagrees with the OCCA's ultimate determination that he had not shown that the testimony at issue was false. His disagreement with the application of a properly stated rule does not warrant certiorari review.

Second, although Petitioner characterizes the claim he presses as a constitutional *Napue* claim, his true dispute is with the trial court's determination that K.A.'s prior statements and testimony were admissible under Oklahoma law pursuant to exceptions to the hearsay rule and as impeachment evidence. *See* Petition at 13-21; Direct Appeal Brief at 38-41 (challenging these evidentiary rulings). Indeed, as shown above under the first question presented, where contradictory versions of events are both admitted at trial, including a version that is claimed to be false, and the jury is permitted to make credibility determinations and resolve the dispute, *Napue* is simply not violated. *Napue* and its progeny are cases where "the false testimony was elicited" but "the truth was unknown to the defense" and "the jury never learned the truth." *Long*, 874 F.3d at 548. Worse than seeking error-correction review of a constitutional claim, Petitioner in reality seeks a do-over of his trial based on his disagreement with the trial court's evidentiary rulings under Oklahoma law. *Cf. Halbert v. Michigan*, 545 U.S. 605, 605 (2005) (explaining that, on "certiorari review in this Court," "error correction is not" this Court's "prime function"). Such does not present an appropriate or compelling issue for certiorari review.

24

Finally, the question of whether Petitioner has satisfied his burden to show that the testimony is false is an extremely fact-bound issue. Indeed, Petitioner demonstrates as much with his lengthy Statement of the Case that is several times as long as the section of his petition arguing why this Court should grant certiorari review. *Compare* Petition at 1-21, *with* Petition at 22-24. Given the fact-bound nature of the issue, it is unlikely to be repeated and therefore unworthy of certiorari review. *See Massachusetts v. Sheppard*, 468 U.S. 981, 988 n. 5 (1984) (stating that issue not reached by this Court "is a fact-bound issue of little importance since similar situations are unlikely to arise with any regularity").

**B. The lower court's decision is correct and is not even arguably in conflict with a decision of this Court or any other court.**

Put simply, the OCCA got it right. Even giving Petitioner the benefit of the lowest quantum of proof he identifies—a preponderance of the evidence standard, Petition at 23—Petitioner has not shown that it is more probable than not that the testimony at issue was false. *See Pickens v. State*, 126 P.3d 612, 621 (Okla. Crim. App. 2005) ("Preponderance of the evidence means more probable than not."). As an initial matter, although Petitioner attempts to muddy the waters and imply that K.A. recanted her sexual abuse allegations against Petitioner in whole, as Respondent demonstrated above, K.A. never recanted her allegation that Petitioner massaged her buttocks—the basis of the

25

sexual abuse charge. The only recantation, and the only dispute, is as to whether Petitioner penetrated K.A.'s anus with his penis or accidentally jabbed her anus with his thumb. Petitioner points to four circumstances that he contends show the testimony that he penetrated K.A. with his penis was false. Petition at 23-24. Put in context, these circumstances, either individually or cumulatively, fail to demonstrate that the testimony was false.

### 1.   *"K.A. herself testified under oath on more than one occasion that [the testimony] was false."*
However, K.A.'s initial allegation, made repeatedly on the same day as the sexual abuse, was that Petitioner had penetrated her anus with his penis (Tr. III 133, 159-60). Moreover, courts generally view recantations with great suspicion. *Allen v. Woodford*, 395 F.3d 979, 994 (9th Cir. 2005). Petitioner never explains how the mere fact of recantation shows either that K.A.'s initial allegation was false or that her recantation is more likely to be true than her initial allegation. *See Jones v. Taylor*, 763 F.3d 1242, 1248 (9th Cir. 2014) ("Recanting testimony is easy to find but difficult to confirm or refute: witnesses forget, witnesses disappear, witnesses with personal motives change their stories many times, before and after trial." (quotation marks omitted)).[20]

---

[20]  For example, Petitioner notes Nurse Bell's cross-examination testimony that the redness she observed to K.A.'s anus could have been caused by a thumb slipping on massage oil (Tr. III 171). Petition at 20. What Petitioner fails to mention, however, is that Nurse Bell's direct testimony was that the redness was

26

In fact, the record provides ample evidence of a motive for K.A. to falsely recant her initial allegation, supporting an inference that her original allegation that Petitioner penetrated her anus with his penis was actually the truth. K.A. was returned to the custody of her mother, Ms. Alvarez, who continued to associate with Petitioner, *after the first preliminary hearing* (Tr. II 237-38). The logical inference from the evidence is that Ms. Alvarez and Petitioner brought pressure on K.A. to recant her allegations against him so he could avoid prison and Ms. Alvarez could marry him. K.A. testified that, after she was returned to her mother's custody, Ms. Alvarez moved the family around to Louisiana and later Arkansas (Tr. II 223). While they lived in Arkansas, and while the trial was still pending, Petitioner (who was out on bond) would come to visit the family on weekends (Tr. II 228). Petitioner and Ms. Alvarez were still engaged and continued to plan their wedding (Tr. II 228-29). Eventually, Ms. Alvarez and her children moved back to Oklahoma, and Ms. Alvarez started working in Petitioner's mother's tanning salon in Tulsa (Tr. II 229-30). At the time of trial, Petitioner was still K.A.'s mother's fiancé, and they planned to marry after the trial was over (Tr. II 228-29).[21] On the stand, K.A. described Petitioner as her

---

also consistent with a penis penetrating K.A.'s anus (Tr. III 166). Indeed, the redness to K.A.'s anus was significant enough that she complained of tenderness on at least three different occasions during the examination (Tr. III 162-63).

[21] As she left the stand, K.A. requested to give Petitioner a hug, a request the trial court denied (Tr. II 290; Tr. III 37). During closing, the prosecutor noted that K.A. was then led by the hand

27

best friend and as "my dad" (Tr. II 220, 287). This evidence of the emotional and financial hold Petitioner and his family held over K.A.'s mother and her children explains why K.A. would recant her allegation against Petitioner to try to keep him out of prison.[22] *See Jones v. Taylor*, 763 F.3d 1242, 1249 (9th Cir. 2014) (recantations by a defendant's family members receive reduced "weight and reliability"); *McCray v. Vasbinder*, 499 F.3d 568, 573 (6th Cir. 2007) (family members might have a personal stake in a defendant's exoneration). In light of these circumstances, Petitioner certainly has not shown that it is more probable than not that K.A.'s original allegation was false.

**2. *"The trial court found as a matter of fact that State actors had coerced K.A. to testify falsely at the first preliminary hearing and ruled that the first preliminary* [hearing] *was a nullity because of this State action."*** Petitioner overstates the trial court's findings. For starters, the trial court later corrected its statement that the first preliminary hearing was a "nullity" (11/9/2016 Tr. 4-6). As to the state actors who allegedly coerced K.A. into testifying

---

out of the courtroom by Petitioner's parents (Tr. V 12). Petitioner and K.A.'s mother did indeed marry after the trial. *See* https://www.oscn.net/dockets/GetCaseInformation.aspx?db=beckham&number=ML-2018-00027&cmid=47101 (last visited May 26, 2019).

[22] Rose Turner, the State's expert on Child Abuse Accommodation Syndrome, testified to the powerful impact such factors—a mother's continuing relationship with a child's abuser, removal of the child from the mother's care, and financial dependency on the abuser—can play in a child's false recantation of abuse allegations (Tr. III 51-62, 64-68, 70-74).

28

falsely at the first preliminary hearing, Petitioner points the finger at DHS worker Lori Hannagan, Forensic Examiner Amy Howard, and DHS worker Lauren Hall. Petition at 7-9. Despite the trial court's finding, based largely on unsupported allegations of trial counsel, that "individuals not employed by the District Attorney's Office, by misfeasance or malfeasance, exercised unreasonable influence on the minor child K.A. to secure testimony to which she had since recanted repeatedly" (10/7/2013 Tr. 3; O.R. 338-40), the record does not show that any of these individuals coerced false testimony by K.A. at the first preliminary hearing.

At the time of the motion to remand for a new preliminary hearing, the only allegation as to Ms. Hannagan was that she was aware of K.A.'s recantation because she referenced it in the juvenile file. Petition at 7. Ms. Hannagan simply noted, based on a conversation with Ms. Alvarez and through several layers of hearsay, that K.A. had allegedly recanted her allegation of penetration during a phone conversation with Petitioner (O.R. 302-03).[23] There was no evidence or even allegation that Ms. Hannagan encouraged K.A. to abandon her recantation and testify consistent with her original allegation at the preliminary hearing.

With regard to forensic examiner Ms. Howard, who interviewed K.A. the day of the crime, Petitioner's allegations make little sense. Petitioner's motion to

---

[23] Petitioner's suggestion that Ms. Hannagan was reporting something K.A. told her directly is inaccurate (O.R. 302-03). Petition at 7.

29

remand did not even mention Ms. Howard (O.R. 301-11). K.A. did say in the July 2013 statement, taken by defense counsel and without the benefit of cross-examination, that "that Amy girl" told K.A. to say what she said in her original accusation of Petitioner and she could go back to her mother (O.R. 172-73). But at the time of the forensic interview K.A. had not even been removed from her mother's care, and she had not yet recanted anything (Tr. II 270).[24]

Finally, as to DHS worker Ms. Hall, the recorded conversation between Ms. Hall and K.A. occurred on August 16, 2013, well *after* the first preliminary hearing in September 2012 (P.H. II Tr. 21-22). Furthermore, at the second preliminary hearing, Ms. Hall testified emphatically that, *prior to the first preliminary hearing*, she never told K.A. how she needed to testify, what she needed to say or not say, that "if she testified in a certain way certain things would happen," or that particular testimony would produce a certain outcome as to the juvenile deprived case or custody placement with her mother (P.H. II 19-20).[25]

---

[24] The children remained with Ms. Alvarez for a few days before they were removed by DHS (Tr. II 270).

[25] Ms. Hall testified that at the time she talked to K.A. in the recorded conversation—again, after the first preliminary hearing—she honestly believed there was DNA evidence supporting K.A.'s original claim of penile penetration, having misconstrued Nurse Bell's report stating that the results were consistent with K.A.'s allegations to mean that DNA had been recovered (P.H. II Tr. 21-24). Moreover, the context of Ms. Hall's conversation with K.A. was the upcoming juvenile hearing concerning the termination of the children's placement with their grandmother due to

30

An additional matter requires discussion. At the time of the motion to remand, there was no allegation, let alone evidence, that the prosecutor Sarah McAmis had coerced K.A. to testify falsely at the first preliminary hearing. Importantly, neither the trial court nor the OCCA has ever made a finding that the prosecutor coerced testimony, false or otherwise, from K.A. In fact, when K.A. claimed for the first time, at the reliability

———————

the court-prohibited contact that had occurred between K.A.'s grandmother, Ms. Alvarez, K.A. and Petitioner and his attorney (P.H. II Tr. 19-20, 22-24, 38). This had nothing to do with the criminal case. Petitioner's assertion that the recording proves Ms. Hall told "K.A. that she must stick to her original claim" finds no support in the recording itself. Petition at 20-21. What Ms. Hall said is this:

> We go to court on Monday. There's a lot of concerns about your mom maybe having some conversations with Adam's attorney and Adam and you having a conversation, and your grandma did, and that was kind of a stipulation of you guys going home that no one spoke to him or the attorney and so it's very possible that the judge will put you back into custody on Monday, okay? So I want you of course to be aware of that. There's a lot of concerns about your recanting your story even though they had DNA evidence that supports your original story, and so everyone believes your original story and no one believes that it didn't happen. And we're very concerned that now you're saying that it didn't happen, because we know it did. And we don't want you to feel like you have to live your life saying it didn't happen, okay? So that's our concerns, so we don't want kids put in that position, and parents and grandparents should *never* put children in that position, especially when they've been told not to, you know?

(Defendant's Exhibit 1 at 0:47-2:10).

31

hearing, that the prosecutor had done so, Ms. McAmis
made the following record:

> I have never, nor would I ever meet with
> a child alone. And specifically I have never
> met with this child alone at any time.

> That when I met with this child in ad-
> vance of the preliminary hearing, both Heather
> Prater, who is the chief advocate for the Dis-
> trict Attorney's office, and Travis Horton, who
> was, at the time, an Assistant District Attor-
> ney for the District Attorney's office and has
> subsequently left and gone into private prac-
> tice, that both of those two individuals were
> with me at all times. That I have a practice
> and procedure of never meeting with children
> alone, and always having persons there pre-
> sent.

> And so, as I have previously stated to the
> Court, and as I have endorsed in this case as
> witnesses both Mr. Horton and Ms. Prater, if
> Your Honor needs to, wants to, for the pur-
> poses of the record, hear from either Ms.
> Prater and/or Mr. Horton about the conversa-
> tion and the statements that were or were not
> made during the course of that meeting, they
> are both available and willing to testify about
> those.

> THE COURT:   Can you represent to me
> as an officer of the court, that she did not
> make that statement to you?

> MS. McAMIS:   110 percent. As I have
> previously stated to the Court, I recognize

32

fully and completely that if I were ever in a situation where a child said to me, for whatever reason, recanted to me, then I have a continuing obligation, whether it is before preliminary hearing, after preliminary hearing, before jury trial, after jury trial, whatever, I have a continuing obligation, both as a prosecutor and as an attorney and as an officer of the court, I have an ethical, moral, legal, responsibility to report that information.

If that had ever happened in this case, or in any other case, I would have reported that both to defense counsel and to the Court.

I can absolutely without any question assure Your Honor that that was not, in any event, a conversation. And, I would assure Your Honor that the preliminary hearing transcript demonstrates that at the time of the preliminary hearing, she had not and did not recant.

(9/9/2014 Tr. 135-37).[26]

**_3. & 4._** *"The trial court found the hearsay statements of K.A. made to a forensic interviewer (the same statements essentially that K.A. made at the coerced first preliminary hearing) were unreliable and therefore inadmissible," and "The*

---

[26] It is also difficult to see how the prosecutor could "know" that K.A.'s original allegation of penile penetration was false. *See Omalza*, 911 P.2d at 307. There was nothing inherently unbelievable about the original allegation, it was corroborated by the SANE examination, and as already discussed, the mere fact of recantation alone did not make it false.

33

**OCCA upheld the finding of the trial court that the hearsay statements of K.A. were unreliable and inadmissible."** To begin with, forensic interviewer Ms. Howard did not testify at trial, and the recording of the forensic interview was not admitted. Rather, K.A.'s prior accusations that Petitioner penetrated her anus with his penis came in through neighbor Ms. Sanford's testimony, Nurse Bell's testimony, and through impeachment of K.A. on direct examination based on prior inconsistent statements.[27]

Moreover, the question answered by the trial court at the reliability hearing, and then reviewed by the OCCA on the State's pretrial appeal, was whether K.A.'s hearsay statements to Ms. Howard and Ms. Sanford were sufficiently reliable based on various statutorily enumerated factors to be admitted under § 2803.1, a broad exception to the hearsay rule for statements of a child describing sexual abuse. This question did not involve consideration of whether the statements were admissible under any other, narrower hearsay exceptions for statements arising in contexts that by their nature provide substantial guarantees of trustworthiness. *See Mitchell v. State*, 120 P.3d 1196, 1204 (Okla. Crim. App. 2005). Other hearsay exceptions further do not have the specific requirement of "consistent repetition" as does § 2803.1(A).

---

[27] The prosecutor was permitted only limited impeachment questions concerning K.A.'s forensic interview but elicited K.A.'s acknowledgment that she told Ms. Howard that Petitioner put his penis in her "butt" (Tr. II 257, 259-60).

34

At trial, K.A.'s statements to Ms. Sanford were admitted as excited utterances under OKLA. STAT. tit. 12, § 2803(2) (2011) (Tr. III 129). The rationale behind the excited utterance exception to the hearsay rule is that "[a] statement that has been offered in a moment of excitement—without the opportunity to reflect on the consequences of one's exclamation—may justifiably carry more weight with a trier of fact than a similar statement offered in the relative calm of the courtroom." *Mitchell*, 120 P.3d at 1204-05 (quoting *White v. Illinois*, 502 U.S. 346, 356 (1992)).

K.A.'s statement to Nurse Bell that Petitioner "put his penis into her butt hole" was admitted under the medical treatment exception to the hearsay rule under OKLA. STAT. tit. 12, § 2803(4) (2011) for statements made for purposes of medical diagnosis or treatment and describing medical history (Tr. III 159-60). The rationale behind the medical treatment exception is that the declarant has a "motivation to provide truthful information in order to promote diagnosis and treatment." *United States v. Barrett*, 8 F.3d 1296, 1300 (8th Cir. 1993) (discussing Fed. R. Evid. 803(4), the counterpart to Oklahoma's § 2803(4)). In any event, the trial court did not rule on the reliability of K.A.'s statement to Nurse Bell at the reliability hearing, and there was no allegation at trial that Nurse Bell coerced K.A. into making the statement.

Finally, and most importantly, the trial court's determination at the reliability hearing that particular hearsay statements of K.A. were not admissible under § 2803.1 due to a lack of consistent repetition did not

35

amount to a finding that the statements were *false* and certainly did not automatically show that other statements of K.A. not considered at the reliability hearing were false.[28]

\*     \*     \*

For all of the above reasons, the OCCA was absolutely correct in holding that Petitioner had not shown that testimony that he penetrated K.A.'s anus with his penis was false. *Zilm*, No. F-2017-69, slip op. at 4. Accordingly, the OCCA's decision is not even arguably in conflict with any decision of this Court or any other court. *See* Rule 10, *Rules of the Supreme Court of the United States*. Certiorari review is entirely unwarranted.

————◆————

---

[28] Indeed, when defense counsel objected at trial to K.A.'s impeachment with her prior inconsistent testimony from the first preliminary hearing based on an argument that this would introduce "a statement which this Court and the Court of Criminal Appeals has determined to be unreliable," the trial court emphatically rejected this logic: "No. No. No. The Court of Criminal Appeals has not determined her statements are not. They determined that the forensic interviewer, and the first witness . . . based on that, and then they specifically said . . . that with the first witness, it may come in under an excited utterance." (Tr. II 233-34; *see* O.R. 517 ("Although not fully developed, it is possible that the first statement made to the neighbor Katherine Sanford was an excited utterance." (Lewis, J., dissenting))).

36

## CONCLUSION

For the reasons set forth above, Respondent respectfully requests this Court deny the Petition for Writ of Certiorari.

Respectfully submitted,

MIKE HUNTER
Attorney General of Oklahoma

CAROLINE E.J. HUNT*
Assistant Attorney General

RANDALL J. YATES
Assistant Solicitor General

313 NE 21st Street
Oklahoma City, Oklahoma 73105
(405) 521-3921
(405) 522-4534 Fax

fhc.docket@oag.ok.gov
Caroline.Hunt@oag.ok.gov
Randall.Yates@oag.ok.gov
*Attorneys for Respondent*

*Counsel of Record*                          June 3, 2019