1

1   IN THE DISTRICT COURT OF TULSA COUNTY

2   STATE OF OKLAHOMA

3

4

5   STATE OF OKLAHOMA,                )     ©COPY

            Plaintiff,          )     F-2017-69

6                                     )

    vs.                               )     No. CF-2012-3037

7                                     )

    ADAM CLAYTON ZILM                 )

8                                     )

            Defendant.         )     DISTRICT COURT

9                                           F I L E D

10                                         JUL 17 2017

11  TRANSCRIPT OF JURY TRIAL PROCEEDINGS    DON NEWBERRY, Court Clerk
                                            STATE OF OKLA. TULSA COUNTY

12  HEARD BEFORE THE HONORABLE KURT G. GLASSCO

13  JUDGE OF THE DISTRICT COURT

14  November 15, 2016

15  **VOLUME 2 OF 5**

16

17  APPEARANCES:

18      MS. SARAH McAMIS, Assistant District Attorney, 500 S.
    Denver, Tulsa County Courthouse, Tulsa, Oklahoma, appears on
19  behalf of the Plaintiff.

20      MR. ALLEN M. SMALLWOOD, Attorney at Law, 1310 S. Denver
21  Ave., Tulsa, Oklahoma, appears on behalf of the Defendant.

22                                          FILED
                                         IN COURT OF CRIMINAL APPEALS
                                            STATE OF OKLAHOMA
23  RECEIVED            REPORTED BY:
                    Cindy G. Workman, CSR, RPR      AUG 0 1 2017
24  AUG 0 1 2017       Official Court Reporter
                    Tulsa County Courthouse
25  ATTORNEY GENERAL     500 South Denver
                       Tulsa, Oklahoma

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT     1-292

186

1    of the State of Oklahoma, Sitting in and for Tulsa County.

2    State of Oklahoma, Plaintiff, versus Adam Clayton Zilm,

3    Defendant.

4         Information:  Be it remembered, that Tim Harris,

5    the duly elected and qualified district attorney for Tulsa

6    County, Oklahoma, who prosecutes in the name and by the

7    authority of the State of Oklahoma, comes now into the

8    District Court of Tulsa County, State of Oklahoma, and gives

9    this Court to be informed, that:

10        Count 1, Adam Clayton Zilm, on or about June 4,

11   2012, in Tulsa County, State of Oklahoma, and within the

12   jurisdiction of this court, did commit the crime of sexual

13   abuse, child under 12, a felony, by willful or maliciously

14   touching and rubbing the buttocks of K.A., a female child

15   under the age of 12, to-wit:  11 years of age, during which

16   time he was involved in a relationship with K.A.'s mother and

17   was a person responsible for the care of K.A.

18        Contrary to the form of the statutes in such cases

19   made and provided, and against the peace and dignity of the

20   state.  Tim Harris, District Attorney, by Steve Kunzweiler,

21   Assistant District Attorney.

22        To this charge the defendant has pled not guilty,

23   which puts the burden of proving all of the elements beyond a

24   reasonable doubt upon the State of Oklahoma.  And that's a

25   burden of proof which we gladly accept.

219

1   A.   The Louisville house, is what we always called it.

2   Q.   The Louisville house?  Is that a yes?

3   A.   Yes.

4   Q.   Is that here in Tulsa?

5   A.   Yes.

6   Q.   Can you tell us who your mom is?

7   A.   Kristi.

8   Q.   What is her last name?

9   A.   Schanek.

10  Q.   Has she gone by Kristina Alvarez?

11  A.   Yes.

12  Q.   And I say Kristina, she -- Kristina is her full name,

13  but she goes by Kristi; is that right?

14  A.   Yes.

15  Q.   Can you tell us who your brother and sisters are?

16  A.   I have two sisters, P.A. and G.A..  And then I have a

17  brother named E.A..

18  Q.   So right now, how old is P.A.?

19  A.   Sixteen.

20  Q.   How old is G.A.?

21  A.   Nine.

22  Q.   And --

23  A.   No, she's ten.  My bad.

24  Q.   And how old is E.A.?

25  A.   Thirteen.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

220

1    Q.    Back when all of this first started, back when you were

2    11, can you tell us who was your mom's boyfriend?

3    A.    Our dad.

4    Q.    Okay.  And at some point in time, were you and your mom

5    and your siblings living with your biological dad?

6    A.    No, I'm not talking about our biological dad.  He's my

7    dad.

8    Q.    What did you call him then?

9    A.    Him?

10   Q.    Yeah.

11   A.    We called him Big Daddy.

12   Q.    Okay.  But I just wanted to make sure I understood when

13   you -- when I asked who was your mom's boyfriend at the time,

14   what did you -- what did you call him?

15   A.    Big Daddy.

16   Q.    Okay.  When all of this happened and when all of this

17   first started, was Big Daddy, was he living in the home with

18   you and your mom and your siblings?

19   A.    Yeah, I think so.

20   Q.    Do you remember how long he had lived with you at the

21   time?

22   A.    No.

23   Q.    Within the house, did he and your mom have their own

24   bedroom?

25   A.    Yes.

223

1    had about going to get to go back home and live with your

2    mom.  Do you remember that?

3    A.    Yes.

4    Q.    And did you remember when you got to go back home and

5    live with your mom that the condition was you weren't

6    supposed to be around Big Daddy?

7    A.    Yeah.

8    Q.    And you remember the Judge saying that?

9    A.    Yeah.

10   Q.    Okay.  After you went back home and lived with your

11   mom -- was that with your grandma, too?

12   A.    Yeah.

13   Q.    And just for the record, is your grandma Barbara Davis?

14   A.    Yes.

15   Q.    Okay.  After you went back home and lived with your mom

16   and your grandma, did you guys move to Louisiana?

17   A.    Yes, a time after that.

18   Q.    Do you remember about how long you lived in Louisiana?

19   A.    No.

20   Q.    After Louisiana, did you live in Arkansas?

21   A.    Yes.

22   Q.    About how long did you live in Arkansas?

23   A.    I don't know exactly.

24   Q.    Who all was living there in Arkansas?

25   A.    My family.

228

1        MR. SMALLWOOD:  Judge, that doesn't help us.

2   That's a relative time --

3        THE COURT:  Excuse me.  Excuse me.

4        I'm looking for a calendar time, as best you can.

5   Q.  (BY MS. McAMIS)  Where last year did you go to school?

6   A.  That would be -- wait -- last year?  Butterfield.

7   Q.  And was that in Arkansas?

8   A.  Yes.

9   Q.  Okay.  And that is when you were living in Arkansas;

10  correct?

11  A.  Yes.

12  Q.  Before you started this school year, you started this

13  school year back here in Tulsa; is that right?

14  A.  Yes.

15  Q.  So when you were living in Arkansas for your last school

16  year, was Big Daddy coming on the weekends to stay with you?

17  A.  He did, before.

18  Q.  And when he would come to stay with you in your house,

19  would he stay in your mom's room with her?

20  A.  Yes.

21  Q.  Did she continue to consider him her fiance?

22  A.  Yes.

23  Q.  Is he still her fiance now?

24  A.  I'd hope so.

25  Q.  Did they make plans for their wedding?

229

1    A.    Yes.

2    Q.    Were there times -- several times that the wedding would

3    be delayed?

4    A.    It's been delayed a long time now.

5    Q.    Because of this court case; right?

6    A.    Yes.

7    Q.    And so after this court case --

8              MR. SMALLWOOD:   Judge, I'm gonna object to this.

9    It's far beyond the scope of what the Court authorized at the

10   bench.

11             THE COURT:   I'm going to allow a little bit further

12   examination on this.   Objection overruled.

13   Q.    (BY MS. McAMIS)   After that court case is over, is that

14   when they're going to get married?

15   A.    Yes.

16   Q.    When you were living in Arkansas, was your mom working

17   at a hair salon?

18   A.    It was.   It had a salon in it.

19   Q.    Did she do spray tans for people?

20   A.    Yes.

21   Q.    And while she was there, was she doing spray tans for

22   people?

23   A.    Yes.

24   Q.    While you were living in Arkansas, did Big Daddy buy her

25   her own spray tan equipment?

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

230

1        MR. SMALLWOOD:  Judge, how far are we going to go?

2        THE COURT:  Sustained.  That's enough.

3   Q.  (BY MS. McAMIS)  Now that you have moved back here, does

4   your mom continue to do spray tans?

5   A.  Yes.

6   Q.  Is that for the salon that Big Daddy's mom owns?

7   A.  Yes.

8   Q.  Now I want to go back to that day that we have been

9   talking about, back in 2012 when the police came.  Okay?

10  A.  Okay.

11  Q.  At some point that morning, did you go outside and wait

12  behind a dumpster?

13  A.  Yes.

14  Q.  What was the weather like when you were doing that?

15  A.  I don't remember.  Like, sort of misty.  I don't know.

16  Q.  Do you remember whether it was raining or not?

17  A.  I think it was sprinkling a little.

18  Q.  When you were hiding out there, or waiting out there

19  behind the dumpster, then, at some point, did you go and talk

20  to your neighbors?

21  A.  Yes.

22  Q.  Where did they live compared to you?

23  A.  Diagonally across the street to the left.

24  Q.  What was your neighbors' names that you went to?

25  A.  Katherine and Karen.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

231

1   Q.   When you got to Katherine and Karen's house, did you

2   ring the door bell?

3   A.   I don't remember if they had a door bell.

4   Q.   Do you remember how you got their attention?

5   A.   No.

6   Q.   Do you remember one of them coming to the door?

7   A.   Yeah.

8   Q.   Do you remember talking to Katherine --

9   A.   Yes.

10   Q.   -- when she came to the door?  And did you tell

11   Katherine and then Karen about what had happened?

12   A.   Yeah, I told them that I had a dream, like a nightmare.

13   Q.   So I want to make sure that I understand what you're

14   saying today.  Is it your testimony that you told Katherine

15   and Karen that you had had a nightmare?

16   A.   Yes.

17   Q.   Before that morning, and before everything that had

18   happened that morning, had Big Daddy ever given you a massage

19   before?

20   A.   Yes.

21   Q.   More than one time?

22   A.   Yes.

23   Q.   When Big Daddy would give you massages, were you wearing

24   clothes?

25   A.   Yes.

232

1   Q.   Do you remember previously testifying about this?

2   A.   Some.

3   Q.   When you previously testified about this, and I'm

4   talking about the first time, at the preliminary hearing.  Do

5   you remember the preliminary hearing?

6   A.   Yes.

7   Q.   At the preliminary hearing, that's when you were living

8   with your uncle; is that right?

9   A.   Yes.

10  Q.   Okay.  And do you remember at the preliminary hearing

11  when, just like today, there was a judge who asked you to

12  tell the truth and to swear to tell the truth.  Do you

13  remember that?

14  A.   Yes.

15  Q.   And so, did you tell the truth that day at the

16  preliminary hearing?

17  A.   No.

18  Q.   The day of the preliminary hearing, did you say

19  something different than what you're saying now?

20  A.   I don't remember what --

21  Q.   Okay.  Let me get the transcript real quick.

22          THE COURT:  Counsel, approach one moment.

23          On the record.

24      (WHEREUPON, at this time, a bench conference was had

25  outside the hearing of the jury, as follows, to-wit:)

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

233

1           THE COURT:  You're going to now attempt to impeach

2    her with what she testified at that first one?

3           MS. McAMIS:  If she testifies inconsistent with

4    that, yes.

5           MR. SMALLWOOD:  Which you declared to be a nullity.

6           THE COURT:  I've already made a ruling from what I

7    understand the Court of Criminal Appeals has told us on that

8    subject.

9           But I do need to give an instruction to the jury.

10   And I've given you a copy of that instruction.

11          MS. McAMIS:  Your Honor, the state would object to

12   an instruction at this point.  I have never, in all of my

13   criminal trials that I've ever had, there have been multiple

14   witnesses who have been impeached, both by me and by the

15   defense, but never before does a judge give,

16   contemporaneously, that instruction; instead, that

17   instruction is given at the end.

18          The only instruction that is to be given

19   contemporaneously is a *Burks* instruction, or other crimes

20   instruction that is to be given at the time.

21          MR. SMALLWOOD:  Judge, the significant thing about

22   this is she's going to be bringing in a statement which this

23   Court and the Court of Criminal Appeals has determined to be

24   unreliable.

25          THE COURT:  No.  No.  No.  The Court of Criminal

234

1   Appeals has not determined her statements are not.  They

2   determined that the forensic interviewer, and the first

3   witness --

4            MR. SMALLWOOD:  Right.

5            THE COURT:  -- based upon that, and then they

6   specifically said -- and then in a dissent on an unrelated

7   issue -- that with the first witness, it may come in under an

8   excited utterance.

9            MR. SMALLWOOD:  She is going to be repeating the

10  same statement which the Court has found to be unreliable,

11  Judge.  It's a rendition of the same story that she initially

12  told, which you and the Court of Criminal Appeals found to be

13  unreliable.

14           THE COURT:  I gave you all the instructions on

15  impeachment of a witness.  And in the notes it says, The

16  Court of Criminal Appeals has held that under certain

17  circumstances, such as where a substantial part of the

18  state's presentation of evidence consists of impeachment of

19  the in-court testimony of its own witness, a positive duty

20  devolves upon the Court to admonish the jurors with respect

21  to the proper use they may make of impeachment evidence.  And

22  failure to fulfill this obligation constitutes reversible

23  error.

24           It's not just giving an instruction, it is

25  admonishing the jury.  And that's what I'm going to do once

235

1   you begin your line of questioning.

2           So what I want you to do is to inform me before you

3   begin so that I could do so.

4           MS. McAMIS:  Well, I anticipate that I am beginning

5   that, so --

6           THE COURT:  Okay.  Then I'll do it now.  Thank you.

7       (WHEREUPON, at this time, the bench conference ended,

8   after which the proceedings continued in open court, as

9   follows, to-wit:)

10          THE COURT:  Ladies and gentlemen of the jury,

11  please listen carefully.  I'm going to give you an

12  instruction.  You will also have written instructions given

13  to you that will contain this instruction when you retire to

14  deliberate.

15          It is anticipated that evidence will be presented

16  that on some prior occasion ████ K.A. ████ made a statement

17  inconsistent with her testimony here today.

18          This evidence is called impeachment evidence.  And

19  it is offered to show that the witness's testimony is not

20  believable or truthful.

21          If you find that a statement was made, you may

22  consider this impeachment evidence in determining what weight

23  and credit to give the testimony of the witness.

24          You may not consider this impeachment evidence as

25  proof of innocence or guilt.  You may consider this

236

1    impeachment evidence only to the extent that you determine it

2    affects the believability of the witness, if at all.

3           Thank you.  You may proceed.

4    Q.   (BY MS. McAMIS)   K.A.  , my question is, had Big Daddy

5    given you massages before when you were not wearing clothes?

6    A.   Yes, he has.  I wasn't never completely naked.

7    Q.   When you testified before, did you testify that he had

8    given you massages when you were not wearing any clothes?

9    A.   Yes.

10   Q.   On the times before this when he had given you massages,

11   where on your body would he massage?

12   A.   He would massage my back.  And he has massaged my neck

13   and shoulders.  And my glutes, which is the area right above

14   my butt.

15   Q.   And he did, in fact, massage your butt; is that correct?

16   A.   Technically.

17   Q.   Were there times before -- well, let me ask you this.

18   The times before this day when the police became involved,

19   when he would give you a massage, where in the house would it

20   happen?

21   A.   He massaged like my back sometimes in the living room,

22   in the bed room.

23   Q.   Were there also other times in his bedroom?

24   A.   Yeah.

25   Q.   Was there ever times when you would give Big Daddy a

237

1  massage?

2  A.   Yes.

3  Q.   During the times before this day when you and Big Daddy

4  would give each other massages, would you use anything with

5  the massages?

6  A.   Oil.

7  Q.   Do you remember what you would do with the oil or where

8  you would get the oil?

9  A.   We get the oil from our kitchen.

10 Q.   What kind of oil was it?

11 A.   Olive.

12 Q.   When you would give Big Daddy a massage, would you

13 sometimes massage his butt underneath his underwear?

14 A.   His glutes, yes.

15 Q.   Was there ever a time that Big Daddy had asked if you

16 wanted a massage and you said no?

17 A.   No.

18 Q.   Do you previously remember testifying about that?

19 A.   No.

20 Q.   And just to be clear, for the record, when I asked you

21 about the first preliminary hearing, that was on September 26

22 of 2012.  Does that sound right to you?

23 A.   I don't remember the dates.

24 Q.   Does it sound right that it was just a few months after

25 all of this first happened?

238

```
 1   A.   Yes.

 2   Q.   Does that sound right at the time period that you were

 3   living with your uncle?

 4   A.   Yeah.

 5   Q.   And I asked you about whether or not there was a time

 6   that Big Daddy had asked you if you wanted a massage and that

 7   you had said no.

 8             THE COURT:   Could you refer to page and line,

 9   please.

10             MS. McAMIS:   Yes, Your Honor, at page 41, starting

11   on line five.

12             THE COURT:   Thank you.

13   Q.   (BY MS. McAMIS)   And were you asked:   "Has he ever asked

14   you if you wanted a massage before and you said no and then

15   it didn't happen?"   And your answer was, "Yes, sir."   You

16   remember that?

17   A.   No.

18   Q.   And when I [sic] say "yes, sir," just to be clear, at

19   the time of this first preliminary hearing, I was asking you

20   questions just like I am now; is that right?

21   A.   Yes.   Could you repeat the question.

22   Q.   Sure.   But let me make sure we're clear about who all

23   was asking you questions.   Okay?   So I was asking you

24   questions like I am now; is that right?

25   A.   Yes.
```

1    Q.    And then it was Mr. Smallwood who was asking you

2    questions after I got done; is that right?

3    A.    Yes.

4    Q.    You actually have referred to him or called him the

5    Monopoly guy?

6    A.    Yes.

7    Q.    Is that how you remember him?

8    A.    Either name.

9          THE COURT:  Either name?  Okay.  Mr. Smallwood or

10   Monopoly guy?

11         THE WITNESS:  Or Allen.

12         THE COURT:  Or Allen.  Go ahead.

13   Q.    (BY MS. McAMIS)  And that was before -- you didn't have

14   April there with you; is that right?

15   A.    I think so.

16   Q.    You think she was there, or you think she was not there?

17   A.    I think she was not.

18   Q.    I'm sorry, I just -- sometimes I want to make sure I'm

19   understanding what you're saying.

20         So you asked me to repeat the question.  And the

21   question was that you were asked by Mr. Smallwood:  "Has he

22   ever asked you if you wanted a massage before and you said no

23   and it didn't happen?"  And your answer was, "Yes, sir."  Do

24   you remember that?

25   A.    So, he asked me and I said no, and then I didn't get a

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

240

1    massage?

2    Q.    Correct?

3    A.    Oh, yes.

4    Q.    Okay.  All right.

5    A.    I didn't understand the question at first.

6    Q.    And anytime we move forward with this, either myself or

7    with Mr. Smallwood, if you don't understand the question, you

8    just let us know.  Okay?

9    A.    Okay.

10   Q.    Now let's talk about that actual morning.  Okay?  Where

11   was your mom that morning?

12   A.    She was at work.

13   Q.    Do you know what kind of hours or what kind of shift she

14   was working?

15   A.    I think she worked nights.

16   Q.    Did the -- that morning, did Big Daddy give you a

17   massage that morning?

18   A.    Yes.

19   Q.    Was that the last time that Big Daddy ever gave you a

20   massage?

21   A.    Yes.

22   Q.    So when we're talking about the last massage, we're

23   clear that that was on June 4th of 2012; is that right?

24   A.    Yes.

25   Q.    Okay.  What time in the morning did the massage start?

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

241

1    A.    I'm not sure.

2    Q.    Do you remember whether or not it was early in the

3    morning?

4    A.    I think.  I don't know.

5    Q.    Do you remember telling anyone that it was around five

6    o'clock in the morning?

7    A.    Possibly, yeah.

8    Q.    Does that seem right if you told someone that?

9    A.    Four or five, maybe.

10   Q.    Okay.  Where were your brother and sisters at that time?

11   A.    They had gone to bed.

12   Q.    Okay.  Where in the house was the massage that morning?

13   A.    The bedroom.

14   Q.    Whose bedroom?

15   A.    My parents'.

16   Q.    So who was actually in the bedroom for the massage?

17   A.    Me and him.

18   Q.    Just you and Big Daddy?

19   A.    Yes.

20   Q.    Your siblings had already gone to bed?

21   A.    Yes.

22   Q.    Who gave who a massage first?

23   A.    I think I gave a massage first.  I don't remember.

24   Q.    Do you remember whether or not he told you his back was

25   hurting and asked for a massage?

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

242

1  A.    No.

2  Q.    Have you ever listened in this case to the recording of

3  the interview that Big Daddy gave with the police?

4  A.    No.

5  Q.    Do you know what he said to the police?

6  A.    No.

7  Q.    If Big Daddy said in his interview to the police that he

8  asked you to give him a massage because his back was hurting,

9  would you agree with that or disagree with that?

10 A.    You mean, would I say yes, I would give him a massage?

11 Q.    Well, do you agree that that's what happened and how it

12 happened, or do you think it happened a different way?

13 A.    I don't think it happened a different way.

14 Q.    Okay.  What was Big Daddy wearing when you gave him the

15 massage that morning?

16 A.    Pajama pants.  Boxers.

17 Q.    Do you remember being asked about that question before?

18 A.    Probably have been.

19 Q.    Do you remember testifying before that he was just

20 wearing underwear?

21 A.    I think.  I don't remember.

22 Q.    And specifically do you remember being asked --

23        THE COURT:  Page and line, please.

24        MS. McAMIS:  Page 15 line 22.

25        THE COURT:  One, 5; line 22.

243

1          MS. McAMIS:  Correct.

2          THE COURT:  Thank you.

3    Q.  (BY MS. McAMIS)  "When you were giving him a massage,

4    what kind of clothes was he wearing?"  And your answer was,

5    "underwear."  Do you remember that?

6    A.  Yes.

7    Q.  Do you remember telling anybody else that that morning

8    he was only wearing underwear?

9    A.  No, I don't remember.

10   Q.  Do you remember ever telling Ms. Howard that Big Daddy

11   was only wearing underwear that morning?

12          MR. SMALLWOOD:  Object; approach the bench?

13          THE COURT:  Yes.

14   (WHEREUPON, at this time, a bench conference was had

15   outside the hearing of the jury, as follows, to-wit:)

16          THE COURT:  Yes, your objection?

17          MR. SMALLWOOD:  This is the statement that's been

18   determined to be unreliable, Judge.  And if she's going to

19   get into impeachment, the jury has to be admonished how they

20   can use that.

21          MS. McAMIS:  Your Honor, Your Honor had made a

22   ruling that while I couldn't show the video, that I could ask

23   direct questions about it.

24          But that does not mean, and Your Honor has not made

25   a ruling, that the jury should be, in any way, admonished

244

1    about it.  This is the same way that I would impeach any

2    other witness.

3              THE COURT:  And it's because you are making your

4    case on impeachment of your own witness.  The Court of

5    Criminal Appeals has instructed me on things that I need to

6    do.  And I told you if you laid a proper foundation you may

7    be able to use those statements, but I would not let you play

8    the video because there's a case on that.  I believe it's

9    *Stiles* -- I think it's *Stiles*.  It's either *Stiles* or *Eddings*

10   I don't remember which one.

11             Be that as it may, I'm only gonna let one, or maybe

12   two at the most of the impeachment witnesses testify because

13   it's cumulative.  So you'll have to pick, at some time, how

14   many you want.  But I'm not going to have eight or ten

15   witnesses come in just for that purpose.

16             MR. SMALLWOOD:  Judge, but this requires an

17   impeachment admonishment just like you did.

18             THE COURT:  If --

19             MR. SMALLWOOD:  We're getting ready to do it, right

20   now.

21             THE COURT:  I've just given it.  I have to do it

22   for each witness, as I interpret it.  So why would I need to

23   give another admonishment for this witness?

24             MR. SMALLWOOD:  Every time a prior inconsistent

25   statement comes in, I believe an impeachment admonishment

245

```
1    needs to be given.
2              THE COURT:  I think my admonishment stands from
3    what I just did.
4              MR. SMALLWOOD:  Would you tell the jury that?
5              THE COURT:  In other words, remind them of the
6    admonition?
7              MR. SMALLWOOD:  Yes, sir.
8              THE COURT:  I will this one time.  Thank you.
9        (WHEREUPON, at this time, the bench conference ended,
10   after which the proceedings continued in open court, as
11   follows, to-wit:)
12             THE COURT:  Ladies and gentlemen, let me continue
13   to remind you of my prior admonition about impeachment
14   testimony.  All right?  I just read it to you.  It may be
15   read to you again during the trial with another witness.  And
16   you'll certainly have it in your packet of instructions when
17   you retire to deliberate.
18             All right.  You may continue.
19   Q.   (BY MS. McAMIS)  I was asking you before if you remember
20   telling anyone else that Big Daddy, that morning, was just
21   wearing his underwear.  Do you remember talking to Amy that
22   morning when you were being interviewed?
23   A.   Kind of.
24   Q.   And is it kind of that you don't remember her name?  Or
25   do you remember going to the Justice Center, the Children's
```

1  Advocacy Center and being interviewed, do you remember that?

2  A.   I remember that morning, that time a little bit.

3  Q.   And do you remember telling Amy that he was only wearing

4  underwear that morning?

5  A.   No.

6  Q.   Where that morning -- well, let me ask because you've

7  told us that you have used oil in the past for the massages.

8  Were you using oil that morning --

9  A.   Yes.

10  Q.   -- when you were massaging him?  And tell us when you

11  were massaging him, Big Daddy, that morning, how was he on

12  the bed?

13  A.   He was laying on his stomach.

14  Q.   He was laying on his stomach on the bed?

15  A.   Yes.

16  Q.   When you massaged Big Daddy's butt that morning, was it

17  on top of his underwear or underneath his underwear?

18  A.   I would, like, if I had to, I would move the underwear

19  down a tiny bit so I could massage the glutes.

20  Q.   So did you massage his glutes underneath his underwear?

21  A.   Yes.

22  Q.   Do you ever remember saying that Big Daddy was the one

23  who moved his underwear down?

24  A.   No.

25  Q.   When you testified at the preliminary hearing, on page

247

1   18 at line five, do you remember being asked:   "And so did

2   you put your hands underneath his underwear?"   And you

3   answering, "No, he would move the back of his underwear down

4   a little bit."

5   A.    No, I don't remember that.

6   Q.    Did you put oil on his butt during this massage?

7   A.    I wouldn't put it on his butt, like, when you're

8   massaging someone, you don't want it to be too cold, so you

9   put the oil on your hand and you heat the oil up because, if

10  it's a professional job, you wouldn't just put it on them.

11  Q.    So once the oil was on your hands, then did you touch

12  your hands with the oil on his butt?

13  A.    Yes.

14  Q.    After you had given Big Daddy a massage that morning,

15  did he ask you if you wanted a massage?

16  A.    No.

17  Q.    Do you remember saying that he did?

18  A.    No.

19  Q.    Do you remember, on page 18 at line 19, being asked:

20  "After you massaged him, then what happened?"   And your

21  answer was, "He was going to give me a massage."   And then

22  the question was, "Okay.   And so did he tell you he was going

23  to do that?"   And your answer was, "No, he asked me if I

24  wanted a massage."   Do you remember that?

25  A.    No.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

248

1   Q.   When I read this to you out of this transcript, have you

2   looked at this transcript or have you read this transcript?

3   A.   Yes.

4   Q.   When was the last time that you looked at it or read it?

5   A.   Last weekend.

6   Q.   Do you believe that just like there's a court reporter

7   here today that's writing down everything you said, you know

8   that that day that's where this transcript comes from; right?

9   A.   Yes.

10  Q.   Okay.  Did you want a massage that morning?

11  A.   Yes.

12  Q.   What clothes did you take off so that you could get a

13  massage that morning?

14  A.   He would leave the room so I could get undressed, and I,

15  like, I'd get on the bed and I'd lay down with covers on me

16  so he would massage my back and my glutes.

17  Q.   Did you take off your shirt?

18  A.   Yes.

19  Q.   Did you take off your pants?

20  A.   Yes.

21  Q.   Did you take off your panties?

22  A.   No.

23  Q.   Do you remember testifying that you took off your

24  panties?

25  A.   Yeah.

249

1   Q.   So you do remember telling that to the other judge that

2   you took off your panties?

3   A.   Yes.

4   Q.   Do you know whether or not when Big Daddy talked to the

5   police whether or not Big Daddy told the police you had taken

6   off your panties?

7   A.   No.

8   Q.   If he said to the police that you took off your panties,

9   would he be wrong about that?

10  A.   I don't know.  I don't remember, so -- I remember having

11  panties on.

12  Q.   Do you remember -- I've asked you about testifying.  Do

13  you remember when you talked to Amy, do you remember telling

14  her about taking off your panties?

15           MR. SMALLWOOD:  Judge, I'm gonna object to that.

16  Ask to approach.

17           THE COURT:  Overruled.  Overruled.

18           Do you remember telling Amy that?

19           THE WITNESS:  No.

20           THE COURT:  Answer was "no."  Please go on.

21  Q.   (BY MS. McAMIS)  How then were you laying on the bed?

22  A.   On my stomach.

23  Q.   So where on your body, then, did Big Daddy massage you?

24  A.   My back and my glutes.

25  Q.   And did he use the oil on you?

250

1  A.    Yes.

2  Q.    What part of his body was he using to massage you?

3  A.    His hands.

4  Q.    When he was massaging you with his hands, did his thumbs

5  get close to your bottom or your private parts?

6  A.    He massaged my glutes and that's, like, right -- like,

7  right down here.  And, like, the oil is, like, really

8  slippery.

9  Q.    So the oil is slippery?

10  A.    Yes.

11  Q.    So when he was massaging your glutes and the oil was

12  slippery, did his thumbs get close to your private parts?

13  A.    His thumb accidentally jabbed me.

14  Q.    Okay.  And I want to ask about that in just a second.

15  But did he actually put oil on your vagina or on your butt?

16  A.    No.

17  Q.    Do you remember telling Amy that?

18  A.    Yes.

19  Q.    So did you tell Amy that?

20  A.    Yes.

21  Q.    Do you remember telling Amy about how it felt when he

22  put the oil on your vagina and on your butt?

23  A.    Yeah.

24  Q.    If he was putting oil on your vagina and on your butt,

25  how could he have done that if you had panties on?

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

251

1    A.    One big thing that is not being, I guess, put into the

2    conversation is I was told what to say.

3    Q.    And I want to ask you about all of that in just a

4    minute.  Okay?  But first of all, if he was putting oil on

5    your vagina and on your butt, how could he have done that

6    with panties on?

7    A.    It won't have been possible.

8    Q.    Did that happen, putting -- his thumbs getting close to

9    your private parts and the oil on your vagina and your butt,

10   did that happen on every massage?

11   A.    No.

12   Q.    Do you remember being asked about that at the

13   preliminary hearing?

14   A.    No.

15   Q.    On page 44, starting at line 13:  When he does that --

16   this is a question -- When he does that his thumbs get real

17   close to your bottom, don't they?  Or to your private parts,

18   don't they?  And your answer was yes, sir.  And then the

19   question was that happens at that point in any massage,

20   doesn't it?  And you said, yes, sir.

21        Do you remember that?  That's when Mr. Smallwood was

22   asking you questions.  Do you remember that?

23   A.    Not during, like, any massage, except when I asked him

24   to massage my glutes.  That's, like, the only time 'cause

25   it's my lower -- basically it's my lower back.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

252

1   Q.    So really only when your glutes are being massaged?

2   A.    Yes.

3   Q.    During the massage, did you -- you told us that you

4   started out laying on your stomach.  At some point did you

5   end up on your side?

6   A.    In that statement that you're talking about?  Yes, in

7   the statement.

8   Q.    Okay.  And just to be clear, we've talked about two

9   different statements.  We've talked about one to Amy and

10  we've talked about the preliminary hearing.

11      Are you agreeing that both of those times you said you

12  ended up on your side?

13  A.    I don't remember both -- what I said during both of

14  those, but I remember what I was told to say.

15  Q.    Okay.  Well, first I'm asking you about what you said.

16  What you testified to, okay?  And so first I want to ask you

17  about, at page 20, line 22, where you testified -- where you

18  were asked, at line 21:  "And then what happened?"  And your

19  answer was, "I don't know.  He must have thought I was a

20  asleep or something.  Next thing I knew I was turned over on

21  my side."  Do you remember that?

22  A.    Yes.

23  Q.    Okay.  And then do you remember, on page 21, at line 2,

24  testifying:  "Next thing I know I was turned over on my

25  side."  Do you remember that?

253

1   A.   Yes.

2   Q.   Did you say yes or no?

3   A.   Yes.

4   Q.   And then again on page 21, at line eight, do you

5   remember being asked:  "Okay.  And so when you said you were

6   on your side, you were laying on the side of your body?"  And

7   your answer was, "Yes, ma'am."  Do you remember that?

8   A.   Yes.

9   Q.   And then still on page 21 at line 22, do you remember

10  being asked:  "And so the next thing you remember, you're

11  laying on your side; is that right?"  And again answering,

12  "Yes, ma'am."  Do you remember that?

13  A.   Yes.

14  Q.   What side were you laying on?

15  A.   That didn't actually happen.

16  Q.   Do you remember testifying about what side you were

17  laying on?

18  A.   No, I don't remember.

19  Q.   Do you remember being asked by Mr. Smallwood, on page

20  43, at line 24 -- I'm sorry, starting at line 16:  "When you

21  were on your side were you facing the side with the door or

22  the side with the window?"  And you answered, "The door."

23       And so Mr. Smallwood asked:  "So, you were on your right

24  side?"  You answered, "My left."  And Mr. Smallwood asked:

25  "You were on your left side?  Okay.  So that would have meant

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

254

1    your right shoulder was up; correct?"  And you answered,

2    "Yes, sir."

3         And then you were asked, "And you said Adam was behind

4    you?"  And you answered, "Yes, sir."  Do you remember that?

5    A.   Yes.

6    Q.   At some point in time, did you testify that Big Daddy

7    thought you were asleep?

8    A.   Yes.

9    Q.   And did you testify that he must have thought you were

10   asleep because you had your eyes closed?

11   A.   Yes.

12   Q.   During that massage, did Big Daddy touch you with any

13   other parts of his body, besides his hands?

14   A.   In the statement, yes.

15   Q.   What about in the statement, what part of his body did

16   you say that he used?

17   A.   In the statement, I said his penis.

18   Q.   Okay.  And did you also testify to that in court?

19   A.   I think so.

20   Q.   Okay.  Specifically on page 24, were you asked, starting

21   at line one:  "And my question is, did Adam ever touch you

22   with any other part of his body besides his hands?"  And your

23   answer was, "His penis."  Do you remember that?

24   A.   Yes.

25   Q.   And then, "Where on your body did you testify, and did

255

1   you say in your statement that Big Daddy had touched you with

2   his penis?"

3   A.   I don't remember exactly.

4   Q.   Do you remember saying that it went inside your butt

5   hole?

6   A.   Yes.

7   Q.   Do you remember saying that in court?

8   A.   I don't remember.

9   Q.   Do you remember being asked, on page 25, When Adam --

10   starting at line one:  "When Adam touched you with his penis

11   on your butt hole, did it stay on the outside of you butt

12   hole, or did it go on the inside of your butt hole?"  And

13   your answer was, "In."  Do you remember that?

14   A.   No, I don't remember.

15   Q.   Do you remember telling Amy that --

16            MR. SMALLWOOD:  Judge, I'm gonna object to this.

17   Basis:  Two court rulings and objection I made before, Judge.

18            THE COURT:  Rephrase your question, please.

19            Sustained rephrase -- sustained.  Rephrase your

20   question.  I'm sorry.

21   Q.   (BY MS. McAMIS)  Do you remember talking to Amy about

22   what Big Daddy did with his penis?

23            MR. SMALLWOOD:  To which I'll object, same basis:

24   two court rulings and --

25            THE COURT:  Excuse me.  Y'all approach.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

256

1          Ladies and gentlemen, you may stand and stretch, if

2   you wish, but please do not talk.

3      (WHEREUPON, at this time, a bench conference was had

4   outside the hearing of the jury, as follows, to-wit:)

5          THE COURT:  Mr. Smallwood, I don't want it said in

6   front of the jury, "two court rulings," because I can't do

7   that.  I cannot bring up the appeal to the Court of Criminal

8   Appeals.  Unless, of course, the state continues to violate

9   it.

10          What I said earlier is there can be impeachment by,

11   potentially, Amy Howard on specific questions.  And it seems

12   like she asked a specific question at that time that she can

13   answer yes or no.  And whether that gets in later with Amy, I

14   don't know.

15          MR. SMALLWOOD:  In the face of two court rulings

16   that that statement to Amy Howard was unreliable, the jury's

17   not gonna know that, Judge, ever?  What was the purpose of

18   all these appeals?

19          THE COURT:  Well, I don't know why the state made

20   the appeal.  They initiated it.  But I don't -- I don't know

21   if it gets in because I haven't heard what all the evidence

22   is yet.

23          MR. SMALLWOOD:  It's in.  It's in all over the

24   place, Judge.

25          THE COURT:  But again, she can do impeachment with

257

1   prior statements that she made to someone.  I'm not saying

2   I'm gonna let Amy testify to it.  I think I've made my ruling

3   and I'm clear, but I do not want it brought back before the

4   jury.

5          MR. SMALLWOOD:  It won't be brought back.  I'm

6   gonna make objections, Judge.

7          THE COURT:  Sure.  Sure.  Make your objections.

8   But I don't want it said "two court rulings."  Thank you.

9       (WHEREUPON, at this time, the bench conference ended,

10  after which the proceedings continued in open court, as

11  follows, to-wit:)

12         BAILIFF BUTCHER:  She took her to the jury room.

13         THE COURT:  Would you get her, please?

14         You may continue.

15  Q.   (BY MS. McAMIS)  What I was asking you about was whether

16  or not you talked to Amy about what Big Daddy had done with

17  his penis.  Did you?

18  A.   I remember talking to her about that.

19  Q.   And did you tell Amy that Big Daddy had put his penis in

20  your butt?

21  A.   I told her that, yes.

22  Q.   Do you remember when you went and got an examination at

23  the hospital?

24  A.   Yes.

25  Q.   Do you remember talking to the nurse who did that exam

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

258

1   on you?

2   A.   Yes.

3   Q.   And do you remember telling her that your mom's fiance

4   had put his penis in your butt?

5   A.   I don't remember telling her that, but I was reminded.

6            THE COURT:  I'm sorry, what?

7            THE WITNESS:  I was reminded.

8            THE COURT:  You were reminded.

9   Q.   (BY MS. McAMIS)  Who reminded you about telling her

10  that?

11  A.   Allen.

12  Q.   When did Allen remind you about that?

13  A.   When we had a meeting.

14  Q.   When was the meeting?

15  A.   On the weekend.

16  Q.   A week ago, is that what you said?  Oh, on this weekend?

17  A.   No.

18  Q.   How many weekends a ago?

19  A.   I think maybe last weekend.

20  Q.   Who all was there for the meeting?

21           MR. SMALLWOOD:  Judge, I object to this.

22           MS. McAMIS:  I don't know what the objection --

23           MR. SMALLWOOD:  The law's clear that I have a right

24  to talk to witnesses just the same as --

25           THE COURT:  Excuse me.  Please.  Please.  Objection

259

1    is sustained.   And I'll give an instruction to the jury that

2    it is proper for attorneys to interview witnesses.

3            You may continue.

4    Q.   (BY MS. McAMIS)   So what were you reminded about the

5    statement that you gave?

6    A.   He wasn't really -- he wasn't telling me that I did

7    that.   He was telling me that you'd probably ask me about

8    that.

9    Q.   Did he tell you I'd ask you about all of this?

10   A.   Not all, not most of what you're talking about.

11   Q.   Did he tell you how to answer --

12   A.   No.   He told me to answer truthfully.

13   Q.   Okay.   Do you remember testifying about how you felt

14   when that happened with Big Daddy's penis?

15   A.   No.

16   Q.   Do you remember testifying that you were scared?

17   A.   No.

18   Q.   I'm gonna go to -- on the transcript, on page 25,

19   starting at line five, after you had talked about his penis

20   being inside your butt hole, you were asked:   "How did

21   that -- did you feel anything when that happened?"   And your

22   answer was, "Scared."   Do you remember that?

23   A.   Yes.

24   Q.   Do you remember telling Amy that you were scared?

25   A.   I remember, yeah.

1  Q.   Do you remember telling Amy that you were still scared

2  at the time that you were talking to her?

3  A.   Yes, I remember saying that.

4  Q.   Do you remember saying whether or not it hurt when he

5  did that to you?

6  A.   No, I don't remember.

7  Q.   Do you remember telling Amy that it hurt?

8  A.   No, I don't remember.

9  Q.   Do you remember during your sexual assault examination,

10  do you remember telling the nurse several different times

11  that it hurt?

12  A.   No.

13  Q.   When -- do you remember describing when Big Daddy was

14  touching you with his penis, what he was doing or how he was

15  moving?

16  A.   No.

17  Q.   Do you remember telling Amy that he was moving his penis

18  back and forth?

19  A.   No.

20  Q.   Do you remember testifying about when he was touching

21  you with his penis how you made it stop?

22  A.   I remember saying that I moved.

23  Q.   Okay.  Do you remember saying that you pretended like

24  you were waking up?

25  A.   Yeah.

261

1  Q.   And do you remember saying that when you pretended like

2  you were waking up, that is when he moved and moved his penis

3  away from you?

4  A.   Could you ask that a different way?

5  Q.   Sure.  Do you remember testifying that when you

6  pretended that you were waking up, that that is when he moved

7  and moved his penis back away from you?

8  A.   I don't remember.

9  Q.   Do you remember telling Big Daddy that you didn't want a

10 massage anymore after that?

11 A.   I think I remember saying that.

12 Q.   Do you remember after he moved back away from you, do

13 you remember what you said that you heard?

14 A.   No.

15 Q.   Did you tell Amy that you heard a sound like him moving

16 his underwear back?

17 A.   No, I don't remember.

18 Q.   After that happened then, and after you said that you

19 pretended to be waking up, do you remember saying what Big

20 Daddy did at that point?

21 A.   No.

22 Q.   Do you remember testifying that he then started

23 pretending like he was massaging your back?

24 A.   No, I don't remember.

25 Q.   Do you remember being asked -- in the transcript it's

262

1    page 27, starting at line 13:  "After he moved back, then

2    what happened?"  And your answer was, "I turned on my

3    stomach."

4         And then the question was:  "And when you turned on your

5    stomach, then what happened?"  And your answer was, "He

6    pretended like he was massaging my back."  Do you remember

7    that?

8    A.    No.

9              THE COURT:  Again, it was page 27?

10             MS. McAMIS:  Twenty-seven, starting at line 13.

11             THE COURT:  Thank you.

12   Q.   (BY MS. McAMIS)  Do you remember telling Amy that he

13   pretended to start massaging you again?

14   A.    No, I don't remember.

15   Q.   Do you remember telling the SANE nurse that was

16   examining you, that after this happened, he pretended to

17   start giving you a massage again?

18   A.    No, I don't remember.

19   Q.   Did you testify that you, at that point, told Big Daddy

20   that you were tired and you wanted to go to bed?

21   A.    In the statement, yes.

22   Q.   And then in court did you testify to that?

23   A.    I think so.

24   Q.   Did you testify then that you got up?  You remember

25   doing that, getting up out of the bed?

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

263

```
 1    A.    I remember saying that, yes.

 2    Q.    And did you get dressed after you got up?

 3    A.    Whenever he gives me massages, he never stays in the

 4    room while I get dressed.

 5    Q.    So, did you get dressed?

 6    A.    Yes.

 7    Q.    And then did you leave the room?

 8    A.    Ask that question again.

 9    Q.    When you got dressed, after all of this had happened,

10    then did you leave the room?

11    A.    Yes.

12    Q.    Did you -- did you wait, then, until he went to sleep?

13    A.    Yes.

14    Q.    Did you wait until he turned out all the lights?

15    A.    Yes.

16    Q.    At some point did you try to wake up your sister or to

17    try to find her phone to try to call your mom?

18    A.    I don't remember.

19    Q.    Do you remember testifying that you tried to wake up

20    your sister, ███████, but she wouldn't wake up?

21    A.    No.

22    Q.    And this was for Mr. Smallwood.  Starting at page 54, on

23    line 14, when were you asked:  "Is there any reason, ███████,

24    why you didn't tell one of your sisters about this?"  And you

25    answered, "I tried."
```

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1    And you were asked by Mr. Smallwood:  Who?  You

2  answered, "My older sister."  And he said, " P.A.   And you

3  said, "Yes, sir."

4    And he said, "How did you try to do that?"  And you

5  said, "I tried waking her up, but she wouldn't wake up."  Do

6  you remember telling Mr. Smallwood that?

7  A.   Was that in court?

8  Q.   That was in court.  Uh-huh.

9  A.   No, I don't remember.

10  Q.   Was it after that that you went outside and you were

11  waiting by the trash can?

12  A.   Yes.

13  Q.   When you went to your neighbor's house, do you remember

14  testifying about what you told your neighbors?

15  A.   Yes, I remember testifying to that.

16  Q.   Did you testify that you told your neighbors that Adam

17  was giving you a massage and afterward he --

18        MR. SMALLWOOD:  Judge, I object to this on the

19  grounds that I made before.  Ask the jury be admonished to

20  disregard.

21        THE COURT:  Counsel, approach.

22        Y'all may stand and stretch, if you like, but

23  please do not talk.

24        THE COURT:  On the record.

25    (WHEREUPON, at this time, a bench conference was had

265

1   outside the hearing of the jury, as follows, to-wit:)

2          MS. McAMIS:  This is what she testified that she

3   told the neighbors, in response to Mr. Smallwood's questions.

4          THE COURT:  And your objection is.

5          MR. SMALLWOOD:  Is that statement has been

6   determined to be unreliable, Judge.

7          THE COURT:  Okay.  But this is not -- this is not a

8   statement by the neighbor.  This is her statement.

9          MR. SMALLWOOD:  She's repeating what she told the

10  neighbor, which has been determined to be unreliable.

11         THE COURT:  I may be mistaken.

12         MS. McAMIS:  This is what she testified at the

13  preliminary hearing that she told the neighbors.

14         MR. SMALLWOOD:  Which has been determined to be

15  unreliable, Judge.

16         MS. McAMIS:  This is the hearsay --

17         THE COURT:  Wait a minute.  Again, as to the first

18  neighbor, it may be an excited utterance.  I haven't ruled on

19  the second neighbor.  I don't think it comes in from what I

20  know so far, on the second neighbor.

21         And I have determined that that's unreliable.

22  There are three people that I've determined are unreliable.

23  That second neighbor -- well, actually, the first neighbor,

24  second neighbor, and Amy.  All right?

25         Now, there's an exception that even the Court of

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1  Criminal Appeals, in their opinion recognized, as to the

2  first one, as it may be a excited utterance.  I haven't heard

3  any evidence that it may be an excited utterance.

4           What I have heard so far is there's a long period

5  of time whenever this happened and she went to the neighbors.

6           This statement, as I understand it, is not what she

7  told her neighbor, but what she said in the preliminary

8  hearing.

9           MR. SMALLWOOD:  What she said she told the neighbor

10  in the preliminary hearing, which is the same thing.

11           MS. McAMIS:  Yes, this is what she said she told

12  her neighbor.

13           MR. SMALLWOOD:  Which has been determined to be

14  unreliable.

15           MS. McAMIS:  Judge, again --

16           THE COURT:  Okay.  Why don't you specify as to

17  which neighbor.  Because part of it is not coming in to the

18  second, but it may come in on the first one.

19           MS. McAMIS:  This is directly in response to

20  Mr. Smallwood's questions where he asked, Where did she go?

21  She said she went to the neighbor's.  And he asked, Did you

22  have a conversation with them?  Yes.  And then he asked, What

23  did you tell them?  And then she testified as to what she

24  told them.

25           THE COURT:  Okay.  You can -- part of that is

267

1    admissible, I agree.  Part of it is not.  I think you're

2    gonna have to re-ask your question, and not impeach -- and

3    not use this to get her to say what she said, but seeing if

4    she remembers what she said to her neighbor.

5                MS. McAMIS:  But she just testified that she didn't

6    remember.  So then --

7                THE COURT:  Okay.  Bring it up to that point, see

8    if that refreshes her memory.  And see if she can.

9                MS. McAMIS:  Okay.

10               THE COURT:  All right.

11        (WHEREUPON, at this time, the bench conference ended,

12   after which the proceedings continued in open court, as

13   follows, to-wit:)

14               THE COURT:  ███K.A.███, listen very carefully to the

15   question.  Okay?

16               THE WITNESS:  Okay.

17               THE COURT:  All right.  Ms. McAmis.

18   Q.   (BY MS. McAMIS)  ███K.A.███, I was just asking you a

19   question about what you remember telling your neighbors after

20   this happened.  You remember me asking you that question?

21   A.   Yes.

22   Q.   And do you remember what you told your neighbors after

23   this happened?

24   A.   Yes.

25   Q.   What did you tell them?

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

268

1   A.    I told them that I had a dream.

2   Q.    Is that all you told them?

3   A.    I told them that I had a dream of what happened when I

4   was five.

5   Q.    What else do you say that you told them?

6   A.    Can you ask the question again?

7   Q.    Did you tell them anything else about what Big Daddy had

8   done to you?

9   A.    No.

10  Q.    Do you remember when Mr. Smallwood was asking you

11  questions about what you told the neighbors?

12  A.    No, I don't remember.

13  Q.    Okay.  I'll start with on page 55 starting at line 20,

14  when Mr. Smallwood asked you:  "It was raining.  Okay.  Then

15  where did you go?"  And your answer was, "The neighbors'

16  across the street."

17       And Mr. Smallwood said:  "Okay.  And you had a

18  conversation with them?"  And you said, "Yes."  Mr. Smallwood

19  asked, "Do you remember what you told them?"  And you said,

20  "Yes, sir."

21       And he asked, "What did you tell them?"  Your answer

22  was, "What happened."  His question:  "Do you remember what

23  it is exactly that you told them?"  And you said, "Yes, sir."

24       And he asked:  "What did you tell them?"  Your answer

25  was, "That I was giving him -- I was giving Adam a massage,

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1   and then afterward he was giving me a massage.  And then I

2   don't remember this one part how I turned over or something."

3       Mr. Smallwood said, "Okay."  And then you said, "And

4   then he -- that he stuck his penis in my butt hole."  Do you

5   remember being asked about that and testifying to that?

6   A.   Yes.

7   Q.   After you went to your neighbors, and when you had

8   talked to your neighbors about what had happened, did your

9   mom show up there?

10  A.   Yes.

11  Q.   Can you describe for us how your mom was acting when she

12  showed up?

13  A.   She came in and wanted to ask me what was going on, but

14  they wouldn't let her talk to me.

15  Q.   Who wouldn't let her talk to you?

16  A.   Katherine and Karen.

17  Q.   So what did you observe about how your mom was acting?

18  A.   She was worried.

19  Q.   Do you remember having to comfort your mom?

20  A.   Yeah.  She was crying.  I was crying.  There were cops

21  there.  I was being told to say things.  And I just had a

22  nightmare.

23  Q.   And I'm gonna ask you about all of that.  But right now

24  what I'm asking is when your mom got there, do you remember

25  talking about how you had to comfort her?

270

```
 1   A.    Yes.

 2   Q.    After the police were involved and everything, did you

 3   stay with your neighbor that night?

 4   A.    Yes.

 5   Q.    Did you remember talking to your neighbor, Katherine,

 6   and telling her that very night that you're mom didn't

 7   believe you?

 8   A.    No.

 9             THE COURT:    Just a moment.    Here you go,  K.A.  .

10   Do you want some water?   Oh, you have some water.   Do you

11   need a break?

12             THE WITNESS:    (Witness shakes head.)

13   Q.    (BY MS. McAMIS)   So was there a couple of days there

14   where you were still with your mom, before you went to the

15   shelter, and before you then went to live with your uncle?

16   A.    Yes.

17   Q.    When you were still living with your mom, did your mom

18   ask you if you wanted to talk to Big Daddy on the phone?

19   A.    No.

20   Q.    Do you remember testifying about that?

21   A.    Yes.

22   Q.    I'm gonna ask you about page 29, starting at line 22.

23   Actually, starting at line 19 when you were asked:   "Okay.

24   Have you ever -- after you went and talked to your neighbors,

25   have you ever talked to Adam about anything that happened?"
```

1  And your answer was, "When we were still living with my mom,

2  she asked me if I wanted to talk to him.  And I didn't know

3  what to say, so I just said yes."  Okay.  Do you remember

4  testifying to that?

5  A.  Yes.

6  Q.  And what did you testify that he told you on that phone

7  call?

8  A.  I don't remember.

9  Q.  Do you remember testifying, "That he was trying to tell

10  me that it could have been his thumb.  That he said he put

11  his hands on my back and he asked me if I was okay."  Do you

12  remember testifying about that?

13  A.  Yes.

14  Q.  Do you remember when Mr. Smallwood was asking you

15  questions about that phone call?

16  A.  No.

17  Q.  Okay.  Do you remember telling Mr. Smallwood, on page

18  57, starting at line 20, when Mr. Smallwood asked:  "Okay.

19  You indicated -- and I don't think you knew exactly when this

20  happened, but some time after this event you said that you

21  called -- or your mom called Adam and then asked you if you

22  wanted to speak with Adam."

23       Your answer was, "Well, I don't know who called, but my

24  mom was talking to him, and then she asked if I wanted to

25  talk to him.  And I just said sure, and then I didn't know

272

1   what else to say."

2       Do you remember telling Mr. Smallwood about that?

3   A.   Yes.

4   Q.   Do you remember talking about, that before that phone

5   call, you had been asking your mom about getting a puppy?

6   A.   I've been asking about getting a puppy long before that.

7   Q.   Do you remember testifying that your mom said that you

8   were gonna have to check with Adam and be sure with Adam

9   about getting the puppy?

10  A.   That was after I had called him.

11  Q.   Okay.  Was this the same phone call?

12  A.   Yes.

13  Q.   And your testimony now today is that you called him;

14  right?

15  A.   Yes.

16  Q.   But I just want to make sure that we're talking about

17  the same phone call.

18  A.   Yes.

19  Q.   Okay.  And do you remember saying that during that phone

20  call that you talked to him about the fact that you wanted a

21  puppy, and you wanted to keep it in the backyard?

22  A.   Yes.

23  Q.   Okay.  So it was after you had that phone conversation

24  with Big Daddy that then you had to go and live at the

25  shelter and you had to go and live with you uncle; is that

273

1    right?

2    A.    Yes.

3    Q.    We've talked about the fact that when you were living

4    with your uncle, that's when you came and testified, this

5    transcript that I'm reading from; is that right?

6    A.    Yes.

7    Q.    Then back when you went back to live with your mom and

8    your grandma, then do you remember when your grandma had

9    Mr. Smallwood come over and talk to you?

10   A.    Yes.

11   Q.    And that was on July 24th of 2013; is that right?

12   A.    I guess.

13   Q.    You know there was a transcript of that too?

14   A.    Yes.

15   Q.    Have you read that?  Have you looked at that?

16   A.    I read some of it.

17   Q.    I didn't hear you.

18   A.    I read some of it.

19   Q.    Was that just last weekend when you were meeting with

20   Mr. Smallwood?

21   A.    Yes.

22   Q.    Did he talk to you about what parts to read?

23   A.    No.

24   Q.    So you're not -- if the transcript says that it happened

25   on July 24th of 2013, you wouldn't disagree with that?

274

1    A.    If it says that, no.

2    Q.    Okay.  At that time when it was your grandma and you

3    talking to Mr. Smallwood, I wasn't there for that; is that

4    right?

5    A.    Yep.

6    Q.    And April, she was not there for that; is that right?

7    A.    No.

8    Q.    Do you remember the lawyer that you had for your

9    juvenile court?

10   A.    No.

11            MR. SMALLWOOD:  Judge, I'm gonna object to this.

12   Ask to approach the bench.

13            THE COURT:  Yes.

14   (WHEREUPON, at this time, a bench conference was had

15   outside the hearing of the jury, as follows, to-wit:)

16            MR. SMALLWOOD:  Judge, I don't know where she's

17   going with this.  But what relevance does it have?  She

18   admitted -- she can talk to her about the statement, but what

19   relevance does it have as to what lawyer she had at the

20   juvenile court?

21            I gave notice to that lawyer I was going to take

22   the statement.  They didn't do anything.  They didn't even

23   contact me.

24            MS. McAMIS:  Well, the record will clearly reflect

25   what happened.  But it all goes to the credibility of her

275

 1    statement as to who was there at the time that the statement

 2    was given.  And I'm entitled to ask her about that.

 3            THE COURT:  Yes, you are entitled to ask that.  And

 4    then as I understand it, her grandmother was there; is that

 5    right?

 6            MR. SMALLWOOD:  I gave notice to her lawyer in

 7    juvenile court that the statement was going to be taken on

 8    this day.  The lawyer didn't respond to me.  Didn't object.

 9    Nothing.  We took the statement.

10            MS. McAMIS:  The record will reflect what really

11    happened.

12            THE COURT:  Was her grandmother present --

13            MS. McAMIS:  Yes.

14            THE COURT:  -- when she made the statement?

15            MS. McAMIS:  If Your Honor will recall, the

16    grandmother was not the custodian and did not have legal

17    authority to allow that conversation and that's been -- I'm

18    not going into any of that.

19            THE COURT:  Let me tell you, you're skating right

20    up to the line, and I don't like it.  There is nothing

21    improper about him interviewing witnesses.  And now what it

22    set up -- I've told them I appointed April to represent her.

23    This is before April was even appointed, I believe.  I don't

24    know if the criminal charge was filed yet or not.

25            MS. McAMIS:  Yes, this is the reason April was

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1    filed [sic].  And Your Honor made a finding that it was

2    incorrect and that he shouldn't have done that.  I can show

3    you the transcript.  But I'm not going into any of that.

4           The only other question I was going to ask her,

5    which I was asking her, was if her juvenile attorney was

6    there?

7           THE COURT:  And what difference does that make?

8           MS. McAMIS:  Your Honor, it makes a difference who

9    all is there when you're assessing the credibility of that

10   particular statement.

11          THE COURT:  Okay.

12          MR. SMALLWOOD:  How does that have any --

13          THE COURT:  I'm gonna overrule the objection.

14          But I'm gonna tell you, if this keeps up, you're

15   gonna force the Court to make a statement to the jury, and an

16   admonition, that I don't want to do.

17          And if that means that with every one of these

18   witnesses I've got to read a cautionary instruction, I'm

19   prepared to do that.  I'm prepared to give them specific

20   instructions in the final instructions, if the state is not

21   going to play close by the rules.

22          I've made my ruling.  Please continue.

23       (WHEREUPON, at this time, the bench conference ended,

24   after which the proceedings continued in open court, as

25   follows, to-wit:)

277

1      THE COURT:  You may continue.

2      MS. McAMIS:  Thank you.

3   Q.   (BY MS. McAMIS)  The people who were there for that

4   statement, it was you, your grandma, and Mr. Smallwood; is

5   that right?

6   A.   Yes.

7   Q.   There was a court reporter writing down what you said,

8   but nobody else; is that right?

9   A.   Yes.

10  Q.   And you, at the time that you talked to Mr. Smallwood,

11  at that time you were 12; is that right?

12  A.   Yes.

13  Q.   Do you remember Mr. Smallwood asking you about, and you

14  telling Mr. Smallwood during that conversation, about what

15  your Uncle Dave had done to you when you were five years old?

16  A.   Yes.

17  Q.   Can you tell us, specifically, what it was that Uncle

18  Dave did to you?

19  A.   Sorry.  He -- he made me suck his penis and he touched

20  me.

21  Q.   Did your Uncle Dave give you massages?

22  A.   No.

23  Q.   Do you remember when Mr. Smallwood asked you if you

24  still had bad dreams about what your Uncle Dave had done to

25  you?

278

1    A.    Yeah.

2    Q.    And do you remember telling Mr. Smallwood that you

3    didn't have many bad dreams about it because you try to

4    forget about it?

5    A.    I remember saying that.

6    Q.    Do you remember telling Mr. Smallwood that Big Daddy was

7    your best friend?

8    A.    Yes.

9    Q.    Do you remember telling Mr. Smallwood that Big Daddy did

10   not really give massages to your sisters or to your brother?

11   A.    Yeah.

12   Q.    You said yes?

13   A.    Yeah.

14   Q.    Okay.  Do you remember telling Mr. Smallwood about how

15   you took off your top for the massage?

16   A.    Yeah.

17   Q.    And is that when you told Mr. Smallwood that during the

18   massage, that Big Daddy had accidentally jabbed you because

19   he slipped and his thumb hit you on the bottom?

20   A.    Uh-huh.  Yeah.

21   Q.    Did you tell Mr. Smallwood that when that happened you

22   told Big Daddy that you were tired and that you wanted to go

23   to bed?

24   A.    Yeah.

25   Q.    Do you remember after telling Mr. Smallwood about that,

1    that it was Mr. Smallwood who asked you if you had been

2    having a dream when that happened?

3    A.    Yeah.

4    Q.    And when Mr. Smallwood asked you about having a dream,

5    did you tell him that you were having a dream when this

6    happened?

7    A.    Yeah.

8    Q.    Did you tell Mr. Smallwood that that's why you, in your

9    words, freaked out when Big Daddy jabbed you?

10   A.    Yes.

11   Q.    Do you remember telling Mr. Smallwood that when you went

12   to talk to your neighbors, that you told them that Big Daddy

13   made you suck his dick?

14   A.    Initially, about my Uncle Dave.

15   Q.    Do you remember telling Mr. Smallwood that you told the

16   neighbors that you thought Big Daddy made you suck his dick

17   like in the dream?

18   A.    Yes, I was freaking out.

19   Q.    And is that what you think you told the neighbors?

20   A.    (Witness shakes head.)  I told the neighbors that I had

21   a bad dream and I told them about what happened with my Uncle

22   Dave.

23   Q.    So why did you tell Mr. Smallwood that you told the

24   neighbors that you thought Big Daddy made you suck his dick?

25   A.    That's what happened, like, in the dream.  That's what

1    Dave made me do.

2    Q.   Do you remember when Mr. Smallwood then was asking you

3    about Amy, and what you had told Ms. Amy?

4    A.   Ask the question again.   Sorry.

5    Q.   Do you remember when Mr. Smallwood was asking you about

6    what you had told Amy that very first morning there at the

7    Children's Advocacy Center?

8    A.   No, I don't remember.

9    Q.   Do you remember telling Mr. Smallwood that it was the

10   neighbors who told you what to say in that interview?

11   A.   Yes.

12   Q.   Is that what your testimony is today?

13   A.   Yes.

14   Q.   Who?   Which neighbors?

15   A.   Katherine, Karen.

16   Q.   Tell us what you say Katherine and Karen told you to

17   say.

18   A.   They told me to say that he did that stuff to me.

19   Q.   But what did they tell you specifically to say about Big

20   Daddy?

21   A.   That he put his penis inside of my butt and tried my

22   vagina.

23   Q.   How did they even know what had happened, like why you

24   were outside, and why you were hiding behind the dumpster,

25   and why you came to their house?

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

281

```
 1   A.    Afterwards, like, they would talk to me.
 2   Q.    Okay.  So are you saying, are you telling this jury,
 3   that when you went and told this SANE nurse about what Big
 4   Daddy had done to you, it was just because the neighbors told
 5   you to do that?
 6   A.    They didn't tell me to tell her that, that's what they
 7   were telling me to say.  And so I didn't know who to say that
 8   to.
 9   Q.    So is that what you're telling us, though, is that why
10   you're saying you said that --
11   A.    Yes.
12   Q.    -- to the SANE nurse?  Do you know about the findings
13   that were on your SANE exam?
14   A.    No.
15   Q.    Do you remember -- do you remember, then, talking to
16   Mr. Smallwood about somebody else telling you what to say?
17   A.    Yes.
18   Q.    And who else do you say told you what to say?
19   A.    I don't remember her name.  But it was in DHS.  It was a
20   woman.
21   Q.    Okay.  At what point did you talk to this person from
22   DHS?
23   A.    I don't remember.
24   Q.    Well, was it like that first morning, or was it later
25   on?
```

282

1   A.    Later on.

2   Q.    So what did the person from DHS later on tell you to

3   say?

4   A.    They told me to tell somebody that he had done that

5   stuff to me, and that my mom had talked to me and told me to

6   say that he didn't do it.

7   Q.    So was this when you were still living with your uncle,

8   or was this at a different time?

9   A.    This is when I was with my uncle.

10  Q.    I'm sorry?

11  A.    When I was living with my uncle.

12  Q.    Okay.  So did they tell you why they were telling you to

13  say these things?

14  A.    No.

15  Q.    And you don't remember the name of who told you to say

16  these things?

17  A.    No.

18  Q.    Do you remember telling Allen that you thought Amy had

19  told to you say these things?

20  A.    Yeah, I remember saying that I thought she did.  Because

21  I didn't know the name of the person.

22  Q.    So now do you still think Amy told you that?

23  A.    I don't know who it was.

24  Q.    Well, Amy was the first main person you talked to for

25  the interview.  So just to be clear, do you think Amy told

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

283

1   you to say that?

2             MR. SMALLWOOD:  Your Honor, I don't think the

3   witness is certain of who Amy is.  If that could be

4   clarified.

5             THE COURT:  Overruled.

6             Do you know who Amy is?

7             THE WITNESS:  First person I talked to.

8             THE COURT:  I can't hear you.

9             THE WITNESS:  First person I talked to.

10            THE COURT:  She said Amy is the first person she

11   spoke to.

12            MR. SMALLWOOD:  I know, Your Honor, but I thought

13   Katherine and Karen were the first persons she spoke to.

14            THE COURT:  I'm just repeating what the witness

15   said.

16            THE WITNESS:  First person who dealt with DHS, I

17   guess.

18   Q.   (BY MS. McAMIS)  The lady at the Children's Advocacy

19   Center where there was a two-way mirror and she was talking

20   to you, is that who you're talking about?

21   A.   No, I don't think it was her.

22   Q.   Do you remember when you were talking to Allen --

23   Mr. Smallwood that day, him asking you a lot of questions

24   about Amy?

25   A.   No, I don't remember.

284

1   Q.   And just to be clear, are you saying, today, that you

2   don't remember telling Mr. Smallwood that day that, it was

3   Amy who told you what to say?

4   A.   No, I don't remember.

5   Q.   Do you remember telling Mr. Smallwood that it was me who

6   told what you to say?

7   A.   That was another time.

8   Q.   Okay.  So just so that I can kind of be clear here, are

9   you saying the neighbors told you what to say, a DHS person

10  told you what to say, and I also told you what to say?

11  A.   You told me after I told the truth that he did not do

12  anything to me, you told me to go back to the story I had

13  said before.

14  Q.   When do you say that I told you that?

15  A.   It was when I had to go to this building -- I don't

16  remember the building -- and I had a meeting with you, and

17  there was two other people in the room.

18       And I don't -- like, I know the other people -- I don't

19  remember if there was a dude still in the room, or if it was

20  the woman who left, or if it was him who left, but there was

21  another person.

22  Q.   There was another person the whole time that you and I

23  were talking; is that what you're saying?

24  A.   Yeah.

25  Q.   Okay.  And just so that I can make sure, are you saying

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

285

1   I told you what to say?

2   A.   Yes.

3   Q.   Do you think that the neighbors and the DHS person and

4   myself, do you think we've all talked about telling you what

5   to say?

6   A.   No.   They told me what to say.   And I think you guys

7   think I'm not telling the truth when I say he didn't do

8   anything.

9   Q.   Okay.   But do you think when I told you -- when you say

10  I told you what to say, do you think we've all talk about

11  what to tell you?

12  A.   No.

13  Q.   No?

14  A.   No.

15  Q.   Do you remember after the day that Mr. Smallwood came

16  and talked to you with your grandma, do you remember after

17  that day that you had to go -- you had to go back to court?

18  Do you remember that?

19  A.   Yeah.

20  Q.   Do you remember on that day asking to talk to the Judge?

21  A.   Yes.

22  Q.   And do you remember telling the Judge that you didn't

23  trust DHS because they had taken you away from your mom?

24  A.   Yes.

25  Q.   So what is your understanding as to why you had to live

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

286

1   apart from your mom?

2   A.   I don't know why.

3   Q.   But do you think it's because of your mom, or do you

4   think it's because of Big Daddy, or do you think it's because

5   of DHS?

6   A.   I don't know.

7   Q.   Do you remember telling the Judge that when you told the

8   truth, that's when DHS took you away from your mom?

9   A.   Yeah.

10  Q.   Do you remember telling the Judge that you didn't trust

11  DHS because they could take you away from your mom again?

12  A.   Yeah.

13  Q.   Do you remember telling the Judge that you just wanted

14  your family back together?

15  A.   Yes.

16  Q.   Do you remember telling the Judge out there that it was

17  an investigator who had told you what to say -- that when had

18  you come to court and testified?

19  A.   I don't remember that.

20  Q.   Do you remember talking to the Judge out there and

21  telling the Judge that you thought DHS had told your

22  siblings, had told E.A. and G.A. and P.A. what to say?

23  A.   Yes, the same DHS person.

24           THE COURT:  You said something "person."

25           MS. SEIBERT:  She said "DHS person."

287

1        THE COURT:  DHS person.  Thank you.

2    Q.   (BY MS. McAMIS)  Do you remember telling the Judge that

3    day that Big Daddy was your best friend?

4    A.   Yes.

5    Q.   Do you remember telling the Judge that day that you

6    didn't think Big Daddy had done anything to you?

7    A.   Yes.

8    Q.   And that was another day of court that the Judge said

9    even after you told the Judge all of this, the Judge said you

10   couldn't have any contact with Big Daddy?

11   A.   I don't remember.

12        MS. McAMIS:  I'm sorry.  I'm checking over my notes

13   real quick.

14   Q.   (BY MS. McAMIS)  When you -- when you talk about

15   everything that's happened, and you talk about -- I've asked

16   you asked about previous times you say that Big Daddy is your

17   best friend.  Do you still consider him your best friend?

18   A.   Yes.

19   Q.   And do you think that if you say that this didn't

20   happen, or that he didn't do anything wrong to you, do you

21   think you'll all get to live together as a family again?

22   A.   Can you reword that?

23   Q.   Do you think that if you say that this didn't happen,

24   and that he didn't do anything wrong to you, do you think

25   that you'll all get to live together as a family again?

```
 1   A.    It's not that I think that, it's I know if I tell the

 2   truth, we can be a family.  And if people understood that

 3   that is the truth, we can be.

 4   Q.    And that's what you want.  You want to be with your mom,

 5   and you want to be with whom she's gonna marry?

 6   A.    My dad.

 7   Q.    Okay.  Okay.  Thank you,  K.A. .  I don't have any more

 8   questions.  Mr. Smallwood's gonna talk to you.

 9             MR. SMALLWOOD:  May we approach, Your Honor?

10             THE COURT:  Yes.

11        (WHEREUPON, at this time, a bench conference was had

12   outside the hearing of the jury, as follows, to-wit:)

13             MR. SMALLWOOD:  Judge, this would be a good

14   break --

15             THE COURT:  Let's -- we're gonna have to work late

16   tomorrow night and Thursday night and probably Friday night

17   to get finished.

18             MR. SMALLWOOD:  I understand that.

19             THE COURT:  Okay.

20        (WHEREUPON, at this time, the bench conference ended,

21   after which the proceedings continued in open court, as

22   follows, to-wit:)

23             THE COURT:  Okay.  Ladies and gentlemen of the

24   jury, we're going to break for the day.  And we'll pick up

25   tomorrow morning with Mr. Smallwood's cross-examination.  I
```

1          Now, remember, tonight, do not discuss the case.

2    Do not allow anyone to discuss the case in you presence.

3    Begin no deliberation.  And do not do any investigation or

4    research about the case.

5          Does anyone have any questions?  Ten o'clock.  Jury

6    assembly room downstairs tomorrow morning.  Have a great

7    evening.  You're excused.

8          Please rise for the jury.

9      (WHEREUPON, at this time, the jury panel was excused

10   from the courtroom.)

11         THE COURT:  Thank you.  You may be seated.

12         Ms. Seibert, you and Miss Alvarez can be excused to

13   go to the ante room and wait.  And I need -- I'm instructing

14   you to be back here at ten o'clock in the morning.  Okay?

15         MS. SEIBERT:  Okay.  We'll be here, Judge.

16         THE COURT:  Yes, ma'am?  You have to talk out loud

17   so everyone can hear you.

18         THE WITNESS:  Can I give him a hug?

19         THE COURT:  No, you may not.  I'm sorry.

20         She asked if she could give the defendant a hug,

21   and I said no.

22         MS. SEIBERT:  Come with me, █K.A.█.  Okay?

23     (WHEREUPON, at this time, the witness was excused from

24   the courtroom.)

25         THE COURT:  Okay.  All right.  I need to have your

1

IN THE DISTRICT COURT OF TULSA COUNTY

STATE OF OKLAHOMA

©COPY

STATE OF OKLAHOMA,           )
                             )
          Plaintiff,         )
                             )      F-2017-69
vs.                          )
                             )      No. CF-2012-3037
                             )
ADAM CLAYTON ZILM            )
                             )
          Defendant.         )      DISTRICT COURT
                             )      F I L E D

                                    JUL 1 7 2017

                                    DON NEWBERRY, Court Clerk
                                    STATE OF OKLA TULSA COUNTY

TRANSCRIPT OF JURY TRIAL PROCEEDINGS

HEARD BEFORE THE HONORABLE KURT G. GLASSCO

JUDGE OF THE DISTRICT COURT

November 16, 2016

**VOLUME 3 OF 5**


APPEARANCES:

     MS. SARAH McAMIS, Assistant District Attorney, 500 S.
Denver, Tulsa County Courthouse, Tulsa, Oklahoma, appears on
behalf of the Plaintiff.


     MR. ALLEN M. SMALLWOOD, Attorney at Law, 1310 S. Denver
Ave., Tulsa, Oklahoma, appears on behalf of the Defendant.

FILED
IN COURT OF CRIMINAL APPEALS
STATE OF OKLAHOMA

AUG 0 1 2017

RECEIVED

AUG 0 1 2017

ATTORNEY GENERAL

REPORTED BY:
Cindy G. Workman, CSR, RPR
Official Court Reporter
Tulsa County Courthouse
500 South Denver
Tulsa, Oklahoma

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1-221

Exhibit 13

28

1   would be going on?  And you don't have to go into detail, but

2   what would be going on in those nightmares?

3   A.    It would happen again.

4   Q.    The same thing that he did to you?

5   A.    Yes.

6   Q.    Okay.  And on the morning of June 4th, as Adam was

7   giving you a massage, did you go to sleep?

8   A.    Yes.

9   Q.    And you had a nightmare?

10  A.    Yes.

11  Q.    And it was a nightmare about your Uncle David from six

12  years ago in Louisiana, wasn't it?

13  A.    Yes.

14  Q.    And you were dreaming that you were being sexually

15  abused again by that uncle from six years ago, were you not?

16  A.    Yes.

17  Q.    Now, when you were being -- when you were being given

18  this massage by Adam, you were on your face?

19  A.    Yes.

20  Q.    And were you on your face and your stomach, on your

21  front, face down, were you that way when you woke up the

22  dream?

23  A.    Yes.

24  Q.    And during the course of this dream, did something

25  painful happen to you, or abrupt?

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

29

```
 1   A.   Yes.

 2   Q.   What?

 3   A.   Like, felt like a jab.

 4   Q.   Some kind of a jab?

 5   A.   Yes.

 6   Q.   In your rear end, or around your private area?

 7   A.   Yes.

 8   Q.   Okay.  What -- how did you interpret that?

 9   A.   I interpreted it with my dream.

10   Q.   Okay.  You awoke?

11   A.   Yes.

12   Q.   And were you confused?

13   A.   Yes.

14   Q.   You didn't know what was going on.

15   A.   Yes.

16   Q.   As you had been on other occasions when you had

17   nightmares like this.  And sometimes that lasted quite a

18   while, did it not?

19   A.   Yes.

20   Q.   And on the early morning hours of June 4th, you were

21   experiencing the same type of confusion.

22   A.   Yes.

23   Q.   And you told Adam that you wanted to stop the massage.

24   A.   Yes.

25   Q.   And he did so.
```

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

30

1    A.    Yes.

2    Q.    Did you ever see his private parts that morning?

3    A.    No.

4    Q.    Has he ever exposed his private parts to you?

5    A.    No.

6    Q.    So if you told anybody that he did something with his

7    penis, you really couldn't have been in a position to know

8    that, as it was happening with Adam, could you?

9    A.    Couldn't have.

10   Q.    But that was part of the nightmare that you were having.

11   Confusing that with reality, or blending that with reality in

12   some fashion?

13   A.    Yes.  Yes.

14   Q.    You okay?

15   A.    (Witness nods head.)

16   Q.    You eventually left the house?

17   A.    Yes.

18   Q.    And when you left the house, were you still suffering

19   this confusion from the nightmare and what had happened?

20   A.    Yes.

21   Q.    And you eventually went to some neighbors?

22   A.    Yes.

23   Q.    And you eventually were interviewed and questioned by

24   several people that morning?

25   A.    Yes.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

31

1    Q.    And at the point in time when you were doing that, you

2    were still operating under this confusion as to what happened

3    or what didn't happened, and you really weren't certain.

4    Would than a fair statement?

5    A.    Yes.

6    Q.    And that would be consistent with the response that you

7    had had to the prior nightmares?

8    A.    Yes.

9    Q.    You indicated on your direct-examination that that

10   morning, after the sun came up, on June 4th, you were at

11   Katherine Sanford's house?

12   A.    Yes.

13   Q.    And your mother came over?

14   A.    Yes.

15   Q.    And I believe you indicated that Katherine Sanford told

16   your mother that she -- your mother -- couldn't leave the

17   house?

18   A.    Yes.

19   Q.    Do you know why Katherine Sanford told her that?

20   A.    No.

21   Q.    Did your mother want to leave the house?

22   A.    She wanted to go check on the other kids, and see if

23   everything was okay.

24   Q.    And Katherine Sanford told her she couldn't do that?

25   A.    Yes.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

32

1    Q.    Do you remember what your mother's behavior or demeanor

2    was that morning?  Do you know what demeanor means?

3    A.    Like how she acted?

4    Q.    How she acted; angry, sad, happy, whatever that might

5    have been.   That's what demeanor is.

6          Can you describe for the jury what your mother's

7    demeanor was that morning?

8    A.    Confused.

9    Q.    She likewise didn't understand what was going on, did

10   she?

11   A.    No.

12   Q.    And part of that confusion, at least on your part, was

13   you know what you had said to people, and you also knew that

14   Adam would never do anything to you like that, didn't you?

15   A.    Yes.

16   Q.    And you didn't know how to deal with that, did you?

17   A.    No, I did not.

18   Q.    At some point in time you were reunited with your mom

19   and your siblings?

20   A.    Yes.

21   Q.    At the house on Louiseville?

22   A.    They brought our siblings -- my siblings over to

23   Katherine's house.

24   Q.    Okay.  Did you spend the night -- if you remember -- did

25   you spend the night June 4th at Katherine's house?

33

1   A.   Yes.

2   Q.   And the next day -- you spent that there with your mom

3   and your siblings?

4   A.   Yes.

5   Q.   And the next day did you go back to the Louisville

6   house?

7   A.   I believe it was the next day.

8   Q.   And that would likewise be with your mom and your

9   siblings?

10  A.   Yes.

11  Q.   Was Adam there?

12  A.   No.

13  Q.   Do you know where Adam was?

14  A.   No.

15  Q.   At some point in time, you determined or came to the

16  conclusion that what you had said about you and Adam was all

17  mixed up in the dream or the nightmare you were having about

18  what your uncle had done to you, did you not?

19  A.   Yes.

20  Q.   Do you remember what day that was or what time of day

21  that was?

22  A.   It was, like, at nighttime.

23  Q.   Okay.  Like a day later?

24  A.   Yes.

25  Q.   And did you call Adam as a result of that?

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

34

1   A.   Yes.

2   Q.   Explain for the jury how you called Adam?

3   A.   My mother had left the room because we are all laying in

4   there with her, and she went to go sleep on the couch.

5   Q.   Is this in the Louisville house?

6   A.   Yes.

7   Q.   Okay.

8   A.   And I went in there and I checked to make sure she was

9   asleep, and I called him.

10  Q.   What did you say to him?

11  A.   That I was sorry.  That I made a mistake.

12  Q.   And he said, don't worry about it.  It'll be okay.

13  A.   Yes.

14  Q.   At some point in time, and you don't know when this was,

15  I assume, ████K.A.████, but at some point in time these charges

16  were filed against Adam.  And you were called as a witness at

17  the preliminary hearing, which occurred on -- on September

18  26, 2012.

19       You remember the prosecutor asking you questions about

20  that yesterday?

21  A.   Yes.

22  Q.   And one of the first things you said in response to her

23  questions about that preliminary hearing was that you didn't

24  tell the truth in that preliminary hearing?

25  A.   Yes.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

35

1    Q.    And are you telling the jury that you didn't tell the

2    truth in that preliminary hearing?

3    A.    Yes.

4    Q.    Why did you say what you said in that preliminary

5    hearing?

6    A.    I was saying what everyone -- not everyone, but, like,

7    what the people wanted me to say.

8    Q.    How long and how often had you been trying to correct

9    your mistake with people in authority, such as the Department

10   of Human Services?

11   A.    Four years.

12   Q.    And did you do that during June, July, August, and

13   September of 2012?

14   A.    Yes.

15   Q.    Would anyone listen to you?

16   A.    No.

17   Q.    And prior to testifying at the preliminary hearing in

18   September of 2012, did you have some sort of a meeting with

19   members of the Department of Human Services?

20   A.    Yes.

21   Q.    Do you remember the names of the people with whom you

22   spoke?

23   A.    No.

24   Q.    Were they females?

25   A.    I think.  Was this the meeting before --

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

36

1   Q.   The first preliminary hearing.  Yes.

2   A.   Yes.  I think two were females and one was a male.

3               THE COURT:  I'm sorry.  Say that again.

4               THE WITNESS:  Two were female.

5               THE COURT:  Two were female?

6               THE WITNESS:  Yes.

7               THE COURT:  One was a male?

8               THE WITNESS:  Yes.

9               THE COURT:  Thank you.

10              Please continue.

11  Q.   (BY MR. SMALLWOOD)  And at that point in time you tried

12  to tell them that you had been mistaken about what you said,

13  and they told you that in order for you to go back with your

14  mother or stay with your mother, you needed to tell the first

15  story you told, didn't they?

16  A.   Yes.

17  Q.   And that's why you told -- that's why you testified the

18  way you testified in the September 26th hearing?

19  A.   Yes.

20  Q.   The prosecutor asked you a question about a conversation

21  with your mother and/or with Adam in a phone call, something

22  about a puppy.  Do you remember that?

23  A.   Yes.

24  Q.   Okay.  What's the story about the puppy?

25  A.   We've all been talking about a puppy for a long time.

37

1    Our neighbors had gotten a puppy.  It was a German Shepherd

2    puppy named Peanut, and I wanted it.

3        And they were talking about -- my mom and my dad had

4    been talking about it a long time about me getting a puppy.

5    Because we had gotten a puppy for Christmas, and when we woke

6    up one morning from putting it outside, it was gone.

7        And so I was sad and I wanted a new puppy.

8    Q.   And that desire to have a puppy and the whole puppy

9    story happened months prior to June 4th, 2012, did it not?

10   A.   Yes.

11   Q.   K.A. , do you feel like you're, in this case, the

12   victim of sexual abuse?

13   A.   No.

14   Q.   You remember yesterday after you finished your

15   direct-examination and the jury left?

16   A.   Yes.

17   Q.   Did you ask the Judge something?

18   A.   Yes.

19   Q.   What did you ask the Judge?

20   A.   If I could give my dad a hug.

21   Q.   And your dad would be Adam?

22   A.   Yes.

23   Q.   The Judge said you couldn't?

24   A.   Yes.

25            MR. SMALLWOOD:  Pass the witness.

38

1          THE COURT:  Redirect?

2                REDIRECT EXAMINATION

3   BY MS. McAMIS:

4   Q.    █████, your dad's attorney just asked you about

5   whether or not you think you're the victim of sexual abuse.

6   You remember him asking you that?

7   A.    Yes.

8   Q.    Do you understand that if you said yes to that question

9   that your mom and him couldn't get married anymore?

10  A.    Yes.

11  Q.    You talked about, with Mr. Smallwood, different people

12  that you said told you what to say.  We talked about that a

13  little bit yesterday.  Do you remember?

14  A.    Yes.

15  Q.    So did all of these different people tell you where to

16  say his penis was, what he did with his penis, how he was

17  moving his penis, did they go into all the specific details

18  you were supposed to say?

19  A.    The only person who went into kind of detail was

20  Katherine and Karen, but I went along with what everyone

21  wanted me to say.  And if I had to fill in a blank, I had to.

22  Because I wanted to go back to my mother.

23  Q.    What specific details did they tell you to say?

24  A.    Where he put his penis.

25  Q.    So what did they tell to you say?

39

1   A.   He stuck his penis in me and tried to put it in my

2   vagina.

3   Q.   So they told you to say he tried to put it in your

4   vagina?

5   A.   Yes.

6   Q.   Why did you say he put it in your butt?

7   A.   I said my butt.

8   Q.   You said he put it in your butt; right?

9   A.   Yes.

10  Q.   And so why if they were telling you to say he tried to

11  put it in your vagina, why did you say he put it in your

12  butt?

13  A.   I just said they said that.

14  Q.   So they told you to say both of those things?

15  A.   Yes.

16  Q.   Did they say you -- to tell how you could hear his

17  underwear being pulled back up and how he was moving when he

18  was doing that to you?  Did they tell you all of those kind

19  of details?

20  A.   No.

21  Q.   You just made up those details?

22  A.   Yes.

23  Q.   Okay.  When you say that Katherine and Karen told you to

24  say these details, that was before you went and had your SANE

25  exam; right?

51

1    THE COURT:  All right.  Ms. Turner, if you'd raise

2  your right hand, please.  Do you solemnly swear or affirm

3  that the testimony you're about to give will be the truth,

4  the whole truth, and nothing but the truth, so help you God?

5    THE WITNESS:  Yes, Your Honor.

6    THE COURT:  Thank you.  Speaking directly into the

7  microphone, please state your name and spell your name for

8  the record.

9    THE WITNESS:  Rose Turner.  R-O-S-E, T-U-R-N-E-R.

10    THE COURT:  Thank you.  You may inquire.

11    MS. McAMIS:  Thank you.

12                    ROSE TURNER,

13  After first being duly sworn, testified as follows, to-wit:

14                  DIRECT EXAMINATION

15  BY MS. McAMIS:

16  Q.   Ms. Turner, how are you employed?

17  A.   I'm managing director at the Child Abuse Network.

18  Q.   How long have you been with the Child Abuse Network?

19  A.   It will be 12 years in April, so approximately 11 and a

20  half years.

21  Q.   Can you tell us, first of all, what is the Child Abuse

22  Network?

23  A.   The Child Abuse Network is part of Tulsa County's

24  Children's Advocacy Center, which houses the

25  multidisciplinary team for Tulsa County.

1       The multidisciplinary team is required by state law,

2   that every county have a team to address child abuse and

3   neglect.  And it outlines that it needs to be lead by the

4   District Attorney's office.  You need to involve law

5   enforcement, all the different law enforcement agencies in

6   your county, as well as Department of Human Services, DHS,

7   the investigative service unit.

8       You have to provide a medical component, which we

9   contract from OU pediatricians.  And there has to be a mental

10   health component, which is what CAN provides, we maintain a

11   facility, but we also provide mental health services, which

12   run the gamut of forensic interviews, mental health

13   consultations.

14       We don't do therapy on site, because there's so many

15   different agencies in Tulsa that provide quality therapeutic

16   services.  We refer to those services, connect families to

17   that.  Then we'll also do community education presentations.

18   Q.   You talked about all of the different agencies that are

19   involved in the Children's Advocacy Center, and you talked

20   about the District Attorney's office, law enforcement, DHS,

21   mental health, doctors, and forensic interviewers; correct?

22   A.   Yes.

23   Q.   And are all of those different agencies, do they all

24   have offices there at the Children's Advocacy Center?

25   A.   Yes, they do.

53

1   Q.   Before you became the managing director at the

2   Children's Advocacy Center, how were you employed?

3   A.   I worked for the Department of Human Services for 19 and

4   a half years, in child welfare.

5   Q.   Can you tell us, before you began working as an

6   investigator for child welfare, DHS, what did you have to do

7   to be able to do that job?  What type of training did you

8   have to accomplish?

9   A.   For DHS?

10  Q.   Correct.

11  A.   For DHS, we were required to have a Bachelor's degree.

12  And I have my Bachelor's degree in social work.

13       We also, once we are hired in the child welfare

14  division, we're provided -- it's called CORE training.  It's

15  the basic 40-hour training.  It's a lot longer now.  They've

16  modified that.

17       Then every year we had to have 40 hours of continuing,

18  ongoing training in the field of child abuse and neglect.

19  Q.   So during your 19 plus years with the Department of

20  Human Services, did you investigate cases of suspected abuse

21  or neglect?

22  A.   I did that at some point within those 19 and a half

23  years, yes.

24  Q.   And did you, in that capacity, work with children and

25  interview children?

54

1   A.    Yes, ma'am.

2   Q.    Can you tell us, then, at the Children's Advocacy

3   Center, what is a forensic interview?

4   A.    A forensic interview is a non-leading, non-suggestive,

5   interview provided to children so that they have the

6   opportunity when they're involved in an abuse or neglect

7   allegation investigation, to talk about what, if anything,

8   has happened.

9   Q.    When you say non-leading, non-suggestive, what do you

10  mean by that?

11  A.    Those are the techniques that the person who's trained

12  to do the forensic interview utilizes.  We don't want to ask

13  questions that would lead a child to the answer, such as, so

14  and so did this to you, didn't they?  Because that's giving

15  them the answer, and not letting them tell you about it on

16  their own, or even bringing it up on their own.  We don't

17  want to introduce that information.

18  Q.    Can you tell us what type of training you have had to

19  conduct forensic interviews?

20          THE COURT:  Counsel, approach, please.

21          On the record.

22          Ladies and gentlemen, you may stand and stretch, if

23  you wish, but please do not talk.

24          (WHEREUPON, at this time, a bench conference was had

25  outside the hearing of the jury, as follows, to-wit:)

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

55

1       THE COURT:  I don't know where the state is going

2   with this, but I'm gonna inform the state now, that if you

3   proceed down this, and it brings up a forensic interview of

4   these children, I will inform the jury with a special

5   instruction that I have excluded that as not being reliable.

6       I'm putting the state on notice that that is going

7   to happen, if you continue in that line of questioning.

8       MS. McAMIS:  Your Honor, Ms. Turner did not conduct

9   any of the forensic interviews, nor am I asking about any of

10  the forensic interviews, but before can I establish her

11  credentials as an expert to testify specifically about Child

12  Sexual Abuse Accommodation Syndrome, I have to establish how

13  she gained that expertise.

14      THE COURT:  Okay.  Ms. McAmis, I understand that.

15  But I also know that I can have a harpoon be rung real quick

16  with this witness on this kind of subject.  And I'm putting

17  the state on notice that I will give a specific instruction

18  to the jury, if necessary, that I have ruled that the

19  forensic interviews given to this child or taken of this

20  child are inadmissible and unreliable.  Judge yourself

21  accordingly.

22      MS. McAMIS:  So is Your Honor saying that I cannot

23  ask about her experience in the field of forensic

24  interviewing to establish her credentials as an expert in

25  this field?

56

1          THE COURT:   I believe you can establish her

2     credentials in other ways, other than open the door for

3     forensic interviews.

4          This is a very difficult topic in this case, as

5     you, yourself, disagreed with my ruling, took me up, and the

6     Court of Criminal Appeals ruled that I was appropriate in it.

7     And further ruled that I was appropriate in interviewing the

8     child and making my decision.

9          I am kindly giving you that notice in advance.

10          Thank you.   Please continue.

11     (WHEREUPON, at this time, the bench conference ended,

12     after which the proceedings continued in open court, as

13     follows, to-wit:)

14          THE COURT:   You may proceed.

15     Q.   (BY MS. McAMIS)   Have you received specialized training

16     specific to your job as the managing director there at the

17     Child Advocacy Center?

18     A.   Yes, ma'am.

19     Q.   As a result of the specialized training that you have

20     received, do you also train other child abuse professionals

21     in the field?

22     A.   Yes, I do.

23     Q.   Do you serve as faculty for a particular training

24     program for other child abuse professionals in the field?

25     A.   Yes, I do.

57

1  Q.   As part of your job, do you participate in a peer review

2  process?

3  A.   Yes, I do.

4  Q.   As part of your job do you attend local state and

5  national conferences that are specifically dedicated to the

6  issues involved in child abuse cases?

7  A.   Yes, I do.

8  Q.   And have you also instructed at those type of

9  conferences?

10  A.   Yes, I have.

11  Q.   Do you serve on any professional committees?

12  A.   Yes, I do.

13  Q.   What is that?

14  A.   I am a member of the Tulsa County Child Death Review

15  Board, which is a subcommittee of the State Death Review

16  Board.  And we review all child death cases that have

17  occurred in Tulsa, Creek, Osage and Washington Counties, and

18  then we provide that information to the state Child Death

19  Review Board to determine what was the cause of death.

20      If there was any type of abuse or neglect, was it

21  investigated properly by the given authorities and

22  professionals in that county?  And make recommendations to

23  that Board, which then goes out to the communities in terms

24  of areas we might need to look at, such as drowning in

25  swimming pools.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

58

1    And what type of education or preventative measures can

2    be made to prevent those things from occurring in the future,

3    if there is something that can be done to prevent that.  So I

4    sit on that.

5        I'm also a member of, it's called NASW, the National

6    Association of Social Workers.  As part of my clinical

7    licensure, that is the professional organization that I

8    belong to.

9        And then I'm also involved in, as an adjunct instructor

10   for Tulsa Community College, I teach a class in the fall and

11   in the spring.  It's called Introductions to Human Relations,

12   Human Services.  Preparing individuals who are interested in

13   providing social services, therapeutic interventions for

14   interested individuals.  That's one of their beginning

15   courses to see if they really want to pursue that line of

16   work then.

17       And then I'm also an adjunct instructor for the

18   University of Oklahoma, their Master's in social work

19   program.  I teach a summer class for them each summer called

20   Understanding Child Abuse and Neglect.

21   Q.   Do you hold any licenses or certifications?

22   A.   Yes.  I am your licensed clinical social worker, and I

23   have my Master's in social work.

24   Q.   Have you previously testified, and have you been

25   previously recognized by courts as an expert in the area of

59

1  Child Sexual Abuse Accommodation Syndrome?

2  A.   Yes, I have.

3  Q.   Can you tell us in your professional career an

4  approximate number of the children that you have spoken with?

5  A.   My entire career, or just my career at Child Abuse

6  Network?

7  Q.   Let's say your career at the Child Abuse Network.

8  A.   I have approximately provided interviews to close to

9  1200 children.

10  Q.   I had asked you about your ability to testify as an

11  expert in the field of Child Sexual Abuse Accommodation

12  Syndrome.  First of all, can you explain what that is?

13  A.    Yes.  The Child Sexual Abuse Accommodation Syndrome was

14  a research project that was done by Dr. Roland Summit in the

15  '80s.  And he studied children who had disclosed that they

16  were victims of sexual abuse.  And he identified common

17  behaviors that were seen in these children that they

18  exhibited.

19      And he identified those behaviors as secrecy.  There was

20  always an element of secrecy involved in the abusive

21  incident.  Children may have been told to keep the secrets by

22  the alleged perpetrator.

23      Helplessness was another behavior that he saw common.

24  Because children who were victims of sexual abuse began to --

25  they felt helpless to stand up against an adult that maybe

60

1    had perpetrated sexual abuse against them.

2         Because there's that element of power inequity, where

3    the adult -- children are told to listen to what the adult

4    tells them to do.  They also may be an adult who is the

5    caregiver provider for not only that child, but maybe that

6    child and their family, so they feel helpless to say anything

7    against that person, whether it be a male or a female.

8         And because of that helplessness, they start to feel

9    trapped.  So there's entrapment in accommodation within that

10   relationship.  They don't feel like they can tell that person

11   no.

12        And on the same level, they may very well have some fond

13   feelings for that person because they may not like what's

14   being done to them, but they may have a very close

15   relationship with that person.  And so then they begin to

16   accommodate whatever that person may ask of them, involved in

17   a sexual abuse relationship.

18        And they may also feel trapped and delay any type of

19   disclosure.  Delayed disclosure is often a behavior that is

20   seen because they may be afraid of what may happen to them or

21   their family if they tell.

22        They don't want to get that person in trouble.  Because,

23   again, they might care very much for that person.  So there's

24   delayed disclosure.  And then sometimes there's recantation.

25   Once they do disclose, then they might recant.

1    And Dr. Summit, when he did that, it's called Child

2   Sexual Abuse Accommodation Syndrome, received a lot of

3   criticism because he called it a syndrome.  And he did

4   further follow-up research with that, stating that he wished

5   he hadn't called it a syndrome, because it is not diagnostic

6   in any manner.

7    You can't say, I see these behaviors, so this child must

8   be sexually abused.  It's not like a medical diagnosis.  He

9   clarified that they were common behaviors he saw in children

10  that were sexually abused.  There could also be other reasons

11  for those behaviors.

12  Q.  I want to go through some of the different factors that

13  you have described for us, but first of all I want to talk

14  about when you were talking about the stage of recantation.

15   So basically what does -- and let me back up even before

16  I ask you that, because you've told us a lot about Dr. Ronald

17  Summit.

18   Does the research that you've told us about that

19  Dr. Summit conducted, is that consistent with what you've

20  seen, in all of your training and experience, and all of your

21  years in the field, of child abuse?

22       MR. SMALLWOOD:  Judge, I'm gonna object to this.  I

23  don't think it's -- it's speculation on this witness's part.

24       THE COURT:  Sustained as to form of the question.

25  Rephrase it.

62

1   Q.    (BY MS. McAMIS)   In addition to basing your testimony

2   today on the research that was conducted by Dr. Summit, do

3   you also base it on any other factors?

4   A.    Yes, ma'am, I do.

5   Q.    What is that?

6   A.    It's my thirty plus years of training, ongoing training

7   that I receive.  And I focus my training on child abuse

8   issues.  Things related to that, such as trauma, child

9   development, as well as my experiences within the field for

10  those thirty plus years.

11  Q.    So can you tell us now what you mean by, and what Dr.

12  Summit meant by recantation?

13  A.    When he was describing recantation, he observed in his

14  research that numerous children --

15          MR. SMALLWOOD:  Once again, I'm gonna object.  Ask

16  to approach the bench.

17          THE COURT:  Come forward.

18      (WHEREUPON, at this time, a bench conference was had

19  outside the hearing of the jury, as follows, to-wit:)

20          MR. SMALLWOOD:  Judge, there has been insufficient

21  evidence established to show any relevancy to the evidence of

22  this case.

23          There is no evidence with respect from all the

24  testimony of this child that there was any secrecy involved.

25  There is no evidence that she had any kind of feeling of

64

1    valid and without medical descent.

2            And they have specifically have held that it's --

3    that it should be allowed, and that it can be allowed during

4    the state's case in chief, after the child testified, and

5    after the child has recanted.

6            That is exactly what has happened in this case.

7    And defense counsel has been on notice of this from the very

8    beginning.

9            THE COURT:  Okay.  I'm acquainted with *Davenport*.

10   Matter of fact, *Davenport* I took into consideration when I

11   made my previous finding on reliability.

12           I'm gonna overrule the objection, but y'all have a

13   lot of leeway on cross-examination on that subject.

14       (WHEREUPON, at this time, the bench conference ended,

15   after which the proceedings continued in open court, as

16   follows, to-wit:)

17           THE COURT:  You may proceed.

18   Q.   (BY MS. McAMIS)  I apologize, Ms. Turner, that I don't

19   remember whether you had been given the opportunity to answer

20   the question about what is recantation?

21           THE WITNESS:  I can proceed?

22           THE COURT:  Yes.

23           THE WITNESS:  Okay.  Recantation occurs oftentimes

24   in a disclosure regarding sexual abuse where a child

25   discloses information.  It may be just pieces of a

65

1    disclosure, or it may be a very detailed disclosure.

2        But following that disclosure, a child may then take

3    back what they've said.  And there's various ways they talk

4    about that in that recantation.  Some children will say I

5    made it up.  Some children will say I misunderstood the

6    situation.  That's not really what happened.

7        And there are various things that influence a child's

8    recantation.  It could be that they don't like what happened

9    after they initially disclosed.  They don't like maybe what

10   happened to them, in terms of a living situation.

11       Or they may not like what has happened to their siblings

12   or even their direct household, depending on the response and

13   belief and support for that child in terms of do people

14   believe the child, boy or girl, whether or not this happened.

15       Sometimes children are removed from their home, if that

16   happens.  And a child, just because they didn't like the

17   abuse and neglect, does not mean they don't want to still be

18   at home.  They just want the abuse and neglect to stop.  So

19   that can influence recantation.

20       Recantation can also be influenced by the response of

21   the community maybe that they lived in.  Does the

22   community -- was the individual, man or a woman, were they

23   respected in the community or even in their neighborhood?

24   Are they hearing disbelief from the individuals that this

25   person didn't really do that.

66

1       Upcoming court can also influence recantation because a

2  lot of people don't like to testify in court or want to

3  undergo that stress associated with the court.

4       So there are various things that can influence a child

5  in terms of recanting.

6  Q.   And again, I kind of want to breakdown some of the

7  things you have just described for us.  One of the things you

8  were describing for us is that there's different types of

9  recantation.

10      You talked about that a child could recant by taking it

11  all back.  A child could recant by taking certain parts of it

12  back.

13      In your training and experience, are you familiar with

14  whether a child will recant by adopting what she has been

15  told to say or what the perpetrator says?

16  A.   Yes.  They can be influenced depending on the type of

17  contact they have following their disclosure.

18      If they continued to have ongoing direct contact,

19  whether it be by phone or living in the same house with them,

20  they may feel that ongoing pressure and be told by different

21  family members to -- that they may have misunderstood it.

22  That this really didn't happen.  This is really the way that

23  they saw it as happening.

24      And sometimes a child hears that from those individuals

25  they love and care for and who are taking care of them, and

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1  then feel that responsibility to then modify what they've

2  initially said, and either take it all back or take pieces of

3  it back.

4  Q.   In your experience have you had a child who has recanted

5  by saying it was just a mistake --

6         MR. SMALLWOOD:  Judge, I object to this.  It

7  assumes a state of facts not in relevance and has no

8  relevance to this case.

9         THE COURT:  Overruled.

10         You may answer the question.

11  Q.   (BY MS. McAMIS)  In your experience, have you been

12  familiar with a child who has recanted by saying it was all

13  just a mistake, or it was all just an accident?

14  A.   Yes, I have.

15  Q.   You talked -- you said a few things about family

16  dynamics being involved and how that might impact a child's

17  decision to ultimately recant.

18         Based on your expertise in this area, can you describe

19  for us how it might affect a child's decision to recant if,

20  in fact, her mother has chosen to stay in a relationship with

21  the perpetrator?

22  A.   It could affect a child's --

23         MR. SMALLWOOD:  Judge, I object to this.  All sorts

24  of things could affect.  We're gonna have to have some

25  certainty here and it's gonna have to be based on knowledge

68

1   of facts of this case, not speculation of hypotheticals.

2            THE COURT:  I'm gonna sustain.

3            Rephrase your question, please.

4   Q.   (BY MS. McAMIS)  Ms. Turner, do you have an opinion

5   based on your expertise about if a child has disclosed that

6   she has been sexually abused, and then her mom continues to

7   stay in a relationship with that perpetrator and, in fact,

8   continues to plan her wedding with that perpetrator, how that

9   might impact the child's decision to recant what she

10  disclosed?

11           MR. SMALLWOOD:  Objection, Your Honor.  It's a

12  hypothetical that assumes a state of facts not in evidence

13  with this witness, and it's speculation.

14           MS. McAMIS:  Your Honor, if I may.  Experts are

15  allowed to testify regarding hypotheticals, and that's

16  specifically what the case law says regarding this particular

17  field.

18           THE COURT:  Counsel, approach.

19           Y'all may stand and stretch if you wish, but please

20  do not talk.

21       (WHEREUPON, at this time, a bench conference was had

22  outside the hearing of the jury, as follows, to-wit:)

23           THE COURT:  I think the Court's made a mistake.

24  *Davenport* does allow this testimony.  But it specifically

25  says it is not admissible for its substance or to establish

70

1    shared with you earlier, I will give you instructions for you

2    to take back to the jury so you'll know the law.

3          And I need to give you a verbal instruction at this

4    time, that the expert's testimony concerning the Child

5    Accommodation Syndrome, is not admitted to establish the

6    truthfulness or untruthfulness of the child's testimony.

7          Thank you.  You may proceed.

8    Q.   (BY MS. McAMIS)  Ms. Turner, I'm gonna back up just a

9    moment with you.  Just to make things perfectly clear, you do

10   not know ███████ K.A. ███████; correct?

11   A.   No, I do not.

12   Q.   You have not been involved in her case or how her case

13   has proceeded through the courts; is that correct?

14   A.   No, I have not.

15   Q.   You are here to testify about your area of expertise in

16   the field; is that correct?

17   A.   That is correct.

18   Q.   So I believe what I was asking you was, can you tell us,

19   based upon your expertise, if a child has disclosed being

20   sexually abused, and her mother chooses to stay in a

21   relationship with that perpetrator, how might that impact the

22   child's decision to recant?

23          MR. SMALLWOOD:  Make a record.  Objection, Your

24   Honor.

25          THE COURT:  Overruled.

71

1          THE WITNESS:  That can be very impactful.  A child

2    looks to the mother.  And if that mother would be marrying

3    the alleged perpetrator, it would appear to the child that

4    mother is really choosing the alleged perpetrator over her

5    child.

6          It's then the child wants her mother to be happy.

7    Children want their parents to be happy.  So they often

8    minimize or recant information that would lead to a difficult

9    situation within the household.

10          They also want -- that child would want to be

11    involved in the happy things that are happening in that

12    family, and if they have been pressured or told that

13    something didn't happen, or they made it up or they

14    misunderstood it, then they would recant just to try to make

15    it all go away.

16          And again, it also depends on once that child

17    initially disclosed, where was that child?  Were they left in

18    the home?  Or were they removed from the home?  Because a

19    child, just because they disclose does not mean that they

20    want to be removed from the home.  They just want that abuse

21    to stop.

22          It does not stop their caring, loving, feelings for

23    their parents, or, in the hypothetical she presented, the

24    mom's person that they were going to marry.

25    Q.   (BY MS. McAMIS)  I want to ask you more about those

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

72

1   carrying, loving, feelings in a moment, but specifically with

2   respect to if a child, when she testifies, she knows that

3   dependent on the outcome of her testimony is whether or not

4   her mom actually gets to marry the perpetrator or not, does

5   that have a tremendous impact on her?

6   A.   Yes, that would impact her greatly.  A child, again,

7   wants to see their parent happy and does not want to keep

8   them from experiencing joy and love.  And that child may also

9   have happy times with that alleged perpetrator and love them,

10  they just don't like the abuse, but they want to protect the

11  parent and do what they need to do for the parent so that

12  they are happy.

13  Q.   You talked a little bit about a child being removed from

14  the home or taken into the custody of DHS.  If that happens

15  to a child, and if the child or her siblings want to go back

16  home, or the siblings put pressure on the child to go back

17  home, how greatly does that impact her decision to recant?

18  A.   That child would feel responsible for their removal, in

19  the siblings' removal.  And sometimes if that happens, and

20  that one child has been identified as the only victim,

21  siblings may be allowed to go back home and then that child

22  really feels pushed aside by the family.  So that may impact

23  the recantation, or the pressure from the siblings to take it

24  back.

25      The siblings may not have known anything was going on

73

1    and nothing may have happened to the siblings, but they also

2    want to be home.  And so that then influences a child to

3    recant.

4    Q.    You told us a little bit also about recanting when the

5    perpetrator is the caregiver of the family.  How might it

6    impact a child's decision to recant if, in fact, the

7    perpetrator, his family owns the home that the children are

8    living in, he's the one who buys the groceries.  He's the one

9    who buys the clothing.  He's the one who purchases the

10   vehicles, how might all that, the financial abilities of the

11   perpetrator, how might that impact the child's decision to

12   recant?

13          MR. SMALLWOOD:  Judge, all of these are

14   hypotheticals that have no bearing on the facts of this case

15   which have been established so far in this trial.

16          THE COURT:  Ma'am, is your response based on your

17   understanding of the Child Abuse Accommodation Syndrome that

18   was advanced by this doctor, or is this your interpretation

19   of it that you believe that things occur?

20   A.    It is based on both my training and my experience in

21   cases that I've seen this occur with children.

22          THE COURT:  Objection overruled.

23          You may answer.

24          THE WITNESS:  Okay I'm sorry I can't remember.

25   Q.    (BY MS. McAMIS)  The question was about if the

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

74

1    perpetrator is the financial provider of the family, how that

2    might impact whether or not the -- how the child feels about

3    the mom's ability to provide for the family, or how that

4    might affect the child's wanting to recant?

5    A.    It has a great impact.   The child doesn't want to see

6    their family homeless, destitute.   And again, hearing

7    information from possibly the mom about what might happen to

8    the family.   If it does not paint a picture where that child

9    can continue to feel safe and taken care of.

10        Children depend on the adults to take care of them.   So

11   if they believe that an adult is not gonna be able to take

12   care of them, they would recant that information because they

13   are more comfortable --

14            MR. SMALLWOOD:   I want to object to this.   She is

15   saying "they would recant that allegation."   She has

16   absolutely no basis to make that statement in such an overt

17   way.

18            THE COURT:   I'm going to overrule the objection and

19   allow you leeway on cross-examination.

20            THE WITNESS:   They may feel responsible and recant

21   because they want themselves and their family taken care of.

22   Q.    (BY MS. McAMIS)   You told us about carrying, loving,

23   feelings, and close relationships within the family.

24        First of all, I want to ask, in your 30 years of

25   experience in the field, do all children who have been abused

123

1    A.    Yes.

2    Q.    Have you read your testimony from September of 2014?

3    A.    Yes.

4    Q.    Okay.  So when I ask you questions today, I only want

5    you to tell us what you remember.  And if you don't remember

6    something and you need to look at the handwritten note that

7    you wrote, will you please let us know?

8    A.    Yes.

9    Q.    So back on June 4th of 2012, can you tell us where you

10   were living?

11   A.    I was living at 120 North Louisville Avenue, Tulsa.

12   Q.    Is that in Tulsa County?

13   A.    Yes.

14   Q.    Did you know Kristina Alvarez?

15   A.    Yes.

16   Q.    How did you know her?

17   A.    She was a neighbor.

18   Q.    How long had you known her?

19   A.    I don't know, probably a couple, three months.  Three or

20   four, maybe.

21   Q.    When you say she was a neighbor, where was her house

22   compared to where your house was?

23   A.    Across the street and two doors down.

24   Q.    Did you know who lived there with her?

25   A.    Her children and her boyfriend.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

124

1   Q.   Did you know her boyfriend, Adam Zilm?

2   A.   He'd come over to the house and introduced hisself one

3   day, yes.

4   Q.   Did you know the children?

5   A.   I also met them through -- they all came over at one

6   time.

7   Q.   Okay.  So on the morning of June 4th, before anything

8   happened, what was it that you were doing?

9   A.   I was getting ready for work.

10  Q.   About what time in the morning was that?

11  A.   Between six, 6:15.

12  Q.   As you were getting ready for work, is there something

13  that you heard or something that came to your attention?

14  A.   Yes.

15  Q.   What was it?

16  A.   It was the doorbell was ringing.

17  Q.   When you say the doorbell was ringing, was it like one

18  ring, or more than one ring?  Or could you describe it?

19  A.   Maybe a couple of rings.  I had yelled out for my

20  roommate to answer the door, but she didn't hear me.  She was

21  still sleeping.

22  Q.   Who was your roommate at the time?

23  A.   Karen Landrum.

24  Q.   So at the time you believed she was asleep, and you

25  didn't think she responded to you when you said "could you

125

1    answer the door"?

2    A.   Right.

3    Q.   So when Karen didn't respond, did you go to the door?

4    A.   I went -- yes.  I put on my robe and I went to the door.

5    Q.   Were you expecting anyone that morning?

6    A.   No.

7    Q.   So when you put on your robe and you went to the door,

8    can you tell us who you found at the door?

9    A.   Well, I kinda talked through the door and I said "who is

10   it?"

11   Q.   What was the response?

12   A.   I heard this crying voice saying "it's ▮K.A.▮."  And

13   then I opened the door immediately.

14   Q.   When you opened the door, you told us that ▮K.A.▮'s

15   voice, you could tell she was crying; is that right?

16   A.   Yes.  Yes.

17   Q.   So when you opened the door, can you describe what you

18   saw?

19   A.   It was raining real, real hard.  She had a towel over

20   her head and I had -- I told her to come in.  And she was

21   crying.  So I asked her, I said -- I didn't know if she had

22   run away or what was wrong.

23       And she came in and I just asked her, you know.

24   Q.   And when you say she was crying, was she also shaking?

25   A.   Very shaky, yes.  She was soaking wet.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1   Q.   Even though you didn't know what was wrong, was it

2   obvious to you that something was wrong?

3   A.   Yes.

4   Q.   So what did ███ K.A. ███ tell you?

5        MR. SMALLWOOD:  Judge, I'll object to this.  Ask to

6   approach the bench.

7        THE COURT:  I'm gonna -- I know what the objection

8   is.  I'm gonna sustain the objection.

9        You're gonna have to lay a better foundation.

10  Q.   (BY MS. McAMIS)  Had you ever seen ███ K.A. ███ in that kind

11  of condition before?

12  A.   No.

13  Q.   And it was obvious to you that something was wrong?

14  A.   Yes.

15  Q.   Did it appear to you that she was very upset about

16  something?

17  A.   Yes.

18  Q.   Did it appear to you that she was under the influence of

19  whatever it was that she was upset about?

20       MR. SMALLWOOD:  Judge, I object to this.  This

21  witness can't testify as to what she was under the influence

22  of.  It's speculation at this point.

23       THE COURT:  Overruled.

24       You may continue.

25  Q.   (BY MS. McAMIS)  Did it appear to you that whatever was

1   upsetting her was something that had just happened.  She was

2   still under the influence of that?

3   A.   Yes.

4           MR. SMALLWOOD:  Objection, Judge.  This witness

5   would have to speculate to answer that question.  She's going

6   to have to get in the head of ███ K.A. ███.

7           THE COURT:  Objection overruled.

8   Q.   (BY MS. McAMIS)  So what did ███ K.A. ███ say to you?

9   A.   She came in, and I asked her, I said, what's wrong?  And

10  she told me that Big Daddy -- she called him Big Daddy,

11  which -- and she said had touched her.

12  Q.   So as she was telling you that Big Daddy had touched

13  her, did she continue to be so upset, crying, shaking, all of

14  those things that you described?

15  A.   Very.

16          MR. SMALLWOOD:  I object.

17          THE COURT:  Sustained; leading and suggestive.

18  Q.   (BY MS. McAMIS)  How did she act as she was telling you

19  about Big Daddy touching her?

20  A.   She was crying.  She was shaking.  Just trembling, you

21  know, in a tremble.  Voice was trembling.

22  Q.   Did she tell what you she had been doing before Big

23  Daddy touched her?

24  A.   She had been sleeping.

25  Q.   Did she tell you where it had happened with Big Daddy?

128

1   A.    In her bedroom.

2   Q.    Did she tell you what Big Daddy had done to her?

3         MR. SMALLWOOD:  Your Honor, may I approach and make

4   a record?

5         THE COURT:  Yeah, come forward.

6         (WHEREUPON, at this time, a bench conference was had

7   outside the hearing of the jury, as follows, to-wit:)

8         MR. SMALLWOOD:  Judge, I would like, in order to

9   expedite this matter, I would like to have the Court to

10   recognize a continuing objection to any statements that

11   K.A.  made to her, for the reasons that they have been

12   determined by this Court and the Court of Criminal Appeals to

13   be unreliable.

14         And even if the Court determines that they may be

15   admissible under some present sense impression or excited

16   utterance exception to the hearsay rule, that has no effect

17   on making it anymore reliable than two Court's have found it

18   to be.

19         And I would also ask at the conclusion of this

20   testimony that the Court indicate to the jury that those

21   statements have been found to be unreliable.  A judicial

22   finding's been made that they aren't reliable.

23         MS. McAMIS:  Your Honor, as I briefed for the

24   Court, the standard for excited utterance is completely

25   different than the standard for the hearsay under 2803.1.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

129

1        In fact, the case law as I briefed for the Court,

2   specifically under excited utterance says that you can't add

3   an additional element to it.  And if Your Honor does so, that

4   it is improper.  That is a misconstruction of the statute.

5        These statements come in under excited utterance.

6        THE COURT:  And I have received it under the

7   excited utterance exception of 2802.  I have reviewed the

8   exception and the case law under it.

9        I will tell you that you're now about to move into

10  an inquiry and not an excited utterance.  So I believe I've

11  let the statement get in under excited utterance, but it

12  doesn't stay in excited utterance for complete interview

13  purposes.  That'll be my ruling.

14       MR. SMALLWOOD:  So from this point forward --

15       THE COURT:  Yes.  Continuing exception.

16   (WHEREUPON, at this time, the bench conference ended,

17  after which the proceedings continued in open court, as

18  follows, to-wit:)

19       THE COURT:  Excuse me.  That was 2803.

20       You may continue.

21  Q.   (BY MS. McAMIS)  Ms. Sanford, what did ███ K.A. ███ tell you

22  that Big Daddy had done to her with his penis?

23       MR. SMALLWOOD:  To which I'll object, Your Honor,

24  for the record.

25       THE COURT:  Do you wish to *voir dire* the witness?

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

133

1    follows, to-wit:)

2              THE COURT:  Please continue.

3    Q.   (BY MS. McAMIS)  Ms. Sanford, I was asking you about did

4    you review today the written statement that you made for the

5    police on the same day that this happened.

6    A.   Yes.

7    Q.   What did ███K.A.███ say that Big Daddy did had done with

8    his penis?

9    A.   She said that he tried to put it in her butt.

10   Q.   At some point in time then when you were speaking with

11   ███K.A.███ , did you get your roommate up?

12   A.   Yes, I did.  I called for her.

13   Q.   Tell us what you did?

14   A.   While I was at the -- in the front room, I called for

15   Karen and we -- I took ███K.A.███ into her bedroom, and I woke

16   her up and I told her we had an emergency, Karen being a

17   nurse she could deal with this a little bit better than -- I

18   had to call the mother.

19   Q.   So did you call ███K.A.███ 's mother?

20   A.   Yes.  Yes, I did.

21   Q.   Where did you call her?  How did you know where to call

22   her?

23   A.   I had gotten her her job.  She worked for the Lora

24   Dester Children's Center also.

25   Q.   So did you call her at work?

1    Q.    And who actually made the phone call to the police?

2    A.    Karen did.

3    Q.    Once the police showed up, then were you -- did you talk

4    to the police and tell them what had happened up to that

5    point?

6    A.    Yes, I stayed outside and waited for them to come.

7    Q.    Where was ██K.A.██s mother during this?

8    A.    Kristi was still laying on the couch.

9    Q.    Even when the police were there?

10   A.    She finally -- well, the police had told me, once they

11   came in, they said you need to get her off the couch because

12   she shouldn't be laying there like that.

13              MR. SMALLWOOD:  Judge, I object to that.  Ask it be

14   stricken.  It's hearsay.

15              THE COURT:  Sustained.  It is hearsay.

16   Q.    (BY MS. McAMIS)  Ultimately, was ██K.A.██ taken to the

17   hospital so that she could have an examination?

18   A.    Yes.

19   Q.    And did you go with them for that?

20   A.    Yes, I did.

21   Q.    To be clear, were you actually in the room while the

22   examination was being performed?

23   A.    No, I wasn't.

24   Q.    Were you in the waiting room outside before that?

25   A.    Yes, I was.

142

1    you solemnly swear or affirm that the testimony you're about

2    to give will be the truth, the whole truth, and nothing but

3    the truth, so help you God?

4              THE WITNESS:  Yes.

5              THE COURT:  Thank you.  Speaking directly in the

6    microphone there, would you state your name and spell your

7    name for the record?

8              THE WITNESS:  Kathy Bell.  Kathy with a K.  Bell,

9    B-E-L-L.

10             THE COURT:  Thank you.  You may inquire.

11                       KATHY BELL,

12   After first being duly sworn, testified as follows, to-wit:

13                     DIRECT EXAMINATION

14   BY MS. McAMIS:

15   Q.   Ms. Bell, how are you employed?

16   A.   I'm employed as the forensic nursing administrator with

17   the Tulsa Police Department.

18   Q.   How long have you had that position?

19   A.   Since December of 1994.

20   Q.   Can you tell us a little bit about what that position

21   entails?

22   A.   That position entails a day-to-day management of the

23   forensic nursing programs that we have.

24        We have an adult and adolescent Sexual Assault Nurse

25   Examiner program.  We have a pediatric sexual assault

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1    Q.   Can you explain to us what a sexual assault nurse

2    examination is?  What does that entail?

3    A.   It entails assessment.  It entails making a nursing

4    diagnosis.  Collection of specimens.  Planning for the care

5    of the individual, you know, once they leave the exam room.

6    And then documentation and photography of the actual process.

7    Q.   Where in Tulsa are SANE examinations completed?

8    A.   We have an exam room that's located at Hillcrest Medical

9    Center.

10   Q.   So if anyone in Tulsa, if a person, a victim, calls the

11   police and a sexual assault is reported, that's where the

12   patient is taken, to Hillcrest Hospital?

13   A.   Yes.  As long as they don't have injuries that require

14   that they can't be discharged from wherever they are to get

15   to that exam room.

16   Q.   And within Hillcrest Hospital, you said you had an

17   examination room; is that correct?

18   A.   Correct.

19   Q.   So how are they treated differently than other general

20   patients who are coming to Hillcrest Hospital, if you will?

21   A.   They're not admitted as a patient at Hillcrest.  They

22   are -- Hillcrest basically gives us that space to use to

23   provide exams to these patients.  So they're not -- they

24   don't go through the admitting process, again, unless they

25   have injuries where they have to be seen in the emergency

157

1    A.    That's correct.

2    Q.    Are there certain factors, certain substances that can

3    determine whether or not or affect whether or not you

4    collect -- are able to collect DNA?

5    A.    You mean as far as time that might go by, or water that

6    might wash it away, or distribute the amount of DNA to where

7    we couldn't collect it, those things.  Yes.

8    Q.    I want to specifically direct your attention to June 4th

9    of 2012.  On that date, did you perform a SANE exam on a

10   child by the name of ███████ K.A. ███████?

11   A.    Yes.

12   Q.    On that day, were you able to determine her date of

13   birth?

14   A.    Yes.

15   Q.    What was it?

16   A.    3/7 of 2001.

17   Q.    So was she 11 years old at the time?

18   A.    Yes.

19   Q.    Were you able to determine where she was living?

20   A.    Yes.

21   Q.    Where was that?

22   A.    131 North Louisville Avenue.

23   Q.    Is that in Tulsa?

24   A.    Yes.

25   Q.    And is that in Tulsa County?

158

1   A.   Yes.

2   Q.   Were you able to determine who she was living with?

3   A.   Yes.

4   Q.   Who was she living with?

5   A.   She was living with her mother, I believe, Kristina

6   Alvarez.  She was living with her mother's fiance, Adam Zilm.

7   And she had three siblings, ███P.A.███ who was 12; ███E.A.███, who was

8   nine; and ███G.A.███ was six.

9   Q.   Did you determine approximately what time that morning

10  the sexual assault had taken place?

11  A.   Around 5 a.m.

12  Q.   At approximately what time did your examination begin?

13  A.   About 8:50.

14  Q.   Were you able to determine who the alleged perpetrator

15  of the sexual abuse was?

16  A.   She said Adam Zilm.

17  Q.   Did she describe him as her mom's fiance?

18  A.   Yes.

19  Q.   Were you able to determine where the sexual assault had

20  taken place within the home?

21  A.   She said in his bedroom.

22  Q.   And I'm asking you about what she had said.  Did you

23  take a history from ███K.A.███?

24  A.   Yes.

25  Q.   Where was her mother, Kristina Alvarez, while you were

159

1   taking the history from █K.A.█?

2   A.   She would have been outside the exam room.

3   Q.   How did you approach █K.A.█ about asking about what

4   happened?

5   A.   What we say to all children is -- for the nurse exam is,

6   what happened that you came to see me today.

7   Q.   And when you asked her "what happened that you came to

8   see me today," what did she tell you?

9              MR. SMALLWOOD:   Judge, I'm gonna object to that.

10  Ask to make a record.

11             THE COURT:   Yeah, come forward.

12             Y'all may stand and stretch if you wish.   Please do

13  not talk.

14       (WHEREUPON, at this time, a bench conference was had

15  outside the hearing of the jury, as follows, to-wit:)

16             MR. SMALLWOOD:   Judge, we object to this.   It was

17  taken perhaps not contemporaneous but within a few hours of

18  when two statements that were made were determined to be

19  unreliable.

20             I understand it's offered under the medical advice

21  exception, but I still feel that it is tainted with being

22  unreliable.

23             THE COURT:   I've consulted 2803, hearsay

24  exceptions, and under paragraph four, statements made for

25  medical diagnosis, treatment, and describing medical history,

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1   that this statement falls outside the hearsay rule and will

2   be admitted.

3        (WHEREUPON, at this time, the bench conference ended,

4   after which the proceedings continued in open court, as

5   follows, to-wit:)

6            THE COURT:  You may continue.

7   Q.   (BY MS. McAMIS)  What did ▮▮K.A.▮▮ tell you had happened?

8   A.   She said that her mom's fiance was giving her a massage.

9   She said that he put his penis into her butt hole.  Then he

10  started giving her a massage again.

11       She said then she went outside behind the dumpster.  And

12  then she went to -- ran to the neighbor.

13  Q.   Did you ask ▮▮K.A.▮▮ if she was having any physical

14  symptoms as a result?

15  A.   Yes.

16  Q.   And what did she describe for you?

17  A.   She said she had some heartburn.

18  Q.   During your -- during your examination, the physical

19  examination part, then did Kristina, ▮▮K.A.▮▮'s mom, come back

20  in for the physical examination part?

21  A.   As far as I know.

22  Q.   Did you do -- when you do a physical examination of

23  ▮▮K.A.▮▮ specifically, do you just look at her genitalia or do

24  you look head to toe?

25  A.   We look head to toe.

162

1    Q.    Describe what you mean by that?

2    A.    So if there is -- so in a area that would be round then

3    if there was an injury at the top we would document that as

4    twelve o'clock.  If it was down below, then we would document

5    that a six o'clock, three o'clock, nine o'clock.

6    Q.    Can you describe for us what you observed about

7    ███K.A.███'s anus?

8    A.    That there was an area of redness.  And that redness was

9    between five o'clock and seven o'clock.

10   Q.    When you talk about this area of redness between five

11   o'clock and seven o'clock, first you're using the clock face;

12   is that correct?

13   A.    Correct.

14   Q.    So what was significant about that, to you?

15   A.    Was that there was redness, and that it was also tender

16   in that area.  She complained of tenderness when I separate

17   those anal folds to be able to observe all the tissue.

18   Q.    To be clear, when you're separating the anal folds,

19   describe for us how you do that, or how gently you do that?

20   A.    So I'm gonna take my gloved hand and generally separate

21   the tissue, and, you know, just stretch that area.  It's not

22   a forceful or quick movement.  It's kind of a slow, gentle

23   separation.

24   Q.    Is there any reason whatsoever why that should be

25   painful for a child?

163

1    A.    No.

2    Q.    You told us that she complained of tenderness when you

3    were doing that.  In fact, how many different times in your

4    records did you document how ███ K.A. ███ reacted with respect to

5    your examination on her anus?

6    A.    Each time I documented about the anus, and I believe

7    that was three times.

8    Q.    Is that significant to you that you documented it three

9    different times within your report?

10   A.    It was significant to me in that the tenderness would be

11   something that I felt needed maybe further evaluation and an

12   awareness to anyone that would look at that record.

13   Q.    Did you make any findings with respect to ███ K.A. ███ s

14   vagina?

15   A.    Yes.

16   Q.    And what was that?

17   A.    That she had normal structures there.  And that of the

18   actual vagina itself, not the external genitalia, is that

19   what you mean?

20   Q.    Correct.

21   A.    I just noticed that -- we don't put anything inside the

22   vagina, so with, again, genital separation I'm only able to

23   see part of the actual vagina.  And I documented that those

24   walls of what I could see were normal.

25   Q.    Did you take any swabs from ███ K.A. ███?

164

1   A.   Yes.

2   Q.   Where on ▓K.A.▓ did you swab?

3   A.   Her entire body, or just are you taking about the

4   genitalia?

5   Q.   Her entire body.

6   A.   Her entire body.  I collected an oral swab.  I collected

7   bellybutton swab.  I collected -- and those would have been

8   two swabs on each one of those.

9        I collect a swab from that gluteal cleft area.  That

10  crease between her buttocks.  I collected two.  And then

11  later on when I had her -- normally when we collect those two

12  swabs they're sitting up.  And so we go from the top kind of

13  down into that area.

14       Then I -- when I have her laying on her back as I

15  examined the entire genitalia, then I collected two more so

16  that the swabs that I collected from that area covered the

17  entire area.  So I used four swabs there.

18       I then collected an external genital swab.  I collected

19  a anal swab; two in each one of those packages.  And a buccal

20  swab.

21            THE COURT:  A what?

22            THE WITNESS:  Buccal.

23  Q.   (BY MS. McAMIS)  Did you collect any of ▓K.A.▓'s

24  clothing?

25  A.   Yes.

1   Q.   What clothing did she wear, then, when she left the

2   examination?

3   A.   I don't remember specifically, but we keep clothing that

4   is there in the exam room that -- new clothing that we can

5   give to patients to wear away from there.  Or they may bring

6   clothing for them to wear.  Those are our options.

7   Q.   After ███ K.A. ███ actually left your examination, did you

8   have any further contact with her or with the case?

9   A.   No.

10  Q.   And Ms. Bell, did ███ K.A. ███ at any point in time tell you

11  this was all the result of a nightmare?

12  A.   No.

13  Q.   At any point in time, did she tell you that this was all

14  about something that her uncle had done to her years before?

15  A.   No.

16  Q.   If she had told you any of those things, would you have,

17  in fact, documented that?

18  A.   Yes.

19  Q.   And based upon your training and experience, were the

20  results of ███ K.A. ███'s physical examination consistent with the

21  history that she provided to you?

22          MR. SMALLWOOD:  Which I'll object, Your Honor.  I

23  don't think this witness can testify to that.

24          MS. McAMIS:  Judge, she's been a SANE nurse for --

25  she wrote the test.

166

 1              THE COURT:  I'm gonna overrule the objection.

 2    Q.   (BY MS. McAMIS)  Let me ask again, Ms. Bell.  Based on

 3    your training and experience were the results of ██K.A.██'s

 4    physical examination consistent with the history she provided

 5    to you?

 6    A.   Yes.

 7              MS. McAMIS:  Thank you.  I have no further

 8    questions.

 9              THE COURT:  Cross, Mr. Smallwood.

10                         CROSS EXAMINATION

11    BY MR. SMALLWOOD:

12    Q.   And Ms. Bell, how you are?

13    A.   Just fine.  Thank you.

14    Q.   We've met before, I think.

15    A.   We have.

16              MR. SMALLWOOD:  Can I approach the witness, Your

17    Honor?

18              THE COURT:  Yes.

19    Q.   (BY MR. SMALLWOOD)  I'm gonna hand you what I believe is

20    six pages, Ms. Bell.  It's been provided to me by the

21    prosecution.  It purports to be a copy of your report of this

22    exam.

23        Would you look at that and tell me if that's what that

24    is, and if it's complete?

25    A.   Yes.

171

1   A.   That's correct.

2   Q.   There was no bleeding?

3   A.   Correct.

4   Q.   And isn't it a fact, Ms. Bell, that you don't know what

5   caused whatever condition it was you were looking at?

6   A.   Only what she told me.

7   Q.   Well, it could have been caused by any number of things,

8   couldn't it?

9   A.   Other possibilities besides what she told me.

10  Q.   How about a person giving her a massage and a thumb

11  slipping into that area -- slipping on some oil and going

12  into that area?  That could have caused the same injury,

13  could it not?

14  A.   Yes.

15  Q.   Okay.  Then on the clothing, your notes in that regard

16  are similar to what your testimony has been about what you

17  did or didn't do with the clothing?

18  A.   That's correct.

19          MR. SMALLWOOD:  And this is on page three for

20  counsel.

21  Q.   (BY MR. SMALLWOOD)  You've got a -- my copy's not very

22  good -- "evidence collected," yes or no.  You say "yes" for

23  clothing.  "No" for underpants.  "Yes" for miscellaneous

24  collection.  "Yes" for oral swabs.  "No" head hair combings.

25  "No" for pulled hair, ten hair combings.

196

1  Q.   What was your understanding as to where sexual abuse

2  between the defendant and █K.A.█ had occurred?

3  A.   At her residence, 131 North Louisville Avenue.

4  Q.   Is that in Tulsa?

5  A.   It's in the city and county of Tulsa.  Yes, in Oklahoma.

6  Q.   Where did you actually locate the defendant so that you

7  could, in fact, interview him?

8  A.   He had gone to his parents' house.  6762 East 25th

9  Place, I believe.

10  Q.   Who did you go to the defendant's parents' house with so

11  that you could interview the defendant?

12  A.   Well, actually, Detective Hodges was on call that day.

13  So I went with him.  And also Officer Taylor, the original

14  officer.

15  Q.   When you first arrived at the defendant's parents' home,

16  who did you first speak with?

17  A.   His father.

18  Q.   How was it that you made contact with his father?

19  A.   Well, we knocked on the door and he answered the door.

20  Q.   And today, Corporal Smith, you're dressed in your blue

21  uniform; is that correct?

22  A.   Yes.

23  Q.   At that day, and on that time, were you wearing plain

24  clothes or were you wearing a patrol officer uniform?

25  A.   No, I wasn't in uniform.  I was dressed as I normally do

1   in the detective division; shirt and slacks.

2   Q.    The shirt that you wear as part of the detective

3   division, could you describe the insignia on it for us?

4   A.    Well, it's a gold badge it's embroidered.   It's a

5   replica of a metal badge on the patrol unit.

6   Q.    So were you -- did you clearly identify yourself as a

7   law enforcement officer?

8   A.    Yes.

9   Q.    Who else, other than -- you said that his father

10  answered the door.  Who else was there that you spoke to,

11  other than the defendant?

12  A.    His mother was in the kitchen area, right off the living

13  room.  So we spoke to her very briefly.

14  Q.    Did you want to speak to the defendant in front of his

15  mother and dad?

16  A.    No.

17  Q.    Why not?

18  A.    Well, that's never a good practice for interviewing

19  someone, where you have person's -- one is reason that they

20  might answer questions for them or interject answers.  It

21  gets a little bit confusing.  They might lead them.

22      And then in this case, these type of cases, as we

23  mentioned before, sometimes it's a bit embarrassing to have

24  this accusation made, and we would not want him to -- we

25  would want him to feel free to talk to us about the

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

198

1   situation, to give us his side of the story, and he may not

2   be comfortable doing that in front of his parents.

3       So, you know, both are good interview techniques.  And

4   in these particular cases, we want the person to not be

5   embarrassed by the situation in front of their family or

6   friends.

7   Q.   At any point in time speaking to the defendant that day,

8   before, during, or after, did either you or Detective Hodges

9   offer the defendant anything, or promise him anything, in

10  exchange for speaking with you?

11  A.   No.  We just told him we wanted to talk to him about it.

12  Q.   At any point in time did you threaten or harass the

13  defendant in any way?

14  A.   No.

15  Q.   As a law enforcement officer, are you trained in

16  detecting whether or not a person is under the influence of

17  any type of intoxicating substance?

18  A.   Yes.

19  Q.   Did you form an opinion about whether or not the

20  defendant was?

21  A.   No, he seemed to be just fine.

22  Q.   Did you have any difficulty in speaking with him?

23  A.   No.

24  Q.   During the entire conversation with the defendant, was

25  he under arrest?

199

1    A.    No, he wasn't.

2    Q.    Was he free to leave at any time, or was he free to ask

3    you to leave at any time?

4    A.    Yes, that's correct.

5    Q.    At the end of your conversation with the defendant, was

6    he placed under arrest?

7    A.    No.

8    Q.    If you go through an interview of a suspect and a

9    suspect makes an admission to you, why do you not immediately

10   place him under arrest?

11   A.    Well, we haven't had a chance to look at all aspects of

12   the case, or to compare that with witness' statements and the

13   victim's statement yet.  And most the time we're not going to

14   make an immediate arrest until we've got all our information

15   together.

16   Q.    Was the entire interview recorded?

17   A.    It was audio recorded with a digital recording.

18   Q.    Thank you.

19            MS. McAMIS:  Your Honor, may we approach?

20            THE COURT:  Yes.

21        (WHEREUPON, at this time, a bench conference was had

22   outside the hearing of the jury, as follows, to-wit:)

23            MS. McAMIS:  It's actually just scheduling, Your

24   Honor.  If I recall correctly it's approximately an hour, and

25   I didn't know if you wanted to take a break first.  I'm ready

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

200

1  to set that equipment up.

2          THE COURT:  Has it been redacted?

3          MS. McAMIS:  Yes.

4          THE COURT:  Okay.  I'll inform the jury and we'll

5  take a 15 minute break.

6          MS. McAMIS:  And can we make that record about

7  admitting the redacted copy?

8          THE COURT:  Outside their presence.  Yeah.

9      (WHEREUPON, at this time, the bench conference ended,

10  after which the proceedings continued in open court, as

11  follows, to-wit:)

12          THE COURT:  Ladies and gentlemen, I anticipate the

13  state is going to want to play this recording for you, and it

14  will last about an hour.  So I think we ought to take a break

15  before we do that.

16          So if you'd take your materials and put them in

17  your envelope, turn your envelope face down on your chair.

18  And at 4:05 -- that's about 20 minutes because I have a

19  little bit of work I have to do outside your presence --

20  about 4:05 be out by the elevators.  Ms. Letha will get you.

21          It might be the last break of the day, so if you

22  want to step outside for a smoke or something, now is the

23  time to do it.  4:05, that's about 20 minutes.

24          Again, do not discuss the case.  Do not allow

25  anyone to discuss the case in your presence.  Begin no

201

1    deliberation.  You may leave your personal belongings here.

2    You're excused.

3          Please rise for the jury.

4       (WHEREUPON, at this time, the jury panel was excused

5    from the courtroom.)

6          THE COURT:  You may be seated.  The record will he

7    reflect we're outside the presence and hearing of the jury.

8          Ms. McAmis, you wish to make a record?

9          MS. McAMIS:  Yes, Your Honor.  I don't know how you

10   wish me to mark these.  What I have is the original full and

11   complete CD of the audio interview that you have previously

12   listened to.  And then I also have a redacted version of that

13   audio, which ends at the place where Your Honor directed that

14   it end.  In other words, it ends right before there's any

15   mention of an attorney.

16         THE COURT:  All right.  So the redacted version

17   will be 1; and the unredacted version will be 1-A.  1-A will

18   be maintained by the court reporter.  And 1 will be played

19   for the jury, assuming you offer them into evidence.

20         MS. McAMIS:  Your Honor, for that reason, may I

21   move to offer them now -- or offer it now so that I can get

22   it set up and be ready for the jury when they come?

23         THE COURT:  If you make an identification with the

24   witness.  If he identifies the exhibit.

25         MR. SMALLWOOD:  Your Honor, just so I'm sure,

1          MR. SMALLWOOD:  And I would also like to -- even

2    though we've had a *Jackson Denno* hearing, I would like to

3    lodge an objection to the playing of this exhibit before the

4    jury, for all the reasons that I already put in my Motion to

5    Suppress.

6          THE COURT:  And I've noted those and I made a prior

7    ruling, which is the purpose of the *Jackson Denno* hearing,

8    and determined that with the redaction, that this exhibit is

9    admissible to the jury.

10         Anything before I call the jury now?

11         MR. SMALLWOOD:  It's my understanding that both 1

12   and 1-A have been admitted -- or will?

13         THE COURT:  Yes.  But 1-A stays with the court

14   reporter.  It will never be available to the jury.

15         MR. SMALLWOOD:  The only one that's gonna be

16   available to the jury is 1?

17         THE COURT:  And my procedure will be, if the jury

18   asks to listen to it, I will bring them out into the

19   courtroom with counsel present and play it for them.  I do

20   not send it back to them to listen to.

21         All right.  Anything else?  State?

22         MS. McAMIS:  No, Your Honor.

23         THE COURT:  Are we ready?

24         MS. McAMIS:  Yes.  Okay.  Bring the jury in.

25         BAILIFF BUTCHER:  All rise for the jury.

1

1    IN THE DISTRICT COURT OF TULSA COUNTY

2    STATE OF OKLAHOMA

3

4    Ⓒ COPY

STATE OF OKLAHOMA,                    )

5                                      )

Plaintiff,                   )    F- 2017-69

6                                      )

vs.                                   )    No. CF-2012-3037

7                                      )

ADAM CLAYTON ZILM                     )

8                                      )    DISTRICT COURT

Defendant.                   )    F I L E D

9

JUL 1 7 2017

10

DON NEWBERRY, Court Clerk

11   TRANSCRIPT OF JURY TRIAL PROCEEDINGS   STATE OF OKLA. TULSA COUNTY

12   HEARD BEFORE THE HONORABLE KURT G. GLASSCO

13   JUDGE OF THE DISTRICT COURT

14   November 17, 2016

15   VOLUME 4 OF 5

16

17   APPEARANCES:

18       MS. SARAH McAMIS, Assistant District Attorney, 500 S.

19   Denver, Tulsa County Courthouse, Tulsa, Oklahoma, appears on
     behalf of the Plaintiff.

20

21       MR. ALLEN M. SMALLWOOD, Attorney at Law, 1310 S. Denver
     Ave., Tulsa, Oklahoma, appears on behalf of the Defendant.

22                                              F I L E D

IN COURT OF CRIMINAL APPEALS

23   RECEIVED            REPORTED BY:          STATE OF OKLAHOMA

Cindy G. Workman, CSR, RPR

24   AUG 0 1 2017         Official Court Reporter    AUG 0 1 2017

Tulsa County Courthouse

25   ATTORNEY GENERAL     500 South Denver

Tulsa, Oklahoma

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT        1-119

18

1   Honor?

2            THE COURT:  Yes.

3   Q.   (BY MR. SMALLWOOD)   I've handed you what actually is an

4   empty cartridge that is marked as Defendant's Exhibit No. 1.

5   That contained a compact disk of a recording.  Have you had

6   an opportunity to listen to that?

7   A.   Yes.

8   Q.   Without saying what's on it, describe -- describe -- I

9   mean in detail -- describe what is on it?  What does it

10  purport to be?

11  A.   Could you explain that?

12  Q.   Is it a recording of you and someone else?

13  A.   Yes.

14  Q.   And calling your attention to August 16th, 2013, is that

15  the date of the recording?

16  A.   Yes.

17  Q.   Have you had an opportunity to listen to that?

18  A.   Yes.

19  Q.   It's not an audio [sic].  There's no visual is there?

20  A.   Yes.

21  Q.   It's just -- I mean, there's no visual, it's just audio?

22  A.   Yes.

23  Q.   How many people are on that recording?

24  A.   Two.

25  Q.   Who are they?

1    A.    Me and Lauren Hall.

2    Q.    Who is Lauren Hall?

3    A.    I don't know exactly what she was, but she would come

4    monthly and visit.

5    Q.    Did she work for any bureau or organization of the State

6    of Oklahoma?

7    A.    I think DHS.

8    Q.    Okay.  And do you know -- where did this recording

9    occur?

10   A.    My house.  The bedroom.

11   Q.    Pardon me?

12   A.    My house.  The bedroom.

13   Q.    Okay.  In August of '13, where were you living?

14   A.    A townhouse in Tulsa.

15   Q.    Is that on Nogales Avenue?

16   A.    I think.

17   Q.    But it was in Tulsa?

18   A.    Yes.

19   Q.    And do you know what the occasion was that Ms. Hall was

20   at your house?

21   A.    A monthly visit.

22   Q.    A monthly visit?

23   A.    Yeah.

24   Q.    And did she visit with just you?

25   A.    No.

20

1   Q.   Did you have -- were your brothers and sisters there as

2   well?

3   A.   One at a time she would visit.

4   Q.   So, did she make this recording?

5   A.   No.

6   Q.   Who made this recording?

7   A.   I did.

8   Q.   Why did you make this recording?

9   A.   I didn't trust her.

10  Q.   And why didn't you trust her?

11  A.   She works for DHS.

12  Q.   Okay.  There a lot of people in DHS, and they're

13  certainly not all untrustworthy.  Did you have any particular

14  reason to mistrust Ms. Hall?

15  A.   I didn't believe she believed me.

16  Q.   Believe you about what?

17  A.   That I was telling the truth.

18  Q.   About what?

19  A.   That he did not do it.

20  Q.   Did not do what?

21  A.   He did not sexually touch me in any way.

22  Q.   And you had told her that?

23  A.   Yes.

24  Q.   On many occasions?

25  A.   Yes.

21

1   Q.   And you have listened to this recording?

2   A.   Yes.

3   Q.   It's not all audible, is it?

4   A.   No.

5   Q.   There are portions of it that you can't really

6   understand at all.  But are there portions that are audible?

7   A.   Yes.

8   Q.   The portions that are understandable or audible, are

9   they true and accurate to the best of your knowledge with

10  respect to what you said and what Ms. Lauren Hall said?

11  A.   Yes.

12  Q.   How exactly did you record this conversation?

13  A.   I put my iPod in my pocket and put it on record.

14  Q.   Okay.  Was Ms. Hall aware that she have being recorded?

15  A.   No.

16          MR. SMALLWOOD:  We would offer Defense Exhibit

17  No. 1, Your Honor.

18          THE COURT:  Any objection?

19          MR. SMALLWOOD:  And ask it to be played to the

20  jury.

21          THE COURT:  Just a moment.  Any objection?

22          MS. McAMIS:  Just the same discussion we had

23  earlier, Your Honor.

24          THE COURT:  All right.  Defendant's Exhibit 1 will

25  be played.  It will be admitted.  One moment.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1      You're requesting that I publish it; correct?

2           MR. SMALLWOOD:  I am, Your Honor.

3           THE COURT:  All right.

4           Ladies and gentlemen, this exhibit, like the

5    exhibits you had yesterday, will be now published.  I think

6    you'll be able to hear it better.

7           I'm going to go off the record for the publication

8    of it only, and then we'll come back on the record at its

9    conclusion.

10          We'll now go off the record.  And you may turn it

11   on.

12        (WHEREUPON, at this time, Defendant's Exhibit No. 1 was

13   played for the jury.)

14          THE COURT:  Back on the record in State versus

15   Zilm.  All parties and counsel are present.  All jurors are

16   in the courtroom.  And Miss ███ K.A. ███ and her attorney are

17   present.

18          Miss ███ K.A. ███ is in the witness stand.  We've just

19   completed publishing Defendant's Exhibit No. 1.

20          Mr. Smallwood, you may continue with your

21   direct-examination.

22   Q.   (BY MR. SMALLWOOD)  ███ K.A. ███, is the recording that we

23   all just heard the same one that you heard a few minutes ago

24   and determined was true and accurate?

25   A.   Yes.

23

1    Q.    There appears to be two female voices on that.  One

2    appears to be an adult, the other appears to be a child.  Who

3    is the adult?

4    A.    Lauren Hall.

5    Q.    Who is the child?

6    A.    Me.

7    Q.    And that is the same recording that you made on August

8    16, 2013, with your iPad?

9    A.    Yes.

10          MR. SMALLWOOD:  Pass the witness Your Honor.

11          THE COURT:  Cross.

12          MR. SMALLWOOD:  We would offer, if I haven't

13   offered it.

14          THE COURT:  You have.  It's been admitted.

15          All right.  Cross?

16          MS. McAMIS:  Just very briefly.

17                    CROSS EXAMINATION

18   BY MS. McAMIS:

19   Q.    ████ K.A. ████ on this recording Ms. Hall never told you what

20   to say when you went to court; is that correct?

21   A.    Correct.

22   Q.    And it was after that recording and after you went to

23   court that again a judge told you couldn't have any contact

24   with Big Daddy; correct?

25   A.    Correct.

30

1      MS. McAMIS:  The state does, Your Honor.

2      I would specifically direct your attention to a

3  transcript that Your Honor has been previously made aware of

4  and that was completed by the Honorable Judge Doris Fransein

5  at the juvenile proceedings.

6      The juvenile proceedings took place after such time

7  as Judge Fransein became informed that ███K.A.███ had been

8  provided to Mr. Smallwood to have a statement made with the

9  services of a court reporter.

10      Judge Fransein, in that proceeding, was very, very

11  clear that she knew that ██K.A.██ had recanted.  She knew

12  about the fact that ██K.A.██ had been provided to

13  Mr. Smallwood for the purposes of her statement.  And Judge

14  Fransein made very clear in no uncertain terms in her ruling

15  starting at page 78 of that particular transcript, wherein

16  she stated that she realized and recognized that the criminal

17  case was still proceeding.

18      She recognized and she realized that although

19  ██K.A.██ had recanted, that she continued to make a finding

20  that ██K.A.██ had, in fact, been sexually abused and that, in

21  fact, her finding would not be contingent upon the results of

22  the criminal case, nor would it change depending upon the

23  results of the criminal case.

24      After making that finding, Judge Fransein

25  specifically ordered, again, that the defendant was not to be

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

31

```
 1   allowed any access to the children.  But going beyond that,

 2   she discussed that her impulse at the time was to remove the

 3   children yet again from Ms. Alvarez's custody; however, she,

 4   based upon Ms. Alvarez's testimony, sworn testimony, that she

 5   would now follow the Court order, she didn't want to cause

 6   any more irreparable damage to these children.

 7        But having made that finding, she specifically and

 8   in no uncertain terms ordered while Ms. Alvarez was in the

 9   court, while  K.A.  was in the court, while the children

10   were in the court, that they were to have no contact with the

11   defendant's attorney -- with either the defendant or the

12   defendant's attorney.  And that if they were subpoenaed, if

13   they were contacted by the defendant's attorney, that the

14   court was to be informed, DHS was to be informed, and that

15   their juvenile lawyer was to be informed.  And she

16   specifically then inquired about whether or not an attorney

17   was going to be appointed in the criminal case, which after

18   this proceeding Your Honor did appoint an attorney,

19   specifically for  K.A.  in this criminal case.

20        She was completely clear and unequivocal in her

21   rulings.  If Your Honor will recall, it was after this time,

22   after the mother stated, in no uncertain terms that she would

23   no longer continue to allow this behavior, that the family

24   then moved and went to Arkansas.

25        And although Your Honor has not allowed the
```

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

32

1    evidence of what transpired in Arkansas in this case, before

2    this case, it's very important and significant for the

3    record, and it is very important and significant when Your

4    Honor is considering whether or not a minor is to testify in

5    this situation.

6          What happened in Arkansas, although the Oklahoma

7    DHS had, in no uncertain terms, said that they could not be

8    around this defendant, is that they -- this defendant came

9    every weekend or every other weekend and directly lived in

10   the same home with the children.  He shared --

11         MR. SMALLWOOD:  Judge, I'm gonna object to this.

12         MS. McAMIS:  This is a record.  I'm making a

13   record.

14         THE COURT:  She's making a record.  I'm gonna let

15   her make it, and I'll give you an ample opportunity to

16   respond.

17         MS. McAMIS:  He lived in the home with the

18   children.  He shared a bed with the mother.  He frequently

19   was alone with the children.  He frequently -- the mother

20   worked at a salon there, and she frequently brought the kids

21   up to work.  The defendant frequently came to work.

22         There were numerous, numerous statements by the

23   mother to numerous, numerous different witnesses about her

24   excuses to the Arkansas people as to why the defendant still

25   lived here and why she lived there.  None of which included

33

1    the fact that he was still standing trial and still accused

2    of the sexual abuse of her child.

3            And then she made multiple different plans for

4    wedding dates.  And every time that this court case was

5    continued, then the wedding dates were continued.

6            They weren't hiding it.  They weren't -- they were

7    being open to everyone involved.  She had engagement photos

8    made.  She posted them on her Facebook.  She changed her last

9    name on Facebook, but she posted all of this on Facebook.

10           There wasn't any hiding about it, until such time

11   as the State of Oklahoma found out where they were, and until

12   such time -- and the only reason all of that happened for the

13   purposes of the state making an offer of proof and for the

14   purposes of the state making a record, is because the

15   mother's -- I don't know whether it was her father or her

16   stepfather -- someone passed away and so her sister went to

17   Arkansas.

18           In looking for Kristina Alvarez, informed all the

19   people at the salon that she was looking for her sister.

20   When the people at the salon began to talk about that she was

21   with Adam Zilm, that she was with Big Daddy, that's when it

22   all came to light that none of this was supposed to have

23   occurred.

24           After such time as the state found out about that

25   and after such time as the state informed the Court and

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

34

 1    informed defense counsel that we were aware of it, that we

 2    had witness statements, that we had photographs of the

 3    defendant's vehicle.

 4              And I will say that during this same period of time

 5    when the defendant was not spending the weekend with K.A.

 6    and her family in Arkansas, then Kristina was coming here and

 7    spending the weekend with the defendant, in the defendant's

 8    parents' home.

 9              And at times the girls would come back and forth.

10    And that there were doctor visits back and forth here in

11    Tulsa, and otherwise.

12              At the time period -- and then when the state

13    informed the Court and defense counsel about the location in

14    Arkansas, K.A.'s mom abruptly quit her job and the family

15    moved back here to Tulsa.

16              And allegedly, during the intervening period of

17    time, she has not allowed access to the defendant, but has

18    been very open and very obvious in her continued relationship

19    with the defendant.

20              She works for the defendant's mom's salon.  She's

21    planning -- he's planning on going into business after this

22    trial is over with one of his brother-in-laws.  It's very

23    open and it's very obvious.

24              None of this -- if Judge Fransein knew about all of

25    this and knew about what had transpired and the Oklahoma

35

1   Department of Corrections [sic] knew about all this and knew

2   about what had transpired, I would submit to the Court that

3   it would be absolutely shocking.

4         And regardless of the outcome of this trial, I

5   would anticipate that Judge Fransein will be taking a long,

6   hard, good look at all of this.

7         So now today we know that ███ K.A. ███ was taken last

8   weekend -- Your Honor would not let me inquire as to who took

9   her or who was there, but we know that she was taken and met

10  with Mr. Smallwood last weekend.

11        And now ███ P.A. ███, who is apparently 15, and not 16,

12  clearly a minor under any definition of the word, is here

13  alone without any parent, without any parental supervision.

14  And while I completely agree, based on Kristina Alvarez's

15  involvement in this case that if Kristina Alvarez were here

16  she would give her permission for her daughter to testify

17  about her fiance, all of this is completely improper.

18        And the neighbor, the friend is not someone who

19  should be in charge of caring for this minor child's best

20  interest.

21        Your Honor was concerned enough about ███ K.A. ███'s

22  best interest, I don't know, two, three years ago that you

23  appointed an attorney for her. But now we're going to

24  proceed with her sibling being put on the stand to testify

25  under direct, under cross-examination, with all due respect,

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

36

1    to potentially subject herself to some type of perjurious

2    statement.  And the yet we're just --

3         Counsel can laugh at that, but we have prior

4    recorded statements by her that if she is today going to say

5    something completely different, it's not just enough for

6    counsel to sit and laugh at that.  We have to understand --

7         MR. SMALLWOOD:  Judge, I am not laughing.  This is

8    a lie by this prosecutor.  The Court saw me.

9         THE COURT:  Mr. Smallwood, please remain calm.

10        Ms. McAmis, finish your argument.

11        MS. McAMIS:  If this were any other case, or any

12   other attorney, or any other circumstance, I don't even think

13   we'd be having this discussion.  It is not proper for this

14   witness to testify as a minor without a parent present.

15        THE COURT:  Mr. Smallwood?

16        MR. SMALLWOOD:  Judge, you're aware of the posture

17   and procedural history of this case.  I took those sworn

18   statements because I had received information from sources

19   that ███K.A.███ had recanted her testimony.

20        I didn't have any particular proof of that because

21   I had not spoken with her.  At that time, the juvenile

22   court -- the juvenile case was in progress.  And I was not

23   aware that they had been prohibited from speaking with me.

24        But out of an abundance of caution, I subpoenaed

25   them, gave notice to their public defender attorney, and took

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

37

1    those witness statements.

2            I don't have access to the juvenile court records,

3    other than what you gave me, Judge, and then I couldn't copy

4    anything.  I just had to make notes.  So I didn't know what

5    the posture of that was.  It was represented to me --

6            THE COURT:  And excuse me for interrupting.  When

7    that issue came up about the records at juvenile, before I

8    gave you access to those, I spoke with Judge Fransein and I

9    said I believe that this is probably going to be a

10   significant issue in my criminal case.

11           I'm going to let Mr. Smallwood come and observe and

12   view the file, but not copy anything, and she agreed with

13   that.  So I want everyone to know, I don't know that I've

14   ever shared that before.  If I have, it's because it's been

15   over three years, but I'll telling you that that procedure I

16   cleared with the juvenile court before that took place.

17           I'm sorry for interrupting.  I thought it was a

18   important point to make.  You may continue.

19           MR. SMALLWOOD:  Thank you, Judge.

20           As I indicated, I -- not being -- having made an

21   entry of appearance in the juvenile deprived matter, I don't

22   have access to those records, other than the little bit of

23   access the Court gave me with Judge Fransein's permission.

24           It was represented to me by sources, I believe, at

25   some point in time, I can't tell you when, that the Tulsa

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

38

1    County juvenile court deprived case was closed.

2            And my understanding is that any contact which

3    might have existed -- which might occur with respect to

4    Mr. Zilm and the Alvarez family, did not occur until after

5    that juvenile case was closed.

6            It's my understanding that it's never been

7    reopened.  I don't believe there was any juvenile deprived

8    action filed in the State of Arkansas.  And I don't think

9    there's anything filed now.

10           This Court, on the state's motion, in March of

11   2016, entered an order that Mr. Zilm was to refrain from any

12   on contact with the Alvarez children.  And as far as I know,

13   he has complied with that.

14           But that did not prohibit me from speaking with

15   approximate witnesses.  If I had not had experience as I have

16   in this case, Judge, with the deception and the deceit by

17   members of the Department of Human Services, my approach

18   would have been entirely different.

19           I've done what I think I need to do to zealously

20   represent my client.  I have information that I gleaned from

21   the juvenile court records that Lora [sic] Hannagan, in July

22   2012, documented an affidavit, the recantation that ▇▇K.A.▇▇

23   made some 24 to 36 hours after her initial allegations.

24           That was never provided anybody as far as I know,

25   Judge.  And the only way I got wind of it was through rumors

39

1    on the ground from other sources.

2         Didn't speak with K.A.   Spoke with none of the

3    kids.  You gave me access.  I found out that, in fact, that

4    was true.

5         We then have a circumstance of Lauren Hall some --

6    the DNA -- the DNA records are some time in, I think, May or

7    June of 2013.  That's when they were completed.  No DNA found

8    on this child attributable to my client.

9         I assume the State of Oklahoma had possession or

10   had receipt of that at that time; and therefore, Lauren Hall

11   had constructive receipt of it some three to four months

12   later.

13        She specifically makes an affirmative statement in

14   an effort to try to force this child to testify in the way

15   that she wants her to by lying to her about the existence of

16   DNA, that supports the first allegation.

17        Those are the procedural -- the procedural history

18   of this case.  So if anybody's operating in bad faith, Judge,

19   it's representatives of the State of Oklahoma, not me.

20        THE COURT:  All right.  We have a couple of issues

21   here.  First of all, I was under the impression from

22   information that both parties had given the Court, that the

23   juvenile case had been previously closed.

24        Is that correct, Ms. McAmis?

25        MS. McAMIS:  It was closed upon the condition and

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

40

1   the understanding and the affirmative statements by ▮K.A.▮'s

2   mother that she would not allow contact, not only with the

3   defendant, but with defense counsel.

4            THE COURT:  I'm not aware of that part.

5            MS. McAMIS:  It's in the order.

6            THE COURT:  Excuse me just a moment.  But it is --

7   but it was closed; is that correct?

8            MS. McAMIS:  That is correct.

9            THE COURT:  All right.  All right.

10           And I do recall that when it was brought to my

11   attention that there was contact, I ordered no contact.  I

12   thought it was in '15, but was it this year?

13           MR. SMALLWOOD:  I think it was March of this year,

14   Judge.

15           THE COURT:  All right.  I also recall that earlier

16   the issue about protecting the child, ▮K.A.▮ that with

17   agreement of everyone, I appointed an attorney for her.  And

18   that's been several years now.  I don't know how long that's

19   been, but more than two years, I believe.

20           Was ▮P.A.▮ a subject of the deprived action, or was

21   it ▮K.A.▮?

22           MS. McAMIS:  They are all were.

23           THE COURT:  They all were?  Okay.

24           MS. McAMIS:  Yes.

25           THE COURT:  It appears now that from

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

41

1   Mr. Smallwood's statement that he spoke to the mother and the

2   mother assented for her to come.  I almost never let a child

3   testify without a parent being here.

4            I have had that happen though.  It appears that

5   Rhonda Shockley [sic] has been -- this child's been placed in

6   her care, custody, and control at least for coming down to

7   the courthouse to testify.

8            And as long as Ms. Shockley [sic] remains in the

9   courtroom while she testifies, I'll allow the testimony by

10   ██████████ .

11            MR. SMALLWOOD:  Your Honor, based upon the

12   statements made by the State of Oklahoma, which clearly are

13   not even veiled threats of perjury charges being filed

14   against this child, I'm gonna withdraw her, under that

15   duress, I'm gonna withdraw her as a witness.

16            MS. McAMIS:  I would like --

17            THE COURT:  You know, folks, let me tell ya, it was

18   said -- whether it was veiled threat is in the ears of

19   hearer.  I don't know that.

20            But Mr. Smallwood, you do what you feel is best for

21   your case.  I have ruled that she can testify.  And you use

22   your best decision on going forward on how you wish to

23   proceed in your case.

24            MR. SMALLWOOD:  May I have a brief recess to speak

25   with ██████ ?

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

42

1           THE COURT:  Yes.

2           Tell the jury, Ms. Letha, to take ten minutes off

3    the floor because they're out here.

4           BAILIFF BUTCHER:  Are you asking them to leave the

5    floor?

6           THE COURT:  Leave the floor, and come back in ten

7    minutes.  And we'll take a ten minute recess.  Thank you.

8           BAILIFF BUTCHER:  All rise.

9                    (Recess taken.)

10          THE COURT:  On the record, in open court, Case No.

11   -- or in State versus Zilm.

12          All parties and counsel are present.  We're outside

13   the presence and hearing of the jury.

14          Have you decided, are you calling ███P.A.███,

15   Mr. Smallwood?

16          MR. SMALLWOOD:  Judge, I'm gonna decline to call

17   her based upon the representations that were made to me on

18   the record.

19          THE COURT:  All right.  Then all you'll need to

20   inform the jury -- or do you want me to inform them -- that

21   you have declined to call her, and I've excused her.

22          MR. SMALLWOOD:  And that they're not -- to take no

23   inferences from the fact that she's not called.

24          THE COURT:  All right.  So who's your next witness?

25          MR. SMALLWOOD:  Jon Wilson, TPD forensic lab.  And

48

1    eight, so on and so on.  So by the end of amplification, you

2    have millions of pieces of the same DNA.

3        Then we run it on an instrument that gives us a series

4    of peaks, and underneath those peaks are numerical values.

5    We compare the numerical values from the evidence to the

6    numerical values of known individuals, or reference samples,

7    to determine if that person can or cannot be excluded.

8    Q.    Did you have an occasion in the spring of two thousand

9    -- either in 2010 or in 2013 to perform an examination on

10   what is your lab file No. 12-1303?

11   A.    Yes, sir, I did.

12   Q.    And in that regard, what items of evidence did you have

13   at your disposal, and were you requested to examine?

14   A.    I examined the known buccal swabs of ███████K.A.███████.

15   Known buccal swabs from Adam Zilm, and anal swabs.

16   Q.    Okay.  Now when you say known swabs from two people,

17   what do you mean by "known swabs"?

18   A.    Known swabs are swabs that are taken from the inside of

19   the mouth or -- we're obtaining the buccal cells from inside

20   the mouth.  And those act as a known sample since you know

21   where that sample came from.

22   Q.    And those samples have a highest percentage of being

23   non-contaminated with anybody else's DNA?

24   A.    That is correct.

25   Q.    And, where did you receive or where did you obtain this

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

49

1   evidence?

2   A.    From the property room.

3   Q.    And was it inventoried there in the property room under

4   any particular identification process?

5   A.    Yes.  They have a property receipt number and item

6   number.

7   Q.    And do you have any reason to believe that the property

8   receipt and the item number are tied to any other known

9   sources, other than ███████ K.A. ███████ or Adam Zilm?

10  A.    No, I don't.

11  Q.    As far as you know, the chain of custody was intact and

12  unaltered, when you got that from the property room, and it

13  had been there since it had been delivered by the police

14  department?

15  A.    To my knowledge.

16  Q.    Is this what's known as, at least, partially, a rape

17  kit?

18  A.    Yes.  It's a sexual assault kit.

19  Q.    Would this have been the sexual assault kit, at least a

20  portion of it with respect to ███████ K.A. ███████, which would

21  have been conducted by the SANE nurse, with ███████ K.A. ███████

22  being the alleged victim?

23  A.    The SANE nurses do collect the evidence for the sexual

24  assault kit.

25  Q.    And what you saw here was consistent with that procedure

50

1   and that protocol?

2   A.   I have no reason to believe otherwise.

3   Q.   Okay.  You indicated that you had -- what items, other

4   than the known sample from ▮▮▮▮K.A.▮▮▮▮, did you have and

5   did you examine?

6   A.   I examined the anal swabs from the sexual assault kit,

7   and the known buccal swabs from Adam Zilm.

8   Q.   And do you need to tell us any more, for the jury, as to

9   exactly how you do that, with details about how that's done?

10  A.   The only thing I would add is when an item is -- there's

11  a potential for seminal fluid to be on an item, then we do

12  what is called a differential extraction.  And this basically

13  tries to separate the skin cells from the sperm cells.

14      So Fraction E in a perfect extraction -- Fraction A

15  would only contain the skin cells, and Fraction B would only

16  contain the sperm cells.  It's a way to deconvolute a

17  mixture.

18  Q.   And did you perform that procedure?

19  A.   I did.

20  Q.   Did you perform any other procedure with respect to any

21  of the other swabs taken from ▮▮▮▮K.A.▮▮▮▮, other than the

22  buccal swab?

23  A.   Just anal swabs.  That was it.

24  Q.   Okay.  And as a result of doing that procedure, did you

25  then engage in any activity or reach any kind of conclusion

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

51

1   with respect to the existence of any foreign DNA on the anal

2   swabs from ████ K.A. ████?

3   A.    I did.

4   Q.    And what was your conclusion?

5   A.    That the Fraction A appears to have come from one

6   individual.  And no significant DNA was obtained from

7   Fraction B.

8         And then after subtracting the DNA information

9   attributable to ████ K.A. ████, no DNA information remained.

10  Q.    So what you're telling us is that after performing your

11  examination on the anal swab, you were unable to find any DNA

12  which you could attribute to the -- tie and compare to the

13  known swab of Adam Zilm?

14  A.    That is correct.

15  Q.    Do you have any reason to believe that your procedure in

16  this case or your results in this case are anything other

17  than as accurate as you can make them?

18  A.    I have no reason to believe otherwise.

19              MR. SMALLWOOD:  Pass the witness, Your Honor.

20              THE COURT:  Cross.

21                        CROSS EXAMINATION

22  BY MS. McAMIS:

23  Q.    Mr. Wilson you talked about the presence or the lack

24  thereof of seminal fluid.  If a suspect ejaculates into his

25  hand or on his leg or his bed; in other words, not in or on

58

1    determines to finalize its instructions we would like the

2    opportunity do that as well.

3           THE COURT:  Well, I will give you an opportunity

4    before I finalize instructions to make all the argument that

5    you see fit, but with Ms. McAmis present on whether I allow a

6    lesser included or not.  She gets to participate in that

7    discussion.

8           But, you will have an ample opportunity to make all

9    the record you want.

10          MR. SMALLWOOD:  Very well.

11          THE COURT:  All right.  Would you ask Ms. McAmis to

12   come back in, please.

13          BAILIFF BUTCHER:  I believe she's in your office.

14          THE COURT:  Let me look.

15          MR. SMALLWOOD:  You're not going to inquire of him,

16   Judge?

17          THE COURT:  No, I'm gonna let her be here when I

18   inquire of him.

19          MR. SMALLWOOD:  Okay.

20          THE COURT:  Mr. Zilm, would you please stand and

21   raise your right hand.  Do you solemnly swear or affirm that

22   the testimony you're about to give will be the truth, the

23   whole truth, and nothing but the truth, so help you God?

24          THE DEFENDANT:  I do.  Yes, sir.

25          THE COURT:  Thank you.  Tell me your name.

59

1          THE DEFENDANT:  Adam Zilm.

2          THE COURT:  And you've been present throughout this

3   entire jury trial proceeding; correct?

4          THE DEFENDANT:  Yes, sir.

5          THE COURT:  And you are the defendant, one and the

6   same Adam Clayton Zilm; is that correct?

7          THE DEFENDANT:  Yes, Your Honor.

8          THE COURT:  And sir, how old are you?

9          THE DEFENDANT:  Thirty-four.

10          THE COURT:  And what is your education background?

11          THE DEFENDANT:  I'm sorry.  I'm 35.  I just turned

12   35.

13          THE COURT:  What's your education background?

14          THE DEFENDANT:  I have an Associate's degree in

15   Associated Body Work and Massage and some additional

16   college --

17          THE COURT:  Speak up.

18          THE DEFENDANT:  I have an Associate's degree in

19   Associated Body Work and Therapeutic Massage.  I have

20   additional college with -- in regards to network systems

21   administration.

22          THE COURT:  Okay.  And are you taking any

23   medications today?

24          THE DEFENDANT:  No.

25          THE COURT:  Is there any medication that you're

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

60

1    supposed to be taking that you're not taking?

2              THE DEFENDANT:  No.

3              THE COURT:  Have you had any alcohol in the last 12

4    hours?

5              THE DEFENDANT:  No.

6              THE COURT:  Are you thinking clearly?

7              THE DEFENDANT:  Yes.

8              THE COURT:  Do you understand that you're making

9    decisions here today that can affect you the rest of your

10   life?

11             THE DEFENDANT:  Yes.

12             THE COURT:  All right.  Sir, you have an absolute

13   right to testify if you see fit.  No one can make you

14   testify.  The state cannot call you as a witness.  And you

15   also have the right to waive that.

16             Do you understand that?

17             THE DEFENDANT:  Yes, Your Honor.

18             THE COURT:  It's my understanding you've discussed

19   this with your attorney; is that true?

20             THE DEFENDANT:  This is true.

21             THE COURT:  And you talked with him all you wish

22   about this subject?

23             THE DEFENDANT:  Yes.

24             THE COURT:  And it's my understanding that you've

25   decided that you will not testify; is that correct?

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

61

1          THE DEFENDANT:  That's correct.

2          THE COURT:  Has anyone forced you, threatened you,

3    or promised you anything to get you to give up your right to

4    testify and not testify?

5          THE DEFENDANT:  No.

6          THE COURT:  Would you say that this is a free and

7    voluntary act on your part?

8          THE DEFENDANT:  Yes.

9          THE COURT:  Thank you.  You can be seated.

10         Anything further, Mr. Smallwood?

11         MR. SMALLWOOD:  No, sir.

12         THE COURT:  Based upon the Court's inquiry and

13   having heard statements of counsel with Mr. Zilm present, I'm

14   finding that Mr. Zilm is freely, voluntarily declining his

15   right to testify on his own defense.  And that this is a

16   knowing decision on his part, without reservation.  And with

17   the amount of consultation with his counsel as he saw fit in

18   making the decision.

19         Anything further before I call for the jury?

20         MS. McAMIS:  Not by the state, but -- except for

21   scheduling purposes.  It's not even yet 11.  Do we still not

22   intend to close today?

23         THE COURT:  I don't know how fast I can get the

24   instructions done.  But we're gonna work on instructions

25   after I excuse the jury.

1

1    IN THE DISTRICT COURT OF TULSA COUNTY

2    STATE OF OKLAHOMA

3

4
STATE OF OKLAHOMA,              )          🔲ⓒⓒCOPY
5
          Plaintiff,           )
6                                )          F-2017-69
vs.                            )          No. CF-2012-3037
7                                )
ADAM CLAYTON ZILM               )
8                                )          DISTRICT COURT
          Defendant.           )          FILED
9

10                                          JUL 17 2017

11    TRANSCRIPT OF JURY TRIAL PROCEEDINGS   DON NEWBERRY, Court Clerk
                                            STATE OF OKLA, TULSA COUNTY
12    HEARD BEFORE THE HONORABLE KURT G. GLASSCO

13    JUDGE OF THE DISTRICT COURT

14    November 18, 2016

15    **VOLUME 5 OF 5**

16

17  APPEARANCES:

18      MS. SARAH McAMIS, Assistant District Attorney, 500 S.
    Denver, Tulsa County Courthouse, Tulsa, Oklahoma, appears on
    behalf of the Plaintiff.
19

20      MR. ALLEN M. SMALLWOOD, Attorney at Law, 1310 S. Denver
    Ave., Tulsa, Oklahoma, appears on behalf of the Defendant.
21

22                                          FILED
                                            IN COURT OF CRIMINAL APPEALS
23  RECEIVED        REPORTED BY:            STATE OF OKLAHOMA
                Cindy G. Workman, CSR, RPR
24  AUG 01 2017     Official Court Reporter  AUG 01 2017
                Tulsa County Courthouse
25  ATTORNEY GENERAL  500 South Denver
                Tulsa, Oklahoma              1-68

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

12

1        MR. SMALLWOOD:  I'm gonna object to this.  Ask the

2   jury be admonished to disregard and move for a mistrial.

3        THE COURT:  Objection overruled.  Mistrial denied.

4        MS. McAMIS:  Whether or not she's able to come and

5   say what she needs to say.

6        But in deciding what parts of her testimony to

7   believe and listen to when deciding whether her original

8   information that she gave is what you should listen to, or

9   whether the preliminary hearing testimony is what you should

10  listen to, or whether what she said on the stand is what you

11  should listen to, you can take everything into consideration,

12  including her demeanor on the stand.

13       Including how she answered the questions when she

14  got upset.  How she got upset.  Including everything about

15  the fact that when she originally testified and left this

16  courtroom, she reached out and took the hands of the

17  defendant's parents as she left the room.  You can and you

18  should consider all of that.

19       You should also consider what interest she has in

20  the outcome of these proceedings.  That's Instruction No. 17.

21  Again, that little girl has the weight of the world on her

22  shoulders.  Nobody else in this courtroom has an interest in

23  the outcome, who testified.  In other words --

24       MR. SMALLWOOD:  Judge, I'm gonna object to that.

25  Ask to make a record at the bench.

30

1  prosecution team gave that to anyone.

2          That was obtained by me by this Judge's court

3  order, to allow me to get into confidential records, because

4  it was necessary to get the truth out.  And that's what

5  happened.

6          Now what did █K.A.█ tell you was said to her prior

7  to the preliminary hearing in September of 2012?  She's not

8  with her mom.  She's in somebody else's custody.  And she

9  wants to go home.  Of course she wants to go home.

10         She tried to tell them about that, and they said,

11 You wanna go home?  Maybe you can go home.  Tell us what you

12 said the first time and you can go home.

13         Now the only proof of that comes from █K.A.█.  And

14 you could rightly say, um, coming from a 12-year-old kid --

15 11-year-old kid at the time, you know.  You know, why is that

16 believable?  It's believable because of what happened the

17 next summer.

18         And what happened the next summer is utterly

19 undisputed in this courtroom by anybody.  She goes from that

20 preliminary hearing all the way through the fall in '12

21 through the spring and into the summer of '13, trying, on

22 every attempt, that an 11-year-old, 12-year-old kid is doing

23 to correct her mistake.  Nobody wants to listen.  Nobody

24 wants to listen.

25         Stop and think about how gutsy and innovative and

31

1    smart it would take for a 12-year-old child to become so

2    fearful of people lying to her and representing things to her

3    and refusing to believe her, that knowing that she's going to

4    be interviewed by members of the Department of Human

5    Services, she secrets on her body somewhere a recording

6    device.

7         Now what must have been going on in her life with

8    members of the Department of Human Services, and her mind to

9    try to correct her mistake, what must have been going on for

10   her to have felt like she had to do that to protect herself?

11   Because I don't trust those people.  What did you hear on

12   this recording?

13        It's important that you remember that Jon Wilson,

14   the DNA guy -- I'll talk about little bit later -- but Jon

15   Wilson told us that this DNA test finding no evidence of Adam

16   Zilm's -- any of his body secretions on that child was

17   completed in May of 2013.

18        Now the procedure when that is done is to turn it

19   effort to the D.A.'s office.  I'm not sure when that was

20   done, but it's available by all members of their team.  So

21   that had been in the possession of the prosecution for three

22   months.  Lauren Allen -- Lauren Hall comes to talk to K.A.

23   She records K.A.  And once again, threatens -- remember --

24   listen to this -- she threatens her.

25        I don't know if you're gonna go back in custody or

48

1    kidding me?

2          But listen also to how he responds to the question

3    of "Did you put your penis in her?"  Because again, how would

4    any innocent man respond to that?

5          If the police showed up right now and said an

6    11-year-old girl is saying you put your penis in her, your

7    response would be horrified.  That's the most disgusting,

8    disturbing thing anybody could ever accuse you of.  How could

9    you say that?  Get the hell out of my house.

10         MR. SMALLWOOD:  Judge, I object to this.  This is

11   histrionics.  This is improper.  And ask the jury be advised

12   to disregard it and move for a mistrial.

13         THE COURT:  Motion for mistrial will be denied.

14         Counsel, I'll ask you to refrain from histrionics.

15         MS. McAMIS:  And yet how the defendant responds is,

16   oh, yeah, now I remember.  Must have been my thumb.

17         But then they give the opportunity.  Is there

18   anything else that you want that tell us?  Anything else?

19   Nope.  Nope.  Nope.  We're good.

20         Defense counsel, in his closing argument to you,

21   said that, you know, he doesn't deny.  He doesn't show a

22   guilty conscience.  He doesn't do any of those things.  He

23   was so full and fair and forthright with them.

24         But it wasn't until they said, hey, can we get your

25   DNA?  "Oh, yeah.  Fuck me.  Holy shit."  Really?  He didn't

51

1   Do you remember when he said those things?

2           And do you remember when he said all parents touch

3   their children in this way.  And that if someone were

4   watching his wife change a diaper we could infer a bad

5   intent.

6           And I would suggest to you that that comparison is,

7   with all due respect, ridiculous.  We're not talking about

8   normal parenting.  We're not talking about changing diapers

9   or bathing kids.  We're talking about naked massages.

10          Counsel also asked and also said that the fact that

11  K.A. recorded Lauren Hall, that that corroborated that

12  what everybody -- that everybody told her what to say.

13          And when he talked about that, he talked about how

14  gutsy, and how innovative, and how smart K.A. was for

15  doing that.  Does anybody think it's a huge coincidence that

16  right when she met with Mr. Smallwood alone, then she

17  recorded Lauren Hall?  That's a coincidence.

18          MR. SMALLWOOD:  Judge, I object to that.  Ask the

19  jury be admonished to disregard it.  She's impugning my

20  character based on no evidence whatsoever.  Ask the jury be

21  admonished to disregard it.  Move for mistrial.

22          THE COURT:  Motion for mistrial be denied.

23          Ms. McAmis, confine yourself to the matters that

24  are actually of evidence, and not of statements of counsel

25  during *voir dire*.

55

1          And regardless of what her family wanted, 12

2    members of her community stood up and said it's wrong.  It's

3    wrong, Big Daddy.  It's wrong that you've tried to get us off

4    in the weeds.

5          It's wrong that you violated a little girl and then

6    put her through the next four years to get to this day.

7          MR. SMALLWOOD:  Judge, I'm gonna object to this.

8    Ask the jury be admonished to disregard it, and move for a

9    mistrial.  This is outrageous conduct.

10          THE COURT:  I'm gonna sustain the objection.

11          The jury will disregard putting through four years

12    to get to today.

13          And your motion for mistrial is denied.

14          MS. McAMIS:  You now have the opportunity to go

15    back to that jury room.  And when you do, take as little time

16    as you need; take as much time as you need.

17          When you come back out from that jury room, show

18    that you have seen the truth.  Show that you have heard the

19    truth.  Bring justice back with you.  Bring your common sense

20    back with you.  Thank you.

21          THE COURT:  Ladies and gentlemen of the jury, as I

22    promised, you would have one last break, and this will be it

23    before you begin deliberating.  But you will be in the care,

24    custody, and control of the bailiff, which means you have to

25    remain together.

IN THE DISTRICT COURT IN AND FOR TULSA COUNTY

STATE OF OKLAHOMA

STATE OF OKLAHOMA,                )
                                  )
            Plaintiff,            )      F-2017-69
                                  )
      -vs-                        )      CF-2012-3037
                                  )
ADAM CLAYTON ZILM,                )
                                  )
            Defendant.            )


     TRANSCRIPT OF PRELIMINARY HEARING in the above-styled

cause, before the Honorable David Youll, Special Judge of the

District Court in and for Tulsa County, State of Oklahoma,

heard on the 26th day of September, 2012.


**COPY**

<u>APPEARANCES:</u>

For the Plaintiff:        MS. SARAH McAMIS
                          Assistant District Attorney
                          Tulsa County Courthouse
                          Tulsa, Oklahoma   74103


For the Defendant:        MR. ALLEN SMALLWOOD
                          Attorney at Law
                          1310 South Denver
                          Tulsa, Oklahoma   74119


Reported by:              LANA S. GOTCHER, CSR, RPR-CP
                          Official Shorthand Reporter
                          Tulsa County Courthouse
                          Tulsa, Oklahoma   74103

RECEIVED

AUG 0 1 2017

ATTORNEY GENERAL

FILED
IN COURT OF CRIMINAL APPEALS
STATE OF OKLAHOMA

AUG 0 1 2017

1-64

OKLAHOMA DISTRICT COURT - OFFICIAL TRANSCRIPT

1   A.    I took off my shirt and my pants and my panties.

2   Q.    You took off your shirt and pants and your panties; is

3   that right?

4   A.    (Nodding head.)

5   Q.    Is that a yes?

6   A.    Yes, ma'am.

7   Q.    Okay.  And were you on the -- still on the bed?

8   A.    After I got on the bed.

9   Q.    Were you on top of the covers or underneath the covers?

10  A.    I think -- I don't remember if I had some on.

11  Q.    Okay.

12  A.    On my legs or something.  I don't know.

13  Q.    How were you on the bed?  Were you laying or sitting or

14  standing or something else?

15  A.    Laying on my stomach.

16  Q.    You laid on your stomach; is that right?

17  A.    Yes, ma'am.

18  Q.    And then did Adam massage you?

19  A.    Yes, ma'am.

20  Q.    Where on your body did he massage you?

21  A.    My back and my glutes, which is butt.

22  Q.    Okay.  So let me ask first about your back.  Did he use

23  anything on you to massage you on your back?

24  A.    Oil.

25  Q.    Okay.  And what part of his body was he using to massage

```
 1   your back?

 2   A.   His hands.

 3   Q.   Okay.  And then you said that he massaged your glutes; is

 4   that right?

 5   A.   (Nodding head.)

 6   Q.   Yes?

 7   A.   Yes, ma'am.

 8   Q.   Then you said your glutes were your butt; is that right?

 9   A.   Yes, ma'am.

10   Q.   How did you know the word glutes for your butt?

11   A.   Because he told me.

12   Q.   Okay.  And so what part of his body did he use to massage

13   your glutes?

14   A.   His hands.

15   Q.   Did he use one hand or both hands?

16   A.   Usually used both.

17   Q.   I'm sorry?

18   A.   He used both.

19   Q.   Okay.  Did he put oil on your body?

20   A.   Yes, ma'am.

21   Q.   Okay.  And then what happened?

22   A.   I don't know.  He must have thought I was asleep or

23   something.  Next thing I knew I was turned over on my side.

24        MR. SMALLWOOD:  Excuse me, Your Honor.  I didn't

25   hear that answer.
```

1   Q.   Okay.   When Adam touched you with his penis on your butt

2   hole, did it stay on the outside of your butt hole or go on

3   the inside of your butt hole?

4   A.   In.

5   Q.   How did that -- did you feel anything when that happened?

6   A.   Scared.

7   Q.   Okay.   When that happened, just so that I understand,

8   were you laying on your side, or on your back or your stomach

9   or something else?

10  A.   Side.

11  Q.   Okay.   Did Adam say anything to you when that happened?

12  A.   No.

13  Q.   And while you were lying there, did he -- did he touch

14  you anywhere else on your body with his penis?

15  A.   I don't remember.

16  Q.   Okay.   This time that you have told us about, this last

17  time, when this -- that you just told us about, was that the

18  first time that he had touched you with his penis, or had that

19  happened more than one time?

20  A.   First.

21  Q.   Okay.   You told us earlier that he had given you massages

22  more than one time; is that right?

23  A.   Yes, ma'am.

24  Q.   Had he given you massages before when you weren't wearing

25  any clothes?

1   you?

2   A.   Yes, sir.

3   Q.   Okay.   Do you know how long the massage that Adam gave

4   you lasted?

5   A.   No, sir.

6   Q.   You indicated that he used the almond oil or some sort of

7   body item on your body like you did on his?

8   A.   Yes, sir.

9   Q.   That's normal as far as massages go; is that right?

10   A.   Yes, sir.

11   Q.   And he massaged your shoulders and back; correct?

12   A.   Just my back.

13   Q.   Just your back.   And was there anything out of the

14   ordinary about the way he massaged your back?

15   A.   No, sir.

16   Q.   Didn't say anything to you?

17   A.   No, sir.

18   Q.   Okay.   And then you said he massaged what he told you

19   were glutes, so you would call that your butt, your hips?

20   A.   No, sir.

21          THE COURT:   She never said hips.   That's Counsel's

22   word.

23   Q.   (By MR. SMALLWOOD)   Well, he massaged your bottom or your

24   butt, and he did that the way he'd done it before; correct?

25   A.   Yes, sir.

OKLAHOMA DISTRICT COURT - OFFICIAL TRANSCRIPT

1    Q.    And he was still massaging your body?

2    A.    No, sir.

3    Q.    Had the massage stopped?

4    A.    Yes, sir.

5    Q.    How long was it stopped before you felt what you say

6    happened?

7    A.    I don't know how long.

8    Q.    Okay.  During this massage did Adam massage your -- the

9    backs of your thighs?

10   A.    No, sir.

11   Q.    Okay.  Just your glutes, or your butt?

12   A.    Yes, sir.

13   Q.    When he does that, his thumbs get real close to your

14   bottom, don't they?  Or to your private parts, don't they?

15   A.    Yes, sir.

16   Q.    That happens at that point on any massage, doesn't it?

17   A.    Yes, sir.

18   Q.    Okay.  And when you say you felt that thing enter your,

19   what you call your butt, you are still facing the door?

20   A.    Yes, sir.

21   Q.    You couldn't see Adam?

22   A.    No, sir.

23   Q.    And so you don't know what that was, do you?

24   A.    No, sir.

25   Q.    Could really have been his thumb, couldn't it?

1          (The following proceedings were had in open court in the

2    presence of the witness.)

3          THE COURT:  Okay.  The Record will show that the

4    witness has come back in the courtroom and is again sitting in

5    the witness chair.

6          We had to take a short break to talk about some things

7    when you weren't here.  Mr. Smallwood is going to have some

8    more questions for you; okay?

9          THE WITNESS:  Yes, sir.

10          THE COURT:  Mr. Smallwood.

11   Q.   (By MR. SMALLWOOD)  And I know you still remember that we

12   want truthful questions -- or truthful answers?

13   A.   Yes, sir.

14   Q.   Okay.  When you felt this on your bottom, was it painful?

15   A.   Kind of.

16   Q.   Okay.  Did it cause you to have any kind of what's called

17   flash backs of that prior incident with a family member who

18   hurt you years before?

19   A.   Yes, sir.

20   Q.   Okay.  And those things were going through your mind, the

21   prior awful experience you had were going through your mind

22   when you felt that, weren't they?

23   A.   Yes, sir.

24   Q.   Okay.  And do you think, K.A. that might have

25   influenced what you believe happened here, or what you might

OKLAHOMA DISTRICT COURT - OFFICIAL TRANSCRIPT

```
 1          THE COURT:  Thank you very much.  You can step down;

 2   okay?

 3          THE WITNESS:  Yes, sir.

 4      (Witness excused.)

 5          THE COURT:  What else does the State have?

 6          MS. MCAMIS:  Your Honor, may I inquire of Defense

 7   Counsel whether or not he is willing, for the purposes of the

 8   Record, to stipulate to the fact that the defendant is over

 9   the age of eighteen, that the address in question on North

10   Louisville in Tulsa is in Tulsa County, that the date that the

11   neighbors and the police responded was in fact on June 4th of

12   2012?

13          MR. SMALLWOOD:  For the purpose of preliminary, we

14   so stipulate.

15          THE COURT:  The Court will accept that stipulation

16   as outlined strictly for the purpose of preliminary hearing

17   and preliminary hearing only.

18      Additional on behalf of the State?

19          MS. MCAMIS:  Your Honor, with those stipulations,

20   the State has no further evidence to present, so the State

21   would rest.

22          THE COURT:  Mr. Smallwood.

23          MR. SMALLWOOD:  Your Honor, I would demur, and I

24   have brief argument, if I could?

25          THE COURT:  Yes, sir, go ahead.
```

```
1          MR. SMALLWOOD:  I don't think this child knows what

2   happened or exactly how anything happened.  Her testimony is

3   ambiguous at best.  She seems certain until you press her a

4   little bit, then she becomes uncertain.  Granted, the burden

5   at preliminary hearing is only probable cause, but it's got to

6   be consistent, believable, basically uncontradicted testimony

7   that a judge can hang his hat on as establishing credible

8   probable cause.  I don't think it does here.

9          THE COURT:  I'm going to overrule your demurrer,

10  show the State has met the burden of showing probable cause to

11  believe that the listed offense occurred, probable cause to

12  believe the defendant committed that offense.

13      It's still a Judge Glassco case; is that your

14  understanding?

15          MS. MCAMIS:  Yes, Your Honor.

16          THE COURT:  Sir, at this time I'm going to bind you

17  over for District Court Arraignment before Judge Glassco for

18  October 1st at nine-thirty.  Tha's nine-thirty, Judge Glassco,

19  upstairs in Courtroom 401.  You are recognized back to that

20  date and time.  Make sure and maintain contact with Mr.

21  Smallwood between now and that date.

22      We will be off the Record.

23      (Proceedings concluded.)

24

25
```

OKLAHOMA DISTRICT COURT - OFFICIAL TRANSCRIPT

1                 IN THE DISTRICT COURT IN AND FOR TULSA COUNTY

2                            STATE OF OKLAHOMA

3

4        STATE OF OKLAHOMA,            )
                                       )
5                      Plaintiff,      )          F- 2017-69
                                       )
6        -vs-                          )       Case No. CF-2012-3037
                                       )
7        ADAM CLAYTON ZILM,            )
                                       )
8        _____Defendant.____)

9

10

11                        TRANSCRIPT OF PROCEEDINGS

12                          **PRELIMINARY HEARING**

13                        HAD ON NOVEMBER 6, 2013

14                               BEFORE THE

15                      HONORABLE CLIFFORD SMITH

16                       SPECIAL DISTRICT JUDGE

17

18

19

20

21       **REPORTED BY:**

22       JUDY K. BROWN, CSR, RPR
         OFFICIAL CERTIFIED SHORTHAND REPORTER
23       Tulsa County District Court
         3rd Floor - Criminal Division
24       Tulsa, Oklahoma 74103
         (918) 596-5395

25

FILED
IN COURT OF CRIMINAL APPEALS
STATE OF OKLAHOMA
AUG 0 1 2017

RECEIVED

AUG 0 1 2017

ATTORNEY GENERAL



1-98

1   about now is not things that she told you --

2   A      Uh-huh.

3   Q      -- but rather -- is that "yes"?  I'm sorry.  She

4   has to write that down.

5   A      Yes.

6   Q      Okay.  But things that you told her.  What did you

7   tell her about testifying at the Preliminary Hearing?

8   A      I told her that there would be people there to

9   support her, not to be scared, just to be brave and tell

10  the truth.

11  Q      Did you at any point before the Preliminary Hearing

12  tell her how she needed to testify?

13  A      Absolutely not.

14  Q      Did you at any point before the Preliminary Hearing

15  tell her what she needed to say?

16  A      Absolutely not.

17  Q      Did you at any point before the Preliminary Hearing

18  tell her what not to say?

19  A      Absolutely not.

20  Q      At any point before the Preliminary Hearing did you

21  tell her that if she testified in a certain way certain

22  things would happen?

23  A      Absolutely not.

24  Q      Did you ever promise her or assure her that

25  depending on how her testimony was that there would be a

1    certain outcome in her juvenile deprived case?

2    A      No.

3    Q      Or with respect to custody placements with the mom

4    or otherwise?

5    A      No.

6    Q      And I -- and I just want to make clear, you've

7    testified that you never told her any of those things

8    before the Preliminary Hearing.  On the day of the

9    Preliminary Hearing, did you tell her anything like that?

10   A      No.

11   Q      Did you ever have any contact with her or

12   conversations with her on the day of the Preliminary

13   Hearing?

14   A      No.

15   Q      After the Preliminary Hearing and before any of the

16   next court hearings -- and let me back up and ask for the

17   purposes of the record --

18                  THE COURT:  Let me interrupt one second.

19   I'm sorry.

20

21

22                  (Off the record, briefly.)

23

24                  THE COURT:  Back on the record.  Sorry.

25                  MS. MCAMIS:  Thank you.

1    Q     (By Mr. McAmis)  After the Preliminary Hearing at

2    this courthouse, is it correct that there were several

3    juvenile hearings that took place at the juvenile

4    courthouse?

5    A     Yes.

6    Q     At any point in time before any of those hearings,

7    did you instruct ██K.A.██ to testify in a particular

8    manner?

9    A     No.

10   Q     Did you ever tell her what to say or what not to

11   say at any time that she testified?

12   A     No.

13   Q     On August 16th of 2013, did you go to ██K.A.██'s

14   home?

15   A     Yes.

16   Q     What was your purpose in that visit on that day?

17   A     It was a monthly home visit and we also had an

18   upcoming court date that I was speaking to ██K.A.██ about

19   because she had some questions.

20   Q     Was the upcoming court date on that occasion a

21   juvenile court date?

22   A     Yes.

23   Q     And so during the time that you were there on that

24   day, did you speak with her?

25   A     Yes.

1    Q    Where in the home did that conversation take place?

2    A    In ███K.A.███ -- the girls all share a bedroom, so the

3    girls' bedroom.

4    Q    Who all was present for that conversation?

5    A    Just ███K.A.███ and I.

6    Q    Do you know whether or not that conversation was

7    recorded?

8    A    I do now.

9    Q    At the time were you aware that you were being

10   recorded?

11   A    No.

12   Q    You've told us that the purpose of your

13   conversation that day was to talk about the upcoming

14   juvenile court hearing?

15   A    Correct.

16   Q    On that occasion did you instruct her to testify in

17   any particular manner?

18   A    No.

19   Q    On that occasion did you -- had you formed an

20   opinion whether correct or incorrect that there was some

21   type of DNA evidence in the case?

22   A    Yes.

23   Q    What was your opinion based upon?

24   A    The SANE exam completed after ███K.A.███'s disclosure.

25   Q    Did you talk to ███K.A.███ about your opinion about

1    whether or not there was DNA evidence in the case?

2    A      Yes.

3    Q      What was your purpose in doing that?

4    A      ███K.A.███ had asked why I --

5                    MR. SMALLWOOD:  Judge, I'm going to object

6    to anything that ███K.A.███ said as being hearsay.

7                    THE COURT:  Response?

8                    MS. MCAMIS:  Your Honor, my question was --

9    I wasn't asking for that.  I was asking why she had

10   had -- why she had made the statements that she made to

11   ███K.A.███ .

12                   THE COURT:  Okay.  Then I'll sustain the

13   objection.

14            (To The Witness)  Did you understand her

15   question?

16                   THE WITNESS:  I do.

17            There were concerns from the child about why we

18   were asking to end what's called trial reunification in

19   the home with the mother.  And my discussion with ███K.A.███

20   was to hopefully relieve the question as to why she

21   wanted -- she wanted to know why I wanted trial

22   reunification to end with her mother.

23   Q      (By Ms. McAmis)  Do you know whether or not the

24   statements that you made to ███K.A.███ regarding the DNA

25   evidence -- at this point do you know whether or not

1    those statements were true or were accurate or not

2    accurate?

3    A      The SANE exam --

4              MR. SMALLWOOD:  Objection.  Calls for a

5    "yes" or "no" answer.  It calls for a "yes" or "no"

6    answer.

7              THE COURT:  All right.  It is not asking

8    whether it was accurate or not, just whether you now have

9    knowledge that the statement was accurate or inaccurate

10   at the time you made it.  Do you know now whether it was

11   accurate or inaccurate?

12             THE WITNESS:  No, I don't.

13   Q    (By Ms. McAmis)  At the time you made the

14   statement, did you believe that it was accurate?

15   A      Absolutely.

16   Q    Before such time as you took the stand this

17   morning, did you and I go over any of these questions

18   that I was going to ask you today?

19   A      No.

20   Q    At any point during any of your involvement in the

21   case, have you attempted to exercise unreasonable

22   influence upon  K.A. ?

23   A      Absolutely not.

24             MS. MCAMIS:  I have no further questions.

25             THE COURT:  Cross?

1    A    They were in our emergency children's shelter.

2    Q    The Laura Dester Shelter?

3    A    Correct.

4    Q    And when do you recall first seeing K.A. ?

5    A    It would be July 2012.

6    Q    Sometime there?

7    A    Uh-huh.

8    Q    Is it normally your practice when you have contact

9    with children under these circumstances to record any

10   questions and answers that are made?

11   A    No.  We're not allowed to record anything.

12   Q    You're not allowed to record anything?

13   A    Not to my knowledge, no.

14   Q    Do you make any notes of conversations you have

15   with them?

16   A    Sometimes.

17   Q    Do you incorporate those written notes sometimes

18   into reports?

19   A    We log a monthly home visit or a monthly contact

20   that is recorded in our computer's data base.

21   Q    Do you recall how many times you had conversation

22   with     K.A.     from the first time you got

23   associated with the case until the Preliminary Hearing on

24   September 6th, 2012?

25   A    It probably would have been approximately three

1    times, because I have to see them monthly.

2    Q      And would that have been at the Laura Dester

3    Emergency Shelter?

4    A      They were placed with their uncle and --

5    Q      And, for the record, do you recall his name?

6    A      Oh, Jake -- I can't remember his last name.

7    Q      Would it be Schwinderman?

8    A      Yes, Schwinderman.

9    Q      And, for the record, you say the uncle, is he the

10   brother of Kristie Alvarez?

11   A      Yes.

12   Q      And the mother of ▮▮K.A.▮▮?

13   A      Yes.

14   Q      Do you recall when that placement with

15   Mr. Schwinderman occurred?

16   A      I don't recall an exact day.  I believe it was late

17   August.

18   Q      And do you recall having conversations with ▮▮K.A.▮▮

19   at his -- at that place, the Schwinderman residence?

20   A      Yes.

21   Q      Who would have been present when you spoke with

22   ▮▮K.A.▮▮?

23   A      Well, all four of the children and

24   Mr. Schwinderman.  He is married, so his wife was present

25   at times.  He has a son that frequented the home.

1    ████ K.A. ████ ?

2    A      It would have most likely been in October of 2012.

3    Q      And do you recall what that -- why that discussion

4    occurred?

5    A      It was my mandatory monthly home visit.

6    Q      To the Schwinderman home?

7    A      Correct.

8    Q      And you continued to do these monthly home visits

9    to the Schwinderman home as long as they were there?

10   A      Correct.

11   Q      When did that placement change?

12   A      December.

13   Q      Of '12?

14   A      Uh-huh.

15   Q      And at that point in time placement was changed

16   from the Schwinderman home to who?

17   A      The children were placed on an extended pass with

18   their grandmother because we were trying to get trial

19   reunification started in the mother's home.  And we didn't

20   want to place the children in separate foster homes

21   because there was four of them, so they went to grandma's

22   for an extended pass and then home with mom I believe

23   January or February --

24   Q      Okay.

25   A      -- in trial reunification.

1    Attorney's Office with respect to your knowledge of what

2    occurred at that deposition, where it occurred and how it

3    occurred and that sort of thing?

4    A       Not that I'm aware of.

5    Q       Did anybody contact you about your knowledge of

6    that deposition at all prior to the hearing on August

7    19th, 2013?

8    A       The deposition that ▮K.A.▮ gave in her

9    grandmother's home?

10   Q       Yes.

11   A       Okay.  I was aware of that, yes.

12   Q       Did anybody in the Tulsa County District Attorney's

13   Office Juvenile Division contact you to receive your

14   input with respect to that at all?

15   A       I don't recall.

16   Q       When you went to the Alvarez home on Friday, August

17   16th, 2013, you indicated that you spoke with the mother,

18   Kristie?

19   A       I -- yes.

20   Q       You almost would have had to at some point in time?

21   A       Yes, exactly.

22   Q       And you spoke to the other four children?

23   A       Uh-huh, yes.

24   Q       Did you speak to the other four children alone?

25   A       Yes.

1    Q      Well, if Ms. McAmis provided that verbatim in

2    e-mail communication or text communication, would you

3    have any doubts that Ms. McAmis was being honest and

4    straight forward with that?

5    A      No.

6    Q      Okay.  The trial unification or the attempt to

7    terminate the trial unification hearing was held before

8    Judge Fransein three days after your conversation with

9    K.A.  on Monday, August 19th, 2013, was it not?

10   A      Yes, it was.

11   Q      And the outcome of that hearing was what?

12                    MS. MCAMIS:  Object to the relevance of the

13   outcome of that hearing, Your Honor.

14                    THE COURT:  Response?

15                    MR. SMALLWOOD:  Well, I'm just trying to

16   find out what she knows about the case, Judge.

17                    MS. MCAMIS:  Well, we know we have

18   transcripts of that.  Counsel has a transcript of that

19   hearing.  He knows the outcome and whether or not she's

20   able to relate the outcome what a juvenile court decided

21   has no bearing on the purpose -- the purpose of this

22   Preliminary Hearing.

23                    THE COURT:  I'll sustain the objection.

24   Q      (By Mr. Smallwood)  Were you present at that

25   hearing?

1   whole truth, and nothing but the truth so help you God?

2                    THE WITNESS:  I do.

3                    THE COURT:  All right.  Please be seated.

4

5   (The witness takes the witness stand.)

6

7                    THE COURT:  And when you're situated there,

8   if you would, state your first and last name for me.

9                    THE WITNESS:  It's Mark Hodges.

10                    THE COURT:  And he is your witness.

11                    MS. MCAMIS:  Thank you.

12

13                        **DETECTIVE MARK HODGES,**

14            *Was called as a witness on behalf of the*

15   *STATE OF OKLAHOMA.  After having been first duly sworn to*

16   *tell the truth, testified as follows:*

17                        **DIRECT EXAMINATION**

18   **BY MS. MCAMIS:**

19   Q     Mr. Hodges, can you tell us how you're employed?

20   A     Tulsa Police Department.

21   Q     In what capacity?

22   A     Right now I'm just a patrol officer.

23   Q     How long have you this time period been working as

24   a patrol officer?

25   A     Two months.

```
 1    Q      How long have you in total been a law enforcement

 2    officer?

 3    A      19 years.

 4    Q      Always with the Tulsa Police Department?

 5    A      Yes.

 6    Q      And before this most recent two-month approximate

 7    time period of being in patrol, where were assigned?

 8    A      The Child Crisis Unit.

 9    Q      In what capacity?

10    A      As a detective there.

11    Q      How long were you a detective in the Child Crisis

12    Unit?

13    A      Eight years.

14    Q      So were you working in that capacity on June 4th,

15    2012?

16    A      Yes.

17    Q      Did you on that date become involved in a case

18    involving Adam Zilm and          K.A.          ?

19    A      Yes.

20    Q      How was it that you became involved in the case?

21    A      We were called by officers that had responded to

22    the call.

23    Q      And when you say "we", do you mean the Child Crisis

24    Unit?

25    A      Well, yeah, yes.
```

49

1    Q      And how was it that it became assigned to you?

2    A      I believe I was the one that -- I was detective on

3    call that day.

4    Q      Once you received the initial information -- and

5    let me back up and ask, what was the nature of the

6    initial information that you received?

7    A      It was a molestation call.

8    Q      All right.  And once you received that initial

9    information, then did you subsequently speak with and

10   interview the Defendant, Adam Zilm?

11   A      Yes.

12   Q      Did that interview take place on June 4th of 2012?

13   A      Yes.

14   Q      Where did that interview take place?

15   A      At his parents' house.

16   Q      Where was his parents -- not the exact address, but

17   his parents, was it in the City of Tulsa?

18   A      Yes.

19   Q      All right.  Who went with you for that interview?

20   A      It was my corporal, Corporal Greg Smith.

21   Q      So just the two of you and then the Defendant?

22   A      Yes.

23   Q      All right.  When you first arrived at the home, how

24   were you and Corporal Smith dressed?

25   A      We had in a Polo with the -- the police badge

1    that's embroidered on it and slacks.

2    Q       How did you identify yourself when you arrived at

3    the home?

4    A       As detective with the Tulsa Police Department.

5    Q       Do you recall who was present in the home at the

6    time you arrived?

7    A       It was Mr. Zilm and his mother and father.

8    Q       All right.  And once you arrived then at the home,

9    how did you begin or initiate the conversation?

10               MR. SMALLWOOD:  Judge, we're going to

11    object at this time.  I'm well aware of what the question

12    and answers were.  There's no Corpus Delicti that's been

13    presented in this case.  They're attempting to offer this

14    statement in an effort to establish probable cause in

15    this case.  And I'm well aware, Judge, that 21 O.S. § 693

16    appears to be limited to murder and homicide cases with

17    respect to you can't get a statement in, a purported

18    confession in, without a Corpus Delicti, but I've got

19    authority all the way from the Court of Criminal Appeals,

20    the 10th Circuit Court that I would ask that the Court

21    review prior to ruling on my motion, which holds that in

22    other cases non-homicide, non-murder, non-manslaughter

23    cases, an admission or confession is not admissible nor

24    sufficient to establish probable cause absent the

25    existence, the prior existence of the Corpus Delicti

1    crime.  We haven't had that here.

2              THE COURT:  Do you want me to review that

3    prior to allowing the testimony or proceed with a motion

4    under advisement and then make a decision after I review

5    the material?

6              MR. SMALLWOOD:  Whatever you would care to

7    do, Judge.

8              THE COURT:  I'm perfectly capable of

9    suppressing in my own mind any statements that I allow if

10   I determine that they shouldn't have been allowed.

11             MR. SMALLWOOD:  It's your call, Judge.

12             THE COURT:  All right.  Then I'll take it

13   under advisement and I'll review that authority.

14             MR. SMALLWOOD:  Will the record reflect

15   that I'm objecting to everything he testifies to with

16   respect coming from my client?

17             THE COURT:  The best I can protect you, I

18   will note that everything this officer says with respect

19   to statements made by your client is the subject of a

20   Motion To Suppress based on your argument under the lack

21   of Corpus Delicti and any other arguments that you wish

22   to reserve.

23             MR. SMALLWOOD:  Thank you, Judge.

24             THE COURT:  And re-ask your question,

25   please.

1    Q      (By Ms. McAmis)  I believe I had asked at the time

2    you arrived at the home how did you begin or start with

3    the conversation?

4    A      I just explained to Mr. Zilm why we were there,

5    that we had received some allegations.

6    Q      All right.  And at that point in time where within

7    the home did you speak with him?

8    A      In the living room.

9    Q      Were there other people in the home or in the

10   living room at the same time?  In other words, you said

11   it was his parents' home?

12   A      Yeah.  At first there was, but then we stated that

13   we'd like to speak to him alone, and so his mom and dad

14   went into another room.

15   Q      All right.  So just in the living room during the

16   conversation was yourself, Corporal Smith, and the

17   Defendant?

18   A      Yes.

19   Q      And was the entirety of your interview, your

20   conversation with the Defendant on that day recorded?

21   A      Yes.

22   Q      At any point during that day was the Defendant

23   under arrest?

24   A      No.

25   Q      At all times was he free to leave?

1    A    Yes.

2    Q    At any point in time did you threaten him or coerce

3    him in any manner to gain his agreement to speak with

4    you?

5    A    No.

6    Q    Did you promise him anything or offer him anything

7    in exchange for agreeing to speak with you?

8    A    No.

9    Q    In your years and training and experience as a law

10   enforcement officer, have you been trained to detect when

11   a person is under the influence of any type of

12   intoxicating substance?

13   A    Yes.

14   Q    Did you form an opinion that day as to whether or

15   not the Defendant was under the influence of any type of

16   intoxicating substance?

17   A    He did not appear to be.

18   Q    Did you have any difficulty in communicating with

19   him?

20   A    No.

21   Q    At any point in the conversation did he ask you to

22   leave or ask you to stop?

23   A    No.

24   Q    All right.  During that conversation, which you

25   said took place at his parents' house, did you ask the

1     Defendant where he usually and regularly resided?

2     A      Yes.

3     Q      And where did he -- where did he tell you?

4     A      I believe it was 131 North Louisville.

5     Q      And is that in Tulsa?

6     A      Yes.

7     Q      And in what county?

8     A      Tulsa.

9     Q      Did the Defendant tell you who he lived there with?

10    A      It was with ▮K.A.▮ and her mom, Kristina, and her

11    other children.

12    Q      All right.  And did he tell you what the nature of

13    his relationship was with ▮K.A.▮'s mother, Kristina?

14    A      I believe they're just dating.

15    Q      All right.  Were you able to determine how old or

16    did you ask the Defendant how old he was?

17    A      I believe he was around 30, 31 years old.

18    Q      All right.  And were you able to determine how old

19    ▮K.A.▮ was at that time?

20    A      Yeah.  I believe she was 11.

21    Q      All right.  Did you ask the Defendant about what

22    had happened with ▮K.A.▮ that morning?

23    A      Yes.

24    Q      What did he tell you?

25    A      He stated that he had asked her to work on him and

# **RULING OF THE COURT**

1

2       THE COURT:  We're back on the record.

3       The Court has reviewed OUJI No. 439.  And in

4  that OUJI it references the specific act to be alleged by

5  the State of Oklahoma.  And in this case, the Court notes

6  that there's not any particular act alleged in support of

7  sexual abuse, but the Court found that it was directed to

8  10(1) 1-1-105, subsection 2(b) for the relevant language.

9  And the State has certain elements that are fairly

10  non-specific under the OUJI No. 439, but it does have to

11  meet the elements of a crime that's delineated under that

12  10(a) provision and sexual abuse is a relevant crime that

13  has been established and it is defined as a lewd act, at

14  least in relevant part a lewd act to a child.  The Court

15  then made reference to 4-139 for the definition of what

16  constituted a lewd act.  And it indicates that it is an

17  obscene or lustful act.

18       In this case, the statement of the Defendant was

19  that he was conducting a massage and that massage did

20  entail his touching of the private areas of the victim in

21  a manner consistent with giving a massage, but in a

22  private area of a child under the age indicated by

23  statute.  His statement also included an admission that

24  at one point when he placed his hand into his shorts he

25  got on his hand perhaps what he described as pre-cum.

1    And that is sufficient to establish an inference that the

2    touching that occurred was in a lustful manner.  So I'm

3    going to overrule the demurrer, find the State has met

4    its burden for Preliminary Hearing.

5            And, with that, the Defendant rests?

6            MR. SMALLWOOD:  We do, Your Honor.

7

8                    **FINDINGS OF THE COURT**

9            THE COURT:  Both sides resting, the Court

10   is going to find the State has demonstrated probable

11   cause to believe the crime of Sexual Abuse to a Child

12   Under 12 occurred in Tulsa County, probable cause to

13   believe the named Defendant, Adam Clayton Zilm, did

14   commit that offense after no priors.  He'll be bound over

15   for District Court.  That date will be I believe --

16            MR. HORTON:  It should be 11/12, Your

17   Honor.  We're off on Monday, so 11/12.

18            THE COURT:  11/12 at 9:00, before

19   Judge Glassco.

20            MR. HORTON:  Actually 9:30 for out of

21   custody, Your Honor.

22            THE COURT:  All right.  9:30.  We'll see

23   you then.

24            We're adjourned.

25                    (Proceedings were concluded.)

IN THE DISTRICT COURT OF TULSA COUNTY

STATE OF OKLAHOMA

STATE OF OKLAHOMA,      )
                        )
              PLAINTIFF, )      F-2017-69
                        )
         VS.            )      CASE NO. CF-2012-3037
                        )
ADAM CLAYTON ZILM,      )
                        )
              DEFENDANT. )

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE KURT G. GLASSCO

JUDGE OF THE DISTRICT COURT

TULSA COUNTY COURTHOUSE

TULSA, OKLAHOMA

OCTOBER 7, 2013

A P P E A R A N C E S

FOR THE PLAINTIFF:        MS. SARAH MCAMIS and
                          MR. TRAVIS HORTON
                          Assistant District Attorneys
                          Tulsa County Courthouse
                          Tulsa, Oklahoma    74103

FOR THE DEFENDANT:        MR. ALLEN SMALLWOOD
                          Attorney at Law
                          Tulsa, Oklahoma

FOR MINOR CHILD K.A.:     MS. APRIL SEIBERT
                          Attorney at Law
                          Tulsa, Oklahoma

REPORTER:                 BRENDA EL HASSAN, CSR, RMR, CRR
                          Official Court Reporter

DISTRICT COURT OF OKLAHOMA
Official Transcript

DISTRICT COURT FILED
DEC 11 2014
SALLY HOWE SMITH, COURT CLERK
STATE OF OKLA. TULSA COUNTY

FILED
IN COURT OF CRIMINAL APPEALS
STATE OF OKLAHOMA
AUG 01 2017

RECEIVED
AUG 01 2017
ATTORNEY GENERAL



3

1        Two. That a preliminary hearing was conducted

2  by the Honorable Judge David Youll on September 26th,

3  2012. The Defendant was bound over to the District

4  Court for the felony offense of sexual abuse of a child

5  under 12 years of age.

6        Three. That prior to the preliminary hearing,

7  on the day of the preliminary hearing, and following

8  the preliminary hearing, individuals not employed by

9  the District Attorney's Office, by misfeasance or

10  malfeasance, exercised unreasonable influence on the

11  minor child K.A. to secure testimony to which she has

12  since recanted repeatedly. The recantations occurred

13  shortly after the initial reporting of the crime and

14  continue to the present day.

15        Four. That the unreasonable influence placed on

16  the child by the persons identified to the Court and

17  the false statements made to the child which have been

18  confirmed by the State indicate that the child was

19  improperly influenced in her direct testimony at the

20  preliminary hearing.

21        Five. That accordingly, the preliminary hearing

22  was a nullity and the matter is remanded for a new

23  preliminary hearing.

24        It is therefore ordered that the matter be

25  remanded for a new preliminary hearing, to be held on

DISTRICT COURT OF OKLAHOMA
Official Transcript

6

individuals, and I believe with respect to DHS
individuals, about Your Honor's determination of
exercising improper or unreasonable influence.  For the
purposes of the record, I would state that it appears
that Your Honor has made those findings based upon the
representations of defense counsel and without those
individuals or that individual having the opportunity
to be heard or represented or offer any type of her own
testimony.  And so certainly, the State would take
issue with the Court's ability to make those findings
at this point in time without that particular
individual or individual -- individuals being subjected
to sworn testimony or cross examination.

THE COURT:  Well, Ms. McAmis, I'm sorry,
ma'am, but I believe you're incorrect.  I stated for
the record that I made my decision based upon the
authority submitted to me, the arguments made by
counsel, the exhibits provided to me, and the
transcript that I read of testimony that was given by
the minor child to Judge Fransein.  Based upon all of
those matters, that's what I made my decision.  And the
options that I had before me today were to dismiss the
case or remand the case or do nothing.  After reading
that transcript, I chose to remand the case.  If I had
dismissed the case, you could have appealed that.

DISTRICT COURT OF OKLAHOMA
Official Transcript

```
1              IN THE DISTRICT COURT OF TULSA COUNTY

2                        STATE OF OKLAHOMA

3

4

5   STATE OF OKLAHOMA,              )        COPY
                                    )
6              Plaintiff,           )      F-2017-69
                                    )
7   vs.                             )   No. CF-2012-3037
                                    )
8   ADAM CLAYTON ZILM,              )
                                    )
9              Defendant.           )

10

11              TRANSCRIPT OF PROCEEDINGS

12       HEARD BEFORE THE HONORABLE KURT G. GLASSCO

13              JUDGE OF THE DISTRICT COURT

14                   September 9, 2014

15

16

17   APPEARANCES:

18       MS. SARAH McAMIS, Assistant District Attorney, 500 South
     Denver, Tulsa County Courthouse, Tulsa, Oklahoma, appears on
19   behalf of the Plaintiff.

20       MR. ALLEN SMALLWOOD, Attorney at Law, 1310 South Denver,
     Tulsa, Oklahoma, appears on behalf of the Defendant.
21

22                        REPORTED BY:
23                   Cindy G. Workman, CSR, RPR
                     Official Court Reporter
24                   Tulsa County Courthouse
                       500 South Denver
25                     Tulsa, Oklahoma
```

DISTRICT COURT FILED JAN 1 2 2015 SALLY HOWE SMITH, COURT CLERK STATE OF OKLA. TULSA COUNTY

IN COURT OF CRIMINAL APPEALS FILED STATE OF OKLAHOMA AUG 0 1 2017

RECEIVED AUG 0 1 2017 ATTORNEY GENERAL

9

1   case law for Your Honor and statutory law.

2            Do you want me to do that now?

3            THE COURT:  No.  I'll give you that opportunity

4   when I consider it.  Okay?  Because right now I just want to

5   get these people on and off as fast as we can so they're not

6   here all day.

7            MS. McAMIS:  Thank you.

8            THE COURT:  So now we're going to proceed with the

9   reliability hearing under 12 O.S. 2803.1  And you may call

10  your first witness.

11           MS. McAMIS:  And in that regard, may I inquire,

12  Your Honor, the first witness will be the forensic

13  interviewer, Amy Howard.

14           And as has been typical in cases like this in the

15  past, what I have done is put the forensic interviewer on,

16  establish her credentials, if you will, and move for

17  admission of the tape, the DVD, so that you can subsequently

18  review the tape without going into the contents of the tape.

19           I assume that we are to follow that same procedure

20  today.  That's what I'm inquiring about.

21           MR. SMALLWOOD:  I have a transcript of that.  I'm

22  familiar with its contents, as long as that will not limit my

23  cross-exam of the witness.

24           THE COURT:  No.  No.  It doesn't.  I mean, no.

25  It's just to make things move faster so I can just watch the

11

1           THE WITNESS:   Amy Nichole Howard.  A-M-Y.  Nichole,

2    N-I-C-H-O-L-E.  Howard, H-O-W-A-R-D.

3           THE COURT:   You may inquire.

4                     AMY NICHOLE HOWARD,

5    After first being duly sworn, testified as follows, to-wit:

6                     DIRECT EXAMINATION

7    BY MS. McAMIS:

8    Q.   How are you employed?

9    A.   With the Child Abuse Network.

10   Q.   How long have you been employed with the Child Abuse

11   Network?

12   A.   About five and a half years.

13   Q.   How are you employed there?

14   A.   I am a child specialist.

15   Q.   Can you tell us what that means?

16   A.   It's kind of a two-part position.  I'm a forensic

17   interviewer and also a mental health specialist.

18   Q.   Could you explain what you mean, to us, by your duties

19   and responsibilities as a forensic interviewer?

20   A.   I went through a specialized training to be able to

21   conduct fact-finding forensic interviews with children who

22   have alleged to have been abused or neglected.

23   Q.   Can you tell us about that specialized training?

24   A.   Yes.  This interview was conducted with the CornerHouse

25   method, or RATAC, as it was called.  Which is a five part

12

1    process of rapport, anatomy identification, touch inquiry,

2    abuse scenario, and closure.

3         It's kind of a semifluid process that allows us to ask

4    questions and explore things as we need to throughout the

5    interview.

6    Q.    You said that you were trained in this RATAC procedure

7    by the CornerHouse method?

8    A.    Correct.

9    Q.    And is that a nationally recognized method?

10   A.    Yes, it is.

11   Q.    Did you receive the initial or basic CornerHouse

12   training, if you will?

13   A.    Yes.

14   Q.    And then did you also receive advanced CornerHouse

15   training?

16   A.    Yes, I did.

17   Q.    How long ago did you receive that training?

18   A.    In 2009 and 2010.

19   Q.    Subsequent to receiving that training in 2009 and 2010,

20   have you continued to receive updates on training and

21   continued on your -- continued training, if you will?

22   A.    Yes.  We have national peer reviews that we attend

23   monthly.  We also do quarterly Oklahoma peer reviews.  These

24   are opportunities to be able to show either our DVDs or watch

25   others.  Kind of see what is going on.  Also to check

13

1   research and see how things are progressing through the

2   industry.

3   Q.    You said that the RATAC process is semifluid?

4   A.    Yes.

5   Q.    Could you explain what you mean by that?

6   A.    Well, for instance, if we got into a disclosure or we

7   got into some information in an abuse scenario and a child

8   was feeling -- or showed some discomfort, then I can go back

9   to the rapport area of RATAC and just able to ask questions

10  to maybe make the child feel a little bit more comfortable

11  again, to kind of back away from the abuse that they're

12  talking about, and then possibly go back where we were at

13  before.

14       But it gives them an opportunity to kind of feel a

15  little bit more comfortable in the interview.

16  Q.    What is the purpose of following this RATAC procedure?

17  A.    It's non-leading, non-suggestive questions that give a

18  child an opportunity to talk about their experiences and not

19  put something in their mind that did or did not happen.

20  Q.    Before you went to work for the Child Abuse Network, how

21  were you employed?

22  A.    I have been a hospital social worker and a child welfare

23  investigator.

24  Q.    In both your possessions as a hospital social worker and

25  a child welfare investigator, did you receive training for

14

1   both of those positions?

2   A.   Yes, I did.

3   Q.   And was part of the training that you received for both

4   of those positions how to speak with children, how to

5   interview children?

6   A.   Yes.

7   Q.   And specifically children who have -- there has been an

8   allegation of abuse or neglect?

9   A.   Yes.

10   Q.   And during the course of your employment as both a

11   hospital social worker and a child welfare investigator, did

12   you have the opportunity to speak to and interview children

13   who had had an allegation of abuse or neglect?

14   A.   Yes.

15   Q.   Since you have been working as a forensic interviewer at

16   the -- for the Child Abuse Network, approximately how many

17   forensic interviews have you conducted?

18   A.   Over 2500.

19   Q.   And during that time, have you had the opportunity to

20   testify in different courts about the forensic interviews

21   that you have conducted?

22   A.   Yes, I have.

23   Q.   In all the different district courts in Tulsa County,

24   the criminal district courts?

25   A.   Yes.

15

1    Q.    And in other counties as well?

2    A.    And other states as well, too.

3    Q.    Do you also -- outside of your work at the Child Abuse

4    Network, do you teach?

5    A.    Yes, I do.

6    Q.    And in what area?

7    A.    At Tulsa Community College and Saint Gregory's

8    University, in the social science and human services areas.

9    Q.    Do you also hold any other licenses?

10   A.    I have a LCSW, or a licensed clinical social worker

11   license.  You can use that for various things, but most

12   typically it's used for therapeutic interventions.

13   Q.    With respect to your job as a forensic interviewer for

14   the Child Abuse Network, when you are preparing to conduct a

15   forensic interview with a child, how much information do you

16   know going into that forensic interview?

17   A.    We go in with very basic information, only the basics of

18   an allegation because we're only one part of an

19   investigation.  So there is no reason for us to have a lot of

20   details.

21         Aside from that, it also gives us an opportunity to seek

22   whatever information the child is willing to give us.

23   Q.    Are your interviews recorded from start to finish?

24   A.    Video recorded and audio.

25   Q.    And during the course of the interview, do you tell the

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

16

1    child that it's being recorded?

2    A.    Yes.

3    Q.    And during the course of the interview, do you wear some

4    type of earpiece?

5    A.    Yes.

6    Q.    Why?

7    A.    There's several different ways that this is taken care

8    of with different interview processes.  We at Child Abuse

9    Network, use the earpiece to be able to communicate with the

10   investigator.

11        It gives them -- whomever the investigator is -- will

12   be -- at the time watches behind a one-way mirror, and they

13   are able to ask us questions through the little earpiece.

14   Kinda looks like a little hearing aid.

15        And that way -- maybe there's some more information or

16   some detail that I wasn't able to get that they may be

17   wanting.

18   Q.    And ultimately whose decision is it whether a question

19   is to be asked, and/or if that question is to be asked, in

20   what way it is to be asked?

21   A.    That would be mine.

22   Q.    In other words, even if the investigator requests

23   certain information, you're the one to make that call?

24   A.    Correct.

25   Q.    Were you working as a forensic interviewer for the Child

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

17

1   Abuse Network on June 4th of 2012?

2   A.   Yes.

3   Q.   And on that day, did you have the opportunity to

4   interview a ██████ K.A. ██████?

5   A.   Yes, I did.

6   Q.   How was it that that came about?

7   A.   The investigator at the time had contacted CAN, or Child

8   Abuse Network, and asked for a forensic interview to be

9   conducted.

10  Q.   Before you began the forensic interview, what

11  information, if any, did you know about ██ K.A. ██'s situation?

12  A.   I don't remember the specifics, but with every interview

13  that we do, we meet with the investigator that will be

14  watching the interview.  They give us the basic information

15  and tell us what the basic allegations are so we know whether

16  it's physical abuse or sexual abuse or neglect.  It could

17  also be a witness to a crime.  There's several different

18  reasons for why an interview would be conducted.

19  Q.   And so as you begin the interview with her -- first of

20  all, who all was in the interview room?

21  A.   Myself and ██ K.A. ██.

22  Q.   Were there any individuals watching from behind the

23  glass?

24  A.   Yes.

25  Q.   Do you know who those individuals were?

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

18

1    A.    The only one that I recall is the investigator,

2    Detective Hodges.

3    Q.    It's Mark Hodges?

4    A.    Yes.

5    Q.    For the Tulsa Police Department?

6    A.    Correct.

7    Q.    And when you began your interview -- well, first of all,

8    how old was ███K.A.███ at the time that you interviewed her?

9    A.    She was 11.

10   Q.    Did you go over the rules of the room, if you will?  In

11   other words, did you explain to her the two-way mirror and

12   the earpiece and things of that nature?

13   A.    Yes, I did.

14   Q.    Did you go through the different stages of the RATAC

15   process that you've described?

16         MR. SMALLWOOD:  Judge, I'm gonna object to this as

17   being leading.  She just needs to answer questions.

18         THE COURT:  All right.  I'm gonna overrule it for

19   purpose of this hearing.  I know the procedure very well.

20         You may proceed.

21   Q.    (BY MS. McAMIS)  In the beginning stages of the

22   interview, what did you establish to do with -- did you

23   attempt to establish to do with ███K.A.███?

24   A.    Rapport.

25   Q.    And were you able to do that?

19

1   A.   Yes.  She was very quiet, but she did seem open to talk

2   to me.

3   Q.   During the course of your interview, did you come to

4   understand kind of the time frame of events?  In other words,

5   when you were speaking with ▬K.A.▬ in relation to when the

6   alleged event had occurred in her life?

7   A.   Yes, she said it was that morning.

8   Q.   And as you were speaking with her, can you tell us a

9   little bit about how she was dressed or what her demeanor

10  was, her physical demeanor?

11  A.   She was cocooned within a blanket that she had brought

12  into the interview room.  She was very, very quiet.  At times

13  often whispering her answers to me.  And stayed within that

14  blanket during the whole interview.

15  Q.   And were you able to communicate well with ▬K.A.▬?

16  A.   Yes.

17  Q.   Was she able to communicate well with you?

18  A.   Yes.

19  Q.   During the course of the interview, did you do things

20  that you talked about in the RATAC, for instance, anatomy

21  identification as well?

22  A.   Yes.

23  Q.   And did you establish different body parts and her names

24  for different body parts?

25  A.   Yes, as she talked about them.  The RATAC process allows

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

20

1    us to make some changes depending upon the age of the child.

2    For instance, with ▮K.A.▮ she's 11, so I wouldn't have

3    automatically gone over anatomy identification with her.

4         What we typically do with someone that's 11 that appears

5    to be on target for their age is just simply ask them why

6    they came to visit us.  Why they came to talk to me.  And I

7    did that with her.

8         But later in her disclosure when she was talking about

9    different body parts, the drawings were put up and she

10   identified the body parts that she was talking about.

11   Q.   Before you asked ▮K.A.▮ why she had come to talk to you

12   today, had there been any discussion whatsoever about any

13   type of abuse?

14   A.   No.

15   Q.   Had you asked ▮K.A.▮ why she had come to see you today,

16   how did she respond?

17   A.   She talked about Adam, or Big Daddy as she called him.

18   She also told me in the interview that she would prefer at

19   some points maybe to call him "A" instead saying Adam.  She

20   was a little uncomfortable with his name.

21        And so at that point I said to her, if there's ever a

22   time that you feel uncomfortable and you want to just say "A"

23   please let me know.

24        She said that she had been touched inappropriately

25   during a massage, and she rattled off really quickly all of

21

1   this stuff that had happened, and eventually said she ran out

2   of the bedroom.  Said she wanted to go to bed.  Then ran out

3   of the house to the neighbors.

4        It all went really quickly to begin with, so then we

5   took a step back and kind of walked through the process a

6   little bit slower.

7   Q.   In other words, was she the one to bring up the abuse

8   and the touching scenario?

9   A.   Yes.

10  Q.   And then from there, did you continue to explore it?

11  A.   Yes.

12  Q.   Throughout your conversation with ███K.A.███, did you --

13  what types of questions did you attempt to use?

14  A.   We use non-leading or open-ended questions.  Sometimes

15  we use multiple choice questions with two options, and then a

16  "something else" or "anything else" to give the child an

17  option to give a different answer than one of those two.  And

18  they go from there.

19  Q.   And, in fact, during the course of your interview, was

20  ██K.A.██ clear with you in details about things that had

21  happened?

22  A.   Yes.

23  Q.   Could you give us examples of what you mean by that?

24  A.   For instance, when she's talking about the bedroom where

25  the massage was taking place, she was very specific about the

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

22

```
 1    color of the sheets, how the pillows were, how one pillow's a
 2    little bit harder than another one.
 3        She gave several examples of how things felt to her.
 4    Some of those things were very spontaneous and not asked
 5    before.
 6    Q.   You told us that in the beginning of the interview she,
 7    in essence, blurted out a lot of information and then you
 8    continued to explore it.
 9        Throughout your interview, did she continue to tell you
10    the same information that she had told you, in other words?
11    A.   Yes.
12    Q.   Was it consistent throughout your interview?
13    A.   It continued to be consistent, yes.
14    Q.   Was there, at any point in your interview, did she take
15    back what she had said, or say that she was mistaken, or made
16    it up, or anything of that nature?
17    A.   No.
18    Q.   You told us a little bit about her -- what I would
19    characterize as -- her nonverbal demeanor throughout the
20    interview.  Was it consistent throughout the interview?
21    A.   Yes, it was.
22    Q.   Can you explain what you mean by that?
23    A.   She was very withdrawn, kind of "inside" would be a term
24    that we might use.  Meaning that the blanket kind of holds
25    her inside.
```

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

23

1          Her emotions stayed very flat for the majority of the

2     interview.  There were a couple of times that she smiled or

3     kind of looked around.  But for the most part very quiet,

4     inside, kind of turtle-ish like.  Not really willing to come

5     out of that.

6     Q.   Were there ever any opportunities throughout the

7     interview that she was given -- or that corrected you in

8     anything that you said to her?

9     A.   Yes, there were a few times.

10    Q.   And is that significant to you?

11    A.   It is.  We tell the children at the beginning when we go

12    through the rules, if you will, that if I get anything wrong

13    or if I say anything wrong or repeat it wrong, please correct

14    me.  I want to make sure I get everything right.

15         So, to me, that meant she was following through the

16    interview.  She was following what I was saying to her, and

17    felt comfortable enough to say "that's not what I said."

18    Q.   Were there ever any times when she asked you for any

19    type of clarification?

20    A.   Yes.

21    Q.   And is that significant to you?

22    A.   It is because that's saying to me that she didn't feel

23    comfortable with the question that I asked.  And she felt

24    comfortable enough with me to say "that's not what I said,"

25    or "that's not how I understood that," or "please explain it

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

24

1   to me."

2   Q.    During the course of the interview, did you become aware

3   of any information from her that would cause you concern

4   about a motive to fabricate?

5   A.    None that I know of.

6   Q.    During the course of your conversation with her, did she

7   continue to be spontaneous in her answers to you?

8   A.    Yes.

9   Q.    And in the information that she was providing?

10  A.    Yes.

11  Q.    During the course of your interview with her, was the

12  terminology that she used, was it consistent with what you

13  would expect of a child of her age and her abilities?

14  A.    Yes.

15  Q.    You told us that the interview was taped from start to

16  finish; is that correct?

17  A.    Yes.

18  Q.    And have you had the opportunity to review that DVD to

19  determine whether or not it's the same DVD of the interview

20  you took that day?

21  A.    Yes.

22          MS. McAMIS:  May I approach, Your Honor?

23          THE COURT:  Yes.

24          MS. McAMIS:  I apologize, I don't have a State's

25  Exhibit sticker.  I don't know if you have any here?

25

1          THE COURT:  I do have a question.  Is that the

2   original or a copy?

3          MS. McAMIS:  This is a copy.

4          THE COURT:  I don't want the original.

5          MS. McAMIS:  Right.

6          THE COURT:  All right.  Go ahead.

7   Q.   (BY MS. McAMIS)  Ms. Howard, I'll hand you what has been

8   marked as S No. 1.  Is that the DVD that you had the

9   opportunity to review?

10  A.   Yes, it is.

11  Q.   And does it bear your initials and today's date?

12  A.   Yes, it does.

13  Q.   And is that a fair and complete copy of your forensic

14  interview with ████ K.A. ████?

15  A.   Yes.

16         MS. McAMIS:  Your Honor, at this time, the state

17  moves for admission of State's Exhibit No. 1.

18         THE COURT:  For the purposes of this hearing only;

19  right?

20         MS. McAMIS:  Correct.

21         THE COURT:  All right.

22         MR. SMALLWOOD:  Judge, I know what it is.  I assume

23  it's precisely as the prosecutor described.  And if it's not

24  when the Court listens to it can tell us.

25         MS. McAMIS:  For the purposes of the record, it has

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

26

1   been provided in discovery, of course.

2          MR. SMALLWOOD:  And I made a transcript of it, so I

3   assume you've got an accurate copy.

4          THE COURT:  All right.  Any objection, Ms. Seibert?

5          MS. SEIBERT:  No, sir.

6          THE COURT:  All right.  For the purposes of this

7   hearing only, S-1 is admitted.

8          You may continue.

9   Q.  (BY MS. McAMIS)  Ms. Howard, did you also, subsequent to

10  your interview with ███ K.A. ███, did you have an

11  opportunity to conduct an interview with ███ P.A. ███?

12  A.  Yes.

13  Q.  Is ██ P.A. ██ an older sibling to ██ K.A. ██?

14  A.  Yes.

15  Q.  At the time that you conducted your interview with

16  ██ P.A. ██, how old was she?

17  A.  Honestly, I don't remember.  I believe she was 12 or 13.

18  Q.  When you conducted your interview with ██ P.A. ██, did you

19  use this same process and procedure that you just told us

20  about, the RATAC procedure, and the non-leading questions, et

21  cetera?

22  A.  Yes.

23  Q.  And during the course of your interview with Paula, did

24  you also go over the rules of the room and you established

25  the same information about the earpiece and the two-way

55

1          THE COURT:  Thank you.

2          You may inquire, Ms. McAmis.

3          MS. McAMIS:  Thank you.

4                    KATHERINE SANFORD,

5   After first being duly sworn, testified as follows, to-wit:

6                    DIRECT EXAMINATION

7   BY MS. McAMIS:

8   Q.   Ms. Sanford, I'd like to direct your attention to the

9   morning of June 4th of 2012.  Do you recall that day?

10  A.   Yes.

11  Q.   Did -- did you receive a knock or an announcement at

12  your door that morning?

13  A.   Yes.

14  Q.   Before you received the knock or announcement at your

15  door, what had you been doing?

16  A.   I was in the shower getting ready to go to work.

17  Q.   Okay.  Approximately what time in the morning was it?

18  A.   Six -- between 6, 6:15.

19  Q.   A.m.?

20  A.   A.m.

21  Q.   Do you remember what the whether was at that particular

22  time?

23  A.   Yes.  It was raining.

24  Q.   And was it a light rain, a hard rain?

25  A.   It was -- it was hard.  I would say at that time it was

56

1    a hard rain.

2    Q.    So you were in the shower.  And did something come to

3    your attention while you were in the shower?

4    A.    The doorbell was ringing.

5    Q.    Once you heard the doorbell ring, what did you do in

6    response?

7    A.    My roommate -- I called out to her and I asked her, I

8    said, "somebody's at the door.  You need to answer it."

9    Q.    What is your roommate's -- or, at the time, did you have

10   a roommate?

11   A.    Yes.

12   Q.    What was her name?

13   A.    Karen Landrum.

14   Q.    Does she still reside with you?

15   A.    No.

16   Q.    But at the time she did?

17   A.    Yes.

18   Q.    Is she an adult as well?

19   A.    Yes.

20   Q.    And so you said you called out to her.  Do you know what

21   she have doing at the time you called out to her?

22   A.    She was sleeping because she didn't answer me.

23   Q.    So once you called out to her and she didn't answer,

24   then what did you do?

25   A.    I went ahead and got out of the shower, put on my robe,

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

57

1    and I went to the front door and asked who was it -- who's at

2    the door.

3    Q.    And when you asked that, did you receive a response?

4    A.    Yes.

5    Q.    What did you hear?

6    A.    She said, "it's ██ K.A. ██."

7    Q.    Did you, at that time -- did you know ████ K.A. ████?

8    A.    Yes.

9    Q.    Was she one of your neighbors?

10   A.    Yes.

11   Q.    And do you know approximately how old she was at the

12   time?

13   A.    I want to say 11.

14   Q.    And so when you heard her say it's ██ K.A. ██, how did you

15   respond?

16   A.    I opened the door immediately.

17   Q.    When you opened the door, can you just describe for us

18   what you saw of ██ K.A. ██'s appearance?

19   A.    She was -- she had a towel on her head.  She was soaking

20   wet.  I had her come in right away.

21   Q.    Could you describe her emotional demeanor?

22   A.    She was crying.  She was very upset.  She was crying and

23   shaking.

24   Q.    And so at this point, did you have any idea what was

25   going on?

58

1    A.    No.

2    Q.    Did you have any foreknowledge that she was coming to

3    your home or anything --

4    A.    No, not at all.

5    Q.    And so when you saw her, did you ask her what was wrong?

6    A.    Yes.

7    Q.    And what did she tell you?

8    A.    She said -- I said, "what happened" and "what's wrong?"

9    And she said "Big Daddy" -- she called him Big Daddy --

10   "touched me."

11   Q.    Okay.  So was this immediately in response to your

12   question what's wrong, she responded that way?

13   A.    Yes.

14   Q.    And you said "Big Daddy," did you know who she was

15   referring to as Big Daddy?

16   A.    Yes.

17   Q.    Who was she referring to?

18   A.    Adam.

19   Q.    Did you know this from your prior relationship with the

20   two of them?

21   A.    Yes.

22   Q.    So had she said to you "Big Daddy touched me," again,

23   what was her emotional demeanor when she said that?

24   A.    She was very upset.  She was crying.  I immediately took

25   her and called out to Karen and told her we had an emergency.

65

1    Q.    Okay.  I apologize for that.  So, what did she tell you

2    about him pulling his pants down?

3    A.    She said that she was -- she had pretended she was

4    sleeping, and Big Daddy came in her room, and she opened her

5    eyes, and closed them and said that she saw his private.

6    Q.    Did she refer to it as "his private"?

7    A.    She called it "his penis."

8    Q.    Did she tell you what he had done with his penis?

9    A.    He was trying to put it in her butt.

10   Q.    During what time period or what length of time, then,

11   did ▮▮K.A.▮▮ and the other children stay with you after this

12   incident?

13   A.    That same day after, they were told to come over to the

14   house.

15   Q.    And during the time period that ▮▮K.A.▮▮ was staying with

16   you, did she make any statements to you about whether or not

17   her mother, Kristi, believed her?

18   A.    I think that was later on.  I can't really pinpoint that

19   part.

20         MR. SMALLWOOD:  Well, Judge, if she can't pinpoint

21   the time.  It's critical --

22         THE COURT:  Sustained.

23   Q.    (BY MS. McAMIS)  Let's back up just a moment.

24   A.    Okay.

25   Q.    When was the last time you were around or had

```
 1          THE COURT:  Is this all academic?  I mean, if she's
 2   13, am I allowed -- I mean --
 3          MR. SMALLWOOD:  She was 11 at the time of the
 4   incident, Judge.
 5          THE COURT:  Okay.  What's your take on this,
 6   Ms. Seibert?
 7          MS. SEIBERT:  Judge, obviously, I represent a
 8   client who has certain wishes, and she wants nothing but to
 9   come in and explain to the Court that this was a mistake.  I
10   mean, that's gonna be her position.  I anticipate that will
11   be her testimony.
12          I've talked to Ms. McAmis about her desire
13   regarding this case.  I haven't read the case law, Judge, but
14   I would think if the whole matter comes down to this girl,
15   why wouldn't she be testifying today?  And that's my take on
16   that.
17          THE COURT:  Well, I'm not gonna receive the expert
18   today.  I think, Mr. Smallwood --
19          MR. SMALLWOOD:  We're on the clock, Judge, can I
20   let her --
21          THE COURT:  Yeah, you can let her go.
22                    (Off the record.)
23          THE COURT:  All right.  So are there any other
24   witness that someone wants to call?  Mr. Smallwood?
25          MR. SMALLWOOD:  ████ K.A. ████.
```

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

121

1          THE COURT:  Okay.  -- has told me that you want to
2   tell me some things --
3          THE WITNESS:  Yes, sir.
4          THE COURT:  -- concerning something that is -- you
5   know what the word "alleged" means?
6          THE WITNESS:  No, sir.
7          THE COURT:  Okay.  You want to tell me -- you want
8   to tell me some information about something that may have
9   happened to you with Adam.  Do you know what I'm talking
10  about?
11         THE WITNESS:  Yes, sir.
12         THE COURT:  Okay.  Did you call him by any other
13  name, other than Adam?
14         THE WITNESS:  Big Daddy.
15         THE COURT:  Big Daddy?
16         THE WITNESS:  (Witness nods head.)
17         THE COURT:  Okay.  And what was it that you told
18  April that you wanted to tell me?
19         THE WITNESS:  That nothing happened.
20         THE COURT:  Well, did you tell the police something
21  happened?
22         THE WITNESS:  I didn't get to talk to the police.
23         THE COURT:  You never talked to the police?
24         THE WITNESS:  No.
25         THE COURT:  Okay.  Did you tell a neighbor of yours

122

1   that something happened?

2           THE WITNESS:  I told them that I had a nightmare.

3           THE COURT:  Okay.  And did you tell the neighbor

4   that?

5           THE WITNESS:  Yes, sir.

6           THE COURT:  Okay.  Did you ever tell anyone that

7   this was all a nightmare before today?

8           THE WITNESS:  Yes, I told Allen and April.

9           THE COURT:  Okay.  Did you ever tell someone either

10  with the police, or at Laura Dester, or the Department of

11  Human Services, that these things didn't happen?

12          THE WITNESS:  What do you mean?

13          THE COURT:  Well, I've been told that you said that

14  Big Daddy touched you inappropriately.  Are you aware of

15  that?

16          THE WITNESS:  Yes, sir.

17          THE COURT:  Did you ever tell anybody that that did

18  not happen?

19          THE WITNESS:  I have tried.

20          THE COURT:  Okay.  And when did you try to tell

21  them that?

22          THE WITNESS:  When I was talking to Sarah.

23          THE COURT:  Okay.  This Sarah?

24          THE WITNESS:  Yes, sir.

25          THE COURT:  You tried to tell Sarah that?  Is that

123

1    a yes?

2              THE WITNESS:  Yes, sir.

3              THE COURT:  Okay.  Before that, did you try to tell

4    anybody?  Anybody that maybe worked for DHS or anyone else?

5              THE WITNESS:  I remember me saying that it didn't

6    happen, and I think Lori -- Lori Hannagan -- knew I said that

7    nothing happened.  But we got tooken away because I said

8    nothing happened.

9              THE COURT:  Did anybody ever, you know, threaten

10   you that you had to say that it did happen?

11             THE WITNESS:  What kind of threat do you mean?

12             THE COURT:  Well, why don't you tell me what you

13   would think would be a threat.  Did anybody ever tell you to

14   say it didn't happen and you thought it was a threat?

15             THE WITNESS:  Like, if like someone says, if you

16   say this, you can go back, or something, would that be a

17   threat?

18             THE COURT:  Well, did you think that?

19             THE WITNESS:  Yeah.

20             THE COURT:  Okay.  Then tell me what that was?

21             THE WITNESS:  It was, like, Lori Hannagan said

22   this -- like, when I was talking to her, she said if you say

23   that -- if you tell someone that your mom told -- say that

24   your mom, or something, told you to say none of it happened.

25             I told my uncle that because Lori Hannagan told me

124

1   to say -- and, yeah, that.

2           THE COURT:  Okay.  So I want to make sure I

3   understand what you just told me.  Okay?  Are you saying that

4   this person told you you had to say that Big Daddy did

5   something to you, or you wouldn't get to live with your

6   mother?

7           THE WITNESS:  That -- that's another one.

8           THE COURT:  Oh, there's another one?

9           THE WITNESS:  (Witness nods head.)

10          THE COURT:  Okay.  Tell me about that one.

11          THE WITNESS:  That's when I was talking to Sarah,

12  and she said say what you said in the beginning, and you can

13  go back to your mom.

14          THE COURT:  This Sarah?

15          THE WITNESS:  Yes, sir.

16          THE COURT:  Are you with your mom now?

17          THE WITNESS:  Yes, sir.

18          THE COURT:  Ms. Seibert, would you care to inquire?

19          MS. SEIBERT:  Yes.  I'm just gonna stand over here.

20          THE COURT:  Okay.  Take your time.

21          You all right?  There you go.

22          For the purposes of the record, that the witness is

23  emotional and tearful, and that's okay.  All right?

24          THE WITNESS:  (Witness nods head.)

25          THE COURT:  All right.  I'm gonna let April ask you

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

135

1    thereafter that, but I felt it was a continuation of the

2    first one.

3          But the one you just described was at the very end

4    of the proceedings.

5          MS. McAMIS:  I'd like to also say something else

6    for the purposes of the record --

7          THE COURT:  Sure.

8          MS. McAMIS:  -- which I have previously stated in

9    previous hearings that we have had on this matter, but I

10   would, again, reiterate, Your Honor, that I have never, nor

11   would I ever meet with a child alone.  And specifically I

12   have never met with this child alone at any time.

13         That when I met with this child in advance of the

14   preliminary hearing, both Heather Prater, who is the chief

15   advocate for the District Attorney's office, and Travis

16   Horton, who was, at the time, an Assistant District Attorney

17   for the District Attorney's office and has subsequently left

18   and gone into private practice, that both of those two

19   individuals were with me at all times.  That I have a

20   practice and procedure of never meeting with children alone,

21   and always having persons there present.

22         And so, as I have previously stated to the Court,

23   and as I have endorsed in this case as witnesses both

24   Mr. Horton and Ms. Prater, if Your Honor needs to, wants to,

25   for the purposes of the record, hear from either Ms. Prater

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

136

1    and/or Mr. Horton about the conversation and the statements

2    that were or were not made during the course of that meeting,

3    they are both available and willing to testify about those.

4              THE COURT:  Can you represent to me as an officer

5    of the court, that she did not make that statement to you?

6              MS. McAMIS:  110 percent.  As I have previously

7    stated to the Court, I recognize fully and completely that if

8    I were ever in a situation where a child said to me, for

9    whatever reason, recanted to me, then I have a continuing

10   obligation, whether it is before preliminary hearing, after

11   preliminary hearing, before jury trial, after jury trial,

12   whatever, I have a continuing obligation, both as a

13   prosecutor and as an attorney and as an officer of the court,

14   I have an ethical, moral, legal, responsibility to report

15   that information.

16             If that had ever happened in this case, or in any

17   other case, I would have reported that both to defense

18   counsel and to the Court.

19             I can absolutely without any question assure Your

20   Honor that that was not, in any event, a conversation.  And,

21   I would assure Your Honor that the preliminary hearing

22   transcript demonstrates that at the time of the preliminary

23   hearing, she had not and did not recant.

24             At the time of the preliminary hearing -- the first

25   preliminary hearing, she, in fact, did testify about the

137

1    things that were -- the allegations that she had originally

2    made.

3              I also would affirmatively state to the Court, as I

4    have previously in other hearings, that I would never, could

5    never, should never, have never, stated to this victim, or

6    any other victim, that they should testify a particular way,

7    that they must testify a particular way, that if they testify

8    a particular way, either they get to go home or they don't

9    get to go home, or someone will go to prison or not go to

10   prison, or anything of that nature.

11             And it is for that reason, as well as others, that

12   I never, ever, ever meet with a child who is alleged to be

13   the victim of sexual or physical abuse or neglect alone.  I

14   always have witnesses present.

15             THE COURT:  Thank you.

16             Anything further today, Mr. Smallwood?

17             MR. SMALLWOOD:  No, sir.

18             THE COURT:  Ms. McAmis?

19             MS. McAMIS:  Your Honor, I just want to make sure

20   that for the purposes of this hearing, my understanding is

21   that now Your Honor will review --

22             THE COURT:  Yes.

23             MS. McAMIS:  -- the recordings.  And then at a

24   subsequent time, will we be able to come back, once Your

25   Honor has reviewed the recordings, and perhaps make some type

1      IN THE DISTRICT COURT IN AND FOR TULSA COUNTY

2                  STATE OF OKLAHOMA

3

4    STATE OF OKLAHOMA,            )
                                   )
5                   Plaintiff,     )      *F - 2017 - 69*
                                   )
6        -vs-                      )   Case No. CF-2012-3037
                                   )
7    ADAM CLAYTON ZILM,            )
                                   )
8    _____Defendant.    )

9

10

11

12              TRANSCRIPT OF PROCEEDINGS

13           HAD ON SEPTEMBER 12, 2014

14                  BEFORE THE

15           HONORABLE KURT GLASSCO

16              DISTRICT JUDGE

**DISTRICT COURT**
**F I L E D**

OCT 2 7 2014

SALLY HOWE SMITH, COURT CLERK
STATE OF OKLA. TULSA COUNTY

17

18

19

20

21   **REPORTED BY:**

FILED
IN COURT OF CRIMINAL APPEALS
STATE OF OKLAHOMA

AUG 0 1 2017

22   JUDY K. BROWN, CSR, RPR
     OFFICIAL CERTIFIED SHORTHAND REPORTER
23   Tulsa County District Court
     3rd Floor

RECEIVED

24   Tulsa, Oklahoma 74103
     (918) 596-5315

AUG 0 1 2017

25                                    ATTORNEY GENERAL



1-24

1    head, they would have already had to have known what he

2    was going to say and how it was going to corroborate.  The

3    only difference in all of this, Your Honor, is that

4    K.A. says that he tried to put his penis in her butt.

5    He says, oops, no, my finger slipped into her butt while I

6    was giving this innocent naked massage.  It's important

7    that Your Honor remember all of that in context.

8         For all of those different reasons, Your Honor,

9    the State believes that all of this hearsay by K.A. is

10   and should be admissible at the trial.

11        THE COURT:  All right.  Thank you.

12   Mr. Smallwood?

13

14   **ARGUMENT ON BEHALF OF THE DEFENDANT**

15        MR. SMALLWOOD:  It's hard to know where to

16   start.  But any misrepresentation by the State as to what

17   I did or didn't do and what's corroborated and what's not

18   corroborated, Judge, all you have to do is read -- is read

19   the 2803.1 requirements.  And the major requirement is

20   that the child's statements be consistent.  And it doesn't

21   make sense, Judge, that the consistency is limited solely

22   to the statements that's been being made to the person

23   who's going to sponsor the hearsay.  If that were the

24   case, as we have here, we have a statement to -- No. 1, we

25   have a statement to Landrum and Sanford, which is

1    significantly different from the statement she makes an

2    hour, an hour and a half, two hours later with respect to

3    where it happened, what she saw, or what she didn't see.

4    If that were the case, the State of Oklahoma could have

5    three people talk to a Defendant and come up with three

6    entirely different stories.  But as long as they can show

7    that within the context of the statement for A to

8    Defendant and B to Defendant, and C to Defendant, that

9    they were consistent, all of those things would come in

10   even when they tell entirely different stories.  I mean,

11   it simply boggles the imagination that that's what is

12   meant by the statute with respect to consistency.

13          This child, Judge, for whatever the reason, is

14   all over the mat.  But I would recall the Court's

15   attention to its Order of October 8th, 2013, when

16   remanding this case for a Preliminary Hearing, paragraph

17   No. 4.

18          "That the unreasonable influence placed on the

19          child by the persons identified to The Court and

20          the false statements made to the child, which

21          have been confirmed by the State, indicate that

22          the child was improperly influenced in her Direct

23          Testimony at the Preliminary Hearing of September

24          26th, 2012."

25

1     The Court therefore held that that testimony was

2     a nullity and could not be used.

3         The testimony we heard yesterday from Amy Howard

4     came from a child who had suffered a previous molestation.

5     The testimony -- I don't know if this is testimony before

6     you, Judge, but the fact of the matter is that this child

7     never received counseling.  Misty Center would have

8     indicated to The Court how significant that is --

9         MS. MCAMIS:  Your Honor, I'm sorry.  Are we

10    arguing things that go outside the scope of the hearing?

11    There was a -- you ruled that Ms. Center could not come

12    and testify for the purposes of this hearing.  So why

13    would we would hear argument about that?

14        THE COURT:  I am going to let him make his

15    argument.  I know what was -- what was said at the

16    hearing.  I have my notes before me.  And I have read all

17    the pleadings concerning this case.

18        You may continue, sir.

19        MR. SMALLWOOD:  The bottom line is, Judge,

20    Katherine Sanford has organic brain disorders, which she

21    admitted causes her memory problems.  She says she has

22    indicated that she gets confused.  She doesn't know what

23    was said.  But if what was said to her by ▮K.A.▮ is

24    accurate, it's significantly different than what ▮K.A.▮

25    says a few hours later to Amy Howard.  Specifically with

1    reference to whether or not this happened in her bedroom

2    or Adam Zilm's bedroom, how they were clothed, what she

3    could see and what she couldn't is he.  So to allow both

4    of these statements to come in, Judge, totally destroys

5    this Defendant's right to a fair trial and due process.

6    And to be quite honest with you, if The Court allows me to

7    call ▮▮▮▮▮K.A.▮▮▮▮▮ at the Preliminary Hearing, I'm not

8    sure what she's going to say there.

9              THE COURT:  You mean at trial?

10             MR. SMALLWOOD:  I mean at the trial.

11             THE COURT:  Yeah.

12             MR. SMALLWOOD:  This kid is all over the

13   place for whatever reasons.  There is no testimony that

14   anybody, other than State's witnesses and State's

15   employees, have placed false information in this child's

16   mind to get her to testify to something or not testify to

17   something else.  Not from the Defense.  Not from the

18   mother.  Not from the family.  From the State's employees.

19        There's another issue that hasn't come before

20   The Court.  And I'll address that after The Court enters

21   its order, Judge.  But I think the State has failed for

22   all of these reasons to establish a sufficient basis to

23   allow these hearsay statements to come in without

24   completely violating my client's right to due process of

25   law.

1   case.  So I don't know if it's different.  I didn't know

2   Mr. Smallwood's office had also prepared one.  But I don't

3   know if they're the same.

4            THE COURT:  It seemed the same when I was --

5   it helped me, but I thought that the quality was not that

6   great.  Maybe it was because K.A. just had a soft

7   voice.  She had a soft voice in here, I felt, when she

8   came to testify.  But it may just be a 13-year-old child

9   in a strange place.  And it's not like it's out on the

10  playground where they yell and scream.

11       I've read 2803.1.  I paid particular attention to

12  the *Davenport* case.  I'm sure both of you are aware of the

13  *Davenport* case, 806 P.2d 655.  It deals with procedural

14  limitations and indicia of reliability.

15       As to P.A. , I do not have any indicia of

16  a problem with what P.A. is saying.  And I'm going to say

17  that, for the reliability hearing, the State met its

18  burden on No. 2, the State's 2, P.A. .

19       As to State's 1, K.A. , looking at the

20  totality of the circumstances, I am determining that it is

21  not admissible and will suppress that statement.

22       As to the witness, Ms. Sanford, your point is

23  well taken, Ms. McAmis, that you could -- there may be --

24  these statements may be admissible under some other

25  exception to hearsay.  I'm not advising you that they are.

1  This is not an advanced ruling. There are other things

2  that have to be established. But I am suppressing that

3  statement, as well. I had just a very difficult time

4  following that witness. And she appeared to The Court to

5  change her testimony as to what happened during the time

6  that she was here.

7                  MR. SMALLWOOD: Your Honor, State's No. 1,

8  the forensic statement of Amy Howard is suppressible?

9                  THE COURT: Yes.

10                 MS. MCAMIS: Your Honor?

11                 THE COURT: Well, it's actually not

12  Amy Howard's statement. It's ███K.A.███ statement

13  to Amy Howard is suppressed.

14                 MR. SMALLWOOD: Yes.

15                 THE COURT: The State's No. 2, █P.A.█

██     ███████'s statement to Amy Howard is allowed.

17       Yes, ma'am?

18                 MS. MCAMIS: Your Honor, before you proceed

19  any further, this is a situation where Your Honor has

20  suppressed evidence that the State believes is necessary

21  for its case.

22                 THE COURT: Right.

23                 MS. MCAMIS: So, as a result, the State will

24  be seeking to appeal Your Honor's ruling.

25                 THE COURT: Yes, ma'am.

1          MS. MCAMIS:  And we will be seeking that the

2    matter be stayed to allow us such time to do so.

3          THE COURT:  Once you -- once you initiate --

4    as long as you have it initiated 10 days before trial, you

5    have that right.  And then when you do that, I will stay

6    it.

7          MS. MCAMIS:  Okay.  And so because we intend

8    to do that, I don't know if Your Honor feels it necessary

9    to proceed with other matters.  Counsel had stated he had

10   other matters.  But I can assure Your Honor that's what's

11   going to happen.

12         THE COURT:  Okay.

13         MR. SMALLWOOD:  Just so I'm clear, Judge,

14   the forensic interview conducted by Amy Howard of K.A.

     ████    ████████ you have suppressed and the State has indicated

16   they're going to appeal?

17         THE COURT:  Yes.

18         MR. SMALLWOOD:  You have also suppressed the

19   hearsay statements of ████ K.A. ████ supplied by Katherine

20   Sanford on the witness stand?

21         THE COURT:  Yes.

22         THE COURT:  You have suppressed that, as

23   well?

24         THE COURT:  Yes.

25         MR. SMALLWOOD:  Okay.

1

1    IN THE DISTRICT COURT OF TULSA COUNTY

2    STATE OF OKLAHOMA

3

4    STATE OF OKLAHOMA,                    )

5              Plaintiff,                  )

6    vs.                                   )        No. CF-2012-3037

7    ADAM CLAYTON ZILM                     )

8              Defendant.                  )

9

10

11    TRANSCRIPT OF JACKSON DENNO HEARING

12    HEARD BEFORE THE HONORABLE KURT G. GLASSCO

13    JUDGE OF THE DISTRICT COURT

14    February 25, 2016

15

16

17    APPEARANCES:

18    MS. SARAH McAMIS, Attorney at Law, 500 S. Denver, Suite
900, Tulsa, Oklahoma, appears on behalf of the Plaintiff.

19

20    MR. ALLEN SMALLWOOD, Attorney at Law, 1310 S. Denver,
Tulsa, Oklahoma, appears on behalf of the Defendant.

21

22                    REPORTED BY:

23              Cindy G. Workman, CSR, RPR
              Official Court Reporter

24              Tulsa County Courthouse
                500 South Denver

25              Tulsa, Oklahoma

DISTRICT COURT — FILED
OCT 1 7 2016
SALLY HOWE SMITH, COURT CLERK
STATE OF OKLA. TULSA COUNTY

F-2017-69

ORIGINAL

FILED
IN COURT OF CRIMINAL APPEALS
STATE OF OKLAHOMA
AUG 0 1 2017

RECEIVED
AUG 0 1 2017
ATTORNEY GENERAL

V-53

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

5

1          MS. McAMIS:   Thank you.

2                   MARK HODGES,

3   After first being duly sworn, testified as follows, to-wit:

4                 DIRECT EXAMINATION

5   BY MS. McAMIS:

6   Q.    How are you employed, sir?

7   A.    I'm with the Tulsa Police Department.

8   Q.    And in what capacity are you currently serving?

9   A.    Just a patrol officer.

10  Q.    Were you previously a detective assigned to the Child

11  Crisis Unit?

12  A.    Yes.

13  Q.    How long were you assigned to that unit?

14  A.    Eight years.

15  Q.    Were you working there specifically in June of 2012?

16  A.    Yes.

17  Q.    And in June of 2012, specifically on June 4 of 2012, did

18  you become involved in the investigation surrounding the

19  defendant in this case, Adam Zilm?

20  A.    Yes.

21  Q.    How did you become involved?

22  A.    We were called by officers that had responded to a

23  molestation call.

24  Q.    And after you became involved, did you have the

25  opportunity to observe the victim in the case being

6

1   forensically interviewed?

2   A.   Yes.

3   Q.   After such time as you observed that forensic interview,

4   then did you make contact with the defendant in the case?

5   A.   Yes.

6   Q.   How did you make contact with him?

7   A.   We went to his parents' house where we had learned he

8   may be, and spoke to him there.

9   Q.   You said "we," who went to his parents' house?

10  A.   It was myself, Corporal Greg Smith, and then there was a

11  uniformed officer with us also.

12  Q.   So the house that you went to, that being identified as

13  the defendant's parents' house, is that in Tulsa?

14  A.   Yes.

15  Q.   And is that in Tulsa County?

16  A.   Yes.

17  Q.   When you went to the home, you said there was a

18  uniformed officer, yourself, and Corporal Smith.  How were

19  you and Corporal Smith dressed that day?  Were you dressed in

20  uniforms?

21  A.   No.  We were in, like, slacks and a Polo shirt that had

22  the Tulsa police badge sewn in.

23  Q.   Both you an Corporal Smith; is that correct?

24  A.   Yes.

25  Q.   Did you also, in addition to having the shirt with the

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

7

1   Tulsa police insignia on it, did you also each have a badge?

2   A.    Yeah, on our belts.

3   Q.    Did you each have a firearm?

4   A.    Yes.

5   Q.    Then you said the uniformed officer, was that officer in

6   the standard Tulsa police uniform?

7   A.    Yes.

8   Q.    When you arrived at the house, did you knock?

9   A.    Yes.

10  Q.    Who answered the door?

11  A.    I believe it was Adam's father.

12  Q.    And did you then identify yourself to him as law

13  enforcement officers?

14  A.    Yes.

15  Q.    Did you then ask to speak with the defendant, Adam Zilm?

16  A.    Yes.

17  Q.    What happened at that point?

18  A.    I believe he invited us in, Mr. -- Adam's father invited

19  us in and then he went and got Adam and brought him to us.

20  Q.    To your knowledge, who was present in the home that

21  morning?

22  A.    I believe it was just Adam, his father and mother.

23  Q.    All right.  And when you first then made contact with

24  the defendant, how did you identify yourselves?

25  A.    As detectives with Tulsa Police Department.

8

1    Q.    Did the defendant then agree to speak with you?

2    A.    Yes.

3    Q.    Where in the residence did you speak with him?

4    A.    It was the living room.

5    Q.    Okay.  Who all was present during the course of that

6    conversation?

7    A.    Myself, Corporal Smith, and then Adam.

8    Q.    To your knowledge, where were his parents, his mom and

9    dad, at that point?

10   A.    I believe they went to a different room in the house.

11   Q.    To your knowledge, do you know whether or not they were

12   listening to or observing the conversation in any manner?

13   A.    Not that I know of.

14   Q.    The location in the home where were you speaking with

15   Mr. Zilm, was it behind closed doors?  In other words, was

16   the living room closed off?

17   A.    No, there is -- I think, if I remember correctly, there

18   was like an opening that went into the kitchen, I believe.

19   Q.    During the entire interview, was it recorded?

20   A.    Yes.

21   Q.    Was the entire interview recorded, your approach to the

22   home, your entire conversation, and then your exit from the

23   home?

24   A.    Yes.

25   Q.    And, in fact, what you've told us about your request of

10

1   some point, but, in fact, when we had the remand of

2   preliminary hearing, he purported to this officer and to

3   myself, although he never provided it, he purported that he

4   had an actual transcript of the recording.

5          MR. SMALLWOOD:  I do have a transcript, Judge, of

6   interview with Mr. Zilm.  That's all.

7          THE COURT:  Is there more than Mr. Zilm on the

8   recording.

9          MS. McAMIS:  Yes, sir.

10          MR. SMALLWOOD:  I don't have that, Judge.  I've

11   never received it.

12          THE COURT:  Well, I tell you what.  I'm gonna take

13   your objection under advisement so that I can continue

14   through the hearing, and then I'll deal with that issue.

15          Please continue.

16          MS. McAMIS:  Thank you.

17   Q.   (BY MS. McAMIS)   I believe what I was inquiring, was the

18   defendant over the age of 18?

19   A.   Yes.

20   Q.   During the course of your conversation with him, at any

21   time when either you, Corporal Smith, or the uniform officer,

22   at any point in time did you threaten or harass the defendant

23   in any manner?

24   A.   No.

25   Q.   At any point in time did you offer him anything or

11

1   promise him anything for speaking with you?

2   A.   No.

3   Q.   At all point in time was the defendant free to leave?

4   A.   Yes.

5   Q.   At all point in time was the defendant free to ask you

6   to leave?

7   A.   Yes.

8   Q.   At any point in time did he state that he wanted to end

9   the interview or ask that you, in fact, leave?

10   A.   No.

11   Q.   At any point in time did he request an attorney?

12   A.   Towards the end, when we asked for a buccal swab, he

13   later said he wanted to speak to an attorney.

14   Q.   And I'll back up and ask you about that in a moment.

15   But up and until the time you asked for his buccal swab, at

16   any point in the conversation had he requested an attorney?

17   A.   No.

18   Q.   At the conclusion of the interview, did you, Corporal

19   Smith, and the uniformed officer all leave the residence?

20   A.   Yes.

21   Q.   Was the defendant ever placed under arrest that day?

22   A.   No.

23   Q.   During the course of your conversation you've previously

24   told us that you and Corporal Smith were in the living room

25   with the defendant; is that correct?

12

1   A.    Correct.

2   Q.    After you had spoken with the defendant for some period

3   of time, did you ever leave the residence?

4   A.    Can you ask the question again.

5   Q.    Did just you leave the residence, wherein Corporal Smith

6   stayed behind?

7   A.    Yes, there was, like, one, maybe two times, I left.

8   Q.    For what purpose did you leave?

9   A.    One, the time that I can recall, I went out to actually

10  get the buccal swab that I was gonna get a sample from

11  Mr. Zilm.

12  Q.    And as you then left the residence to obtain the buccal

13  swab, was that actually in your car, outside the residence?

14  A.    Yes.

15  Q.    Did you ever leave the physical perimeter of the

16  residence?

17  A.    No.

18  Q.    Do you know approximately how long that took you to walk

19  out to your car and then return back?

20  A.    Oh, just a couple of minutes.

21  Q.    Were you the case agent on this case?

22  A.    Yes.

23  Q.    And do you know whether during the couple of minutes,

24  approximately, that you were retrieving the buccal swab,

25  whether or not Corporal Smith continued to speak with the

13

1   defendant?

2   A.    Yes.

3   Q.    Is all of that on the tape?

4   A.    Yes.

5   Q.    Have you had the opportunity to review that?

6   A.    Yes.

7   Q.    Once you then return back into the residence, then did

8   you present the defendant with the buccal swab request?

9   A.    Yes.

10  Q.    And how did he respond to that?

11  A.    He wanted to discuss it with his father.

12  Q.    Okay.  And what happened at that point?

13  A.    I told him he was -- if that's what he wanted to do,

14  that was fine.

15  Q.    And then, did he, in fact, have a conversation with his

16  father?

17  A.    Yes.

18  Q.    Then what happened?

19  A.    They came back in and stated that they wanted to talk to

20  a lawyer first.

21  Q.    And was that the first point in time that you had heard

22  any mention of a request for an attorney?

23  A.    Yes.

24  Q.    And upon that request, did the conversation end?

25  A.    Yes.

14

1   Q.    And upon that request did then you and Corporal Smith

2   and the uniformed officer leave the residence?

3   A.    Yes.

4   Q.    As a law enforcement officer, are you trained in

5   determining whether or not a person is under the influence of

6   an intoxicating substance?

7   A.    Yes.

8   Q.    And did you form an opinion that day as to whether or

9   not the defendant was?

10  A.    Yes.

11  Q.    What was your opinion?

12  A.    He didn't appear to be under any influence of an

13  intoxicant.  And we'd asked him and he said he hadn't taken

14  any.

15  Q.    Did you have any difficulty in communicating with him

16  whatsoever?

17  A.    No.

18  Q.    And during the course of your conversation, did you

19  inquire or did the defendant make any statements about sleep?

20  A.    He said that he hadn't had much sleep.

21  Q.    Did you form an opinion as to, during the course of that

22  conversation, if that impacted your ability, in any manner,

23  to communicate with him?

24  A.    It didn't appear to have an affect, no.

25  Q.    Did you observe, in any manner, during the course of

1          THE COURT:  Thank you.  We'll try to accommodate

2     that.

3          MR. SMALLWOOD:  Thank you.

4          THE COURT:  Please continue.

5     Q.   (BY MS. McAMIS)  Just to be clear, for the purposes of

6     the record, Detective Hodges, on that day, did you have any

7     conversations with the defendant, Adam Zilm, that are not

8     contained on that recording?

9     A.   No.

10    Q.   And did you, as recently as last night, review that

11    recording?

12    A.   Yes.

13    Q.   For the purposes of the record, is the defendant whom

14    you've described as having a conversation with on that

15    recording, is he here in the courtroom today?

16    A.   Yes.

17    Q.   Could you identify him, please?

18    A.   He's sitting at the table there in a gray suit, purple

19    tie.

20         MS. McAMIS:  Your Honor, the state would request

21    that the record reflect that the witness has identified the

22    defendant.

23         THE COURT:  Record will so reflect.

24         MS. McAMIS:  Thank you.  I have no further

25    questions.

22

1   A.    Yes.

2   Q.    At the Justice Center?

3   A.    Yes.

4   Q.    Do you remember about what time of day that would have

5   been, at the Justice Center?

6   A.    At the Justice Center?

7   Q.    Yes, sir.

8   A.    It would have been early morning.  I'm purely guessing,

9   but probably around, I'd say eight, nine o'clock in the

10  morning, maybe.  Even a little earlier, I'm not for sure.

11  Q.    After you heard that interview, did you form in your

12  mind an opinion as to whether Adam Zilm was guilty of this?

13            MS. McAMIS:  Object to the relevance.  This simply

14  goes to his statements, Your Honor.

15            MR. SMALLWOOD:  Judge, I think it goes to the

16  argument that I'm going to make with respect to the

17  statements that were made to Mr. Zilm before and during this

18  statement that was taken from him.

19            THE COURT:  On the -- will I hear it on --

20            MR. SMALLWOOD:  I don't know what I'm gonna hear on

21  that.  I'll be hearing it for the first time, but I think

22  it's relevant.

23            THE COURT:  I'm gonna receive it as I can sort

24  through this, and we're outside the presence of a jury.  I'm

25  acting as a gatekeeper as to whether or not the statements

24

1   A.   No.

2   Q.   Would it have been Greg Smith?

3        MS. McAMIS:   Your Honor, he just said he didn't

4   know.   Object to the question.

5   Q.   (BY MR. SMALLWOOD)   Well, you came to Robert Zilm and

6   Mary Zilm's residence on that morning.   And you were there,

7   Greg Smith was there, who else was there?

8   A.   There was a uniformed officer there.

9   Q.   Do you remember his name?

10  A.   I believe it was Jay Taylor.

11  Q.   Okay.   But you don't know who entered the house on North

12  Louisville earlier that day?

13  A.   No.

14  Q.   Did you have any information about that at all?

15  A.   Just what officers had told us, that they had responded

16  to the scene.

17  Q.   And that was all?

18  A.   Yes.

19  Q.   You don't know what they did there?

20  A.   No.

21  Q.   Was that recorded in any fashion, if you know?

22  A.   Not that I know of.

23  Q.   So your first contact with Mr. Zilm was when you knocked

24  on the door of the residence there on East 25th Place?

25  A.   Yes.

25

1    Q.    That would have been about what time?

2    A.    I would say late morning.  Probably around 11, noon

3    maybe, somewhere around there.

4    Q.    And you're sure it was that late?  Is that your memory?

5    Could it have been earlier than that?

6    A.    It may have been a little earlier.

7    Q.    Would your notes -- have you looked at your notes that

8    you made with respect to whether that would reflect the time

9    of day?

10   A.    I don't believe the time was in there.

11   Q.    Okay.  You were recording as you walked up to the house?

12   A.    Yes.

13   Q.    And how was that being recorded?

14   A.    On audio recorder.

15   Q.    Okay.  You've heard that and that's all there?

16   A.    Yes.

17            THE COURT:  Excuse me for interrupting.  Am I to

18   understand that the disk is all audio?  It's not a video?

19            MS. McAMIS:  It is all audio.

20            THE COURT:  All right.  Thank you.

21            Please continue.

22   Q.    (BY MR. SMALLWOOD)  You approach the house, and you

23   indicated that Robert -- you believe Robert Zilm responded to

24   your knock?

25   A.    I believe so.

28

1    A.    No, I don't.

2    Q.    That's not on the tape?

3    A.    I don't recall a time, other than -- anything being

4    talked about a lawyer, other than when the DNA sample came

5    up.

6    Q.    So you don't remember Adam Zilm asking you if he needed

7    a lawyer, and you or another one of the officers telling him,

8    "I don't know, do you?"

9    A.    I don't recall that.  No.

10   Q.    You're telling me that's not on that tape?

11   A.    Not that I recall.

12   Q.    When you first spoke with Adam after he came from the

13   bedroom, or wherever he was, with his T-shirt and his shorts

14   on, was he sitting on the couch?

15   A.    Can you repeat the question again.

16   Q.    When you first met Adam and had your conversation with

17   him, do you recall if he was sitting on a couch in the living

18   room?

19   A.    When we first started talking and he came in, I don't

20   remember if he was sitting in a chair or a couch, but we were

21   in the living room.

22   Q.    You recall his mother sitting there with him?

23   A.    No, I don't recall her sitting there with him.  No.

24   Q.    Do you recall any police officers telling Adam that he

25   didn't need a lawyer, that you just wanted to talk with him?

30

1    Q.    And after you read to him that he can consult a lawyer,

2    what did he say?

3    A.    He wanted to talk to his father.

4    Q.    His father was not in the room?

5    A.    No.

6    Q.    So Adam left?

7    A.    Correct.

8    Q.    How long was he gone, if you remember?

9    A.    Just a couple of minutes.

10   Q.    Okay.  Returned by himself?

11   A.    I believe his father came back with him then.

12   Q.    And what did Adam say to you at that time?

13   A.    That they wanted to consult with an attorney.

14   Q.    And all of that is on the tape?

15   A.    Yes.

16   Q.    And when you received that information from Adam, what

17   did you do then?

18   A.    I told him that was fine.  I believe I told him that I

19   was gonna give him -- or I did give him my name and number,

20   and that if they needed to contact me, they could.  And I

21   think that was about the extent of it.

22   Q.    Okay.  Did Adam, during the course of that statement,

23   ever admit that he sexually molested this girl?

24   A.    No.

25              MR. SMALLWOOD:  That's all I have, Your Honor.

32

1          THE COURT:  And approximately what time was that?

2          THE WITNESS:  I believe it was around 11 a.m.

3          THE COURT:  So what you saw at the Justice Center

4    was not a video of what was going on, you were on the other

5    side of the two-way mirror observing the interview; is that

6    right?

7          THE WITNESS:  Yes.

8          THE COURT:  Okay.  Now, I got a picture of it.

9    That is all I have.

10         Do you have any questions?

11         MS. McAMIS:  No, sir.

12         THE COURT:  Do you, Mr. Smallwood?

13                     RECROSS EXAMINATION

14   BY MR. SMALLWOOD:

15   Q.   Are you telling us, Detective Hodges, that you could or

16   could not hear what this young lady was saying?

17   A.   I could hear, yes.

18   Q.   But to the best of your knowledge, because of the

19   mechanics of the situation, she probably didn't know you were

20   there?

21   A.   She didn't know I was there.

22   Q.   Because she couldn't see through the two-way mirror?

23   A.   Correct.

24         MR. SMALLWOOD:  That's all I have.

25         THE COURT:  That brings up another question.  I'm

35

1    June 4 of 2012?

2    A.    Yes, I was.

3    Q.    And on that date, did you have the opportunity to become

4    involved in the investigation surrounding the defendant, Adam

5    Zilm?

6    A.    Yes, I did.

7    Q.    On that day, did you accompany Detective Mark Hodges to

8    an interview with the defendant?

9    A.    I did.

10   Q.    Where did that interview take place?  Where did the two

11   of you go?

12   A.    At Mr. Zilm's parents' house.

13   Q.    Do you know whether that interview was being recorded

14   from start to finish?

15   A.    Yes, audio recorded.

16   Q.    Who was in charge of, or who did the recording for that

17   interview?

18   A.    Detective Hodges.

19   Q.    Were you with Detective Hodges when he arrived at the

20   residence, knocked on the door, and entered the residence?

21   A.    Yes, I did.

22   Q.    Do you recall speaking with the defendant's father at

23   the time you arrived at the residence?

24   A.    Yes.

25   Q.    How were you dressed on that occasion?

36

1   A.   Wearing pullover shirt and slacks.

2   Q.   Is your pullover one for the Child Crisis Unit, that has

3   the insignia of the Tulsa Police Department sewn on?

4   A.   Yes.

5   Q.   Were you also wearing a badge?

6   A.   Yes.

7   Q.   And were you also wearing a gun?

8   A.   Yes.

9   Q.   Did you identify yourself to the defendant as a law

10  enforcement officer?

11  A.   Yes, we did.

12  Q.   Who all, to your knowledge, was present in the home,

13  other than the defendant's father and the defendant?

14  A.   I believe his mother.

15  Q.   And to all individuals involved, were you identified as

16  law enforcement officers?

17  A.   Yes.

18  Q.   At any point in time during your contact with the

19  defendant that day, did either yourself, Detective Hodges or

20  the uniformed officer, ever threaten or harass or coerce the

21  defendant in any manner?

22  A.   No.

23  Q.   At any point in time did you promise him anything, or

24  offer him anything in exchange for speaking with you?

25  A.   No, we didn't.

37

1    Q.    At any point in time was the defendant placed under

2    arrest?

3    A.    No.

4    Q.    Was the defendant always free to leave?

5    A.    Yes.

6    Q.    Was the defendant always free to ask you to leave?

7    A.    Yes.

8    Q.    Up and until -- I'm gonna ask you some questions about

9    the end of the interview and the DNA, the request for the DNA

10   swab.  But up and until that point, did the defendant ever

11   say that he wanted to stop the interview?

12   A.    No, he was cooperative with us.

13   Q.    Did he ever ask you to leave?

14   A.    No, he didn't.

15   Q.    Did he ever ask for an attorney?

16   A.    No, he didn't.

17   Q.    During the course of that interview, did you -- as a law

18   enforcement officer, are you trained in determining whether

19   or not someone is under the influence of an intoxicating

20   substance?

21   A.    Yes.

22   Q.    And did you form an opinion as to whether or not the

23   defendant was in any way impaired?

24   A.    No, he was not impaired.  He seemed fine.

25   Q.    During the course of that interview, did the defendant

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

38

1   talk to you about having been asleep?

2   A.   Yes.

3   Q.   At any point in time during that interview, did you form

4   an opinion that he was suffering from some type of lack of

5   sleep that, in any way, impaired your interview?

6   A.   No.  He was woken up when we arrived.  But he seemed

7   fine.  Seemed to be able to answer questions.

8   Q.   Was he ever falling asleep in front of you, or anything

9   of that nature?

10   A.   No, once he got in and sat down and woke up, we

11   continued the conversation as normal.

12   Q.   At some point during your interview with the defendant,

13   did Detective Hodges walk out -- and back out to the patrol

14   car?

15   A.   He went out to get a release form -- or a waiver.

16   Q.   And was that for the purposes of the buccal swab, the

17   DNA?

18   A.   That's correct.  Yes.

19   Q.   When -- and perhaps I jumped ahead a little bit.

20       During your conversation with the defendant, who all was

21   present in that room?

22   A.   Detective Hodges, Mr. Zilm, and myself.  We asked his

23   parents if we could talk to him private, and they went down

24   the hallway, I think, to a bedroom.

25   Q.   Do you have any way of knowing whether they were

39

1    listening to or overhearing your conversation in any manner?

2    A.    Not really.  Although, as I recall, his father did come

3    back to the kitchen area, which is adjacent to the living

4    room, for a short period.  Got something and left again.

5    Q.    For any event, for the course of the conversation as

6    you've told us, it was yourself and Detective Hodges?

7    A.    And Mr. Zilm.

8    Q.    Yes.  And then you told us that Detective Hodges left to

9    walk out to the car to obtain the buccal swab information.

10   Do you know approximately how long he was gonna?

11   A.    Not long, maybe five, six minutes.

12   Q.    Okay.  After he left the residence, then did the

13   defendant continue to make statements to you?

14   A.    Yes.  He asked a couple of questions and we chatted.

15   Q.    And did the defendant make statements to you

16   specifically about his DNA, and whether it may or may not be

17   found on the victim?

18   A.    Yes.  He realized that there may have been a situation

19   that would cause DNA to be on the victim.

20   Q.    And then did he describe that for you?

21   A.    He told me how that would have occurred.

22   Q.    Is all of that contained on the audio tape of the

23   interview?

24   A.    I believe it is.  I think Detective Hodges left the

25   recorder in the room with us.

40

1   Q.   After such time or as you were having this continued

2   conversation with the defendant and the issue of his DNA was

3   discussed, did Detective Hodges come back into the residence?

4   A.   Yes, he did.

5   Q.   At the point in time that Detective Hodges came back

6   into the residence, then did he present the defendant with

7   the request for the buccal swab and the waiver form that you

8   all use for that?

9   A.   I'm not sure if he had the actual form with him then,

10  but at that point Mr. Zilm changed his mind and declined

11  that.

12  Q.   Okay.  And, so, at the point in time, ultimately, that

13  the defendant declined to give his buccal swab, at that point

14  in time, did the idea of an attorney arise?

15  A.   I'm sorry?

16  Q.   During that part of the -- where he was declining to

17  give his buccal swab, did the notion of an attorney, did he

18  bring that up that perhaps he needed an attorney, or words to

19  that effect?

20  A.   I believe he may have asked if he needed one.  But I

21  don't recall exactly what he said.

22  Q.   After that, after he declined to give his buccal swab

23  and after there was -- whatever mention there was of an

24  attorney, did either you or Detective Hodges continue to

25  question the defendant in any way?

41

1   A.   No.   At that point we were through.   And as I said, he

2   declined the buccal swab, so we left.

3   Q.   And the defendant was not placed under arrest or in

4   custody at that point; is that correct?

5   A.   No.   He remained at the residence.

6   Q.   For the purposes of the record, is the defendant who you

7   were referring to, is he here in the courtroom today?

8   A.   Yes, he is.

9   Q.   Could you identify him, please?

10  A.   He's wearing a gray suit and has a multi-colored

11  purple-ish tie.

12          MS. McAMIS:   Your Honor, the state would request

13  the record reflect the witness has identified the defendant.

14          THE COURT:   The record will so reflect.

15          MS. McAMIS:   Thank you.   I have no further

16  questions.

17                  (Off the record.)

18          THE COURT:   Thank you.   Back on the record.

19          Mr. Smallwood.

20                  CROSS EXAMINATION

21  BY MR. SMALLWOOD:

22  Q.   Is it Detective Smith?

23  A.   Yes.

24  Q.   Prior to June 4, 2012, had you ever met or heard

25  anything about Adam Zilm?

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

42

1   A.   No, I hadn't.

2   Q.   Were you present when the alleged victim in this case

3   was -- a statement, a forensic statement was taken from her

4   at the Justice Center?

5   A.   No, I was not.

6   Q.   When, in the course of that morning, did you become

7   involved in this investigation?

8   A.   When Detective Hodges asked me to accompany him over to

9   interview Mr. Zilm.

10  Q.   Do you recall what time of day that would have been?

11  A.   It was late morning, possibly after lunch.  But I think

12  it was late morning.

13  Q.   And do you recall about what time that you arrived?

14  A.   No, just few minutes after we left the office.  It was

15  close.

16  Q.   And when, if you know, Detective Smith, did this

17  recording that you describe begin?

18  A.   I didn't see him press the button.  It was either at the

19  door or after we had asked to speak with Mr. Zilm.

20  Q.   Okay.  And have you heard it?

21  A.   No, I haven't.

22  Q.   Okay.  Were you aware of events that occurred at the 131

23  North Louisville earlier that morning, 5:00, 5:30, six

24  o'clock?

25  A.   Well, I was told of an incident and that was our reason

47

1   Detective Hodges was questioning Adam Zilm?

2   A.   Yes.

3   Q.   At any point in time during that questioning, did Adam

4   Zilm admit that he had sexually molested this girl?

5   A.   He admitting to touching.  He gave an explanation.

6   Q.   He said he gave her a massage?

7   A.   Exactly.

8   Q.   But he never admitted that he did so with any sexual

9   intent or purpose?

10  A.   He did not give any intent.  Yes.

11           MR. SMALLWOOD:  That's all I have, Judge.

12           THE COURT:  Redirect?

13                    REDIRECT EXAMINATION

14  BY MS. McAMIS:

15  Q.   Corporal Smith, any questions or any statements made by

16  the defendant would all be contained on this recording;

17  correct?

18  A.   Yes, it should be.

19  Q.   So when counsel's asking you if he asked about a lawyer,

20  if he made responses, there wasn't anything outside of this

21  recording --

22  A.   No.

23  Q.   -- correct?  Okay.

24           MS. McAMIS:  Thank you.  I have no further

25  questions.

48

1          THE COURT:  Excuse me.  Off the record.

2                      (Off the record.)

3          THE COURT:  Back on the record.

4                    RECROSS EXAMINATION

5    BY MR. SMALLWOOD:

6    Q.    Detective Smith, you don't know if there's anything that

7    was said that's not on the tape or not, because you haven't

8    heard the tape?

9    A.    No, I haven't heard the tape.

10         MR. SMALLWOOD:  Okay.  That is all I have.

11         THE COURT:  Anything further?

12                 FURTHER REDIRECT EXAMINATION

13   BY MS. McAMIS:

14   Q.    Just for the purposes of the record, you weren't ever

15   outside, other than what you have talked about when Detective

16   Hodges went out to the car, you weren't ever in some other

17   location speaking with the defendant, other than in the

18   living room, as you've described, with Detective Hodges?

19   A.    That's correct.  There was no time that we were --

20   either one of us was with Mr. Zilm, other than in the living

21   room.  And I was present that whole time, and I believe the

22   recorder was running the whole time.

23         MS. McAMIS:  Thank you.  No further questions.

24         THE COURT:  Anything further?

25         Thank you, Detective.  You may step down and go

49

1   about your business.  Thank you very much.  Have a good day.

2           Call your next witness.

3           MS. McAMIS:  Your Honor, the state has no further

4   witnesses to call.

5           We understand that we have offered State's Exhibit

6   No. 1.  I believe that you have held that in abeyance.

7           THE COURT:  And I'm gonna let Mr. Smallwood put on

8   his witnesses before I rule.

9           MR. SMALLWOOD:  Your Honor, I would like to hear

10  this before I put on --

11          THE COURT:  Just a moment.

12          Yes, ma'am.

13          MS. McAMIS:  I just wanted to state for the record

14  that normally I would rest; however, unless or until it's

15  admitted, I wouldn't want to rest.

16          THE COURT:  Yeah, I understand that.

17          Mr. Smallwood -- well, let me ask Ms. McAmis.

18          How long is this?

19          MS. McAMIS:  I believe it's an hour and seven

20  minutes somewhere, if I'm correct.

21          THE COURT:  You want to listen to it before you put

22  Mrs. Zilm on the stand?

23          MR. SMALLWOOD:  Before I put on any evidence, yes,

24  sir.

25          THE COURT:  Any evidence?

1

1          IN THE DISTRICT COURT OF TULSA COUNTY

2                    STATE OF OKLAHOMA

3

4    STATE OF OKLAHOMA,                )        ©COPY

5                                      )
              Plaintiff,               )        F- 2017-69
6                                      )
     vs.                               )        No. CF-2012-3037
7                                      )
     ADAM CLAYTON ZILM,                )
8                                      )        DISTRICT COURT
              Defendant.               )        F I L E D
9
                                                JUL 1 7 2017
10
                                                DON NEWBERRY, Court Clerk
11          TRANSCRIPT OF MOTION HEARING PROCEEDINGS    STATE OF OKLA, TULSA COUNTY

12        HEARD BEFORE THE HONORABLE KURT G. GLASSCO

13                 JUDGE OF THE DISTRICT COURT

14                    November 9, 2016

15

16   APPEARANCES:

17        MS. SARAH McAMIS, Assistant District Attorney, 500 S.
     Denver, Tulsa County Courthouse, Tulsa, Oklahoma, appears on
18   behalf of the Plaintiff.

19        MR. ALLEN M. SMALLWOOD, Attorney at Law, 1310 S. Denver
     Ave., Tulsa, Oklahoma, appears on behalf of the Defendant.
20

21

22                      REPORTED BY:
                     Cindy G. Workman, CSR, RPR
23                     Official Court Reporter
                      Tulsa County Courthouse
24                       500 South Denver
                          Tulsa, Oklahoma
25

RECEIVED

AUG 0 1 2017

ATTORNEY GENERAL

4

1        A witness subject to cross-examination must testify

2   and be given a chance to explain or deny any discrepancy

3   between that testimony and a previous statement before

4   evidence from the previous statement is admissible.

5        At that point, the witness may be impeached with

6   the specific inconsistent portions of her statement.  This

7   court -- that court in *Stiles* -- said playing the unedited

8   tape is not an appropriate impeachment procedure, and I'm

9   going to prohibit that in this case.

10        MS. McAMIS:  Correct.  And we did not intend to do

11   that whatsoever.  What we intended to do was to follow the

12   specific procedure that was set forth in *Stiles*.

13        In other words, ask her and give her the

14   opportunity to explain her statement.  And if not, then ask

15   her a specific question directly in response from the

16   forensic interview.

17        In other words, just like you would impeach any

18   other witness, Did you previously tell Amy Howard such and

19   such?  We did not intend to play the interview or an unedited

20   portion of the interview, but simply to follow the specific

21   procedure that was set forth in *Stiles*.

22        THE COURT:  Okay.  Let me take it back another

23   level.

24        Mr. Smallwood, I told you originally, and I entered

25   an order, determining that the first preliminary hearing --

5

1   and I used the term of art "a nullity," which means there's

2   nothing there.  It doesn't exist.  And you specifically asked

3   me that question on at least two occasions.  And I said that

4   is correct.

5        After reading these cases and consulting with two

6   district judges, I believe I erred.  And the two judges I

7   consulted with were retired District Judge David Peterson,

8   and District Judge Linda Morrissey.  Both have had extensive

9   criminal docket backgrounds.  I attempted to contact my

10  mentor, Judge Gillert, but could not get ahold of him.

11       Based upon that, I believe that on specific

12  questions they can -- they can ask a question of the victim,

13  Did you say such and such, whatever that such and such is,

14  and if the victim answers, no, I didn't, or, yes, I did,

15  whichever the answer may be, the victim has to be given the

16  opportunity to explain.  And then if that doesn't work, then

17  use the statement for impeachment.

18       Now, sir, that changes something I know you have

19  relied upon.  And I am willing, that if you believe that

20  changes your defense strategy this late in the eve, I'm

21  willing to continue the case to allow you to take care of the

22  issues of preparation.  I don't know.  But that is a dramatic

23  change, and I apologize.

24       And I've determined from reading the cases and in

25  consultation with other judges that I erred in that portion.

6

1   Do you wish to contemplate that for a minute as I go on with

2   the rest of the Motion *in limine*.

3          MR. SMALLWOOD:  No, I don't, Judge.  But I would --

4   I would like to be able to discuss that with my client.

5          THE COURT:  Okay.

6          MR. SMALLWOOD:  And advise both counsel and you

7   tomorrow.

8          THE COURT:  Okay.

9          MR. SMALLWOOD:  I can represent to both counsel and

10  you that I do not anticipate, at this late stage, seeking to

11  continue this matter.

12         THE COURT:  I'm telling you -- you're not seeking a

13  continuance; I'm offering a continuance.

14         MR. SMALLWOOD:  I understand that.

15         THE COURT:  This is not to be held against you,

16  it's against me because I am in error.

17         MR. SMALLWOOD:  Well, I don't anticipate that I'm

18  going to take the Court up on its offer for a variety of

19  reasons that I'm not going into, but I would like the

20  opportunity to discuss this with my client.

21         THE COURT:  Absolutely.  Absolutely.  Okay.  Let's

22  continue on then.

23         I am not inclined -- I'm not telling you for sure,

24  but I am not inclined to allow you to use any of the portions

25  of the video for cross-examination.  I know that --

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

```
1              IN THE DISTRICT COURT OF TULSA COUNTY

2                       STATE OF OKLAHOMA

3


4    STATE OF OKLAHOMA,           )
                                  )
5                    PLAINTIFF,   )          I-2017-69
                                  )
6         VS.                     )     CASE NO. CF-2012-3037
                                  )
7    ADAM CLAYTON ZILM,           )
                                  )
8                    DEFENDANT.   )            COPY

9

10

11               TRANSCRIPT OF PROCEEDINGS

12        BEFORE THE HONORABLE KURT G. GLASSCO

13           JUDGE OF THE DISTRICT COURT

14           TULSA COUNTY COURTHOUSE              DISTRICT COURT
                                                    F I L E D
15              TULSA, OKLAHOMA
                                                    APR 20 2017
16            SEPTEMBER 28, 2016
                                              DON NEWBERRY, Court Clerk
17                                            STATE OF OKLA. TULSA COUNTY

18               A P P E A R A N C E S

19   FOR THE PLAINTIFF:        MS. SARAH MCAMIS
                               Assistant District Attorney
20                             Tulsa County Courthouse
                               Tulsa, Oklahoma   74103
21

22   FOR THE DEFENDANT:        MR. ALLEN SMALLWOOD
                               Attorney at Law
23            RECEIVED         Tulsa, Oklahoma

24           AUG 0 1 2017
25   REPORTER:                 BRENDA EL HASSAN, CSR, RMR, CRR
          ATTORNEY GENERAL     Official Court Reporter
```

DISTRICT COURT OF OKLAHOMA
Official Transcript

FILED
IN COURT OF CRIMINAL APPEALS
STATE OF OKLAHOMA
AUG 0 1 2017



40

1    A    Adam Zilm.

2    Q    And how old are you?

3    A    34.

4    Q    What's your date of birth?

5    A    11-10-81.

6    Q    Speak up a little bit or move that -- there you

7    go.  That's better.

8    A    11-10-81.

9    Q    Great.

10        What do you do for a living?

11   A    I am a quality control technician.

12   Q    Okay.  And what's your education?

13   A    I have an associate's degree in massage therapy.

14   Q    In massage therapy?

15   A    Yes.

16   Q    And were you ever a massage therapist?

17   A    Yes.

18   Q    For how long?

19   A    Around four years.

20   Q    And what was that time frame?

21   A    Around 2008 to 2012.

22   Q    Calling your attention to the spring of 2012,

23   where were you living?

24   A    At 131 North Louisville.

25   Q    Is that in Tulsa?

DISTRICT COURT OF OKLAHOMA
Official Transcript

47

```
 1   A      I told my dad that I woke up and I got
 2   handcuffed and I don't know what's going on, but I'm
 3   going to try to get some sleep.  And I went in my
 4   parent's bedroom and tried to go to sleep.
 5   Q      Did you go to sleep?
 6   A      No.
 7   Q      Okay.  What happened next?
 8   A      I was awakened by my dad telling me that there
 9   were some detectives that would like to talk to me.
10   Q      Okay.  You said you weren't asleep and then you
11   said you were awakened.  You mean he came in the room?
12   A      It wasn't really -- he came in the room, yes.  I
13   tried to lay down and go to sleep.  It didn't happen.
14   Q      And what happened then?
15   A      They brought me in the living room and sat me on
16   the couch and introduced themselves.
17   Q      How were you dressed?
18   A      How was I dressed?
19   Q      Yes.
20   A      Shorts and tee shirt.
21          MR. SMALLWOOD:  May I approach, Your Honor?
22          THE COURT:  Yes.
23          MR. SMALLWOOD:  These are the originals.
24   And may I approach the witness?
25          THE COURT:  Yes.
```

DISTRICT COURT OF OKLAHOMA
Official Transcript

51

1   me earlier with his arms crossed (indicating).  At

2   first he did uncross his arms to turn down his radio,

3   but he was positioned to where my parents couldn't get

4   to me and I wasn't going anywhere.

5   Q      What was your -- strike that.  When you were

6   sitting on the couch with the two detectives there, how

7.  close were they in their chairs to the corners of the

8   couch?

9   A      They were both leaning -- leaning into me

10  (indicating).

11  Q      How far away from you physically?

12  A      Hodges was about three -- I'd say three feet

13  (indicating), and Corporal Smith, I could smell his

14  cologne, I remember that.  He was closer, even closer

15  than that (indicating).

16  Q      If you had wanted to get out of that couch, you

17  had the option of rolling over and breaking the back

18  window; right?

19  A      Yes.

20  Q      Jumping over or moving the coffee table; right?

21  A      (Moved head in an up and down fashion.)

22  Q      Or pushing one of the two detectives away to get

23  out of that couch; right?

24  A      Yes.

25  Q      Did you feel you had the freedom or option to do

DISTRICT COURT OF OKLAHOMA
Official Transcript

52

1   that?

2   A      No.

3   Q      Could you -- did you feel you had the freedom or

4   option of leaving that house?

5   A      No.

6   Q      Why?

7   A      Because I would have had to have gone through

8   three guns and the guy who handcuffed me with a vest

9   on.

10   Q      What was your impression of the uniformed

11   officer who had arrested you -- or handcuffed you

12   earlier, standing directly in front of your parents'

13   front door?

14   A      I -- my perception of it was to keep me from

15   getting to my parents and to keep me from leaving.

16   Q      Were you ever told you were free to leave?

17   A      No.

18   Q      Were you ever told that you had become the focus

19   of a suspect in a sexual assault case against an

20   eleven-year-old girl?

21   A      No.

22   Q      Were you given a Miranda warning prior to the

23   questioning beginning?

24   A      No.

25   Q      Do you have any legal training?

DISTRICT COURT OF OKLAHOMA
Official Transcript

1   A       I can see that, yes.

2   Q       Sure.

3           During the course of this entire conversation

4   with the detectives, did you ever say to them, before

5   such time as the issue of collecting your DNA came up,

6   okay, before that, did you ever say to them, I don't

7   want to talk to you?

8   A       No.

9   Q       Did you ever say to them, I would like to leave?

10  A       No.

11  Q       Did you ever say to them, I would like for you

12  to leave?

13  A       They had the guns.  You don't tell people with

14  guns to leave.

15  Q       My question was, sir:  Did you ever say to them,

16  I would like for you to leave?

17  A       No.

18  Q       Did you ever say to them before the issue of

19  your DNA came up that you wanted an attorney?

20  A       No.

21  Q       You said on direct examination with your

22  attorney that because the patrol officer was standing

23  in the position that you said that he was, that you

24  felt like there was no option, that that was to keep

25  your parents from coming and leaving and that was to

DISTRICT COURT OF OKLAHOMA
Official Transcript

61

1    keep you from coming and leaving; is that correct?

2    A      Yes.

3    Q      Would you agree with me, sir, that on the tape

4    it clearly indicates that your mom comes in and out of

5    the room?

6    A      She doesn't.

7    Q      So your testimony is that's not indicated on the

8    tape?

9    A      Whether it's indicated or not, she didn't come

10   in and out of the room.

11   Q      Okay.  And so do you recall on the tape when she

12   specifically came in and asked the detectives if they

13   wanted anything like water or anything like that?

14   A      That was before I sat down, at least from what I

15   remember.  In the beginning she said, Can I be in here

16   for it?  And they said, No, we want to talk to him

17   alone.  And then she walked out of the room and --

18   Q      And if the tape indicates otherwise, you

19   certainly wouldn't argue with the tape, would you?

20   A      No.

21   Q      And if -- on the tape, in fact, it indicates

22   when you specifically asked the detectives if you could

23   go in the other room and speak with your father, you

24   did go in the other room and speak with your father;

25   correct?

DISTRICT COURT OF OKLAHOMA
Official Transcript

62

```
 1    A      Once they moved out of my way, yes, I did.

 2    Q      My question was:  If the tape indicates that,

 3    you have no dispute with the tape; right?

 4    A      Correct.

 5    Q      And nowhere on the tape do you say, Can you

 6    please move out of my way so that I can go talk with my

 7    father, anything of that nature; right?

 8    A      I asked if I could -- I'm pretty sure I asked if

 9    I could talk to my dad.

10    Q      And their answer was, Yes, absolutely; right?

11    A      I believe so.

12    Q      And in fact, if the tape indicates that your

13    father came into the room and talked to the detectives,

14    you wouldn't dispute that in any way, would you?

15    A      Once I went and got him and showed him the --

16    the thing I said, that I could have an attorney

17    present, he was, like, You need to have an attorney

18    present.

19    Q      And my question was:  If the tape indicates that

20    your father came into the room, then you wouldn't

21    dispute that, would you?

22    A      No.

23    Q      You also -- your attorney was asking you about

24    the waiver form for the purposes of obtaining your DNA.

25    Do you recall that?
```

75

```
1    A       No.

2    Q       And again, the tape would reflect all of the

3    statements that you made?

4    A       Uh-huh, yes.

5    Q       Thank you.

6            MS. MCAMIS:  Nothing further.

7                       EXAMINATION

8    BY THE COURT:

9    Q       Mr. Zilm, when they -- when Hodges and Smith --

10           THE COURT:  Isn't that correct, the other

11   officer's name?

12           MS. MCAMIS:  Yes.

13   Q       (BY THE COURT)  When they finished with this

14   conversation that was recorded, they left your parents'

15   home; is that right?

16   A       Yes.

17   Q       And they didn't take you with them, did they?

18   A       No, sir.

19   Q       Okay.  And you were subsequently arrested at

20   another day; is that right?

21   A       I turned myself in.

22   Q       And how long after that statement was that?

23   A       I really -- I don't remember.

24   Q       Okay.  Days, weeks, months?

25   A       Oh, I think it may have been weeks.
```