*10189774 58*

## IN THE DISTRICT COURT OF THE FOURTEENTH JUDICIAL DISTRICT OF THE STATE OF OKLAHOMA SITTING IN AND FOR TULSA COUNTY

STATE OF OKLAHOMA,

CF-2012-3087

Case No.

Plaintiff,

Felony Information

vs.

DISTRICT COURT
FILED

**Adam Clayton Zilm**

Defendant(s).

JUL 1 2 2012

SALLY HOWE SMITH, COURT CLERK
STATE OF OKLA. TULSA COUNTY

## INFORMATION

**BE IT REMEMBERED:**

That **TIM HARRIS**, the duly elected and qualified **District Attorney for Tulsa County, Oklahoma,** who prosecutes in the name and by the authority of **The State of Oklahoma,** comes now into the District Court of Tulsa County, State of Oklahoma, and gives the Court to understand and be informed that:

### (COUNT 1)
### 21 O.S. 843.5F

**ADAM CLAYTON ZILM,** on or about **6/4/2012,** in Tulsa County, State of Oklahoma and within the jurisdiction of this Court, did commit the crime of **SEXUAL ABUSE - CHILD UNDER 12,** a Felony, by willfully or maliciously touching and rubbing the buttocks of K.A., a female child under the age of 12, to-wit: 11 years of age, during which time he was involved in a relationship with K.A.'s mother and was a person responsible for the care of K.A.,

Contrary to the form of the statutes in such cases made and provided, and against the peace and dignity of the State.

**TIM HARRIS,** District Attorney

By _____
Assistant

### WITNESS(ES) ENDORSED FOR THE STATE OF OKLAHOMA

| | | |
|---|---|---|
| Off. Steven Douglas 01967 | Tulsa Police Dept. 600 Civic Center | Tulsa, OK  74103 |
| Det. Mark R Hodges 01761 | Tulsa Police Dept. 600 Civic Center | Tulsa, OK  74103 |
| Cpl. Gregory K Smith 01491 | Tulsa Police Dept. 600 Civic Center | Tulsa, OK  74103 |
| Off. Jaye W Taylor 01329 | Tulsa Police Dept. 600 Civic Center | Tulsa, OK  74103 |

28



IN THE DISTRICT COURT IN AND FOR TULSA COUNTY
STATE OF OKLAHOMA

| STATE OF OKLAHOMA, | ) |
|---|---|
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| ADAM CLAYTON ZILM, | ) |
| | ) |
| Defendant. | ) |

DISTRICT COURT
F I L E D
JUL 3  2013

SALLY HOWE SMITH, COURT CLERK
STATE OF OKLA. TULSA COUNTY

Case No. CF-2012-3037

OBA #8308

## RECIPROCAL DISCOVERY DISCLOSURE

Allen M. Smallwood, counsel for the above-named defendant, Adam Clayton Zilm, submits this Reciprocal Discovery Disclosure with respect to the allegations contained in the felony information filed on July 12, 2012. In support of this disclosure counsel states:

1.    This defendant is charged by way of felony information with one felony count of sexual abuse – child under 12. This defendant is currently free on bond.

2.    This matter is scheduled for a discovery hearing on Thursday, August 1, 2013, at 9:30 a.m., and jury trial is scheduled for Monday, September 9, 2013, at 1:30 p.m.

3.    This Reciprocal Discovery Disclosure represents evidence the defendant may present by way of live testimony and/or exhibits to the allegations and referenced above, and the evidence received by counsel through the discovery process in support of those allegations. Counsel reserves the right to file additional reciprocal discovery disclosures to any additional allegations the State may make either by way of amended information, or by any other offer of evidence of any other acts allegedly committed by this defendant. To the extent that amended allegations, or other acts' evidence is offered, counsel will respond, as timely as possible, by way of reciprocal discovery disclosure with respect to evidence, witnesses, and exhibits in opposition to those amended allegations, or other acts' assertions.

4.    This Reciprocal Discovery Disclosure includes a list of witnesses who will be offered in the defendant's case in chief, other than the testimony of the defendant himself,

K.A. , 7-24-13

COPY

1

1

2

3

4

5

6

7

8

9            SWORN STATEMENT

10

11                  OF

12

13                K.A.

14

15

16           JULY 24, 2013

17

18

19

20

21

22

23

24

25

TULSA FREELANCE REPORTERS
918-587-2878

1              A P P E A R A N C E S

2

3

4     QUESTIONS PROPOUNDED BY:     MR. ALLEN M. SMALLWOOD
                                   Attorney at Law
5                                  1310 South Denver
                                   Tulsa, OK 74119
6
      ALSO PRESENT:                MS. BARBARA DAVIS
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K.A. , 7-24-13                                                    6

```
 1    right now.
 2    Q      Okay.
 3    A      And my brother, he is 10 right now, his name
 4    is  E.A.   --
 5              COURT REPORTER:  His name is what?        11:08
 6    A      E.A. k, but we call him  E.A.   and my little
 7    sister, her name is  G.A. , she's 7.
 8    Q      (By Mr. Smallwood)  Okay.  And your mom's name
 9    is?
10    A      Kristi.                                      11:08
11    Q      And where do you live?  Do you know your
12    address?
13    A      Off Nogales, 1407, in Country Garden Clubs.
14    Q      Why are we here at your grandmother's house,
15    Barbara Davis's house today?                        11:08
16    A      Because I want to get the truth out about what
17    happened.
18    Q      Okay.  Is your grandmother here with us today?
19    A      Yes, sir.
20    Q      How close is she to you right now physically?   11:08
21    A      Right next to me.
22    Q      Okay.  And what's her name?
23    A      Barbara Davis.
24    Q      And did you have any conversation with your
25    Grandmother Barbara about us having this talk today?  11:08
```

TULSA FREELANCE REPORTERS
918-587-2878

K.A. ███████ 7-24-13                                    14

```
 1    A      No, sir.
 2    Q      Tell me what happened then.
 3    A      First me and him were playing the Xbox.
 4    Then --
 5    Q      Which is a computer game?                    11:16
 6    A      (Witness nods head up and down.)
 7    Q      Okay.
 8    A      Then my back was hurting really bad, so he --
 9    I asked him to give me a massage, and he said okay.
10    And he left the room, I got undressed, and he gave   11:16
11    me a massage on my back.
12    Q      Okay.  When you asked him to do that, where
13    was your mother?
14    A      At work.
15    Q      Was she working nights at that time, if you   11:16
16    recall?
17    A      Yes, sir.
18    Q      Were your brothers and sisters in the house,
19    as well?
20    A      Yes, sir.                                     11:16
21    Q      Do you remember where they were?
22    A      Yes, sir.
23    Q      Where?
24    A      My -- E.A. was in the room across the hall.
25           COURT REPORTER:  My what?                     11:17
```

TULSA FREELANCE REPORTERS
918-587-2878

162

```
 1   Q      (By Mr. Smallwood)   E.A. ?
 2   A      My brother.
 3   Q      E.A. ?
 4   A      Yes.  And my sisters were in the back room.
 5   Q      Did they have their own bedroom?              11:17
 6   A      (Witness nods head up and down.)
 7   Q      Yes?
 8   A      Well, me and my sisters share a room.  My
 9   brother has his own room.
10   Q      Okay.  So the three girls have a bedroom,    11:17
11   share a bedroom, and  E.A.  has his own bedroom?
12   A      (Witness nods head up and down.)
13   Q      This massage, whose room did that occur in?
14   A      My mom's.
15   Q      Would that be mom and Adam's?                11:17
16   A      (Witness nods head up and down.)
17   Q      So you indicated that you asked him for a
18   massage after you'd been playing the Xbox.  He left
19   the room, you took your clothes off, he came back
20   in?                                                 11:17
21   A      Yes, sir.
22   Q      How were you situated when he came back in?
23   By that I mean, were you sitting, standing, laying
24   down?
25   A      I was laying down with the covers over me.   11:17
```

TULSA FREELANCE REPORTERS
918-587-2878

163

```
 1   Q    Facedown or faceup?
 2   A    Facedown.
 3   Q    And what clothing did you have on?
 4   A    Panties and pants.
 5   Q    Okay.  What about top?                    11:18
 6   A    No, sir.
 7   Q    Just a sheet over you?
 8   A    (Witness nods head up and down.)
 9   Q    Okay.  And tell me what happened.  Were you on
10   a bed?                                         11:18
11   A    (Witness nods head up and down.)
12   Q    Your answer is yes?
13   A    Yes, sir.
14   Q    Okay.  Tell me what happened next.
15   A    He was massaging my back.  I passed out, and  11:18
16   I --
17   Q    Let me ask you this, [K.A.].  When you say
18   you passed out, do you mean you went to sleep?
19   A    Yes, sir.
20   Q    Okay.  You weren't sick or anything that     11:18
21   caused you to faint.  When you say pass out, you
22   just mean you went to sleep?
23   A    Yes, sir.
24   Q    Okay.  When Adam was massaging you, was he
25   using any kind of substance?                    11:18
```

TULSA FREELANCE REPORTERS
918-587-2878

K.A.          , 7-24-13                                    17

```
 1    A      He just always used oil.
 2    Q      Okay.  Is that real slick?
 3    A      Yes, sir.
 4    Q      Okay.  And was he using the oil this time?
 5    A      Yes, sir.                                        11:18
 6    Q      So you said Adam was massaging your back and
 7    you passed out or went to sleep, and what happened
 8    next that you remember?
 9    A      I woke up and he was massaging my glutes for
10    me.                                                     11:19
11    Q      What are your glutes?
12    A      Back here.  (Indicating).
13    Q      What I'd call your bottom or your butt?
14    A      Yes, sir.
15    Q      Your hips?                                       11:19
16    A      He -- yeah, he was doing my glutes for me.
17    Q      Is that okay?
18    A      Yes, sir.
19    Q      Okay.  He's done that before?
20    A      Yes, sir.  And I passed out again, and he       11:19
21    accidentally jabbed me because he slipped, and his
22    thumb hit me.
23    Q      Where did his thumb hit you?
24    A      Back here.  (Indicating).
25    Q      Okay.  When you point to that, and I don't      11:19
```

TULSA FREELANCE REPORTERS
918-587-2878

K.A. , 7-24-13          18

```
 1    need to see this, but when you point to that, would
 2    that be your bottom?
 3    A      My bottom, yes, sir.
 4    Q      Or your other private part?
 5    A      Just my bottom.                              11:19
 6    Q      And you were asleep when this happened?
 7    A      And I woke up when he jabbed me, and he asked
 8    me if I was okay.
 9    Q      And what did you tell him?
10    A      I said, yes, sir.  And I said I was tired so I  11:19
11    wanted to go to bed now.
12    Q      Had you been having a dream when that
13    happened?
14    A      Yes, sir.
15    Q      What kind of a dream had you been having?    11:20
16    A      It was the dream about my Uncle David.
17    Q      And what was going on in the dream?
18    A      When he first made me suck his thing.
19    Q      Okay.  And did you tell Adam that you were
20    having that dream?                                  11:20
21    A      (Witness shakes head from left to right.)
22    Q      What was your reaction to being jabbed by Adam
23    while this massage was going on?
24    A      I freaked because I didn't know what happened,
25    and then he asked me if I was okay.                 11:20
```

## TULSA FREELANCE REPORTERS
### 918-587-2878

KATELYN ALVAR..., 7-24-13                                      19

```
 1    Q      And you said you were tired and wanted to go
 2    to sleep?
 3    A      (Witness nods head up and down.)
 4    Q      What did Adam do then, if you know?
 5    A      He left the room, let me get dressed, and then   11:20
 6    he came back in when I said I was done and left.
 7    Q      Do you know where he went?
 8    A      To bed.
 9    Q      And what did you do?
10    A      I went to my room.                                11:20
11    Q      What were you thinking at that time?
12    A      I don't remember what I was thinking.
13    Q      Did you think something had happened to you
14    that --
15    A      (Witness nods head up and down.)                  11:21
16    Q      What did you think had happened to you?
17    A      The same thing that happened with my Uncle
18    David.  I was freaking, so I went over to Karen and
19    Katherine's.
20    Q      Karen and Katherine are the neighbors --          11:21
21    A      Yes.
22    Q      -- across the street?
23    A      Across the street, and they opened the door,
24    they took me inside, and I just told them that I had
25    a dream, and when he was giving me a massage and I       11:21
```

TULSA FREELANCE REPORTERS
918-587-2878

```
 1    woke up, I freaked.  I didn't know what happened.
 2    And they called the police, called my mom.  My mom
 3    came home, and the police came, they told me to go
 4    lie down in the bed while they go talk to the
 5    police.                                                    11:22
 6    Q      Your neighbors did?
 7    A      Uh-huh.
 8    Q      Okay.
 9    A      I didn't get to talk to the police, though.
10    The neighbors told me to go lay down in the bed, and    11:22
11    they told my mom to just sit down on the couch.
12    Q      When you talked to Katherine and Karen, is
13    that who the neighbors are?
14    A      (Witness nods head up and down.)
15    Q      Did you tell Katherine and Karen that you'd    11:22
16    had a dream?
17    A      (Witness nods head up and down.)
18    Q      Did you describe what you thought Adam had
19    done to you?
20    A      Yes, sir.                                        11:22
21    Q      And what did you tell them you thought Adam
22    had done to you?
23    A      I told them that I thought he made me suck his
24    dick, like in the dream.  It was just a dream.
25    Q      Do you remember talking with anybody else or   11:22
```

K.A.                    , 7-24-13   35

```
 1    guns in the house, one is my mom's and one is his.

 2    Do you remember telling her that?

 3    A      No, sir.

 4    Q      Was that part of what Katherine and Karen told

 5    you to say?                                            11:27

 6    A      I think so.

 7    Q      Can you tell me why you told Amy those things

 8    if they weren't true?

 9    A      I tried telling the truth about what happened

10    before, but I -- I went to go talk to them, they       11:27

11    told me to say what I said in the beginning and I'd

12    get to go back to my mom.

13    Q      When did you have this conversation?

14    A      That same day.

15    Q      Okay.  Do you remember -- we've talked about     11:27

16    you testifying at the preliminary hearing in front

17    of the judge?

18    A      Yes, sir.

19    Q      And you testified at the preliminary hearing

20    to pretty much the same thing you told Amy.  Did you   11:27

21    have any conversations with anybody prior or before

22    you testified at that preliminary hearing?

23    A      Just with her.

24    Q      Who is her?

25    A      I think that Amy girl.                           11:28
```

K.A., 7-24-13

```
 1    Q     And what did she tell you?
 2    A     That's what she told me, to say what I said
 3    before and I'd get to go back to my mom and live
 4    with her again.            -
 5    Q     Did you try to tell Amy what really happened?    11:28
 6    A     Yes, sir.
 7    Q     What did you say to her to try to tell her
 8    what really happened?
 9    A     I told her that he didn't do that to me and I
10    was having a dream, and she said, well, say what you   11:28
11    said before and you get to go back to your mom.
12    Q     Okay.  And that was at the courthouse just
13    before you testified at the preliminary hearing?
14    A     Yes, sir.
15    Q     Do you remember the lady who asked you the      11:28
16    questions at the preliminary hearing?
17    A     Not really.
18    Q     Did you have any conversation with her before
19    you testified at the preliminary hearing?
20    A     I don't know what you mean.                      11:29
21    Q     You don't think so?
22    A     (Witness shakes head from left to right.)
23    Q     You just remember having a conversation with
24    who you think was Amy?
25    A     Yes, sir.                                        11:29
```

173

DISTRICT COURT
F I L E D

IN THE DISTRICT COURT IN AND FOR TULSA COUNTY
STATE OF OKLAHOMA                     AUG 2 0 2013

| | | |
|---|---|---|
| THE STATE OF OKLAHOMA, | ) | SALLY HOWE SMITH, COURT CLERK |
| | ) | STATE OF OKLA. TULSA COUNTY |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. CF-2013-3037 |
| | ) | |
| ADAM CLAYTON ZILM, | ) | OBA #8308 |
| | ) | |
| Defendants. | | |

## MOTION FOR ACCESS TO JUVENILE COURT FILE

**ALLEN M. SMALLWOOD**, counsel for the above-named defendant, seeks an order of the court authorizing him to have access to all juvenile court records generated in a companion case to this criminal case for the following reasons:

1.      This defendant is charged with sexual abuse of a minor child under the age of 12 (21 O.S. § 843.5F). The defendant is free on bond and jury trial is scheduled for September 9, 2013 at 1:30 p.m.

2.      Shortly after these allegations arose, the State of Oklahoma filed a deprived action with respect to the four minor children including the alleged victim in this case.

3.      It is counsel's understanding that the deprived matters are proceeding under the case number JD-12-219.

4.      Counsel has previously obtained an order of this court authorizing the release of statements from the alleged victim's three siblings. However, counsel believes that orders, directives, and legal advice given to the natural mother in this case may become an issue with respect to the voluntariness and/or accuracy of any statements made at any time by the alleged victim in this case. Therefore, in order to render effective assistance of counsel to this defendant, counsel needs access to that juvenile deprived file, under the provisions of any protective order which the court should feel appropriate, in order to properly prepare the defense of this case to render effective assistance of counsel to the defendant.

**WHEREFORE**, counsel seeks to have this application filed for hearing on the anticipated pretrial hearing date of Thursday, August 29, 2013 at 1:30 p.m. Counsel will be responsible for giving notice to all interested parties.

196

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖
* 1 0 2 2 7 6 1 3 0 3 *

IN THE DISTRICT COURT IN AND FOR TULSA COUNTY
STATE OF OKLAHOMA

| | | |
|---|---|---|
| STATE OF OKLAHOMA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. CF-2012-3037 |
| | ) | |
| ADAM CLAYTON ZILM, | ) | OBA #8308 |
| | ) | |
| Defendant. | ) | |

DISTRICT COURT
F I L E D

SEP 0 4 2013

SALLY HOWE SMITH, COURT CLERK
STATE OF OKLA. TULSA COUNTY

**MOTION TO DISMISS AND/OR IN THE ALTERNATIVE
TO REMAND FOR PRELIMINARY HEARING
FOR THE STATE'S FAILURE TO PROVIDE
EXCULPATORY EVIDENCE ON A TIMELY BASIS
WHICH DENIED DEFENDANT DUE PROCESS OF LAW
IN A MEANINGFUL PRELIMINARY HEARING
AND
MEMORANDUM OF LAW IN SUPPORT**

Allen M. Smallwood, counsel for the above-named defendant, Adam Clayton Zilm, moves to dismiss this case and/or in the alternative to remand for preliminary hearing for the State's failure to provide, or to actively conceal material exculpatory evidence of a timely recantation made by the prosecuting witness/alleged victim in this case.   In support of this Motion counsel states:

1.   This defendant is charged by way of felony information with one felony count of sexual abuse – child under 12.  This defendant is currently free on bond.

2.   This matter is scheduled for a jury trial on Monday, September 9, 2013, at 1:30 p.m.

301

## Pertinent Timeline

**June 4, 2012:**

        3.    Alleged victim, K.A., makes accusations the defendant engaged in sexual abuse while giving her a massage. A statement was taken by Justice Center counselors and timely provided to counsel by way of preliminary hearing discovery.

**June 5 – 6, 2012:**

        4.    K.A. called the defendant's mother, the defendant answered the telephone, and K.A. apologized to him for making a mistake saying she was having a dream of a prior sexual abuse and misinterpreted his accidental touching of her anus as sexual abuse. K.A.'s mother, Kristi Alvarez, was asleep when the phone call was made and was awakened by K.A. who told her she had called the defendant and admitted her mistake. There is no evidence from any source that K.A. was in any way coerced, cajoled, or intimidated into making this first recantation. As the timeline will reveal, counsel only learned of this recantation from Kristi Alvarez on September 2, 2013, and upon viewing the juvenile court file on September 3, 2013.

**June 7, 2012:**

        5.    After K.A. disclosed her admission and recantation of her initial allegations to her mother, the natural mother told the DHS worker, Laura Hannagan, of the telephone conversation K.A. had related she had with the defendant, Adam Zilm.

**June 12 – 15, 2012:**

        6.    Laura Hannagan, the DHS worker assigned to this case files an affidavit in the juvenile case which contains on paragraph 8:

On 6/7 NM Ms. Alvarez told worker K_____ had called Mr. Zilm's mother and Mr. Zilm answered the phone so he talked with K_____ at that time. Since then NM said K_____

told her "she might have been mistaken Mr. Zilm might not have done anything. She just got scared and thought about the time when she was 5 and something like this happened to her." (Paragraph 8 was handwritten by counsel on viewing the court file on September 3, 2013, as counsel was not allowed to copy any of the pleadings. This handwritten duplication of the affidavit is accurate to the best of counsel's ability).

**End of July, 2012:**

   7. Counsel has phone calls with Barbara Davis, maternal grandmother of K.A., and Jessica Swinny-Raush, a friend of the natural mother, both of whom informed counsel that shortly after the incident, probably weeks rather than days, K.A. disclosed to both of them that she had "lied" about what she said about Adam Zilm and she was confusing his innocent accidental actions with a nightmare she was having of prior sexual abuse.

**September 26, 2012 (Trial of Preliminary Hearing):**

   8. At the time of the preliminary hearing counsel for defendant had only telephonic confirmation with Jessica Swinny-Raush and Barbara Davis. Not being a party in the juvenile case he had no access to the juvenile records nor had anybody provided him with any information from any of the juvenile findings or court orders there. Kristi Alvarez, the natural mother, believed at that time and continued to believe until August 29, 2013, that court orders or directives from the Department of Human Services prohibited her from having any contact with or being interviewed by counsel for Adam Zilm. Directing the court's attention to pages 23 and 24 of the preliminary hearing transcript, when asked if "Adam ever touched you with any other part of his body besides his hands?" K.A. ultimately answered "his penis". Counsel made a record that she only answered that question after a 20- to 25-second lapse which was not challenged by the State and actually commented upon by the magistrate, Judge David Youll, that it took a minimum of 25 to 35 seconds, if not longer, for the child to respond.

**July 24, 2013:**

9.    Counsel takes the sworn statement of K.A. in which she confirms her recantation of the day or two after her allegations against Adam Zilm and also confirms the only reason she testified at the preliminary hearing to the facts there was that she was told if she did not continue with the same statement she initially given, she might not be given back to the custody of her mother (K.A. at that time was placed by the juvenile court with her uncle which remained until some time in December of 2012).

**August 16, 2013:**

10.    Lauren Hall, the current DHS worker with the Alvarez children, spoke with each of the children individually at the home of Kristi Alvarez in anticipation of a juvenile court hearing the following Monday, August 19, 2013.   There, Lauren Hall told K.A. that no one believes her second statement and that everyone believes her first statement because there was DNA evidence to prove the first statement.   This statement by Lauren Hall to K.A. was blatantly false as the State has provided DNA evidence in May of 2013 which reflects there was no male DNA evidence detected on K.A., specifically including no DNA evidence from the defendant, Adam Zilm.

**September 2, 2013:**

11.    Counsel learns from Kristi Alvarez that K.A. informed her on June 5 or June 6, 2012, she was mistaken about what Adam did and she was confusing his innocent accidental touching with a nightmare of a prior sexual abuse.   This is the first time counsel learned from any direct source that K.A. had recanted this allegation within 48 hours of making it.

304

**September 3, 2013:**

12.   Counsel reads the affidavit of Laura Hannagan confirming that the State knew of K.A.'s recantation at least by June 15, 2012. Counsel hand copied paragraph 8 of that affidavit as referenced above.

## Memorandum of Law

13.   The State's failure to timely produce material exculpatory evidence which it had in its possession no later than June 15, 2012, denied this defendant due process of law at the preliminary hearing as well as the right to conduct and confront the witness at the preliminary hearing.

14.   Material exculpatory evidence has long been required by the State, irrespective of good faith, to provide the defendant on a timely basis in order to make effective use of the same:

> *There are three components of a true* <u>Brady</u> *violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.* <u>Strickler v. Greene</u>, *527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).*

15.   Analyzing the three factors to make out a valid <u>Brady</u> violation it is abundantly apparent that such a violation occurred here:

**A.   Favorable to the Accused**

It would be difficult to conjure up a piece of evidence more favorable to an accused in a sexual assault case than a recantation of the alleged victim, particularly if made shortly thereafter in the absence of any information that any pressure or coercion was used to cause the recantation. Here, the suppressed recantation is both exculpatory and impeaching and was not available for counsel to use at the preliminary hearing;

**B.    Evidence Was Clearly Suppressed By The State, With Or Without Bad Faith**; and,

**C.    Prejudice Accrued To The Defendant**

Had counsel had the information of the recantation, this witness would have at least been impeached with that and, in all likelihood, without the coercion and duress placed upon her by someone on the State's side, would have testified truthfully, leaving the magistrate with the only sworn testimony being the recantation, not the initial accusation.    Under that scenario, the magistrate would not have had probable cause that a crime had been committed as even if the State impeached K.A. with her initial statement, not being sworn, it could not be used substantively, and would be insufficient to establish probable cause that a crime was committed. Omalza v. State, 1995 OK CR 80, 911 P.2d 286.

16.    This suppression or failure to disclose on a timely basis the recantation transcends the constitutionally guaranteed access to evidence:

> Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness. We have long interpreted this standard of fairness to require that criminal defendants be afforded a meaningful opportunity to present a complete defense. To safeguard that right, the Court has developed what might loosely be called the area of constitutionally guaranteed access to evidence. California v. Trombetta, 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984).

17.    Material evidence has been defined as:

> Four aspects of materiality under Bagley bear emphasis.    Although the constitutional duty is triggered by the potential impact of favorable but undisclosed evidence, a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant). . . .The second aspect of Bagley materiality bearing emphasis here is that it is not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. The possibility of an acquittal on a criminal charge

*does not imply an insufficient evidentiary basis to convict. One does not show a Brady violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. Third, we note that. . . .once a reviewing court applying Bagley has found constitutional error there is no need for further harmless-error review . . . .The fourth and final aspect of Bagley materiality to be stressed here is its definition in terms of suppressed evidence considered collectively, not item-by-item. Kyles v. Whitley, 514 U.S. 419, 434-36, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).*

18.   All that is needed is that the suppressed evidence create a reasonable probability which would undermine the outcome of the proceeding (here the preliminary hearing).  The Supreme Court has held in U.S. v. Robinson, 583 F.3d 1265, 1271 (10th Cir. 2009), that:

*The district court concluded that the CI's records did not contain information material to [the] defense. We cannot agree. '[E]vidence is material. . .if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome.' A defendant need not show that the withheld records would have 'resulted ultimately in [his] acquittal.' Rather, 'the touchstone is simply whether the ultimate verdict is one 'worthy of confidence.' This materiality test applies with equal force to both exculpatory and impeachment evidence. . .Because the CI was the only witness who testified about [the defendant]'s possession and because his testimony was essentially uncorroborated, the CI's credibility was of paramount concern. Given the importance of the CI's credibility, we cannot affirm the district court's conclusion that the medical records did not contain material information.*

19.   Good faith on the part of the State is neither an excuse nor a defense to failure to supply this evidence in a timely fashion.  The Tenth Circuit has established clearly that good faith or inadvertence is no defense:

*The potential impact of the undisclosed evidence should be weighed in light of the whole record. What might be considered insignificant evidence in a strong case might suffice to disturb an already questionable verdict. U.S. v. Robinson, 39 F.3d 1115, 1119 (10th Cir. 1994).*

*To establish a Brady violation, the defense must prove that the prosecution suppressed the evidence, the evidence would have been favorable to the accused, and the suppressed evidence was material. . . .However, with respect to the first element, we have held that negligent or inadvertent suppression of evidence is nevertheless suppression for Brady purposes. . . .Here the carpet was apparently misplaced inadvertently. Nevertheless, despite numerous requests for the carpet evidence and promises by the prosecution that it would be produced, it was not given to the defense until after it was rediscovered after trial. Thus, the first element of a Brady violation was established. Fero v. Kerby, 39 F.3d 1462, 1472 (10th Cir. 1994).*

20.  The State's obligation is governed by its umbrella position which makes it responsible for all other investigative agencies, including here the Department of Human Services. The Supreme Court has held:

*The definition of Bagley materiality in terms of the cumulative effect of suppression must accordingly be seen as leaving the government with a degree of discretion, it must also be understood as imposing a corresponding burden. On the one side, showing that the prosecution knew of an item of favorable evidence unknown to the defense does not amount to a Brady violation, without more. But the prosecution, which alone can know what is undisclosed, must be assigned to the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of reasonable probability is reached. This in turn means that the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police. Kyles v. Whitley, 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).*

21.  One accused of a felony offense in the State of Oklahoma has both a constitutional and statutory right to a preliminary hearing. Art. 2, § 17, provides:

***Indictment or information - Preliminary examination - Prosecutions in courts not of record***

*No person shall be prosecuted criminally in courts of record for felony or misdemeanor otherwise than by presentment or indictment or by information. No person shall be prosecuted for a felony by information without having had a preliminary examination before an examining magistrate, or having waived such preliminary examination. Prosecutions may be instituted in courts not of record upon a duly verified complaint.*

22.   22 O.S. § 258, provides in pertinent part:

*Preliminary Examinations and Proceedings Thereon*

. . .

*Sixth: A preliminary magistrate shall have the authority to limit the evidence presented at the preliminary hearing to that which is relevant to the issues of: (1) whether the crime was committed, and (2) whether there is probable cause to believe the defendant committed the crime. . . .*

23.   Credibility is always at issue in any proceeding including a preliminary hearing. Baker v. State, 2010 OK CR 19, 238 P.3d 10.

24.   The knowing suppression of a recantation by K.A., as called as a witness in the preliminary hearing, is akin to sponsoring perjured testimony.   Use of such testimony which is material to guilt is a violation of one's right to a fair and honest preliminary hearing which this defendant did not receive.   The Supreme Court has held such violations should not go unpunished:

*[This] Court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. . . .In those cases, the Court has applied a strict standard of materiality, not just because they involve prosecutorial misconduct, but more importantly because they involve a corruption of the truth-seeking function of the trial process.  U.S. v. Agurs, 427 U.S. 97, 103-04, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) (holding modified by, U.S. v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)).*

*[A] conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment. . . .The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.  Napue v. People of State of Ill., 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).*

## Lack of Ability to Confront Witnesses

25.    Failure to provide the exculpatory evidence for use at a preliminary hearing is a denial of the defendant's right to confront witnesses by meaningful cross-examination. Motivation, bias, and by implication, recantations, clearly fall within the constitutionally protected right to confront witnesses.  Our Circuit has held:

> *The Sixth Amendment right to confrontation includes the right to cross-examination. . . .The exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.* Jones v. Gibson, *206 F.3d 946, 956 (10th Cir. 2000).*

26.    Here, at the very least, had counsel been provided the recantation which the State had in its possession for three months, the testimony of K.A. would have been thoroughly impeached, and could very well have provided her with the opportunity to overcome her fears and testify to the truth.  Counsel refers this Court to K.A.'s sworn statement taken by counsel on July 24, 2013, in which she indicated "someone" prior to the preliminary hearing informed her that if she didn't testify consistent with her initial accusation, it would place her custody with her mother in jeopardy.  Her behavior at the preliminary hearing, hesitating before plunging in the final dagger for as much as 25 to 35 seconds is perfectly consistent with knowing she was not telling the truth but fearing to do otherwise because of the intimidation and coercion placed upon her by someone associated with the State of Oklahoma.  While counsel was not privy to any pre-preliminary hearing conferences, it is counsel's understanding it is common for the DHS worker as well as members of the family and the district attorney's office to visit with the witness, whether jointly or separately.  Counsel's experience with the Department of Human Services, particularly with the workers in this case, strongly support K.A.'s representations that she was in effect threatened to tell the story they wanted her to tell, not the truthful story she knew and wanted to tell.

10

27.   If in fact K.A. had been uncoerced and allowed to testify consistent with the representations she had made for many months, there is a great likelihood that the only sworn testimony that would have been presented at the preliminary hearing would have been her recantation.  Even though the State could have impeached her with her prior statements, as those statements were not sworn, they could be used solely for that—impeachment—not as substantive evidence.

**WHEREFORE**, counsel for defendant seeks an order of this Court dismissing this case and/or in the alternative remand for a preliminary hearing for the State's failure to disclose material exculpatory evidence in a timely fashion which denied this defendant due process of law, a meaningful preliminary hearing, and justifies dismissal or remanding of this case as the only remedy consistent with the violation.

ALLEN M. SMALLWOOD          OBA #8308
Attorney for Defendant
 ADAM CLAYTON ZILM
1310 South Denver Avenue
Tulsa, Oklahoma 74119-3041
(918) 582-1993          (918) 582-1991 Fax

**CERTIFICATE OF SERVICE**
        I hereby certify that on this _____ day of _____, 2013, a true and correct copy of the above and foregoing was delivered to Sarah McAmis, Assistant District Attorney, Tulsa County Courthouse, 500 South Denver Avenue, Tulsa, Oklahoma 74103.

ALLEN M. SMALLWOOD

311

# IN THE DISTRICT COURT OF TULSA COUNTY
## 2013 OCT STATE OF OKLAHOMA

STATE OF OKLAHOMA                    )
                                     )
                Plaintiff,           )
                                     )   Case No. CF-2012-3037     DISTRICT COURT
vs.                                  )   Judge CF C                **F I L E D**
                                     )
ADAM CLAYTON ZILM,                   )                            OCT   8 2013
                                     )
                Defendant.           )                            SALLY HOWE SMITH, COURT CLERK
                                                                  STATE OF OKLA. TULSA COUNTY

## ORDER

THIS MATTER comes on for decision on reconsideration of Defendant's Motion to Dismiss or In The Alternative, Remand For a Preliminary Hearing.

The state is represented by Assistant District Attorneys Sara McAmis and Travis Horton, the Defendant is present and represented by Allen M. Smallwood, and the minor child "K.A." appears not but is represented by her attorney, April Seibert.

The court has considered the authority submitted by the parties, heard the argument of counsel, reviewed the transcript of the August 19, 2013 *in camera, ex parte* hearing before the Honorable Judge Doris Fransein, and reviewed the exhibits and the audio recording of the conversation between the minor child and D.H.S. case worker.

The court FINDS:

1.    The defendant is entitled to a meaningful preliminary hearing as guaranteed by Art. 2, § 17, of the Oklahoma Constitution.

2.    That a preliminary hearing was conducted by the Honorable Judge David Youll on September 26, 2012. The defendant was bound over to the District Court for the felony offense of Sexual Abuse of a Child Under 12.

1

338



*CF-12-3037*

3. That prior to the preliminary hearing, on the day of the preliminary hearing, and following the preliminary hearing, an individual(s) (not employed by the District Attorney's Office), by misfeasance or malfeasance, exercised unreasonable influence on the minor child "K.A." to secure testimony to which she has since recanted repeatedly. The recantations occurred shortly after the initial reporting of the crime and continue to the present day.

That the unreasonable influence placed on the child by the persons identified to the court, and the false statements made to the child, which have been confirmed by the state, indicate that the child was improperly influenced in her direct testimony at the preliminary hearing.

5. That accordingly, the preliminary hearing is a nullity and the matter is remanded for a new preliminary hearing.

IT IS THEREFORE ORDERED that the matter be remanded for a new preliminary hearing to be held on November 6, 2013 at 9 o'clock a.m. in room 347 of the Tulsa County Courthouse.

IT IS FURTHER ORDERED that the jury trial setting for February 14, 2014 and the *Allen* Discovery Hearing set October 28, 2013, are stricken.

IT IS FURTHER ORDERED that the defendant shall remain released on his present bond.

IT IS SO ORDERED.

DATED _Oct 7, 2013_ .

KURT G. GLASSCO, District Judge

2

339

## Affidavit of Mailing

I, Sally Howe Smith, Court Clerk for Tulsa County, Oklahoma, hereby certify that on the _7th_ day of October, 2013, a true and correct copy of the forgoing Order was mailed to each attorney listed above, and a true and correct copy of the foregoing Order was filed in each of the foregoing cases.

SALLY HOWE SMITH, Court Clerk

By: _Margaret L. Reynolds_
Deputy

3

340

**IN THE DISTRICT COURT OF TULSA COUNTY**
**STATE OF OKLAHOMA**

2016 OCT 13 AM 9: 42        **ORDER**

OCT 1 3 2016

SALLY HOWE SMITH, COURT CLERK
STATE OF OKLA. TULSA COUNTY

NOW ON this ⧸ 2 day of October 2016, the following matters in the designated cases came on for trial, hearing and/or docket re-assignment or decision, pursuant to the Rules of the District Court of Tulsa County. The Clerk of the court is directed to notify counsel of record by mailing a copy of this Order to their last known address and to file a copy in each case.

**CF-2012-3037        State of Oklahoma vs. Adam Clayton Zilm**

Upon consideration of the State's request for the admission of child hearsay through witness Karen Landrum, the court has considered the proffered testimony, the authority of 12 O. S. §2803.1, the prior rulings of the court and opinion of the Court of Criminal Appeals, and the argument of counsel, FINDS:

1.    The time, content and surrounding of the taking of the statement, under the totality of the circumstances, does not have sufficient indicia of reliability so as to render it inherently trustworthy and therefore the State's request is DENIED.

2.    The request by the State, in the alternative, to admit the child's hearsay statements as an "excited utterance" under 12 O. S. § 2803, may be admissible at trial however, this determination is RESERVED until such time as it is offered during the State's case in chief. PROVIDED that the statement is offered by witness Sanford and not witness Landrum.

The State seeks to introduce a statement made by the defendant taken by officers with the Tulsa Police Department.

At the bifurcated *Jackson-Denno* hearing, the State presented the two (2) officers who initiated the interrogation at the home of the defendant's parents. The interrogation took place several hours after the alleged criminal event. The State offered the audio recording for the court to review.

The Court reviewed the officer's testimony. The defendant testified that his statement was not free and voluntary, was given in a custodial setting where he was not free to leave, and under duress.

3.    The court has considered the testimony, the authority submitted, argument of counsel, and reviewed the audio recording *en camera* in it's entirety, and determines that under the totality of the circumstances that the statement should not be suppressed and is ADMISSIBLE.

-1-

608

4. The statement was voluntary, without duress and not given in a custodial setting. The defendant was free to leave and in fact left the room during the interrogation only to return and invoke his right to legal counsel after a conversation with his father.

5. PROVIDED, that any statement of the defendant after he invokes his right to legal counsel is SUPPRESSED and should be redacted from the audio statement offered into evidence.

The court has allowed the State to endorse additional witnesses over the defendant's objection. The defendant is free to seek relief to exclude the proposed testimony at trial.

The Court has reviewed the file and docket sheet and determined that the following matters should be clarified. They are:

2/19/13      Motion for Discovery has previously been granted.

3/25/13      Supplemental Motion for Discovery has previously been granted.

8/14/13      Motion for Juror Questionnaire will be considered upon presentment at least ten (10) days prior to trial.

8/14/13      Motion in Limine has previously been ruled on. All Motions in Limine by either party may be re-urged at trial.

8/23/13      Motion to Introduce Res Gestae Evidence or Evidence of Other Crimes is GRANTED, in part.

8/23/13      Motion to Seal Court File is DENIED.

8/28/13      Motion for Reciprocal Discovery is GRANTED, PROVIDED that it does not expand existing State Discovery Code or *Allen vs. District Court of Washington County,* or their progeny.

8/30/13      State's Motion to Endorse Additional Witnesses is GRANTED.

9/3/13       State's Motion to reconsider is MOOT.

9/3/16       Additional discovery motions, See 3/25/13 and 8/28/13.

1/21/16      Motion to Confirm Prior Orders is MOOT.

-2-

609

*1035306912*

**ORIGINAL**

## IN THE DISTRICT COURT OF THE FOURTEENTH JUDICIAL DISTRICT OF THE STATE OF OKLAHOMA SITTING IN AND FOR TULSA COUNTY

STATE OF OKLAHOMA, )
)
　　　　　　　　Plaintiff, )
vs. ) Case No.  CF- 2012-3037
)
ADAM CLAYTON ZILM, )
)
　　　　　　　　Defendant. )

DISTRICT COURT
F I L E D

NOV 2 3 2016

SALLY HOWE SMITH, COURT CLERK
STATE OF OKLA. TULSA COUNTY

### VERDICT

### COUNT 1 – SEXUAL ABUSE – CHILD UNDER 12

We, the jury, empaneled and sworn in the above-entitled cause, do, upon our oaths, find as follows:

Defendant is:

_____ Guilty and fix punishment at _____

　　　　　and a fine in the amount of $ _____.

_____ Not Guilty.

_____
FOREPERSON

CR 10-14

674

INSTRUCTION NO. _19_

No person may be convicted of the sexual abuse of a child unless the State has proved beyond a reasonable doubt each element of the crime. These elements are:

First, a person willfully or maliciously engaged in;

Second, sexual abuse;

Third, with or to a child under the age of twelve.

In order to satisfy the second element above, the State must prove each element below beyond a reasonable doubt:

First, the defendant looked upon or touched or mauled or felt;

Second, the body or private parts;

Third, of a child;

Fourth, in any lewd or lascivious manner; and

Fifth, the defendant was at least three years older than the child.

CR 4-39
CR-4-129

INSTRUCTION NO. 20

<u>Child</u> - Any person under eighteen years of age.

<u>Malicious</u> - The term imports a wish to vex, annoy or injure another

person.

<u>Lewd –</u> Obscene, lustful, indecent, lascivious, lecherous.

<u>Lascivious</u> - Characterized by or expressing lust or lewdness.

<u>Willful</u> - Purposeful. "Willful" is a willingness to commit the act or omission

referred to, but does not require any intent to violate the law

or to acquire any advantage.

<u>Person Responsible for a Child's Health, Safety or Welfare</u> -

a person eighteen years of age or older with whom the

child's parent cohabitates or any other adult residing in the

home of the child.

CR 4-40D
CR 4-139

INSTRUCTION NO. _21_

If you find beyond a reasonable doubt that the defendant committed the crime of Sexual Abuse – Child under 12, you shall return a verdict of guilty by marking the Verdict Form appropriately.

If you have a reasonable doubt of the defendant's guilt of the charge or you find that the State has failed to prove each element beyond a reasonable doubt, you shall return a verdict of not guilty by marking the Verdict Form appropriately.

If you find the defendant guilty, you shall then determine the proper punishment. The crime of Sexual Abuse – Child under 12 is punishable by imprisonment in the State Penitentiary for a term of not less than twenty five (25) years nor more than life imprisonment, and by a fine of not less than Five Hundred Dollars ($500.00) nor more than Five Thousand Dollars ($5,000.00).

When you have decided on the proper punishment, you shall fill in the appropriate space on the Verdict Form and return the verdict to the Court.

CR 10-13