## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **ADAM CLAYTON ZILM,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| v. | ) | **Case No. 20-CV-0509-CVE-JFJ** |
| | ) | |
| **STEVEN HARPE,[1]** | ) | |
| | ) | |
| **Respondent.** | ) | |

### OPINION AND ORDER

Adam Clayton Zilm petitions for a writ of habeas corpus, under 28 U.S.C. § 2254, claiming that he is in state custody in violation of federal law under the judgment and sentence entered against him in Tulsa County District Court Case No. CF-2012-3037.  Zilm contends that the trial court's erroneous admission of evidence and the prosecutor's egregious misconduct deprived him of his Fourteenth Amendment right to due process and that his trial attorney's deficient performance resulted in prejudice and deprived him of his Sixth Amendment right to the effective assistance of trial counsel.  Having considered Zilm's petition and supporting brief (Dkt. ## 2, 11), respondent's response brief (Dkt. # 14), Zilm's reply brief (Dkt. # 16), the state-court record (Dkt. ## 14-1 through 14-14, 15, 17), and applicable law, the Court denies the petition.

### BACKGROUND

In the summer of 2012, when K.A. was eleven years old, she lived in Tulsa with her mother, three siblings, and Zilm.  Dkt. # 15-17, at 217-21; Dkt. # 15-18, at 158.[2]  Zilm, who was then thirty

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), the Court substitutes Steven Harpe, the current Director of the Oklahoma Department of Corrections ("ODOC"), in place of Scott Crow, the ODOC's former director, as party respondent.  The Clerk of Court shall note on the record this substitution.

[2] For consistency, the Court's citations refer to the CM/ECF pagination.

years old, was the boyfriend of K.A.'s mother.  Id. at 220-21; Dkt. # 17 (State's Ex. 1A).[3]  Zilm

worked in his mother's salon as a massage therapist.  Dkt. # 15-1, at 14.  K.A.'s mother worked

the overnight shift at a local children's shelter, leaving her children in Zilm's care.  Dkt. # 15-8, at

10-11.  K.A. and her siblings referred to Zilm as "Big Daddy."  Dkt. # 15-17, at 217-20.

On June 4, 2012, around 6:00 a.m., K.A. went across the street to the home of a neighbor,

Katherine Sanford, and knocked on the door.  Dkt. # 15-18, at 123-26.  When Sanford opened the

door, Sanford saw that it was raining, that K.A. had a towel over her head, and that K.A. was

crying and shaking.  Id. at 125-26.  K.A. told Sanford that Big Daddy "touched her."  Id. at 127.

K.A. told Sanford that Zilm "tried to put [his penis] in [K.A.'s] butt."  Id. at 133. Sanford called

K.A.'s mother, who was at work; Sanford's roommate, Karen Landrum, called the police.  Id. at

133-36.  A few hours later, K.A. told a sexual assault nurse, Kathy Bell, that Zilm "was giving her

a massage" and "that he put his penis into her butt hole."  Id. at 142, 160.  Bell observed "an area

of redness" on K.A.'s anus, and Bell noted that K.A. "complained of tenderness" in that area.  Id.

at 162-63.  Later that same morning, K.A. told a forensic interviewer, Amy Howard, that Zilm

"touched [her] inappropriately during a massage," that he put oil on her vagina and anus, that he

put his penis in her butt, and that she "ran out of the bedroom" and "ran out of the house to the

neighbors."  Dkt. # 15-10, at 11, 17-21; Dkt. # 15-17, at 250-57.[4]

---

[3] State's Exhibit 1A is the unredacted audio recording of Zilm's statements to law enforcement officers.  Dkt. # 15-18, at 199-208.  The redacted version, State's Exhibit 1, was played for the jury.  Id.  Due to a technical issue, this Court has listened only to the unredacted version.

[4] Before trial, the trial court determined that K.A.'s videotaped forensic interview with Howard was inadmissible.  Dkt. # 15-11, at 16-23.  But, as further discussed below, the trial court permitted the prosecutor to impeach K.A. at trial with statements she made to Howard during the interview.

After K.A.'s forensic interview, Detective Mark Hodges and Corporal Greg Smith interviewed Zilm at the home of Zilm's parents.  Dkt. # 15-8, at 49; Dkt. # 17 (State's Ex. 1A). During the audiotaped interview, Zilm admitted that he used oil and his hands to massage K.A. while the two were alone in his bedroom around 5:00 or 5:30 a.m., while K.A. was wearing only a t-shirt and socks, and while Zilm was wearing only boxers.  Dkt. # 15-8, at 55-62; Dkt. # 14, at 4-5.  Zilm told the detectives that when he massaged K.A.'s "glutes" his hands and thumbs "would get close to [K.A.'] anus and would be in the crack of her buttocks" and that he "worked," or massaged, her adductors—which Zilm described as muscles surrounding K.A.'s labia majora— for about five minutes.  Id. at 59; Dkt. # 14, at 5.  Zilm denied touching K.A. with his penis, but he offered two explanations for why K.A. might have made that allegation.  Dkt. # 15-8, at 59-60. First, Zilm stated that when he was lying on the bed behind K.A. and putting pressure on her adductors and tailbone, the pressure might have caused K.A. to feel like something was in her vagina or anus.  Id. at 60, 62.  Second, Zilm stated that while he was rubbing K.A.'s buttocks, his hand slipped due to the oil and he accidentally jabbed K.A.'s anus with his thumb.  Id. at 60, 62; Dkt. # 14, at 5.  Near the end of the interview, the detectives asked Zilm whether any of his DNA would be found on K.A and whether he would provide a DNA sample.  Dkt. # 14, at 5-7.  At that point, Zilm remembered that as he laid down on the bed next to K.A., he "squished [his] balls," got "pre-cum" on his hand when he reached into his boxers to adjust his genitals, and that he wiped his hand on his leg before he continued massaging K.A.  Dkt. # 14, at 5-6; Dkt. # 15-8, at 64.

In July 2012, the State of Oklahoma ("the state") charged Zilm with one count of sexual abuse of a child under the age of twelve, in violation of OKLA. STAT. tit. 21, § 843.5(F), alleging that Zilm "willfully or maliciously touch[ed] and rubb[ed] the buttocks of K.A., a female child under the age of 12 . . . during which time [Zilm] was involved in a relationship with K.A.'s mother

and was a person responsible for the care of K.A." Dkt. # 15-23, at 33.[5]  Zilm's criminal case proceeded to a jury trial in November 2016.  However, to provide sufficient context for Zilm's habeas claims, it is necessary to discuss several pretrial proceedings.

## I.     First preliminary hearing

Zilm's first preliminary hearing was held on September 26, 2012.  Dkt. # 15-1, at 1.  K.A.—who was then eleven years old—described Zilm as her mother's boyfriend and testified that Zilm worked as "a massage therapist at his mom's shop."  Id. at 14.  K.A. testified that Zilm gave her massages on more than one occasion and that he gave them to her "[s]ometimes in the living room, and [her] bedroom, and his bedroom."  Id. at 14, 34-35.  The last massage that K.A. recalled occurred on June 4, 2012, in Zilm's bedroom, while K.A.'s mother was at work, and after K.A.'s siblings went to bed.  Id. at 15, 35-38.  K.A. testified that she and Zilm were alone in his bedroom, that Zilm was wearing his "[u]nderwear," that she was fully clothed, and that she used oil and her hands to massage Zilm's "back and his butt."  Id. at 15-16, 40.  K.A. first testified that she massaged Zilm's butt "[u]nderneath" his underwear, but later testified that Zilm "move[d] the back of his underwear down a little bit" and that she did not put her hands underneath his underwear.  Id. at 17-18.  After K.A. finished massaging Zilm, he "asked [her] if [she] wanted a massage" and she "said sure."  Id. at 18, 41.  K.A. testified that she then "took off [her] shirt and [her] pants and [her] panties."  Id.  She recalled that she was lying on her stomach on the bed, but she did not recall if she had any covers on.  Id. at 19.  K.A. testified that Zilm used oil and his hands to massage her

---

[5] The state initiated a separate proceeding in juvenile court regarding the custody of K.A. and her siblings, all of whom were removed from the home following K.A.'s disclosure of sexual abuse and the filing of the criminal charge against Zilm.  Dkt. # 15-8, at 14-22; Dkt. # 15-24, at 105-06, 129, 139.

"back and [her] glutes, which is [her] butt."  Id. at 19-20, 43.  The next thing that K.A. could remember is that she was lying on her side and that Zilm was lying behind her.  Id. at 20-21, 43.  When the prosecutor asked K.A. if Zilm "use[d] any other part of his body to touch [K.A.]," K.A. testified "I don't know."  Id. at 22.  The prosecutor then asked K.A. a series of questions about identifying body parts and asked K.A. whether Zilm "ever touch[ed her] with any other part of his body besides his hands."  Id. 22-24.  After a noticeable delay, K.A. testified that Zilm touched her with his "penis."[6]  Id. at 24.  K.A. further testified that Zilm put his penis in her "butt hole" while she was lying on her side.  Id. at 24-26.  K.A. testified that Zilm stopped and "moved back" away from her after she "pretended [she] was waking up" and she rolled back onto her stomach.  Id. at 26-27.  K.A. then told Zilm that she "wanted to go to bed," picked up her clothes from the floor, "went to the bathroom and got dressed," and went to her room.  Id. at 27-28, 52-54.  K.A. testified that "once the lights were all turned off, [she] went to the couch and waited" for her mother to come home from work.  Id. at 27-28, 52-54.  After waiting for a few minutes, K.A. went outside in the rain and waited next to a dumpster before going to the neighbor's house across the street.  Id. at 28-29, 55.  K.A. testified that she told the neighbor that Zilm was giving her a massage and that "he stuck his penis in [her] butt hole."  Id. at 29, 55-56.  She recalled that her mother and the police arrived at the neighbor's house shortly thereafter.  Id. at 29, 56-57.  K.A. testified that her

---

[6] The special district judge who presided over the preliminary hearing stated:

> I will note that I have been given an opportunity to view [K.A.'s] character and demeanor as she's testified, that every time they get close to that question [of whether Zilm touched K.A. with any body part other than his hands] she became even more silent and more withdrawn.  So I will note that it was after the second question about that particular topic that it took a minimum of twenty-five to thirty-five seconds, if not longer, for [K.A.] to respond.

Dkt. # 15-1, at 24.

mother was talking with Zilm on the phone a few days later, that her mother asked if K.A. wanted to speak with Zilm, that K.A. said yes, and that Zilm told K.A. that "it could have been his thumb." Id. at 29-30, 57-58.  On cross-examination, K.A. testified that Zilm's thumbs were "real close to [her] bottom" and "private parts" during the massage and testified that she did not see whether it was his penis or his thumb that she felt "enter" her "butt."  Id. at 44-45, 51.  K.A. also testified on cross-examination that the pressure she felt on her "bottom" was "kind of" "painful."  Id. at 50. The following colloquy then occurred between defense counsel and K.A.:

> Q.    Okay.  Did it cause you to have any kind of what's called flash backs of that prior incident with a family member who hurt you years before?
>
> A.    Yes, sir.
>
> Q.    Okay.  And those things were going through your mind, the prior awful experience you had were going through your mind when you felt that, weren't they?
>
> A.    Yes, sir.
>
> Q.    Okay.  And do you think, K.A., that might have influenced what you believed happened here, or what you might have felt happened here?
>
> A.    No.

Id. at 50-51.  K.A. also testified on cross-examination that she has trouble with telling the truth. Id. at 60-61.  On redirect examination, K.A. testified that her testimony about what happened during the last massage that Zilm gave her was the truth.  Id. at 61.  After hearing K.A.'s testimony, the special district judge presiding over the preliminary hearing found probable cause to bind Zilm over for trial.  Id. at 63.

## II.    Motion to remand

Over one year later, on Zilm's motion, the trial court remanded the case for a second preliminary hearing.  Highly summarized, Zilm alleged in the motion that K.A. had recanted to her mother within days of disclosing the sexual abuse; that at least two employees of the Oklahoma

Department of Human Services ("DHS")—Lori Hannagan and Lauren Hall—both of whom were involved in the juvenile proceeding that was initiated after K.A. disclosed the sexual abuse, knew as early as June 15, 2012, that K.A. had recanted; that the prosecutor knew or should have known before the first preliminary hearing that K.A. had recanted but the prosecutor did not timely disclose that information to Zilm; and that Zilm's counsel did not learn until July or September 2013 that K.A. had recanted.  Dkt. # 15-24, at 104-14; Dkt. # 15-5, at 4-12.

The trial court held three hearings on Zilm's motion, heard oral arguments on Zilm's motion, reviewed a transcript from a hearing in the juvenile proceeding, heard testimony from K.A., and reviewed exhibits related to, and an audio recording of, a conversation between K.A. and Hall.[7]  Dkt. ## 15-5, 15-6, 15-7.  During the second motion hearing, K.A.'s attorney, April Seibert, informed the trial court:  (1) that K.A. told Seibert that she was "feel[ing] that pressure is coming from DHS regarding wanting [K.A.] to tell the first story that she told police," (2) that K.A. told Seibert that the "first story [K.A. told] is not the truth and [K.A.] want[s] to tell the truth which is what [K.A.] tried to tell" the DHS worker, (3) that K.A. told Seibert that she did "not even really recall talking to or preparing with the District Attorney," and (4) that K.A. told the judge presiding over the juvenile proceeding, during a private conference with that judge, that K.A. felt pressure from "the ladies at juvenile DHS" to maintain her first story even though that story was not the truth.  Dkt. # 15-6, at 21-25, 32.  On October 7, 2013, the trial court concluded that

---

[7] As described at the second motion hearing, the audio recording of the August 16, 2013, conversation between K.A. and Hall, which K.A. recorded without Hall's knowledge, captured Hall telling K.A., three days before a hearing in the juvenile proceeding, that nobody believed K.A.'s recantation and that everyone believed her first story because there was DNA evidence to support the first story.  Dkt. # 15-6, at 4-5.  Evidence presented at trial demonstrated that Zilm's DNA was not found on any swabs of K.A.'s body that were obtained during K.A.'s sexual assault examination.  Dkt. # 14, at 7 n.6.

Zilm had been denied his state constitutional right to a meaningful preliminary hearing. In reaching that conclusion, the trial court found, in relevant part:

> Three. That prior to the preliminary hearing [on September 26, 2012], on the day of the preliminary hearing, and following the preliminary hearing, individuals not employed by the District Attorney's Office, by misfeasance or malfeasance, exercised unreasonable influence on the minor child K.A. to secure testimony to which she has since recanted repeatedly. The recantations occurred shortly after the initial reporting of the crime and continue to the present day.

> Four. That the unreasonable influence placed on the child by the persons identified to the Court and the false statements made to the child which have been confirmed by the State indicate that the child was improperly influenced in her direct testimony at the preliminary hearing.

> Five. That, accordingly, the preliminary hearing was a nullity and the matter is remanded for a new preliminary hearing.

Dkt. # 15-7, at 2-3.

## III. Second preliminary hearing

Zilm's second preliminary hearing was held on November 6, 2013. Dkt. # 15-8, at 1. The State presented three witnesses—K.A.'s mother, Lauren Hall, and Detective Mark Hodges. K.A. was present for the hearing but did not testify. Id. at 3, 5.

K.A.'s mother testified that in June 2012, she was dating Zilm, he lived with her and her four children, she worked overnights at the Laura Dester Children's Center, and Zilm—who was thirty years old—cared for the children while she worked. Id. at 10-11. K.A.'s mother testified that she received a phone call on June 4, 2012, while she was at work and law enforcement officers later "responded to the neighbor's home" but K.A.'s mother did not remember talking to the officers. Id. at 11-12.

Lauren Hall testified that in June 2012 she worked for DHS and that she became involved in K.A.'s juvenile case in July 2012 when K.A. and her siblings were placed in DHS custody. Id. at 15-16. Hall testified that the initial investigation was conducted by Lori Hannagan. Id. at 16.

Hall testified that she spoke with K.A. before Zilm's first preliminary hearing, in September 2012, but Hall denied that she either told K.A. how to testify or told K.A. that her testimony could influence whether she would be returned to her mother's custody.  Id. at 17-20.  Hall further testified that she met with K.A. at K.A.'s home on August 16, 2013, a few days before a court hearing in the juvenile proceeding, that she told K.A. that there was DNA evidence to support K.A.'s initial disclosure of sexual abuse, and that when she made the statement to K.A. about DNA evidence Hall believed that information was accurate.  Id. at 21-24.  On cross-examination, Hall clarified that she did not know whether there was DNA evidence and testified that she thought that there was "[m]edical evidence" from the sexual assault examiner's report to corroborate K.A.'s initial disclosure.  Id. at 33-35.

Detective Hodges testified that he and Corporal Greg Smith interviewed Zilm at Zilm's parents' house on the morning of June 4, 2012, a few hours after K.A. disclosed the sexual abuse.  Id. at 49.  Hodges testified that the entirety of the interview was audiotaped, and that Zilm was not under arrest when he was interviewed.  Id. at 52-53, 63.  Hodges testified that Zilm denied touching K.A. with his penis but that Zilm admitted that he used his hands to massage K.A.'s buttocks, tailbone area, and "the area that runs down next to the labia majora," and that Zilm admitted that he accidentally "jammed" K.A.'s anus with his thumb.  Id. at 54-64.

At the conclusion of the second preliminary hearing, the special district judge found probable cause to bind Zilm over for trial.

## IV.     Reliability hearings and state's appeal

On September 9, 2014, the trial court held a reliability hearing, pursuant to OKLA. STAT. tit. 12, § 2803.1, to assess the admissibility of K.A.'s out-of-court statements to Sanford and

Howard.[8]  Dkt. # 15-10, at 1, 9.  Howard testified that she interviewed K.A. on June 4, 2012, and

that K.A. disclosed that Zilm, "or Big Daddy as she called him," "touched her inappropriately

during a massage."  Id. at 11, 17, 20-21.  Howard testified that K.A. disclosed specific details about

the touching, that she made consistent statements throughout the interview, and that K.A. appeared

withdrawn and quiet during the interview but she was able to communicate with Howard in a

manner appropriate for K.A.'s age.  Id. at 19-24, 52-53.  The state introduced a videotape of K.A.'s

forensic interview as evidence for purposes of the hearing.  Id. at 25.

Sanford testified that she lived across the street from K.A., and that she was in the shower

when someone knocked on her door about 6:00 a.m. on June 4, 2012.  Id. at 55-57.  When Sanford

answered the door, she saw K.A. standing there with a towel on her head.  Id. at 57.  Sanford

testified that K.A. was "soaking wet," "crying," and "shaking," and that K.A. appeared to be "very

upset."  Id.  Sanford asked K.A. "what happened," or "what's wrong," and K.A. told Sanford that

"Big Daddy touched [her]."  Id. at 58, 73-74.  Sanford left K.A. with her roommate, Karen

Landrum, and went to the living room to call K.A.'s mother.  Id. at 59-60.  K.A.'s mother arrived

within ten minutes, and, at some point, someone called the police.  Id. at 61-62, 75-76.  Sanford

spoke with the responding officer and, sometime thereafter, Sanford transported K.A. and K.A.'s

mother to the hospital for K.A.'s sexual assault examination.  Id. at 62-63, 84-85.  Sanford later

transported K.A. and K.A.'s mother to the Justice Center for K.A.'s forensic interview.  Id. at 63,

---

[8] Section 2803.1 provides for the admission of hearsay statements by a child under thirteen
years old that describe "any act of sexual contact performed with or on the child."  OKLA. STAT.
tit. 12, § 2803.1(A).  "Th[is] provision requires an in camera hearing for the trial court to determine
that the time, content and totality of circumstances surrounding the taking of the statement provide
sufficient indicia of reliability so as to render it inherently trustworthy."  Folks v. State, 207 P.3d
379, 382 (Okla. Crim. App. 2009).  "'In determining such trustworthiness, the court may consider,
among other things . . . the spontaneity and consistent repetition of the statement.'"  Id. (quoting
OKLA. STAT. tit. 12, § 2803.1(A)(1)).

85.  On further questioning about the details of K.A.'s disclosure, Sanford testified that K.A. told her that "she had pretended she was sleeping, and Big Daddy came in her room, and she opened her eyes, and closed them and said that she saw his [penis]." Id. at 65.  Sanford further testified that K.A. told her that Zilm "was trying to put [his penis] in her butt." Id.  On cross-examination, Sanford testified that she is employed by DHS and works at the Laura Dester Children's Shelter. Id. at 68.  Sanford clarified that when K.A. came in the front door, she told Sanford that Zilm "touched her," that Sanford said, "okay, like what," and K.A. then said, "he tried to put his penis in my butt." Id. at 80.  She further testified that K.A. said she saw Zilm "pull his underwear down." Id. at 81-82.  After demonstrating some difficulty in answering questions, Sanford testified that she has a disease that significantly affects her short-term and long-term memory. Id. at 87-94.

Zilm called K.A. as a witness at the reliability hearing. Id. at 99.  K.A.—who was then thirteen years old—testified that "nothing happened" with Zilm, that she never talked to the police, and that she told her neighbor only that she "had a nightmare." Id. at 119-22.  Then, the following colloquy occurred:

> THE COURT:  Okay.  Did you ever tell anyone that this was all a nightmare before today?
>
> [K.A.]:  Yes, I told [Zilm's attorney] and [K.A.'s attorney].
>
> THE COURT:  Okay.  Did you ever tell someone either with the police, or at Laura Dester, or the Department of Human Services, that these things didn't happen?
>
> [K.A.]:  What do you mean?
>
> THE COURT:  Well, I've been told that you said that Big Daddy touched you inappropriately.  Are you aware of that?
>
> [K.A.]:  Yes, sir.
>
> THE COURT:  Did you ever tell anybody that that did not happen?
>
> [K.A.]:  I have tried.

11

THE COURT:  Okay.  And when did you try to tell them that?

THE WITNESS:  When I was talking to [the prosecutor].

THE COURT:  Okay.  This [prosecutor]?

[K.A.]:  Yes, sir.

THE COURT:  You tried to tell [the prosecutor] that?  Is that a yes?

[K.A.]:  Yes, sir.

THE COURT:  Okay.  Before that, did you try to tell anybody?  Anybody that maybe worked for DHS or anyone else?

[K.A.]:  I remember me saying that it didn't happen, and I think Lori – Lori Hannagan – knew I said that nothing happened.  But we got tooken [sic] away because I said nothing happened.

THE COURT:  Did anybody ever, you know, threaten you that you had to say that it did happen?

[K.A.]:  What kind of threat do you mean?

THE COURT:  Well, why don't you tell me what you would think would be a threat.  Did anybody ever tell you to say it didn't happen and you thought it was a threat?

[K.A.]:  Like, if like someone says, if you say this, you can go back, or something, would that be a threat?

THE COURT:  Well, did you think that?

[K.A.]:  Yeah.

THE COURT:  Okay.  Then tell me what that was?

[K.A.]:  It was, like, Lori Hannagan said this – like, when I was talking to her, she said if you say that – if you tell someone that your mom told – say that your mom, or something, told you to say none of it happened.

I told my uncle that because Lori Hannagan told me to say – and, yeah, that.

THE COURT:  Okay.  So I want to make sure I understand what you just told me.  Okay?  Are you saying that this person told you you had to say that Big Daddy did something to you, or you wouldn't get to live with your mother?

[K.A.]:  That – that's another one.

THE COURT:  Oh, there's another one?

[K.A.]:  (Witness nods head.)

THE COURT:  Okay.  Tell me about that one.

[K.A.]:  That's when I was talking to [the prosecutor], and she said say what you said in the beginning, and you can go back to your mom.

THE COURT:  This [prosecutor]?

[K.A.]:  Yes, sir.

THE COURT:  Are you with your mom now?

[K.A.]:  Yes, sir.

Dkt. # 15-10, at 122-24.  K.A. further testified that she remembered "seeing [Lori Hannagan] at the place that night – not night – day that [K.A.] went to talk to someone."  Id. at 126-27.  K.A. also testified that she talked to Hannagan at the Laura Dester Children's Shelter, and that Hannagan "started talking to [her] and saying, like, tell us – you can tell someone that your mom told you to say, no, that nothing happened.  And, like, you can, like, go home and stuff."  Id. at 127.  K.A. also testified that she recorded a conversation she had with Lauren Hall because Hall was "really rude" and K.A. did not trust her.  Id. at 128.  When asked if she tried to tell Hall that the sexual abuse allegation "was a mistake," K.A. testified, "I think I have told her, yes."  Id. at 129.  K.A. then testified that she told five people—Zilm's attorney, K.A.'s attorney, Hannagan, Hall, and the prosecutor—that her allegation against Zilm "was a mistake."  Id.  When asked to explain how the allegation was a mistake, K.A. testified:

Because that night I had a nightmare.  And I went over to Katherine and Karen's and I told them that I had a nightmare.  And they told me to lay down.  And they left out of the room.  And then, like, a little bit later, they came back and said that they were calling my mom.

And my mom tried to talk to me about it, but they wouldn't let her.  And they got to talk to the police.  I tried to go with her to go over to the house to pack some clothes because we were gonna stay at Katherine and Karen's for a while, and they wouldn't let me go.  They told me to go lay down.

> And they told me what to say to the person at the place – the lady that I talked to in a room.

Id. at 129-30.  On further questioning by the trial court, K.A. clarified that Sanford told K.A. what to say to Howard during the forensic interview.  Id. at 130.  K.A. also testified that she recanted to her mother the first night after she and her mother were not at Sanford's house.  Id. at 130-32. K.A. testified that she called Zilm while her mother was sleeping and apologized to him.  Id. at 132.  After K.A. was excused, the prosecutor stated for the record and as an officer of the court, that she never spoke with K.A. without another person present, and that she never told K.A. to "testify a particular way" and never told K.A. that she needed to testify a certain way to either go home or not go home.  Id. at 136-37.

Three days later, the trial court heard oral arguments regarding the admissibility of K.A.'s out-of-court statements to Howard and Sanford. Dkt. # 15-11.  In addition to the parties' arguments, the trial court reviewed the videotaped forensic interviews of K.A. and her sister, P.A., and a transcript of K.A.'s forensic interview.  Id. at 17-18.  The trial court ruled that K.A.'s out-of-court statements to Howard during the forensic interview and K.A.'s statements to Sanford were not admissible under OKLA. STAT. tit. 12, § 2803.1 and that they would be suppressed.  Id. at 17-19.  The state immediately announced its intent to appeal that ruling.  Id. at 18-19.

The state perfected an interlocutory appeal, and the Oklahoma Court of Criminal Appeals ("OCCA") affirmed the trial court's suppression of K.A.'s out-of-court statements to Howard and Sanford. Dkt. # 14-4.  One judge dissented and noted that K.A.'s first statement to Sanford might be admissible under a different exception to the hearsay rule.  Id. at 7.

**V.      Other relevant pretrial proceedings**

The trial court held hearings on February 25, 2016, and September 28, 2016, to consider the admissibility of Zilm's statement to Detective Hodges and Corporal Smith and the admissibility of K.A.'s out-of-court statements to Sanford's roommate, Karen Landrum. Dkt. ## 15-12, 15-13. After hearing testimony from Hodges, Smith, and Zilm, the trial court determined that Zilm's statement was admissible. Dkt. # 15-26, at 16. The trial court specifically determined that Zilm's statement was "voluntary, without duress and not given in a custodial setting," that Zilm "was free to leave and in fact left the room during the interrogation only to return and invoke his right to legal counsel after a conversation with his father." Id. at 17. The trial court clarified that any statements Zilm made after he invoked his right to counsel were suppressed and should be redacted from the audiotaped interview. Id. After hearing testimony from Landrum, the trial court determined that K.A.'s out-of-court statements to Landrum were not admissible under OKLA. STAT. tit. 12, § 2803.1. Id. at 16.

On November 7, 2016, the trial court heard arguments regarding Zilm's motion to bar the state from using K.A.'s testimony from the first preliminary hearing and other prior inconsistent statements to impeach K.A.'s testimony at trial. Dkt. # 15-14. Two days later, the trial court clarified that it erred when it previously described the first preliminary hearing as "a nullity," and the trial court ruled that the state would be permitted to impeach K.A. at trial with prior inconsistent statements that K.A. made at the first preliminary hearing. Dkt. # 15-15, at 2-8. The trial court further ruled that the state could not publish at trial K.A.'s videotaped forensic interview with Howard, but the state could, through proper procedures and without referencing the videotape, impeach K.A. at trial with prior inconsistent statements that she made to Howard during the interview. Id.

## VI.    Jury trial

Zilm's jury trial began on November 14, 2016.  Dkt. # 11, at 10-11; Dkt. # 15-16, at 1.  To establish Zilm's guilt, the state had to prove, beyond a reasonable doubt, that Zilm (1) willfully or maliciously engaged in (2) sexual abuse (3) with K.A. while she was under the age of twelve.  Dkt. # 15-26, at 102.  As to the element of "sexual abuse," the state had to prove, beyond a reasonable doubt, that Zilm (1) "looked upon or touched or mauled or felt" (2) the body or private parts (3) of K.A. (4) in any lewd or lascivious manner and (5) that Zilm was at least three years older than K.A.  Id.

At trial, K.A.—who was then fifteen years old—identified Zilm as her "dad" and "best friend" and testified that she and her siblings referred to him as "Big Daddy."  Dkt. # 15-17, at 217-20.  K.A. testified that Zilm and K.A.'s mother continued to make plans for a wedding during the school year before Zilm's trial, when K.A., K.A.'s mother, and K.A.'s siblings lived in Arkansas, and that after she and her family moved back to Tulsa, K.A.'s mother began working in a salon owned by Zilm's mother.  Id. at 223-30.  K.A. testified that on the morning of June 4, 2012, she went outside, waited by a dumpster, went to her neighbor's house, and told her neighbor and her neighbor's roommate "that [she] had a dream, like a nightmare."  Id. at 230-31.  K.A. testified that before that morning, Zilm had given her massages more than one time while she was wearing clothing.  Id. at 231.  K.A. testified that she remembered the preliminary hearing, and, when the prosecutor asked K.A. if she told the truth at the preliminary hearing, K.A. said, "No."  Id. at 232.  Over Zilm's objection, the trial court permitted the prosecutor to impeach K.A.'s trial testimony by presenting K.A.'s testimony from Zilm's first preliminary hearing that was inconsistent with her trial testimony.  Id. at 233-35.  The trial court gave a contemporaneous limiting instruction informing the jury that the jury "could not consider the impeachment evidence as proof of

innocence or guilt" but could consider the impeachment evidence "in determining what weight and credit to give the testimony of the witness." Id. at 232-36.  K.A. testified that, on June 4, 2012, her mother was at work and Zilm gave her a massage, maybe between four or five in the morning, while K.A. and Zilm were alone in Zilm's bedroom. Id. at 240-41.  According to K.A., Zilm was wearing "pajama pants" or "boxers." Id. at 242.  K.A. testified that she put oil on her hands and massaged Zilm's "butt" or "glutes" while he was lying on the bed on his stomach. Id. at 245-47. K.A. testified that Zilm did not ask her if she wanted a massage, but she admitted that she testified at the preliminary hearing that he did ask her if she wanted a massage. Id. at 247-48.  K.A. testified that Zilm left the bedroom so that she could undress, that she took off her shirt and pants but not her underwear, and that she would "lay down with covers on [her] so [Zilm] would massage [her] back and [her] glutes." Id. at 248.  K.A. testified that she remembered previously testifying that she had also taken off her underwear for the massage. Id. at 249.  According to K.A., Zilm oiled his hands and massaged her glutes, the oil was slippery, and Zilm's "thumb accidentally jabbed [her]." Id. at 249-50.  K.A. testified that Zilm did not put oil on her vagina or butt, but also testified that she had told Howard during the forensic interview that he did and that she had described to Howard how it felt when Zilm put oil on her vagina and butt. Id. at 250.  K.A. testified that her neighbors told her what to say during her forensic interview and that DHS workers and the prosecutor told her to repeat her initial disclosures which, according to K.A., were not true. Id. at 251, 280-86.  On cross-examination, K.A. testified, again, that Zilm was her dad and best friend, and that he never did and never would touch her inappropriately. Dkt. # 15-18, at 9-37.  K.A. testified that she asked Zilm to give her a massage early in the morning on June 4, 2012, after her siblings went to sleep. Id. at 23, 26.  K.A. testified that she fell asleep during the massage, that she had a dream about sexual abuse committed against her by an uncle when she was five years

old, that she "felt like a jab" near her "rear end" during the dream, that she woke up confused, and that she went to the neighbor's house.  Id. at 28-31.  K.A. also testified that she called Zilm one or two days after the massage to apologize and to say that she "made a mistake."  Id. at 33-34.  K.A. testified that she lied during Zilm's first preliminary hearing because she "was saying what everyone - - not everyone, but, like, what the people wanted [her] to say," and that no one she spoke with at DHS would believe her when she tried to tell the truth.  Id. at 34-36, 48-49.

The jury also heard testimony from Rose Turner, the managing director of the Child Abuse Network, who testified about Child Sexual Abuse Accommodation Syndrome and the reasons why a child may recant after disclosing sexual abuse.  Dkt. # 15-18, at 51-74, 82-109, 118-20.  Sanford, K.A.'s neighbor, and Bell, the sexual assault nurse, testified about their observations of K.A. on June 4, 2012, and about the disclosures K.A. made to each of them that morning that alleged Zilm put his penis in her butt.  Id. at 121-36, 142-65.[9]  Sanford and Bell both testified that K.A. made no statements to them about having a nightmare or about an uncle who previously abused her.  Id. at 137-38, 165.  Sanford testified that she did not, at any point in time, tell K.A. what to say about Zilm's actions.  Id. at 137.  Zilm did not testify at trial, but the jury heard the audiotaped recording of the statement he made to Detective Hodges and Corporal Smith.  Id. at 199-208.

After the state rested, Zilm announced to the trial court that he anticipated calling three witnesses, K.A., her sister, P.A., and Jon Wilson, a DNA analyst.  Id. at 216.  As a defense witness, K.A. testified that she recorded her conversation with Lauren Hall, a DHS worker, because she did

---

[9] The trial court admitted K.A.'s out-of-court statements to Sanford under the excited-utterance exception in OKLA. STAT. tit. 12, § 2803(2).  Dkt. # 15-18, at 129.  The trial court admitted K.A.'s out-of-court statements to Bell under § 2803(4)'s exception to the hearsay rule for "statements made for medical diagnosis, treatment, and describing medical history."  Id. at 159-60.

not trust Hall and because Hall did not believe her when she told Hall that Zilm did not sexually abuse K.A.  Dkt. # 15-19, at 17-21.  The recorded conversation between Hall and K.A. was played for the jury, over the state's objection.  Id. at 22; Dkt. 17 (Def. Ex. 1).

Immediately after Zilm's attorney called P.A. as a witness, a bench conference was held regarding whether P.A., a minor, should be allowed to testify without a parent present.  Dkt. # 15-19, at 24-41.  During the conference, the prosecutor stated, in part,

> Your Honor was concerned enough about K.A.'s best interest . . . that you appointed an attorney for her.  But now we're going to proceed with her sibling being put on the stand to testify under direct, under cross-examination, with all due respect, to potentially subject herself to some type of perjurious statement.  And the yet we're just - -
>
> Counsel can laugh at that, but we have prior recorded statements by her that if she is today going to say something completely different, it's not just enough for counsel to sit and laugh at that.  We have to understand . . .
>
> If this were any other case, or any other attorney, or any other circumstance, I don't even think we'd be having this discussion.  It is not proper for this witness to testify as a minor without a parent present.

Id. at 36-37.  After hearing arguments from both parties, the trial court ruled that he would allow P.A. to testify if the family friend who transported her to the courthouse would remain in the courtroom.  Id. at 41.  Defense counsel then stated, "Your Honor, based upon the statements made by the State of Oklahoma, which clearly are not even veiled threats of perjury charges being filed against this child, I'm gonna withdraw her, under that duress, I'm gonna withdraw her as a witness."  Id.  The trial court noted that "whether it was a veiled threat is in the ears of the hearer," and stated that defense counsel should "use [his] best decision on going forward on how you wish to proceed in your case."  Id.  The trial court ordered a brief recess, defense counsel conferred with P.A., and defense counsel informed the trial court that he would "decline to call [P.A.] based upon the representations that were made to [him] on the record."  Id. at 41-42.  Jon Wilson then testified

that Zilm's DNA was not found on any swabs obtained from K.A.'s sexual assault examination kit.  Id. at 44, 48-51.

Ultimately, the jury found Zilm guilty as charged and recommended a thirty-six-year prison sentence, and the trial court sentenced him accordingly.  Dkt. # 14-12, at 30; Dkt. # 15-20, at 64; Dkt. # 15-22, at 33.

## VII.    Direct appeal

Zilm filed a direct appeal in the OCCA raising six claims.  First, he claimed "that four state actors, including the prosecutor Sarah McAmis, coerced [K.A.] into testifying falsely at the first preliminary examination; and thereafter pressured her to lie about the veracity of her recantation." Dkt. # 14-5, at 30.  Zilm asserted this conduct violated his Fourteenth Amendment right to due process, as interpreted in Napue v. Illinois, 360 U.S. 264 (1959), because the prosecutor knew that K.A. had recanted but did not disclose the recantation to Zilm, obtained inculpatory testimony from K.A. during the first preliminary hearing knowing that it was false, then used the "tainted testimony to impeach K.A. at trial."  Id. at 31-37.  Second, Zilm claimed that prosecutorial misconduct—specifically, the Napue violation alleged in his first claim and four additional instances of misconduct—deprived him of a fair trial.  Id. at 38-44.  Third, he claimed that "multiple erroneous evidentiary rulings prejudiced [him] resulting in a fundamentally unfair trial." Id. at 45.  Relying on state law, Zilm argued that the trial court committed reversible error by admitting hearsay statements that K.A. made to Sanford and Bell and by admitting K.A.'s testimony from the first preliminary hearing.  Id. at 45-48.  Fourth, Zilm claimed that the trial court erred in admitting his incriminating statements to police because (a) he was in custody and "was not given *Miranda* warnings," and (b) he asked for an attorney at the beginning of the interview and Detective Hodges and Corporal Smith told him he did not need one.  Id. at 49-53.  Fifth, he

claimed that trial counsel provided constitutionally deficient representation, in violation of his Sixth Amendment right to counsel, (1) by not developing the record to show that Zilm wanted to call two defense witnesses—Zilm's mother and Zilm's fiancée—but decided not to call them "because [of] the threats made by the prosecutor," and (2) by failing to call Zilm and Zilm's fiancée as defense witnesses to testify about Zilm's "medical condition." Id. at 54-56. Sixth, Zilm claimed that the cumulative effect of the prosecutor's misconduct, the trial court's erroneous evidentiary rulings, and his trial counsel's ineffectiveness deprived him of his Fourteenth Amendment right to a fair trial. Id. at 56-57.

The OCCA considered each claim on the merits, denied relief as to each claim, and affirmed Zilm's judgment and sentence. Dkt. # 14-1, Zilm v. State, No. F-2017-69 (Okla. Crim. App. Sept. 6, 2018) (unpublished) (hereafter, "OCCA Op."), at 1-18. The United States Supreme Court denied Zilm's petition for writ of certiorari. Dkt. ## 14-9, 14-11.

## DISCUSSION

Zilm seeks federal habeas relief, reasserting the claims that he presented to the OCCA. Dkt. ## 2, 11. Respondent urges the Court to deny Zilm's petition, primarily arguing that 28 U.S.C. § 2254(d) bars relief because the OCCA's adjudication of each federal claim that was fairly presented on direct appeal did not result in a decision that is either contrary to clearly established federal law, based on an unreasonable application of clearly established federal law, or based on an unreasonable determination of the facts presented in state court. Dkt. # 14.

## I.     Legal standards

A federal court has discretion to grant federal habeas relief to a prisoner who is in state custody pursuant to a final criminal judgment if the prisoner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); see Wilson v. Corcoran,

21

562 U.S. 1, 5 (2010) ("[I]t is only noncompliance with federal law that renders a State's criminal judgment susceptible to collateral attack in the federal courts.").  But the federal habeas statutes, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") and as interpreted by the United States Supreme Court, significantly circumscribe a federal court's discretion to grant habeas relief to a state prisoner.

As relevant here, when a state prisoner fairly presents a federal claim in state court and the state court adjudicates that claim on the merits, a federal court cannot grant habeas relief as to that claim unless the prisoner first shows that the state court's decision as to that claim either (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Douglas v. Workman, 560 F.3d 1156, 1170 (10th Cir. 2009) (quoting 28 U.S.C. § 2254(d)(1)-(2)).

As used in § 2254(d)(1), the phrase "clearly established Federal law" means "the governing legal principle or principles" stated by "the holdings" of the Supreme Court's "decisions as of the time of the relevant state-court decision."  Lockyer v. Andrade, 538 U.S. 63, 71 (2003) (quoting Williams v. Taylor, 529 U.S. 362, 412 (2000)).  Thus, when § 2254(d)(1)'s framework informs a federal court's analysis, the first question for the court is whether the petitioner's claim rests on law that was clearly established by Supreme Court precedent at the time of the relevant state-court decision.  House v. Hatch, 527 F.3d 1010, 1015-18 (10th Cir. 2008).  If such law exists, and the state court has correctly identified that law, the only question under § 2254(d)(1) is "whether the decision 'unreasonably applies that principle to the facts of the prisoner's case.'"  Cullen v. Pinholster, 563 U.S. 170, 182 (2011) (quoting Williams, 529 U.S. at 413).  To establish that the state court's decision unreasonably applied the law, a petitioner "must show that the state court's

ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. 86, 103 (2011). In other words, "a petitioner must persuade a federal court that no 'fairminded juris[t]' could reach the state court's conclusion under [the Supreme] Court's precedents." Brown v. Davenport, 596 U.S. 118, 135 (2022) (alteration in original) (quoting Davis v. Ayala, 576 U.S. 257, 269 (2015)).

Under § 2254(d)(2), a petitioner must show that the state court's decision rests on an unreasonable determination of the facts. But "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." Wood v. Allen, 558 U.S. 290, 301 (2010). Instead, the reasonableness of a state court's factual determination also is measured by Richter's fairminded-disagreement standard. Dunn v. Madison, 583 U.S. 10, 13-14 (2017). And "if [Richter's] rule means anything, it is that a federal court must carefully consider all the reasons and evidence supporting the state court's decision" and that the federal court may not disturb the state court's decision "without identifying—let alone rebutting—all of the justifications" that may support that decision. Mays v. Hines, 592 U.S. 385, 391-92 (2021) (per curiam). In addition, when § 2254(d) applies, the federal court's review is limited to the same record that was presented in state court unless and until the petitioner satisfies § 2254(d)'s demanding preconditions to relief, Pinholster, 563 U.S. at 185, and the federal court must presume the correctness of any state-court factual findings unless the petitioner presents clear and convincing evidence to rebut that presumption, 28 U.S.C. § 2254(e)(1).

If a petitioner satisfies § 2254(d)'s preconditions to relief, the federal court may then review the petitioner's federal claim de novo. Milton v. Miller, 744 F.3d 660, 670-71 (10th Cir.

2014).  But, even on <u>de novo</u> review, a federal court must apply § 2254(e)(1)'s presumption of correctness to any state-court factual findings relevant to the federal claim.  <u>Sumpter v. Kansas</u>, 61 F.4th 729, 750 (10th Cir. 2023).   Moreover, even if the federal court determines that a constitutional error occurred, the court may not grant federal habeas relief unless the petitioner also "show[s] that the error had a '"substantial and injurious effect or influence"' on the outcome of his trial."  <u>Davenport</u>, 596 U.S. at 126 (quoting <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993)).

Applying these legal standards, the Court turns to Zilm's claims.[10]

## II.    Claim one:  The prosecutor knowingly used false testimony.

Zilm claims that the prosecutor violated his Fourteenth Amendment right to due process, as that right is interpreted in <u>Napue v. Illinois</u>, 360 U.S. 264 (1959), by knowingly using false testimony to obtain his conviction.  Dkt. # 11, at 33-41.  Zilm argues that K.A.'s testimony from the first preliminary hearing was false because four state actors, including the prosecutor, "overtly

---

[10] Zilm requests an evidentiary hearing as to all issues asserted in the petition.  Dkt. # 11, at 64.  But when § 2254(d)'s framework applies, as it does in this case, a federal habeas court must consider whether the petitioner has satisfied § 2254(d)(1)'s precondition to relief only by looking to the record that was presented in state court proceedings.  <u>Pinholster</u>, 563 U.S. at 181 (holding "that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits").  In addition, "[i]f a prisoner has 'failed to develop the factual basis of a claim in State court proceedings,' a federal court 'shall not hold an evidentiary hearing on the claim' unless the prisoner satisfies one of two narrow exceptions, <u>see</u> 28 U.S.C. § 2254(e)(2)(A), and demonstrates that the new evidence will establish his innocence 'by clear and convincing evidence,' § 2254(e)(2)(B)."  <u>Shinn v. Ramirez</u>, 596 U.S. 366, 371 (2022).  "In all but these extraordinary cases, AEDPA 'bars evidentiary hearings in federal habeas proceedings initiated by state prisoners.'"  <u>Id.</u> (quoting <u>McQuiggin v. Perkins</u>, 569 U.S. 383, 395 (2013)).  For the reasons discussed next, Zilm has not demonstrated, as to any claim, that he can satisfy § 2254(d)'s preconditions to habeas relief.  And Zilm does not argue, much less demonstrate, that he can make the showings necessary to obtain an evidentiary hearing under § 2254(e)(2).  For these reasons, the Court denies Zilm's request for an evidentiary hearing.

coerced and manipulated K.A. in this case to change her testimony in a way that implicated Zilm," after those state actors knew that K.A. had recanted her allegations against Zilm only a few days after she told a neighbor, a forensic interviewer, and a sexual assault nurse that Zilm sexually abused her.  Dkt. # 11, at 34-37.  Zilm further argues that the prosecutor "used this coerced testimony during trial to impeach K.A. and to convict Zilm."  Id. at 39-41.

### A.    Clearly established federal law

In Napue, the Supreme Court "held that the Due Process Clause would be violated if the prosecutor knowingly failed to correct perjured testimony in its case, even when the evidence went only to the credibility of the witness."  United States v. Garcia, 793 F.3d 1194, 1207 (10th Cir. 2015).  Garcia explained that "[a] Napue violation occurs when (1) a government witness committed perjury, (2) the prosecution knew the testimony to be false, and (3) the testimony was material."  Id.  The first two showings necessary to establish a Napue violation require a reviewing court to make factual findings.  Id.  The third showing requires the reviewing court to apply a harmless-error test; specifically, "[t]he false testimony is material 'unless failure to disclose [the perjury] would be harmless beyond a reasonable doubt.'"  Id. (quoting United States v. Bagley, 473 U.S. 667, 680 (1985)).

### B.    OCCA decision

The OCCA rejected this claim.  Citing Napue and Giglio v. United States, 405 U.S. 150 (1972), the OCCA stated, "If it is true that the State sponsored testimony at the preliminary hearing known to be false and then impeached the child victim's trial testimony with the false evidence at trial, this conduct would indeed violate Zilm's right to a fair trial."  Dkt. # 14-1, OCCA Op., at 3.  The OCCA further stated:

> The State has a duty to disclose false testimony which goes either to the merits of the case or the credibility of the witness.  The burden is on the defendant

to show that (a) testimony was false or misleading, (b) the prosecution knowingly used it, and (c) its admission of false testimony was material to guilt or innocence. The fact that a witness's testimony is impeached does not by itself establish the State knowingly used false testimony.  Mere inconsistencies or conflicts between witnesses' testimony will not support a claim that prosecutors used perjury to obtain a conviction.

Id. at 3-4 (internal citations omitted).

Applying these principles, the OCCA reasoned that "[t]o obtain relief for the State's use of false evidence at trial it is a logical prerequisite that an appellant first show that the testimony complained of was actually false." Id. at 4.  And the OCCA concluded, on the facts presented, that "Zilm fail[ed] to meet his burden of showing that the State knowingly used or failed to correct false evidence material to guilt or innocence in this prosecution," and that "Zilm was not denied his due process right to a fair trial." Id.

### C.    Analysis and conclusion

Zilm asserts that the OCCA's decision as to his Napue claim "is both contrary to and an unreasonable application of clearly established federal law and the undisputed facts." Dkt. # 11, at 41.  He specifically argues that "[t]he OCCA dismissed all of [the] evidence in the record—the recantation under oath, the recordings of coercion, the findings by the magistrate of State coercion—on the basis that the testimony complained of (the initial false story of K.A.) was not shown to be false." Id.

Respondent contends that if Napue supplies the clearly established federal law as to this claim, then § 2254(d) bars relief because fairminded jurists would agree with the OCCA that Zilm did not show (1) that K.A.'s preliminary hearing testimony was false, (2) that the prosecutor knew

the testimony was false, or (3) that "the only potentially false testimony introduced at trial," namely, that Zilm "penetrated K.A.'s anus with his penis" was material.  Id. at 26-34.[11]

Zilm argues in his reply brief that he does not seek an extension of Napue but merely a determination that the OCCA unreasonably applied it to the facts of this case.  Dkt. # 16, at 4-13.

Applying § 2254(d)(1), this claim fails for two reasons.  First, because the OCCA correctly identified the controlling legal principles from Napue, i.e., the clearly established federal law that Zilm identifies as providing the rule Zilm seeks to apply, Zilm has not shown that the OCCA's decision is contrary to clearly established federal law.  Second, on the record presented in state court, Zilm has not shown that the OCCA unreasonably applied Napue to the facts of this case. Critically, the OCCA found that Zilm failed to show that the state knowingly used or failed to correct false evidence.  Dkt. # 14-1, OCCA Op., at 4.  This factual finding by the state court is entitled to a presumption of correctness absent clear and convincing evidence to overcome that presumption.  28 U.S.C. § 2254(e)(1).  Zilm has not presented any clear and convincing evidence that the state knew that K.A.'s initial disclosures were false or that the state knowingly obtained false testimony from K.A. at the first preliminary hearing.  Rather, the record presented in state court supports the reasonableness of the OCCA's presumptively correct finding because that

---

[11] Respondent argues, in part, that Zilm's claim is not a Napue claim because his complaint is about coerced testimony rather than false testimony.  Dkt. # 14, at 22-23.  On this point, respondent notes that the United States Court of Appeals for the Tenth Circuit, in an unpublished decision, "recently made this distinction" by "separately analyzing a habeas petitioner's Napue claim and his claim, based on the same conduct, that the State violated his due process rights by repeatedly informing his wife, a witness in his defense, that her children would not be returned to her if she supported him.  Id.; see Whitely v. Farris, 793 F. App'x 680, 701 (10th Cir. 2019) (declining to resolve "whether clearly-established federal law provides that a defendant's due process rights are violated when government pressure results in false testimony"), cert. denied sub nom, Whitely v. McCoy, 141 S. Ct. 256 (2020).  Because the OCCA treated this claim as a Napue claim and because this Court agrees with respondent's alternative argument that § 2254(d) bars relief, the Court declines to address respondent's argument that Napue does not provide the clearly established law governing this claim.

record shows that K.A. initially and consistently disclosed to her neighbor, the forensic interviewer, and the sexual assault nurse that Zilm put his penis in her butt.  And K.A.'s testimony at the first preliminary hearing was consistent with her initial disclosures.  The fact that K.A. recanted to her mother and DHS workers before the first preliminary hearing, and maintained at trial that Zilm only jabbed her anus with his thumb does not render her initial disclosures or her testimony from the first preliminary hearing false or show that the state knowingly used false testimony to convict Zilm.  Instead, the record shows that K.A. made statements consistent with two different versions of events, either one of which was sufficient to obtain Zilm's conviction: Zilm put oil on his hands and rubbed K.A.'s buttocks and the area around her vagina while the two were lying on his bed early in the morning, while her mother was at work, while K.A.'s siblings were in bed, while Zilm was in his boxers, and while K.A. was not wearing any underwear, and Zilm either (1) intentionally penetrated K.A.'s anus with his penis when he was massaging her naked buttocks and the area near her vagina (K.A.'s initial version) or (2) accidentally penetrated her anus with his thumb while he was massaging her naked buttocks and the area near her vagina (K.A.'s recanted version and Zilm's version).  As the OCCA reasoned, "[m]ere inconsistencies or conflicts between witnesses' testimony will not support a claim that prosecutors used perjury to obtain a conviction."  Dkt. # 14-1, at 3-4; see United States v. Crockett, 435 F.3d 1305, 1317 (10th Cir. 2006) (noting that "the movant does not sustain his burden of demonstrating perjury merely by proving that a government witness has testified falsely or has given testimony that conflicts with other statements").

Moreover, as respondent argues, it was reasonable for the OCCA to determine that Zilm failed to show that K.A.'s allegedly false testimony that Zilm touched her with his penis was material.  Critically, K.A.'s recanted version of events was consistent with Zilm's version of events

and penetration (whether accidental or intentional) was not an element of the crime for which Zilm

was convicted.  Instead, to obtain his conviction, the state had to prove, beyond a reasonable doubt,

that Zilm willfully or maliciously engaged in sexual abuse with K.A. while she was under the age

of twelve by "look[ing] upon or touch[ing] or maul[ing] or fe[eling]" K.A.'s body or private parts

in any lewd or lascivious manner when Zilm was at least three years older than K.A.  Dkt. # 15-

26, at 102.  The jury was instructed that willfully means purposefully and does not require an intent

to violate the law; that lewd means "[o]bscene, lustful, indecent, lascivious, lecherous"; and that

lascivious means "[c]haracterized by or expressing lust or lewdness."  Id. at 103.  The undisputed

facts drawn from Zilm's own statement to detectives demonstrated that Zilm, a thirty-year-old

male, intentionally used his hands to rub eleven-year-old K.A.'s naked buttocks and the area

surrounding her vagina, and that he touched his own genitals during the massage and thought that

he may have transferred pre-ejaculate from his hand to K.A.'s body during the massage.  Even if

the jury entirely disregarded K.A.'s testimony, the jury would have had sufficient evidence before

it to find Zilm guilty beyond a reasonable doubt.  Thus, it was objectively reasonable for the OCCA

to decide that "Zilm fail[ed] to meet his burden of showing that the State knowingly used or failed

to correct false evidence material to guilt or innocence in this prosecution," and that "Zilm was not

denied his due process right to a fair trial."  Dkt. # 14-1, OCCA Op., at 4.

For these reasons, § 2254(d) bars relief and the Court denies the petition as to claim one.

### III.   Claim two:  The prosecutor engaged in egregious misconduct.

Next, Zilm claims that the prosecutor committed egregious misconduct, not only as to the

conduct underlying the Napue violation alleged in claim one, but also in four other specific

instances.  Zilm specifically contends that the prosecutor:  (1) "threatened defense witnesses with

perjury or to re-open the juvenile case if they testified"; (2) "accused defense counsel of

orchestrating the recording of Lauren Hall's false DNA comment to K.A."; (3) "made improper argument to the jury that Zilm should be punished for exercising his right to a jury trial"; and (4) "engaged in courtroom histrionics during closing argument, which seems to be a pattern with this particular prosecutor."  Dkt. # 11, at 42.

> ### A.      Clearly established federal law

To obtain federal habeas relief on a prosecutorial misconduct claim, a habeas petitioner must show that the prosecutor's alleged misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974); see also Neill v. Gibson, 278 F.3d 1044, 1061 (10th Cir. 2001) (noting that, "to warrant habeas relief, 'it is not enough that the prosecutors' remarks were undesirable or even universally condemned.  The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to'" deny due process (quoting Darden v. Wainwright, 477 U.S. 168, 181 (1986))).  To determine whether prosecutorial misconduct rendered a trial unfair, a reviewing court must evaluate the prosecutor's conduct in the context of the entire trial and consider "the strength of the evidence against the petitioner."  Bland v. Sirmons, 459 F.3d 999, 1024 (10th Cir. 2009).  Because DeChristoforo establishes a general rule, state courts have more leeway in applying that rule to the circumstances of each case.  Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).

> ### B.      OCCA decision

Applying the same legal principles identified in Darden and DeChristoforo, the OCCA rejected Zilm's prosecutorial misconduct claim.  The OCCA stated:

> Zilm first complains that the prosecutor improperly threatened to bring perjury charges and reopen the juvenile case if the defense called the victim's older sister to testify at trial.  He asserts that this had a chilling effect on his right to present a defense.  The comments at issue were not threats, veiled or otherwise, to prosecute the witness for perjury or to reopen the juvenile case.  There was no error here.

Zilm also complains that during closing argument the prosecutor accused defense counsel of coaching the child victim to record a conversation she had with a DHS case worker.  Defense counsel objected arguing that the comment impugned his character.  While the prosecutor's argument was speculative, it did not impugn defense counsel's character.

Next, Zilm complains that the prosecutor improperly commented on his exercise of his right to trial.  During closing argument the prosecutor stated, "It's wrong that you [Zilm] violated a little girl and then put her through the next four years to get to this day."  Defense counsel objected to this comment and asked for a mistrial.  The trial court denied the request for a mistrial but sustained the objection and admonished the jury to disregard the improper comment.  "[T]his Court has repeatedly held that an admonishment cures the error from improper testimony or comment at trial, unless the improper testimony or comment was such that it appears to have 'determined' the result of the defendant's trial."  A defendant's decision to exercise his constitutionally protected right to a jury trial is a factor which cannot be used against him at trial to influence the jury in their determinations regarding guilt or sentencing.  While the comment at issue was not a direct comment on Zilm's exercise of his right to trial, it was implied and to this extent, it was improper.  The error, however, was cured by the trial court's admonishment and relief is not required.

Finally, Zilm complains that he was prejudiced when the prosecutor engaged in "inflammatory courtroom histrionics."  Defense counsel objected and asked that the jury be admonished or that a mistrial be granted.  The trial court denied the motion for mistrial and admonished the prosecutor.  Again, we will only grant relief on a claim of prosecutorial misconduct where it was grossly improper and affected the defendant's rights.  Relief is not warranted here.

Dkt. # 14-1, OCCA Op., at 4-7 (internal citations omitted).

## C.   Analysis and conclusion

The OCCA adjudicated this claim on the merits, but Zilm—who appears through counsel—fails to argue, either in his petition, his supporting brief, or his reply brief, that he can satisfy the preconditions to relief set forth in § 2254(d).  Dkt. ## 2, 11, 16.  This failure is fatal to his request for federal habeas relief.  Section 2254(d) "demands that state-court decisions be given the benefit of the doubt."  Woodford v. Visciotti, 537 U.S. 19, 24 (2002) (per curiam).  And "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  Richter, 562 U.S. at 101 (quoting

Yarborough, 541 U.S. at 664).  More importantly, as the habeas petitioner, Zilm "'carries the burden of proof' in satisfying AEDPA's demanding standards, and, to that end, 'must . . . show[] there was *no* reasonable basis for the state court to deny relief."  Meek v. Martin, 74 F.4th 1223, 1249 (10th Cir. 2023) (emphasis in original) (internal citations omitted) (first quoting Pinholster, 563 U.S. at 181, then quoting Richter, 562 U.S. at 98).  Zilm's regurgitation of the same arguments that he presented to the OCCA on direct appeal and his reassertion of his view that the prosecutor committed "reversible error" fall far short of satisfying his demanding burden to show that the OCCA had no reasonable basis, either under clearly established federal law or the specific facts of this case, to reject his prosecutorial misconduct claim.  The Court therefore denies the petition as to claim two.

## IV.    Claim three:  The trial court made multiple erroneous evidentiary rulings.

In his third claim, Zilm contends that the trial court deprived him of his Fourteenth Amendment right to a fundamentally fair trial by:  (1) erroneously admitting hearsay statements that K.A. made to her neighbor, Katherine Sanford; (2) erroneously admitting hearsay statements that K.A. made to the nurse who performed K.A.'s sexual assault examination, Kathy Bell; and (3) erroneously permitting the prosecutor to impeach K.A.'s trial testimony with K.A.'s testimony from the first preliminary hearing.  Dkt. # 11, at 50-54.

### A.    OCCA decision

Applying state law, the OCCA found that the statements to Sanford were admissible under the statutory exception for "excited utterances," that the statements to Bell were admissible under the statutory exception for statements made for purposes of receiving medical treatment, and that K.A.'s testimony from the first preliminary hearing was admissible as impeachment evidence because it was inconsistent with her trial testimony.  Dkt. # 14-1, OCCA Op., at 6-12.  The OCCA

also noted that state law permits a party to impeach its own witnesses, that the prosecutor complied with state law regarding the procedure for impeaching a state witness, and that the trial court gave a contemporaneous instruction advising the jury how it could consider the impeachment evidence. Id. at 12.  The OCCA thus concluded that the trial court did not abuse its discretion in admitting the challenged evidence.  Id. at 6-12.

### B.     Analysis and conclusion

For two reasons, the Court concludes that Zilm is not entitled to federal habeas relief as to claim three.  First, Zilm did not fairly present a Fourteenth Amendment due process claim to the OCCA on direct appeal.  The "AEDPA prohibits federal courts from granting habeas relief to state prisoners who have not exhausted available state remedies."  Ellis v. Raemisch, 872 F.3d 1064, 1076 (10th Cir. 2017).  To exhaust available state remedies, "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts . . . or that a somewhat similar state-law claim was made."  Anderson v. Harless, 459 U.S. 4, 6 (1982) (internal citation omitted).  Rather, the petitioner must show that "the 'substance' of the petitioner's claim has been presented to the state courts in a manner sufficient to put the courts on notice of the federal constitutional claim.'"  Grant v. Royal, 886 F.3d 874, 890 (10th Cir. 2018) (quoting Prendergast v. Clements, 699 F.3d 1182, 1184 (10th Cir. 2012)).  In the brief he filed in the OCCA, Zilm relied solely on state law to argue that the trial court abused its discretion in admitting the evidence that he claims should have been excluded at trial.  Dkt. # 14-5, at 38-41.  Zilm made two vague and cursory references to a potential federal claim.  In his issue statement, Zilm asserted that the trial court's evidentiary rulings "result[ed] in a fundamentally unfair trial."  Id. at 38.  In his conclusion paragraph, Zilm asserted that "[t]he constitutional burden of proof standard of beyond a reasonable doubt demands that the State's evidence be free of the taint of unreliability."  Id. at 41.

Unsurprisingly then, the OCCA applied state law to evaluate Zilm's claim that the trial court abused its discretion in admitting the challenged evidence and nothing in the OCCA's decision suggests that it understood Zilm's arguments as asserting a violation of his Fourteenth Amendment right to due process. Thus, as respondent argues, Zilm's decision to "bookend[] a state-law claim with unexplained references to 'a fundamentally unfair trial' and 'the constitutional burden of proof'" does not show that he fairly presented his Fourteenth Amendment claim to the OCCA. Dkt. # 14, at 52-53; see, e.g., Johnson v. Williams, 568 U.S. 289, 299 (2013) (noting that "a state court may not regard a fleeting reference to a provision of the Federal Constitution or federal precedent as sufficient to raise a separate federal claim" and further noting that "[f]ederal courts of appeals refuse to take cognizance of arguments that are made in passing without proper development"); Gray v. Netherland, 518 U.S. 152, 163 (1996) (to fairly present a claim alleging the denial of a petitioner's Fourteenth Amendment right to due process in state court, "it is not enough to make a general appeal to a constitutional guarantee as broad as due process"); Wilder v. Cockrell, 274 F.3d 255, 260 (5th Cir. 2001) ("A fleeting reference to the federal constitution, tacked onto the end of a lengthy, purely state-law evidentiary argument, does not sufficiently alert and afford a state court the opportunity to address an alleged violation of federal rights. Moreover, to hold that vague references to such expansive concepts as due process and fair trial fairly present, and therefore exhaust, federal claims is to eviscerate the exhaustion requirement."). As a result, Zilm did not exhaust available state remedies as to claim three and the Court finds that the OCCA would apply a procedural bar if Zilm were to return to state court to exhaust that claim through an application for postconviction relief because he could have, but did not, raise the Fourteenth Amendment claim on direct appeal. See Grant, 886 F.3d at 891-82 (discussing anticipatory procedural bar and procedural default of habeas claims); id. at 901-02 (concluding that habeas

petitioner's unexhausted claim was subject to an anticipatory procedural bar because "if [the petitioner] attempted to pursue [the claim] in state court, that court would deem the claim procedurally barred under Oklahoma law because [the petitioner] could have raised it on direct appeal"). Zilm does not address respondent's argument that claim three is procedurally barred and does not even attempt to show why this Court should review his procedurally barred claim. Dkt. # 16; see Grant, 886 F.3d at 892 ("A petitioner may overcome the procedural bar only if he can 'demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.'" (quoting Coleman v. Thompson, 501 U.S. 722, 750 (1991))).

Second, even if it would be reasonable to construe Zilm's state appellate brief as fairly presenting a federal due process claim and to construe the OCCA's decision as having silently adjudicated a federal due process claim,[12] § 2254(d) bars relief. As previously discussed, Zilm has the burden to show that he can satisfy the preconditions to habeas relief that are set forth in § 2254(d). Meek, 74 F.4th at 1249. He has not met that burden as to claim three. Zilm's supporting brief primarily focuses on whether the trial court erroneously admitted the challenged evidence and Zilm only briefly refers to the OCCA's decision, as follows:

> The OCCA found no abuse of discretion in allowing in this hearsay, but Zilm asserts that this holding is based upon the erroneous holding in Proposition 1, supra, in which the OCCA found no Napue claim where the State clearly coerced the inculpatory statements from the minor complaining witness.
>
> In this light, the bad faith of the prosecutor, combined with the falsity of the statements, remove this claim from state evidentiary rules to fundamentally unfair under the Fourteenth Amendment.

---

[12] As respondent notes, when a state prisoner fairly presents a federal claim in state court and the state court adjudicates that claim without reference to federal law, a federal habeas court must presume that the state court rejected the federal claim on the merits. Richter, 562 U.S. at 98-99.

Dkt. # 11, at 54.  These arguments do not identify any clearly established federal law that the OCCA either failed to apply or applied in an objectively unreasonable manner, nor do these arguments show that the OCCA misstated or misapprehended facts relevant to the trial court's evidentiary rulings.  Having failed to show that he can satisfy either part of § 2254(d), Zilm nonetheless asks this Court to assume that the allegedly erroneous evidentiary rulings resulted in a constitutional violation, to conclude that the constitutional error was not harmless under <u>Brecht</u>, and to grant federal habeas relief.  <u>Id.</u> at 54.  But "[w]hen a state court has ruled on the merits of a state prisoner's claim, a federal court cannot grant relief without first applying both the test [the Supreme Court] outlined in <u>Brecht</u> and the one Congress prescribed in AEDPA."  <u>Davenport</u>, 596 U.S. at 122.  Because Zilm has not demonstrated that he can satisfy § 2254(d)'s preconditions to relief, the Court has no reason to consider whether he might be able to satisfy <u>Brecht</u>.  <u>See id.</u> at 134 (explaining that "a federal court must *deny* relief to a state habeas petitioner who fails to satisfy either [the Supreme] Court's equitable precedents [including <u>Brecht</u>] or AEDPA" and that "to *grant* relief, a court must find that the petitioner has cleared both tests" (emphases in original)).

For these reasons, the Court denies the petition as to claim three.

## V.      Claim four:  The trial court should have suppressed Zilm's statement to detectives.

Zilm claims that the trial court should have suppressed the statement he made to detectives when they interviewed him at his parents' house because that statement was obtained in violation of his constitutional rights as interpreted in <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), and <u>Jackson v. Denno</u>, 378 U.S. 368 (1964).  Dkt. # 11, at 55-59.  Zilm makes two arguments to support this claim.  First, he argues that the officers should have advised him of his rights, as required by <u>Miranda</u>, because he was in custody during the interview.  <u>Id.</u> at 57-58.  Second, he argues that his statement was involuntary, and therefore inadmissible under <u>Jackson</u>, because he asked the officers

at the beginning of the interview whether he needed an attorney, and the officers told him that he did not need an attorney.  Id. at 58-59.

### A.      Clearly established federal law

In Miranda, the Supreme Court "held that preinterrogation warnings are required in the context of custodial interrogations given 'the compulsion inherent in custodial surroundings.'" Yarborough, 541 U.S. at 661 (quoting Miranda, 384 U.S. at 458).  The Miranda Court specifically held that, to safeguard the Fifth Amendment privilege against self-incrimination, a person subject to custodial interrogation "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires."  384 U.S. at 478-79.  But "Miranda only applies when an individual is subject to 'custodial interrogation.'"  United States v. Hudson, 210 F.3d 1184, 1190 (10th Cir. 2000).  "The [Miranda] Court explained that 'custodial interrogation' meant 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'"  Yarborough, 541 U.S. at 661 (quoting Miranda, 384 U.S. at 444).  The Yarborough Court thoroughly discussed several post-Miranda cases that developed the test for determining when a person is in custody.  As relevant here, the Yarborough Court explained:

> Our more recent cases instruct that custody must be determined based on how a reasonable person in the suspect's situation would perceive his circumstances.  In Berkemer v. McCarty, 468 U.S. 420, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984), a police officer stopped a suspected drunk driver and asked him some questions.  Although the officer reached the decision to arrest the driver at the beginning of the traffic stop, he did not do so until the driver failed a sobriety test and acknowledged that he had been drinking beer and smoking marijuana.  The Court held the traffic stop noncustodial despite the officer's intent to arrest because he had not communicated that intent to the driver.  "A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a

37

particular time," the Court explained.  Id., at 442, 104 S. Ct. 3138.  "[T]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation."  Ibid.  In a footnote, the Court cited a New York state case for the view that an objective test was preferable to a subjective test in part because it does not "'place upon the police the burden of anticipating the frailties or idiosyncrasies of every person whom they question.'"  Id., at 442, n. 35, 104 S. Ct. 3138 (quoting People v. P., 21 N.Y.2d 1, 9-10, 286 N.Y.S.2d 225, 233 N.E.2d 255, 260 (1967)).

Stansbury v. California, 511 U.S. 318, 114 S. Ct. 1526, 128 L.Ed.2d 293 (1994) (per curiam), confirmed this analytical framework. Stansbury explained that "the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Id., at 323, 114 S. Ct. 1526.  Courts must examine "all of the circumstances surrounding the interrogation" and determine "how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action." Id., at 322, 325, 114 S. Ct. 1526 (internal quotation marks and alteration omitted).

Finally, in Thompson v. Keohane, 516 U.S. 99, 116 S. Ct. 457, 133 L. Ed. 2d 383 (1995), the Court offered the following description of the Miranda custody test:

"Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.  Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry:  was there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." 516 U.S. at 112, 116 S. Ct. 457 (internal quotation marks and footnote omitted).

Yarborough, 541 U.S. at 661-63.

A different line of Supreme Court precedent sets forth principles for determining whether a person's statement to law enforcement officers is voluntary.  As the Jackson Court stated, "It is now axiomatic that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession."  378 U.S. at 376.  Thus, even if a person is not subjected to a custodial interrogation, that person's confession must be voluntary to be admissible at trial.  United States v. Cash, 733 F.3d 1264, 1280 n.12 (10th Cir. 2013).  To be admissible, a confession "must be free and voluntary; that is, must not be extracted by any sort of

threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of improper influence." Bram v. United States, 168 U.S. 532, 542-43 (1897). The relevant inquiry for a reviewing court is "whether a defendant's will was overborne by the circumstances surrounding the giving of a confession," taking "into consideration the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." Dickerson v. United States, 530 U.S. 428, 434 (2000) (citation and internal quotation marks omitted). The Supreme Court has explained that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'" Colorado v. Connelly, 479 U.S. 157, 167, 170 (1986); see Cash, 733 F.3d at 1281 ("[I]t is clear after Connelly that a confession is only involuntary if the police use coercive activity to undermine the suspect's ability to exercise his free will.").

## B.    OCCA decision

The OCCA rejected Zilm's claim that the trial court erred in finding that his statement to law enforcement officers was admissible at trial. The OCCA stated:

> The morning the sexual assault was reported, Tulsa police detectives interviewed Zilm at his parents' house and the interview was audio recorded. Zilm subsequently filed a motion to suppress his statement arguing that it was inadmissible because the statement was made during a custodial interrogation and the detectives did not advise him of his rights pursuant to Miranda v. Arizona. Prior to trial the court held a Jackson v. Denno hearing to address the admissibility of Zilm's statement. The trial court denied Zilm's motion to suppress and Zilm argues on appeal that this ruling was error.

Dkt. # 14-1, OCCA Op., at 12 (footnotes omitted). As a reminder, the trial court considered the admissibility of Zilm's statement before trial. Dkt. ## 15-12, 15-13. And, after hearing testimony from Detective Hodges, Corporal Smith, and Zilm, the trial court determined that Zilm's statement was admissible. Dkt. # 15-26, at 16. The trial court specifically determined that Zilm's statement was "voluntary, without duress and not given in a custodial setting," that Zilm "was free to leave

and in fact left the room during the interrogation only to return and invoke his right to legal counsel after a conversation with his father." Id. at 17. The OCCA noted that it would review the trial court's ruling for an abuse of discretion, "defer to the trial court's findings of fact unless they are clearly erroneous," and review the trial court's legal conclusions de novo. Id. at 12-13. Applying federal law, the OCCA stated:

> It is well established that "police officers are not required to administer Miranda warnings to everyone whom they question." Oregon v. Mathiason, 429 U.S. 492, 495, 97 S. Ct. 711, 714, 50 L. Ed. 2d 714 (1977). Rather, Miranda warnings are only required when a person is subject to a custodial interrogation which occurs where questioning is initiated by law enforcement officers after a person has been taken into custody or is otherwise deprived of his freedom in any significant way. Miranda, 384 U.S. at 467, 86 S. Ct. at 1624. See also Little v. State, 1981 OK CR 46, ¶ 4, 627 P.2d 445, 447. A person is in custody for purposes of Miranda when there is "a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." Stansbury v. California, 511 U.S. 318, 322, 114 S. Ct. 1526, 1529, 128 L. Ed. 2d 293 (1994) (per curiam). The relevant inquiry as to whether a suspect is in custody is how a reasonable person in the suspect's position would have understood the situation. Berkemer v. McCarty, 468 U.S. 420, 442, 104 S. Ct, 3138, 3151, 82 L. Ed. 2d 317 (1984). If a reasonable person facing the same factual circumstances would have felt he or she was not at liberty to terminate the interrogation and leave, the person is in custody for Miranda purposes. Thompson v. Keohane, 516 U.S. 99, 112, 116 S. Ct. 457, 465, 133 L. Ed. 2d 383 (1995). The record strongly supports the conclusion that Zilm was not in custody at the time he made his statement to the detectives and that his statement was the product of a free and deliberate choice. The trial court's decision denying Zilm's motion to suppress was not an abuse of discretion.

Dkt. # 14-1, OCCA Op., at 13-14.

The OCCA applied a different standard of review to Zilm's argument that his statement was involuntary. Id. at 14. Specifically, the OCCA noted that Zilm did not argue in the trial court, either in his suppression motion or at his Jackson v. Denno hearing, that his statement was involuntary based on his assertions that he asked the detectives if he needed an attorney and that they responded that he did not. Id. at 14-15. The OCCA thus applied its plain-error test. Id. The OCCA rejected Zilm's argument, stating, "To be entitled to relief for plain error, Zilm must prove

that an error occurred, that the error is plain and obvious, and that the error affected his substantial

rights.  He has not made this showing."  Id. at 15 (internal citation omitted).

### C.      Analysis and conclusion

Having reviewed the state court record, including Zilm's audiotaped statement, the Court

agrees with respondent that § 2254(d) bars relief as to claim four.  Zilm appears to argue that the

OCCA either unreasonably applied clearly established federal law or unreasonably determined the

facts when the OCCA agreed with the trial court's determination that Zilm was not in custody for

Miranda purposes.  Dkt. # 11, at 57-58.  Zilm argues that he was "subject to the functional

equivalent of an arrest during the time that he was questioned" because he

> was approached by three officers, one of whom was uniformed with a gun, was
> separated from his parents (in their own home) so that the police could talk to him
> privately, were in close physical proximity to Zilm the entire time, and, according
> to Zilm, his perception of the uniformed officer who stood guard at the door was
> that the officer was there to "keep [him] from getting to [his] parents and to keep
> [him] from leaving."

Id. at 57.  Zilm's argument is unpersuasive for two reasons.  First, the trial court found that Zilm

"was free to leave and in fact left the room during the interrogation only to return and invoke his

right to legal counsel after a conversation with his father."  Dkt. # 15-26, at 17.  That factual finding

is presumptively correct and, in any event, is supported by the record, including the audiotape of

Zilm's statement.  Dkt. # 17 (State's Ex. 1A); 28 U.S.C. § 2254(e)(1).  Second, as previously

discussed, and as stated by the OCCA, the test for determining whether a person is in custody for

Miranda purposes is an objective one that looks at the totality of the circumstances and how a

reasonable person would feel in those circumstances. Dkt. # 14-1, OCCA Op., at 13-14; Berkemer,

468 U.S. at 442.  Thus, Zilm's perception that an armed officer guarded the door "to keep [him]

from getting to his parents and to keep [him] from leaving" not only is irrelevant to application of

the reasonable person standard, but also considers only some, rather than the totality of, the

circumstances.  Considering the totality of the circumstances, Zilm—who was then thirty years old—was interviewed in the living room of his parents' home by two detectives, while a uniformed officer stood nearby.  Dkt. # 15-26, at 51-52.  The audiotaped statement and testimony from both detectives during the <u>Jackson v. Denno</u> hearing demonstrate that Detective Hodges began an audio recording of the interview as he and Corporal Smith walked to the door of Zilm's parents' house, that the detectives knocked on the door and asked Zilm's father if they could speak with Zilm, that Zilm's father brought Zilm into the living room, that the detectives asked Zilm's parents if they could speak privately with Zilm, that Zilm's parents were in the home in a different room during the interview, and that Zilm and the detectives spoke in a conversational tone for about one hour while all three were seated in the living room.  Dkt. # 15-12, at 5-48; Dkt. 17 (State's Ex. 1A).  And, as the trial court found, Zilm left the living room at one point during the interview to consult his parents.  Dkt. # 15-26, at 17; Dkt. # 17 (State's Ex. 1A).  Both detectives testified that the interview ended, with no formal arrest, when Zilm returned to the living room with his father, declined to provide a DNA sample, and told the detectives that he wanted to consult an attorney.  Dkt. # 15-12, at 40-41.

These circumstances, viewed in their totality, do not support Zilm's view that he was subjected to the functional equivalent of a formal arrest or a custodial interrogation.  <u>Compare</u> <u>Beckwith v. United States</u>, 425 U.S. 341 (1976), <u>with</u> <u>Orozco v. Texas</u>, 394 U.S. 324 (1969).  In <u>Beckwith</u>, the Supreme Court rejected a defendant's claim that he was in custody for <u>Miranda</u> purposes when the defendant was questioned by government agents for nearly three hours in the dining room of a private home where he occasionally stayed.  <u>Beckwith</u>, 425 U.S. at 342-43, 347.  The <u>Beckwith</u> Court held that "[a]n interview with Government agents in a situation such as the one shown by this record simply does not present the elements which the <u>Miranda</u> Court found so

inherently coercive as to require its holding." Id. at 347.  In contrast, the Orozco Court found that a defendant was in custody for purposes of Miranda when four police officers entered the boardinghouse bedroom where the defendant was sleeping during early morning hours, all four officers immediately began questioning the defendant, and the officers testified that the defendant was under arrest at that time and not free to leave.  Orozco, 394 U.S. at 325-27.  On the record presented, the Court finds that the circumstances of this case are more like those in Beckwith than those in Orozco.  Simply stated, the facts in the state court record support the objective reasonableness of the OCCA's decision affirming the trial court's determination that Zilm was not in custody for Miranda purposes during the interview at his parents' house, and Zilm has not shown that the OCCA's decision is based on a misunderstanding of the facts presented in state court.

Likewise, the record does not support Zilm's contention that his statement was involuntary because, he allegedly "asked if he needed a lawyer at the beginning of the interview," and the detectives responded by saying, "No, we just want to ask a few questions," and "I don't know, do you?"  Dkt. # 11, at 58.  To support this contention, Zilm cites his own affidavit that he attached to a motion he filed in the OCCA seeking leave to supplement the appellate record for purposes of his claim that he was denied his constitutional right to the effective assistance of counsel.  Id.  As relevant to claim four, Zilm stated in the affidavit, his belief "that agents for the State, most likely the Detectives who interviewed [him], deleted from the recording the part of the conversation about [Zilm] asking for an attorney, as well as the Detective telling [Zilm] that [he] did not need one."  Dkt. # 14-6, at 4-5.  Notably, the OCCA denied Zilm's request to supplement the appellate record with this and other affidavits.  Dkt. # 14-1, at 16-17.  Regardless, as Zilm acknowledges, neither his purported request for an attorney nor the detectives' purported responses are "contained in the recorded version of the interview."  Id.; see Dkt. # 17 (State's Ex. 1A).  Instead, the record

shows that both detectives testified at the <u>Jackson v. Denno</u> hearing that the entire interview was recorded, that they had no conversations with Zilm other than the conversation reflected in the audiotaped interview, and that Zilm did not ask about an attorney until the end of the interview, when the detectives asked Zilm whether he would consent to giving a DNA sample. Dkt. # 15-12, at 13, 18-19, 25, 27-28, 30, 35, 47-48. More importantly, Zilm testified at the <u>Jackson v. Denno</u> hearing that he did not tell the detectives that he wanted to speak to an attorney until the detectives raised the issue of providing a DNA sample. Dkt. # 15-13, at 60. On these facts, the Court finds that it was objectively reasonable, as a matter of law and a matter of fact, for the OCCA to affirm the trial court's determination that Zilm's statement to the detectives was voluntary and admissible at trial.

For these reasons, § 2254(d) bars relief, and the Court therefore denies the petition as to claim four.

## VI.    Claim five:  Trial counsel provided constitutionally deficient representation.

In claim five, Zilm contends that he was deprived of his Sixth Amendment right to the effective assistance of counsel. As he did on direct appeal, Zilm argues that trial counsel performed deficiently, resulting in prejudice, on two grounds. First, Zilm argues that trial counsel failed to make "a record regarding the additional witnesses that Zilm wished to call, but decided not to because [of] the threats made by the prosecutor." Dkt. # 11, at 61. Zilm identifies these additional witnesses as Mary Zilm (Zilm's mother), and Kristi Shaneck (K.A.'s mother and Zilm's fiancée). <u>Id.</u> He further argues that trial counsel's failure to adequately develop the record resulted in prejudice because Zilm's mother would have testified as to the involuntary nature of his statement to detectives. <u>Id.</u> at 62. Second, Zilm argues that trial counsel "failed to call Zilm or his fiancée" to testify that Zilm had a medical condition that caused "leakage" of seminal fluid to help explain

why Zilm told detectives that he may have transferred his DNA to K.A. during the massage.  Id. at 61-62.

### A.    Clearly established federal law

On direct review, courts analyze claims of ineffective assistance of counsel under the two-prong test clearly established in Strickland v. Washington, 466 U.S. 668 (1984).  A defendant must first demonstrate that counsel's performance was deficient, which requires a showing that the attorney's performance "fell below an objective standard of reasonableness."  Strickland, 466 U.S. at 687-88.  "There is a strong presumption that counsel's performance falls within the 'wide range of professional assistance'[;] the defendant bears the burden of proving that counsel's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy."  Kimmelman v. Morrison, 477 U.S. 365, 381 (1986) (internal citation omitted) (quoting Strickland, 466 U.S. at 689).  Even if a defendant can show deficient performance, the defendant also must demonstrate that "the deficient performance prejudiced the defense."  Strickland, 466 U.S. at 687.  To establish prejudice, the defendant must show that there is "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.

Obtaining federal habeas relief on an ineffective-assistance-of-counsel claim that has been adjudicated on the merits in state court is difficult.  This is so because "[w]hen § 2254(d) applies, the question [for the federal habeas court] is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard."  Richter, 562 U.S. at 105; see also id. ("The standards created by Strickland and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." (internal citations omitted)).

B.      **Additional facts and OCCA decision**

As previously discussed, on the day before trial counsel presented Zilm's case-in-chief,

counsel advised the trial court that he intended to call three defense witnesses:  K.A., the victim;

P.A., K.A.'s older sister; and John Wilson, an expert witness who would testify about DNA

analysis and test results specific to Zilm's case.  Dkt. # 15-18, at 216.  The next day, after K.A.

testified, trial counsel called P.A. as a witness, and a bench conference was held.  Dkt. # 15-19, at

24.  The prosecutor objected to having P.A. testify as a witness because P.A. was fifteen years old

and P.A.'s mother (Zilm's fiancée) was not present at trial; instead, P.A. had been transported to

the courthouse by a family friend.  Id.  Near the end of a long discussion about whether it would

be appropriate for P.A. to testify without her mother present, the prosecutor referred to a deprived

child action that involved the state taking temporary custody of K.A. and her three siblings, stated

that the prosecutor anticipated that, "regardless of the outcome of [Zilm's] trial," the judge who

presided over the deprived child action would "be taking a long, hard, good look at all of this,"

noted that the trial court had previously agreed to protect K.A. by appointing counsel to represent

her, and stated that if P.A. were allowed to testify P.A. might "potentially subject herself to some

type of perjurious statement" because the state had "prior recorded statements by [P.A.]" and P.A.

might "today . . . say something completely different."  Id. at 30-35.  Ultimately, the trial court

ruled that P.A. would be permitted to testify if the family friend who accompanied her to the

courthouse remained in the courtroom.  Id. at 39-41.  Trial counsel then stated:  "Your Honor,

based upon the statements made by the State of Oklahoma, which clearly are not even veiled

threats of perjury charges being filed against [P.A.], I'm gonna withdraw her, under that duress,

I'm gonna withdraw her as a witness."  Id. at 41.  The trial court responded that "whether it was a

veiled threat is in the ears of [the] hearer," reiterated that P.A. could testify without her mother

present, and reminded defense counsel to "use [his] best decision on going forward on how [he] wish[ed] to proceed in [the] case." Id. Following a brief discussion with P.A. off the record, trial counsel told the trial court that he would "decline to call [P.A.] based upon the representations that were made to [him] on the record." Id. at 42.

Applying Strickland, the OCCA determined that Zilm's allegations regarding trial counsel's alleged ineffectiveness established neither deficient performance nor prejudice. Dkt. # 14-1, OCCA Op., at 15-17. The OCCA reasoned,

> Zilm argues that after the prosecutor made veiled threats to file perjury charges against a proffered defense witness defense counsel should have made a record of the other witnesses the defense intended to call but decided not to because of the prosecutor's threats. Zilm has failed to show either that counsel's performance was deficient or that this alleged deficient performance affected the outcome of his case. Without such proof, his ineffective assistance of counsel claim is denied.

Id. at 16. The OCCA contemporaneously denied Zilm's motion requesting an evidentiary hearing to further develop this claim—following consideration of affidavits signed by Zilm, Zilm's mother, Zilm's fiancée, and Zilm's appellate counsel, and an unsworn statement from P.A.— concluding that Zilm "ha[d] not shown a strong possibility that the outcome of his trial would have been different." Id. at 16-17; see Lott v. Trammell, 705 F.3d 1167, 1213 (10th Cir. 2013) (discussing Rule 3.11, Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (2007), and noting that "even in cases . . . where the OCCA summarily disposes of a defendant's Rule 3.11 application [for evidentiary hearing] without discussing the non-record evidence, we can be sure that the OCCA in fact considered the non-record evidence in reaching its decision").

## C.   Analysis and conclusion

Zilm argues that the OCCA unreasonably applied Strickland to the facts of his case. Dkt. # 11, at 60-62. Having thoroughly reviewed the state court record, the Court finds that the OCCA's decision denying relief as to Zilm's ineffective-assistance-of-trial-counsel claim is based on an

objectively reasonable application of <u>Strickland</u>.  Significantly, "the decision of which witnesses to call is quintessentially a matter of strategy for the trial attorney."  <u>Boyle v. McKune</u>, 544 F.3d 1132, 1139 (10th Cir. 2008).  And while counsel's strategic choices are not insulated from appellate review, they are nonetheless "virtually unchallengeable" when they have been "made after thorough investigation of the law and facts relevant to plausible options."  <u>Strickland</u>, 466 U.S. at 690.

As to trial counsel's alleged failure to make a record regarding Zilm's desire to present his mother and fiancée as defense witnesses, it is not at all clear from the record that Zilm or trial counsel had any intention of calling Zilm's mother or Zilm's fiancée as defense witnesses or that any decisions that might have been made to not call these two witnesses were influenced in any manner by the prosecutor's alleged threats.  The record presented in state court indicates that even before the prosecutor made any statements regarding the decision to call P.A. as a defense witness, and how that might expose P.A. to perjuring herself, trial counsel told the trial court that he intended to call only three witnesses, K.A., P.A., and Wilson.  Dkt. # 15-18, at 216.  Nothing in the record suggests that Zilm was absent from the courtroom when trial counsel made this announcement, or that Zilm motioned to his attorney that he should also inform the trial court that he intended to call his mother and fiancée as witnesses because both had evidence crucial to his defense.  <u>Id.</u>  After trial counsel identified only three anticipated defense witnesses, the prosecutor objected to having K.A. testify as a defense witness because Zilm had thoroughly cross-examined K.A. when she appeared as a state witness.  <u>Id.</u> at 217-18.  The trial court asked trial counsel if "it is necessary for you to re-call [K.A.] in order to submit your case totally to the jury," trial counsel responded in the affirmative, and the trial court overruled the prosecutor's objection, citing "the interest of justice."  <u>Id.</u> at 218.  Given that the prosecutor made no threats, veiled or otherwise,

when trial counsel identified only three anticipated defense witnesses, and given that the trial court overruled the state's objection to calling K.A. as a defense witness, it was reasonable for the OCCA to conclude, based on this portion of the record, that trial counsel did not perform deficiently by failing to make a record "regarding the additional witnesses that Zilm wished to call, but decided not to because [of] the threats made by the prosecutor." Dkt. # 11, at 61.

The next day, trial counsel did make a record as to his decision not to call P.A., citing the prosecutor's purported threats to reopen a juvenile case or to charge P.A. with perjury if she testified. Dkt. # 15-19, at 24-42. During that lengthy discussion, trial counsel told the trial court that he did not know "[t]he exact location of" Zilm's fiancée, that he had only subpoenaed the children of Zilm's fiancée, and that he could contact Zilm's fiancée by phone if needed. Dkt. # 15-19, at 26. These statements to the trial court strongly suggest that trial counsel had already made a strategic decision not to call Zilm's fiancée as a defense witness. And, viewing this portion of the record, it is not surprising that trial counsel did not make a record regarding the impact, if any, of the prosecutor's statements on a decision to call or not call Zilm's mother or Zilm's fiancée as witnesses because (1) nothing in the trial record suggests that trial counsel had any apparent intent to call either of these two witnesses, and (2), as respondent argues, the prosecutor's statements that trial counsel perceived as threats pertained only to the decision to call P.A. as a witness. Dkt. # 14, at 77.[13]

---

[13] Zilm asserts in his supporting brief that "the prosecutor clearly signaled to the defense that she would not only seek to re-open the juvenile case . . . but that she would also be looking to file perjury charges against *defense witnesses in the event that they took the stand*, specifically against P.A." Dkt .# 11, at 61 (emphases added). To the extent this assertion can be read as suggesting that any purported threats were made against "defense witnesses," this assertion is contradicted by the record because the prosecutor's statements pertained only to P.A.

Trial counsel and Zilm had two more opportunities to inform the trial court that Zilm wanted to present testimony from his mother and fiancée and that he "forewent calling these witnesses because of the [prosecutor's] threats." Dkt. # 11, at 61-62.  First, after Wilson testified, trial counsel asked the trial court to hold an ex parte hearing regarding Zilm's decision to testify, the trial court agreed to do so, and trial counsel expressly informed the trial court that he did not anticipate calling any other witnesses. Dkt. # 15-19, at 53-54.  Nothing in the record indicates that Zilm alerted trial counsel or otherwise tried to inform the trial court that he did, in fact, want to present additional witnesses but he was afraid to do so after hearing the prosecutor's statements regarding P.A.  Then, during the ex parte hearing when only the trial judge, Zilm, and trial counsel were present, neither trial counsel nor Zilm informed the trial court that there were, in fact, additional witnesses whom Zilm would like to call or that he declined to call any additional witnesses based on the prosecutor's statements regarding P.A.  Id. at 56-58.  When the prosecutor returned to the courtroom, the trial court placed Zilm under oath, and Zilm testified about his own decision not to testify at trial.  Id. at 58-61.  Zilm offered no testimony regarding his desire to call any additional defense witnesses, testified that he had thoroughly discussed the decision whether he should testify at trial with his attorney, and testified that his decision not to testify at trial was not the product of any threats or coercion.  Id. at 59-61.  The trial court found that Zilm was "freely, voluntarily declining his right to testify on his own defense," and that Zilm made a "knowing decision" following consultation with trial counsel.  Id. at 61.

On the record presented in state court, it was objectively reasonable for the OCCA to determine that trial counsel did not perform deficiently by failing to make a record about why Zilm decided not call Zilm's mother and Zilm's fiancée—namely, two witnesses that Zilm had no apparent intent to call at trial.

It was also objectively reasonable for the OCCA to reject Zilm's claim that trial counsel's failure to make a record regarding the decision not to call Zilm's mother did not result in <u>Strickland</u> prejudice.  As he does in this proceeding, Zilm argued on direct appeal that he "was prejudiced because his mother . . . could have corroborated the fact that Zilm actually did ask the detectives whether he needed a lawyer, and their answer that he did not" because his mother "was standing there listening when it happened."  Dkt. # 11, at 62.  As previously discussed, both detectives testified at the <u>Jackson v. Denno</u> hearing that the entire interview with Zilm was recorded, that they had no conversations with Zilm other than the conversation reflected in the audiotaped interview, and that Zilm did not ask about an attorney until the end of the interview, when the detectives asked Zilm whether he would consent to giving a DNA sample.  Dkt. # 15-12, at 13, 18-19, 25, 27-28, 30, 35, 47-48.  Likewise, Zilm testified at the <u>Jackson v. Denno</u> hearing that he did not mention the need to consult an attorney until near the end of his interview, when the detectives asked him if he would voluntarily provide a DNA sample.  Dkt. 15-13, at 60.  The audiotape of Zilm's interview that was played for the jury also supports that the detectives began recording the interview as they walked to the Zilms' front door, and that Zilm did not mention an attorney until after the detectives mentioned a DNA swab.  Dkt. # 17 (State's Ex. 1A).  On this record, it was objectively reasonable for the OCCA to conclude that the outcome of Zilm's trial would not have been different but for trial counsel's alleged failure to make a record as to why Zilm did not call his mother to testify at trial.

And it was objectively reasonable for the OCCA to reject Zilm's claim as to the alleged failure to call Zilm or Zilm's fiancée to testify about his medical condition.  Aside from the optics of calling Zilm's fiancée, <u>i.e.</u>, K.A.'s mother, to explain to the jury why Zilm might have had seminal fluid on his hands while he massaged K.A.'s naked buttocks, it is clear from the record

that the prosecutor would have thoroughly discredited any testimony Zilm's fiancée may have provided.  The jury had already heard evidence that K.A.'s mother:  (1) either orchestrated or permitted a phone call between Zilm and K.A. only a few days after K.A. disclosed the sexual abuse so that K.A. could apologize to Zilm for making a "mistake," and so that Zilm could tell K.A. that he must have jabbed her anus with his thumb instead of his penis; (2) temporarily lost custody of her children because she continued to have contact with Zilm after he was charged with sexually abusing K.A.; and (3) continued to plan a wedding with Zilm while he was awaiting trial for sexually abusing K.A.  Dkt. # 15-17, at 219-24, 227-29, 269-73; Dkt. # 15-18, at 34; Dkt. # 14, at 78.  Under the facts of this case, any failure to call Zilm's fiancée as a defense witness not only appears to be a sound strategic decision by trial counsel, but also does nothing to advance Zilm's argument that trial counsel's alleged error in failing to call Zilm's fiancée resulted in Strickland prejudice.  As to the alleged failure to call Zilm as a witness, it is abundantly clear from the record that Zilm freely and voluntarily decided not to testify, after consultation with counsel.  Dkt. # 15-19, at 59-61.  Thus, there is no factual or legal basis to fault trial counsel for failing to present testimony from Zilm regarding his medical condition or to support that this alleged failure resulted in prejudice.

Based on the record, and viewing the OCCA's decision with double deference, the Court concludes that § 2254(d) bars relief because the OCCA reasonably applied both Strickland prongs to reject Zilm's claim.  The Court therefore denies the petition as to claim five.

## VII.   Claim six:  The cumulative effect of trial errors deprived Zilm of a fair trial.

In his sixth and final claim, Zilm contends that the cumulative effect of trial errors deprived him of his Fourteenth Amendment right to a fair trial.  Dkt. # 11, at 63-64.  He further contends

that this Court should review claim six "de novo under the Brecht standard" because "[t]he OCCA found no error and did not conduct a cumulative error analysis." Id. at 63.

### A.     Clearly established federal law

The United States Court of Appeals for the Tenth Circuit has held that "when a habeas petitioner raises a cumulative error argument under due process principles the argument is reviewable because 'Supreme Court authority clearly establishes the right to a fair trial and due process.'" Hanson v. Sherrod, 797 F.3d 810, 852 n. 16 (10th Cir. 2015) (quoting Darks v. Mullin, 327 F.3d 1001, 1017 (10th Cir. 2003)); but see Bush v. Carpenter, 926 F.3d 644, 686 n. 16 (10th Cir. 2019) ("Although we are bound by Tenth Circuit precedent on this issue, we note, in passing, that the Supreme Court has never recognized the concept of cumulative error.  And because there is no 'clearly established Federal law' on this issue, we question whether a state appellate court's rejection of a cumulative error argument can justify federal habeas relief under the standards outlined in § 2254(d).").

"A cumulative-error analysis aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." Smith v. Duckworth, 824 F.3d 1233, 1255 (10th Cir. 2016) (quoting Cargle v. Mullin, 317 F.3d 1196, 1206 (10th Cir. 2003)).  But "[t]he cumulative-error analysis applies where there are two or more actual errors.  It does not apply, however, to the cumulative effect of non-errors."  United States v. Franklin-El, 555 F.3d 1115, 1128 (10th Cir. 2009).  "In the federal habeas context, the only otherwise harmless errors that can be aggregated are federal constitutional errors, and such errors will suffice to permit relief under cumulative error doctrine 'only when the constitutional errors committed in the state court trial so fatally infected the trial that they violated the trial's fundamental fairness.'"  Matthews v. Workman, 577 F.3d

1175, 1195 n.10 (10th Cir. 2009) (quoting Jackson v. Johnson, 194 F.3d 641, 655 n.59 (5th Cir. 1999).

**B.      OCCA decision**

The OCCA rejected Zilm's cumulative error claim.  In doing so, the OCCA acknowledged that "[t]he cumulative error doctrine applies when several errors occurred at the trial court level, but none alone warrants reversal" and that "[a]lthough each error standing alone may be of insufficient gravity to warrant reversal, the combined effect of an accumulation of errors may require a new trial."  Dkt. # 14-1, OCCA Op., at 17-18.  The OCCA reasoned, however, that:

> [c]umulative error does not deprive the defendant of a fair trial when the errors considered together do not affect the outcome of the proceeding.  Baird v. State, 2017 OK CR 16, ¶ 42, 400 P.3d 875, 886.  And clearly, a cumulative error claim is baseless when this Court fails to sustain any of the alleged errors raised on appeal. Id.  There were no errors, either individually or when considered together, that deprived Zilm of a fair trial.  This claim is denied.

Id. at 18.

**C.      Analysis and conclusion**

On the record presented, the Court disagrees with Zilm's suggestion that the OCCA did not consider his cumulative error claim simply because it found no errors.  The OCCA identified the legal principles governing this claim and rejected it on the merits as "baseless" because it found no errors to aggregate.  Identifying any harmless constitutional errors is the first step of the cumulative error analysis.  Smith, 834 F.3d at 1255.  And, when there are not at least two actual federal constitutional errors to aggregate, the analysis ends.  Id.  On federal habeas review, the question thus becomes whether it was objectively reasonable, as a matter of law and a matter of fact, for the OCCA to determine that the cumulative effect of harmless constitutional errors, if any, did not deprive the petitioner of a fair trial.  28 U.S.C. § 2254(d).  Zilm does not address this question.  Instead, he urges this Court to ignore the limitations imposed on federal habeas review

by § 2254(d) and consider this claim without giving the OCCA's decision any benefit of the doubt. The Court declines to do so. The OCCA determined that there were no constitutional errors, harmless or otherwise, to aggregate. And, for the reasons discussed in this opinion and order, this Court finds that the OCCA's determination was objectively reasonable. Section 2254(d) therefore bars relief, and the Court denies the petition as to claim six.

## CONCLUSION

In sum, the Court concludes that Zilm has not shown that he is in state custody in violation of federal law. The Court therefore denies the petition for writ of habeas corpus. In addition, the Court finds that reasonable jurists would not debate this Court's assessment of Zilm's constitutional claims and the Court therefore declines to issue a certificate of appealability as to any issues raised in the petition. 28 U.S.C. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 484 (2000).

**IT IS THEREFORE ORDERED** that the Clerk of Court shall note the substitution of Steven Harpe in place of Scott Crow as party respondent.

**IT IS FURTHER ORDERED** that: (1) Zilm's request for an evidentiary hearing is **denied**; (2) the petition under 28 U.S.C. § 2254 for writ of habeas corpus by a person in state custody (Dkt. # 2) is **denied**; (3) a certificate of appealability is **denied**, and (4) a separate judgment shall be entered in this matter.

**DATED** this 5th day of January, 2024.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE